APPEAL,GILBERT,HABEAS,TERMED

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 6.1.1.2 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:13-cv-03947
## Internal Use Only

Snow v. Lemke

Assigned to: Honorable Elaine E. Bucklo

Case in other court: 17-01113

Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 05/28/2013

Date Terminated: 12/20/2016

Jury Demand: None

Nature of Suit: 530 Prisoner: Habeas Corpus

Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 05/28/2013 | 2 | Exhibit List and Exhibits 1-22 by James Snow *in support of Petition for Writ of Habeas Corpus* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16-1, # 17 Exhibit 16-2, # 18 Exhibit 16-3, # 19 Exhibit 16-4, # 20 Exhibit 17, # 21 Exhibit 18, # 22 Exhibit 19, # 23 Exhibit 20, # 24 Exhibit 21, # 25 Exhibit 22-1, # 26 Exhibit 22-2, # 27 Exhibit 22-3, # 28 Exhibit 22-4, # 29 Exhibit 22-5, # 30 Exhibit 22-6, # 31 Exhibit 22-7, # 32 Exhibit 22-8, # 33 Exhibit 22-9)(Wang, Elizabeth) (Entered: 05/28/2013) |

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| JAMES SNOW, Reg. No. N-50072, | ) | |
| | ) | |
| PETITIONER | ) | No. 13 CV 3947 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL LEMKE, Warden, Superintendent, | ) | |
| or authorized person having custody of petitioner, | ) | |
| | ) | Case Number of State Court |
| RESPONDENT. | ) | Conviction: 99 CR 1016 |

**LIST OF EXHIBITS TO PETITION FOR WRIT OF
HABEAS CORPUS – PERSON IN STATE CUSTODY**

| | |
|---|---|
| Exhibit 1 | Affidavit of Jeffery Pelo |
| Exhibit 2 | Police radio tape recording, March 31, 1991 |
| Exhibit 3 | Jeffery Pelo interview transcript, March 2, 1999 |
| Exhibit 4 | Affidavit of William Hendricks |
| Exhibit 5 | Affidavit of Dennis Hendricks |
| Group Exhibit 6 | Inquest testimony of Paul Williams, May 20, 1991, and Williams initial case report |
| Group Exhibit 7 | Police reports relating to Danny Martinez |
| Exhibit 8 | Affidavit of Carlos Luna |
| Exhibit 9 | Thomas Sanders testimony in *People v. Claycomb*, No. 99 CF 1017 |
| Exhibit 10 | Affidavit of Larry Biela |
| Exhibit 11 | Affidavit of Anthony Matens |
| Exhibit 12 | Affidavit of Dawn Roberts |
| Exhibit 13 | Affidavit of Tina McCombs |

Exhibit 14                          Affidavit of Mark Huffington

Group Exhibit 15                    Filings in *United States v. Schaal*, Case No. 3:00-CR-103-J-25C

Group Exhibit 16                    Bruce Roland sentencing documents

Exhibit 17                          Jody Winkler sentencing documents

Exhibit 18                          Statement of Mary Jane Burns

Exhibit 19                          Affidavit of Darren Smart

Exhibit 20                          Grand jury testimony of Russell Thomas

Group Exhibit 21                    ARDC Documents related to Frank Picl

Group Exhibit 22                    Sentencing documents related to Frank Picl

Exhibit 23                          Affidavit of Maureen Kevin

Exhibit 24                          Affidavit of Ed Palumbo

Exhibit 25                          Police reports relating to Ed Palumbo

Group Exhibit 26                    Police reports relating to Bill Moffitt

Exhibit 27                          Affidavit of Danielle Prosperini

Exhibit 28                          Affidavit of Randall Howard

Exhibit 29                          Police reports relating to Randall Howard

Exhibit 30                          Affidavit of Dan Tanasz

Exhibit 31                          Affidavit of Mark McCown

Exhibit 32                          Affidavit of David Arison

Exhibit 33                          Affidavit of Leigh Denison

Group Exhibit 34                    Pleadings and opinions in *People v. Beaman*, No. 94 CF 476

Group Exhibit 35                    Opinions and testimony in *People v. Drew*, No. 98 CF 790

| Exhibit 36 | July 16, 2012 FOIA response letter |
| Exhibit 37 | McCann polygraph worksheet relating to Danny Martinez |
| Exhibit 38 | Affidavit of Kaeleigh Rousey |
| Exhibit 39 | October 27, 1993 Scheel polygraph report |
| Exhibit 40 | Redacted January 24, 2000 Scheel polygraph report |
| Exhibit 41 | Unredacted January 24, 2000 Scheel polygraph report |
| Exhibit 42 | Unredacted January 5, 2000 Roland polygraph report |
| Exhibit 43 | Redacted January 5, 2000 Roland polygraph report |

Respectfully submitted,

/s/ Elizabeth Wang
Counsel for Petitioner

Jon Loevy
Gayle Horn
Tara Thompson
Elizabeth Wang
THE EXONERATION PROJECT
  at the University of Chicago Law School
312 N. May St., Ste. 100
Chicago, IL 60607
O: (312) 243-5900
F: (312) 243-5902
*Counsel for Petitioner*

STATE OF ILLINOIS        )
                         )    SS
COUNTY OF COOK           )

IN THE CIRCUIT COURT FOR THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF McLEAN

JAMES SNOW,                        )
                                   )
              Petitioner,          )    No. 99 CF 1016
                                   )
       - vs -                      )
                                   )
PEOPLE OF THE STATE OF ILLINOIS,   )    The Honorable Paul Lawrence,
                                   )    Judge Presiding
              Respondent.          )

---

### AFFIDAVIT

I, Jeffrey Pelo, under oath and penalty of perjury, state as follows:

1.   My name is Jeffrey Pelo.  I am 45 years old and competent to testify.  My birthday is October 29, 1964.

2.   I am giving this statement of my own free will.  No promises or threats have been made to me.

3.   I was a member of the Bloomington Police Department from 1989 to 2007.

4.   In 1991, my rank was patrol officer.

5.   In 1991, I was assigned to Area 2.  I was and am very familiar with the area around the intersection of Empire and Linden Streets in Bloomington, Illinois.  As part of my duties in 1991, I drove around my area checking out gas stations and other business to make sure everything was OK.  I would look in the windows as I drove by to make sure that there were no problems.

6.   I was on duty March 31, 1991.  This was Easter Sunday.  That evening I drove past the Clark Oil gas station on the corner of Empire and Linden.  I knew the gas station attendant,

Exhibit 1

Bill Little, from stopping there during my patrols to buy cigarettes. As I drove by, I looked into the gas station and saw Bill Little with two other people in the gas station. At that time, everything looked routine to me. I slowed down as I drove by, thinking about whether I should stop to buy cigarettes or a candy bar. I decided not to stop, and kept driving.

7.    A few minutes later, when I was about eleven or twelve blocks from the gas station, a "1090" call came over the radio for the Clark Oil gas station. From my experience, I knew this was a hold-up/panic alarm for the gas station.

8.    When I got the 1090 call, I turned on my overhead lights and headed back to Empire and Linden. When I got to Locust approaching Linden, I turned off all my lights and headed onto Linden. I pulled into ~~the~~ a drive south of the old credit union on the southeast corner of Empire and Linden. I parked the car, said "1023" to the radio, and got out of the car.

9.    When I got out of the car, I looked over at the gas station. From the corner of the credit union property I couldn't see anyone, including Bill Little, in the gas station. I saw a blue Chevy parked by the gas station air pump in the southeast corner of the gas station parking lot. I saw a person, who I know now as Danny Martinez, on the driver's side of the car. I saw him walk around the front of his car, which was facing north, and squat down by his front passenger side tire. It looked like he was putting air in the tire.

10.    As he was crouched down I crossed in front of the credit union to see what he was doing, still keeping an eye on the gas station.

11.    At some point, Danny Martinez stood up and walked toward the station. He paused about 10 feet from his car and looked back at his car. He then walked toward the station, and within seconds was walking back to his car.

12.    As he was walking in the parking lot, I was constantly looking between him, the

2

surroundings, and the front of the station. From the time I arrived across the street to the time I entered the gas station, my gaze was never off the front of the station for more than a few seconds.

13. As Martinez walked back to his car he paused, looked back at the station, and then got in his car and drove west on Empire. I saw him go west on Empire past Linden at least a few blocks. As his car went west on Empire, I looked at his plate to memorize the number.

14. At some point, I had an exchange with dispatch about running the Chevy's plate. There was no reason to run the plate other than that Danny Martinez was leaving the lot. I remember thinking it was strange that he went back to his car without going into the station.

15. Up to this point, I had not spoken to Danny Martinez. I did not tell him to leave the gas station. I did not tell him to move his car.

16. Danny Martinez did not speak to me at the gas station. He did not back out of the gas station parking lot and park his car across the street from his house, which was next door to the gas station. Instead, he drove west on Empire.

17. I am absolutely positive that from the time I arrived at the Empire and Linden intersection in response to the 1090 call to the time that I eventually entered the gas station, no one other than Bill Little was either in the gas station or entered or exited the gas station. I had a clear, unobstructed view of the gas station door and was focusing on the station because I was concerned about the 1090 call and the fact that I couldn't see anyone inside. Had someone left the gas station, I would have seen them. Had someone left the gas station, I would have called that information in so that someone could have tracked that person down.

18. After Danny Martinez drove away, I started to cross Empire to go to the gas station. I looked at the road to make sure I could cross and saw a brown car drive by on Empire. There

3



were two or three people inside, with a white female driver and a white male passenger. I think there was also someone in the back seat. I saw this car within seconds of Martinez driving away. I made contact with the female driver and she had a look on her face like, "Oh shit, it's the police." I do not think that Susan Claycomb was in the car. I tried to grab the plate number as the car drove by, but couldn't. It passed, and I crossed over Empire and walked past the air pump where Martinez's car had been parked.

19.     As I was walking on the east side of the lot, a pickup truck pulled into the lot. The passenger got out, and the driver started to get out. I walked toward the station door, asking them to go across the street. As I was talking, I looked through the gas station window and saw Bill Little's foot sticking out from behind the counter. I pulled out my gun, and told the two people to go across the street and wait for me. They went across the street.

20.     I went into the station, checked Bill Little's pulse, cleared the station, and came back out. As I was pushing open the station's door to exit, I called in over the radio and said the 1090 call was real. I then saw Paul Williams at the door, and he went into the station. That was the first time I saw him on the scene.

21.     After I made the radio call, other units arrived and began securing the scene. Because I was the first officer to arrive I was initially in charge of the scene, but soon a sergeant arrived and relieved me. A few minutes after I'd made the call that the 1090 call was real, I heard someone say, "Is there a problem?" I saw that the person who had said this was Danny Martinez, who was standing on his property next door to the gas station. His car was now parked on Empire across from his house. I told another officer to speak to Martinez and I radioed to say that we didn't need to search for the Blue Chevy because Martinez had come back.

22.     I canvassed the street for witnesses later that night. I then didn't have any more

4

direct involvement in the investigation until I made detective in 1999. I did have several conversations with detectives over the years, telling them about the brown car and about what I'd seen. In 1991, I told Detective Barkes what I had seen, including that from the time I got to the corner to the time I went in the Clark Oil station, no one could have left the gas station. In 1999, I accompanied Detective Dan Katz and prosecutor Tina Griffin on a few witness interviews related to the case.

23.    Originally Detective Rick Barkes worked on the investigation into whether Jamie Snow was involved in Bill Little's death. Sometime in the early 1990s I heard that Detective Barkes was taken off the Snow investigation because of things he had done on the case. I heard his wife had given him information about the case that she learned from confidential communications in her job as a crisis counselor at the McLean County Jail. I heard that Barkes was eventually sent back to patrol because he was caught doing his own investigation on the side into Jamie Snow's case.

24.    Sometime in the early 1990s Detective Mike Fazio told me that he and Detective Barkes had visited Ed Palumbo's trailer to ask him a question about this case. They saw Detective Barkes' wife's car parked outside. When they knocked, Barkes' wife came to the door with her clothes in disarray. Fazio told me how funny this was. He told this story several times over the years.

25.    Right before Jamie Snow's trial I had a few meetings with prosecutor Tina Griffin and Detective Katz. They talked with me about my testimony. I had never been told exactly what Danny Martinez said had happened, but I knew there was some kind of discrepancy between his version of events and mine. I had told Griffin and Katz what I told Barkes, that no one could have left the gas station while I was on the scene. Through Griffin's questions in

5

preparing me to testify, she implied that she wanted me to say the opposite. I told Griffin that I would not lie. She told me that she was not asking me to lie, but she instructed me to only answer the questions I was asked.

26. During the trial, I followed Griffin's instructions. I expected that Jamie Snow's lawyer might ask me questions that would bring out the fact that a person could not have come out of the gas station while I was on the scene. Although he asked me a few questions in this area, he did not really go into it. Had he asked me additional questions about what happened that night, I would have testified consistent with the information contained in this affidavit.

27. Until 2007, I never knew exactly what Danny Martinez's story was, or what he'd testified to at Jamie Snow's trial. Before I read his trial testimony in 2007, I did not know that he had testified I spoke to him before he left the Clark Oil lot, or that he testified that he had left the gas station by backing out to park on Empire in front of his home. These two things are false.

28. No attorneys for Jamie Snow came to speak with me before his trial, nor did anyone else acting on Jamie Snow's behalf.

29. If called to testify, I would testify consistent with this affidavit.


Dated this 18 day of November, 2009:



Jeffrey Pelo


Subscribed and sworn before me on this 18 day of November, 2009



_____
Notary Public, State of Illinois

LARRY E. BIELA
MY COMMISSION EXPIRES
JUNE 25, 2011

6

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| JAMES SNOW, Reg. No. N-50072, | ) | |
| | ) | |
| PETITIONER | ) | No. 13 CV _____ |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL LEMKE, Warden, Superintendent, | ) | |
| or authorized person having custody of petitioner, | ) | |
| | ) | Case Number of State Court |
| RESPONDENT. | ) | Conviction: 99 CR 1016 |

**EXHIBIT 2 TO
PETITION FOR WRIT OF
<u>HABEAS CORPUS – PERSON IN STATE CUSTODY</u>**

Police radio tape recording, March 31, 1991

(CD included with courtesy copies to Court and counsel of record)

Exhibit 2

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MC LEAN

THE PEOPLE OF THE )
STATE OF ILLINOIS, )
)
    Plaintiff, )
)
    vs. )    No. 99 CF 1016
)
    **James Snow** )
)
    Defendant. )

### BPD Interview with Officer Pelo

OP:    Officer Pelo
UO:    Unknown officer 1
OF:    Unknown officer 2

UO:    This is a tape recorded interview with Officer Jeff Pelo. Also present during this interview is Detective Rick Barcus and Detective Dan Cats. The interview is taking place at the Criminal Investigation Division at the Bloomington Police Department on March 2, 19-99. The time is 8-25 a.m. in the morning. Officer Pelo you were informed that we wanted to talk to you about a case that took place back in 19991 is that not correct?

OP:    Yes.

UO:    Specifically, a homicide case involving William Little who was shot at a gas station back uh, in 19-91. Case number 91-0-0-2-1-5-0. Is that correct?

OP:    Yes.

UO:    Are you aware this interview's being tape recorded?

OP:    Yes.

UO:    And do we have your permission to tape record this interview?

OP:    Yes.

UO:    Jeff, what I'd like to do is, we have, we've discussed before this uh, tape recorded interview started and basically you were one to respond, one of the first responding

Exhibit 3

officers to that scene and what I would like you to do is just give us a narrative on how you approached, and what you did on March thirty-first, 19-91 at the uh, gas station where William Little was killed.

OP:    Call came out of the 10-90 at Clark station. I believe the address was 8-0-1 East Empire Street. Responded from uh, center, Chestnut Street. Took Center Street south to Locust; went east to Linden went north uh, approached on, north on Linden Street. I turned my headlights off and parked in either on Linden Street on the drive just to the south of the credit union on the south side of the road. I got out. There were several parked cars in the parking lot. I walked around to the front of the credit union: walked toward the east side of the credit union's parkin lot. Standing there watching the Clark station. In the Clark station parking lot was a older car, blue, with a male putting air in the tires as I was watching it I was watchin the front of the station. There was no, . couldn't see and movement or anything inside. Ran the license plate number of the blue vehicle that was in the lot. One of the dispatchers was givin me a hard time about runnin the plate cuz leads was down, and the male walks from his car towards the station stops looks back towards his car; turns walks towards the station some more; stops and turns around and goes back to his vehicle got in it, can't remember if he was backin out of the lot or did a little u-turn and drove out of the lot. He drove west bound on Empire street after he did that I started walking across Empire Street on the East side of the lot. I was walkin toward the east side of the lot. I was watchin the gas station. As that was goin on a pickup truck with 2 white males pulled up started getting out of the truck. I told 'em to get in the truck and go across the street; got a little argumentative wanted to know why. At that time I realized you know there's a tennis shoe stickin out from behind the counter. I ordered the 2 to get in the truck and go across the street and wait. Get my weapon; started lookin through the windows from the east side of the building goin towards the west to see if there was visibly anybody in there. No one was in there. I entered the front of the station went down cleared the bathroom no one was in the bathroom came back towards the counter there was a little storeroom behind the counter area where the tenant was at. See the tenant lyin there. Step past him and cleared the storage room area. There's no one in it so I came back up. Opened the front door. Warned dispatch that it was, don't know exactly what I said, but basically it was real; had a man down appeared as if you know, we needed a coroner for him.

(Inaudible)

UO:    Then what'd you do?

OP:    I stepped back towards the attendant around the counter; leaned down I checked for his pulse. First place I checked for his pulse was his wrist; couldn't get one. Reached up checked for a pulse on his neck; couldn't find one there then he, I thought his eye, one of his eyes blinked and uh, when that happened I stepped back officer Paul Williams was at the door now I told him what I was gonna go, I was gonna go to my car uh, my CPR mask. I took a few, can't really remember what I did after that, but I stopped uh, you know I was like wait a minute maybe I shouldn't worry about my CPR

2

mask. I turned to go back to the station that's when Paul Williams informed me that you know, the young man was dead there was nothin we could do for him.

UO:    Then what did you do?

OP:    By that time I stepped back. Other officers had begun to arrive. Sergeant Williams came back out. No it wasn't Sergeant Williams, no he wasn't a Sergeant yet, Officer Williams came out and uh we started directing people to block off the entrance around the uh, uh, the gas station itself that's about the point where I noticed that the person in the blue car who had left, I know his name now. His name is, his last name is Martinez I believe. I noticed that he had parked on the south side of the uh, Empire street he was walking up the house next to the Clark station at that point I, it was, I can't remember who I told, but I informed them that that man, that man had just been in the lot they went over to talk to him by that time Sergeant Cox had arrived started puttin up crime scene tape and I really can't remember what we did right after that.

UO:    Now, speaking of uh, Mr. Martinez and that vehicle that you said, that vehicle was by the air pumps?

OP:    Yes.

UO:    And you said when you first observed him it looked like he was squatting down by the front passenger side?

OP:    Yes, the, the front, passenger tire. There was a point where he was crouched down there with the air hose comin through as if he was puttin air in the tire.

UO:    Then you said he got up from that position, walked towards the Clark station office; stopped, turned, looked at his vehicle then turned around and started to proceed back to the Clark station stopped a second time, looked at his vehicle, walked back to his vehicle and left the parking lot.

OP:    Yes I can't remember if he walked around his car and then got in it or if he just went to the driver's door. That part I just don't remember.

UO:    But at any time did you order off the lot?

OP:    No. I never, I never spoke to him at all. The closest I come to speaking with him that night was, was when I pointed at him and informed the officers that he had just been on the lot.

UO:    Now when he left his vehicle and walked the first time towards the Clark station, how far, and I know it's difficult, but how far do you think he was away from his vehicle before he stopped and turned around?

OP:    Wadn't that far. 20 feet maybe. 25, I, I don't know the exact distance.

UO:     Would it help if you did it in relationship to, what, he was half way to the Clark door or he was closer to his car or?

OP:     He was closer to his vehicle than he was to the front of the business.

UO:     Ok. Now the second time after he stopped he turned around looked at his car and then looked back around to look at the store, how much further do you think he walked?

OP:     I wanna say he got like within like15 feet of the front.  He was at, he was at an angle I wanna say like 15 feet in front of the door.

UO:     So he's fairly close?

OP:     Yeah.

UO:     To the, to the front of the store.

OP:     Yes.

UO:     Ok.  Now, he leaves.  Another truck pulls up when you're walkin up?

OP:     Umhmm.

UO:     And you order them to leave?

OP:     Yep.

UO:     Do you know where they went?

OP:     They went, initially they went to the credit union lot on the south side.  They actually went where I told 'em to and, and stopped.  I remember seein 'em stopped over there.

UO:     Now that vehicle wasn't there prior to you getting there?

OP:     No.

UO:     And you actually observed the people in the vehicle?

OP:     Yes.

UO:     And uh, I know it's hard, but those people in the vehicle, the second vehicle now, which I think you said earlier was a truck?

OP:     Pickup truck, yes.

4

UO:    None of those people you observed goin into the building?

OP:    They never entered the building, no.  They got out of the vehicle, but they never went into the building.

UO:    Now I'm gonna show you a picture that I marked...as soon as I find it...it's gonna be marked with the letter C and I hope then what we have here is a picture of what?

OP:    The Clark station.  You're on the south side.  I believe you're on the south side of Empire Street looking north towards the Clark station.

UO:    Yes and from this picture can you tell me where the air pump is?

OP:    It's on, it's on the east side of the lot or the right side of the picture as you're lookin at it.

UO:    So basically is, it's to the far east side of the business, the far east side?

OP:    Yes.

UO:    And then this picture also shows some gas pumps.

OP:    Yes.

UO:    Now these gas pumps are on the east side, far east side of the business also.  Is this where the truck pulled up?

OP:    Yeah, they pulled up, there's actually 2 sets of pumps.  They pulled up towards the middle of the pumps.  They, they pulled up at an, they didn't pull up like they were gonna get gas.  They pulled up basically towards the middle of the lot.

UO:    Ok.  So you're sayin, I, I also showed ya another picture marked with a letter B.  It shows 2 punch, 2 gas pump islands uh, in front of Clark Oil on the north side and you're sayin that this truck pulled in between 'em like it wasn't getting gas like it was just possibly goin in there to get somethin else?

OP:    Yeah.

UO:    Ok.  Alright.  Now, you went into the gas station you, well first off before you went into the gas station you saw a, a tennis shoe?

OP:    Yes.

UO:    Ok and that was uh, sticking out from the counter correct?

OP:     Yes.

UO:     On the floor?

OP:     Yes.

UO:     And you assumed at that point what?

OP:     Two things; one somebody was dead or they were laying down a hype.

UO:     Ok. And them um you went in?

OP:     Yes.

UO:     And you observed?

OP:     I didn't go right in at that point.

UO:     Ok. What did you do right then?

OP:     I, do you have one of those pictures with you?

UO:     Umhmm. Which on would you like? The one...

OP:     The one that shows the vehicle. I mean not the vehicle the store.

UO:     Ok.

OP:     I, when I came up, I started here on the east side of the building looking through
the windows and walked down the front of the building so I could see what was inside
the building.

UO:     Ok.

OP:     Then, I went back and went inside the building.

UO:     So you saw the shoe and you stepped back out and took what, some cover to look
and see if you saw anything else? Or I don't understand.

OP:     I was approaching up from an angle here.

UO:     Ok.

OP:     Once I realized the shoe was there I told 'em, the 2 guys get in that truck and the
same time I drew my revolver they got in the truck and drove away and I approached at

angle to the south, what would be the southeast corner of the building. I started looking through the windows to see if I could see anybody.

UO:    How close were you to the building when you saw the shoe?

OP:    I can't give you the, the exact distance it was it a southeast angle to the building.

UO:    Ok. Would you have been at about the same location or further or closer?

OP:    It woulda been a very similar approach.

UO:    Did you (Inaudible)

OP:    I don't know if I was at the exact angle, but I was at a very similar angle.

(Inaudible)

OP:    Yeah cuz I had walked up by the where the air pumps was at, as I was walkin up lookin and I started my angle approach. I can't remember if I was slightly north of it or...

UO:    Then after you, after saw the tennis shoe (Inaudible) your revolver (Inaudible) and (Inaudible) witness (Inaudible) business (Inaudible).

OP:    Yes. I went down to look to see if there was anybody in the building.

UO:    Then you're at the front door and (Inaudible)

OP:    Yes.

UO:    How many officers did you know were inside the building besides you and officer Williams?

OP:    No. I don't know of anyone else other than the crime scene people I don't know of anyone else that went in the building.

UO:    Ok. I'm gonna show you another picture. This was a shot, taken by a crime scene tech. Is that the way the body was when you first observed it?

OP:    No.

UO:    What's different about it?

OP:    He was laying at a different angle. A big different angle. About a 90 degree different angle than what he was layin, layin originally. And his shirt's open. When I first saw him, his shirt was not open. It was intact.

7

UO: Ok and when you first saw him, was he layin on his back?

OP: No he wasn't. He was layin on his chest.

UO: Who turned him over?

OP: I never saw anyone turn him over, but my assumption is that Paul Williams turned him over.

UO: And why'd he do that?

OP: Because, I don't' know why he did that, but I looked back in after I went to get my CPR mask, when I came back he had the body rolled over.

UO: Now did he move the body like that?

OP: He must of cuz there's no one else in...

UO: The rest of the people (Inaudible)

OP: This was, yeah, but...

UO: And they checked (Inaudible)

OP: Puh, yeah lifeline and rescue both showed up, but he'd been moved prior to they, them getting there.

UO: He'd been moved by Paul Williams?

OP: Yes.

UO: And he could have been moved by rescue...either one or both could have moved him.

OP: Yes.

UO: Did you, were you in there when rescue was there?

OP: Yes, but he'd been moved before rescue got there.

UO: Ok. So, where he, the picture I was showing you and I know you said a 90 degree angle...

OP: It was basically a 90 degree angle.

8

UO:    Could, coulda been more of a 180 degree?  And the reason why I'm askin is in this picture, this is, this is the front of the counter, we got some blood dropping here.

OF:    Why don't, why don't we show also the (Inaudible) report, page 6.  In yellow I've marked the description of how the body was layin.

OP:    Yes where it says he was, he was a white male lying on chest; legs were slightly bent left; arm was; I'm sorry slightly bent; left arm was under his body; right arm was bent around at the elbow towards his chest.  His head was turned facing the restroom.

UO:    So, would you say his body was turned more than 90 degrees?

OP:    To make things easy, when I first went in, his head was to the south.  His feet were towards the middle.  His face was facin towards the  west inside the building behind the counter.  He was layin, he had one arm underneath...

UO:    And now how, now according to this picture...

OP:    His head is now facing the east and I can't see...

UO:    If his head was, if his head was at the west at one point now...

OP:    No.  His face was going west.  His head was going south.

OF:    He's gone, he gone 180 degrees.

UO:    Right.

OF:    Instead of going to the south he's now going to the west.

UO:    It says northeast here.

OF:    Northeast

OP:    Northeast ,he woulda yeah; he was facing, he was stopped like this and now when you turn him around...

UO:    Sure.

OP:    He's now facing this way.

UO:    Exactly.  That's exactly 180 degrees.

UO:    360.

OF:     360 would be all the way around.

OP:     Yeah.  1-80 a 1-80 is a reversal

UO:     Right.  So maybe, maybe a little…

OP:     Maybe a little more than 180, but yeah, roughly you're correct.

UO:     Ok.  Well great.  We're just tryin to figure out how the body got to where it was.
Um…

OP:     To make it easier, his head was initially down towards in here.

UO:     Right.

OP:     Up towards in here; on the floor.  I can't remember.  Parts of him were touchin up
in the counter or not.

UO:     Now, when you went there, the call was possible armed robbery correct?

OP:     I'm not gonna…

UO:     The alarm, the alarm came up…

OP:     10-90 yea, hold up, hold up alarm at a gas station.

UO:     Ok.  Was there anything that you observed when you were in there that led you to
believe that maybe there was a robbery.

OP:     Yeah, the cash draw was open and the, the money tray itself, the black money tray
was gone.

UO:     Now how do you know it was black?

OP:     I've been in that gas station repeatedly.  That's where I bought cigarettes at.

UO:     So you're…

OP:     I've seen it many times.

UO:     So you're familiar with that kind of money tray?

OP:     Yes.

UO:     Now that money tray, does it slide in and out?

OP:    I don't know exactly how they operate, but most of 'em I, that one, most of mine counted, they just, they just pop out.  Some have a thing a button you have to push to release it to come out.  Some are activated by alarms.  I don't know this, I think this one is act, activated actually activated by an alarm (Inaudible).

UO:    Now, and you, you said the black money tray was gone?

OP:    Yes.

UO:    Now, did you touch the cash register at all?

OP:    No.

UO:    You said it was open.  Was it all the way extended or?  Or it was just partially open or?  Can you kinda give me an idea on…

OP:    I don't know if it was fully out or not.  It was at, at least like 3 quarters, a half to 3 quarters open.

UO:    That's fine.  Uh, did you secure the scene?

OP:    I assisted in securing the perimeter, but yes.

UO:    And you really had no conversation with anybody else?

OP:    At the scene of the gas station?

UO:    Other, other than police personnel I mean you didn't interview anybody out there?  You didn't talk to anybody out there?  Any bystanders or anything?

OP:    During the (Inaudible) search we talked to some people, yeah.

UO:    Who'd you talk to?

OP:    A bunch of people.  Most of 'em I don't, most of 'em I don't remember.  There's a report.

UO:    One of the people and again, reflect your memory back to your report, this, is marked 0-0-7, about the (Inaudible) you talked to Jim Osborne.

OP:    Yes.

UO:    And what did he tell ya?

OP:    Stated he'd gone to the Clark station around 19-45, bought a pack of cigarettes; (Inaudible).

11

UO:    Did he ever tell you what kind of cigarettes he bought?

OP:    I don't remember if he told me what type of cigarettes he bought.

UO:    Did he, did he buy anything else other than a pack of cigarettes; 2 packs of cigarettes?

OP:    I recall him telling me he bought some cigarettes.

OF:    Did he tell ya 19-45 or did you just translate it into 19-45?

OP:    He would have said 7-45 around 7-45 P-M and I translated it into military time in the report yeah.

UO:    You also talked to uh, according to report on 0-0-8, you also talked to another individual did you not?  It starts I'm sorry, it starts at the bottom (Inaudible) 0-0-8.

OP:    In reference to Robert Coleman, Coldman, however you want to pronounce his name.

UO:    Yes.  What, what did you, what did he tell you?

OP:    He was, he was very concerned about the attendant.  He wanted to know if there had been a, if he had been killed.

UO:    Specifically, did he say that he saw anything out of the ordinary?

OP;    No he doesn't I, I mean his daughter saw something.

UO:    What did he mean (Inaudible)

OP:    Uh, she saw I'm sorry...

UO:    It was brown wasn't it?

OP:    Yes.  11-0-3 Home.  Brown saw 2 people walking up the alley behind the Clark station.

UO:    Did you see this alley behind the Clark station?

OP:    Yes.

UO:    Now, this alley, which way does it go?  Does it go east and west?  North south?

OP:    It's a east west alley.

UO:    Is there another alley perp, perpendicular to that alley?

OP:    there one the run uh north off there's the east west alley and then there's a, an alley that'll run to the north off of that alley there, yes.

UO:    Is that close to being by the Clark station?

OP:    It's not directly behind it if you go into the alley, you have to go over, I don't know the exact distance, but several feet.

UO:    Ok, but it's close though?

OP:    It's close yes.

UO:    Alright, did you happen to get brown's first name?

OP:    It's marked in here somewhere. The sec, the second one I had doesn't indicate it, I, I thought I'd written the overall witness, that I had indicated everybody's name, but...

UO:    Who do you have? I don't see it?

OP:    I don't, I don't remember his first name though.

UO:    Well, when you first started this interview you made reference that you responded to 8-0-1 East Empire Street which is the address of the Clark Oil. However the actual address of Clark Oil's 8-0-2 East Empire, is that correct?

OP:    Yeah. Yeah it would be, I'm sorry. It's on the north side of the road my fault.

UO:    You also, when I, when you talked to us before this tape had started you said you were goin down Empire street you passed Clark and you hesitated for a minute because uh you were thinking possibly purchasing some cigarettes yourself and um, you were goin go there is that correct?

OP:    Yes.

UO:    But you didn't do that?

OP:    No I didn't.

UO:    Now when you went by there, did you see anything you didn't like?

OP:    There was at least one, maybe 2 cars in the lot. I do remember people inside the station. I can't describe them for ya, I can't, I don't remember what color the vehicle was.

13

UO:    So why wouldn't, why do you remember thinking you might of bought, you were thinking about buying cigarettes there?  Why would you do that?

OP:    Cuz I always bought cigarettes there.

UO:    Ok.  Did you recognized the guy who was deceased?

OP:    The attendant?

UO:    Yes.

OP:    I don't, didn't know his last name until after he was identified, but...

UO:    Have you ever purchased anything from him?

OP:    Yes.  He went by the name Phil.

(Inaudible)

OF:    The only, the only question that wasn't asked and I'm sure you were told us, but you never saw anybody comin out of the gas station from the time you first observed the gas station?

OP:    No I did not.

That's all I got.

OF:    Jeff do you have anything for us?  This interview is concluded on March second, 19-99 at 8-49 A-M.

End of Tape

14

STATE OF ILLINOIS    )
                      )   SS
COUNTY OF MCLEAN   )

### IN THE CIRCUIT COURT FOR THE ELEVENTH JUDICIAL CIRCUIT
### COUNTY OF MCLEAN

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | |
| | ) | No. 99 CF 1016 |
| Respondent, | ) | |
| | ) | |
| | ) | |
| - vs - | ) | |
| | ) | |
| | ) | |
| JAMES SNOW, | ) | The Honorable Paul Lawrence, |
| | ) | Judge Presiding. |
| Petitioner. | ) | |

### Affidavit of William Hendricks

I, William Lee Hendricks, under oath and penalty of perjury, state as follows:

1. My name is William Hendricks. My date of birth is May 13, 1966. I currently live at 2502 S. Bunn Street in Bloomington.

2. I have lived in Bloomington my entire life.

3. I grew up in South Hill—I lived there from 3rd grade through high school.

4. I knew Danny Martinez growing up. He and his brother went to school with me. We hung out together, played sports, and when to each other's houses.

5. Jamie Snow also hung out with us. He stayed at our house all the time, including weekends, and played sports with us. Danny Martinez saw Jamie many times. All of us played sports together at Lincoln School. I knew Detective Katz was a school cop at Bloomington High School, and knew us from there.

6. I started working as a laborer at Laborer's Local No. 362 in Bloomington is 1988. Danny Martinez was already a member of the hall at that time. We saw each other on jobs and at the hall all the time. We were good friends. He was very religious and tried to help me with my problems.



Exhibit 4

7. In 1991, I was on work release, working at State Farm on a job. Danny was working the same job and picked me up every morning and drove me home every night.

8. I remember when Bill Little was killed, and soon after a sketch came out of a suspect. At the time there weren't too many people I knew with long blond hair, and there was a rumor that it looked like Jamie Snow.

9. I had several conversations with Danny Martinez about this starting when the sketch came out. I know Danny Martinez lived next door to the gas station where this happened. We talked about that rumor that the sketch looked like Jamie. Danny said words to the effect of, "No that ain't Jamie. Jamie doesn't look like that. I know what Jamie looks like."

10. I remember having another conversation with Danny after Jamie took a polygraph. I told Danny that Jamie passed a polygraph, and he said, "Don't worry. I don't believe Jamie did it either."

11. During the ten years between Bill Little's death and Jamie's arrest, Danny and I talked about this numerous times. He never told me he was a witness or that he thought Jamie was involved.

12. When Jamie was arrested and it came out in the paper that Danny Martinez said he was there, I confronted Danny. I asked him about how he could identify Jamie when all these years he never told me he was there and had always said Jamie was not involved. He had no answer.

13. The business agent of Local 362 in 1991 was John Penn. His sister is Linda Penn. Back in 1991 she was very good friends with Bill Little's mom. I know this because around the time of Jamie's trial she told me this, and tried to convince me that Jamie was involved and that I should not testify for Jamie.

14. I also know that the Martinez family and the Penn family are friends. I know this because before Jamie was arrested Danny told me that Mrs. Little had been over to his house a few times. He told me the Penn family was family friends. He didn't tell me why she came over. I thought because he lived next door she was coming by.

15. The business agent of the union is the head of the local and makes all decisions, including who gets what jobs. This person has a lot of influence.

16. A week or two before they convened Jamie's grand jury, Detective Katz called me down to the police station. Katz told me he knew I was friends with Jamie, and asked me if Jamie had told me he did it. He told me there was reward money. I told him Jamie had told me he hadn't done it. They then asked me where I was that night. They told me if I knew something I could be charged with obstruction of justice.

17. I did not tell Jamie's attorney about my conversations with Danny. I didn't think it was important because I didn't know Danny was claiming he didn't know Jamie. I didn't tell Jamie about this because he was in jail and we couldn't talk. I only ever spoke with Jamie's attorneys briefly before court.

18. If asked about these issues at trial, I would have testified consistent with this affidavit. If called to testify now, I would testify consistent with this affidavit.

19. I am 43 years old and competent to testify. No threats or promises were made to me in exchange for this affidavit.

_____          12-21-09
William Hendricks                           Date

Subscribed and sworn before me, _____12/21_____, on 2009 .



_____
Notary

LARRY E. BIELA
MY COMMISSION EXPIRES
JUNE 25, 2011
NOTARY PUBLIC
OFFICIAL SEAL
STATE OF ILLINOIS

STATE OF ILLINOIS          )
                           )          SS
COUNTY OF MCLEAN           )

IN THE CIRCUIT COURT FOR THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

PEOPLE OF THE STATE OF ILLINOIS        )
                                       )          No. 99 CF 1016
                    Respondent,        )
                                       )
                                       )
         - vs -                        )
                                       )
                                       )
JAMES SNOW,                            )          The Honorable Paul Lawrence,
                                       )          Judge Presiding.
                    Petitioner.        )

---

### Affidavit of Dennis Hendricks

I, Dennis Eugene Hendricks, under oath and penalty of perjury, state as follows:

1.  My name is Dennis Hendricks.  My date of birth is January 10, 1964.  I currently live at 408 ½ South Allin Street in Bloomington.

2.  I have known Jamie Snow for about 25 years.

3.  I have lived in Bloomington my entire life.

4.  I was locked up in Dixon Correctional Center for about 18 months.  During the time I was there, I ran into Bill Moffit, who I knew from Bloomington.  I had gone to a few parties at his house, but we didn't know each other well.

5.  At first, Bill was leery of me, but we spent time working out, playing softball, and walking on the track together.

6.  After we had spent time together and he was more comfortable with me, he told me words to the effect of, "Hey bro, I just want you to know that I testified against Jamie Snow."

7.  He tried to butter it up, saying that he hadn't said anything that mattered.  But he told me that he got a time cut in exchange.  He told me, "If there's anything I could do about it, I would."



Exhibit 5

8. I wasn't surprised to hear that he got a deal. I had already heard that Ed Palumbo and Ronnie Wright got deals in exchange for testifying. Back then, this was unusual in Bloomington.

9. At the time, I didn't tell anyone what Bill had told me. I figured that Jamie was already convicted so it wouldn't have mattered. I was concentrating on doing my time and didn't want to cause any trouble for myself.

10. I grew up with Danny Martinez's family. He and his brothers were laborers. Jamie grew up with us, too. Danny and Jamie had mutual friends. Growing up, all of us met to play sports at Lincoln School.

11. I remember that sometime after Bill Little was killed, but before Jamie's trial, I ran into Danny Martinez at a bar in Bloomington. Danny told me that he knew I was friends with Jamie. I knew he was involved in Jamie's case from the newspaper. Danny told me that he hadn't been able to pick Jamie out of a lineup and that he didn't think Jamie was involved.

12. When I met with Jamie's attorney before trial I told him about this run-in with Danny. Jamie's attorney didn't want to ask me about this. He wanted me to focus on showing that Billy Bradford was lying that Jamie had ever told him he'd killed Bill Little.

13. I don't think that Jamie Snow did this. I know him from growing up and this isn't something he would have done. If I thought he was involved, I would say so.

14. If called to testify, I would testify consistent with this affidavit.

15. I am 45 years old and competent to testify. No threats or promises were made to me in exchange for this affidavit.

_____          _12/21/09_
Dennis Hendricks                          Date

Subscribed and sworn before me, _12/21_____, on _2009_.

_____
Notary



TIMONY GIVEN IN THE INQUEST OF WILLIAM LITTLE

May 20, 1991

CORONER: Please raise your right hand to be sworn in: Do you solemnly swear and affirm that the testimony you are about to give in this inquest will be the truth, the whole truth and nothing but the truth, so help you God?

WITNESS: I do.

CORONER: Please state your name, residence and occupation.

WITNESS: Paul Williams, I am a police officer for the city of Bloomington.

CORONER: On March 31, 1991 were you a sworn police officer for the city of Bloomington?

OFFICER WILLIAMS: Yes sir, I was.

CORONER: In that capacity, were you along with others called to a death scene in the city of Bloomington?

OFFICER WILLIAMS: We responded to a hold-up alarm, sir.

CORONER: About what time did that come in?

OFFICER WILLIAMS: The alarm came in at approximately 8:18.

CORONER: What was your location when you received the call?

OFFICER WILLIAMS: When I received the call, I was on routine patrol at Jefferson & McLean Street.

CORONER: So, within a matter of minutes, you arrived at the scene of the alarm?

OFFICER WILLIAMS: Yes.

CORONER: When you arrived there, were you the first police officer at the scene?

FILED
JAN 9 - 2008
McLEAN COUNTY
CIRCUIT CLERK

Exhibit 6

Case: 1:13-cv-03947 Document #: 2-6 Filed: 05/28/13 Page 2 of 8 PageID #:64
Case: 17-1113    Document: 33-3        Filed: 09/21/2017    Pages: 781

4

OFFICER WILLIAMS: Officer Pelo and I arrived at the same time. Officer Pelo got out on foot before I did in the area.

CORONER: Would you describe to the jury what you saw and what you did?

OFFICER WILLIAMS: Officer Pelo had arrived and I had parked my squad car on Linden Street and waited until I heard him arrive. Once I heard him arrive, he stated that he was out on foot by the gas station. So, I pulled my squad up closer. I had been sitting there about 15 or 20 seconds and hadn't seen any unusual activity, so I got out of my squad car and as I approached the station, Officer Pelo exited and said there was someone on the floor inside the station.

CORONER: Then what happened?

OFFICER SHEPHERD: I went up to the station, entered the station and observed the attendant inside the station on the floor.

CORONER: Had the rescue squad been called by then?

OFFICER SHEPHERD: No sir, not yet.

CORONER: But soon after that it was?

OFFICER SHEPHERD: Soon after that it was.

CORONER: And they responded?

OFFICER SHEPHERD: Yes sir.

CORONER: And they found no life?

OFFICER SHEPHERD: No sir.

CORONER: Then what did you and your fellow police officer do?

OFFICER SHEPHERD: Well I had taken control of the scene. I was the senior officer at the scene. The only people who were allowed in, once I entered the station, was Lifeline

TESTIMONY GIVEN IN THE INQUEST OF WILLIAM LITTLE

May 20, 1991

CORONER: Please raise your right hand to be sworn in: Do you solemnly swear and affirm that the testimony you are about to give in this inquest will be the truth, the whole truth and nothing but the truth, so help you God?

WITNESS: I do.

CORONER: Please state your name, residence and occupation.

WITNESS: Paul Williams, I am a police officer for the city of Bloomington.

CORONER: On March 31, 1991 were you a sworn police officer for the city of Bloomington?

OFFICER WILLIAMS: Yes sir, I was.

CORONER: In that capacity, were you along with others called to a death scene in the city of Bloomington?

OFFICER WILLIAMS: We responded to a hold-up alarm, sir.

CORONER: About what time did that come in?

OFFICER WILLIAMS: The alarm came in at approximately 8:18.

CORONER: What was your location when you received the call?

OFFICER WILLIAMS: When I received the call, I was on routine patrol at Jefferson & McLean Street.

CORONER: So, within a matter of minutes, you arrived at the scene of the alarm?

OFFICER WILLIAMS: Yes.

CORONER: When you arrived there, were you the first police officer at the scene?

OFFICER WILLIAMS: Officer Pelo and I arrived at the same time. Officer Pelo got out on foot before I did in the area.

CORONER: Would you describe to the jury what you saw and what you did?

OFFICER WILLIAMS: Officer Pelo had arrived and I had parked my squad car on Linden Street and waited until I heard him arrive. Once I heard him arrive, he stated that he was out on foot by the gas station. So, I pulled my squad up closer. I had been sitting there about 15 or 20 seconds and hadn't seen any unusual activity, so I got out of my squad car and as I approached the station, Officer Pelo exited and said there was someone on the floor inside the station.

CORONER: Then what happened?

OFFICER SHEPHERD: I went up to the station, entered the station and observed the attendant inside the station on the floor.

CORONER: Had the rescue squad been called by then?

OFFICER SHEPHERD: No sir, not yet.

CORONER: But soon after that it was?

OFFICER SHEPHERD: Soon after that it was.

CORONER: And they responded?

OFFICER SHEPHERD: Yes sir.

CORONER: And they found no life?

OFFICER SHEPHERD: No sir.

CORONER: Then what did you and your fellow police officer do?

OFFICER SHEPHERD: Well I had taken control of the scene. I was the senior officer at the scene. The only people who were allowed in, once I entered the station, was Lifeline

BLOOMINGTON POLICE DEPARTMENT                                   POLICE INITIAL CASE REPORT

| ☒ CRIME REPORT | ☐ STOLEN VEHICLE | 1. Offense Code | Page | Of | 2. Case No. |
|---|---|---|---|---|---|
| ☐ INCIDENT REPORT | ☐ STOLEN BICYCLE | 0110-0318 · · · | 1 | 4 | C91-002150 |

| 4. Supervisory Correction | 5. Incident No. |
|---|---|
| | E910900099 |

3. Offense
MURDER--ARMED ROBBERY

| 5. Complainant Name (Victim, Business, Arrested) | 6a. Responsible Party |
|---|---|
| CLARK OIL  Little, William | |

| 7. Complainant Address (Street, City, State, Zip) | 8. Home Phone | |
|---|---|---|
| 802 E. EMPIRE BLOOMINGTON ILL. | / – | |
| | 9. Business Phone | 309 / 828 – 8025 |

| 10. Sex | 11. Race | 12. DOB | 13. Age | 14. Weapon, Force | 15. Describe Injury | 16. Place of Treatment |
|---|---|---|---|---|---|---|
| -- | -- | -- | - | TO BE DETERMINED | TO BE DETERMINED | NONE |

| 17. Mo. Occurred | 18. Day | 19. Year | 20. Mil. Time | 21. Mo. Reported | 22. Day | 23. Year | 24. Mil. Time | 25. How Reported | 26. Location Code |
|---|---|---|---|---|---|---|---|---|---|
| 03 | 31 | 91 | 2018 | 03 | 31 | 91 | 2018 | IP | A2 |

| 27. Reported By (Name) | 28. Address of Reporter (Street, City, State, Zip) |
|---|---|
| WILLIAMS (OFC) | ON FILE |

| 29. Home Phone ON FILE – | 31. Exact Address of Offense (Location or Site) |
|---|---|
| 30. Business Phone ON FILE – | #7 |

32. Was there a witness to the crime?                                      No ☐  Yes ☐

| 33. Witness/Neighborhood Check (Circle one) | Age | Sex | Race | 34. Address (Incl. Street, City, State, Zip) | 35. Home Phone | 37. ☐ Interviewed |
|---|---|---|---|---|---|---|
| TO BE DETERMINED | – | – | – | | 36. Business Phone | ☐ Statement |
| 33a. | | | | 34a. Address | 35a. Home Phone | 37a. ☐ Interviewed |
| | | | | | 36a. Business Phone | ☐ Statement |

38. Suspect?  ☐ Named  ☐ Known  ☐ Known Location  ☐ Identified  ☐ Previously Seen  ☐ Description   No ☐  Yes ☒

| 39. ☐ Suspect (Alias) ☐ Arrested | 40. DOB | 39a. ☐ Suspect (Alias) ☐ Arrested | 40a. DOB |
|---|---|---|---|
| TO BE DETERMINED | | | |

| 41. Location/Address | 41a. Location/Address |
|---|---|
| | |

| 42. Description - Use Sex, Race, Hgt., Wgt., Hair, Eyes, Scars, Tattoos, Clothing | 42a. Description - Use Sex, Race, Hgt., Wgt., Hair, Eyes, Scars, Tattoos, Clothing |
|---|---|
| | |

43. Vehicle Identified?  ☐ Victim  ☐ Suspect  ☐ Stolen  ☐ Recovered  ☐ Bicycle   No ☐  Yes ☐

| 44. Color | 45. Yr. | 46. Veh. Make | 47. Model | 48. Body Style | 49. Lic. Yr. | 50. Lic. St. | 51. Lic. Type | 52. Lic. No. | 53. VIN |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| 54. Damage | 55. Unlocked? ☐ Yes ☐ No | 56. Keys in Vehicle? ☐ Yes ☐ No | 57. Misc. Information to ID Vehicle |
|---|---|---|---|
| | | | |

| 58. Lienholders (If Any?) | 59. Value | 60. Condition | 61. If Bicycle ☐ Boys ☐ Girls | 62. Misc. Bicycle Information |
|---|---|---|---|---|
| | | | | |

63. Was There?  ☐ Traceable Property  ☒ Significant Physical Evidence   No ☐  Yes ☒

| 64. Document # | 65. Date of Doc. | 66. Bank Drawn On | 67. Name of Account | 68. Payable To | 69. Amount | 70. Endorsee |
|---|---|---|---|---|---|---|
| 71. Damaged Property/Property Stolen/Property Recovered Stolen (Circle Appropriate One) | | | | 72. Identification No. | | 73. Value |
| 71a. | | | | 72a. Identification No. | | 73a. Value |
| 71b. | | | | 72b. Identification No. | | 73b. Value |

FILED
McLEAN COUNTY
JAN 3 – 2008
CIRCUIT CLERK

| LOCK SPACE | NARRATIVE: | 74. Crime Scene Tech. ☒ BPD ☒ Other  ISP |
|---|---|---|
| N | OFFICERS RESPONDED TO 802 E. EMPIRE TO A HOLD UP ALARM. UPON ARRIVAL ATTEDANT WAS | |
| | ON THE FLOOR.  CORONOR NOTIFIED, CRIME SCENE TECH NOTIFIED, AS WELL AS COMMAND. | |

| 0 UNFOUNDED | 3 CLEARED BY ARREST - ADULT | 6 EXCEPTIONALL | | ADMINISTRATIVELY CLEARED |
|---|---|---|---|---|
| 1 REFERRED TO RESPONSIBLE JURISDICTION | 4 CLEARED BY ARREST - JUVENILE | 7 OTHER EXCEPTIONAL CLEARANCES - ADULT | | |
| 2 PENDING | 5 EXCEPTIONALLY CLEARED ADULT | 8 OTHER EXCEPTIONAL CLEARANCES - JUVENILE | 75. LEADS | |

| 76. Initial Officers Name, ID, Date | 77. Field Supervisor | 78. Recommend to Continue ☐ Field ☐ Investigation | 79. Assigned Investigator |
|---|---|---|---|
| WILLIAMS 3771 03-31-91 | | | |

BLOOMINGTON POLICE DEPARTMENT

POLICE SUPPLEMENTAL CASE REPOR

| | 1. Page | of | 2. Case No. |
|---|---|---|---|
| | 2 | 4 | C91-002150 |

Offense
MURDER,--ARMED ROBBERY

5. Victim Name (or if Business list incorporated Name)
CLARK OIL

| 4. Supervisory Correction No. 2 or 3 | | 5a. Responsible Party |
|---|---|---|

| BLOCK SPACE | NARRATIVE: N = narrative for use in block space, block numbers will otherwise be used to further detail sequence of events or to expand on any information in any block. List the property form number. List the value of stolen/recovered property only in block six (6). List name, I.D. number, and description of all arrested subjects. |
|---|---|

N

ON 03-31-91 I WAS ASSIGNED TO AREA 2. AT APPROXIMATELY 2018 MYSELF AND

OFFICER PELO, WHO WAS ASSIGNED AS 2B2 WERE DISPATCHED TO CLARK OIL, 802 E. EMPIRE.

AT APPROXIMATELY 2021 OFFICERS ARRIVED. I PULLED UP ON LINDEN N.B. AND SHUT OFF

MY SQUADS LIGHTS AND STOPPED ABOUT ½ BLOCK SHORT OF EMPIRE. I HEARD PELO CALL

THAT HE WAS AT THE SCENE AND I SLOWLY PULLED MY SQUAD UP CLOSER. THE AMOUNT OF

TIME I SAT IN THE SQUAD WATCHING THE STATION WAS APPROXIMATELY 15-20 SECONDS.

DURING THIS TIME I DID SEE 2 VEHICLES PULL INTO THE LOT AND THE DRIVERS OF THESE

VEHICLES GET OUT AND STAND BY THE FUEL PUMPS. PELO HAD PARKED IN A CONCEALED

LOCATION AND APPROACHED THE STATION ON FOOT. I OBSERVED HIM WALKING UP TO THE

STATION AND HEARD HIM ASK DISPATCH TO HOLD A LICENSE PLATE. AT THIS TIME I STILL

HAD NOT SEEN THE ATTENDANT, HOWEVER I HAD NOT OBSERVED ANY MOVEMENT INSIDE THE

STATION EITHER. I THEN PULLED MY SQUAD INTO THE STATION PARKING LOT.


PELO ENTERED THE STATION AND IMMEDIATELY CAME BACK OUT AND VERBALLY ADVISED

ME THAT THE THERE WAS A SUBJECT ON THE FLOOR BEHIND THE COUNTER, PRESUMABLY THE

ATTENDANT. AT THIS TIME I ENTERED THE STORE AND OBSERVED A M/W LYING ON THE FLOOR

BEHIND THE COUNTER. THE M/W WAS NOT MOVING. HE WAS LYING ON HIS LEFT SIDE FACING

SOUTH WEST, IN A PRE-NATEL POSITION. (I.E. LEGS CURLED UP TOWARDS HIS STOMACH)

THE M/W'S EYES WERE OPEN AND I OBSERVED HIS CONTACT LENSE WAS POPPED AWAY FROM

HIS RIGHT EYE. I OBSERVED NO MOVEMENT OF ANY KIND, NOT EVEN RESPIRATORY MOVEMENTS

FROM HIS CHEST AREA. PELO HAD RE-ENTERED THE STATION AND FELT DOWN FOR A PULSE

AND STATED THAT HE COULD NOT FEEL A PULSE. PELO THEN LEFT THE STATION.

CONT.

| 6. Initial Officer's Name, PE, Date |
|---|
| WILLIAMS  3771  03-31-91 |

| 7. Initial Officer's Status | 8. Recommended to Continue | 9. Field Supervisor's Name, PE, Date |
|---|---|---|
| ☐ Active ☐ Suspended ☐ Unfounded ☐ Cleared | ☐ Field ☐ Investigative | |
| 10. Assigned Investigator's Initials, PE, Date | 11. Final Status (Investigative Coordinator) | 12. Date of Offense |

**BLOOMINGTON POLICE DEPARTMENT**      **POLICE SUPPLEMENTAL CASE REPORT**

| 1. Page | of | 2. Case No. |
|---|---|---|
| 3 | 4 | C91-002150 |

Offense

MURDER--ARMED ROBBERY

4. Supervisory Correction No. 2 or 3

5. Victim Name (or if Business list Incorporated Name)  Little, Wm

CLARK OIL

5a. Responsible Party

| BLOCK SPACE | NARRATIVE: N = narrative for use in block space, block numbers will otherwise be used to further detail sequence of events or to expand on any information in any block. List the property form number. List the value of stolen/recovered property only in block six (6). List name, I.D. number, and description of all arrested subjects. |

**N**

I ADVISED PELO TO STAND BY OUTSIDE THE STATION, AND THAT THE ONLY PERSON

TO RE-ENTER THE STATION WOULD BE LIFELINE WHEN THEY ARRIVED. AS I WAS ADVISING

PELO OF THIS OFFICER CLIFFORD ARRIVED. I INFORMED CLIFFORD THAT I WOULD BE

TAKING CONTROL OF THE SCENE UNTIL A COMMAND OFFICER ARRIVED. AT THIS POINT I RE-

ENTERED THE STATION AND RETURNED TO THE VICTIM. I REACHED DOWN AND ATTEMPTED TO

GET A PULSE FROM THE VICTIMS NECK, I COULD NOT GET A PULSE. I THEN DECIDED THAT

I WOULD ATTEMPT TO ADMINISTER C.P.R. TO THE VICTIM. I CHECKED FOR ANY WOUNDS FROM

A KNIFE OR SIMILAR OBJECT AND FOUND NONE. I THEN DECIDED THAT BEFORE I ATTEMPTED

ANY C.P.R. THAT I SHOULD VISUALLY OBSERVE THE VICTIMS CHEST BEFORE ADMINISTERING

ANY CHEST STIMULI, IN CASE THERE WAS A KNIFE OR OTHER OBJECT IMBEDDED IN THE VICTIMS

CHEST. I THEN TURNED THE VICTIM ONTO HIS BACK AND WITH MY KNIFE I CUT THE SHIRT

OFF THE VICTIM. AT THIS TIME I OBSERVED 2 BULLET WOUNDS. ONE WAS IN THE AREA

OF THE STERNUM, NEARLY DIRECTLY CENTERED. THE OTHER WOUND WAS IN THE LEFT DELTOID

AREA. AT THIS TIME I OBSERVED THE LOCATION OF THE WOUND, THE EYES OF THE VICTIMS,

WHICH WERE OPEN AND GLASSY, LISTENED FOR BREATHS BEING TAKEN, AND OBSERVED THE

VICTIMS BODY HAD TURNED A PURPLEISH COLOR, AND OBSERVED THE BODY WAS LIMP. I

THEN DECIDED THAT I COULD BE OF NO HELP TO THE VICTIM. I EXITED THE STATION.


A FEW MOMENTS LATER LIFELINE RESCUE ARRIVED. I ALLOWED A RICK WOLF

AND RANDY STROUD OF LIFELINE INSIDE. THEY WERE INSIDE A FEW MOMENTS AND STATED

THAT THE VICTIM WAS BEYOND HELP. BLM RESCUE ARRIVED AND I DENIED THEM ENTRY TO

THE STATION. LIFELINE THEN EXITED THE STATION AND I DID NOT ALLOW ANY FURTHER

PEOPLE INSIDE.

6. Initial Officer's Name, PE, Date
WILLIAMS 3771 03-31-91

| 7. Initial Officer's Status | 8. Recommended to Continue | 9. Field Supervisor's Name, PE, Date |
|---|---|---|
| ☐ Active ☐ Suspended ☐ Unfounded ☐ Cleared | ☐ Field ☐ Investigative | |
| 10. Assigned Investigator's Initials, PE, Date | 11. Final Status (Investigative Coordinator) | 12. Date of Offense |

Case: 1:13-cv-03947 Document #: 2-6 Filed: 05/28/13 Page 8 of 8 PageID #:70
Case: 17-1113    Document: 33-3    Filed: 09/21/2017    Pages: 781

10

BLOOMINGTON POLICE DEPARTMENT          POLICE SUPPLEMENTAL CASE REPORT

| | | 1. Page | of | 2. Case No. |
|---|---|---|---|---|
| | | 4 | 4 | C91-002150 |

| Offense | | | |
|---|---|---|---|
| MURDER--ARMED ROBBERY | | 4. Supervisory Correction No. 2 or 3 | |

| 5. Victim Name (or if Business list Incorporated Name) | 5a. Responsible Party |
|---|---|
| CLARK OIL.   *Little, Wm* | |

| BLOCK SPACE | NARRATIVE: N = narrative for use in block space, block numbers will otherwise be used to further detail sequence of events or to expand on any information in any block. List the property form number. List the value of stolen/recovered property only in block six (6). List name, I.D. number, and description of all arrested subjects. |
|---|---|

N

CLIFFORD AND OTHER UNITS HAD ARRIVED AND SEALED OFF THE ENTRYS TO THE STATION WITH SQUAD.  SGT. COX ARRIVED AND PLACED POLICE TAPE ARCOSS THE AREA.    SGT. IRVIN ARRIVED AND I TURNED THE SCENE OVER TOO HIM.

LATER THE BODY WAS REMOVED  FROM THE STATION AND I WAS PRESENT AS THE FUNERAL HOME  WORKERS PLACED THE BODY IN THE    FUNERAL HOME VEHICLE.   I THEN RODE WITH THE BODY TO THE MORGUE.

AT  THE MORGE I WAS PRESENT AS  ROBERT L. MURPHEY, THE UNCLE OF THE VICTIM POSITIVELY IDENTIFIED VICTIM.  THE  VICTIM WAS NOW IDENTIFIED TO ME AS  WILLIAM W. LITTLE,  10-12-72, S.S.# 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.    A FEW MINUTES LATER THE VICTIMS FATHER ALSO ARRIVED AND CORONOR ANDERSON ADVISED THAT HE WAS GOING TO ALLOW THE FATHER TO VIEW THE BODY.  I WAS PRESENT AS ANDERSON ALLOWED THE FATHER TO OBSERVE THE BODY.  THE BODY WAS NOT TOUCHED BY ANYONE, INCLUDING THE CORONOR, MYSELF, THE FATHER OR THE UNCLE.

AT 2309 I SIELED THE MORGUE WITH EVIDENCE TAPE. I INITIALED, TIMED AND DATED THE TAPE.  ANDERSON ADVISED ME THAT THE PADLOCK HE HAD LOCKED THE MORGUE DOOR WITH HAD ONLY ONE KEY AND HE WOULD HAVE SOLE CUSTODY OF THE KEY.

| 6. Initial Officer's Name, PE, Date |
|---|
| WILLIAMS  3771  03-31-91 |

| Initial Officer's Status | 8. Recommended to Continue | 9. Field Supervisor's Name, PE, Date |
|---|---|---|
| ☐ Active  ☐ Suspended  ☐ Unfounded  ☐ Cleared | ☐ Field  ☐ Investigative | |
| 10. Assigned Investigator's Initials, PE, Date | 11. Final Status (Investigative Coordinator) | 12. Date of Offense |

BLOOMINGTON POLICE DEPARTMENT                POLICE SUPPLEMENTAL CASE REPORT

| 1 Page | of | 2 Case No. |
|--------|-----|-----------|
| 1 | | 07-003150 |

**Offense**
ARMED ROBBERY, HOMICIDE

4 Supervisory Correction No. 2 or 3

5. Victim Name (or if Business list incorporated Name)
CLARK STATION (LINDEN + EMPIRE)

5a. Responsible Party

| BLOCK SPACE | NARRATIVE: N = narrative for use in block space, block numbers will otherwise be used to further detail sequence of events or to expand on any information in any block. List the property form number. List the value of stolen recovered property only in block six (6) List name, I.D. number, and description of all arrested subjects. |
|---|---|

N    AT ABOUT 0108 HRS. 4/1/91 DANNY MARTINEZ WAS
LOOKING AT THE SUSPECT PHOTO FILE WHEN HE TOLD
ME THAT "MUG NUMBERS" BP6395 AND BP6558 BOTH
RESEMBLED THE SUSPECT. HE SAID " IT'S BETWEEN
THESE TWO.

AT ABOUT 0140 HRS. OFFICER PELO INFORMED ME
THAT GERARDO GUTTIEREZ HAD ALSO IDENTIFIED "MUG
NUMBER" BP6395, FIRST TO OFFICER NEWTON AND
THEN TO HIM. I ASKED GERARDO IF THAT
WAS THE SUSPECT AND HE ANSWERED IN THE AFFIRMATIVE

FILED
JAN 9 - 2008
McLEAN COUNTY
CIRCUIT CLERK

Exhibit 7

6 Initial Officer's

| Initial Officer's Status | | | | 8 Recommended to Continue | | 9. Field Supervisor's Name, P.E. Date |
|---|---|---|---|---|---|---|
| ☐ Active | ☐ Suspended | ☐ Unfounded | ☐ Cleared | ☐ Field | ☒ Investigative | |

10. Assigned Investigator's Initials, P.E. Date | 11 Final Status Investigative Coordination | 12 Date of Offense

DATE 04-01-91  PLACE Bloomington Police Department  TIME STARTED 2:50

I, the undersigned, Danny Martinez , am 27 years of age, having be

on 08-07-1963 , at Crystal City Texas

I now live at 806 East Empire Street Bloomington, Illinois

Crowe     Q. Danny, what can you tell me about a shooting at the Clark

Station at Clinton and Empire streets at about 8:15PM
last night?

Martinez  A. Well, I just live next door to the gas station and my wife

and I had just got home and I drove my car over to the sta
and parked on the East side of the station at the air pump
so that I could air up my tire. I left my car running and
put air in the tire. I did not notice the attendant when
I first pulled in and I thought that he might have gone to
the bath room. Usually he stands right up front and I see
him every day he works because I go over there all the tim
As I am filling the tire up I heard a couple of pops and t
that my car was back firing. I finished filling the tire
and started walking towards the front door and saw this gu
come out of the gas station  and he had his hands in his p
and I looked at him and he looked at me as if he was suppr
I heard my car sounding as if it was going to die and I tu
around towards my car aNd when I turned back around he was
turning the corner on the East side of the station heading
North. I started back towards the station and I saw a Blac
pick up truck pull up right in front of the door and a guy
got out and was going to go in and the police came next do
and told the guy not to go in. I parked my car back in th
street and then I told the officer about what I had seen.

Crowe     q. Can you describe the person you saw leaving?

Martinez  A. He was a White male about in his 20's and he was about my

height which is about 5'8" and he was thin. He had Blue Je
on and they were not new because they were faded. He was
wearing tennis shoes and a Brown jacket and a  baseball ty

I have read each page of this statement consisting of ___Two___ page(s) each page of which bears my signature and correction, if any, bear my in
and I certify that the facts contained herein are true and correct.

DATED AT  Bloomington PD  this  1st  day of  April  19

WITNESS: Charles Crowe

WITNESS:

X Danny Martinez
Signature of person giving voluntary statement

FILED
JAN 9 2008
McLEAN COUNTY
CIRCUIT CLERK

12

Date 04-01-90 _____ Page No. TWO

STATEMENT OF:

                    Danny Martinez

Crowe       Q. Was thge anything distintive about the hat?
Martinez    A.  Thge was no Logo on the hat but it was a dark color.
Crowe       Q. What about the coat, what was the length?
Martinez    A It was a short one thgat was waist length and I couldn't tell
            if it was cloth or leather all I know is that it was a darker
            coat..
Crowe       Q. What about the shoes?
Martinez    A. They were low quarters and they were White.
Crowe       Q. Do you remember anything else about him?
Martinez    A. His hair was shoulder length and it was blondish Brown and par
            of it was sticking out the back of the hat. He had a day or tv
            of stubble on his face  and I didn't notice a mustache. He had
            a small nose and a thin face.
Crowe       Q. Was he carring any thing?
Martinez    A. No, he had his hands in his pockets.
Crowe       Q. Is there anything else thatyou remember?
Martinez    A. Well, the guy that was shot always had a buddy in there at
            closing time. He had Black long hair and looked as if he was a
            band member .

**BLOOMINGTON POLICE DEPARTMENT**                    **POLICE SUPPLEMENTAL CASE REPORT**

| | 1. Page | of | 2. Case No. |
|---|---|---|---|
| | 1 | 1 | C91-002150 |

| Offense | 4. Supervisory Correction No. 2 or 3 |
|---|---|
| Murder | |

| 5. Victim Name (or if Business list incorporated Name) | 6a. Responsible Party |
|---|---|
| Little, William | |

| BLOCK SPACE | NARRATIVE: N = narrative for use in block space, block numbers will otherwise be used to further detail sequence of events or to expand on any information in any block. List the property form number. List the value of stolen/recovered property only in block six (6). List name, I.D. number, and description of all arrested subjects. |
|---|---|

On 10-22-91, Danny Martinez came to the Bloomington Police Department and looked through Book One and Book Two of pictures in the above case. After looking at all the pictures, Martinez stated that he has seen Picture A in the Clark Station on numerous occasions and this subject must have been a friend of Bill or Randy. He stated that picture O looks a lot like the subject he saw coming from the station however the ghy he saw coming from the station didn't have as long hair and his mustache was not full like picture O.

Picture A is Kenneth Lee and picture O is Charles Renfro.

FILED
JAN 9 - 2008
McLEAN COUNTY
CIRCUIT CLERK

| | | 6. Initial Officer's Name, PE, Date |
|---|---|---|
| Initial Officer's Status | 8. Recommended to Continue | 9. Field Supervisor's Name, PE, Date |
| XXXXtive ☐ Suspended ☐ Unfounded ☐ Cleared | ☐ Field ☐ Investigative | |
| 10. Assigned Investigator & Initials, PE, Date | 11. Final Status (Investigative Coordinator) | 12. Date of Offense |
| C Crowe 0088 10-22-91 | 228 | |

Case: 1:13-cv-03947 Document #: 2-7 Filed: 05/28/13 Page 5 of 27 PageID #:75
Case: 17-1113    Document: 33-3    Filed: 09/21/2017    Pages: 781

14

BLOOMINGTON POLICE DEPARTMENT                          POLICE SUPPLEMENTAL CASE REPORT

| 1 Page | of | 2 Case No |
|---|---|---|
| 1 | 2 | 91-002150 |

| Offense | 4 Supervisory Correction No 2 or 3 |
|---|---|
| Murder | |

| 3 Victim Name (or) Business (if incorporated) Name | 4a Responsible Party |
|---|---|
| Little, William | |

| BLOCK SPACE | NARRATIVE: N = narrative for use in block space, block numbers will otherwise be used to further detail sequence of events or to expand on any information in any block. List the property form number. List the value of stolen, recovered property only in block 5 × 6. List name, I.D. number, and description of all arrested subjects |
|---|---|

N    On November 3, 1993 at 1545 hours, Detectives Crowe and Tom Sanders met with Danny Martinez at the Bloomington Police Department. Martinez is a witness to the William Little murder on March 31, 1991 and a written statement was given to Detective Crowe on April 1, 1991.

Detectives asked Martinez if he remembers the events of March 31, 1991 and he stated that he will never forget that night. He stated that he lived next door to the station and was over there everyday for something. Martinez stated that there was this kid that was a visitor at the station each night that Little worked except for the night of the robbery and this kid was even back three nights after the murder and used the phone at the gas station. Martinez stated that this has always bugged him. Martinez stated that on the night of the murder he and his wife had just got home and he drove his car to the Clark station and parked on the lot on the east side of the station at the air pump, with his car facing east. He did not notice the attendant when he first pulled in and thought that the attendant might have gone to the bathroom. Martinez stated that he left his car running and as he was putting air in his right front tire he heard two pops and thought his car was back firing. Martinez checked the other tires by just glancing at them and then he started for the door of the station and saw a male subject coming out backwards from the station door. At this time Martinez's car sounded as if it was going to die and Martinez turned around and looked towards his car and it was alright. After looking towards his car, Martinez turned back towards the station and the male subject that was backing out of the door had turned around and Martinez met face to face and they were about two or three feet from each other. This subject had his hands in his jacket pockets like he was holding something up under the jacket. This subject walked around the east end of the station and then turned and went north. Martinez stated he continued to the door of the station and was about to open it when someone yelled "stop, back up." There was a policeman crossing Empire Street and the policeman asked Martinez if Martinez had seen anyone and Martinez told the policeman about the subject that had gone north.

Note: Martinez stated that after the subject left and went north and before Martinez reached the door of the station, a guy in a black pick-up truck pulled right in front of the door to the station and got out of the truck and started for the door about the same time as Martinez did. When the policeman yelled at Martinez to stop, the guy just got back in his truck and left.

Martinez stated that after telling the policeman that the subject went north, the policeman asked Martinez if that was his car on the lot and when told that it was the policeman told Martinez to get it off the lot and at this time the policeman entered the station and another policeman came to the station lot from Linden Street and the officer came out of the station and told the second officer to get the bag.

Martinez stated that the suspect was a white/male in his 20's and he was about 5'08" or 5'09" tall and he was thin. He was wearing faded blue jeans and white low quarter tennis shoes and a baseball type hat. He had on a light weight windbreaker type jacket that was a dark color that was waist length or a little bit longer.

FILED
JAN 9 – 2008
McLEAN
CIRCUIT CLERK

| 6 Initial Officer's Name, P.E. Date |
|---|
| |

| Officer's Status | | Recommended to Continue | 9 Field Supervisor's Name, P.E. Date |
|---|---|---|---|
| ☐ Active  ☐ Suspended | ☐ Unfounded  ☐ Cleared | ☐ Exc.  ☐ Investigative | |

| 10 Assigned Investigator's Initials, P.E. Date | 11 P-3 Status (Investigative Coordination) | 12 Date of Officer |
|---|---|---|
| Crowe | 255 | |

DETECTIVE SUPPLEMENT

Case: 1:13-cv-03947 Document #: 2-7 Filed: 05/28/13 Page 6 of 27 PageID #:76
Case: 17-1113    Document: 33-3    Filed: 09/21/2017    Pages: 781

14

BLOOMINGTON POLICE DEPARTMENT                    POLICE SUPPLEMENTAL CASE REPORT

| 1 Page | of | 2 Case No |
|--------|-----|-----------|
| 2 | 2 | 91-002150 |

| Offense | 4 Supervisory Correction No 2 of 3 |
|---------|--------------------------------------|
| Murder | |

5 Victim Name (or if Business list incorporated Name                    5a Responsible Party

Little, William

BLOCK SPACE

NARRATIVE: N = narrative for use in block space, block numbers will otherwise be used to further detail sequence of events or to expand or any information in any block. List the property form number. List the value of stolen recovered property only in block six (6). List name, I.D. number, and description of all arrested subjects

| N | Martinez stated that the suspect had blondish brown hair that was down to the top of his shoulders and part of his hair was sticking out of his hat. The suspect had the start of some stubble on his face as if he hadn't shaved in a day or two. Martinez stated that the suspects face was thin and he had a small nose and Martinez did not notice a moustache. When asked if the suspect was wearing an earring, Martinez stated that he did not remember an earring in the suspect's ear.
Detectives showed Martinez the following pictures:
      Book one pictures--A through ZZZZ
      Book two pictures--A-1 through F-2
Martinez stated that he didn't see the suspect among the pictures. Martinez was then shown composite number one which was composed by Detective Sanders with the help of Martinez and composite number two that Sanders composed with the help of Gerardo Gutierrez. Martinez was asked to rate the composites on a scale of one to ten with ten being a good likeness of the suspect. Martinez rated composite number one a ten and composite number two on the lower end of the scale. |
|---|---|

| | 6 Initial Officer's Name, PE, Date |
|---|---|

| Officer's Status | 8 Recommended to Continue | 9 Field Supervisor's Name, PE, Date |
|---|---|---|
| ☑ Active  ☐ Suspended  ☐ Unfounded  ☐ Cleared | ☐ Field  ☐ Investigative | |

| 10 Assigned Investigator's Initials, PE, Date | 11 Final Status Investigative Coordinator | 12 Date of Offense |
|---|---|---|
| | 256 | |

DETECTIVE SUPPLEMENT

Case: 1:13-cv-03947 Document #: 2-7 Filed: 05/28/13 Page 7 of 27 PageID #:77
Case: 17-1113    Document: 33-3    Filed: 09/21/2017    Pages: 781

/5

Bloomington Police Departmen                          *Narrative Supplemental Report*

Offense Description: Homicide                                    Page 1 of 2
Primary Person Involved: Little, William W.                Case Number: 91002150

On March 04, 1999, Detective Dan Katz a:                    ∴ Empire Street, Bloomington Illinois,
to interview Danny Martinez, in reference to the above incident. During the interview, Danny Martinez
gave Detective Dan Katz and myself permission to tape record the interview. The tape recorded
interview took place at 0945 hours. Present during the tape recorded interview were Detective Dan Katz,
myself (Detective Rick Barkes) and Dionicio (Danny) nmn Martinez.

In narrative, Danny Martinez gave the following statement: Danny stated that the night the homicide
took place he arrived home and dropped his family off at his residence. Danny then pulled into the
parking lot of Clark Oil Gas Station which was next door to Danny Martinez' residence (on the west
side). Danny stated that he pulled into the lot of the gas station and pulled up to the air hose which was
located on the east side of the gas station's lot just off Empire Street. Danny stated that his car had a bad
right front tire that had a slow leak. Danny also stated that he was also going to get some pop for his
family because on Sundays they usually watch a movie and eat popcorn. Danny stated that he believe
the time to be around 7:30 - 8 o'clock in the evening on Easter Sunday, March 31, 1991.

Danny continued by telling me that when he pulled into the lot of the gas station he did not see anyone in
the gas station. Danny stated that while he was putting air into his tire, he heard what he thought was his
car backfiring. Danny finished putting air into his tire and started towards the station. Danny stated that
he observed a guy walking backwards out of the gas station. Danny stated he heard his car backfire and
he turned to look at his car and when Danny turned back around he was going back to the gas station and
ran into someone and he was shocked to see me there and then he walked around the corner. Danny
started towards the gas station and he heard someone say "back up." Danny stated that he turned and it
was a police officer.

According to Danny, the police officer asked if Danny had seen anything and Danny stated yes and
explained that a guy had just went around the back of the gas station. Then a truck pulled into the gas
station lot and the police officer told the truck driver to leave the lot. The police officer then told Danny
to get back in his car and go home, since Danny lived next door.

Danny described the guy that was backing up was 5'09" to 5'10", brownish-blonde hair a ball cap on and
he had on a spring jacket and had both his hands in his pockets. Danny stated that he was approximately
3 feet in front of the guy that came out of the gas station.

Danny Martinez stated that he does not know Jamie Snow and would not be able to identify Jamie Snow
in a crowd, because he does not know Jamie Snow.

I showed Danny Martinez three sketches made by Detective Thomas Sanders. The first sketch was the
one Danny Martinez did. The second sketch was one based on the description by Geraldo Guttierrez,
and the third sketch was based on the description by Gloria Luna (from an armed robbery in December
1990, around Christmas time). I then asked Danny to point to the sketch that best resembles the suspect
he observed leaving the gas station. Danny pointed to his sketch. I then asked Danny to point to the
sketch that next best resembles the suspect. Danny pointed to the sketch by Gloria Luna. Danny thought
the sketch by Guttierrez least look like the suspect.

FILED
JAN 9 - 2008
McLEAN COUNTY
CIRCUIT CLERK

290

Bloomington Police Department                    *Narrative Supplemental Report*

Offense Description: **Homicide**                              Page 2 of 2
Primary Person Involved: **Little, William W.**              Case Number: 91002150

The tape recorded interview was concluded at 1014 hours on March 04, 1991. For additional information, listen to the tape recorded interview. R/O placed the tape recorded interview into evidence on March 19, 1999.

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MC LEAN

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 99 CF 1016 |
| ) | |
| **James Snow** ) | |
| ) | |
| Defendant. ) | |

### BPD Interview of Danny Martinez March 4, 1999

DC:    Detective Dan Cats
DB:    Detective Barcus
DM:    Danny Martinez


DC:    This is a tape recorded interview in reference to case number 91-0-0-2-1-5-0 homicide case the victim involved is uh, William Little. The person being interviewed is Danny Martinez M-A-R-T-I-N-E-Z. The place of the interview is, that this interview is being conducted is at uh, Mr. Martinez's residence on East Empire Street 8-0-4 Ease Empire, 8-0-3, 8-0-6, 8-0-6 East Empire. Present during this interview is Detective Rick Barcus, this is Detective Dan Cats from the Bloomington Police Department. Mr. Martinez you are aware that we want to talk to about a homicide that took place at the Clark oil station is that correct?

DM:    That's correct.

DC:    And you're also aware that this interview is being tape recorded?

DM:    That's correct.

DC:    And do we have your permission to do that?

DM:    That's correct.

DC:    Now the Clark oil station we're talkin about, where is that located

DM:    It is located west of my home.

DC:   Exactly, one, one spot west?

DM:   That's correct.

DC:   So the address then would be 8-0, 8-0-2 or 8-0-4 East Empire?

DM:   Uh, I don't know the address 8-0-2, I guess.

DC:   The police reports say 8-0-2 so it's right on the corner of Empire and Linden is that correct?

DM:   That's correct.

DC:   And would it be the northeast corner?  Southwest corner?  Southeast corner? Northwest corner?

DM:   It'd be south uh, west corner.  Northwest corner.

DC:   Northwest, northeast...

DM:   Yes.

DC:   Northeast corner.  North goes...

DM:   Oh...ok.

DC:   Towards Normal.  Would it be northeast corner?

DM:   Right.  Yes.

DC:   Ok.  Well lets try this.  You know what day, the homicide took place on?

DB:   That was on Sunday; Easter Sunday.

DC:   And in the year 19-91?

Dm   Uh, I think that's correct.

DC:   And Easter Sunday in that year was March thirty-first.  Now, specifically were you at that location on that Sunday?

Dm   Uh, that's correct.

DC:   Ok.  What I would like you to do is just narratively tell us what you were doing and how you ended up at the Clark oil station on Easter Sunday March thirty-first 19-91.

2

DM:   As I uh stated before with Detective Crow, I uh had uh arrived home from uh Easter Sunday at my mother-in-law's and uh, approximate time maybe 7-30, 8-ish, uh at that time I told my wife that I would go and get some drinks and uh fill up my uh, car the air, the tire, on the tire and uh, because I had a tire that would always go low and so I pulled up and put air in the tire.

DC:   Ok. So when you pulled into the air, to put air in your tire, you pulled into the Clark station, where is the air pump? Is it closest to the building or closest to the street?

DM:   It was more closer to the street and the side fence that was uh, beside my home.

DC:   Ok so there's a fence that separated your home and the Clark oil?

DM:   That's correct it was a 4 foot uh, fence, uh, chain link fence.

DC:   Ok so you pulled your car in, was your car facing north or south when you pulled in?

DM:   It was facing north.

DC:   And what tire was it that you were putting air in?

DM:   It was the uh right side uh passenger side.

DC:   Front passenger?

DM:   Yes, correct.

DC:   Now you're puttin air in your tire, what happened?

DM:   At that time I was putting air in my tire I heard my car backfired, what I heard, backfire and I end up putting uh finishing putting air in my tire and I start walking to the gas station to get my pop or whatever I was gonna go in the gas station for and at that time I saw a individual come out of the gas station backwards. I had uh walked maybe a couple steps and I heard my car was about to die. I heard it backfire and I turned around and when I turned around to go back to the gas station I had ran into a, someone and he was kind of uh shocked to see me there. Um, and then he walked around the corner and I, I was going toward the building and I heard someone say hey back up and I turned around and it was an officer across the street at the credit union and uh he said did you see anybody and I said yes I just saw someone right there and then uh another person went around the building. He had yelled out to a person was with a black truck next door to the building and told the gentleman to get in his truck and get out of here and that gentleman did and he asked me, I told him where I lived and he said just back up your car and go on home.

3

DC:     So after you put air in your tire you were going into the build, the business area to purchase...

DM:     A pop.

DC:     Ok and then as you're walking towards the business you observed someone backing out or did you observe someone backing out while you were still putting air in your tire?

DM:     No I observed someone backing out of the gas station door uh backwards, and at that moment like I stated that my car was about to die and it kind of backfired again and I turned around so it wouldn't die by the time I turned back around the person...

DC:     So, so you were walking towards the building when you observed someone backing out?

DM:     That's correct.

DC:     Ok and can you describe this person you saw uh observed backing out?

DM:     Uh, no I, I can describe him when I when I turned around and saw him uh he was maybe 5-9 cuz I'm 5-8 maybe 5-9, 5-10 uh brownish blonde hair, ball cap. He had uh spring jacket to me considered a spring jacket and he had both his hands in his pockets.

DC:     And then you, so you observed him backing out your car starts to stutter, sputter a little bit so you turn back to see what's goin on with your car; turn back and at the time how, you and him almost meet face to face?

DM:     That's correct. As I had stated earlier in Crow's papers we were 3 foot apart uh, uh, uh and that's where he was to me he seemed like he was kinda shocked cuz his eyes just opened up and uh that's how (Inaudible).

DC:     Then after as you're walking up, he, he, he almost walks into ya...

DM:     That's correct.

DC:     You're about 3 feet apart and you saw him go which way?

DM:     I saw him go in between the uh gas station and my uh fence and he walked towards the alley back alley (Inaudible).

DC:     When you were walking from you car towards the business did you use anybody inside the business other than the person you observed backing gout?

DM:     No

4

DC:     When you first saw the person backing out of the business, was he already out or was he at the door or?

DM:     He was at the door uh with the door like half way open.

DC:     Ok so he was partially already out when you first observed him?

DM:     Right.  Right.

DC:     And the police officer saw ya?

DM:     Uh, after I saw the gentleman and he went through the building and my chain link fence I started walking maybe 2 steps and I heard the gentleman say back up when I turned around I saw an officer across the street at the credit union and I don't know if it was the credit union back then or not and uh he said he had mentioned did you see anybody and I said yeah I just saw him and I just saw some guy just goin through the, the grass here and he says uh and I told him I live next door and he says well why don't you back up your car and uh go on home and he told the gentleman that was in the black truck or a gentleman that was by the black truck to get in his truck and get out of here.

DC:     Now when you said you heard you car backfire, what you thought might have been your car backfiring, was the black truck in the lot at that time?

DM:     Uh, I'm not sure because I was kneeling down uh on my car putting air in my tire.

DC:     Did you ever see, did you see the gentleman actually get out of the black truck?

DM:     No.  I saw the gentleman by the back black truck uh in front of the black truck.

DC:     Now was there any conversation between the police officer and that gentleman other than for him to get back in his truck and leave?

DM:     No.

DC:     Just for clarity sake, I believe you told us earlier that the black truck was up by the front of the building?

DM:     Yes it was on the…

DC:     Or was it at a pump?  At an island?

DM:     No.  No.  It was right, I don't know what the corner it would be the uh…

DC:     Southwest…

DM:     The southwest corner of the building.

5

DC:    Ok. Um, I apologize I'm trying to think of in, in the reports that you made to Detective Crow um you made some comments about what kind of shoes the person may have been wearing.

DM:    Um, I could have but I just don't remember if I mentioned to him what kind of shoes he was wearin.

DC:    So whatever he has in his report just because of time..

DM:    Right.

DC:    And how much time's elapsed you just can't remember everything in your report. In his report it says that the guy the person you observed was wearing a pair of low cut white tennis shoes?

DM:    Uh, that's correct if I had mentioned to him at that time I did notice him wearing.

DC:    Did you ever go into the gas station that night?

DM:    No I never did.

(Inaudible)

DC:    Yes. Is it possible that prior to you seeing this individual come out of the gas station, is it possible that somebody else coulda came out of that gas station before you saw the individual that you almost bumped into? I mean were you busy enough with your tire and your car that 30 seconds prior to this guy somebody could have came out?

DM:    I was stating that uh, I was kneelin down so I didn't see you know the gas station I was doin more concentration on putting air in the tire.

DB:    How long were you, how long were you maybe and I know it's been 8 years, but if you can help me with maybe a guesstimation of time. You pull into lot up at the air pump you get out of your car you start air in your tire uh, I vaguely remember the air pump being there and sometimes it works and sometimes it didn't work sometimes they didn't have the breaker switch turned on um can you give me a guesstimation of time of how long you might have been messin with your tire?

DM:    Um, be honest uh to remember that far back it's hard to say um, maybe uh if the pump was working pretty good maybe 2 minutes 3 minutes.

DC:    When you got done with your tire...

DM:    Uh-huh.

DC:   You stand up, you looked at your other tires...

DM:   Uh-huh.

DC:   And then you started towards the gas station

DM:   That's correct.

DC:   From the time you start towards the gas station and the time you bumped into or saw this individual are we talking seconds are we talking seconds? We talking 30 seconds? We talking minutes? Are we talking half hours, hour?

DM:   We're talking uh less than a minute from the time that I got up; started walking to the gas station saw this person backing out of the door by the time I turned around to see my car was gonna die turning back around seeing this individual, less than a minute.

DC:   Ok so but let me ask you this. From the time you finished with your car.

DM:   Umhmm.

DC:   Checking your car tires and you start towards the gas station how many seconds or minutes did it take for you to observe the guy coming out of the out of the not to the end but the first time you saw him.

DM:   Um by the time I turned around towards the car when it was dying. Is that what your question is?

DC:   No what I'm saying is when you when you left your car...

DM:   Right.

DC:   And starting walking towards the gas station.

DM:   After I put air in the tire?

DC:   After you put air in the tire. Did you see him comin, backing out of the gas station door.

DM:   That's correct.

DC:   And then you turned around because your car was going to die.

DM:   Right that's correct.

DC:   And then you started walking.

DM:    Right.

DC:    Ok.  My question is from the point that you left your car...

DM:    Right.

DC:    After airing your tires up, to the first time that you see him backing out of the gas station.

DM:    Less than a minute.

DC:    Ok are we, I don't, I don't think we're communicating here.

DM:    You're saying the first time that I got up to go towards the gas station after I put the air in the tire...

DC:    And you saw him coming back out.

DM:    And I saw him coming out...

DC:    Were you walking for a minute?

DM:    O no, I mean...

DC:    Were you walking for 5 seconds?  10 seconds?

DM:    Ok less than uh I figure maybe 10 seconds not even 10 seconds 5 seconds 3 seconds because...

DC:    It's almost immediate.

DM:    Right it was just like 2 steps 3 steps and then my car starts dyin and I turned back around...

DC:    So within a step within 3 steps you see him comin out the door...

DM:    Right.

DC:    Your car's almost gonna die so now you turn around and look at your car

DM:    That's correct.

DC:    And then you look at that for a few seconds?

DM:    Uh maybe a second to see if it was gonna die2 seconds you know.

8

DC:    And then you turn around and start walking?

DM:    Right.

DC:    And that's when you bump into him?

DM:    And that's when he, I turned around and he was there and he...

DC:    So honestly you're talking probably less than 30 seconds?

DM:    Yes.

DC:    From the time you started towards the gas station; you see him; you turn around and look at your car you walk forward you bump almost bump into him is 30 seconds or less?

DM:    That's correct.

DC:    It it's a very short period of time.

DM:    That's correct.

DC:    Ok.  Do you know a person by the name of Jamie Snow?

DM:    Uh no.  I never met the person, but I've heard the name around town.

DC:    You've never seen his face that you're aware of?

DM:    That I'm aware of I have never seen his face.

DC:    You just heard his name.

DM:    I've seen I don't know if uh Detective Crow had shown me pictures of him or uh if uh he was one of the guys in the lineup that I had uh, uh done but uh otherwise I as far as my memory...

DC:    If a person walked in here right now you would not be able to tell me if that's Jamie Snow or not?

DM:    No.

DC:    Ok.

DB:    So you, prior to this incident happening at the Clark station you didn't know Jamie Snow from Mary Blue?

9

DM:    No.

DC:    So you would have never told any police officer or any detective or anybody that would have asked you about this person that you saw at the gas station you wouldn't have said well that's, it could have been Jamie Snow because I know Jamie Snow.

DM:    That's correct, but with me I know people by their faces but not by their name.

DC:    Ok did you know this face?

DM:    No. Not at all.

DB:    I want you to think Danny, when you pulled your when you pulled your vehicle into the lot, did you look into the uh business area of Clark oil? The office area.

DM:    As far as I remember I don't think so. I just pulled it up and got out but

DC:    So you don't you don't know you can't say if you saw anybody in there at that time when you pulled your car in?

DM:    That's correct as I stated before that the front of the building on uh was boarded up and they had plywood all the way to the in front of the class area and uh if I woulda looked over there I probly wouldn't have saw anybody over there because of the boarded up...

DB:    Now you're saying the boarded up area, that would be the east portion of the building?

DM:    Uh that's correct.

DC:    Towards your house?

DM:    That's correct; towards my house.

DB:    When you got out, when you came to Clark's; pulled in the lot, do you remember by chance if there was any other vehicles sitting there on the property?

DM:    Uh,

DB:    At the gas pumps or any place at all?

DM:    No. Not at all. I don't, I don't think I re, you know I don't remember if there was something you know there, but like I had mentioned I remembered seeing the truck when I was walking towards the building you know and the gentleman in front of the truck you know at that at that same time when I say the gentleman back up, I don't know if he had just pulled up or you know and got out of his truck.

10

DC:     And the reason you were at Clark oil, I think we went through that earlier is, I don't know if it's on tape or not, but you had dropped your family off and you always a show on Sunday night.

DM:     That's...

DC:     It was it was...

DM:     We watched a program we, me and my wife had talked about it we don't remember what program uh every night I don't know if it was 8-ish or 9, 9 o'clock but we would watch the program and I would always head over to the gas station and get some sodas and uh we'd make popcorn and eat down here and uh I was saying that there was a gentleman that was always in there his name was Danny and uh and that's the reason why I was over at the gas station, also to put air in my tire for the next morning for work.

DC:     So I take it you were at the gas station numerous times each week?

DM:     Yeah. I would go to the gas station like maybe oh man um, uh on average maybe uh to put air in my tire, my tire would always be low uh maybe 3 times a week. It could have been less it could have been you know more times.

DC:     The attendant that night Billy Little you know is the victim...

DM:     That's correct.

DC:     You've prolly seen him in there before?

DM:     Yes I have uh he used to work the uh I think night shift or you know some days and stuff. I uh I knew a gentleman that always I mean would work there Steve I think his last name is (Inaudible) I went to high school with that uh also worked.

DB:     If I were to ask you, would, would you say the guy had his hands in his pockets...

DM:     That's correct.

DB:     Would you be able to tell me if he was carrying the average jacket or did he just have his hands in his pockets?

DM:     Um, I would say he had his hands like in his pockets like he was had a fist or you know you know I mean he coulda been carrying something or he just you know, but I remember his hands bein in his pockets.

DB:    Lets ask it this way, you remember the night you remember what kind of evening it was temperature wise, it was March 31, did it seem odd that somebody had there hands in their pocket like that?

DM:    Um, no I mean cuz I always put my hands in my pocket you know.

DC:    What, what kind of coat were you wearing that night?

DM:    I don't remember I don't recall what I was wearing that day uh it must, it must have been dress up clothes because we had just gotten back from my mother-in-law's for Easter Sunday and uh we usually have dinner there or…

DB:    Was it cold out?

DM:    No it wasn't it was uh nice spring day uh, uh to me it was a nice spring day I mean it wasn't winter like we have up here you know…

DB:    We've talked about or you've talked about this guy wearing a spring type jacket…

DM:    That's right.

DB:    The person you saw wore a spring type jacket. If I were to ask you about a black leather motorcycle zip up type jacket, is that possible what he had on?

DM:    Uh…

DB:    And if you don't know I…

DM:    I, I ya know right I can't say uh yes and i can't say no because uh it just happened so quick and I can remember having you know a spring jacket on; he had a spring jacket on.

DB:    If, if the person would have been carryin the cash drawer could he have been carryin a cash drawer under his coat with the way his hands were and his coat was? I mean is it, is it possible?

DM:    Yes I think I had uh had mention to Detective Crow because he asked the same question and I, I think that uh it's possible that he could of cuz I don't know how heavy this guy was because it was a loose spring jacket.

DB:    Did you have, when you guys were about 3 feet apart was there any conversation like hi or anything like that between you and the person?

DM:    No. If I, I don't recall, but uh like I said he was shocked that I was there cuz his eyes opened up like this guy was you know maybe uh surprised.

12

DB:    Is there anything you would like to ask us?

DM:    Yes. I would like to know if why uh that we're doing all this uh pages uh again after I've told my story so many times.

DB:    Sure. Sure. I don't blame you for askin. Um (Inaudible) told you there was just like whenever somebody does one thing it not everything gets reduced to writing. They might know it up here, but it's not down there ok. When uh Detective Crow retired he was in charge of this case up until he retired. When he retired it was reassigned to Danny and myself. We don't know what was up there and Detective Crow was a good investigator, but Danny and I don't work that way. Detective Cats and myself, whatever you tell us like we're doin a tape recorded statement that's gonna be transcribed so that there's no ifs ands or buts about what was said or and there's no information that somebody might have up in their brain that's not down on a piece of paper. So that's why, what we're doin and um the other reason is consistency. We're goin back and interviewin every person that we think is important in this case. There's some that probly aren't important, but we still wanna interview them. The State's Attorney's Office has asked us to tape record those interview that way if there's ever a closure on this case and we hope there is, the jury can hear your own, the person's own voice tell their story instead of myself or Detective Cats; well Mr. Martinez said this or Mr. Martinez said that and Mr. Martinez said this and then your reaction is no, I didn't say that, this is what I said, the Detective may have implied that so this the why. It's for your benefit. It's definitely for our benefit by far um there was some things in our conversation briefly on Friday and today that we weren't aware of uh a prime example distance wise of uh of how things went so uh it's (Inaudible) and we really do appreciate you cooperation uh hopefully next time we have to do something like is to show you a picture and say is this the guy?

DM:    Yeah.

DC:    Plus the fact that I have not really been involved in this case since the beginning I mean I just involved here recent, very recently and I have never sat down and talked wit yo about this case and more or less after 8 years, what we're doing is starting at the beginning going through and trying to put it together so that we can come to a conclusion in this case some day and for me to, to work this case and not talk to everybody that's involved in the case is unfair to me and we're just tryin to get this thing solved so that's why it's important that we sit down and talk with you cuz I asked you questions (Inaudible).

DM:    What also gets me is that why that this person in this black truck was told to get out of there and not found or interviewed.

DB:    We would, we would like to know that answer too.

DM:    And another thing I wanted to say is that I don't know who called Mrs. Little to have her call me I mean that was I mean, I mean I know that her son was involved and uh I know Easter's comin around the corner and she's goin through a hard time right now I mean coulda returned your phone call towards me and you know mentioned something to me...

DB:    And I, and I, and I did and I tried doin that and I'll have to take responsibility for that and I'll explain to you a little bit later about what transpired there, but I did remember somethin I wanna talk to you about. I wanna show you 3 drawings and what I would like you to do is look at these 3 drawings and tell me if you had to pick 1 of these 3 drawings as being the person you saw now granted 2 of 'em have some kind of a hat on and 1 of 'em doesn't, but if you had to pick which 1 would you say, this is the person I saw?

DM:    The middle 1.

DB:    Alright and this is the 1 that was uh taken actually it's got those aren't your initials prolly but it does say D-M and I talked to the person who did the composite and uh he said that stood for Danny Martinez.

DM:    That's correct.

DB:    Ok now there's 2 left...

DM:    If he had his mustache shaved, this would be the person. Um and I don't know with the hat you know.

DB:    Ok and that's a composite that was done on January 13 so prior uh 19-91 prior to uh the shooting at the Clark oil ok. So you're saying these 2 are the closest. This one is the best, this is next and the third 1 I mean does that even resemble the person that you saw?

DM:    Uh, his chin is too...

DB:    Narrow?

DM:    Narrow. You know and he would look like a colored person you know.

DB:    Dan do you have anything else?

DC:    No. I just wanna thank you for uh letting us come out today

DB:    Danny I sure appreciate it um I gotta say a couple things on this tape recorded interview real quick number 1 is this interview started at 9-45 A-M on March 4, 19-99 and the time that this interview concluded is 10-14 A-M March 4, 19-99 and Danny one last thing I know Danny is the name you go by, but what is your legal name.

14

DM:   My legal name is Donicio Martinez.

DB:   Thank you.

DM:   Uh...

End of Tape

15

**BLOOMINGTON POL**

**POLICE SUPPLEMENTAL CASE REPORT**

| | 1. Page | of | 2. Case No. |
|---|---|---|---|
| | 1 | 3 | C91-002150 |

Supervisory Correction No. 2 or 3

Title: rder/ Armed Robbery

5a. Responsible Party

5. Victim Name (or if Business list incorporated Name)
Little, William

BLOCK SPACE | NARRATIVE:

...rs will otherwise be used to further detail sequence of events or to expand on ...form number. List the value of stolen/recovered property only in block six (6).

List name, I.D. number, and description of all arrested subjects.

N

On 06-21-91 at 0900 hours, an in person line-up was conducted by the Bloomington Police Department in the McLean County Jail. Present during the line up in the viewing room were Detectives Crowe and R. Thomas, Tina Griffin of the States Attorney Office, and Dick Koritz of the Public Defenders Office. Also present during the line-up were Detectives McKinley, Bagnell, and Agent J.T.Cox of the State Police, DCI.

The witnesses waited in the lobby to the Sheriffs Department and were brought to the viewing separately by Detective R. Thomas.

The first witness to view the line-up was Gloria Jean Luna, who was previously employed at the Clark Oil, 802 E. Empire,when it was robbed on 12-26-90. Ms. Luna was escorted to the viewing room by me and introduced to Detective Crowe who advised her how the line-up procedure would be performed. Detective Crowe advised her that after each person in the line-up had stepped forward and turned around, she may ask to have anyone in the lineup step forward a second time. After the line-up was performed, Detective Crowe asked MS.Luna if she wanted anyone to step forward a second time. She stated no. We then escorted Ms. Luna outside of the interview room, along with Ms. Griffin and Mr Koritz and Detective Crowe asked her if she recognized anyone in the line-up. Ms. Luna stated no. I then escorted her to a separate room away from the other witnesses and advised her not to leave the room or speak to anyone about the line-up.

6. Initial Officer's Name, PE, Date

FILED
JAN 9 - 2008
McLEAN COUNTY
CIRCUIT CLERK

| 7. Initial Officer's Status | 8. Recommended to Continue | 9. Field Supervisor's Name, PE, Date |
|---|---|---|
| XX Active ☐ Suspended ☐ Unfounded ☐ Cleared | ☐ Field XX Investigative | |
| 10. Assigned Investigator's Initials, PE, Date Det. R. Thomas 2267 06-22-91 | 11. Final Status (Investigative Coordinator) | 12. Date of Offense |

**BLOOMINGTON POLICE DEPARTMENT**                    **POLICE SUPPLEMENTAL CASE REPORT**

| | | 1. Page | of | 2. Case No. |
|---|---|---|---|---|
| | | 2 | 3 | C91-002150 |

| 3. Offense | |
|---|---|
| Murder/ Armed Robbery | 4. Supervisory Correction No. 2 or 3 |

| 5. Victim Name (or if Business list incorporated Name) | 5a. Responsible Party |
|---|---|
| Little, William | |

| BLOCK SPACE | NARRATIVE: N = narrative for use in block space, block numbers will otherwise be used to further detail sequence of events or to expand on any information in any block. List the property form number. List the value of stolen/recovered property only in block six (6). List name, I.D. number, and description of all arrested subjects. |
|---|---|

| N | The next witness was Carlos Luna who was taken to the viewing room and shown the same line-up. After the line-up was performed, Detective Crowe asked Carlos Luna if he wanted to view anyone a second time. He asked to look at #6 (Jamie Snow) again. After the second viewing, Carlos was escorted out the room and asked by Detective Crowe if he recognized anyone. He stated that #6 (Jamie Snow) looked like the person. Crowe asked him if he was sure and describe what made him look like the person that he seen leave the gas station. Carlos stated the shape of his face and his hair looked the same. Detective Crowe then advised him that he did not have to pick anyone just because he was shown the line-up. Carlos was then asked if he was sure or if the person he picked just looked like the person he had seen. Carlos Luna stated "I think he is the person". Carlos was then escorted to the room where his aunt, Gloria Luna was at and both were advised not to talk to each other about the line-up. |

|   | The third witness taken to the viewing room was Carlos' brother, Juan "Johnny" Luna.  He was shown the same line-up and was unable to make an identification. He was then taken to the room with his brother and aunt and they were allowed to leave. |

|   | The next person taken to the viewing room was Geraldo Gueterrez who was also unable to identify anyone from the line-up. |

| 6. Initial Officer's Name, PE, Date | |

| 7. Initial Officer's Status | 8. Recommended to Continue | 9. Field Supervisor's Name, PE, Date |
|---|---|---|
| ☒ Active ☐ Suspended ☐ Unfounded ☐ Cleared | ☐ Field ☒ Investigative | |

| 10. Assigned Investigator's Initials, PE, Date | 11. Final Status (Investigative Coordinator) | 12. Date of Offense |
|---|---|---|
| Det. R. THomas 2267 06-22-91 | | |

BLOOMINGTON POLICE DEPARTMENT                    POLICE SUPPLEMENTAL CASE REPORT

| | | 1. Page | of | 2. Case No. |
|---|---|---|---|---|
| | | 3 | 3 | C91-002150 |

urder/ Armed Robbery                    4. Supervisory Correction No. 2 or 3

5 Victim Name (or if Business list incorporated Name)                    6a. Responsible Party
Little, William

BLOCK SPACE | NARRATIVE: N = narrative for use in block space, block numbers will otherwise be used to further detail sequence of events or to expand on any information in any block. List the property form number. List the value of stolen/recovered property only in block six (6). List name, I.D. number, and description of all arrested subjects.

N

    The last witness shown the line-up was Danny Martinez. After view-
ing the line-up, he asked to see numbers 3&4 again. He was escorted out
of the room and asked if he could recognize anyone. He stated #3 looked
like the person, but was not positive.

    At that point I advised Detective McKinley that the subjects in the
line-up were done .

    The following persons participated in the line-up:

(1) Kelly,Randall C.  W/M DOB 06-18-68  Hgt 6'   Wgt 155 lbs

(2) Piwonski, Jeff A  W/M DOB 04-17-62  Hgt 6'   Wgt 175 lbs

(3) VanNote, Steven E  W/M DOB 05-18-65 Hgt 6'   Wgt 160 lbs

(4) Renfro, Charles    W/M DOB 04-04-63 Hgt 6'   Wgt 165 lbs

(5) Hanshaw, Tony J.  W/M DOB 05-19-61 Hgt 6'   Wgt 165 lbs

(6) Snow, James C.    W/M DOB 01-13-66 Hgt 6'   Wgt 165 lbs

    It should be noted that Charles Renfro had agreed to participate in the line-up.
Renfro had been talked to by Detective Sgt Irvin in reference to this case.

(See LEAD # 38-A and #116-A)

6 Initial Officer's Name, PE, Date

7. Initial Officer's Status                    8. Recommended to Continue          9. Field Supervisor's Name, PE, Date
XⓍ Active  ☐ Suspended  ☐ Unfounded ☐ Cleared   ☐ Field  XⓍ Investigative

0. Assigned Investigator's Initials, PE, Date              11. Final Status (Investigative Coordinator)   12. Date of Offense
Det.R. THomas 2267 06-22-91

Exhibit 8

AFFIDAVIT OF Carlos Luna

I, Carlos Luna under oath
and penalty of perjury, state
as follows:

1. My name is Carlos Luna, my
date of birth is 11/19/76, I
live in the state of Arizona.

2. In 1991 I lived at 807 E.
Empire street, Bloomington,
Illinois, I was 14 years old.

3. On march 31, 1991, I was at
home in my bedroom, in the
northwest corner of the House.

4. Approximately at 7:30 pm I looked
out of my bedroom window, I
observed a male white, Approximately
5'11, thin build, dark brown
hair, wearing a black baseball
cap, a black trench coat, and
blue Jeans,

5. I observed he opened the door
of the gas station and walked

CL

east along the gas station
to the end of the building
then turned North and ran
towards the alley. I lost
sight of him at this point.
I also observed that he had
something under his right
arm. I am not able to
describe what he was carrying

6. I do not recall how much
time expired from my observation
to when the police arrived.

7. It was about 1 1/2 hours
before the police came to
interview the neighbors.
I spoke to the police at this
time with my nephew Juan
Luna Junior. I told the
police what I had observed.

8. Several days later I was
contacted by the Bloomington
Police Department to do a line
up & make sketches of the
subject I observed.

CL

9. I did a lineup at this time and chose the person who was Number 6. He was the person who best fit the description of who I originally observed. At 14 years of age and at a distance of about 200 feet I can not say that I am sure that Jamie Snow is the person who I observed.

10. In August, 2000 a Bloomington Police Detective came to Phoenix to interview me and I was told that it was a deposition, this was recorded

11. In January, 2001 I did not know that the Susan claycomb trial and the Jamie Snow.

12. At the Jamie Snow trial I observed Jamie sitting at the defense table wearing shackles. I know he was the defendant, he was not

CF

exactly what I had observed
but he was similar to this
Person

13  As a 14 year old I thought
the Police had caught the
right Person, because of
this I identified JamieSnow.

14  I am Not sure that I
identified the correct Person.
I can Not be sure from a
distance of 200 feet that
I could Identify his face

This affidavit is true and correct
to the best of my knowledge.
No Promises or threats were
made in exchange. If called
to testify, I could do so
competently and would testify
consistent with this affidavit
Dated January, 24, 2010

Subscribed &
Sworn 1/24/10                Carlos Luna

NOTARY PUBLIC
OFFICIAL
SEAL
STATE OF ILLINOIS
LARRY E. BIELA
MY COMMISSION EXPIRES
JUNE 25, 2011

Notary Public

1        A.    If I remember correctly, that is the time we were

2   sent to the area, yes.

3        Q.    Okay.  And it took you a period of a very few

4   minutes to arrive at that location and, in order to see what

5   you've previously testified that you saw?

6        A.    Yes, sir.

7        Q.    Nothing further.

8             THE COURT:  Mr. Skelton, anything further on that?

9             MR. SKELTON:  No.

10            THE COURT:  All right.  You may step down, thank

11   you.

12            (Witness excused)

13

14                     (Witness sworn)

15

16                     THOMAS EDWIN SANDERS,

17   called as a witness on behalf of the People herein, having

18   been first duly sworn, was examined and testified as follows:

19

20                     DIRECT EXAMINATION

21   BY MR. REYNARD:

22        Q.    I need just a moment, judge.  Would you state your

23   name please?

24        A.    Thomas Edwin Sanders.

FILED

McLEAN    JAN 9 - 2008    COUNTY

CIRCUIT CLERK

Exhibit 9

1        Q.   And what is your occupation, sir?

2        A.   I'm detective for the city of Bloomington Police

3   Department.

4        Q.   And how long have you been employed by the city of

5   Bloomington Police Department?

6        A.   About twenty four years.

7        Q.   And what is your current assignment?

8        A.   I am in the criminal investigations division, the

9   forensic and crime scene unit.

10       Q.   And with respect to the forensic and crime scene

11   unit, do you have any particular education and training,

12   which is pertinent to that assignment?

13       A.   Yes, I do.

14       Q.   And what is your basic educational background?

15       A.   I have a Bachelor of Science degree from Illinois

16   State University.  I --

17       Q.   And in what field?

18       A.   Criminal justice.

19       Q.   And with regard to your training, have you

20   participated in, in numerous trainings over the last, well,

21   over the time that you were first employed by the city of

22   Bloomington Police Department?

23       A.   I have.

24       Q.   Okay.  With regard to your current assignment, as

1    part of the forensic and crime scene investigations unit,

2    what, if any specific training, have you had?

3        A.    I trained at the FBI academy, the Scottsdale

4    Artists School, the John Reed College, the Northwestern

5    University, now center for public safety, Midwest Organized

6    Crime Intelligence Center, the -- let's see, I think that's

7    probably the main ones.

8        Q.    Okay.  Now, with regard to that training, what

9    training is -- let me back up for a minute -- have you

10   received training with regard to a drawing to what we refer

11   to as composite drawings?

12       A.    Yes, I was trained in forensic art at the FBI

13   academy and at the Scottsdale Artists School.

14       Q.    And have you received any certifications pertinent

15   to your being a forensic artist?

16       A.    Yes, I have.  I'm -- I was certified by the

17   International Association for Identification and Forensic

18   Art.

19       Q.    And have you also been certified as an instructor

20   of forensic art by the Illinois Law Enforcement Training and

21   Standards Board?

22       A.    I have.

23       Q.    Have you lectured on numerous occasions with regard

24   to forensic crime scene investigations as well as forensic

1   art?

2       A.   I have.

3       Q.   Could you tell the Ladies and Gentlemen of the Jury

4   what they, what the, the basic process is for preparing

5   composite drawings?

6       A.   Yes, I could.  A composite drawing or sketch as

7   it's sometimes called --

8            MR. SKELTON:  Excuse me, Tom, and I'm sorry, could

9   you ask the witness to kind of turn the microphone a little

10  bit?  It's hard to hear him.

11           THE COURT:  Okay.

12      A.   A composite drawing or sketch is, it's sometimes

13  referred to, is prepared from the descriptions given by a

14  victim or witness.  The main purpose is to eliminate broad

15  segments of the population and hopefully, to focus in on what

16  a given unknown suspect looks like so that he can be

17  apprehended.  It's -- in this case, it was hand drawn.  We

18  now computer generate also.  It involves, I guess you would

19  say, the, the, quote, secret of it all, involves what we call

20  commuted interview technique.  That's how we get that image

21  from a witness or a victim's mind on to the computer screen

22  or a piece of paper, and special non-suggestive ways of

23  getting that information so that we can prepare that drawing,

24  and then if it is judged to be a reasonable likeness, it can

1    be released then to the public.

2         Q.    Okay.  With regard to the, I guess, the, the

3    artistry that you performed or that was characteristic of

4    the, of the field of forensic art back in 1991, was that by

5    hand drawing?

6         A.    Yes, sir.

7         Q.    Okay.  Was computer aided drawing available back at

8    that time?

9         A.    No.

10        Q.    So as I understand it, you speak with a witness

11   according to a certain interviewing technique, and secure

12   information that you record in the form of pictures?  Is that

13   correct?  Or features, features on a picture?

14        A.    Yes.  In a case of hand drawn composites, I was

15   trained to work with two identical catalogs, one that the

16   witness would use, and one that I would use.  It consisted of

17   about 13 characteristics or was divided into 13

18   characteristics where they would collect, like -- well, it

19   would be photographs.  Now, it's in data bases, but then they

20   would just, from the micro to the macro kind of taxonomy or

21   arrange, if you will, for instance, noses from smaller to

22   larger to, or they might be longer or whatever in the

23   catalog, and that witness would, would go through for each of

24   those features and pick out a characteristic that was close

1    to or similar to what the suspect had, and then I would, with

2    the identical catalog, would draw that.  We would put them

3    all together, just like -- but we would compose one feature

4    from many features that were selected by the witness.  Then,

5    using special paper and erasers and pens, those features

6    would be altered according to that, the way that witness

7    wanted, wanted them altered if they weren't exactly correct,

8    so at the end of the, the, the session, we would have

9    hopefully a reasonable likeness of a suspect.

10            MR. REYNARD:

11        Q.   Directing your attention to March thirty-one, 1991,

12    or perhaps the early morning hours of April one, 1991, were

13    you assigned to visit with several witnesses concerning

14    descriptions that they might give you that might result in

15    your being able to prepare a composite drawing of the

16    suspect?

17        A.   Yes.

18        Q.   And we're referring to the suspect in the shooting

19    death of Bill Little at the Clark station on that Easter

20    Sunday evening?

21        A.   Yes.

22        Q.   And who was it that you first spoke to that

23    evening?

24        A.   Mr. Martinez.

1          Q.    And that would be Danny Martinez?

2          A.    Yes.

3          Q.    What procedure did you follow with Danny Martinez

4    with regard to securing information from him and drawing a

5    picture?

6          A.    Well, I interviewed Mr. Martinez, using the

7    cognitive interview technique, and with his help, I prepared

8    a composite sketch that we referred to as composite sketch

9    number one.

10         Q.    Your Honor, is that already in evidence now?

11               THE COURT: Do you know the number?

12               MR. REYNARD:    Twenty -- twenty-one.

13               THE COURT:    Twenty-one is admitted.

14               MR. REYNARD:    Okay.  Would you project number 21

15   please.  I'm going to show you what's in evidence marked as

16   People's Exhibit Number 21 and ask if you recognize that

17   item.

18         A.    Yes, I do.

19         Q.    And what is it?

20         A.    This appears to be a, a copy of the sketch that I

21   prepared.

22         Q.    With who?

23         A.    Mr. Martinez, I believe.

24         Q.    Okay.  And does it bear the number that you earlier

1    referred to as composite number one?

2         A.    Yes.

3         Q.    And does Mr. Martinez's initials appear on there as

4    also an identifying marking?

5         A.    Yes, next to my initials and badge number on the

6    bottom line.

7         Q.    Am I pointing first of all at the number of the

8    composite here?

9         A.    Yes, sir.

10        Q.    Number one, and then two lines down, there are some

11   illegible initials here.  Whose initials are those?

12        A.    Those are mine.  That's a TS 1856.

13        Q.    Thank you.  And next to that, in the, in the bottom

14   right-hand corner of the, of the exhibit are two more

15   letters.  What are those letters?

16        A.    Those are the initials of Mr. Martinez.

17        Q.    How long did it take you and Mr. Martinez,

18   Mr. Martinez to discuss the imagery that he was conveying to

19   you that resulted in this drawing?

20        A.    Roughly a half hour.

21        Q.    Okay.  And approximately what time was it, if you

22   can recall, that you were meeting with him?

23        A.    I believe it was late night.  I don't remember the

24   exact time.

1          Q.   Very good.  And you were speaking to him because

2    you had been advised that he saw a suspect shortly after

3    eight o'clock, and that might be the person that was involved

4    in the shooting death of Mr. Little?

5          A.   Yes.

6          Q.   Who did you speak with after you spoke with

7    Mr. Martinez?  Would looking at the drawing refresh your

8    memory?

9          A.   Yes.

10         Q.   I'll show you People's Exhibit Number 22, Your

11   Honor.  Is that in evidence as well?

12              THE COURT:  Twenty-two is admitted.

13              MR. REYNARD:

14         Q.   Would you project 22 please.

15         A.   Yeah, yes.

16         Q.   Mr. Gutierrez, you spoke with?

17         A.   Mr. Gutierrez, yes.

18         Q.   And did you follow the basic same procedure with

19   Mr. Gutierrez, employing the same techniques, using the

20   catalog of features and, and basically talking back and

21   forth, drawing and erasing and correcting and as you earlier

22   indicated?

23         A.   Yes.

24         Q.   Okay.  And with regard to People's Exhibit Number

1     22, is that the drawing, excuse me, that you were able to

2     produce with the assistance of Mr. Gutierrez?

3          A.    Yes.

4          Q.    And with regard to People's 21 and People's 22, are

5     these fair and accurate copies of the original drawings which

6     you actually drew?

7          A.    They appear to be, yeah.

8          Q.    And now, with regard to Mr. Gutierrez, could we put

9     Mr. Gutierrez back?  You've similarly indicated a composite

10    number on this drawing as well, is that correct?

11         A.    Yes.

12         Q.    And what is the composite number that you

13    designated this drawing?

14         A.    Two.

15         Q.    And your initials are in a similar location,

16    actually the, the numbers?

17         A.    Yes.

18         Q.    And you've written out the name Gerardo Gutierrez

19    in the bottom right-hand corner?

20         A.    He did that.

21         Q.    He did that?

22         A.    In lieu of his initials.

23         Q.    And you spoke to Mr. Gutierrez because you had been

24    advised that he saw someone at some point after eight o'clock

1    that evening as well?

2         A.   Yes.

3         Q.   Okay.   If you had known that he had seen somebody

4    an hour beforehand, would he have been a subject to employ to

5    make a drawing?

6              MR. SKELTON:  Objection, Your Honor.  It calls for

7    a conclusion.

8              THE COURT:  Mr. Reynard?

9              MR. REYNARD:  I think the question speaks for

10   itself.  I think it's pertinent.

11             THE COURT:  I'm going to allow the question.

12        A.   Again, sir.

13             MR. REYNARD:  If you had known that Mr. Gutierrez

14   had seen someone an hour earlier than the time at which Bill

15   Little was shot and killed, would you have been doing this

16   drawing with this person?

17        A.   Based upon that information alone, probably not.

18        Q.   Okay.   Mr. Sanders -- excuse me, Detective

19   Sanders, you also had a role in handling of evidence,

20   transporting it to and from the lab.  At this point, I'm not

21   going to be asking you any questions about that because I

22   think we've reached a stipulation, but at this point, Your

23   Honor, no further questions.

24             THE COURT:  Okay, Mr. Skelton.

1                        CROSS EXAMINATION

2    BY MR. SKELTON:

3        Q.   On either March thirty-first, which is I believe

4    the date that was indicated on number two, with Gutierrez

5    composite, for lack of a better term, or on April first

6    before noon of 1991, did you ever have a meeting with a

7    person known to you or introduced to you as Carlos Luna?

8        A.   Yes.

9        Q.   Did you go through the same procedure with him?

10       A.   No.

11       Q.   Why not?

12       A.   In interviewing him, I -- as I recall, he didn't

13   think that he could provide enough information to complete an

14   effective composite.

15       Q.   If I am sitting in your office with you, you're

16   basically going to ask me oral questions, and from my oral

17   responses, you're going to try to translate those words or

18   the images that I've got in my mind that are being described

19   by the words into a drawing?

20       A.   Yes, sir.

21       Q.   So for instance, if I were to, describing you to

22   you, I would suggest that you have a beard and a moustache,

23   your hair is parted on the left side, it's cut above the

24   ears.   I might give a description of the shape of your face,

1    the shape of your eyes, the shape of your nose, the shape of

2    your ears, the shape of your mouth, the shape of your whole

3    head, and you would use those details in an effort to, to

4    match once again your drawing to my oral description?

5        A.    Essentially.

6        Q.    And would it be fair to state that the more precise

7    those facial characteristics or features can be described to

8    you, that is helpful to you?

9        A.    Oh, sure.

10       Q.    So if I just came in, and I'm not talking about you

11   here, and said that the guy that I saw was ugly, that doesn't

12   help you very much, does it?

13       A.    No.

14       Q.    Beauty is in the eye of the beholder, and ugly

15   could be a thousand different things.

16       A.    Yeah.

17       Q.    And how much time did you spend with Mr. Luna?

18       A.    I don't remember exactly.

19       Q.    A long enough time in, to satisfy yourself that you

20   didn't have enough to work with?

21       A.    That would be fair to say, yeah.

22       Q.    Excuse me a minute.  Now, in comparing that

23   session, that interview with the other two persons, that

24   being Mr. Martinez and Mr. Gutierrez, you -- your opinion

1   about your ability to attempt to put together a composite

2   differed?

3       A.   Yes.

4       Q.   Referring to People's Exhibit Number 22, Tom, you

5   have got a baseball type cap on that picture, that drawing,

6   correct?

7       A.   Correct.

8       Q.   You could, from experience, if you wanted to, put

9   the bill of that cap down lower on that forehead, could you

10  not?

11      A.   Only if the witness told me to.

12      Q.   I'm just talking about if you had the physical

13  ability.

14      A.   Oh, yeah.

15      Q.   To, to lower that -- this, we go -- ran it up here

16  or something -- to lower that bill on the forehead, is that

17  correct?

18      A.   Of course, yeah.

19      Q.   And it would appear on that exhibit that is now

20  depicted on the screen there is a scar in the lower left-hand

21  portion of the chin of that person?

22      A.   Yes.

23      Q.   Which was described to you?  You don't make these

24  things up?

1        A.    No.

2        Q.    And there is an earring in the left ear, correct?

3        A.    Correct.

4        Q.    And there's a moustache?

5        A.    No --

6        Q.    You have to answer out loud, excuse me.

7        A.    Yes.    There's a moustache.

8        Q.    It's not a full beard like you have?

9        A.    No.

10        Q.    And it's not mutton chop sideburns or any sideburns

11   really below the mid level of the ears on that drawing,

12   right?

13        A.    Correct.

14        Q.    Would you ever -- were you ever given by any of the

15   three persons that we've earlier named, that being Martinez,

16   Gutierrez, and Luna, given a description of a white female

17   with red hair by any of those three people?

18        A.    No.

19        Q.    I don't have any other questions.    Thank you, Tom.

20             MR. SKELTON:    What page have you got there,

21   Charley?

22             MR. REYNARD:    Sixteen.

23             MR. SKELTON:    Sixteen?

24             MR. REYNARD:    Yes.

REDIRECT EXAMINATION

BY MR. REYNARD:

Q. Detective Sanders, did -- with reference to the questions Mr. Skelton asked you concerning your conversation with Carlos Luna, did you show him the two composites which had already been drawn which are now in evidence as People's Exhibit Number 21 and People's Exhibit 22?

A. Yes, I did, and he chose number one as looking like the person that he had seen.

Q. Would you put up 21 please? Is People's Exhibit 21, the one, the image that's also projected on the screen, the, the drawing that Luna told you to, looked most like the individual that he saw?

A. That's correct.

Q. Let me see that for a moment please. Thank you. No further questions.

MR. SKELTON: Judge, may we approach very briefly?

THE COURT: Sure.

(THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH OUTSIDE THE HEARING OF THE JURY.)

MR. SKELTON: I'm going to need a few minutes, judge. The report that Mr. Reynard referred to as being marked as discovery page number 16 does not correspond to the number 16 that I have.

1          MR. REYNARD:  Let me try 36, sorry.

2          MR. SKELTON:  I'll check that one then.

3          THE COURT:  All right.

4          MR. SKELTON:  Bear with me one moment, if you would

5    please, Tom.  This is a fairly faint copy.

6       A.   Sure.

7          MR. SKELTON:  In relation to that interview with

8    Mr. Luna, did he indicate that he was approximately one

9    hundred feet away from the person?

10      A.   He did.

11      Q.  In number one that is referred to in this report,

12   was a composite that was prepared in a, a different

13   investigation that preceded March thirty-first, 1991?

14      A.   I -- I don't believe so.  I'd have to recheck that

15   report to make sure.

16      Q.   I don't think my arms are long enough here.  Just a

17   moment, I'm sorry.

18          MR. SKELTON:  I have no other questions.  Thank

19   you.

20          THE COURT:  Any further questions?

21          MR. REYNARD:  Nothing further.

22          THE COURT:  All right.  You may step down.

23          (Witness excused)

24          THE COURT:  Could counsel approach for one moment

STATE OF ILLINOIS        )
                         )    SS
COUNTY OF COOK           )

IN THE CIRCUIT COURT FOR THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF McLEAN

JAMES SNOW,                        )
                                   )    No. 99 CF 1016
                 Petitioner,       )
                                   )
        - vs -                     )
                                   )
PEOPLE OF THE STATE OF ILLINOIS,   )    The Honorable Paul Lawrence,
                                   )    Judge Presiding
                 Respondent.       )

---

<u>AFFIDAVIT OF LARRY BIELA</u>

I, Larry Biela, under oath and penalty of perjury, state as follows:

1.    My name is Larry Biela.  I am 46 years old and competent to testify.  My birthday is April 26, 1963.

2.    I am a licensed private investigator in Illinois.  I have been a private investigator for 12 years, and before that I worked for 10-15 years for law firms and corporations as an investigator.  I have been involved in hundreds of investigations.  I have interviewed thousands of witnesses as an investigator.

3.    I am working without charge in the above matter.

4.    As part of my work on Jamie Snow's case, I met with Steven Scheel in the evening on December 22, 2009, at his home in Ash Flat, Arkansas.  Along with attorney Tara Thompson and Scheel's wife, I met with Scheel for several hours.



5.     During our meeting, Scheel was very emotional. He cried several times, and his entire body was shaking. He looked very upset.

6.     He told me that he felt guilty because he knew that he was part of the reason that Jamie Snow has been serving all this time in prison for a crime of which he was innocent. Scheel told me that the testimony he gave in Mr. Snow's criminal trial was false. He said that he gave that testimony because the Bloomington Police and the McLean County State's Attorney pressured him to cooperate and he was afraid what would happen if he did not say what they wanted him to say. He told me that this had been weighing on him all the years since the trial. He said that over the years he had thought about this many times. Scheel said he didn't believe that Jamie had anything to do with this crime.

7.     Scheel said that in 1990 or 1991, he saw Jamie Snow at a party in Bloomington on Lee Street. The party was at his niece Molly Eash's (or Feaster) house. He said that he talked to him a little bit at the party, but that Jamie Snow never said anything to him about a gas station shooting or Bill Little. Scheel said that Jamie never made any confession to him and never said that he was involved in Bill Little's death. Scheel said that before this party he hadn't seen Jamie since Scheel was ten years old. He said he knew Jamie from childhood because Jamie's grandmother lived down the block from him growing up.

8.     Scheel described in detail to me his conversations with the Bloomington Police Department and the McLean County State's Attorney's Office over the years. He said in 1995 or early 1996, Detective Charlie Crowe and another Bloomington detective came to see him at Vienna Correctional Center. He said they brought a tape recorder in to record him, and joked

with each other about smuggling in the tape recorder. He said that he did not want to talk to the detectives but had no choice.

9.     Scheel said that during this interview the detectives interrogated him about the gas station. He said that the detectives told him that somebody had told them that Scheel knew that Jamie Snow "killed that boy at the gas station." Scheel said that the detectives told him that someone who was at the party overheard Jamie talking to him. Scheel told me that he told Crowe that wasn't true and that he and Jamie talked in the kitchen with no one else around.

10.     Scheel told me that during that first interview with detectives, several times the detectives stopped the audio tape and rewound it, telling him that they didn't like his answers. They would then re-record.

11.     Scheel said that about a month later, someone came back to visit him and gave him a polygraph, asking him tons of questions about Jamie and the Clark gas station robbery. Scheel told the interviewer that Jamie had not told him that he committed an armed robbery/murder at the Clark station. Scheel told me that this was the truth.

12.     Scheel described how shortly after that first visit he started being investigated for things in prison, and he told me that although he was cleared, he spent time in segregation and believed that the Bloomington Police Department was behind this.

13.     Scheel said that after he was paroled, he went to North Carolina. He said that Detective Katz and a tall, blond detective came to see him there. Scheel told me that the detectives told him that they knew he was lying and wanted him to say that Jamie had confessed to him. Scheel said that they asked him about the composite sketch of Jamie Snow, and said it

resembled Scheel. Scheel also told me that they recorded the conversation, but again stopped the tape, rewound it, and re-recorded parts.

14. Scheel said that during this conversation, the first time that he denied that Jamie had confessed to him, the detectives stopped the tape and rewound. He said that the detectives told him that his polygraph indicated deception on this question. He said he felt pressure from them, because he was alone in the room with them. He said he was on parole and knew they could revoke it. He said that he knew the detectives had messed with him in prison and had followed him to North Carolina. He said he knew he wouldn't get out of the room with them unless he cooperated.

15. Scheel told me that he "felt like they had a hole in the ground for me." Because of that, he said that he had no choice, and cooperated with them and said on the tape that Jamie had confessed to him, even though this was not true.

16. Scheel said that he knew that the police knew the Jamie had not confessed to him.He said that Detectives Katz and Crowe told him that Bill Little's mom was calling the police station every day and that they wanted to "get her off their backs." Scheel said that in North Carolina Katz told him that Crowe had lost his polygraph and their earlier interview tape with him, and they were going to solve this.

17. Scheel said that after the police came to see him in North Carolina, he moved to Arkansas. He said that in 1999 or 2000, Detective Katz and Reynard called him from his wife's parent's house – her parents lived near him– telling him that he had to meet with them. Scheel said that he told them not to interrupt his family time. Scheel said he met with them the next morning at a restaurant, Lakeview Dinette, with his father-in-law. He said that Detctive Katz

4

was apologetic. He told me that Katz and Reynard wanted him to testify against Jamie and asked him if he would. Scheel said that his father-in-law told them "he'll only testify if you leave him alone and stop harassing him." He said that they agreed. Scheel said that he thought that if he testified and said what they wanted him to say that they would stop bothering him.

18.    Scheel said that the state subpoenaed him and sent him money to come to court to testify.

19.    Scheel said that before he testified, he met in a room in the courthouse with Dan Katz and Charles Reynard. He said that they went over his testimony with him. He said that he didn't remember much and that Katz and Reynard told him what clothes to say Jamie was wearing that night. He said that they wanted a description of him with long hair and shaggy clothes. He told me that he had no idea what Jamie was wearing that night.

20.    Scheel told me that before Jamie's trial no lawyer or investigator for Jamie Snow ever came to speak with him. He said if they had, he probably would have told them what happened in his interviews with the police and what was really going on.

21.    After this conversation, Tara Thompson and I drew up an affidavit for Mr. Scheel to sign based on the things that he had told us. Mr. Scheel read over the affidavit and made corrections to the things that he thought should be changed.

22.    After reading over the affidavit, Mr. Scheel went to the back of his house. After a few minutes, his wife returned and told me that Mr. Scheel wanted to talk this over with his attorney because he was afraid he could be charged with perjury for his testimony at trial being false. During our conversation Mr. Scheel had also asked me whether he could be charged with perjury for his trial testimony being false, and expressed concern about this. Mr. Scheel said that

5

he is a registered sex offender in Arkansas, and that he was worried that the Bloomington police could make trouble for him down in Arkansas.

23.    Mr. Scheel's wife told us that Mr. Scheel would get back in touch with us the next morning. He did not. I believe that Mr. Scheel was too scared to sign this affidavit even though he knew the affidavit to be true.

24.    I am giving this statement of my own free will. No promises or threats have been made to me. If called to testify, I would testify consistent with this affidavit.

Dated this ___ day of January, 2010.

Subscribed and sworn before me on this 26 day of January, 2010.

_____
Notary Public, State of Illinois

ELLIOT R SLOSAR
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
February 03, 2013

<u>Affidavit of Dawn Roberts</u>

I, Dawn Roberts, under oath and penalty of perjury, state as follows:

1. My name is Dawn Roberts. My date of birth is June 8, 1975. My legal name is Darnella Roberts.

2. I gave testimony in Jamie Snow's criminal trial. The state's Attorney molded what I said for the judge and jury to make it sound different.

3. I was at a party in the summer of 1994 attended by Jamie Snow, his wife and kids, me, and other people in the trailer park. I lived with Tina McWhorter at the time and I think she might have been there. There was a barbeque and some drinking.

4. I remember at the party that Jamie made a toast to a "Billy" by pouring out a little bit of alcohol after opening the bottle and saying, "This is for Billy." He didn't give a last name. I didn't know what Billy he was talking about. Thinking back on it now, this must have been for Billy McWhorter, Tina's brother who had died _____ before their

Exhibit 12

5. In my experience, this kind of toasting is always done as a sign of respect or in memory of someone. I have never seen anyone toasting someone in a negative way.

6. After this happened, at some point Detective Charlie Crowe was looking for me. When he and I finally spoke he was very agressive, telling me he knew I knew Jamie Snow and I must have heard something. I met with him the first time at my job. I told him I didn't have anything. He asked me if I had anything to tell him.

7. I met with Detective Crowe again in Atlanta, Illinois, in 1999 or 2000. Again, he was very aggressive, repeatedly asking me the same questions hoping to get different answers.

8. During one of these meetings I told Detective Crowe that the only thing I knew about a Billy was Jamie's toast to a Billy.

9. I never met with Jamie's attorney or the State's attorney before I was subpoenaed to testify. If he had spoken to me I would

have told him exactly what this is in this affidavit. If he had asked me on the stand if the toast could have been for Billy McWhorter, I would have said that made perfect sense. Instead, his attorney didn't really do anything.

10. Other than this toast, I don't have any information that would connect Jamie to this murder.

11. I knew Jamie Snow from the trailer park when he was my neighbor. To this day I don't think he could have done this. That is not the type of person that I saw.

12. I did take down some composite sketches of the suspect in this murder that were hanging up at the courthouse. I did that because Jamie was my friend. He didn't even know I did it until I told him afterward

13. This affidavit is true and correct to the best of my knowledge. No promises or threats

were made in exchange. If called to testify,
I could do so competently and would testify
consistent with this affidavit

_Darnella Roberts_          1-2-10

Dawn Roberts                 Date

Subscribed & Sworn  1/2/10

                                    1/2/10

Notary Public
LARRY BIELA

## Affidavit of Tina McCombs

I, Tina McCombs, under oath and penalty of perjury, state as follows:

1. My name is Tina McCombs. My date of birth is February 6, 1970. My maiden name was McWhorter.

2. In 1993 I let Dawn Roberts live with me and my kids in Southgate Estates. She was my friend and had nowhere else to go. I let her stay with me to get back on her feet.

3. In the summer that she lived with me we both went to a cookout at Jamie and Tammy Snow's mobile home. Denny Hendricks and Mark McGowan were also there.

4. At the cookout Denny Hendricks made a toast. He said, "To the brothers that aren't here" and named Steve Graham, another friend of his and Billy McWhorter. Billy was my brother; he died in a car accident in September 1991.

Exhibit 13

5. I have never heard Bill Little's name come up in a toast or conversation with Jamie Snow, Denny Hendricks or anyone else.

①

6. I never saw Dawn taking down posters of Jamie Snow at the courthouse or anywhere else in town. She never told me she did this.

7. I came to court to testify in Jamie's case. I had never talked to Jamie's attorney ^that day and didn't know why I was being called to testify. I did not testify. While I was out in the hallway Detective Barkus came up and told me I was not needed and could go home. I thought this was strange but I left. I had been there about an hour when I left.

8. I think Jamie's attorney called me to testify and had subpoenaed me. I did not talk to Jamie about my testimony.

9. If called to testify, I would testify truthfully and consistent with this affidavit.

10. I am 39 years old and competent to testify. I give this affidavit of my own free will. No promises or threats have been made to me in exchange.

Tina McCombs                12-21-09
Tina McCombs               Date
Subscribed & Sworn   12/21/09

LARRY E. BIELA
MY COMMISSION EXPIRES
JUNE 25, 2011

notary

②

Exhibit 14

# Affidavit of Mark Huffington

I Mark Huffington, under oath and penalty of perjury, state as follows:

1. My name is Mark Huffington. My date of birth is July 13, 1963. I am currently at Pontiac Correctional Center at the farm.

2. I grew up with Karen Ballinger, now Karen Strong. She and I were close. We called each other brother and sister.

3. In 1991 I was locked up. When I later got out, I saw Karen all the time.

4. She and I talked about Jamie Snow's case many times. We saw each other every other day. We had several conversations in 1995 + 1996 and again in 1999 about the case.

5. Karen told me that the night Bill Little was killed, Mark McGowan --who we called Stretch-- woke her up when he came home. They stayed together at the time. She told me that was all she knew about the case-- that she didn't know anything else about it. She said she and Mark hadn't talked that night.

6. If Karen knew anything else about the case, or Jamie's involvement in it she would have told me. We were close.

7. When I later heard she testified, I was shocked. She told me she didn't know anything so I don't know what she could have testified about.

8. In 1997 I was locked up with Garren Bradford/Gaddis and Travis Gaddis at Lincoln CC. Garren Bradford was locked up as Franklin Roberts. They told me Bloomington detectives had come to talk to them about Jamie's case, and that these detectives told them if they testified against Jamie Snow they could "be out tomorrow."

9. In 1998 Rick Bradford and I were locked up at Western Illinois CC together. He told me the same thing -- that detectives came to talk to him and offered him a deal to testify against Jamie Snow.

10. I was locked up in McLean County with Jamie Snow while he was on trial. I think I told Jamie about what Karen told me after I heard Karen had testified against him. Jamie's lawyer never came to talk to me about the case.

11. I am 46 years old and competent to testify. If I had been called to testify at Jamie's trial, I would have testified truthfully and consistent with this affidavit. If called to testify now, I would testify truthfully and consistent with this affidavit.

12. I give this affidavit of my own free will. No threat or promise have been made to me in exchange.

_Mark Huffington_        N-74103        12-31-09

Mark Huffington                          Date

Subscribed & Sworn 12/21/09

Notary

NOTARY PUBLIC
OFFICIAL SEAL
STATE OF ILLINOIS

LARRY E. BIELA
MY COMMISSION EXPIRES
JUNE 25, 2011

Case: 1:13-cv-03947 Document #: 2-15 Filed: 05/28/13 Page 1 of 7 PageID #:136
Case: 17-1113    Document: 33-3    Filed: 09/21/2017    Pages: 781

Case 3:00-cr-00103-HLA    Document 25    Filed 07/19/2000    Page 1 of 2

FILED

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

00 JUL 19 AM 11: 32

CLERK, US. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

KEVIN LEE SCHAAL

CASE NO. 3:00-cr-103-J-25C

FILED

JAN 9 - 2008

McLEAN COUNTY

CIRCUIT CLERK

## UNITED STATES' MOTION FOR DOWNWARD DEPARTURE FROM SENTENCING GUIDELINES

The United States, pursuant to Section 5K1.1, United States Sentencing Guidelines, hereby moves this Honorable Court to depart below the defendant's guideline imprisonment range which is a minimum mandatory 15 years, based upon substantial assistance he has rendered to the Government. The United States recommends a downward departure of two-levels and supplies the following facts in support of this motion.

Immediately after the defendant was charged on October 21, 1999, with being a felon in possession of a firearm the defendant and his attorney began their cooperation. The defendant's co-defendant was charged in State court with burglaries and firearms possession and the defendant agreed to testify against his co-defendant if necessary. The defendant was also contacted by State Attorneys from the State of Illinois regarding his testimony in a murder trial that will take place in the State of Illinois. The defendant has provided information valuable to the murder trial and has agreed to testify in that trial if called upon to do so. The defendant has provided local law enforcement agents with information concerning burglaries that he and his co-defendant participated in and has been assisting them in solving some of the previously unsolved burglaries. The


Exhibit 15

Case: 1:13-cv-03947 Document #: 2-15 Filed: 05/28/13 Page 2 of 7 PageID #:137
Case: 17-1113    Document: 33-3    Filed: 09/21/2017    Pages: 781

Case 3:00-cr-00103-HLA    Document 25    Filed 07/19/2000    Page 2 of 2

defendant has agreed to testify against those individuals and has agreed to testify in the state murder trial in the State of Illinois.

As a result of the defendant's cooperation, the United States respectfully requests that this Court depart below the defendant's minimum mandatory sentence of 15 years and reduce the defendant's guideline sentence by a range of two-levels. Granting this motion would reward the defendant for his assistance to the United States and local law enforcement agencies and would be in the interest of justice.

Respectfully submitted,

DONNA A. BUCELLA
United States Attorney

By: _____
W. RONALD JENNINGS
Assistant United States Attorney
Post Office Box 600
Jacksonville, Florida 32201
Tel. No. (904) 232-2682

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by mail this 19th day of July, 2000, to the following:

David Makofka, Esq.
24 North Market St., Suite 402
Jacksonville, Florida 32202

W. RONALD JENNINGS
Assistant United States Attorney

2

# U.S. District Court
## Middle District of Florida (Jacksonville)
### CRIMINAL DOCKET FOR CASE #: 3:00-cr-00103-HLA-ALL
### Internal Use Only

se title: USA v. Schaal          Date Filed: 03/02/2000

signed to: Judge Henry Lee Adams, Jr

**_endant_**

in Lee Schaal (1)
  MINATED: 07/24/2000

represented by **David Austin Makofka**
Makofka & Makofka
24 N. Market St.
Suite 402
Jacksonville, FL 32202
904/355-2700
Fax: 904/355-0084
Email: makofkalaw@hotmail.com
_TERMINATED: 07/24/2000_
_LEAD ATTORNEY_
_ATTORNEY TO BE NOTICED_
_Designation: CJA Appointment_

**ling Counts**           **Disposition**

922G.F UNLAWFUL TRANSPORT    Imprisonment: 110 months; Supervised
IREARMS, ETC                Release: 60 months; Special
                                Assessment: $100.00

**est Offense Level (Opening)**

ony

**inated Counts**          **Disposition**

ne

**hest Offense Level (Terminated)**

**plaints**            **Disposition**

intiff

d States of America       represented by W. Ronald Jennings

_Exhibit_

Case: 1:13-cv-03947 Document #: 2-15 Filed: 05/28/13 Page 4 of 7 PageID #:139
nic Case Filing | CaseDistrict Court Middle District of Florida - Docket Report Pages: 781   Page 2 of 4
Document: 53-5       Filed: 09/21/2017

U.S. Attorney's Office
Middle District of Florida
300 N. Hogan Street, Suite 700
Jacksonville, FL 32202
904/301-6300
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| te Filed | # | | Docket Text |
|---|---|---|---|
| 2/2000 | 3p | 1 | INDICTMENT as to Kevin Lee Schaal (1) count(s) 1 (slc) (Entered: 03/03/2000) |
| 02/2000 | | | MAGISTRATE JUDGE CASE ASSIGNMENT Magistrate assigned: Timothy J. Corrigan (slc) (Entered: 03/03/2000) |
| 02/2000 | | | **Added Government attorney W. Ronald Jennings (slc) (Entered: 03/03/2000) |
| 2/2000 | 1p | 2 | MOTION by USA for issuance of arrest warrant as to Kevin Lee Schaal Referred to Magistrate Judge Timothy J. Corrigan (slc) (Entered: 03/03/2000) |
| 2/2000 | 1p | 3 | ORDER as to Kevin Lee Schaal (1): granting [2-1] motion for issuance of arrest warrant (Signed by Magistrate Judge Timothy J. Corrigan ) (slc) (Entered: 03/03/2000) |
| C3/2000 | 1p | 4 | ARREST WARRANT issued as to Kevin Lee Schaal (slc) (Entered: 03/03/2000) |
| C3/2000 | | | ARREST of Kevin Lee Schaal (slc) (Entered: 03/13/2000) |
| 08/2000 | 2p | 6 | INITIAL APPEARANCE held on 3/8/00 before Magistrate Judge Timothy J. Corrigan as to Kevin Lee Schaal; Tape 00-49; Defendant informed of rights. (slc) (Entered: 03/13/2000) |
| 08/2000 | | | ORAL MOTION in open court by Kevin Lee Schaal for appointment of counsel referred to Magistrate Judge Timothy J. Corrigan (slc) (Entered: 03/13/2000) |
| 08/2000 | | | ORAL MOTION in open court by USA as to Kevin Lee Schaal for detention referred to Magistrate Judge Timothy J. Corrigan (slc) (Entered: 03/13/2000) |
| 03/2000 | | | ORAL JOINT MOTION by USA, Kevin Lee Schaal, USA to continue detention hearing referred to Magistrate Judge Timothy J. Corrigan (slc) (Entered: 03/13/2000) |
| 10/2000 | 1p | 5 | ARREST WARRANT returned executed as to Kevin Lee Schaal on 3/8/00 by ATF (slc) (Entered: 03/12/2000) |
| 13/2000 | 1p | 7 | ORDER as to Kevin Lee Schaal (1): granting [0-0] oral motion for appointment of counsel; David A. Makofka, Esq. is appointed to represent the defendant ( Signed by Magistrate Judge Timothy J. Corrigan - nunc pro tunc to 3/8/00 ) (slc) Modified on 03/13/2000 (Entered: 03/13/2000) |
| 3/2000 | 1p | 8 | CJA 20 as to Kevin Lee Schaal : Appointment of Attorney David Austin Makofka (signed by deputy clerk) (slc) (Entered: 03/13/2000) |
| 3/2000 | 1p | 9 | ORDER OF TEMPORARY DETENTION PENDING HEARING as to Kevin Lee Schaal (1): granting [0-1] oral joint motion to continue detention hearing; Detention Hearing set for 9:00 3/13/00; Scheduled for Magistrate Judge Timothy J. Corrigan (Signed by Magistrate Judge Timothy J. Corrigan - nunc pro tunc to |

Case: 1:13-cv-03947 Document #: 2-15 Filed: 05/28/13 Page 5 of 7 PageID #:140
n'c Case Filing | U.S. District Court Middle District of Florida
Case 3:13-... Document: 33-3 Filed: 09/21/2017 Pages: 781

| | | | |
|---|---|---|---|
| | | | 3/8/00) (slc) Modified on 03/13/2000 (Entered: 03/13/2000) |
| 13/2000 | 1R | 10 | ARRAIGNMENT/DETENTION held on 3/13/00 as to Kevin Lee Schaal. Defendant pled not guilty before Magistrate Judge John Steele; Tape 00-32 (slc) (Entered: 03/16/2000) |
| 13/2000 | 1R | 11 | NOTICE of acceptance of general discovery by Kevin Lee Schaal as to Kevin Lee Schaal (filed in open court) (slc) (Entered: 03/16/2000) |
| 13/2000 | | | ORAL ORDER as to Kevin Lee Schaal (1): granting [0-0] oral motion for detention ( Entered by Magistrate Judge John E. Steele ) (slc) (Entered: 03/16/2000) |
| 15/2000 | 1R | 12 | STANDING ORDER as to Kevin Lee Schaal: setting dispositive motions/motions for district judge/motions to suppress filing deadline on 3/27/00; Status conference for 4:00 4/13/00; Jury Trial for trial term commencing 9:00 5/1/00; Scheduled for Judge Ralph W. Nimmons Jr. (Signed by deputy clerk) (slc) (Entered: 03/16/2000) |
| 16/2000 | 3R | 13 | ORDER OF DETENTION PENDING TRIAL as to Kevin Lee Schaal (Signed by Magistrate Judge John E. Steele ) (slc) (Entered: 03/16/2000) |
| 27/2000 | 1R | 14 | NOTICE of acceptance of general discovery by Kevin Lee Schaal (mfk) (Entered: 03/27/2000) |
| 13/2000 | 1R | 15 | STATUS CONFERENCE held on 04/13/00 before Judge Ralph W. Nimmons Jr. as to Kevin Lee Schaal Court Reporter: Marie Splane (mfk) (Entered: 04/14/2000) |
| 18/2000 | 1R | 16 | NOTICE OF HEARING: SCHEDULING change of plea hearing for 2:30 4/24/00 for Kevin Lee Schaal scheduled for Magistrate Judge Timothy J. Corrigan ( Signed by Deputy Clerk ) ctc (mfk) (Entered: 04/19/2000) |
| 19/2000 | 3R | 17 | TRIAL CALENDAR for May trial term scheduled for Judge Ralph W. Nimmons Jr.; SCHEDULING Jury trial deadline 5/2/00 for Kevin Lee Schaal (CASE #5) Signed by Judge Ralph W. Nimmons Jr. (mfk) (Entered: 04/19/2000) |
| 24/2000 | 1R | 18 | CHANGE OF PLEA HEARING held before Magistrate Judge Timothy J. Corrigan, guilty plea proffered as to Kevin Lee Schaal (1) count(s) 1 ; Order of detention shall remain in effect; Court Reporter: Sandra Crowley, Accurate Court Reporters (mfk) (Entered: 04/25/2000) |
| 4/24/2000 | 1R | 19 | CONSENT regarding entry of a plea of guilty by Kevin Lee Schaal (filed in open court) (mfk) (Entered: 04/25/2000) |
| 4/24/2000 | 3R | 20 | PLEA AGREEMENT as to Kevin Lee Schaal (filed in open court) (mfk) (Entered: 04/25/2000) |
| ..25/2000 | 1R | 21 | REPORT AND RECOMMENDATION concerning plea of guilty as to Kevin Lee Schaal ( Signed by Magistrate Judge Timothy J. Corrigan ) ctc (mfk) (Entered: 04/25/2000) |
| 5/04/2000 | 1R | 22 | ACCEPTANCE OF PLEA of guilty and ajudication of guilt as to Kevin Lee Schaal re: count(s) 1; Sentencing set for 2:15 7/28/00 Scheduled for Judge Ralph W. Nimmons Jr. ( Signed by Judge Ralph W. Nimmons Jr. ) ctc (jkl) (Entered: 05/04/2000) |
| 01/2000 | 1R | 23 | NOTICE of case reassignment from Judge Ralph W. Nimmons Jr. to Judge |

| | | | |
|---|---|---|---|
| | | | Henry L. Adams Jr. (Signed by deputy clerk) (jkl) (Entered: 06/01/2000) |
| 6/2000 | 1P | 24 | NOTICE OF HEARING:, RESCHEDULING sentencing for 9:30 7/20/00 for Kevin Lee Schaal scheduled for Judge Henry L. Adams Jr. ( Signed by Deputy Clerk ) ctc (mfk) (Entered: 06/05/2000) |
| .9/2000 | 7l | 25 | MOTION by USA for downward departure from sentencing guidelines to recognize defendant's substantial assistance pursuant to Rule 5k1.1 as to Kevin Lee Schaal (mfk) (Entered: 07/19/2000) |
| /20/2000 | 1P | 26 | SENTENCING held on 07/20/00 before Judge Henry L. Adams Jr., as to Kevin Lee Schaal (1) count(s) 1. Imprisonment: 110 months; Supervised Release: 60 months; Special Assessment: $100.00 ; Plea Agreement ratified and accepted; Defendant shall participate as directed in a program for substance abuse treatment; Defendant is REMANDED to custody of the U.S. Marshal; Court Reporter: Deanne Ferreira-Kozar (mfk) (Entered: 07/20/2000) |
| /20/2000 | | | ORAL ORDER granting [25-1] motion for downward departure from sentencing guidelines to recognize defendant's substantial assistance pursuant to Rule 5k1.1 as to Kevin Lee Schaal (1) ( Entered by Judge Henry L. Adams Jr. ) (mfk) (Entered: 07/20/2000) |
| .4/2000 | 7P | 27 | JUDGMENT as to Kevin Lee Schaal ( Signed by Judge Henry L. Adams Jr. ) ctc (def) (Entered: 07/24/2000) |
| . 4/2000 | | | CASE CLOSED as to Kevin Lee Schaal (all defendants). (def) (Entered: 07/24/2000) |
| .4/2000 | 1P | 28 | CJA 20 voucher # FLM300-089 authorizing payment of $ 1,799.00 to David Austin Makofka for defendant Kevin Lee Schaal ( Signed by Judge Henry L. Adams Jr. ) (mfk) (Entered: 08/24/2000) |
| 1/2000 | 7P | 29 | RETURN of judgment executed as to Kevin Lee Schaal on 08/30/00 at FCI Estill, Estill, SC (mfk) (Entered: 09/12/2000) |

**ARREST AND BOOKING REPORT**
**OFFICE OF SHERIFF**
**JACKSONVILLE, FLORIDA**

DATE 03 08 2x-x P/E0 00-00B 7579  JAIL NUMBER

Page 1 of 1

NAME SCHAAL, KEVIN L    FIRST NAME    MIDDLE NAME    ALIASES OR NICKNAMES NONE    JSO I.D. NUMBER 577337

RESS 4510 53 RD AVE. N.    RESIDENCE TYPE I    PLACE OF BIRTH St Louis MO.    CITY, STATE, COUNTRY    CITIZENSHIP CODE I    CCR#

CITY/STATE St. Pete, FL    JAX. FLA?    HOW LONG IN JAX DAY    DRIVER'S LICENSE NUMBER NONE    STATE

E BOOKED 1905    ARRESTING AGENCY USM    JSO    LOCAL PRIOR ARRESTS YES ☐ NO ☒    DATE OF BIRTH 08-11-56    AGE 43    TAZ

RACE W    SEX M    HEIGHT 510    WEIGHT 170    EYES BRN    HAIR BRN    BUILD MED    COMPLEXION MED    012124619

TINGUISHING MARKS (TATTOOS ETC) CODE I ALL OVER ARMS CHEST BACK CODE I    SOCIAL SECURITY NUMBER 341 52 4093

OCCUPATION WELDER    EMPLOYER CARROLL JONES    EMPLOYER ADDRESS LIVE OAK FL

UCATION 18 YRS    PROPERTY OFFICER DC05015    BOOKING OFFICER CMC0344    RELIGION LUTH.    GOOD TIME

FINGERPRINTING OFFICER 7749    SEARCHING OFFICER    DATE. EXP. SENTENCE

MMISSION OFFICER T722    DATE 3-6-00    TIME 737    COURT COUNTY ☐  CIRCUIT ☐  FEDERAL ☒  OTHER ☐    FDLE NUMBER

FILE DIRECT | BOND HEARING | ARRAIGNMENT | TRIAL | COUNTY CONTINUED | CONTINUED | CONTINUED | CONTINUED | DEF. ATTORNEY

CONTINUED | CONTINUED | CONTINUED | CONTINUED | CONTINUED | CONTINUED | CONTINUED | CONTINUED

| STATUTE OR ORDINANCE # | OFFENSE CHARGED | UCR CODE | CITATION # CASE # / SA # | BOND | DISPOSITION | DATE |
|---|---|---|---|---|---|---|
| FEL. 944.091 MISO. | Felon In Poss of Firearm | | | | | |
| FEL. MISO. | Hold For U.S. Marshal | | | | | |
| FEL. MISO. | | | | | | |
| FEL. MISO. | | | | | | |

WHERE ARRESTED (STREET #, NEAREST MILEPOST, INTERSECTION) Live Oak, FL    BLANKET BOND $    COURT COST $    REDUCED BOND $    BY

ARRESTING OFFICER L. W. Richten    I.D.# 2359    DIV. & WATCH USMS    TRANSPORTED BY (NAME) ID# SAME    SUB-SECTOR    TIME ARRESTED    AMOUNT MONEY

PROPERTY TAKEN BY ARRESTING OFFICER FROM PRISONER TURNED INTO JAIL
NONE ☒

HOW ARREST MADE    CALL ☒  ON VIEW ☐    LOCAL CAPIAS ☐    OTHER CAPIAS ☐    JURISDICTION, SPECIFY:
LOCAL ARREST WARRANT ☐    OTHER WARRANT ☐    LOCATION VEHICLE STORED / OR LEFT AT

VEHICLE DESCRIPTION (YEAR, MAKE, MODEL, COLOR, TAG# AND STATE)

EVIDENCE ☐  NONE ☐    PROPERTY CONTROL #    DESCRIPTION    WHERE TURNED IN PROPERTY ROOM ☐  OTHER ☐
PERSONAL PROPERTY ☐

CO-DEFENDANT'S NAME ( ) ADULT ,( ) JUV.    ADDRESS    DOCKET NUMBER
☐ NONE    TELEPHONE NUMBER    '00 MAR 8 PM 7:30    TIME RECEIVED

( ) VICTIM    ( ) ADULT    ( ) JUV.    ADDRESS    VERIFIED BY
( ) COMPLAINANT    ADDRESS    TELEPHONE NUMBER

WITNESS    RIGHT THUMB PRINT

| DRUG ACTIVITY | DRUG TYPE | DRUG RELATED | ALCOHOL RELATED | TOTAL CASES CLEARED | VIOLATION OR PROBATION YES ☐ NO ☐ |
|---|---|---|---|---|---|
| CODE [ ] | CODE [ ] | CODE [ ] | NO LOCAL RECORD | WEAPON TURNED IN | |
| ARRESTEE INVOLVED | YES  NO | WEAPON SEIZED | | PROPERTY ROOM ( ) OTHER ( ) | |
| IN TRAFFIC ACCIDENT | | CODE [ ] | | ROR OR ☐ | |
| HOW PRISONER RELEASED | BY SURETY ☐  NTA ☐  ROR ☐  EXP. SENT ☐ | | RELEASING OFFICER | BONDED BY: ☐ | REL. TIME |
| CELL LOCATION | | | | P- 002 REV 12/99 | |

Exhibit

# ANTHONY L. MATENS
### INVESTIGATOR
P. O. BOX 3104
BLOOMINGTON, ILLINOIS 61702-3104
(309) 829-5733
1-(800)-964-6782
FAX: (309) 827-4656

## MEMORANDA

**DATE:**       November 13, 2007

**TO:**         Jamie Snow

**FROM:**       Tony Matens

**REGARDING:**  Investigation

F I L E D
McLEAN   JAN 9 - 2008   COUNTY
CIRCUIT CLERK

I spoke with your sister this morning and she indicates she will pursue hiring another investigator. She wanted to debate my ethical standards, which didn't especially make me happy. Though I may have done a bad job explaining things to her, the bottom line is that if a witness is represented by an attorney and if that attorney says they don't want me to talk with their client, then I'm not going to talk with the witness. That's is why people hire attorneys, to get the advice of the attorney. I realize you have your own views on how things should be done, especially legally, which you illustrated by firing Keith Davis. Your going pro se, in my opinion, was a mistake, though I have to admit your understanding of the law and legal procedures is probably better than almost any inmate I have ever dealt with.

On a different issue, I am pleased to let you know that I happened to run into Mac Arnold on the street and spoke with him today. He does verify that the police report is accurate regarding his contact with Dan Katz and his efforts to get some kind of agreed deal for Bruce Roland. Mac said he could never pin down Katz regarding any specific deal for Roland, but says he does recall Katz telling him that he (Katz) had talked with Reynard and Reynard said that if Roland testified truthfully in your case, that his office would take his testimony in consideration at the time of Roland's sentencing on his own case(s). More importantly perhaps is the fact that Mac said he did relay this information on to Bruce Roland.

I hope this latter information is helpful to you. I called and left a message for Leslie after talking with Mac in the event this letter doesn't reach you for awhile.

Exhibit 16-1

I will send Leslie a refund check of whatever I compute to be the unused balance of the $300 retainer she paid me. I don't intend to charge for all of time it has taken me to review everything, meet with you, talk with Leslie and conduct other investigation in order to finally have contact with Mac Arnold. Also, I want to know what you want me to do with the audio tape of ▓▓▓ statement?

Good luck with your case and your next hearing.

Sincerely,

Anthony L. Matens
Investigator

Bloomington Police Department

F I L E Narrati

McLEAN

JAN 9 - 2008

COUNTY

CIRCUIT CLERK

Offense Description: **Murder / Armed Robbery**
Primary Person Involved: **Little, William**

Page 1 of 2
Case Number: **91-2150**

On December 1, 1999 R/O was contacted by attorney Mac Arnold who advised he had a client with information concerning the Clark Station murder. Arnold went on to say his client had been arrested for a DUI charge and he felt his clients information should be worth a free pass on the DUI charge. R/O advised Arnold R/O would not make any promises or guarantees to him or his client in return for his information. Arnold asked R/O to contact Charles Reynard and ask Reynard what kind of a deal Reynard would be willing to make.

On 12/02/99 R/O contacted Charles Reynard and advised him of the situation. Reynard advised R/O to tell Arnold that if his client was totally truthful and his information was correct that his office had a history of taking the persons cooperation into consideration at sentencing time.

On 12/02/99 R/O contacted Arnold and Arnold stated he had slept on the situation and he wanted to bring his client forward with the information because it was a murder. R/O did advise Arnold what Reynard had told R/O. Arrangements were made for R/O to meet with Arnold and his client at Arnold's office on Friday December 3, 1999 at about 7:00 P.M.

On 12/03/99 at about 7:15 P.M. R/O arrived at the Arnold law firm and was met by Mac Arnold. Arnold escorted R/O to his office where R/O was introduced to Bruce Roland. R/O discussed this case with Roland with Arnold present and R/O did take a tape recorded statement from Roland. See tape. The following is a synopsis of that interview.

R/O asked Roland when and how he learned of the incident at the Clark gas station and Roland stated he heard about what happened the next day through the pantagraph or the radio. Roland stated a couple of months after he read about the Clark case he had a conversation with Susan Powell around May 1991. Roland stated the conversation took place at Susan's house on West Oakland Avenue and Susan asked Roland to buy a leather coat. Roland stated the second conversation with Susan took place after the Detectives had spoken to Susan. Roland stated Susan was panicked and stated they were looking for the leather coat as it had something to do with the murder. Susan had pawned the leather coat according to what Susan had told Roland. Roland went on to say that Susan had told him the leather jacket had been given to her by Jamie Snow. Roland stated that since the second conversation with Susan he has not talked to her about the case.

Roland stated the next time he heard anything about this case was February 1994 when he was in Lincoln Correctional Center. Roland stated he ran into a couple of guys from Bloomington that he knew by the name of c-note and Travis Bradford or Travis Gaddis. Roland stated Travis told him Jamie Snow was involved in the case. Roland stated they did not talk about the case after this initial conversation.

Roland stated he was transferred to Logan correctional center he believed in April of 1994. Roland stated it was probably two months after he was transferred to Logan that he had a conversation with Jamie Snow who was also at Logan correctional center. Roland stated his job

Bloomington Police Department                    *Narrative Supplemental Report*

Offense Description: **Murder / Armed Robbery**                              Page 2 of 2
Primary Person Involved: **Little, William**                    Case Number: **91-2150**

assignment at Logan was a trustee and he had free movement as he moped the floors. Roland stated Snow was in solitary confinement as he was on the circuit which meant he was being transferred from prison to prison. Roland stated he did not know that Snow was in Logan prison until one day when he was mopping the floors and Snow knocked on the window. Roland stated he went over to the door and he spoke with Snow. Roland stated he asked Snow why he was in solitary and Snow stated he was on the circuit. Roland stated he was curious why Snow was on the circuit and with the fact of the conversation he had with Gaddis that made Roland all the more curious so Roland started questioning Snow. Snow told Roland that he was on the circuit because of the big name he got for himself because of what happened in Bloomington. Roland stated what happened in Bloomington because there are a lot of things that happen in Bloomington. Snow said that Clark gas station thing. Roland stated that Snow told him they were out partying at Whitmers house which was 3 or 4 houses down from the gas station. Snow went on to say he went to the Clark gas station to buy a pack of cigarettes the attendant wouldn't give them to him and things got out of hand. R/O asked Roland why the attendant wouldn't give him the cigarettes and Roland stated Snow said he did not have enough money. Snow said he tried to take the cigarettes but he did not get them.

Snow stated they went back down there and Roland stated he asked Snow who he meant by they? Snow stated, "stretch" and Roland stated he was familiar with that name as Mark McCown. Snow stated he went back inside Clark's and got the cigarettes and there was an altercation of some sort. Snow stated he shot him and took the money out of the drawer, got in the car and left. Snow also told Roland that he shot the guy because the guy had recognized him from being in there earlier and Snow stated he had to take care of business. Snow also told Roland he was not worried about being caught because they don't have any evidence against him. Roland also stated Snow stated, "there wasn't a fucking thing the cops can do about it".

Snow never said what stretch did at the gas station whether he sat in the car or got out of the car. Snow stated the second time he went in to the gas station he still did not have enough money for the cigarettes but he was determined he was going to get the cigarettes and whatever else he could. Snow stated he entered the store, grabbed the cigarettes the guy started an altercation he shot the guy and took the money. Snow went on to say after this happened they left Bloomington. Snow stated he shot the guy because the guy recognized him from earlier that evening when Snow was there. Roland told Snow I can't believe you killed the guy over $40.00 to $60.00 ? Snow answered there was a hell of a lot more money than that. Snow stated he got at least 1 pack of cigarettes and the money. Roland stated from the conversation with Snow that there was probably a driver who waited in the car.

Roland stated he had only one conversation with Snow and when he saw Snow the next time there were to many people around and he could not talk. Roland stated Snow was then transferred out of Logan as he did not see or hear from him again.

R/O placed the original tape of the interview into evidence.

# DRIVING UNDER THE INFLUENCE
## OF ALCOHOL/DRUGS
### RECORD SHEET

Case No. 99 DT 712    C+y

Nature of Case _____

Attorneys    01

Atty — M. Arnold

PEOPLE OF THE STATE OF ILLINOIS

VS

Bruce L. Roland

| DATE | JUDGE AND REPORTER | | COSTS Dollars | Cents |
|---|---|---|---|---|
| | | CLERK'S FILING FEE | 25 | 00 |
| | | STATE'S ATTORNEY FEE | 10 | 00 |
| | | COURT SYSTEM FEE | 30 | 00 |
| | | COURT SECURITY FEE | 15 | 00 |
| | | AUTOMATION | 5 | 00 |
| | | DRIVER ED. FEE | | |
| | | SURCHARGE | | |
| | | VCVA | | |
| 11 29 99 | | $300 | | |
| 12 8 99 | | arr/PT set 2-23-00. 1:30. | | |
| | | S. to notice | | |
| 12 29 99 | | appearance filed | | |
| 2 23 00 | | Cause set for PT m 6/5/00 @ 9:00am. A to notice | | |
| 6 5 00 | | PT 6-12-00 @ 10:3 | | |

FILED JAN 9 - 2008 McLEAN COUNTY CIRCUIT CLERK

No. _99DT712_    RECORD SHEET    Page No. _2_

| DATE | JUDGE AND REPORTER | | COSTS Dollars | Cer |
|------|---------------------|---|---|---|
| | | | | |
| | | | | |
| 7 00 | | Cause cont. to 6/28/00 @ 10:30. Δ to notice | | |
| | | Cause cont. to 9/5/00 @ 10:30. | | |
| 28 00 | | Δ to notice | | |
| 7/ 00 | KF | No tice of Hearing file | | |
| 5 00 | | Δ by Atty. Arnold ASA O'Rourke? By agreement cause set for PT 11-28-00 @ 9:00 Am. AH N | | |
| 28 00 | KF | Δ by Atty. Arnold; ASA Forman on Δ's motion w/o objection, cause cont'd for FPT 1-22-01 at 9:00 A.M. Δ/c to notice | | |
| 24 00 | CLR | Appearance Filed | | |
| 16 01 | CLR | Motion for Leave to Withdraw as Counsel Filed | | |
| 19 01 | PC | Mot / w'drawi is set 1-22-01 9:00 Def to notice. | | |
| 22 01 | KF | Δ/C M. Arnold present. No proof of service by CC on file. Mot / withdraw cont'd to 2-13-01 @ 9:00 Am. Δ/c to notice | | |
| 16 01 | CLR | Motion to Withdraw as Counsel Filed | | |
| 16 01 | CLR | Notice Filed | | |

No. _9901712_  RECORD SHEET  Page No. _3_

| DATE | JUDGE AND REPORTER | | COSTS | |
| | | | Dollars | Cents |
| | | | | |
| 13 01 | QH | Δ + Arnold; ASA | | |
| | | Mot (Withdraw - allowed | | |
| | | FPT - 3/5/01 | | |
| | | 0900 | | |
| 5 01 | FF | Δ pro se ; ASA Phillips | | |
| | | On Δ's mot., w/o objection | | |
| | | of P/S to 3/2/01 @ 2:30 p.m. cause continued | | |
| | | for _____ to notice. | | |
| | | The Public Defender is appt'd | | |
| | | for Δ in this cause | | |
| 3 6 01 | CLR | PD Granted / Filed | | |
| 25 01 | cre | Stiff w/PD Yarzagaray; ASA Phillips. | | |
| | | By agreement cause cont. for P/S | | |
| | | to 5-4-01 @ 10:30am. AHN. | | |
| 4 01 | KF | Defendant fails to appear. On State's motion bond forfeited, warrant to issue with bond set at $ 1000 (10%) | | |
| 17 01 | KW | **NOTICE OF BOND FORFEITURE ISSUED** | | |
| 17 01 | KW | WARRANT ISSUED | | |
| 9 01 | KF | Δ by APD J. Yarzagaray, who | | |
| | | represents that he has spoken w/ ASA | | |
| | | Barnes + No obj. by state to recalling | | |

# RECORD SHEET

Case No. _____                              Page No. _____

| DATE | JUDGE AND REPORTER | | COSTS | |
|---|---|---|---|---|
| | | | Dollars | Cents |
| 9 a | kf | and reinstating bond. Cause set for 5-18-01 @ 10:30 An. NC to notice State. See Ord | | |
| 9 01 | SB | WARRANT RECALLED BY CLERK | | |
| 18 01 | DeCardy Sw | By agreement Status hearing con't to 6/25/01 @ 10:00 AHN. Order granting leave to depart State entered. See Order | | |
| 7 01 | CLR | Warrant Returned and filed | | |
| 25 01 | buf | Def. and by S. Yunggren ; ASA Thompson On Defs motion, w/o objection, cause continued for Status to 8-27-01 at 10:00 am to notice/AHN | | |
| 27 01 | DeCardy Sw | By agreement, cause continued for plea to 11.9.2001 @ 1:30pm AHN | | |
| 25 01 | AR | RETURNED MAIL FILED | | |
| 26 01 | AR | Mail resent to: 4360 Wildwood Rhinelander, WI 54501 | | |
| 9 01 | DeCardy Brent | Plea agreement tendered and accepted. Def. found guilty of Count(s) 1 Fined $_____ plus costs, To be paid by _____, 20___. Placed on _____ months COURT SUPERVISION / CONDITIONAL DISCHARGE / PROBATION. Bond to be released upon payment of fine and costs. Counts 2 - 5 dismissed. See Order. Deft. is sentenced to serve a Term of 364 days imprisonment, Dep for Dep Within instanter, and | | |

Case No. _99 DT 712_     **RECORD SHEET**     Page No. _5_

| DATE | | JUDGE AND REPORTER | | COSTS Dollars | Cen |
|---|---|---|---|---|---|
| 13 | 01 | KW | Bond applied—pd. in full #525877 | 1+7 | — |
| | | | Remaining bond refunded to deft. | | |
| 13 | 01 | KW | .MITTIMUS ISSUED, COPY SENT TO JAIL | | |
| 21 | 01 | KW | Returned mail filed—sent refund check to deft. in DOC. | | |
| 10 | 01 | for | Notice of filing, Notice of Motion for Reduction of Sentence, Motion for Reduction of Sentence filed | | |
| 9 | 02 | DeCardy | More than 30 days having elapsed since sentencing on Nov. 9, 2001 to filing of Motion on Dec. 10, 2001, Defendant's Motion for Reduction of Sentence is hereby stricken. See letter. | | |

COMPLAINT

McLEAN COUNTY SHERIFF'S POLICE ☐ OTHER

☒ PEOPLE STATE OF ILLINOIS VS.
☐ CITY/VILLAGE OF
☐ MUNICIPAL CORPORATION/PLAINTIFF

The Undersigned states that on IL 1/27/99 at 9:10 A.M. P.M. Defendant did unlawfully operate:

**DEFENDANT**
NAME ROLAND BRUCE KEYSTONE
ADDRESS 1603 (Street)
CITY BLOOMINGTON STATE IL 61701
DR. LIC. R453-0736-4006
STATE IL COL ☐
EXPIR DATE 2-26-03
DATE OF BIRTH 2-26-64
SEX ☐ Female ☒ Male
EYES BLU
HEIGHT 511
WEIGHT 190

**VEHICLE**
MAKE CHEVY
REGISTR. NO. 3156 SW
STATE IL
YEAR 85
COLOR SIL
☐ PEDESTRIAN ☐ PASSENGER CAR ☐ REG VEHIC. OR TRUCK ☐ BUS ☐ TRUCK TRACTOR SEMI-TRAIL. ☐ MOTORCYCLE OR BICYCLE ☐ COM. MOTOR VEHIC. ☐ PLACARDED HAZ. MAT.

Upon a Public Highway, or other Location, Specifically GE RD @ DUNMORE
Located in the County and State Aforesaid and Did Then and There Commit the Following Offense:

**VIOLATION**
NATURE OF OFFENSE: _____
I.V.C. 625 ILCS 5/:
☐ 11-501(____) ILLEGAL TRANSPORTATION/ALCOHOL
☐ 3-707 OPERATING UNINSURED VEHICLE
☐ 16-101(A) NO VALID DRIVER'S LICENSE
☐ 16-101(A) FAILURE TO REDUCE SPEED/ACCIDENT
☒ 6-303 (____) DRIVING WHILE LICENSE SUSPENDED/REVOKED
☐ 11-501(A) SPEEDING _____ MPH IN A _____ MPH ZONE
☐ 11-203 DISOBEYING TRAFFIC CONTROL DEVICE
☐ 11-709(____) IMPROPER LANE USAGE
☐ 11-501(A)(____) DRIVING UNDER INFLUENCE
☐ 12-603.1 FAILURE TO WEAR SEAT BELT (____) DL ___ JP
☐ LOCAL ORDINANCE
CH. _____ ACT _____ /SEC. _____

**ACCIDENT**
ACCIDENT TYPE: ☐ PROPERTY DAMAGE ☐ PERSONAL INJURY ☐ FATAL
ROAD CONDITIONS: ☐ DRY ☐ WET ☐ SNOW ☐ ICE ☐ FOG ☐ CLEAR ☐ OTHER
VISIBILITY: ☐ DAY ☐ NIGHT
METHOD: 1. ☐ RADAR 2. ☐ SNOW 3. ☐ A.CRAFT 4. ☒ MARKED 5. ☐ VASCAR
4. ☐ PL.CAR 6. ☐ C.SIGNED 7. ☐ ASSIST 8. ☐ ACCIDENT
NOTATIONS: MDS
REF. NO. _____

**BOND**
BOND INFORMATION (see middle portion, back side of Gold Copy) ☐ I.CASH $ _____ ☐ FULL AMOUNT ☐ 10%
☒ 2 A. DRIVER'S LICENSE ☐ 3. BOND CARD NO. _____
☒ 4. BOND POSTED ON TICKET NO. _____ ☐ NO BOND/CONFINED AT _____
WITHOUT ADMITTING GUILT, I promise to comply with the terms of this Ticket and Release.
☐ 5. NON-VERBAL ☒ 6. PROMISE TO COMPLY ☐ NO AMOUNT $ _____
☐ 7. PROMISE TO APPEAR
SIGNATURE X _____ ISSUED BY: _____
NOTATIONS: MDS

**COURT PLACE/DATE**
ADDRESS/ COURTHOUSE McLEAN COUNTY CIRCUIT CLERK
CIRCUIT COURT LOCATION AND DATE
104 W. FRONT ST., TRAFFIC DIV., RM. 303 (309) 888-5310
CITY BLOOMINGTON ZIP 61701 IL ON 12/28/99 AT 1:30
☒ COURT APPEARANCE REQUIRED ☐ NO COURT APPEARANCE REQUIRED
See instructions on top portion, back side of Gold copy

CIRCUIT CLERK
NOV 29 1999
FILED
McLEAN COUNTY

Under penalties as provided by law for false certification pursuant to Section 1-109 of the Code of Civil Procedure and perjury pursuant to Section 32-2 of the Criminal Code of 1961, the undersigned...

---

COMPLAINT

McLEAN COUNTY SHERIFF'S POLICE ☐ OTHER

☒ PEOPLE STATE OF ILLINOIS VS.
☐ CITY/VILLAGE OF
☐ MUNICIPAL CORPORATION/PLAINTIFF

The Undersigned states that on IL 1/27/99 at 9:10 A.M. P.M. Defendant did unlawfully operate:

**DEFENDANT**
NAME ROLAND BRUCE KEYSTONE
ADDRESS 1603 (Street)
CITY BLOOMINGTON STATE IL 61701
DR. LIC. R453-0736-4006
STATE IL COL ☐
EXPIR DATE 2-26-03
DATE OF BIRTH 2-26-64
SEX ☐ Female ☒ Male
EYES BLU
HEIGHT 511
WEIGHT 190

**VEHICLE**
MAKE CHEVY
REGISTR. NO. 3156 SW
STATE IL
YEAR 85
COLOR SIL
☐ PEDESTRIAN ☐ PASSENGER CAR ☐ REG VEHIC. OR TRUCK ☐ BUS ☐ TRUCK TRACTOR SEMI-TRAIL. ☐ MOTORCYCLE OR BICYCLE ☐ COM. MOTOR VEHIC. ☐ PLACARDED HAZ. MAT.

Upon a Public Highway, or other Location, Specifically GE RD @ DUNMORE
Located in the County and State Aforesaid and Did Then and There Commit the Following Offense:

**VIOLATION**
NATURE OF OFFENSE: _____
I.V.C. 625 ILCS 5/:
☐ 11-501(____) ILLEGAL TRANSPORTATION/ALCOHOL
☐ 3-707 OPERATING UNINSURED VEHICLE
☐ 16-101(A) NO VALID DRIVER'S LICENSE
☐ 16-101(A) FAILURE TO REDUCE SPEED/ACCIDENT
☒ 6-303 (____) DRIVING WHILE LICENSE SUSPENDED/REVOKED
☐ 11-501(A) SPEEDING _____ MPH IN A _____ MPH ZONE
☐ 11-203 DISOBEYING TRAFFIC CONTROL DEVICE
☐ 11-709(____) IMPROPER LANE USAGE
☐ 11-501(A)(____) DRIVING UNDER INFLUENCE
☐ 12-603.1 FAILURE TO WEAR SEAT BELT (____) DL ___ JP
☐ LOCAL ORDINANCE
CH. _____ ACT _____ /SEC. _____

**ACCIDENT**
ACCIDENT TYPE: ☐ PROPERTY DAMAGE ☐ PERSONAL INJURY ☐ FATAL
ROAD CONDITIONS: ☐ DRY ☐ WET ☐ SNOW ☐ ICE ☐ FOG ☐ CLEAR ☐ OTHER
VISIBILITY: ☐ DAY ☐ NIGHT
METHOD: 1. ☐ RADAR 2. ☐ SNOW 3. ☐ A.CRAFT 4. ☒ MARKED 5. ☐ VASCAR
4. ☐ PL.CAR 6. ☐ C.SIGNED 7. ☐ ASSIST 8. ☐ ACCIDENT
NOTATIONS: MDS
REF. NO. _____

**BOND**
BOND INFORMATION (see middle portion, back side of Gold Copy) ☐ I.CASH $ _____ ☐ FULL AMOUNT ☐ 10%
☒ 2 A. DRIVER'S LICENSE ☐ 3. BOND CARD NO. _____
☒ 4. BOND POSTED ON TICKET NO. 75707 ☐ NO BOND/CONFINED AT _____
WITHOUT ADMITTING GUILT, I promise to comply with the terms of this Ticket and Release.
☐ 5. NON-VERBAL ☒ 6. PROMISE TO COMPLY ☐ NO AMOUNT $ _____
☐ 7. PROMISE TO APPEAR
SIGNATURE X _____ ISSUED BY: _____
NOTATIONS: MDS

**COURT PLACE/DATE**
ADDRESS/ COURTHOUSE McLEAN COUNTY CIRCUIT CLERK
CIRCUIT COURT LOCATION AND DATE
104 W. FRONT ST., TRAFFIC DIV., RM. 303 (309) 888-5310
CITY BLOOMINGTON ZIP 61701 IL ON 12/28/99 AT 1:30
☒ COURT APPEARANCE REQUIRED ☐ NO COURT APPEARANCE REQUIRED
See instructions on top portion, back side of Gold copy

CIRCUIT CLERK
NOV 29 1999
FILED
McLEAN COUNTY

Under penalties as provided by law for false certification pursuant to Section 1-109 of the Code of Civil Procedure and perjury pursuant to Section 32-2 of the Criminal Code of 1961, the undersigned...

McLEAN COUNTY SHERIFF'S POLICE — COMPLAINT

N° 15106

DEFENDANT: ROLAND BRUCE KEYSTONE
2603 KEYSTONE
BLOOMINGTON, IL 61701

FILED
MCLEAN COUNTY CIRCUIT CLERK

BLOOMINGTON, IL 61701
CIRCUIT COURT, McLEAN COUNTY CIRCUIT CLERK
TRAFFIC DIV., RM. 303 (309) 888-5310

---

McLEAN COUNTY SHERIFF'S POLICE — COMPLAINT

N° 15104

DEFENDANT: ROLAND BRUCE KEYSTONE
BLOOMINGTON, IL 61701

FILED
McLEAN COUNTY CIRCUIT CLERK

BLOOMINGTON, IL 61701
CIRCUIT COURT, McLEAN COUNTY CIRCUIT CLERK
104 W. FRONT ST. TRAFFIC DIV., RM. 303 (309) 888-5310

**COMPLAINT**

Nº 15105

☒ McLEAN COUNTY SHERIFF'S POLICE ☐ OTHER

CASE NO.

COUNTY OF McLEAN  99D 712-5  TOWNSHIP OF BLOOMINGTON  ☐ TWP. RD.

☒ PEOPLE STATE OF ILLINOIS VS.  ☐ CITY/VILLAGE OF  ☐ MUNICIPAL CORPORATION PLAINTIFF  vs.

NAME: ROLAND BRUCE L
ADDRESS: 1603 (Street) KEYSTONE (Apt.)
EYES: BLU  ☐ Female ☒ Male
CITY/STATE/ZIP: BLOOMINGTON IL 61701
HEIGHT: 5'11  WEIGHT: 190
DR. LIC. R453-0726-4026  IL STATE ☐ CDL  EXPIR. DATE 1-26-03  DATE OF BIRTH 7-26-64

The Undersigned states that on 11/07/99 at 9:10 ☒ P.M. Defendant did unlawfully operate:

**VEHICLE**
REGISTR. NO. 2156 S/W  STATE IL  YEAR 00
MAKE Chevy  YEAR 85  COLOR SIL

☐ 0. PEDESTRIAN ☐ 1. PASSENGER CAR ☒ 2. REC. VEHICL OR TRUCK ☐ 3. BUS ☐ 4. TRUCK TRACTOR ☐ 5. TRAIL OR SEMI-TRAIL ☐ 6. MOTORCYCLE OR BICYCLE ☐ 7. OTHER ☐ 8. COM. MOTOR VEHCL ☐ 9. PLACARDED HAZ. MAT

Upon a Public Highway, or other Location, Specifically GE RD @ TOWMOA-BARNES RD W/B

Located in the County and State Aforesaid and Did Then and There Commit the Following Offense

**VIOLATION** (I.V.C. 625 ILCS 5/):
☐ 3-707 OPERATING UNINSURED VEHICLE
☐ 6-101 NO VALID DRIVER'S LICENSE
☐ 6-303 DRIVING WHILE LICENSE SUSPENDED/REVOKED
☐ 11-305 DISOBEYING TRAFFIC CONTROL DEVICE
☐ 11-501(a) DRIVING UNDER INFLUENCE
☒ ILCS ☐ LOCAL ORDINANCE  CH.  ACT  SEC 12-201(b)
☐ 11-502(1) ILLEGAL TRANSPORTATION ALCOHOL
☐ 11-601(a) FAILURE TO REDUCE SPEED/ACCIDENT
☐ 11-601(b) SPEEDING ___MPH IN A ___MPH ZONE
☐ 11-709 IMPROPER LANE USAGE
☐ 12-603.1 FAILURE TO WEAR SEAT BELT L___ D L___

NATURE OF OFFENSE DRIVING W/O LIGHTS when REQUIRED

**INCIDENT**
ACCIDENT TYPE: ☐ DRIVER INJURY ONLY ☐ PROPERTY DAMAGE ☐ PERSONAL INJURY ☐ FATAL
ROAD CONDITIONS: ☐ WET ☒ DRY ☐ SNOW ☐ ICE
VISIBILITY: ☐ DAY ☒ NIGHT ☐ RAIN ☐ SNOW ☐ FOG ☒ CLEAR
METHOD: ☐ 0. H.H.RADAR ☐ 1. P.L. CAR ☐ 2. RADAR ☐ 3. A.CRAFT ☒ 4. MARKED ☐ 5. VASCAR ☐ 6. C. SIGNED ☐ 7. ASSIST ☐ 8. ACCIDENT ☐ 9. OTHER
NOTATIONS: M-3

REP. NO.

**BOND**
BOND INFORMATION (see middle portion, back side of Gold Copy) ☐ 1. CASH $ ___ ☐ FULL AMOUNT ☐ 10%
☐ 2. IL DRIVER'S LICENSE ☐ 3 BOND CARD NO. ___ ISSUED BY: ___
☒ 4. BOND POSTED ON TICKET NO. 75707  ☐ 5. NO BOND-CONFINED AT ___
☐ 6. NOTICE TO APPEAR ☐ 7. PROMISE TO CORRECT ☐ 8. INDIVIDUAL BOND (FULL) AMOUNT $ ___
WITHOUT ADMITTING GUILT, I promise to comply with the terms of this Ticket and Release.
SIGNATURE X ___

**COURT/PLACE/DATE**
CIRCUIT COURT LOCATION & DATE  McLEAN COUNTY CIRCUIT CLERK
ADDRESS / COURTHOUSE  104 W. FRONT ST. TRAFFIC DIV., RM. 303 (309) 888-5310
CIRCUIT CLERK
CITY BLOOMINGTON  ZIP 61701 IL  ON 12/28/99 AT 1:30 ☒ A.M. ☐ P.M.
☒ COURT APPEARANCE REQUIRED  ☐ NO COURT APPEARANCE REQUIRED
See instructions on top portion, back side of Gold copy

Under penalties as provided by law for false certification pursuant to Section 1-109 of the Code of Civil Procedure and perjury pursuant to Section 32-2 of the Criminal Code of 1961, the undersigned certifies that the statements set forth in this instrument are true and correct.

11 / 07 / 99
MONTH  DAY  YEAR  OFFICER'S SIGNATURE J. Simmons  I.D. NO. 9487

# Circuit Court of Illinois

### ELEVENTH JUDICIAL CIRCUIT
### McLEAN COUNTY

CHAMBERS OF
WILLIAM D. DeCARDY
LAW & JUSTICE CENTER
BLOOMINGTON, IL 61701
(309) 888-5245

COUNTIES
FORD
LIVINGSTON
LOGAN
McLEAN
WOODFORD

FILED
McLEAN
JAN 1 0 2002
COUNTY
CIRCUIT CLERK

January 9, 2002

Mr. Bruce Lambert Roland
Reg. No. B-53847
Centralia Correctional Center
9330 Shattuc Road
P.O. Box 7711
Centalia, Illinois 62801

RE:    People v. Bruce L. Roland
Cases: 01 CF 13, 01 CF 127, 00 CF 1460,
99 DT 712 and 01 CM 1059

Dear Mr. Roland:

Please be advised that the Court has on this date entered the following entry upon the docket in the above-entitled cases:

"More than 30 days having elapsed since sentencing on November 9, 2001, to filing of Motion on December 10, 2001, defendant's Motion for Reduction of Sentence is hereby stricken."

Respectfully,

William D. DeCardy
Associate Circuit Judge

WDD/sjw

cc:    Joseph Kelley, Attorney at Law
Sandra Thompson, Assistant States Attorney

Clerk of the Court
Sandra Parker
The Law and Justice Center
104 W. Front St.
P.O. Box 2400
Bloomington,IL.61702-2400


RE:    Case No. 99-DT-712    01-CF-13    01-CM-1059
                00-CF-1460    01-CF-127
       Warrant
          NO. _____

To Clerk of the Court, for the ___ELEVENTH_____Judicial Circuit:

      Please find enclosed an original and ___1____copy(s) of a

      Motion For Reduction Of Sentence_____

One (1) additional copy is enclosed for you to kindly file/stamp

and return to me.

      I THANK YOU in advance for your time, effort, and consideration

and  should you need further assistance, please contact me at the

address below.


                              Respectfully Submitted,

                              /s/ B~ R Q

                              Reg. No. B-53847_____
                              Centralia Corr. Center
                              9330 Shattuc Road
                              P. O. Box 7711
                              Centralia, Illinois
                                            62801
                              Ph.(618) 533-4111




IN THE

CIRCUIT COURT OF THE ___11th___ JUDICIAL CIRCUIT

___McLean___ COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,    )
    Plaintiff-Petitioner,     )
                                 )
      -vs-                        )
                                 )
BRUCE LAMBERT ROLAND _____,   )
    Defendant-Respondent.     )

CASE NO.

99-DT-712
00-CF-1460
01-CF-13
01-CF-127 _____
01-CM-1059

HONORABLE: William D. DeCardy
Judge Presiding.

NOTICE OF FILING

TO:  State's Attorney
     Charles Reynard
     The Law and Justice Center
     104 W. Front St.
     P.O. Box 2400
     Bloomington,IL.61701-2400

PLEASE TAKE NOTICE that on ___December 6th___, _2001_, I shall cause to be filed by U.S. Mail with the Clerk of the Circuit Court of ___McLean___ County, Illinois, at ___Centralia C.C.___, ___Centralia___, Illinois _62801_, the attached ___Motion For Reduction Of Sentence___ which is herewith served upon you.

SUBSCRIBED AND SWORN TO
before me this _6th_, day of
December _____, 2001.

NOTARY PUBLIC

"OFFICIAL SEAL"
Gina R. Feazel
Notary Public, State of Illinois
My Commission Exp. 08/31/2005

Defendant, pro se. (Signature)

Bruce L. Roland
Defendant's Name (Print or Type)
Number B-53847
Centralia Correctional Center
P.O. Box 7711
Centralia, Illinois  62801

FILED
McLEAN DEC 1 0 2001 COUNTY
CIRCUIT CLERK

IN THE CIRCUIT COURT OF ____McLEAN____ COUNTY, ILLINOIS
THE COURT FOR THE ____ELEVENTH____ JUDICIAL CIRCUIT
CRIMINAL DIVISION

THE PEOPLE OF THE STATE
  OF ILLINOIS,            )           99-DT-712
          Plaintiff,   )           00-CF-1460
                       )           01-CF-13
      vs.             )  No.  01-CF-127
                       )        01-CM-1059
BRUCE LAMBERT ROLAND  ,   )
          Defendant.   )

## NOTICE OF MOTION FOR REDUCTION OF SENTENCE

    NOW COMES the defendant, __Bruce L. Roland__, pro se,
in order to give notice of intention to file a MOTION FOR
REDUCTION OF SENTENCE before the Court.

    This notice of MOTION FOR REDUCTION OF SENTENCE is
being filed pursuant to Illinois Revised Statutes (1991),
Chapter 38 Section 1005-8-1 et. seq., [730 ILCS 5/5-8-1 et.
seq.]

    Defendant is currently incarcerated at Centralia
Correctional Center, Centralia, Illinois, 62801.

    WHEREFORE, the defendant, __Bruce L. Roland__, prays
for the Court to review the sentence in case numbers ( As men-
__tioned above__) of imprisonment entered against defendant on
__11-9-01__ and to reduce the defendant's sentence.

                    Respectfully submitted,

                    Defendant, pro se
                    Number B-53847
                    Centralia Correctional Center
                    P.O. Box 7711
                    Centralia, Illinois 62801



FILED
McLEAN DEC 1 0 2001 COUNTY
CIRCUIT CLERK

IN THE CIRCUIT COURT OF ___McLEAN___ COUNTY, ILLINOIS
THE COURT FOR THE ___ELEVENTH___ JUDICIAL CIRCUIT
CRIMINAL DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE | ) |
| OF ILLINOIS, | ) 99-DT-712 |
|       Plaintiff, | ) 00-CF-1460 |
| | ) 01-CF-13 |
|    vs. | ) No. 01-CF-127 |
| | ) 01-CM-1059 |
| BRUCE LAMBERT ROLAND , | ) |
|      Defendant. | ) |
| | ) |

## MOTION FOR REDUCTION OF SENTENCE

NOW COMES the defendant, ___Bruce L. Roland___, pro se, and respectfully requests the Court to reduce the sentence of imprisonment imposed upon the defendant in the above captioned cause pursuant to Illinois Revised Statutes (1991) Chapter 38 Section 1005-8-1 et. seq., [730 ILCS 5/5-8-1 et. seq.].

1.    The defendant was sentenced by the Court to a term of imprisonment in the Illinois Department of Corrections.

___5___ years, for the offenses of ___Driving On A Revoked License and Aggravated DUI___.

2.    That the above sentence was imposed upon the defendant by the Honorable Judge ___William D. DeCardy___ on ___November 9th___ ,2001 , following a ( ) jury trial  ( ) bench trial  (XX) plea agreement.

**FILED**
McLEAN DEC 1 0 2001 COUNTY
CIRCUIT CLER...

3.    The defendant requests that the Court review the sentence imposed because there exists a litany of substantial extenuating circumstances that surround the above captioned cause.  The defendant further states the following in support of his motion (State all the reasons why you believe your sentence should be reduced):

Excessive Sentence, I would ask this honorable Court to reconsider the sentence of five (5) years to be reduced to four (4) years or less allowing me to introduce circumstances such as character references, mental state, financial hardship on Spouse and Children, Therapy goals, Treament plans. Wherefore, I ask this Honorable Court for the opportunity to present my circumstances in open court.

4.    WHEREFORE, defendant prays the Court will review the terms of imprisonment and grant relief on MOTION FOR REDUCTION OF SENTENCE.  Defendant further prays that the Court will enter an order thereby reducing his sentence to be served in the Illinois Department of Corrections.

/s/ _____
Defendant, pro se

STATE OF ILLINOIS      )
                           )   SS

COUNTY OF CLINTON    )

### AFFIDAVIT

I, __Bruce L. Roland__ , deposes and says that
as to the petition herein, he is the Defendant in the above
entitled cause; that he has read the foregoing document, by
his signed, and that the statements contained therein are
true in substance and in fact.

/s/ _____
Defendant, pro se

Signed before me this __6th__ day of __December__ , 20 01 .

_____
Notary Public

"OFFICIAL SEAL"
Gina R. Feazel
Notary Public, State of Illinois
My Commission Exp. 08/31/2005

IN THE CIRCUIT COURT OF _____ COUNTY, ILLINOIS
THE COURT FOR THE _____ JUDICIAL CIRCUIT
CRIMINAL DIVISION

THE PEOPLE OF THE STATE )
OF ILLINOIS, )
        Plaintiff, )
 )
    vs. )   No._____
 )
_____, )
     Defendant. )
 )

## ORDER

    Upon the review of the defendant's MOTION FOR REDUCTION

OF SENTENCE, and being fully advised in the premises;

    IT IS HEREBY ORDERED that the defendant, _____

_____, shall have his sentenced

reduced to a term of _____ in the Illinois

Department of Corrections.

ENTERED:

                          _____

                               Judge

IN THE CIRCUIT COURT OF _____ COUNTY, ILLINOIS
THE COURT FOR THE _____ JUDICIAL CIRCUIT
CRIMINAL DIVISION

THE PEOPLE OF THE STATE          )
  OF ILLINOIS,                   )
              Plaintiff,         )
                                 )
       vs.                       )    No._____
                                 )
_____,       )
          Defendant.             )
                                 )

## ORDER

Upon the review of the defendant's MOTION FOR REDUCTION

OF SENTENCE, and being fully advised in the premises;

IT IS HEREBY ORDERED that the defendant, _____

_____, shall have his sentenced

reduced to a term of _____ in the Illinois

Department of Corrections.

ENTERED:

                                 _____
                                         Judge

STATE OF ILLINOIS          )          IN THE CIRCUIT COURT OF THE
COUNTY OF MC LEAN     )          ELEVENTH JUDICIAL CIRCUIT

THE PEOPLE OF THE STATE OF ILLINOIS     )

VS.                                                          )          NO. _79 0 7 712_

_Bura Roland_                                        )

## MOTION TO DISMISS

Now comes the People of the State of Illinois by the State's Attorney of McLean County, and moves
this Court to:

☑ nol-pros (all) Counts _II , III, III, V_ of the above-entitled cause

☐ dismiss the Rule to Show Cause

☐ dismiss the Petition to Revoke

for the following reason(s): _Per Plea to CT, I_

**FILED**

McLEAN   **NOV 0 9 2001**   COUNTY

CIRCUIT CLERK

_____          _____
Date  _11 / 9 / 01_                              (Assistant) State's Attorney

## ORDER

This cause coming on to be heard on the foregoing motion, and the Court being fully advised in the
premises:

IT IS, THEREFORE, ORDERED that (all) Counts _II , III , IV_   _V_

☑ of the above-entitled cause be and the same is/are hereby nol-prossed.

☐ the Rule to Show Cause is hereby dismissed.

☐ the Petition to Revoke is hereby dismissed.

**FILED**

McLEAN   **NOV 0 9 2001**   COUNTY

CIRCUIT CLERK

☐ Defendant is ordered to pay costs from bond.

☐ There is a warrant outstanding for Defendant's arrest on this charge.  Said warrant is hereby
recalled.

☐ Defendant is in custody of the McLean County Sheriff's Department on this charge.  If Defendant
is not being held on any other charges or detainers, said Department is hereby ordered to release
Defendant from custody.

☐ Defendant's bond is ordered released, after it is applied to fine and costs in this cause, in accordance
with applicable statutes.

_____          _____
Date  _11 - 9 - 01_                              Judge

white:          Court Copy
yellow:

MACE PRINTING CO.

WAIVER OR DEMAND OF JURY AND PLEA TO COMPLAINT

**STATE OF ILLINOIS,** } SS.

COUNTY OF McLEAN

IN THE CIRCUIT COURT 11th JUDICIAL CIRCUIT,
McLEAN COUNTY, ILLINOIS

The People of the State of Illinois
vs.

_Bruce Roland_

No. _99-DT 712_

FILED
NOV 0 9 2001
McLEAN COUNTY
CIRCUIT CLERK

The undersigned defendant in the above entitled cause, comes now in open court in _her_
own proper person, acknowledges receipt of copy of complaint in due time, acknowledges admonition by the Court as
to effect of this plea, for plea herein says that _he_ is guilty/not guilty in manner and form
as charged in said complaint, and waives/demands a jury in said cause.

Date this _9_ day of _Nov_ 20 _01_.

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

McLEAN COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS

VS.

**BRUCE LAMBERT ROLAND**

4360 WILDWOOD
RHINELANDER, WI 54501

*DOCKET NO.*
2001002470

*CASE NO.*
1999DT000712

*Alias* BRIAN JAMES ROLAND

*PERSON ID:* 100011739

# WARRANT OF ARREST

*DOCKET NO.* 2001002470

TO ALL PEACE OFFICERS OF THE STATE OF ILLINOIS: **BRUCE LAMBERT ROLAND** *and bring said person without unnecessary delay before Judge* **KEVIN FITZGERALD** *of the Circuit court of the Eleventh Judicial Circuit, McLean County, in the Courtroom usually occupied by this Judge in the Law & Justice Center, Bloomington, Illinois, or if the above-named Judge is unable to act, before the most accessible Court in said County, to answer for the offense(s) of*

DRIVING UNDER THE INFLUENCE OF ALCOHOL Stat:625 ILCS 5/11-501(a)(2) , DRIVING ON REVOKED LICENSE Stat:625 ILCS 5/6-303(a) , OPERATE UNINSURED MOTOR VEHICLE Stat:625 ILCS 5/3-707 , SQUEALING / SCREECHING TIRES Stat:625 ILCS 5/11-505 , HEADLIGHT / TAIL LIGHT / SIDELIGHT / 1ST-2ND Stat:625 ILCS 5/12-201(b)

*and hold said person to bail.*

*Arrest on:* Contempt: Failure to Appear Criminal        *Date of Offense:* 01/27/1999

*The amount of bail is*    $   1,000.00        *Type Bail:*  Bond - 10%

*ISSUED AT BLOOMINGTON, ILLINOIS, this*    07th day of May    , 2001.

*Ken P. Hould*

FILED
McLEAN
JUN 07 2001
COUNTY
CIRCUIT CLERK

## IDENTIFICATION INFORMATION

| Sex | Race | Date of Birth | Height | Weight | Hair | Eyes | |
|-----|------|---------------|--------|--------|------|------|-----|
| M | W | 01/26/1964 | 511 | 175 | | | BLU |

| Master ID # | Social Security # | Drivers License | State | Originating Agency |
|-------------|-------------------|-----------------|-------|--------------------|
| 100011739 | 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 | R45307264026 | IL | MCSP |

STATE OF ILLINOIS }
COUNTY OF McLEAN }        ss.        **RETURN OF SERVICE**

*I have executed the within Warrant by arresting the within-named defendant in accordance with the provisions of 725 ILCS 5/110-9, defendant released on bail in sum of $_____, this _____ day of _____,*

_____.    FEES:   Service and Return $_____; Mileage (_____ mi. @_____$)

$_____;   TOTAL: $_____.

_____
*Peace Officer*

STATE OF ILLINOIS
COUNTY OF McLEAN

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

People _____
                    Plaintiff/Petitioner,

                    vs

Bruce Roland _____
                    Defendant/Respondent.

FILED
MAY 18 2001
CIRCUIT CLERK

No.  00-CF-1460
     01-CF-13
     01-CF-127
     99-DT-712

## ORDER

This cause coming on for status hearing
People appearing by Assistant States Attorney Thompson,
Deft in person & by Attorney Joseph Kelley, and on
Deft's motion, without objection, status hearing
continued to June 25, 2001 at 10:00 AM.

    It is further ordered that Deft having
orally moved to be allowed to reside in
Wisconsin during pendency of these cases, and
the States Attorney having no objection, Deft
is allowed to reside in Wisconsin upon
properly filing with the Clerk of the
Circuit Court a Waiver of Extradition

DATE: 5-18-01

_____
Judge

Name
Attorney for
Address

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF McLEAN

THE PEOPLE OF THE
STATE OF ILLINOIS,                    )
                                      )
                    Plaintiff         )
                                      )
         v.                           )    No.  00-CF-1460
                                      )         01-CF-13
Bruce Roland                          )         01-CF-127
                                      )         99-DT-712
                    Defendant         )

**FILED**
MAY 18 2001
CIRCUIT CLERK

## WAIVER OF EXTRADITION AS CONDITION OF BAIL BOND

I, Bruce Roland , of Rhinelander , State
of Wisconsin , in consideration of having been admitted to bail and being granted
permission by the Court as a condition of my bail bond to travel outside of the State of Illinois
during the pendency of the above-entitled case, in which I am charged with the offense(s) of
Agg Driving under the Influence of Alcohol, Driving on Revoked License ,
which are felony/misdemeanor offense under the laws of the State of Illinois, and travel to:
and reside in Wisconsin, 4360 Wildwood,
Rhinelander, Wisconsin 54501

DO HEREBY WAIVE EXTRADITION TO THE STATE OF ILLINOIS FROM ANY
STATE IN WHICH I MAY BE FOUND in the event I am charged with any violation of the
conditions of said bail bond or with the commission of any additional offenses against the laws of
the State of Illinois. By this statement I waive, forfeit, and give up any and all legal rightrs under
teh laws of the State of Illinois and of the jurisdiction in which I am found to contest my immediate
transfer of custody to authorities of the State of Illinois for return to said State for further legal
proceedings against me.

5-18-01
_____
DATE

_____
,Defendant

Subscribed and sworn to before me this
_____ day of _____, 19_____.

_____

TO BE RETAINED AND RECEIPTED

## STATE OF ILLINOIS
## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## COUNTY OF McLEAN

THE PEOPLE OF THE STATE OF ILLINOIS

|  |  |
|---|---|
| vs. | Plaintiff |
| BRUCE LAMBERT ROLAND | |
|  | Defendant |

Case Number    1999DT000712

Warrant Docket #    2001002470

100011739

## ORDER RECALLING WARRANT

It is ordered that the warrant heretofore ordered to issue on       Monday, May 7, 2001 for the arrest of the above-named defendant is hereby recalled or vacated, and if issued, is directed to be returned to the Office of the McLean County Circuit Clerk.

Enter:    Wednesday, May 9, 2001

_____
Judge
KEVIN FITZGERALD

FILED
McLEAN    MAY 09 2001    COUNTY
CIRCUIT CLERK

TO BE RETAINED AND RECEIPTED

## STATE OF ILLINOIS
## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## COUNTY OF McLEAN

_People_

**Plaintiff**

vs.

_Bruce Roland_

**Defendant**

No. _99 DT 712_

Warrant Docket No.: _2470_

## ORDER RECALLING WARRANT

It is ordered that the warrant heretofore ordered to issue on _5/7/01_

for the arrest of the above-named defendant is hereby recalled or vacated, and if issued, is

directed to be returned to the Office of the McLean County Circuit Clerk. _Bond Ordered reinstated._

Enter: _5/9/01_

_Kent_

JUDGE

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

McLEAN COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS

VS.

BRUCE LAMBERT ROLAND

4360 WILDWOOD
RHINELANDER, WI 54501

*Alias*  BRIAN JAMES ROLAND

*DOCKET NO.*
2001002470

*CASE NO.*
1999DT000712

*PERSON ID:*  100011739

# WARRANT OF ARREST

*DOCKET NO.*  2001002470

TO ALL PEACE OFFICERS OF THE STATE OF ILLINOIS: arrest **BRUCE LAMBERT ROLAND** *and bring said person without unnecessary*

*delay before Judge*  **KEVIN FITZGERALD**  *of the Circuit court of the Eleventh Judicial Circuit, McLean County, in the Courtroom*

*usually occupied by this Judge in the Law & Justice Center, Bloomington, Illinois, or if the above-named Judge is unable to act, before the*

*most accessible Court in said County, to answer for the offense(s) of*

DRIVING UNDER THE INFLUENCE OF ALCOHOL Stat:625 ILCS 5/11-501(a)(2)     ,  DRIVING ON
REVOKED LICENSE Stat:625 ILCS 5/6-303(a)     ,  OPERATE UNINSURED MOTOR VEHICLE Stat:625
ILCS 5/3-707     ,  SQUEALING / SCREECHING TIRES Stat:625 ILCS 5/11-505     ,  HEADLIGHT /
TAIL LIGHT / SIDELIGHT / 1ST-2ND Stat:625 ILCS 5/12-201(b)

*and hold said person to bail.* Arrest on:  Contempt - Failure to Appear Criminal     *Date of Offense:* 01/27/1999

*The amount of bail is*     $     1,000.00     *Type Bail:*  **Bond - 10%**

*ISSUED AT BLOOMINGTON, ILLINOIS, this*     **07th day of May**     , **2001.**

*Kevin P. Fitzgerald*

| IDENTIFICATION INFORMATION | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Sex* | *Race* | *Date of Birth* | *Height* | *Weight* | *Hair* | *Eyes* | |
| M | W | 01/26/1964 | 511 | 175 | | | BLU |
| *Master ID #* | *Social Security #* | *Drivers License* | | *State* | *Originating Agency* | | |
| 100011739 | 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 | R45307264026 | | IL | MCSP | | |

STATE OF ILLINOIS  }
COUNTY OF McLEAN  }          ss.          **RETURN OF SERVICE**

*I have executed the within Warrant by arresting the within-named defendant in accordance with the provisions of 725 ILCS 5/110-9,*
*defendant released on bail in sum of $_____, this _____ day of _____,*

*_____.     FEES: Service and Return $_____; Mileage (_____ mi. @ _____$)*

$_____; TOTAL: $_____.

_____
*Peace Officer*

# NOTICE OF BOND FORFEITURE

STATE OF ILLINOIS
COUNTY OF MCLEAN

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

THE PEOPLE OF THE STATE OF ILLINOIS

vS

**Issued Date:**    **05/07/2001**

**ROLAND, BRUCE**
2603  KEYSTONE RD
BLOOMINGTON, IL  61704
**Case Number:    1999DT000712**



Please take notice that the Circuit Court, 11th Judicial Circuit, McLean County, Illinois, did on 05/04/2001 enter in Order of Forfeiture against you, and said order provides that unless you appear and surrender to said court within 30 days from your said court date, the court will enter a Judgment against you for the amount of Bail and Cost of proceedings.

*Sandra K. Parker*

SANDRA K. PARKER
Circuit Clerk

By: __KRISTI WEAVER_____
Deputy

Certificate of Mailing

I, the undersigned, certify that I did on 05/07/2001 deposit a copy of this notice for order of Forfeiture of Bail, in the United States mail, in a sealed envelope with postage prepaid addressed to the defendant.

*Sandra K. Parker*

SANDRA K. PARKER
Circuit Clerk

By: __KRISTI WEAVER_____
Deputy



**PRAECIPE**

IN THE CIRCUIT COURT OF McLEAN COUNTY
STATE OF ILLINOIS

No. 99 DT 712

PRAECIPE for _____ MOTION AND NOTICE _____

in Suit for _____ Motion to Withdraw _____

The People of the State of Illinois ___ vs. ___ Bruce Roland _____
PLAINTIFF                                              DEFENDANT

PLEASE ISSUE Motion and Notice _____ in the above cause to the

Sheriff of _ McLean _____ County, Illinois, to be served on the following:

Name of Defendant                          Address

Bruce Roland                      2603 Keystone, Bloomington, IL 61704

_____

_____

_____

_____

_____

Plaintiff's Atty. _____ McLean Arnold _____

Street Address _____ 306 N. Center Street _____

City _____ Bloomington, IL 61701 _____

Telephone _____ (309) 827-8212 _____

Directions to Rural address _____

_____

Defendant's place of employment _____

_____

FILED
FEB 0 8 2001

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL DISTRICT
COUNTY OF MCLEAN

THE PEOPLE OF THE STATE OF ILLINOIS    )
                                            )
        vs.                            )      Case No. 99 DT 712
                                            )
BRUCE ROLAND,                      )

## NOTICE OF WITHDRAWAL

TO:    BRUCE ROLAND
        2603 KEYSTONE
        BLOOMINGTON, IL 61704

       This is to advise you that MCLEAN ARNOLD has filed the attached Motion for Leave to Withdraw as your attorney in the above-captioned cause. A hearing on said motion for Leave to Withdraw is now scheduled for **February 13, 2001 at 9:00 a.m.** in the courtroom usually occupied by the Honorable **Judge Fitzgerald** or any Judge sitting in his stead, at Bloomington, Illinois, at which time and place you may appear and be heard. To insure notice of any action in this cause, you should retain other counsel in this cause or file with the Clerk of the Court within 21 days after entry of any order for withdrawal of your counsel your supplementary appearance stating therein an address at which service of notices or other papers may be had upon you.

                                           ————————————————————
                                         MCLEAN ARNOLD, Attorney at Law

McLean Arnold
306 N. Center St.
Bloomington, IL 61701
(309) 827-8212



FILED
FEB 0 6 2001
McLEAN COUNTY
CIRCUIT CLERK

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL DISTRICT
COUNTY OF MCLEAN

THE PEOPLE OF THE STATE OF ILLINOIS )
                                     )
        vs.                          )        Case No. 99 DT 712
                                     )
BRUCE ROLAND,                        )

### NOTICE OF WITHDRAWAL

TO:    BRUCE ROLAND
       2603 KEYSTONE
       BLOOMINGTON, IL 61704

        This is to advise you that MCLEAN ARNOLD has filed the attached Motion for Leave to
Withdraw as your attorney in the above-captioned cause.  A hearing on said motion for Leave to
Withdraw is now scheduled for **January 22, 2001 at 9:00 a.m.** in the courtroom usually
occupied by the Honorable **Judge Fitzgerald** or any Judge sitting in his stead, at Bloomington,
Illinois, at which time and place you may appear and be heard. To insure notice of any action in
this cause, you should retain other counsel in this cause or file with the Clerk of the Court within
21 days after entry of any order for withdrawal of your counsel your supplementary appearance
stating therein an address at which service of notices or other papers may be had upon you.

                              _____
                              MCLEAN ARNOLD, Attorney at Law

McLean Arnold
306 N. Center St.
Bloomington, IL  61701
(309) 827-8212

FILED
McLEAN    FEB 0 6 2001    COUNTY
CIRCUIT CLERK

THE PEOPLE OF THE STATE OF
ILLINOIS
VS
BRUCE LAMBERT ROLAND

Case Number:    1999DT000712

**COURT PAPER TYPE :** Notice
**COURT PAPER SUMMARY:** -ROLAND, BRUCE LAMBERT
**COURT PAPER STATUS: Completed**

**Individual Summary:** ROLAND, BRUCE LAMBERT - **DOB:** 01/26/1964 **RACE:** White
**SEX:** Male
**Individual Return / Service Status:** Served

Substitute Served this writ this _02_ day of February , 2001 ,
by reading it to the within named Brittney Tipp **Step Daughter**.

Served Sex: F        Served Race: W        Served DOB: 01-02-1986

Comment: Served at 2603 Keystone Bloomington, IL.

Service, . . . . . . . . . . . . . . . $  17.00

Miscellaneous Fees:

                SHERIFF

_10_ miles necessary travel from Law and Justice Center to place of service
of within named person and return,

$ .50 per mile . . . . . . . . . . . $  5.00  By___MCSP PROCESS DEPUTY RICHARD SCOTT - ID # 608

Return . . . . . . . . . . . . . . . $  7.00

TOTAL . . . . . . . . . . . . . . . $  29.00

ATTACHMENTS:

FILED
FEB 0 6 2001
McLEAN COUNTY
CIRCUIT CLERK

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL DISTRICT
COUNTY OF MCLEAN

THE PEOPLE OF THE STATE OF ILLINOIS,    )
                                         )
     vs.                                )    Case No. 99 DT 712
                                         )
BRUCE ROLAND,                            )

## MOTION FOR LEAVE TO WITHDRAW AS COUNSEL

    Now comes MCLEAN ARNOLD, Attorney at Law, and respectfully requests leave of this court to withdraw as counsel for the Defendant, BRUCE ROLAND, and in support thereof states as follows:

1. That MCLEAN ARNOLD is now counsel of record for the above Defendant.
2. That there has been a breakdown of communication between counsel and Defendant and a change of circumstances making it impossible for MCLEAN ARNOLD to represent the Defendant.
3. That on the **16th day of January, 2001**, a copy of this Motion and the attached notice to BRUCE ROLAND was sent by MCLEAN ARNOLD by certified mail, postage prepaid, directed to BRUCE ROLAND at the address indicated on the notice which is the last address of BRUCE ROLAND known to MCLEAN ARNOLD.

    WHEREFORE, MCLEAN ARNOLD, respectfully request that he be granted leave to withdraw as counsel for the Defendant, BRUCE ROLAND.

 

_____
MCLEAN ARNOLD, Attorney at Law

STATE OF ILLINOIS    )
                     )    SS
COUNTY OF MCLEAN     )

Subscribed and sworn to before me this 16th day of January, 2001.

_____
NOTARY PUBLIC

McLean Arnold
306 N. Center St.
Bloomington, IL 61701
(309) 827-8212

OFFICIAL SEAL
MARISSA KOREE STANFORD
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-28-2003

JAN 16 2001
CIRCUIT CLERK

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL DISTRICT
COUNTY OF MCLEAN

THE PEOPLE OF THE STATE OF ILLINOIS )
)
vs. )        Case No. 99 DT 712
)
BRUCE ROLAND, )

### NOTICE OF WITHDRAWAL

TO:    BRUCE ROLAND
       2603 KEYSTONE
       BLOOMINGTON, IL  61704

       This is to advise you that MCLEAN ARNOLD has filed the attached Motion for Leave to
Withdraw as your attorney in the above-captioned cause.  A hearing on said motion for Leave to
Withdraw is now scheduled for **January 22, 2001 at 9:00 a.m.** in the courtroom usually
occupied by the Honorable **Judge Fitzgerald** or any Judge sitting in his stead, at Bloomington,
Illinois, at which time and place you may appear and be heard.  To insure notice of any action in
this cause, you should retain other counsel in this cause or file with the Clerk of the Court within
21 days after entry of any order for withdrawal of your counsel your supplementary appearance
stating therein an address at which service of notices or other papers may be had upon you.

                                        _____
                                        MCLEAN ARNOLD, Attorney at Law

McLean Arnold
306 N. Center St.
Bloomington, IL  61701
(309) 827-8212

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

| | |
|---|---|
| STATE OF ILLINOIS, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| Vs. | ) |
| | ) |
| BRUCE ROLAND, | ) |
| | ) |
| Defendant. | ) |

Case No. 99 DT 712

**FILED**
DEC 04 2000
CIRCUIT CLERK
MCLEAN COUNTY

TO:    MCLEAN COUNTY STATE'S ATTORNEY, P.O. BOX 2400, 104 WEST FRONT
STREET, BLOOMINGTON, IL. 61701

ON January 22, 2001 at 9:00 a.m., or as soon thereafter as counsel may be heard, I
shall appear in the Associate Courtroom on the Third Floor at the McLean County Law &
Justice Center, 104 West Front Street, Bloomington, Illinois, and then and there hold a hearing
for PRETRIAL on the above-entitled matter.

MCLEAN ARNOLD                          BRUCE ROLAND, Defendant
Attorney at Law
306 North Center Street                By: _____
Bloomington, IL. 61701                       McLean Arnold, His Attorney
(309) 827-8212

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) SS |
| COUNTY OF MCLEAN | ) |

I, the undersigned, being first duly sworn upon oath, depose and state that on the 27th day
of November, 2000, I mailed a copy of the above NOTICE in a postage pre-paid envelope to:

MCLEAN COUNTY STATE'S ATTORNEY, P.O. BOX 2400, 104 WEST FRONT
STREET, BLOOMINGTON, ILLINOIS  61701

*Mary B. Walther*

Subscribed and sworn to before me this 29th day of November, 2000

*Marissa Koree Stanford*
NOTARY PUBLIC

OFFICIAL SEAL
MARISSA KOREE STANFORD
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-28-2003

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF **MCLEAN** COUNTY

STATE OF ILLINOIS,                )
                    Plaintiff     )          No.: 99 DT 712
           vs.                    )
                                  )
BRUCE ROLAND,                     )          **NOTICE OF HEARING**
                    Defendant     )
                                  )

TO:   MCLEAN COUNTY STATE'S ATTORNEY, P.O. BOX 2400, 104 W. FRONT ST.,
BLOOMINGTON, IL  61701

       ON **September 5, 2000 at 10:30 a.m.** or as soon thereafter as counsel may be heard, I shall
appear in the **Associate Courtroom on the third floor** at the **McLean County Law & Justice
Center, Bloomington,** Illinois, and then and there hold a hearing for the above-entitled matter.

MC LEAN ARNOLD                    BRUCE ROLAND, Defendant
Attorney at Law
306 North Center Street
Bloomington, IL  61701            By: _____
(309) 827-8212                         McLean Arnold, Their Attorney

**CERTIFICATE OF MAILING**

STATE OF ILLINOIS        )
                         ) SS
COUNTY OF MCLEAN         )

       I, the undersigned, being first duly sworn upon oath, depose and say that on the 6th day of
**July, 2000** I mailed a copy of the above NOTICE in a postage pre-paid envelope to:

       MCLEAN COUNTY STATE'S ATTORNEY, P.O. BOX 2400, 104 W. FRONT ST.,
              BLOOMINGTON, IL  61701
                              _____

Subscribed and sworn to before me this 6th day of July, 2000.

                    _Marissa Koree Stanford_
                         NOTARY PUBLIC

FILED
JUL 0 6 2000
McLEAN COUNTY
CIRCUIT CLERK

OFFICIAL SEAL
MARISSA KOREE STANFORD
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-23-2003

STATE OF ILLINOIS
COUNTY OF MCLEAN
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

THE PEOPLE OF THE )
STATE OF ILLINOIS )
)
vs. )
)
BRUCE ROLAND )

**FILED**
McLEAN COUNTY
JUN 0 7 2000
CIRCUIT CLERK

No. 99 DT 712

NOTICE

TO:  MAC ARNOLD, ATTORNEY, 306 N CENTER ST, BLOOMINGTON, IL 61701
BRUCE ROLAND, 2603 KEYSTONE, BLOOMINGTON, IL 61701

YOU ARE HEREBY NOTIFIED that you have been charged in the Circuit
Court of McLean County in the above-entitled cause with the offense(s) of
DUI. The Court has ordered that you be given notice that the matter is set
for **FINAL PRE-TRIAL** at 10:30 am on **JUNE 12, 2000**, in the ASSOCIATE
Courtroom on the THIRD floor of the McLean County Law & Justice Center, 104
W Front Street, Bloomington Illinois, at which time and place you must be
present. If you fail to appear, a trial may proceed in your absence.

Dated at Bloomington, Illinois this day of 5th day of June, 2000.

_____
Assistant State's Attorney

CERTIFICATE OF SERVICE

I, the undersigned, being first duly sworn on oath, says that she served
the foregoing Notice in the above-entitled cause by:

___ Depositing a true and correct copy of the same in the U.S. Post Office
or post office box in the City of Bloomington, Illinois, enclosed in an
envelope, with postage fully prepaid on the 5th day of June, 2000, to above
listed, plainly addressed as indicated in the above Notice.

___ Hand delivering a true and correct copy of the same on the 5th day of
June, 2000.

_____

Subscribed and sworn to before me this 5th day of June, 2000.

_____
Notary Public

"OFFICIAL SEAL"
CORA AMY WICK
NOTARY PUBLIC, STATE OF ILLINOIS
COMMISSION EXPIRES 10/15/2001

IN THE CIRCUIT COURT
THE ELEVENTH JUDICIAL CIRCUIT
McLEAN COUNTY, ILLINOIS

DATE _12-28-99_

NO. _99 DT 712_

_People_
Plaintiff

_Roland_
Defendant

# APPEARANCE

FILED
DEC 29 1999
McLEAN COUNTY
CIRCUIT CLERK

I hereby enter my appearance in the above entitled case.

_Bruce Roland_
Defendant

_____
His Attorney

Address: _____

City/State: _____

Phone: A/C_____ Number_____

Attorney Registration Number_____

# IN THE ELEVENTH JUDICIAL CIRCUIT COURT MCLEAN COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS )
)
vs )
)
Defendant: BRUCE LAMBERT ROLAND )

CASE NO. 99CM1491
99DT712

Defendants date of birth: 01/26/1964

## APPEARANCE BOND

The DEFENDANT, whose signature appears below, has been charged with the offense(s) **DRIVING UNDER THE INFLUENCE**

**OPERATING UNINSURED MOTOR VEHICLE, DRIVE WITHOUT HEADLIGHT/CYCLE/2ND, SQUEALING/SCREECHING TIRES, DRIVING ON REVOKED LICENSE**

Bond for this offense has been set at $ ~~THREE THOUSAND DOLLARS~~ dollars,

Therefore, in consideration of being released from custody, the DEFENDANT, and the BOND DEPOSITOR, if other than the DEFENDANT AGREE:

1. That they are indebted to the PEOPLE OF THE STATE OF ILLINOIS in the full amount of the appearance bond stated above.
2. That as security for the performance of this agreement, there has been deposited the following:
   A. 10% BOND. The defendant/Depositor has deposited, in cash, 10% of the bond as stated above.
   B. RECOGNIZANCE or Individual Bond.
   C. REAL ESTATE BOND. (Separate sworn statement and schedule required. Judicial approval required.)
   D. CASH BOND: No 10% to apply.
3. That the DEFENDANT SHALL:
   A. Personally appear to answer the charges(s) at the MCLEAN COUNTY LAW AND JUSTICE CENTER, Bloomington, Illinois, on the **28** day of **DEC.**, 19 **99**, at **1.30** XXX./P.M. and appear each time as ordered by the Court, until discharged.
   B. Not violate any criminal statute of any jurisdiction.
   C. Not leave the State of Illinois without permission of the Court.
   D. Give written notice of any address change to the Clerk of this Court within 24 hours at P.O. Box 2420, Bloomington, L 61702-2420.
   E. Other Conditions:_____

If victim is a family/household member, as defined by 725ILCS 5/112-A-3(3):
☐ F.  Refrain from contact or communication with_____ fr a minimum period of 72 hours following the defendants release from custody.
☐ G.  Refrain from entering or remaining at residence for a minimum period of 72 hours following the defendant's release from custody.

**NOTICE TO PERSON PROVIDING BOND MONEY IF OTHER THAN THE DEFENDANT**
I hereby acknowledge that I have posted bond for the defendant named above, I further understand that if the defendant fails to comply with the conditions of this bond, that the Court shall enter an Order declaring the bond to be forfeited and used to pay costs, attorney's fees, fines or other purposes authorized by the Court. I further understand that if the defendant is convicted part or all of the bond may be used to pay fines, costs, fees and restitution.

Print Depositor's Name _____

Signature X _____

SS# _____

TIN# _____

Print Address _____

City, State, Zip _____

**ASSIGNMENT OF BOND TO THE DEFENDANT**
I hereby authorize the return of the bond herein posted to the person shown above after all conditions of this bond have been met.

Signature of DEFENDANT _____

FILED
NOV 29 1999
McLEAN COUNTY
CIRCUIT CLERK

**CERTIFICATE OF DEFENDANT**
I, the Defendant, do hereby state that I know and understand the terms and conditions of this appearance bond as shown on the FRONT AND REVERSE SIDE of this appearance bond form. I understand further that if any time prior to the final disposition of the charge(s), I escape or am released on bond and fail to appear in Court when required I hereby waive my right to confront the witnesses against me; the trial and/or sentencing can proceed in my absence; I forfeit the security posted; judgment will be entered against me for the full amount of this bond, plus costs; a warrant may be issued, in which event additional bond may be required to be posted. I understand and accept the terms and conditions set forth above and on the reverse side of this appearance bond.

Signature of DEFENDANT _____

SS# 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

TIN# _____

Print Address 2603 Keystone

City, State, Zip Bloom. Ill 61704

Signed and acknowledged before me and bond received by me this 28TH day of NOV. 199__.

9/30 CLRK
Official Signature

WHITE - Court Copy

## LAW ENFORCEMENT SWORN REPORT

Circuit Court, **McLEAN** County, Municipal District

DUI TRAFFIC CITATION NO. (11-501A1)

DUI TRAFFIC CITATION NO. (11-501A2) **75707**

Case Number **2205712**

DUI TRAFFIC CITATION NO. (OTHER) **75704**

Name **ROLAND** **BRUCE**
Last          First          Middle

| | Driver's License Number | | | | | | | | | | | | State |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ CDL | R | 4 | 5 | 3 | 0 | 7 | 2 | 6 | 4 | 6 | 2 | 6 | | IL |

OPERATING: ☐ Commercial Motor Vehicle  ☒ Placarded Haz. Mat. Vehicle

**2603 KEYSTONE**
Street Address

**McLEAN**

**BLOOMINGTON    IL**
City & State

Arrest Date **11 / 27 / 99 / 2110** AM/PM
Mo.    Day    Yr.    Time

City and/or County of Arrest

Sex **M** / Date of Birth **01/26/64** / Place of Refusal or Location of Test(s) **McLEAN COUNTY JAIL**

Notice of Summary Suspension Given On **11 / 27 / 99**
Mo.    Day    Yr.

Ref. or Test Date **11 / 27 / 99 / 2157** AM/PM
Mo.    Day    Yr.    Time

THE SUSPENSION SHALL TAKE EFFECT ON THE 46th DAY FOLLOWING ISSUANCE OF THIS NOTICE OF SUMMARY SUSPENSION. SUBSEQUENT TO AN ARREST FOR VIOLATING SECTION 11-501 OF THE ILLINOIS VEHICLE CODE, OR A SIMILAR PROVISION OF A LOCAL RDINANCE, YOU ARE HEREBY NOTIFIED that on the date shown above you were asked to submit to a chemical test(s) to determine the alcohol, other ug or drugs, intoxicating compound or compounds or any combination thereof content of your blood and warned of the consequences pursuant to Section ...501.1 of The Illinois Vehicle Code.

☒ Because you refused to submit to or failed to complete testing, your driver's license and/or privileges will be suspended for a minimum of 6 months.*

Because you submitted to testing conducted pursuant to Section 11-501.2 which disclosed:

☐ an alcohol concentration of _____, which is 0.08 or more;
☐ any amount of a drug, substance or intoxicating compound in your blood or urine resulting from the unlawful use or consumption of cannabis listed in the Cannabis Control Act, a controlled substance listed in the Illinois Controlled Substances Act or an intoxicating compound listed in the Use of Intoxicating Compounds Act;

your driving privileges will be suspended for a minimum of 3 months.*

''OTE:  If it is determined that you are not a "first offender," as defined in Section 11-500 of The Illinois Vehicle Code and: ;
You refused to submit to, or failed to complete, all requested chemical testing, the period of suspension will be a minimum of 3 years; or if
You submitted to chemical testing which resulted in an alcohol concentration of 0.08 or more or any amount of a drug, substance or intoxicating compound resulting from the unlawful use or consumption of cannabis listed in the Cannabis Control Act, a controlled substance listed in the Illinois Controlled Substances Act or an intoxicating compound listed in the Use of Intoxicating Compounds Act, the period of suspension will be a minimum of 1 year.

ver's license surrendered? ☒ Yes  ☐ No;  Reason _____

Driver's license valid at time of arrest? ☒ Yes (Sign receipt)  ☐ No (Void receipt)

ive complied with Section 11-501.1 by having reasonable grounds to believe the arrestee was in violation of Section 11-501 or a similar provision of a local ordinance... plain) **SAW VEHICLE AT GE ROAD & TOWANDA BARNES EXIT A BUSINESS**
**W/O HEADLIGHTS, SQUEAL TIRES, SUSPECT STATED HE HAD DRANK 4 OR 5 BEERS**
**AND SAID IT WAS PROBABLY TO MUCH**

ursuant to Section 11-501.1 of The Illinois Vehicle Code I have:
Served immediate notice of summary suspension of driving privileges on the above named person.
Given notice of summary suspension of driving privileges to the above named person by depositing in the United States mail said notice in an envelope with the postage prepaid addressed to said person at the address shown on the Uniform Traffic Ticket.

der penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the ements set forth in this instrument are true and correct.

**NOV 29 1999**

CIRCUIT CLERK

**9487**

Signature of Arresting Officer                Identifying Number

**McLEAN CO Sheriffs POLICE**        Date **11 / 27 / 99**

## FELONY
## RECORD SHEET

se No. __00 CF 1460__

Nature of Case  I–DRIVING WHILE LICENSE R
VOKED/SUSPENDED–SUBSEQU.
OFFENSE FELONY
II–OPERATION OF UNINSURED
MOTOR VEHICLE
Attorneys  III–FAILURE TO CARRY OR DIS-
PLAY DRIVERS LICENSE OR
PERMIT

PEOPLE OF THE STATE OF ILLINOIS

VS

BRUCE LAMBERT ROLAND

FILED
JAN 9 - 2008
McLEAN COUNTY
CIRCUIT CLERK

J. H. Kelley
BH Arnold

| DATE | | JUDGE AND REPORTER | | COSTS | |
|---|---|---|---|---|---|
| | | | | Dollars | Cents |
| 05 | 00 | | | | |
| | | | CLERK'S FILING FEE | 40 | 00 |
| | | | COURT SECURITY FEE | 15 | 00 |
| | | | STATE'S ATTORNEY FEE | 30 | 00 |
| | | | AUTOMATION FEE | 5 | 00 |
| | | | SURCHARGE | | |
| | | | VCVA | | |
| | | | COURT DOCUMENT STORAGE FEE | 5 | 00 |
| | | | COURT SYSTEM FEE | 5 | 00 |

500  # Notice of Arraignment / Status
at 9:00 AM on Dec 22, 2000 filed
bond to be transferred from
00TR 24696

200  Deft by counsel, BH Arnold;
ASA Buck Saith

People shows the deft atty and moves
to continue this case. Motion allowed.
This case is hereby ordered continued
to 1-12-01 at 10:00am   AHH.

00  Appearance ...

No. OOCF 1460          RECORD SHEET          Page No. 2

| DATE | JUDGE AND REPORTER | | COSTS | |
| | | | Dollars | Cents |
|---|---|---|---|---|
| 12 01 | Art DeCardy Trust | Deft., Age _36_, appears in person with copy of complaint Bond set at $ ~~posd~~ Deft pleads not guilty and (does not) waive(s) jury _____ ordered set for _arraign_ on _2-9-2000_ at _10:00a.m._ On failure to furnish bond Deft. remanded to custody of Sheriff Attorneys to ~~issue~~. Affidavit on file. Public Defender (granted) (denied) | | |
| 16 01 | | Motion for leave to withdraw as counsel filed | | |
| 24 01 | | BILL OF INDICTMENT RETURNED Cts. I, II + III filed. | | |
| 06 01 | | Motion and Notice of Withdraw filed | 34 | 00 |
| 9 01 | DeCardy Black | Deft in person; ASA Thomson. On _court_ met., w/o objection ~~of~~ _____, cause continued for _arraigns_ to _3-2-01_ @ 10:00a.m. _State_ to notice. _def atty. BM Arnold._ Cause set for hearing on motion of def atty. to w/draw 3-2-01 @ 10:00 a.m. | | |
| 21 01 | | Notice filed | | |
| 2 01 | DeCardy Black | Deft w/ Bob Arnold; ASA Weng. On _def. atty._ met., w/o objection of _state_ cause continued for _status_ to 3-15-01 @ 10:00 a. AFH ~~to notice~~. Order P.D. appointed. Motion of BM Arnold to withdraw heard & allowed. ~~granted~~ | | |
| 16 01 | DeCardy ... | Defendant present w/ PA Hill and ASA S. Thompson. Status hearing continued to 5/4/01 @ 10:30 by agreement. | | |
| 21 01 | | Discovery Compliance Pursuant to Rule | | |

Case No. 00CF 1460    RECORD SHEET    Page No. 3

| DATE | JUDGE AND REPORTER | | COSTS Dollars | Cent |
|------|-------------------|---|---------------|------|
| 4 02 01 | | Answer to State's Motion for Discovery filed | | |
| 2 01 | | On self def JKelly met, w/o objection of State, cause continued for States to 5-8-01 @ 10:00 q. Agtd to notice. | | |
| 2 01 | | Appearance filed - Joseph Kelly | | |
| 4 01 | | Notice filed | | |
| 18 01 | DeCardy | By agreement, status hearing cont to 6/25/01 @ 10:00. AHn. Order granting leave to depart state entered. See Order | | |
| 25 01 | | Def and by J. Kelly ASA Thompson On dthat motion, w/o objection, cause continued for Status to 8-27-01 at 10:00 am to notice / AHN | | |
| 27 01 | DeCardy | By agreement, cause continued for plea to 11.9.2001 @ 1:30 pm. AHN. | | |
| 9 01 | Defendt Brent | Dft w/ J. Kelly; ASA Thompson. Dft pleads guilty to Count I Per plea agreement in which Court concurs. Counts 2+3 nol-Prossed. Dft. is Sentenced to 2½ years imprisonment D.O.C See order. | | |
| 13 01 | | Certified copies of Judgment-Sentence to IDOC (3) Sent to Sheriff's Dept w/proof of receipt filed. | | |
| 14 01 | | State's Attorney History Sheet Filed. | | |
| 15 01 | | Informations dismissed nol-prossed. | | |

Case No. _OOCF1460_    RECORD SHEET    Page No. ___4___

| DATE | JUDGE AND REPORTER | | COSTS Dollars | Cent |
|---|---|---|---|---|
| 1 26 01 | Art | Deft by counsel, S. Kelly; ASA Thompson. Stipulated amended order for commitment to D.O.C. So Order. | | |
| 2 14 01 | | Certified copy of Amended Judgment-Sentence mailed to: Dept of Corrections, Prisoner Review Board and Centralia Correctional Cntr (certified mail as proof of receipt) # B53847. | | |
| 2 10 01 | | Notice of filing, Notice of Motion for Reduction of Sentence, Motion for Reduction of Sentence filed | | |
| 9 02 | DeCardy | More than 30 days having elapsed since, sentencing on Nov. 9, 2001, to filing of Motion on Dec. 10, 2001, defendant's Motion for Reduction of Sentence is hereby stricken. See letter. | | |
| 29 02 | ✓ | Jail Sheet Time Filed. | | |
| 28 01 | ✓ | Certified mail receipt returned and filed. | | |
| 28 01 | ✓ | Certified mail receipt returned and filed. | | |
| 3 03 | | REFERRED TO TSI FOR COLLECTION | | |
| 10 03 | | COLLECTION CANCELLED/BAD ADDRESS | | |
| 15 04 | Jme | TME Inmate Sheet Filed | | |
| 15 04 | Jme | Ext given Per SA. Bay to appear. date 11/12/04 at 1:30 PM. | | |
| 15 04 | Jme | Summary of Collection efforts filed | | |
| 27 04 | Jme | Mail returned & filed. | | |
| 12 04 | A | Def. fails to appear. On State's Motion Bond forfeited, warrant to issue. Bond set at $ 1000 | | |

IN THE CIRCUIT CC   T OF THE ELEVENTH JUDICIAL CIRCUI  
McLEAN COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS
VS.
**BRUCE LAMBERT ROLAND**

*Date of Information:*     05/25/2000
2603 KEYSTONE
BLOOMINGTON, IL 61704-

*Alias:* BRIAN JAMES ROLAND

*DOCKET NO.*
2004008065
*CASE NO.*
2000CF001460



*PERSON ID:* 100011739

*DATE:* 11/09/2001

# WARRANT OF ARREST





*DOCKET NO.* 2004008065

TO ALL PEACE OFFICERS OF THE STATE OF ILLINOIS:

*You are hereby commanded to arrest* **BRUCE LAMBERT ROLAND** *and bring said person without unnecessary*

*delay before Judge* **PAUL G. LAWRENCE** *of the Circuit court of the Eleventh Judicial Circuit, McLean County, in the Courtroom*

*usually occupied by this Judge in the Law & Justice Center, Bloomington, Illinois, or if the above-named Judge is unable to act, before the most*

*accessible Court in said County, to answer for the offense(s) of*

DRIVING WHILE LICENSE REVOKED / SUSPENDED-SUBSEQUENT OFFENSE FELONY - 2ND DRIVING
UNDER THE INFLUENCE Stat:625 ILCS 5/6-303(d)

*and hold said person to bail.*

*Arrest on:* Contempt- Failure to Pay or Appear    *Date of Offense:* 10/18/2000

*The amount of bail is*   $  1,000.00    *Type Bail:* Bond - 10%

*ISSUED AT BLOOMINGTON, ILLINOIS, this*   **16th day of November, 2004.**

---

## IDENTIFICATION INFORMATION

Date Of Info: 11/09/2001

| Sex | Race | Date of Birth | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|
| M | W | 01/26/1964 | 511 | 210 | BRO | BLU |

| Master ID # | Social Security # | Drivers License | State | Originating Agency |
|---|---|---|---|---|
| 100011739 | 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 | R45307264026 | IL | BPD |

STATE OF ILLINOIS  }
COUNTY OF McLEAN  }    ss.           RETURN OF SERVICE

*I have executed the within Warrant by arresting the within-named defendant in accordance with the provisions of 725 ILCS 5/110-9,*
*defendant released on bail in sum of $_____ this _____ day of _____*

_____.   *FEES:* Service and Return $_____; *Mileage* (_____ mi. @_____ $)
$_____; *TOTAL:* $_____.

*Peace Officer*       FILED
NOV 16 2004
CIRCUIT CLERK

STATE OF ILLINOIS
IN THE CIRCUIT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

ROLAND BRUCE LAMBERT
( Defendant's Name )

Case No. _____ 2000CF001460

# NOTICE TO DEFENDANT

YOU ARE HEREBY NOTIFIED that the following fine and court costs have been assessed against
you in connection with this case:

| | | Assessed | Paid | |
|---|---|---|---|---|
| 010 | CIRCUIT CLERK | $ 40.00 | $ .00 | 705 ILCS 105/27.1 |
| 090 | STATE'S ATTORNEY | $ 30.00 | $ .00 | 55 ILCS 5/4-2002 |
| 100 | SHERIFF | $ 34.00 | $ .00 | 55 ILCS 5/4-5001 |
| 120 | COURT AUTOMATION | $ 5.00 | $ .00 | 705 ILCS 105/27.3a |
| 130 | COURT SYSTEM FEE | $ 50.00 | $ .00 | 55 ILCS 5/5-1101 |
| 131 | SECURITY FEE | $ 15.00 | $ .00 | 55 ILCS 5-1103 |
| DSF | DOCUMENT STORAGE FEE | $ 5.00 | $ .00 | 705 ILCS 105/27.3c |
| RES | Restitution | $ 60.00 | $ .00 | |

| | | |
|---|---|---|
| TOTAL AMOUNT DUE | $ | 239.00 |
| Past Due Probation | $ | .00 |
| Less Bond Posted | $ | .00 |
| NET DUE/REFUND | $ | 239.00 |
| Remaining Probation Fee ( 016) | $ | .00 ($ _____ X _____ mos. ) |
| **GRAND TOTAL** | $ | 239.00 |

YOU HAVE BEEN ORDERED BY THE PRESIDING JUDGE TO <u>PAY THE FINE AND
COSTS IN FULL BY **11/12/2004**</u> AT _1: 30 Pm_ OR APPEAR BEFORE THE COURT.

<u>FAILURE TO PAY SAID AMOUNT OR APPEAR ON SAID DATE MAY RESULT IN A
FORFEITURE AND/OR A WARRANT BEING ISSUED FOR YOUR ARREST.</u>

Mailing address : Circuit Clerk of McLean County , P.O. BOX 2420 , BLOOMINGTON , IL , 61702-2420
Street address: 104 W Front St., Bloomington, IL, 61702
If receipt of payment is needed, please enclose self-addressed stamped envelope.



McLEAN    F I L E D    COUNTY
JAN 15 2004
CIRCUIT CLERK

I acknowledge Receipt of this Notice:

_____          _____
Date                                       Signature

_____
Mailing Address


CERTIFICATE OF MAILING

I, the undersigned, certify that I did on _____1-15-04_____ deposit a copy of this Notice to Defendant,
in the United States Mail, in a sealed envelope with postage prepaid, addressed
to: _Roland Lambert_ _Wildwood_____
    _____4360_____ _____
    _____Rhinelander, WI, 54501_____

                                    CIRCUIT CLERK OF MCLEAN COUNTY

                        By: _____
                                        Deputy

Case: 1:13-cv-03947 Document #: 2-17 Filed: 05/28/13 Page 1 of 50 PageID #:192
Case: 17-1113   Document: 33-3   Filed: 09/21/2017   Pages: 781

ent of Corrections - Inmate Search                                    Page 1 of 3

# Illinois Corrections
## Department of

Inmate Search

Other Inmate Locaters

Federal Inmate Locater

Press for Printer Friendly Version (no graphics)

CHECK TO INCLUDE PHOTO ☑



## B53847 - ROLAND, BRUCE L.

| | |
|---|---|
| Parent Institution: | Logan Correctional Center |
| Inmate Status: | PAROLE |
| Location: | PAROLE DISTRICT 2 |
| Discharge Reason: | |

### VITALS
| | |
|---|---|
| Date of Birth: | 01-26-1964 |
| Weight: | 190 lbs. |
| Hair: | Blonde or Strawberry |
| Sex: | Male |
| Height: | 6 ft. 00 in. |
| Race: | White |
| Eyes: | Blue |

### MARKS, SCARS, & TATTOOS
TATTOO, CHEST - SKULL ON REBAL FLAG
TATTOO, ARM, RIGHT UPPER - DRAGON
TATTOO, ARM, LEFT UPPER - EAGLE/SKULL
TATTOO, FOREARM, LEFT - TRIBAL ART W/"DANIELLE"
TATTOO, HAND, LEFT - MARIJUNA LEAF

### ADMISSION / RELEASE / DISCHARGE INFO
| | |
|---|---|
| Custody Date: | 11/15/2001 |
| Projected Parole Date: | |
| Paroled Date: | 11-07-2003 |
| Tentative Discharge Date: | |
| Discharge From Parole: | 11/09/2004 |

*McLEAN COUNTY FILED JAN 14 2004 CIRCUIT CLERK*

### SENTENCING INFORMATION
| MITTIMUS: | 00CF1460 |
|---|---|
| CLASS: | 4 |
| COUNT: | 1 |
| OFFENSE: | REVOKED/SUSPENDED 2ND DUI |
| CUSTODY DATE: | 11/09/2001 |
| SENTENCE: | 2 YEARS 6 MONTHS 0 DAYS |
| COUNTY: | MCLEAN |
| SENTENCE DISCHARGED?: | NO |
| | |

Exhibit 16-2

Illinois Department of Correcti   - Inmate Search                    Page 2 of 3

| | |
|---|---|
| MITTIMUS: | 01CF13 |
| CLASS: | 4 |
| COUNT: | 1 |
| OFFENSE: | DUI LIC SUSPENDED OR REVOKED |
| CUSTODY DATE: | 11/09/2001 |
| SENTENCE: | 2 YEARS 6 MONTHS 0 DAYS |
| COUNTY: | MCLEAN |
| SENTENCE DISCHARGED?: | NO |

| | |
|---|---|
| MITTIMUS: | 01CF127 |
| CLASS: | 4 |
| COUNT: | 1 |
| OFFENSE: | REVOKED/SUSPENDED 2ND DUI |
| CUSTODY DATE: | 11/09/2001 |
| SENTENCE: | 2 YEARS 6 MONTHS 0 DAYS |
| COUNTY: | MCLEAN |
| SENTENCE DISCHARGED?: | NO |

| | |
|---|---|
| MITTIMUS: | 92CF938 |
| CLASS: | 4 |
| COUNT: | 1 |
| OFFENSE: | DRVG U/INFLU/DRUG/<10/3RD/SUBQ |
| CUSTODY DATE: | 01/14/1994 |
| SENTENCE: | 3 YEARS 0 MONTHS 0 DAYS |
| COUNTY: | MCLEAN |
| SENTENCE DISCHARGED?: | YES |

| | |
|---|---|
| MITTIMUS: | 92CF938 |
| CLASS: | 4 |
| COUNT: | 1 |
| OFFENSE: | REVOKED/SUSPENDED 2ND DUI |
| CUSTODY DATE: | 01/14/1994 |
| SENTENCE: | 3 YEARS 0 MONTHS 0 DAYS |
| COUNTY: | MCLEAN |
| SENTENCE DISCHARGED?: | YES |

| | |
|---|---|
| MITTIMUS: | 94CF408 |
| CLASS: | 3 |
| COUNT: | 1 |
| OFFENSE: | THEFT >$300-$10K |
| CUSTODY DATE: | 01/14/1994 |
| SENTENCE: | 4 YEARS 0 MONTHS 0 DAYS |
| COUNTY: | MCLEAN |
| SENTENCE DISCHARGED?: | YES |

Illinois Department of Correcti ˙ ˙ - Inmate Search

Copyright © 2002
IDOC

IDOC Privacy Information | Illinois Privacy Information | Kids Privacy | Web Accessibility | IDOC Webmaster

# MCLEAN COUNTY CIRCUIT CLERK
## SUMMARY OF COLLECTION EFFORTS ON PAST DUE ACCOUNTS

CASE NUMBER _00 CF 1460_

NAME _Bruce Roland_

FINE AMOUNT _Ø_

COST AMOUNT _179.00_

PAST DUE PROBATION FEES _Ø_

RESTITUTION _60.00_

PUBLIC DEFENDER FEE _Ø_

TOTAL DUE _239.00_

DATE DUE _8/11/03_

DEFENDANT'S ADDRESS _4360 Wildwood_

_Rhinelander, WI 54501_

## COLLECTION INFORMATION

DATE SENT _10/3/03_

DATE CANCELLED FROM COLLECTIONS _11/10/03_

DATE REFERRED TO S.A FOR REVIEW _____

## STATE'S ATTORNEY ACTION

PLANNED ACTION _ADC_

DATE _11-12-03_

STATE'S ATTORNEY SIGNATURE _M wix_

_St Notified in
Clerk DOC
D list given_

### IN THE CIRCUIT COURT, 11th JUDICAL CIRCUIT
### McLEAN COUNTY, ILLINOIS

Subject:    Bruce Lambert Roland                              W/M   01-26-64

Memo – Re: Prisoner's period spent in jail in connection with case No. 2000CF001460

      Driving While License Revoked

### INTERVAL

11 - 09 - 01   to   11 - 15 - 01

David Owens _____

                                                               Sheriff

      By   Records
11/14/2001



# Circuit Court of Illinois

ELEVENTH JUDICIAL CIRCUIT
McLEAN COUNTY

CHAMBERS OF
WILLIAM D. DeCARDY
LAW & JUSTICE CENTER
BLOOMINGTON, IL 61701
(309) 888-5245

COUNTIES
FORD
LIVINGSTON
LOGAN
McLEAN
WOODFORD

January 9, 2002

Mr. Bruce Lambert Roland
Reg. No. B-53847
Centralia Correctional Center
9330 Shattuc Road
P.O. Box 7711
Centalia, Illinois 62801

RE:    People v. Bruce L. Roland
       Cases: 01 CF 13, 01 CF 127, 00 CF 1460,
       99 DT 712 and 01 CM 1059

Dear Mr. Roland:

Please be advised that the Court has on this date entered the following entry upon the docket in the above-entitled cases:

"More than 30 days having elapsed since sentencing on November 9, 2001, to filing of Motion on December 10, 2001, defendant's Motion for Reduction of Sentence is hereby stricken."

Respectfully,

William D. DeCardy
Associate Circuit Judge

WDD/sjw

**FILED**
McLEAN JAN 0 9 2002 COUNTY
CIRCUIT CLERK

cc:    Joseph Kelley, Attorney at Law
       Sandra Thompson, Assistant States Attorney

## REPORT OF FELONY CONVICTION

Circuit Court, _McLean_ County, _Eleventh_ Municipal District

☒ Involving a motor vehicle as referenced in section 6-205(a)3 of the *Illinois Vehicle Code*.
☐ Mandatory Insurance as referenced in section 7-603 of the *Illinois Vehicle Code*.

| | |
|---|---|
| Driver's License Number _R453072 0402 6_ | Licensing State _IL_ |
| Plate Number | Licensing State |

Full Name _Roland_ Last _Bruce Lambert_ First _____ Middle

Street _4360 Wildwood_

| City _Rhinelander_ | County _Oneida_ |
|---|---|
| State _Wisconsin_ | Zip _54501_ |

| COL | Classification | Sex _M_ | Date of Birth Month _08_ Day _26_ Year _1964_ |
|---|---|---|---|

Case No./Docket Number _00 CF 1460_ Ticket Number _Indictment_

Arrest Date _10 / 18 / 2000_ Conviction Date _11 / 26 / 2001_
        Month  Day  Year                  Month  Day  Year

Description of Offense _Ct. 1, Driving While license revoked/suspended_
_Subsequent offense felony, Class 4_

Violation of Chapter _625 ILCS_ Section _5/6-303_ Para. _(d)_

☐ Operating a Commercial Motor Vehicle    ☐ Operating a Placarded HazMat Vehicle

I certify that a motor vehicle was used in the commission of the above identified felony.

COURT SEAL    _William D. DeCardy_
        Signature of Judge or State's Attorney

I hereby certify that the information on this Report of Felony Conviction is a true abstract of this Court, as required by The Illinois Vehicle Code.

**FILED**
DEC 17 2001
CIRCUIT CLERK

McLEAN COUNTY

_Sandra K. Parker, Clerk_
_Valorie A. French, Deputy_
        Signature of Circuit Clerk

Date mailed to the
Secretary of State _12 / 17 / 2001_
        Mo.  Day  Yr.

MAIL TO:
    Secretary of State
    Driver Services Department
    2701 South Dirksen Parkway
    Springfield, Illinois 62723

OSD CC-112.2

FOR OFFICE USE ONLY

Clerk of the Court
Sandra Parker
The Law and Justice Center
104 W. Front St.
P.O. Box 2400
Bloomington,IL.61702-2400


RE:    Case No. 99-DT-712    01-CF-13    01-CM-1059
           00-CF-1460    01-CF-127
       Warrant
         NO._____

To Clerk of the Court, for the ____ELEVENTH_____Judicial Circuit:

      Please find enclosed an original and ___1___copy(s) of a

         Motion For Reduction Of Sentence_____

One (1) additional copy is enclosed for you to kindly file/stamp

and return to me.

      I THANK YOU in advance for your time, effort, and consideration

and  should you need further assistance, please contact me at the

address below.


                              Respectfully Submitted,

                              /s/ [signature]
                              _____

                              Reg. No. B-53847_____
                              Centralia Corr. Center
                              9330 Shattuc Road
                              P. O. Box 7711
                              Centralia, Illinois
                                          62801
                              Ph.(618) 533-4111


FILED
McLEAN DEC.10 2001 COUNTY
CIRCUIT CLERK

IN THE

CIRCUIT COURT OF THE __11th__ JUDICIAL CIRCUIT

McLean COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,

    Plaintiff-Petitioner,

       -vs-

BRUCE LAMBERT ROLAND ,

    Defendant-Respondent.

)
)
)
)
)
)
)
)
)
)
)

99-DT-712
00-CF-1460
01-CF-13
CASE NO. 01-CF-127
01-CM-1059

HONORABLE: William D. DeCardy
Judge Presiding.

## NOTICE OF FILING

TO: State's Attorney
    Charles Reynard
    The Law and Justice Center
    104 W. Front St.
    P.O. Box 2400
    Bloomington, IL. 61701-2400

PLEASE TAKE NOTICE that on __December 6th__, 2001, I shall cause to be filed by U.S. Mail with the Clerk of the Circuit Court of __McLean__ County, Illinois, at __Centralia C.C.__, __Centralia__, Illinois __62801__, the attached __Motion For Reduction Of Sentence__ which is herewith served upon you.

SUBSCRIBED AND SWORN TO before me this __6th__, day of December _____, 2001.

_____
NOTARY PUBLIC

"OFFICIAL SEAL"
Gina R. Feazel
Notary Public, State of Illinois
My Commission Exp. 08/31/2005

Defendant, pro se. (Signature)

Bruce L. Roland
Defendant's Name (Print or Type)
Number B-53847
Centralia Correctional Center
P.O. Box 7711
Centralia, Illinois 62801

FILED
McLEAN DEC 1 0 2001
CIRCUIT CLERK COUNTY

IN THE CIRCUIT COURT OF ___McLEAN___ COUNTY, ILLINOIS
THE COURT FOR THE ___ELEVENTH___ JUDICIAL CIRCUIT
CRIMINAL DIVISION

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff, | ) ) ) ) | 99-DT-712 00-CF-1460 01-CF-13 |
| vs. | ) ) | No. 01-CF-127 01-CM-1059 |
| BRUCE LAMBERT ROLAND , Defendant. | ) ) ) | |

## NOTICE OF MOTION FOR REDUCTION OF SENTENCE

NOW COMES the defendant, ___Bruce L. Roland___, pro se, in order to give notice of intention to file a MOTION FOR REDUCTION OF SENTENCE before the Court.

This notice of MOTION FOR REDUCTION OF SENTENCE is being filed pursuant to Illinois Revised Statutes (1991), Chapter 38 Section 1005-8-1 et. seq., [730 ILCS 5/5-8-1 et. seq.]

Defendant is currently incarcerated at Centralia Correctional Center, Centralia, Illinois, 62801.

WHEREFORE, the defendant, ___Bruce L. Roland___, prays for the Court to review the sentence in case numbers ( As mentioned above) of imprisonment entered against defendant on ___11-9-01___ and to reduce the defendant's sentence.

Respectfully submitted,

Defendant, pro se
Number B-53847
Centralia Correctional Center
P.O. Box 7711
Centralia, Illinois 62801

FILED
McLEAN
DEC 1 0 2001
CIRCUIT CLERK
COUNTY

IN THE CIRCUIT COURT OF ___McLEAN___ COUNTY, ILLINOIS
THE COURT FOR THE ___ELEVENTH___ JUDICIAL CIRCUIT
CRIMINAL DIVISION

THE PEOPLE OF THE STATE            )
   OF ILLINOIS,                    )          99-DT-712
              Plaintiff,           )          00-CF-1460
                                   )          01-CF-13
       vs.                         )   No.___01-CF-127___
                                   )          01-CM-1059
BRUCE LAMBERT ROLAND___ ,          )
              Defendant.           )
                                   )

## MOTION FOR REDUCTION OF SENTENCE

NOW COMES the defendant, ___Bruce L. Roland___ , pro se, and respectfully requests the Court to reduce the sentence of imprisonment imposed upon the defendant in the above captioned cause pursuant to Illinois Revised Statutes (1991) Chapter 38 Section 1005-8-1 et. seq., [730 ILCS 5/5-8-1 et. seq.].

1.    The defendant was sentenced by the Court to a term of imprisonment in the Illinois Department of Corrections.
___5___ years, for the offensesof ___Driving On A Revoked License and Aggravated DUI___ .

2.    That the above sentence was imposed upon the defendant by the Honorable Judge ___William D. DeCardy___ on ___November 9th___ ,___2001___ , following a
( ) jury trial  ( ) bench trial  (XX) plea agreement.

FILED
DEC 1 0 2001
McLEAN                    COUNTY

3.    The defendant requests that the Court review the sentence imposed because there exists a litany of substantial extenuating circumstances that surround the above captioned cause.  The defendant further states the following in support of his motion (State all the reasons why you believe your sentence should be reduced):

Excessive Sentence, I would ask this honorable Court to reconsider the sentence of five (5) years to be reduced to four (4) years or less allowing me to introduce circumstances such as character references, mental state, financial hard-ship on Spouse and Children, Therapy goals, Treament plans. Wherefore, I ask this Honorable Court for the opportunity to present my circumstances in open court.

_____

_____

4.    WHEREFORE, defendant prays the Court will review the terms of imprisonment and grant relief on MOTION FOR REDUCTION OF SENTENCE.  Defendant further prays that the Court will enter an order thereby reducing his sentence to be served in the Illinois Department of Corrections.

/s/ _____
Defendant, pro se

STATE OF ILLINOIS          )
                           )    SS
COUNTY OF CLINTON          )

<u>AFFIDAVIT</u>

I, <u>Bruce L. Roland</u>, deposes and says that as to the petition herein, he is the Defendant in the above entitled cause; that he has read the foregoing document, by his signed, and that the statements contained therein are true in substance and in fact.

/s/ _____
Defendant, pro se

Signed before me this <u>6th</u> day of <u>December</u>, 20<u>01</u>.

_____
Notary Public

```
"OFFICIAL SEAL"
Gina R. Feazel
Notary Public, State of Illinois
My Commission Exp. 08/31/2005
```

IN THE CIRCUIT COURT OF _____ COUNTY, ILLINOIS
THE COURT FOR THE _____ JUDICIAL CIRCUIT
CRIMINAL DIVISION

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. _____ |
| _____, Defendant. | ) ) ) ) | |

ORDER

Upon the review of the defendant's MOTION FOR REDUCTION OF SENTENCE, and being fully advised in the premises;

IT IS HEREBY ORDERED that the defendant, _____

_____, shall have his sentenced

reduced to a term of _____ in the Illinois

Department of Corrections.

ENTERED:

_____
Judge

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
STATE OF ILLINOIS, COUNTY OF McLEAN

PEOPLE OF THE STATE OF ILLINOIS

vs.                                                    Case No. _00 - CF - 1460_

_Bruce Lambert Roland_

Defendant

_AMENDED_
## JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above-named defendant _____ has been adjudged guilty of the offenses enumerated below,
                                    (date of birth)
IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | OFFENSE | DATE OF OFFENSE | STATUTORY CITATION | CLASS | SENTENCE |
|---|---|---|---|---|---|
| _I_ | _Driving While Lic. Revoked (sub. fel.)_ | _10/8/00_ | _625 ILCS 5/6-303(d)_ | _4_ | _2_ Yrs. _6_ Mos. |

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:

_____  _____  _____  _____  ___  ____ Yrs. ____ Mos.
and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:

_____  _____  _____  _____  ___  ____ Yrs. ____ Mos.
and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:

_____  _____  _____  _____  ___  ____ Yrs. ____ Mos.

IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) _____I_____ be (concurrent with) (consecutive to) the sentence imposed in case number _01-CF-127_ in the Circuit Court of _McLean_ County; be (concurrent with) (consecutive to) the sentence imposed in case number _01-CF-13_ in the Circuit Court of _McLean_ County; be (concurrent with) (consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

The Court finds that the defendant is entitled to receive credit for time actually served in custody (of ____0____ days as of the date of this order) (from/to [specify dates]): _____

(Check boxes if applicable)

☐ Convicted of a class _____ offense but sentenced as a class X offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in great bodily harm to the victim (730 ILCS 5/3-6-3[a][2][iii]).

IT IS FURTHER ORDERED that Defendant is sentenced to pay a fine of $ _0_ plus costs of $_145 + 34.00 Sheriff's fee_ ; to pay restitution of $ _0_ to _____ ; all to be paid by _within 6 months of release_ . Bond applied.

IT IS FURTHER ORDERED that _____

IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

This order is ( ✓ effective immediately) (_____ stayed until _____ ).

FILED
NOV 2 6 2001
McLEAN CO

DATE: _11-26-01_  ENTER: _____

_____
JUDGE



F I L E D

NOV 1 4 2001

CIRCUIT CLERK

McLEAN COUNTY STATE'S ATTORNEY
104 W. Front Street
Bloomington, IL   61701


STATE'S ATTORNEY'S STATEMENT FOR DEFENDANT
COMMITTED TO THE ILLINOIS DEPARTMENT OF CORRECTIONS

Defendant's Name:   Bruce Roland

Defendant's Address: McLean County Jail
                     Bloomington, IL


Sex: male               Race:  white
Date of birth: 1-26-64        Other:

Defendant's Prior Record: FBI: 308315x8   IBI:

McLean County Case Number:     00 cf 1460
Arresting Agency:   Bloomington
Charges:   DWLR - sub offense, operation uninsured motor vehicle,
failure to carry or display drivers license or permit,


Offenses Convicted of:   DWLR - sub offense


Victim/Complainant:
Address:


Details of Offense:  see attached indictment


Sentencing Date:    11-9-01

Sentence Imposed:   2 ½ years DOC


Relevant Information about defendant:


(Assistant) State's Attorney:  Sandy Thompson
Sentencing Judge:   William DeCardy


      Prepared pursuant to 38 Illinois Revised Statutes 1005-4-1(d)
1982

RECEIVED

NOV 14 200_

McLEAN CO. Sheriff's Dept.

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
STATE OF ILLINOIS, COUNTY OF McLEAN

PEOPLE OF THE STATE OF ILLINOIS

vs.                                                    Case No. _00 - CF - 1460_

_Bruce Lambert Roland_

Defendant

COPY

## JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above-named defendant _1-26-6X_ has been adjudged guilty of the offenses enumerated below,
                                    (date of birth)

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | OFFENSE | DATE OF OFFENSE | STATUTORY CITATION | CLASS | SENTENCE |
|---|---|---|---|---|---|
| I | Driving While License Revoked (sub. Fel) | 10-18-00 | 625 ILCS 5/6-303(d) | 4 | 2 Yrs. 6 Mos. |

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:

_____    _____    ___ Yrs. ___ Mos.

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:

_____    _____    ___ Yrs. ___ Mos.

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:

_____    _____    ___ Yrs. ___ Mos.

IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) ___I___ be (concurrent with) (consecutive to) the sentence imposed in case number _01-CF-127_ in the Circuit Court of _McLean_ County; be (concurrent with) (consecutive to) the sentence imposed in case number _01-CF-13_ in the Circuit Court of _McLean_ County; be (concurrent with) (consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

The Court finds that the defendant is entitled to receive credit for time actually served in custody (of ___0___ days as of the date of this order) from/to [specify dates]): _____

(Check boxes if applicable)

☐ Convicted of a class _____ offense but sentenced as a class X offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in great bodily harm to the victim (730 ILCS 5/3-6-3[a][2][iii]).

IT IS FURTHER ORDERED that Defendant is sentenced to pay a fine of $_____ _0_

plus costs of $ _$145.00 + 34.00 Sheriff's fee_ ; to pay restitution of $ _X 60_

_____ ; all to be paid by _within 6 months of release_ . Bond applied.

IT IS FURTHER ORDERED that _____

_____

IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

This order is (___✓___ effective immediately) (_____ stayed until _____).

FILED

NOV 0 9 2001    DATE: _11-9-01_    ENTER: _____

                                                                        JUDGE

STATE OF ILLINOIS
IN THE CIRCUIT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

_ROLAND BRUCE LAMBERT_    Case No. ___2000CF001460___
( Defendant's Name )

## NOTICE TO DEFENDANT

YOU ARE HEREBY NOTIFIED that the following fine and court costs have been assessed against you in connection with this case:

| | | Assessed | | Paid | |
|---|---|---|---|---|---|
| 010 | CIRCUIT CLERK | $ | 40.00 | $ .00 | 705 ILCS 105/27.1 |
| 090 | STATE'S ATTORNEY | $ | 30.00 | $ .00 | 55 ILCS 5/4-2002 |
| 100 | SHERIFF | $ | 34.00 | $ .00 | 55 ILCS 5/4-5001 |
| 120 | COURT AUTOMATION | $ | 5.00 | $ .00 | 705 ILCS 105/27.3a |
| 130 | COURT SYSTEM FEE | $ | 50.00 | $ .00 | 55 ILCS 5/5-1101 |
| 131 | SECURITY FEE | $ | 15.00 | $ .00 | 55 ILCS 5-1103 |
| DSF | DOCUMENT STORAGE FEE | $ | 5.00 | $ .00 | 705 ILCS 105/27.3c |
| RES | Restitution | $ | 60.00 | $ .00 | |

| | | | |
|---|---|---|---|
| TOTAL AMOUNT DUE | $ | 239.00 | |
| Past Due Probation | $ | .00 | |
| Less Bond Posted | $ | .00 | |
| NET DUE/REFUND | $ | 239.00 | |
| Remaining Probation Fee ( 016) | $ | .00 ($ _____ X _____ mos. ) | |
| **GRAND TOTAL** | $ | 239.00 | |

YOU HAVE BEEN ORDERED BY THE PRESIDING JUDGE TO **PAY THE FINE AND COSTS IN FULL BY** 08/11/2003.

**FAILURE TO PAY SAID AMOUNT OR APPEAR ON SAID DATE MAY RESULT IN A FORFEITURE AND/OR A WARRANT BEING ISSUED FOR YOUR ARREST.**

Mailing address : Circuit Clerk of McLean County , P.O. BOX 2420 , BLOOMINGTON , IL , 61702-2420
Street address: 104 W Front St., Bloomington, IL, 61702



I acknowledge Receipt of this Notice:

_____          _____
Date                                                                    Signature

_____
Mailing Address


## CERTIFICATE OF MAILING

I, the undersigned, certify that I did on ___*11/14/01*___ deposit a copy of this Notice to Defendant,

in the United States Mail, in a sealed envelope with postage prepaid, addressed to: __*Deft*__

_____*C/o  Mclean  County  Jail*_____

_____

_____

_____


                                        CIRCUIT CLERK OF MCLEAN COUNTY


                    By: _____
                                                Deputy




IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
STATE OF ILLINOIS, COUNTY OF McLEAN

PEOPLE OF THE STATE OF ILLINOIS

vs.                                              Case No. _O O - C F - / 4 6 0_

_Bruce hambert Roland_
Defendant

## JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above-named defendant _1~26~64_ has been adjudged guilty of the offenses enumerated below,
(date of birth)

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | OFFENSE | DATE OF OFFENSE | STATUTORY CITATION | CLASS | SENTENCE |
|---|---|---|---|---|---|
| _I_ | _Driving While License Revoked (sub. Fel)_ | _10-18-00_ | _625 ILCS 5/6-303(d)_ | _4_ | _2_ Yrs. _6_ Mos. |

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on: _____ Yrs. ___ Mos.

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on: _____ Yrs. ___ Mos.

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on: _____ Yrs. ___ Mos.

IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) _____I_____ be (concurrent with) (consecutive to) the sentence imposed in case number _01~CF-127_ in the Circuit Court of _McLean_ County; be (concurrent with) (consecutive to) the sentence imposed in case number _01-CF-13_ in the Circuit Court of _McLean_ County; be (concurrent with) (consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

The Court finds that the defendant is entitled to receive credit for time actually served in custody (of _0_ days as of the date of this order) from/to [specify dates]):_____

(Check boxes if applicable)

☐ Convicted of a class _____ offense but sentenced as a class X offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in great bodily harm to the victim (730 ILCS 5/3-6-3[a][2][iii]).

IT IS FURTHER ORDERED that Defendant is sentenced to pay a fine of $_____ _0_ __

plus costs of $ _$ 145°° + 34.00 Sheriffs Fee_ ; to pay restitution of $ _$60_

_____ ; all to be paid by _within 6 months of release_ . Bond applied.

IT IS FURTHER ORDERED that _____

_____

IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

This order is (_✓_ effective immediately) (_____ stayed until _____).

FILED
NOV 0 9 2001
McLEAN COUNTY

DATE: _11-9-01_    ENTER: _____

JUDGE

STATE OF ILLINOIS          )          IN THE CIRCUIT COURT OF THE
COUNTY OF MC LEAN     )          ELEVENTH JUDICIAL CIRCUIT

THE PEOPLE OF THE STATE OF ILLINOIS     )

VS.                                    )          NO. _00 CF- 1460_

_Bruce Roland_                          )

## MOTION TO DISMISS

Now comes the People of the State of Illinois by the State's Attorney of McLean County, and moves

this Court to:

- ☑ nol-pros (all) Counts ___II , III___ of the above-entitled cause
- ☐ dismiss the Rule to Show Cause
- ☐ dismiss the Petition to Revoke

for the following reason(s): _____Per Plea to CT. I_____

_____

_____

FILED
NOV 0 9 2001
McLEAN COUNTY CIRCUIT CLERK

_____11 / 9 / 01_____          _____
Date                                   (Assistant) State's Attorney

## ORDER

This cause coming on to be heard on the foregoing motion, and the Court being fully advised in the

premises:

IT IS, THEREFORE, ORDERED that (all) Counts ___II , III___

- ☑ of the above-entitled cause be and the same is/are hereby nol-prossed.
- ☐ the Rule to Show Cause is hereby dismissed.
- ☐ the Petition to Revoke is hereby dismissed.
- ☐ Defendant is ordered to pay costs from bond.
- ☐ There is a warrant outstanding for Defendant's arrest on this charge. Said warrant is hereby recalled.
- ☐ Defendant is in custody of the McLean County Sheriff's Department on this charge. If Defendant is not being held on any other charges or detainers, said Department is hereby ordered to release Defendant from custody.
- ☐ Defendant's bond is ordered released, after it is applied to fine and costs in this cause, in accordance with applicable statutes.

FILED
NOV 0 9 2001
McLEAN COUNTY CIRCUIT CLERK

_____11-9-01_____          _____
Date                                   Judge

white:        Court Copy
yellow:       State's Attorney

STATE OF ILLINOIS )
COUNTY OF McLEAN )

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

THE PEOPLE OF THE
STATE OF ILLINOIS

vs

Bruce Roland

)
)
)
)
)    No.
)
)
)

*00 CF 1460*
*01 CF 13*
*01 CF 127*
*99 DT 712*
*01 CM 1059*

**PLEA AGREEMENT**

The defendant and the State's Attorney hereby submit to the Court the following Plea Agreement which was reached pursuant to discussions initiated by them. The defendant consents to the Court's receiving evidence in aggravation and mitigation in advance of the tender of this plea. The Agreement is as follows:

1.  Defendant agrees to plead guilty to *CT. I 00 CF 1460 - CT I DWLR-SOF, CT. I* *01 CF 13* *Agg DUI, 01 CF 127 CT. I DWLR-SOF, 99 DT 712 CT. I*

2.  State's Attorney agrees to nolle pros *00 CF 1460 CT. II - IV, 01 CF 13 CT. II, III, IV* *99 DT 712, CTS. II, III, IV, V 01 CM 1059 - CT. I*

3.  The court will impose as a maximum sentence in this case the following:

    a.  $_____ fine, plus court costs and fees as authorized by law, payable as follows:

    b.  *5* years/months/days imprisonment in *IDOC* , as follows: *00 CF 1460 - 2½ years, 01 CF 13 and 01 CF 127 - 2½ yrs* *consecutive to 00 CF 1460 , 364 days on 99 DT 712* concurrent

    c.  Probation/Conditional Discharge/Court Supervision for _____ years/months with payment of court costs and fees no later than _____

        Payment of Restitution no later than _____, as follows:

PERSONS OWED                          AMOUNT PAYABLE
*Weavers Rent - 911*                  *$ 60.00*
*212 N. Main St.*                     FILED
*Norman, ILL 61761*

    d.  Additional conditions: _____

FILED
McLEAN    NOV 0 9 2001    COUNTY
CIRCUIT CLERK

4.  It is stipulated that the defendant's prior record is as follows: *92 OF 938 - DUI SOF, 94 CF 408 Theft over - no records*

5.  The defendant does (not) waive presentence investigation and written report.

Date *11/9/01*                        Defendant

_____                      _____
State's Attorney                      Defendant's Attorney

white:    Court copy
yellow:   State's Attorney

MACE PRINTING CO.

WAIVER OR DEMAND OF JURY AND PLEA TO COMPLAINT

STATE OF ILLINOIS,  } SS.
COUNTY OF McLEAN

IN THE CIRCUIT COURT 11th JUDICIAL CIRCUIT,
McLEAN COUNTY, ILLINOIS

The People of the State of Illinois
vs.

Bruce Roland

No. _00 CF - 1460_

COUNTY

FILED
NOV 0 9 2001
CIRCUIT CLERK
McLEAN

The undersigned defendant in the above entitled cause, comes now in open court in _____ own proper person, acknowledges receipt of copy of complaint in due time, acknowledges admonition by the Court as to effect of this plea, for plea herein says that _____ _he_ is guilty/not guilty in manner and form as charged in said complaint, and waives/demands a jury in said cause.

x _____

Date this ___9___ day of ___Nov___ 20_01_ .

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MC LEAN

THE PEOPLE OF THE STATE )
OF ILLINOIS, )
)
    Plaintiff, )
)
vs. ) No. 01 CF 13
) 01 CF 127
BRUCE ROLAND, ) 00 CF 1460
)
    Defendant. )

**FILED**

JUN 2 5 2001

McLEAN COUNTY

CIRCUIT CLERK

## MOTION TO CONTINUE

Now come the Defendant, BRUCE ROLAND, by his attorney of record, JOSEPH H. KELLEY, and moves for a continuance of this cause scheduled at 10:00 a.m. on June 25, 2001, and in support thereof states as follows:

1.    The above-captioned matter is presently set for a status hearing at 9:00 a.m. on June 25, 2001, before the Honorable William DeCardy presiding.

2.    BRUCE ROLAND now resides in the State of Wisconsin and an emergency mental health detention hearing is scheduled for June 25, 2001 at 11:00 a.m. in Oneida County Wisconsin.  Bruce Roland attempted to commit suicide on June 20, 2001.  Correspondence from Assistant Corporation Counsel Tomas Wiensch is attached to this motion.

3.    The Defendant waives any speedy trial rights occasioned by this continuance.

1

Lawrence R. Heath
Corporation Counsel

Thomas D. Wiensch
Assistant Corporation Counsel

CORPORATION COUNSEL
ONEIDA COUNTY
Court House Building
P.O. Box 400
Rhinelander, Wisconsin 54501-0400
Telephone (715) 369-6155
Thomas D. Wiensch 362-1550
Fax (715) 369-6284

June 21, 2001

VIA FACSIMILE 309-827-5693

Mr. Joe Kelly
Attorney at Law
237 E. Front Street
Bloomington, IL 61701

Re:    Bruce L. Roland

Dear Mr. Kelly:

As you are aware, Mr. Roland has a matter pending in Oneida County. This matter is scheduled for June 25, 2001 at 11:00 a.m. You need to be aware that Oneida County does not include weekends and holidays when calculating the time limits for these cases. Also, Mr. Roland's wife, Danielle, and her daughter, Brittany, are required to attend the hearing on Monday.

If you have any further questions, please do not hesitate to call.

Sincerely

Thomas D. Wiensch
Assistant Corporation Counsel
Bar No. 1018958

TDW/cla

Jun 21 01 01:21p    Roland Painting and Finis    309-665-0853    p.2

STATE OF WISCONSIN, CIRCUIT COURT, _Oneida_ COUNTY

IN THE MATTER OF THE CONDITION OF:

**STATEMENT OF EMERGENCY DETENTION BY LAW ENFORCEMENT OFFICER**

_Bruce C. Roland_
Name of Subject

_For Official Use_

_I.C.V_

_1-26-64_
Date of Birth

Case No. _01SC56-72_

- File this statement with the court immediately, because a probable cause hearing must be held within 72 hours of detention.
- Please print or type all information below. All blanks must be filled in.

_MON-25-01_
_72 hrs - Bus. Days_

I am a law enforcement officer and have cause to believe:
- The subject is mentally ill, drug dependent, or developmentally disabled.
- The subject evidences behavior which constitutes a substantial probability of physical harm to self or to others, as set forth in §51.15, Wisconsin Statutes.

My belief is based on specific and recent dangerous acts, attempts, threats or omissions by the subject as observed by me or reliably reported to me as stated below:

When: _6-20-01        1223_

Where: _4360 W. Idlewood_

Dangerous Behavior: _Bruce has been making suicidal threats for the past few days. Today he took 15-20 lithium caro. 500mg tabs and 15-20 5mg clonazepam in addition to a large amount of alcohol. Bruce has an extensive history of alcohol abuse and was treated at a mental health facility as a teenager. Just prior to our arrival Bruce attempted to cut his throat with a utility knife_

_Attach additional page if necessary._

Witnesses to the dangerous behavior (including officers who observed behavior):

| Witness Name | Address and Telephone |
|---|---|
| _Brittany J Sipp_ | _4360 Wildwood    362-7097_ |
| _Danielle E Roland_ | _4360 Wildwood    362-7097_ |

The subject was detained at _St. Mary's Hospital_
Name of §51.15(2) Facility

on _6-20-01_ at _1330_ ☐ am. ☒ pm.
Date        Time

| Subject's Street Address _4360 Wildwood_ | City _Rhinelander_ | County _Oneida_ | State _WIS_ |
|---|---|---|---|

Distribution:
1. Original - Court
2. §51.15(2) Detention Facility
3. Subject with Notice of Rights

Signature of Officer _B. Wyss_

Department _Oneida County Sheriff_

Name Printed or Typed _Bryan Wyss_

Telephone _361-5100_

E-901.8/99   STATEMENT OF EMERGENCY DETENTION BY LAW ENFORCEMENT OFFICER     §51.15, Wisconsin Statutes

STATE OF ILLINOIS
COUNTY OF McLEAN

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

FILED
MAY 18 2001
CIRCUIT CLERK

People
_____
Plaintiff/Petitioner,

vs

Bruce Roland
_____
Defendant/Respondent.

No. _____
00-CF-1460
01-CF-13
01-CF-127
99-DJ-712

## ORDER

This cause coming on for status hearing
People appearing by Assistant States Attorney Thompson,
Deft in person & by Attorney Joseph H. Kelley, and on
Deft's motion, without objection - status hearing
continued to June 25, 2001 at 10:00 AM.
  It is further ordered that Deft having
orally moved to be allowed to reside in
Wisconsin during pendency of these cases, and
the State's Attorney having no objection, Deft
is allowed to reside in Wisconsin upon
properly filing with the Clerk of the
Circuit Court a Waiver of Extradition

DATE: 5-18-01

_____
Judge

Name
Attorney for
Address

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF McLEAN

THE PEOPLE OF THE
STATE OF ILLINOIS,                          )
                                            )
                        Plaintiff           )
                                            )
                                            )      No.  00-CF-1460
            v.                              )           01-CF-13
                                            )           01-CF-127
    Bruce Roland                            )           99-DT-712
                                            )
                        Defendant           )

**FILED**
McLEAN COUNTY
MAY 18 2001
CIRCUIT CLERK

### WAIVER OF EXTRADITION AS CONDITION OF BAIL BOND

I, Bruce Roland, of Rhinelander, State

of Wisconsin, in consideration of having been admitted to bail and being granted

permission by the Court as a condition of my bail bond to travel outside of the State of Illinois

during the pendency of the above-entitled case, in which I am charged with the offense(s) of

Agg Driving under the Influence of Alcohol, Driving on Revoked License

which are felony/misdemeanor offense under the laws of the State of Illinois, and travel to:

and reside in Wisconsin, 4360 Wildwood,
Rhinelander, Wisconsin 54501

DO HEREBY WAIVE EXTRADITION TO THE STATE OF ILLINOIS FROM ANY

STATE IN WHICH I MAY BE FOUND in the event I am charged with any violation of the

conditions of said bail bond or with the commission of any additional offenses against the laws of

the State of Illinois. By this statement I waive, forfeit, and give up any and all legal rightrs under

teh laws of the State of Illinois and of the jurisdiction in which I am found to contest my immediate

transfer of custody to authorities of the State of Illinois for return to said State for further legal

proceedings against me.

_5-18-01_____                    _____
DATE                                        Defendant

Subscribed and sworn to before me this
_____ day of _____, 19_____.

_____
Notary Public

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

THE PEOPLE OF THE
STATE OF ILLINOIS,                    }

    Plaintiff,                    }          $00-CF-1460$ ✓

    vs.                           }   NO:  01-CF-~~359~~ $13$
                                                       $01-CF-127$

BRUCE LAMBERT ROLAND              }

    Defendant.                    }

### NOTICE

TO:  State's Attorney's Office          Bruce Lambert Roland
     104 West Front Street             4360 Wildwood
     Law & Justice Center              Rhinelander, Wisconsin 54501
     Bloomington, IL   61701

     You are hereby notified that the undersigned, as attorney for
DANIELLE ROLAND, will appear before the Honorable William D.
DeCardy, in the courtroom usually occupied by him at McLean County
Law & Justice Center, 104 W. Front Street, Bloomington, Illinois,
on _____May 18, 2001_____ at 0:00 a.m for the purpose of having a
hearing a continued status, at which time you must appear and be
heard.

                            BRUCE LAMBERT ROLAND, Defendant

                            BY:
                                JOSEPH H. KELLEY
                                Attorney for Defendant

JOSEPH H. KELLEY
Attorney at Law
237 East Front Street
Bloomington, IL   61701
.(309) 827-8375

FILED
MCLEAN MAY 0 4 2001 COUNTY
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing instrument was hand-delivered to the McLean County State's Attorney's Office on _____ 5-4-01 _____.

JOSEPH H. KELLEY

IN THE CIRCUIT COURT
THE ELEVENTH JUDICIAL CIRCUIT
McLEAN COUNTY, ILLINOIS

DATE  5-2-01

NO.  00 F 140

_People_

Plaintiff

_Bruce Roland_

Defendant

**FILED**

COUNTY,

MAY 0 2 2001

McLEAN

CIRCUIT CLERK

# APPEARANCE

I hereby enter my appearance in the above entitled case.

_Bruce Roland_

Defendant

_Joseph H Kelly_

His Attorney

Address:  237 E Front

City/State:  Bloomington, IL 61701

Phone:  A/C 309 Number 827-8375

Attorney Registration Number _____

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

THE PEOPLE OF THE STATE OF ILLINOIS      )
                                      )

    PLAINTIFF,                  )

    VS.                       )    NO. 00 CF 1460
                                        )

BRUCE ROLAND                )

DEFENDANT.               )

### ANSWER TO STATE'S MOTION FOR DISCOVERY

Now comes Bruce Roland, by Brian McEldowney, Public Defender and in response to State's Motion for Discovery states as follows:

1.    There are no reports available at this time.

2.    Defendant intends to assert that he is not guilty. Defendant may call any of the persons listed in State's Answer to Motion for Discovery as a witness.

3.    There are no written or recorded statements available at this time.

4.    Defendant does not intend to assert an affirmative defense.

Respectfully submitted,
Bruce Roland, Defendant

his Public Defender
Brian McEldowney

FILED
APR 02 2001
McLEAN COUNTY
CIRCUIT CLERK

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the 2nd,

day of April, 2001.

Brian McEldowney
Asst. Public Defender
104 W. Front Street, Room 603
Bloomington, IL 61701
Telephone: (309)888-5235

| | | | IN THE CIRCUIT COURT OF THE |
|---|---|---|---|
| STATE OF ILLINOIS | ) | SS | |
| COUNTY OF MCLEAN | ) | | ELEVENTH JUDICIAL CIRCUIT |

THE PEOPLE OF THE )
STATE OF ILLINOIS )
              )
       VS. )       NO.   00 CF 1460
              )
BRUCE ROLAND )

FILED
McLEAN
MAR 2 1 2001
CIRCUIT CLERK

## DISCOVERY COMPLIANCE PURSUANT TO RULE 412

Now comes the People of the State of Illinois by Sandra Thompson, Assistant State's Attorney in and for the County of McLean, State of Illinois, and presents as Discovery Compliance herein the following:

1. Pursuant to Supreme Court Rule 412(a)(i), the State may call the following as witnesses:

Danielle Roland
2603 Keystone Blvd.
Bloomington, IL 61701

Michael Alcorn
Officer Raycraft
Bloomington Police Dept
305 S. East St.
Bloomington, IL 61701

See exhibits 1-4 for statements or memoranda of statements of the above-listed witnesses.

2. Pursuant to Supreme Court Rule 412(a)(ii), see exhibits 1-4 for statements of the accused or codefendants. See #1 above for witnesses of the statements.

3. Pursuant to Supreme Court Rule 412(a)(iii), see exhibit 4 for a transcript of the grand jury testimony.

4. Pursuant to Supreme Court Rule 412(a)(iv), there are no reports of experts at this time.

5. Pursuant to Supreme Court Rule 412(a)(e), physical evidence is available for inspection and/or copying during reasonable business hours by contacting the undersigned attorney and scheduling a viewing/copying time. Physical evidence may include: Secretary of State and any and all evidence contained or mentioned in exhibits provided..

6. Pursuant to Supreme Court Rule 412(a)(vi), there are no known prior convictions of above witnesses.

7. Pursuant to Supreme Court Rule 412(b), there has been no electronic surveillance.

8. Pursuant to Supreme Court Rule 412(c), see exhibits 1-4 for known <u>Brady</u> material.

Respectfully submitted,

Sandra Thompson
Assistant State's Attorney

I, Sandra Thompson, hereby certify that the answer to Defendant's Motion for Discovery in People v. Bruce Roland, 00 CF 1460, is complete to the best of my knowledge, information and belief and all exhibits referenced in this Answer have been provided to the defense.

Sandra Thompson
104 W. Front St., Room 605
PO Box 2400
Bloomington, IL 61702-2400
(309) 888-5400

## PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorney's of record of all parties to the above cause by:
____ Depositing a true and correct copy of the same in the U.S. Post Office or post office box in the City of Bloomington, Illinois, enclosed in an envelope with postage fully prepaid on the ____ day of _____, 2001.
__/__ Hand delivering a true and correct copy of the same on the _20_ day of _March_____, 2001.

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL DISTRICT
COUNTY OF MCLEAN

THE PEOPLE OF THE STATE OF ILLINOIS       )
                                          )
        vs.                               )       Case No. 00 CF 1460
                                          )       Case No. 00 TR 24696
BRUCE ROLAND,                             )

## ORDER

This cause coming on to be heard on Attorneys MCLEAN ARNOLD and CHARLES ERICKSON's Motion for Leave to Withdraw as Counsel for Defendant BRUCE ROLAND; the Court having considered the matter does find as follows:

1. That notice of said motion for Leave to Withdraw as Counsel and of the hearing in this cause having been mailed to BRUCE ROLAND by certified mail as provided by statute;

2. That the McLean County State's Attorney's Office has been noticed of this Motion for Leave to Withdraw as Counsel for Defendant by MCLEAN ARNOLD and CHARLES ERICKSON.

WHEREFORE, IT IS HEREBY ORDERED THAT:

1. Attorneys MCLEAN ARNOLD and CHARLES ERICKSON are allowed to withdraw as counsel for BRUCE ROLAND.

2. That within 21 days BRUCE ROLAND shall file a supplementary appearance stating an address at which the service of notices and other papers may be had upon him.

Date: _____3 - 2 -01_____        Enter: _____
                                                        JUDGE

McLean Arnold
306 N. Center St.
Bloomington, IL  61701
(309) 827-8212

FILED
MAR 0 2 2001
McLEAN COUNTY
CIRCUIT CLERK

STATE OF ILLINOIS    )            IN THE CIRCUIT COURT OF THE
                     ) SS
COUNTY OF MC LEAN    )    **FILED**     ELEVENTH JUDICIAL CIRCUIT

THE PEOPLE OF THE    )
STATE OF ILLINOIS    )    FEB 2 1 2001
                     )
     VS.           )    CIRCUIT CLERK     NO.     00 cf 1460
                     )
Bruce Roland           )

### N O T I C E

TO:    Mac Arnold, 306 N. Center, Bloomington, IL

      YOU ARE HEREBY NOTIFIED that you have been charged in the Circuit
Court of McLean County in the above-entitled cause with the offense(s) of
DWLR – sub offense.  The Court has ordered that you be given notice that
the matter is set for hearing at 10:00 a.m. on March 2, 2001, in Judge
DeCardy's Courtroom on the third floor of the McLean County Law and Justice
Center, 104 West Front Street, Bloomington, Illinois, at which time and
place you must be present.
      Dated at Bloomington, Illinois, this 20 day of February, 2001.

                             *Aaron Hornsby*
                (Assistant) State's Attorney

### CERTIFICATE OF SERVICE

Debra Newman, being first duly sworn on oath, says that she served the
foregoing Notice in the above-entitled cause by:

   ✓   Depositing a true and correct copy of the same in the U. S. Post
Office or post office box in the City of Bloomington, Illinois, enclosed in
an envelope, with postage fully prepaid on the _21_ day of _feb_,
2001, to same as above, plainly addressed as indicated in the above Notice.

      Hand delivering a true and correct copy of the same on the _____ day
of _____, 2001, to same as above.

                        _____

Subscribed and sworn to before me this _21_ day of _Feb_ 2001.

               *Virginia Bicknell*
            NOTARY PUBLIC

"OFFICIAL SEAL"
VIRGINIA BICKNELL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6/8/2002



FILED
FEB 06 2001
McLEAN COUNTY
CIRCUIT CLERK

PRAECIPE

IN THE CIRCUIT COURT OF McLEAN COUNTY
STATE OF ILLINOIS

00 CF 1460
No. 00 TR 24696

PRAECIPE for ____MOTION AND NOTICE_____

in Suit for _____Motion to Withdraw_____

The People of the State of Illinois ___vs.__Bruce Roland_____
PLAINTIFF                                      DEFENDANT

PLEASE ISSUE _Motion and Notice_____ in the above cause to the

Sheriff of _McLean_____ County, Illinois, to be served on the following:

Name of Defendant                              Address

BRUCE ROLAND                          2603 Keystone, Bloomington, IL 61704

_____    _____

_____    _____

_____    _____

_____    _____

Plaintiff's Atty. _____McLean Arnold_____

Street Address_____306 N. Center Street_____

City _____Bloomington, IL 61701_____

Telephone ` _____(309) 827-8212_____

Directions to Rural address _____

_____

Defendant's place of employment _____

_____

★ Star Printing, Heyworth ★

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL DISTRICT
COUNTY OF MCLEAN

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | |
| | ) | |
| vs. | ) | · Case No. 00 CF 1460 |
| | ) | Case No. 00 TR 24696 |
| BRUCE ROLAND, | ) | |

## NOTICE OF WITHDRAWAL

TO:   BRUCE ROLAND
      2603 KEYSTONE
      BLOOMINGTON, IL  61704

    This is to advise you that MCLEAN ARNOLD and CHARLES ERICKSON have filed the attached Motion for Leave to Withdraw as your attorneys in the above-captioned cause. A hearing on said motion for Leave to Withdraw is now scheduled for **February 9, 2001 at 11:00 a.m.** in the courtroom usually occupied by the Honorable **Judge DeCardy** or any Judge sitting in his stead, at Bloomington, Illinois, at which time and place you may appear and be heard. To insure notice of any action in this cause, you should retain other counsel in this cause or file with the Clerk of the Court within 21 days after entry of any order for withdrawal of your counsel your supplementary appearance stating therein an address at which service of notices or other papers may be had upon you.

_____          _____
MCLEAN ARNOLD, Attorney at Law            CHARLES ERICKSON, Attorney at Law

McLean Arnold
306 N. Center St.
Bloomington, IL  61701
(309) 827-8212

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL DISTRICT
COUNTY OF MCLEAN

THE PEOPLE OF THE STATE OF ILLINOIS,    )
                                        )
        vs.                             )    Case No. 00 CF 1460
                                        )    Case No. 00 TR 24696
BRUCE ROLAND,                           )

## MOTION FOR LEAVE TO WITHDRAW AS COUNSEL

Now comes MCLEAN ARNOLD and CHARLES ERICKSON, Attorneys at Law, and respectfully request leave of this court to withdraw as counsel for the Defendant, BRUCE ROLAND, and in support thereof states as follows:

1. That MCLEAN ARNOLD is now co-counsel of record for the above Defendant.
2. That CHARLES ERICKSON is now co-counsel of record for the above Defendant.
3. That there has been a breakdown of communication between counsel and Defendant and a change of circumstances making it impossible for MCLEAN ARNOLD and CHARLES ERICKSON to represent the Defendant.
4. That on the 16th day of January, 2001, a copy of this Motion and the attached notice to BRUCE ROLAND was sent by MCLEAN ARNOLD and CHARLES ERICKSON by certified mail, postage prepaid, directed to BRUCE ROLAND at the address indicated on the notice which is the last address of BRUCE ROLAND known to MCLEAN ARNOLD and CHARLES ERICKSON.

WHEREFORE, MCLEAN ARNOLD and CHARLES ERICKSON, respectfully request that they be granted leave to withdraw as co-counsel for the Defendant, BRUCE ROLAND.

_____        _____
MCLEAN ARNOLD, Attorney at Law         CHARLES ERICKSON, Attorney at Law

STATE OF ILLINOIS    )
                     )    SS
COUNTY OF MCLEAN     )

Subscribed and sworn to before me this 16th day of January, 2001.

_____
NOTARY PUBLIC

McLean Arnold
306 N. Center St.
Bloomington, IL  61701
(309) 827-8212

OFFICIAL SEAL
MARISSA KOREE STANFORD
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-28-2003

FILED
JAN 16 2001
McLEAN COUNTY
CIRCUIT CLERK

PEOPLE OF THE STATE OF ILLINOIS
VS
BRUCE LAMBERT ROLAND

Case Number: 2000CF001460

---

COURT PAPER TYPE : Notice
COURT PAPER SUMMARY: -ROLAND, BRUCE LAMBERT
COURT PAPER STATUS: **Completed**

---

**Individual Summary: ERROR RETRIEVING PEOPLE INFORMATION**
**Individual Return / Service Status: <u>Served</u>**

Substitute Served this writ this <u>02</u> day of <u>February</u> , <u>2001</u> ,
by reading it to the within named <u>Brittney Jipp</u> **Step Daughter**.

Served Sex: <u>F</u>        Served Race: <u>W</u>        Served DOB: <u>01-02-1986</u>

Comment: <u>Served at 2603 Keystone  Bloomington, IL.</u>

Service, . . . . . . . . . . . . . . . $ <u>17.00</u>

Miscellaneous Fees:

_____ SHERIFF

<u>20</u> miles necessary travel from Law and Justice Center to place of service
of within named person and return,

$ <u>.50</u> per mile . . . . . . . . . . $ <u>10.00</u> By___MCSP PROCESS DEPUTY RICHARD SCOTT - ID # 608

---

Return . . . . . . . . . . . . . . $ <u>7.00</u>

TOTAL . . . . . . . . . . . . . . $ <u>34.00</u>

ATTACHMENTS:

Page 1    of 1

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL DISTRICT
COUNTY OF MCLEAN

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| vs. | ) | Case No. 00 CF 1460 |
| | ) | Case No. 00 TR 24696 |
| BRUCE ROLAND, | ) | |

## <u>MOTION FOR LEAVE TO WITHDRAW AS COUNSEL</u>

Now comes MCLEAN ARNOLD and CHARLES ERICKSON, Attorneys at Law, and respectfully request leave of this court to withdraw as counsel for the Defendant, BRUCE ROLAND, and in support thereof states as follows:

1. That MCLEAN ARNOLD is now co-counsel of record for the above Defendant.
2. That CHARLES ERICKSON is now co-counsel of record for the above Defendant.
3. That there has been a breakdown of communication between counsel and Defendant and a change of circumstances making it impossible for MCLEAN ARNOLD and CHARLES ERICKSON to represent the Defendant.
4. That on the 16th day of January, 2001, a copy of this Motion and the attached notice to BRUCE ROLAND was sent by MCLEAN ARNOLD and CHARLES ERICKSON by certified mail, postage prepaid, directed to BRUCE ROLAND at the address indicated on the notice which is the last address of BRUCE ROLAND known to MCLEAN ARNOLD and CHARLES ERICKSON.

WHEREFORE, MCLEAN ARNOLD and CHARLES ERICKSON, respectfully request that they be granted leave to withdraw as co-counsel for the Defendant, BRUCE ROLAND.

_____          _____
MCLEAN ARNOLD, Attorney at Law            CHARLES ERICKSON, Attorney at Law

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | )   SS |
| COUNTY OF MCLEAN | ) |

Subscribed and sworn to before me this 16th day of January, 2001.

_____
NOTARY PUBLIC

McLean Arnold
306 N. Center St.
Bloomington, IL  61701
(309) 827-8212



OFFICIAL SEAL
MARISSA KOREE STANFORD
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-25-2003

FILED
JAN 1 6 2001

McLEAN COUNTY
CIRCUIT CLERK

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL DISTRICT
COUNTY OF MCLEAN

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | |
| | ) | |
| vs. | ) | Case No. 00 CF 1460 |
| | ) | Case No. 00 TR 24696 |
| BRUCE ROLAND, | ) | |

## NOTICE OF WITHDRAWAL

TO:     BRUCE ROLAND
        2603 KEYSTONE
        BLOOMINGTON, IL  61704

        This is to advise you that MCLEAN ARNOLD and CHARLES ERICKSON have filed the attached Motion for Leave to Withdraw as your attorneys in the above-captioned cause. A hearing on said motion for Leave to Withdraw is now scheduled for **February 9, 2001 at 11:00 a.m.** in the courtroom usually occupied by the Honorable **Judge DeCardy** or any Judge sitting in his stead, at Bloomington, Illinois, at which time and place you may appear and be heard. To insure notice of any action in this cause, you should retain other counsel in this cause or file with the Clerk of the Court within 21 days after entry of any order for withdrawal of your counsel your supplementary appearance stating therein an address at which service of notices or other papers may be had upon you.

_____          _____
MCLEAN ARNOLD, Attorney at Law              CHARLES ERICKSON, Attorney at Law

McLean Arnold
306 N. Center St.
Bloomington, IL  61701
(309) 827-8212

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MC LEAN

THE PEOPLE OF THE STATE OF      )
ILLINOIS                        )
                                )
                                )
            vs.                 )        No.: 2000 CF 1460
                                )
BRUCE L. ROLAND                 )

**APPEARANCE**

I hereby enter my Appearance on behalf of the Defendant, BRUCE L.

ROLAND.

_____
MC LEAN ARNOLD, Defendant's Attorney


MC LEAN ARNOLD
Attorney for Defendant
306 N. Center Street
Bloomington, IL  61701
(309) 827-8212

STATE OF ILLINOIS )        IN THE CIRCUIT COURT OF THE
              ) SS
COUNTY OF MC LEAN )     ELEVENTH JUDICIAL CIRCUIT

THE PEOPLE OF THE )
STATE OF ILLINOIS )
              )
       VS.       )
              )     NO. 00 CF 1460; 00-24696
BRUCE LAMBERT ROLAND )

**F I L E D**
McLEAN COUNTY
DEC 05 2000
CIRCUIT CLERK

### N O T I C E

TO:   Bruce Lambert Roland, 2603 Keystone, Bloomington, IL 61704
       McLean Arnold and Charles N. Erickson, 306 N. Center, Bloomington, IL 61701

      YOU ARE HEREBY NOTIFIED that you have been charged in the Circuit Court of McLean
County in the above entitled cause with the offense(s) of Driving While License Revoked-Subsequent
Offense Felony, Operation of Uninsured Motor Vehicle and Failure to Carry or Display Drivers License
or Permit. The Court has ordered that you be given notice that the matter is set for
**ARRAIGNMENT/STATUS AT 9:00 A.M. ON DECEMBER 22, 2000,** in Judge DeCardy's
Courtroom at the McLean County Law and Justice Center, 104 West Front Street, Bloomington, Illinois,
at which time and place YOU MUST BE PRESENT.

      THE DEFENDANT SHALL FILE all pre-trial motions of a discovery nature on or before the
arraignment date, at which time said motions shall be heard.
      Dated at Bloomington, Illinois, this 5th day of December, 2000.

                                      (Assistant) State's Attorney

### CERTIFICATE OF SERVICE

Virginia Bicknell, being first duly sworn on oath, says that she served the foregoing Notice in the above-
entitled cause by:

✓     Depositing a true and correct copy of the same in the U. S. Post Office or post office box in the
City of Bloomington, Illinois, enclosed in an envelope, with postage fully prepaid on the 5 day of
_Dec_ , 2000, to above listed, plainly addressed as indicated in the above Notice.

_____ Hand delivering a true and correct copy of the same on the ___ day of _____, 2000,
to

                           Virginia Bicknell

Subscribed and sworn to before me this 5 day of December, 2000.

"OFFICIAL SEAL"
DEBRA NEWMAN             NOTARY PUBLIC

STATE OF ILLINOIS
COUNTY OF McLean
The People of the State of Illinois
                VS.

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

DEFENDANT:
BRUCE LAMBERT ROLAND
2603  KEYSTONE
BLOOMINGTON, IL  61704

Case#:   2000CF001460

# INFORMATION

COUNT 1    :The STATE's ATTORNEY of McLean County, Illinois, in the name
and by the authority of the People of the State of Illinois charges that
BRUCE LAMBERT ROLAND on or about  18th day of October  , 2000  at

BLOOMINGTON,
in the County of McLean, State of Illinois, committed the offense of

DRIVING WHILE LICENSE REVOKED/SUSPENDED-SUBSEQUENT OFFENSE FELONY

IN THAT SAID DEFENDANT KNOWINGLY DROVE A MOTOR VEHICLE ON A HIGHWAY IN THE STATE OF
ILLINOIS AT A TIME WHEN HIS DRIVER'S LICENSE OR PRIVILEGE TO DRIVE WAS REVOKED BY
THE ILLINOIS SECRETARY OF STATE AND THE BASIS OF SAID REVOCATION WAS A CONVICTION
FOR DRIVING UNDER THE INFLUENCE OF ALCOHOL IN VIOLATION OF 625 ILCS 5/11-501 (OR A
STATUTORY SUMMARY SUSPENSION PURSUANT TO 625 ILCS 5/11-501.1) AND HE WAS PREVIOUSLY
CONVICTED OF DRIVING WHILE LICENSE REVOKED IN MCLEAN COUNTY CASE 92-CF-938,

(UPGRADE OF 2000 TR 024696)
in violation of  625 ILCS 5/6-303(d)

A Class 4 Felony

CHARLES   REYNARD
By Assistant State's Attorney

The undersigned, on oath, states that the facts set forth in the foregoing
information are true in substance and matter of fact, to the best of his
knowledge, information and belief.

Complainant

Subscribed and sworn to before me
04th day of December  ,  2000

|  | DESCRIPTION |  |
| --- | --- | --- |
| D.O.B. | SEX | RACE |
| 01/26/1964 | Male | White |

Additional ID
Hgt: 5 11   Wgt: 225   Hair:        Eyes: BLU
SSN: 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        DLN: IL R45307264026

*OFFICIAL SEAL*
AMY MAURER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10/4/2001



Notary Public

People request bond be set at $0.00
Case Request Type: Notice to Appear
Enhanced Penalty: N
Incident: 200013830        Agency: Bloomington PD
Intake#: 205054

Bond Transfer

M
c
L   Filed
E   12/05/2000 09:12:19 AM
A
N   CIRCUIT CLERK
C
O
U
N
T
Y

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

STATE OF ILLINOIS
COUNTY OF McLean
The People of the State of Illinois
                  VS.

DEFENDANT:                                          Case#:    2000CF001460
BRUCE LAMBERT ROLAND
2603  KEYSTONE
BLOOMINGTON, IL  61704

# INFORMATION

COUNT 2      :The STATE's ATTORNEY of McLean County, Illinois, in the name
and by the authority of the People of the State of Illinois charges that
BRUCE LAMBERT ROLAND on or about  18th day of October   , 2000  at

BLOOMINGTON,
in the County of McLean, State of Illinois, committed the offense of


OPERATION OF UNINSURED MOTOR VEHICLE

IN THAT HE KNOWINGLY OPERATED A MOTOR VEHICLE ON A PUBLIC HIGHWAY OF THE STATE OF
ILLINOIS AT A TIME WHEN SUCH VEHICLE WAS NOT COVERED BY A LIABILITY INSURANCE
POLICY,
in violation of  625 ILCS 5/3-707                    A Traffic Vio/Business Offense


CHARLES  REYNARD
By Assistant State's Attorney

The undersigned, on oath, states that the facts set forth in the foregoing
information are true in substance and matter of fact, to the best of his
knowledge, information and belief.


Complainant

| DESCRIPTION | | |
| --- | --- | --- |
| D.O.B. | SEX | RACE |
| 01/26/1964 | Male | White |

Subscribed and sworn to before me
04th day of December   ,  2000

Additional ID
Hgt: 5 11   Wgt: 225  Hair:       Eyes: BLU
SSN:  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         DLN: IL R45307264026

*OFFICIAL SEAL*
AMY MAURER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10/4/2001

Notary Public

People request bond be set at  $0.00          Bond Transfer
Case Request Type: Notice to Appear
Enhanced Penalty: N
Incident: 200013830       Agency: Bloomington PD
Intake#: 205054

| | Filed | C |
| M | | O |
| c | | U |
| L | 12/05/2000 09:12:19 AM | N |
| E | | T |
| A | | Y |
| N | CIRCUIT CLERK | |

STATE OF ILLINOIS
COUNTY OF McLean
The People of the State of Illinois
                    VS.

DEFENDANT:
BRUCE LAMBERT ROLAND
2603  KEYSTONE
BLOOMINGTON, IL  61704

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

Case#:   2000CF001460

# INFORMATION

COUNT 3    :The STATE's ATTORNEY of McLean County, Illinois, in the name
and by the authority of the People of the State of Illinois charges that
BRUCE LAMBERT ROLAND on or about  18th day of October  , 2000  at

BLOOMINGTON,
in the County of McLean, State of Illinois, committed the offense of

FAILURE TO CARRY OR DISPLAY DRIVERS LICENSE OR PERMIT

IN THAT HE OPERATED A MOTOR VEHICLE AT A TIME WHEN HE DID NOT HAVE HIS DRIVERS
LICENSE OR PERMIT IN HIS IMMEDIATE POSSESSION,
in violation of  625 ILCS 5/6-112

A Petty Traffic-Fine Only

CHARLES  REYNARD
By Assistant State's Attorney

The undersigned, on oath, states that the facts set forth in the foregoing
information are true in substance and matter of fact, to the best of his
knowledge, information and belief.

| DESCRIPTION | | |
| --- | --- | --- |
| D.O.B. | SEX | RACE |
| 01/26/1964 | Male | White |

Additional ID
Hgt: 5 11  Wgt: 225  Hair:      Eyes: BLU
SSN: 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     DLN: IL R45307264026

Complainant

Subscribed and sworn to before me
04th day of December  ,  2000

"OFFICIAL SEAL"
AMY MAURER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10/4/2001

Notary Public

People request bond be set at  $0.00
Case Request Type: Notice to Appear
Enhanced Penalty: N
Incident: 200013830     Agency: Bloomington PD
Intake#: 205054

Bond Transfer

| M<br>c<br>L<br>E<br>A<br>N | Filed<br><br>12/05/2000 09:12:19 AM<br><br>CIRCUIT CLERK | C<br>O<br>U<br>N<br>T<br>Y |
| --- | --- | --- |

STATE OF ILLINOIS
COUNTY OF McLean

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

The People of the State of Illinois

VS.

DEFENDANT:
BRUCE LAMBERT ROLAND
2603  KEYSTONE
BLOOMINGTON, IL  61704

Case#:    2000CF001460



# BILL OF INDICTMENT

COUNT 3  / 3   :The GRAND JURY of McLean County, Illinois, charges that
BRUCE LAMBERT ROLAND on or about the 18th day of October   , 2000       at
BLOOMINGTON,
in the County of McLean, State of Illinois, committed the offense of

FAILURE TO CARRY OR DISPLAY DRIVERS LICENSE OR PERMIT

IN THAT HE OPERATED A MOTOR VEHICLE AT A TIME WHEN HE DID NOT HAVE HIS DRIVERS LICENSE
OR PERMIT IN HIS IMMEDIATE POSSESSION,

in violation of   625 ILCS 5/6-112              A Petty Traffic-Fine Only

A TRUE BILL

| DESCRIPTION | | |
| --- | --- | --- |
| D.O.B. | SEX | RACE |
| 01/26/1964 | Male | White |

Paul Horsman
Foreman

Additional ID
Hgt: 5 '11 " Wgt: 225  Hair:        Eyes: BLU
SSN:  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     DLN: ILR45307264026

Intake#:     205054

LIST OF WITNESSES
RANDALL MCKINLEY

Incident: 200013830  Agency: Bloomington PD

FILED
JAN 24 2001
McLEAN COUNTY
CIRCUIT CLERK

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

STATE OF ILLINOIS
COUNTY OF McLean

The People of the State of Illinois

VS.

DEFENDANT:
BRUCE LAMBERT ROLAND
2603 KEYSTONE
BLOOMINGTON, IL 61704

Case#:   2000CF001460

# BILL OF INDICTMENT

COUNT 2 / 3 :The GRAND JURY of McLean County, Illinois, charges that
BRUCE LAMBERT ROLAND on or about the 18th day of October , 2000    at
BLOOMINGTON,
in the County of McLean, State of Illinois, committed the offense of

OPERATION OF UNINSURED MOTOR VEHICLE

IN THAT HE KNOWINGLY OPERATED A MOTOR VEHICLE ON A PUBLIC HIGHWAY OF THE STATE OF
ILLINOIS AT A TIME WHEN SUCH VEHICLE WAS NOT COVERED BY A LIABILITY INSURANCE POLICY,

in violation of   625 ILCS 5/3-707

A Traffic Vio/Business Offense

A TRUE BILL

| DESCRIPTION | | |
|---|---|---|
| D.O.B. | SEX | RACE |
| 01/26/1964 | Male | White |

_Paul Horman_
Foreman

Additional ID
Hgt: 5 '11 " Wgt: 225  Hair:     Eyes: BLU
SSN: 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     DLN: ILR45307264026

LIST OF WITNESSES
RANDALL MCKINLEY

Incident: 200013830  Agency: Bloomington PD

Intake#:    205054

FILED
JAN 2 4 2001
McLEAN COUNTY
CIRCUIT CLERK

STATE OF ILLINOIS
COUNTY OF McLean

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

The People of the State of Illinois
                    VS.

DEFENDANT:
BRUCE LAMBERT ROLAND
2603  KEYSTONE
BLOOMINGTON, IL  61704

Case#:   2000CF001460

# BILL OF INDICTMENT

COUNT 1 / 3   :The GRAND JURY of McLean County, Illinois, charges that
BRUCE LAMBERT ROLAND on or about the 18th day of October  , 2000     at
BLOOMINGTON,
in the County of McLean, State of Illinois, committed the offense of

DRIVING WHILE LICENSE REVOKED/SUSPENDED-SUBSEQUENT OFFENSE FELONY

IN THAT SAID DEFENDANT KNOWINGLY DROVE A MOTOR VEHICLE ON A HIGHWAY IN THE STATE OF
ILLINOIS AT A TIME WHEN HIS DRIVER'S LICENSE OR PRIVILEGE TO DRIVE WAS REVOKED BY THE
ILLINOIS SECRETARY OF STATE AND THE BASIS OF SAID REVOCATION WAS A CONVICTION FOR
DRIVING UNDER THE INFLUENCE OF ALCOHOL IN VIOLATION OF 625 ILCS 5/11-501 (OR A
STATUTORY SUMMARY SUSPENSION PURSUANT TO 625 ILCS 5/11-501.1) AND HE WAS PREVIOUSLY
CONVICTED OF DRIVING WHILE LICENSE REVOKED IN MCLEAN COUNTY CASE 92-CF-938,

(UPGRADE OF 2000 TR 024696)

in violation of  625 ILCS 5/6-303(d)                    A Class 4 Felony

A TRUE BILL

_Paul Horman_
Foreman

| DESCRIPTION | | |
|---|---|---|
| D.O.B. | SEX | RACE |
| 01/26/1964 | Male | White |

Additional ID
Hgt: 5'11" Wgt: 225   Hair:        Eyes: BLU
SSN: 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    DLN: ILR45307264026

LIST OF WITNESSES
RANDALL MCKINLEY

Incident: 200013830  Agency: Bloomington PD

Intake#:      205054

Exhibit 16-3

FILED
JAN 24 2001
McLEAN COUNTY
CIRCUIT CLERK

**FELONY
RECORD SHEET**

I & II—AGGRAVATED DRIVING
UNDER THE INFLUENCE OF AL-
COHOL

Case No. ___01 CF 13___

Nature of Case III—DRIVING WHILE LICENSE
REVOKED—SUBSEQUENT OFFENSI
FELONY

PEOPLE OF THE STATE OF ILLINOIS

VS

Attorneys

IV—ILLEGAL TRANSPORTATION
OF ALCOHOL

FILED
McLEAN JAN 3 - 2008 COUNTY
CIRCUIT CLERK

J. H. Kelley
PD

BRUCE LAMBERT ROLAND

| DATE | | | JUDGE AND REPORTER | | COSTS | |
|---|---|---|---|---|---|---|
| | | | | | Dollars | Cents |
| 1 | 03 | 01 | | CLERK'S FILING FEE | 40 | 00 |
| | | | | COURT SECURITY FEE | 15 | 00 |
| | | | | STATE'S ATTORNEY FEE | 30 | 00 |
| | | | | AUTOMATION FEE | 5 | 00 |
| | | | | SURCHARGE | | |
| | | | | VCVA | | |
| | | | | COURT DOCUMENT STORAGE FEE | 5 | 00 |
| | | | | COURT SYSTEM FEE | 50 | 00 |
| 01 | 04 | 01 | | *Notice of Arraignment / Status at 9:00 on Jan. 19, 2001 filed Bond to be transferred from 00 DT 723* | | |
| 1 | 19 | 01 | | Deft. Age 36, appears in person with copy of complaint. Bond set at $ pooled. Deft. pleads not guilty and (does not) waive(s) jury. Cause ordered set for status on 2-2-01 @ 9:00 on | | |

# RECORD SHEET

Case No. 01 CF 13    Page No. 2

| DATE | JUDGE AND REPORTER | | COSTS Dollars Cent |
|------|--------------------|--|-----|

Defendant fails to appear. On State's ~~motion bond forfeited, license west to~~ ~~gee of State~~, warrant to issue, ~~upon~~ ~~just being cissed~~, with bond set at ~~$500~~ ~~Diff now appears. order for warrant vacated.~~

2/2/01 — ___ ~~name 37__~~, appears in person with copy of complaint. bond set of $ ~~posted___ Deft pleads not guilty and (does not) waives) jury cause ordered set for __States__ on 3-2-, 01 @ 10:00u ___ ___ Deft remanded to custody of Sheriff. Mittimus ~~issue~~. Affidavit on file. Public Defender (granted) ~~(denied)~~.

2/7/01 — Affidavit filed / copy to P.D.

8/01 — Discovery Compliance Pursuant to Rule 4B filed

1/30/01 — Bond transferred from 00DT723 $300.00 # 508910/911

2/16/01 — Answer to States Motion for Discovery filed.

3/2/01 — On deft. ___ met. w/o objection of State cause continued for status to 3-16-01 @ 10:00 Agen

5/2/01 — Supplemental DISCOVERY COMPLIANCE PURSUANT TO Rule 4/2 FILED

3/16/01 DeCardy — Defendant present w/ PD Will and ASA S. Thompson. Status hearing continued to 5/4/01 @ 10:30 by agreement.

/2/01 — Copies made & pd # 10131 26

Case No. _01CF13_          RECORD SHEET          Page No. _3_

| DATE | JUDGE AND REPORTER | | COSTS Dollars | Cen |
|---|---|---|---|---|
| 5 2 01 | Uhl | ~~Def. att'y S. Kell~~ met., w/o objection of ~~State~~ , cause continued for _Status_ to _5-8-01_ @ _10:00 am_ AHN ~~to notice~~ | | |
| 5 3 01 | | $1.00 pd. for copy # 1014733 | | |
| 5 2 01 | | Appearance filed – Joseph Kelly | | |
| 5 4 01 | | Notice filed | | |
| 5 18 01 | DeCardy Uhl | By agreement Status hearing cont to 6/25/01 @ 10:00. AHN. Order granting leave to depart State entered See Order | | |
| 6 25 01 | Uhl | Def. ~~and~~ by J. Kelly ; ASA Thompson On _Deft_ motion, w/o objection, cause continued for _Status_ to _8-27-01_ at _10:00 am_ ~~to notice~~ / AHN | | |
| 8 27 01 | DeCardy Uhl | By agreement, cause continued for plea to 11-9-2001 @ 1:30 pm. AHN | | |
| 11 9 01 | DeCardy Brent | Deft w/ J. Kelly ; ASA Thompson Plea agreement tendered & accepted. Court finds Deft guilty of Ct. I on plea. Cts. 2-4 nol-prossed. Deft. is sentenced to 2½ years imprisonment D.O.C. See order | | |
| 11 13 01 | | Certified copies of Judgment-Sentence to IDOC (3) sent to Sheriff's Dept w/proof of receipt filed. | | |
| 11 14 01 | | Bond applied # 1023334 Bal 0 | | |
| 11 14 01 | | Bal of Bond transferred to 01CF127 | | |
| 11 14 01 | | State's Attorney History Sheet Filed. | | |

ase No. _01 CF 13_          # RECORD SHEET          Page No. __3__

| DATE | JUDGE AND REPORTER | | COSTS Dollars | Cent |
|---|---|---|---|---|
| 2/12/01 | | Notice of filing Notice of Motion for Reduction of Sentence. Motion for Reduction of Sentence filed | | |
| 1/9/02 | DeCardy Jw | More than 30 days having elapsed since Sentencing on Nov. 9, 2001, to filing of Motion for Reduction of Sentence is hereby Stricken. See Letter. | | |

Clerk of the Court
Sandra Parker
The Law and Justice Center
104 W. Front St.
P.O. Box 2400
Bloomington,IL.61702-2400

RE:   Case No. 99-DT-712   01-CF-13   01-CM-1059
      00-CF-1460   01-CF-127
      Warrant
      NO.

To Clerk of the Court, for the ___ELEVENTH___ Judicial Circuit:

    Please find enclosed an original and __1__ copy(s) of a

    Motion For Reduction Of Sentence

One (1) additional copy is enclosed for you to kindly file/stamp

and return to me.

    I THANK YOU in advance for your time, effort, and consideration

and should you need further assistance, please contact me at the

address below.

                              Respectfully Submitted,

                              /s/ 

                              Reg. No. B-53847
                              Centralia Corr. Center
                              9330 Shattuc Road
                              P. O. Box 7711
                              Centralia, Illinois
                                              62801
                              Ph.(618) 533-4111

                    FILED
                    DEC 16
                 CIRCUIT CLERK

IN THE

CIRCUIT COURT OF THE __11th__ JUDICIAL CIRCUIT

__McLean__ COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,

    Plaintiff-Petitioner,

-vs-

BRUCE LAMBERT ROLAND_____,

    Defendant-Respondent.

)
)
)
)
)
)
)
)
)
)

99-DT-712
00-CF-1460
01-CF-13
CASE NO. 01-CF-127
01-CM-1059

HONORABLE: William D. DeCardy

Judge Presiding.

## NOTICE OF FILING

TO:  State's Attorney
     Charles Reynard
     The Law and Justice Center
     104 W. Front St.
     P.O. Box 2400
     Bloomington,IL.61701-2400

    PLEASE TAKE NOTICE that on __December 6th__, 20__01__, I shall cause to be filed by U.S. Mail with the Clerk of the Circuit Court of __McLean__ County, Illinois, at __Centralia C.C.__, __Centralia__, Illinois __62801__, the attached __Motion For Reduction Of Sentence__ which is herewith served upon you.

SUBSCRIBED AND SWORN TO

before me this _6th_, day of

December_____, 20_01_.

NOTARY PUBLIC

"OFFICIAL SEAL"
Gina R. Feazel
Notary Public, State of Illinois
My Commission Exp. 08/31/2005

Defendant, pro se. (Signature)

Bruce L. Roland
Defendant's Name (Print or Type)
Number  B-53847
Centralia Correctional Center
P.O. Box 7711
Centralia, Illinois  62801

FILED

McLEAN  DEC 1 0 2001  COUNTY

CIRCUIT CLERK

IN THE CIRCUIT COURT OF ____McLEAN____ COUNTY, ILLINOIS
THE COURT FOR THE ____ELEVENTH____ JUDICIAL CIRCUIT
CRIMINAL DIVISION

THE PEOPLE OF THE STATE                )
  OF ILLINOIS,                         )        99-DT-712
            Plaintiff,                 )        00-CF-1460
                                       )        01-CF-13
      vs.                              )  No. 01-CF-127
                                       )        01-CM-1059
BRUCE LAMBERT ROLAND  ,                )
            Defendant.                 )

## NOTICE OF MOTION FOR REDUCTION OF SENTENCE

NOW COMES the defendant, ˙Bruce L. Roland____, pro se,
in order to give notice of intention to file a MOTION FOR
REDUCTION OF SENTENCE before the Court.

This notice of MOTION FOR REDUCTION OF SENTENCE is
being filed pursuant to Illinois Revised Statutes (1991),
Chapter 38 Section 1005-8-1 et. seq., [730 ILCS 5/5-8-1 et.
seq.]

Defendant is currently incarcerated at Centralia
Correctional Center, Centralia, Illinois, 62801.

WHEREFORE, the defendant, ____Bruce L. Roland____, prays
for the Court to review the sentence in case numbers ( As men-
_tioned above) of imprisonment entered against defendant on
__11-9-01___ and to reduce the defendant's sentence.

Respectfully submitted,

Defendant, pro se
Number B-53847
Centralia Correctional Center
P.O. Box 7711
Centralia, Illinois 62801



FILED
DEC 1 0 2001
McLEAN COUNTY
CIRCUIT CLERK

IN THE CIRCUIT COURT OF ____McLEAN____ COUNTY, ILLINOIS
THE COURT FOR THE ____ELEVENTH____ JUDICIAL CIRCUIT
____CRIMINAL DIVISION____

THE PEOPLE OF THE STATE )
OF ILLINOIS, )
    Plaintiff, )
     )
  vs. )
     )
BRUCE LAMBERT ROLAND___, )
    Defendant. )
     )

No. 99-DT-712
  00-CF-1460
  01-CF-13
  01-CF-127
  01-CM-1059

## MOTION FOR REDUCTION OF SENTENCE

NOW COMES the defendant, ____Bruce L. Roland____, pro se, and respectfully requests the Court to reduce the sentence of imprisonment imposed upon the defendant in the above captioned cause pursuant to Illinois Revised Statutes (1991) Chapter 38 Section 1005-8-1 et. seq., [730 ILCS 5/5-8-1 et. seq.].

1. The defendant was sentenced by the Court to a term of imprisonment in the Illinois Department of Corrections.

____5____ years, for the offensesof ____Driving On A Re-voked License and Aggravated DUI____.

2. That the above sentence was imposed upon the defendant by the Honorable Judge ____William D. DeCardy____ on ____November 9th____, ____2001____, following a

( ) jury trial  ( ) bench trial  (XX) plea agreement

FILED
DEC 1 0 2001
McLEAN COUNTY
CIRCUIT CLERK

3. The defendant requests that the Court review the sentence imposed because there exists a litany of substantial extenuating circumstances that surround the above captioned cause. The defendant further states the following in support of his motion (State all the reasons why you believe your sentence should be reduced):

Excessive Sentence, I would ask this honorable Court to reconsider the sentence of five (5) years to be reduced to four (4) years or less allowing me to introduce circumstances such as character references, mental state, financial hard-ship on Spouse and Children, Therapy goals, Treament plans.

Wherefore, I ask this Honorable Court for the opportunity to present my circumstances in open court.

4. WHEREFORE, defendant prays the Court will review the terms of imprisonment and grant relief on MOTION FOR REDUCTION OF SENTENCE. Defendant further prays that the Court will enter an order thereby reducing his sentence to be served in the Illinois Department of Corrections.

/s/

Defendant, pro se

STATE OF ILLINOIS          )
                           )    SS
COUNTY OF CLINTON          )

### AFFIDAVIT

I, ___Bruce L. Roland_____ , deposes and says that

as to the petition herein, he is the Defendant in the above

entitled cause; that he has read the foregoing document, by

his signed, and that the statements contained therein are

true in substance and in fact.

/s/ _____
    Defendant, pro se

Signed before me this ___6th___ day of ___December_____ , 20_01_ .

_____
Notary Public

"OFFICIAL SEAL"
Gina R. Feazel
Notary Public, State of Illinois
My Commission Exp. 08/31/2005

IN THE CIRCUIT COURT OF _____ COUNTY, ILLINOIS
THE COURT FOR THE _____ JUDICIAL CIRCUIT
CRIMINAL DIVISION

THE PEOPLE OF THE STATE        )
OF ILLINOIS,                   )
            Plaintiff,         )
                               )
      vs.                      )    No._____
                               )
_____,            )
            Defendant.         )
                               )

## ORDER

Upon the review of the defendant's MOTION FOR REDUCTION

OF SENTENCE, and being fully advised in the premises;

IT IS HEREBY ORDERED that the defendant, _____

_____, shall have his sentenced

reduced to a term of _____ in the Illinois

Department of Corrections.

ENTERED:

                              _____
                                      Judge

# Circuit Court of Illinois
ELEVENTH JUDICIAL CIRCUIT
McLEAN COUNTY

CHAMBERS OF
WILLIAM D. DeCARDY
LAW & JUSTICE CENTER
BLOOMINGTON, IL 61701
(309) 888-5245

COUNTIES
FORD
LIVINGSTON
LOGAN
McLEAN
WOODFORD

January 9, 2002

Mr. Bruce Lambert Roland
Reg. No. B-53847
Centralia Correctional Center
9330 Shattuc Road
P.O. Box 7711
Centalia, Illinois 62801

RE:    People v. Bruce L. Roland
       Cases: 01 CF 13, 01 CF 127, 00 CF 1460,
       99 DT 712 and 01 CM 1059

Dear Mr. Roland:

Please be advised that the Court has on this date entered the following entry upon the docket in the above-entitled cases:

"More than 30 days having elapsed since sentencing on November 9, 2001, to filing of Motion on December 10, 2001, defendant's Motion for Reduction of Sentence is hereby stricken."

Respectfully,

William D. DeCardy
Associate Circuit Judge

WDD/sjw



cc:    Joseph Kelley, Attorney at Law
       Sandra Thompson, Assistant States Attorney

IN THE CIRCUIT COURT, 11th JUDICAL CIRCUIT
McLEAN COUNTY, ILLINOIS

Subject:     Bruce Lambert Roland                         W/M    01-26-64

Memo – Re: Prisoner's period spent in jail in connection with case No. 2001CF000013

Aggravated Driving Under The Influence Of Alcohol

INTERVAL

11 - 09 - 01   to   11 - 15 - 01

11 - 07 - 00   to   11 - 07 - 00

David Owens
                                                          Sheriff

By   Records
11/14/2001



## REPORT OF FELONY CONVICTION

Circuit Court, _McLean_ County, _Eleventh_ Municipal District

☒ Involving a motor vehicle as referenced in section 6-205(a)3 of the *Illinois Vehicle Code*.

☐ Mandatory Insurance as referenced in section 7-603 of the *Illinois Vehicle Code*.

| Driver's License Number R 453 072 64026 | Licensing State IL |
|---|---|
| Plate Number | Licensing State |

| Full Name Last First Middle | |
|---|---|
| Roland , Bruce Lambert | |

| Street 4360 Wildwood | |
|---|---|
| City Rhinelander | County Oneida |
| State WI | Zip 54501 |
| CDL | Classification | Sex M | Date of Birth Month 01 Day 26 Year 1964 |

Case No./Docket Number _01CF 13_ Ticket Number _Indictment_

Arrest Date __11 / 07 / 00__ Conviction Date __11 / 09 / 01__
            Month   Day   Year            Month   Day   Year

Description of Offense _Ct. 1, Agg. driving under the influence of_
_alcohol, Class 4_

Violation of Chapter _625 ILCS_ Section _5/11-501_ Para. _(d) (1) (A)_

☐ Operating a Commercial Motor Vehicle    ☐ Operating a Placarded HazMat Vehicle

I certify that a motor vehicle was used in the commission of the above identified felony.

_William D. DeCardy_

COURT SEAL                    Signature of Judge or State's Attorney

I hereby certify that the information on this Report of Felony Conviction is a true abstract of this Court, as required by The Illinois Vehicle Code.

_Sandra K. Parker, Clerk_
_Valarie A. French, Deputy_
Signature of Circuit Clerk

**FILED**
NOV 14 2001
McLEAN COUNTY
CIRCUIT CLERK

MAIL TO: Secretary of State
Driver Services Department
2701 South Dirksen Parkway
Springfield, Illinois 62723

Date mailed to the Secretary of State __11 / 14 / 01__
                                        Mo.  Day  Yr.

F I L E D

NOV 1 4 2001

McLEAN COUNTY

CIRCUIT CLERK

McLEAN COUNTY STATE'S ATTORNEY
104 W. Front Street
Bloomington, IL  61701

STATE'S ATTORNEY'S STATEMENT FOR DEFENDANT
COMMITTED TO THE ILLINOIS DEPARTMENT OF CORRECTIONS

Defendant's Name:   Bruce Roland

Defendant's Address: McLean County Jail
                     Bloomington, IL

Sex: male                    Race:  white
Date of birth: 1-26-64        Other:

Defendant's Prior Record: FBI: 308315x8  IBI:

McLean County Case Number:     01 cf 13
Arresting Agency:  Bloomington
Charges:  aggravated DUI - 2 cts, DWLR - sub offense, ill trans

Offenses Convicted of:    one count aggravated DUI

Victim/Complainant:
Address:

Details of Offense: see attached indictment

Sentencing Date:    11-9-01

Sentence Imposed:    2 ½ years DOC

Relevant Information about defendant:

(Assistant) State's Attorney: Sandy Thompson
Sentencing Judge:    William DeCardy

      Prepared pursuant to 38 Illinois Revised Statutes 1005-4-1(d)
1982

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
STATE OF ILLINOIS, COUNTY OF McLEAN

RECEIVED
NOV 14 2001
McLEAN CO. Sheriffs Dept. J7

PEOPLE OF THE STATE OF ILLINOIS

vs.                                                    Case No. _01 - CF - 12_

_Bruce Lambert Roland_

Defendant

COPY

## JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above-named defendant _1-26-64_ has been adjudged guilty of the offenses enumerated below,
(date of birth)

T IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | OFFENSE | DATE OF OFFENSE | STATUTORY CITATION | CLASS | SENTENCE |
|---|---|---|---|---|---|
| I | Aggravated Driving Under Influence of Alcohol | 11-7-00 | (625 ILCS 5/11-501(c-1)(1) | 4 | 2 Yrs. 6 Mos. |

ind said sentence shall run (concurrent with) (consecutive to) the sentence imposed on: _____ Yrs. ___ Mos.

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on: _____ Yrs. ___ Mos.

ind said sentence shall run (concurrent with) (consecutive to) the sentence imposed on: _____ Yrs. ___ Mos.

T IS FURTHER ORDERED that the sentence(s) imposed on count(s) _I_ be (concurrent with) (consecutive to) the sentence imposed in case number _01-CF 127_ in the Circuit Court of _McLean_ County; be (concurrent with) (consecutive to) the sentence imposed in case number _00-CF-1460_ in the Circuit Court of _McLean_ County; be (concurrent with) (consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

The Court finds that the defendant is entitled to receive credit for time actually served in custody (of _0_ days as of the date of this order) from/to (specify dates): _____

(Check boxes if applicable)

☐ Convicted of a class _____ offense but sentenced as a class X offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in great bodily harm to the victim (730 ILCS 5/3-6-3[a][2][iii]).

IT IS FURTHER ORDERED that Defendant is sentenced to pay a fine of $_____

plus costs of $ _L $75⁰⁰_ ; to pay restitution of $ _____

:o _____ ; all to be paid by _within 6 months of release_ . Bond applied.

IT IS FURTHER ORDERED that _____

IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

This order is ( _✓_ effective immediately) (_____ stayed until _____ ).

FILED

DATE: _11-8-01_    ENTER: _____    JUDGE

Date : 11/14/2001 10:19 AM

Clerk of The Circuit Court
Eleventh Judicial Circuit
County of McLean
104 W Front St. Bloomington, IL 61702

Page 1 of 1

## BOND RECEIPT

Date Received :   11/14/2001          Batch Id :  CR311142001          Effective Date:  11/14/2001     Receipt # :          1023335
                                                                                                        ManualReceipt # :

Received From :     $125.00 to Case# 2001CF000127          Booking # :     130111981

Defendant Name :   ROLAND, BRUCE LAMBERT          Citation # :
Case Number :     2001CF000013

| Bond Seq | Bond Type | Face Amount | Source | Check/CC# | Deposit Amount |
|----------|-----------|-------------|--------|-----------|----------------|
| 2 | D3 | $  3,000.00 | Transfer Bond Out | | $  -  125.00 |
| | | | | Total Deposited : | $  -  125.00 |

Date : 11/14/2001  10:19 AM         -        Clerk of The Circuit Court                    Page 1 of 1
Eleventh Judicial Circuit
County of McLean
104 W Front St. Bloomington, IL 61702

RECEIPT  VOUCHER

Date Received : 11/14/2001      Batch Id : CR311142001      Effective Date 11/14/2001         Receipt # :  1023334
Manual Receipt # :

| Received From : | ROLAND, BRUCE LAMBERT | Source/Ck# or CC Val.# | Amount |
|---|---|---|---|
| Party Name : | ROLAND, BRUCE LAMBERT | BOND RECLASSIFY | $     175.00 |
| Case Number : | 2001CF000013 | Total Paid : | $     175.00 |
| New Party Balance : | $      .00 | | |

| Count | Citation # | Account Name | Starting Balance | Amount Paid | Ending Balance |
|---|---|---|---|---|---|
| | | CIRCUIT CLERK | $     40.00 | $     40.00 | $      .00 |
| | | CIRCUIT CLERK BOND FEE | $     30.00 | $     30.00 | $      .00 |
| | | STATE'S ATTORNEY | $     30.00 | $     30.00 | $      .00 |
| | | COURT AUTOMATION | $      5.00 | $      5.00 | $      .00 |
| | | COURT SYSTEM FEE | $     50.00 | $     50.00 | $      .00 |
| | | SECURITY FEE | $     15.00 | $     15.00 | $      .00 |
| | | DOCUMENT STORAGE FEE | $      5.00 | $      5.00 | $      .00 |

STATE OF ILLINOIS
IN THE CIRCUIT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

ROLAND BRUCE LAMBERT                    Case No. _____ 2001CF000013
( Defendant's Name )

## NOTICE TO DEFENDANT

YOU ARE HEREBY NOTIFIED that the following fine and court costs have been assessed against
you in connection with this case:

|     |                          | Assessed | Paid |                      |
| --- | ------------------------ | -------- | ---- | -------------------- |
| 010 | CIRCUIT CLERK            | $ 40.00  | $ .00  | 705 ILCS 105/27.1  |
| 011 | CIRCUIT CLERK BOND FEE   | $ 30.00  | $ .00  | 705 ILCS 105/27.1  |
| 013 | COPY OR NOTICE FEE       | $ 16.50  | $ 16.50 | 705 ILCS 105/27.1 |
| 090 | STATE'S ATTORNEY         | $ 30.00  | $ .00  | 55 ILCS 5/4-2002   |
| 120 | COURT AUTOMATION         | $ 5.00   | $ .00  | 705 ILCS 105/27.3a |
| 130 | COURT SYSTEM FEE         | $ 50.00  | $ .00  | 55 ILCS 5/5-1101   |
| 131 | SECURITY FEE             | $ 15.00  | $ .00  | 55 ILCS 5-1103     |
| DSF | DOCUMENT STORAGE FEE     | $ 5.00   | $ .00  | 705 ILCS 105/27.3c |

TOTAL AMOUNT DUE         $       175.00
Past Due Probation       $          .00
Less Bond Posted         $       300.00   —transfered to 01CF127
NET DUE/REFUND           $(     125.00)
Remaining Probation Fee ( 016)  $     .00 ($ _____ X _____ mos. )
GRAND TOTAL              $(       0.00 )

YOU HAVE BEEN ORDERED BY THE PRESIDING JUDGE TO **PAY THE FINE AND
COSTS IN FULL BY** _____.

**FAILURE TO PAY SAID AMOUNT OR APPEAR ON SAID DATE MAY RESULT IN A
FORFEITURE AND/OR A WARRANT BEING ISSUED FOR YOUR ARREST.**

Mailing address : Circuit Clerk of McLean County , P.O. BOX 2420 , BLOOMINGTON , IL , 61702-2420
Street address: 104 W Front St., Bloomington, IL, 61702



FILED
McLEAN COUNTY
NOV 0 9 2001
CIRCUIT CLERK

I acknowledge Receipt of this Notice:

_____          _____
Date                                                          Signature

_____
Mailing Address


### CERTIFICATE OF MAILING

I, the undersigned, certify that I did on __11/14/01__ deposit a copy of this Notice to Defendant,

in the United States Mail, in a sealed envelope with postage prepaid, addressed to: _Deft_

_____c/o Mclean County Jail_____

_____

_____


CIRCUIT CLERK OF MCLEAN COUNTY


By: _____

Deputy

FILED
McLEAN COUNTY
NOV 0 9 2001
CIRCUIT CLERK

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
STATE OF ILLINOIS, COUNTY OF McLEAN

STATE OF ILLINOIS

Case No. _01 - CF -13_

_Lamber Roland_

ant

## DGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

ed defendant _1-26-64_ has been adjudged guilty of the offenses enumerated below,
(date of birth)

:D that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years
ach offense.

| OFFENSE | DATE OF OFFENSE | STATUTORY CITATION | CLASS | SENTENCE |
|---|---|---|---|---|
| _Driving Under Influence of Alcohol_ | _11-7-00_ | _625 ILCS 5/11-501(c-1)(1)_ | _4_ | _2_ Yrs. _6_ Mos. |

n (concurrent with) (consecutive to) the sentence imposed on:

_____ _____ _____ __ ____ Yrs. ____ Mos.

n (concurrent with) (consecutive to) the sentence imposed on:

_____ _____ _____ __ ____ Yrs. ____ Mos.

n (concurrent with) (consecutive to) the sentence imposed on:

_____ _____ _____ __ ____ Yrs. ____ Mos.

) that the sentence(s) imposed on count(s) ___ _I_ ___ be (concurrent with) (consecutive to) the sentence imposed

_-CF 127_ in the Circuit Court of _McLean_ County; be (concurrent with) (consecutive to) the sentence

_00-CF-1460_ in the Circuit Court of _McLean_ County; be (concurrent with) (consecutive to)

case number _____ in the Circuit Court of _____ County.

defendant is entitled to receive credit for time actually served in custody (of _O_ days as of the date of this order)

: _____

le)

ss ____ offense but sentenced as a class X offender pursuant to 730 ILCS 5/5-5-3(c)(8).

finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in great bodily harm
ILCS 5/3-6-3[a][2][iii]].

RDERED that Defendant is sentenced to pay a fine of $ _____

_25.00_ _____; to pay restitution of $ _____

_____; all to be paid by _within 6 months of release_ . Bond applied.

RDERED that _____

RDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

RDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine
piration of his sentence or until he is otherwise released by operation of law.

_ effective immediately) (_____ stayed until _____ ).

DATE: _11-5-01_    ENTER: _____    JUDGE

STATE OF ILLINOIS ).
COUNTY OF McLEAN )

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

THE PEOPLE OF THE
STATE OF ILLINOIS

vs

*Bruce Roland*

No.    *00 CF 1460*
*01 CF 13*
*01 CF 127*
*99 DT 712*
*01 CM 1059*

**PLEA AGREEMENT**

The defendant and the State's Attorney hereby submit to the Court the following Plea Agreement which was reached pursuant to discussions initiated by them. The defendant consents to the Court's receiving evidence in aggravation and mitigation in advance of the tender of this plea. The Agreement is as follows:

1. Defendant agrees to plead guilty to *CT. I 00 CF 1460 — CT I DWLR-SOF, CT. I 01 CF 13 Agg DUI, 01 CF 127 CT. I DWLR-SOF, 99 DT 712 CT. I*

2. State's Attorney agrees to nolle pros *00 CF 1460 CT. II — IV, 01 CF 13 CT. II, III, IV 99 DT 712, CTS. II, III, IV, V 01 CM 1059 — CT. I*

3. The court will impose as a maximum sentence in this case the following:

    a. $ _____ fine, plus court costs and fees as authorized by law, payable as follows:

    _____

    b. *5* years/months/days imprisonment in *IDOC*, as follows: *00 CF 1460 — 2½ years, 01 CF 13 and 01 CF 127 — 2½ yrs. consecutive to 00 CF 1460, 364 days on 99 DT 712 concurrent*

    c. Probation/Conditional Discharge/Court Supervision for _____ years/months with payment of court costs and fees no later than _____.

    Payment of Restitution no later than _____, as follows:

    PERSONS OWED        AMOUNT PAYABLE

    *Weavers Rent-a-11*      *$ 60.00*
    *212 N. Main St.*
    *Normal, ILL 61761*

    d. Additional conditions: _____

FILED
McLEAN   NOV 0 9 2001   COUNTY
CIRCUIT CLERK

4. It is stipulated that the defendant's prior record is as follows:

    *92 QF 938 - DUI SOF, 94 CF 408 Theft over — see records*

5. The defendant does (not) waive presentence investigation and written report.

_____      _____
*11/9/01*
Date                Defendant

_____      _____
State's Attorney        Defendant's Attorney

white:    Court copy
yellow:   State's Attorney

MACE PRINTING CO.

WAIVER OR DEMAND OF JURY AND PLEA TO COMPLAINT

STATE OF ILLINOIS,   } SS.

COUNTY OF McLEAN

IN THE CIRCUIT COURT 11th JUDICIAL CIRCUIT,
McLEAN COUNTY, ILLINOIS

### The People of the State of Illinois

### vs.

Bruce Roland     }   No. _01-CF-13_

FILED
NOV 0 9 2001
McLEAN COUNTY
CIRCUIT CLERK

The undersigned defendant in the above entitled cause, comes now in open court in _his_ own proper person, acknowledges receipt of copy of complaint in due time, acknowledges admonition by the Court as to effect of this plea, for plea herein says that _the_ is guilty/not guilty in manner and form as charged in said complaint, and waives/demands a jury in said cause.

X _[signature]_

Date this ____9____ day of ____Nov____ 20_01_.

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MC LEAN

THE PEOPLE OF THE STATE )
OF ILLINOIS, )
                     )
    Plaintiff, )
                     )
    vs. )  No. 01 CF 13
                   )     01 CF 127
BRUCE ROLAND, )    00 CF 1460
                   )
    Defendant. )

**F I L E D**

McLEAN COUNTY    JUN 2 5 2001

CIRCUIT CLERK

## MOTION TO CONTINUE

Now come the Defendant, BRUCE ROLAND, by his attorney of record, JOSEPH H. KELLEY, and moves for a continuance of this cause scheduled at 10:00 a.m. on June 25, 2001, and in support thereof states as follows:

1. The above-captioned matter is presently set for a status hearing at ~~9:00~~ *10:00* a.m. on June 25, 2001, before the Honorable William DeCardy presiding.

2. BRUCE ROLAND now resides in the State of Wisconsin and an emergency mental health detention hearing is scheduled for June 25, 2001 at 11:00 a.m. in Oneida County Wisconsin. Bruce Roland attempted to commit suicide on June 20, 2001. Correspondence from Assistant Corporation Counsel Tomas Wiensch is attached to this motion.

3. The Defendant waives any speedy trial rights occasioned by this continuance.

1

WHEREFORE, Defendant requests the entry of an Order continuing this cause from its present setting at 10:00 a.m. on June 25, 2001, to some future date.

BRUCE ROLAND, Defendant

By: _____

Joseph H. Kelley
Attorney for Defendant


JOSEPH H. KELLEY
Attorney at Law
237 East Front Street
Bloomington, Illinois 61701
Phone: (309) 827-8375

2

Lawrence R Heath
Corporation Counsel

Thomas D. Wiensch
Assistant Corporation Counsel

CORPORATION COUNSEL
ONEIDA COUNTY
Court House Building
P O Box 400
Rhinelander, Wisconsin 54501-0400
Telephone (715) 369-6155
Thomas D Wiensch 362-1550
Fax (715) 369-6284

June 21, 2001

VIA FACSIMILE 309-827-5693

Mr. Joe Kelly
Attorney at Law
237 E. Front Street
Bloomington, IL 61701

Re:   Bruce L. Roland

Dear Mr. Kelly:

As you are aware, Mr. Roland has a matter pending in Oneida County. This
matter is scheduled for June 25, 2001 at 11:00 a.m  You need to be aware that
Oneida County does not include weekends and holidays when calculating the time
limits for these cases. Also, Mr. Roland's wife, Danielle, and her daughter,
Brittany, are required to attend the hearing on Monday.

If you have any further questions, please do not hesitate to call.

Sincerely

Thomas D. Wiensch
Assistant Corporation Counsel
Bar No  1018958

TDW/cla

Jun 21 01 01:21p    Roland Painting and Finis  309-665-0853    p.2

F- Official Use

STATE OF WISCONSIN, CIRCUIT COURT, _Oneida_ COUNTY

_ICV_

IN THE MATTER OF THE CONDITION OF:

**STATEMENT OF
EMERGENCY DETENTION BY
LAW ENFORCEMENT OFFICER**

_Bruce C Roland_
Name of Subject

_1-26-64_
Date of Birth

Case No. _01SC5617_

- File this statement with the court immediately, because a probable cause hearing must be held within 72 hours of detention.
- Please print or type all information below. All blanks must be filled in.

MON-25-01
72 hrs - Bus. days

I am a law enforcement officer and have cause to believe:
- The subject is mentally ill, drug dependent, or developmentally disabled.
- The subject evidences behavior which constitutes a substantial probability of physical harm to self or to others, as set forth in §51.15, Wisconsin Statutes.

My belief is based on specific and recent dangerous acts, attempts, threats or omissions by the subject as observed by me or reliably reported to me as stated below:

When: _6-20-01     1223_

Where: _4360 Wildwood_

Dangerous Behavior: _Bruce has been making Suicidal threats for the past few days. Today he took 1500 lithium Carb. 300mg tabs and 15-20 .5mg Clonazepam in addition to a large amount of alcohol. Bruce has an extensive history of alcohol abuse and was treated at a mental health facility as a teenager. Just prior to our arrival Bruce attempted to cut his wrist with a utility knife_

Attach additional page if necessary.

Witnesses to the dangerous behavior (including officers who observed behavior):
Witness Name                     Address and Telephone

_Brittany J Sipp_          _4360 Wildwood   362-7097_

_Danielle E Felland_       _4360 Wildwood   362-7097_

The subject was detained at _St. Mary's Hospital_
Name of §51.15(2) Facility

on _6-20-01_ at _1330_ ☐ am. ☒ pm.
Date        Time

| Subject's Street Address _4360 Wildwood_ | City _Rhinelander_ | County _Oneida_ | State _WI_ |
|---|---|---|---|

| Signature of Officer _Bryan Wege_ | Department _Oneida Cnty Sheriff_ |
|---|---|
| Name Printed or Typed _Bryan Wege_ | Telephone _362-5101_ |

Distribution:
1. Original - Court
2. §51.15(2) Detention Facility
3. Subject with Notice of Rights

§51.15, Wisconsin Statutes

E-901.8/99  STATEMENT OF EMERGENCY DETENTION BY LAW ENFORCEMENT OFFICER

STATE OF ILLINOIS
COUNTY OF McLEAN

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

_People_
Plaintiff/Petitioner,

FILED
MAY 18 2001
CIRCUIT CLERK
McLEAN

No. _____

00-CF-1460
01-CF-13
01-CF-127
99-DJ-712

vs

_Bruce Roland_
Defendant/Respondent.

## ORDER

This cause coming on for status hearing
People appearing by Assistant State Attorney Thompson,
Deft in person & by Attorney Joseph Kelley, and on
Deft's motion, without objection - Status hearing
continued to June 25, 2001 at 10:00 AM.
    It is further ordered that Deft having
orally moved to be allowed to reside in
Wisconsin during pendency of these cases, and
the State's Attorney having no objection, Deft
is allowed to reside in Wisconsin upon
properly filing with the Clerk of the
Circuit Court a Waiver of Extradition

DATE: ___5-18-01___

_____
Judge

Name
Attorney for
Address
City

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF McLEAN

THE PEOPLE OF THE )
STATE OF ILLINOIS, )
                          Plaintiff )
 )
 )   No.  00-CF-1460
 v. )        01-CF-13
 )        01-CF-127
Bruce Roland )        99-DT-712
                          Defendant )

**FILED**
MAY 1 8 2001
McLEAN COUNTY
CIRCUIT CLERK

WAIVER OF EXTRADITION AS CONDITION OF BAIL BOND

I, Bruce Roland            , of Rhinelander               , State

of Wisconsin     , in consideration of having been admitted to bail and being granted

permission by the Court as a condition of my bail bond to travel outside of the State of Illinois

during the pendency of the above-entitled case, in which I am charged with the offense(s) of

Agg Driving under the Influence of Alcohol, Driving on Revoked License  ,

which are felony/misdemeanor offense under the laws of the State of Illinois, and travel to:

and  reside in Wisconsin,  4360 Wildwood,

Rhinelander, Wisconsin 54501

DO HEREBY WAIVE EXTRADITION TO THE STATE OF ILLINOIS FROM ANY

STATE IN WHICH I MAY BE FOUND in the event I am charged with any violation of the

conditions of said bail bond or with the commission of any additional offenses against the laws of

the State of Illinois. By this statement I waive, forfeit, and give up any and all legal rightrs under

teh laws of the State of Illinois and of the jurisdiction in which I am found to contest my immediate

transfer of custody to authorities of the State of Illinois for return to said State for further legal

proceedings against me.

5-18-01
_____
DATE

_____ ,Defendant

Subscribed and sworn to before me this
_____ day of _____, 19_____.

_____
     Notary Public

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

THE PEOPLE OF THE            }
STATE OF ILLINOIS,
                            }
        Plaintiff,          }           $00-CF-1460$
                            }
        vs.                 }   NO:  01-CF-~~2000~~ $13\checkmark$
                                     $01-CF-127$
BRUCE LAMBERT ROLAND
                            }
        Defendant.          }

## NOTICE

TO:  State's Attorney's Office    Bruce Lambert Roland
     104 West Front Street        4360 Wildwood
     Law & Justice Center         Rhinelander, Wisconsin 54501
     Bloomington, IL   61701


        You are hereby notified that the undersigned, as attorney for
DANIELLE ROLAND, will appear before the Honorable William D.
DeCardy, in the courtroom usually occupied by him at McLean County
Law & Justice Center, 104 W. Front Street, Bloomington, Illinois,
on      May 18, 2001      at/9:00 a.m for the purpose of having a
hearing a continued status, at which time you must appear and be
heard.

                        BRUCE LAMBERT ROLAND, Defendant

                        BY:  _____
                             JOSEPH H. KELLEY
                             Attorney for Defendant


JOSEPH H. KELLEY
Attorney at Law
237 East Front Street
Bloomington, IL   61701
(309) 827-8375



FILED
MCLEAN    MAY 0 4 2001    COUNTY
CIRCUIT CLERK

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of
the foregoing instrument was hand-delivered to the McLean County
State's Attorney's Office on _____ 5-4-01 _____.

JOSEPH H. KELLEY

IN THE CIRCUIT COURT
THE ELEVENTH JUDICIAL CIRCUIT
McLEAN COUNTY, ILLINOIS

DATE _5-2-01_

NO. _00 CF 13_

_____
_Peozle_
Plaintiff

_____
_Bruce Roland_
Defendant

# APPEARANCE

F I L E D
MAY 0 2 2001
McLEAN COUNTY, CIRCUIT CLERK

I hereby enter my appearance in the above entitled case.

_Bruce Roland_
Defendant

_Joseph H Kelley_
His Attorney

Address: _237 E. Front_

City/State: _Bloomington, IL 61701_

Phone: A/C _309_ Number _827-8375_

Attorney Registration Number _____

Case: 1:13-cv-03947 Document #: 2-18 Filed: 05/28/13 Page 34 of 50 PageID #:275
Case: 17-1113    Document: 33-3    Filed: 09/21/2017    Pages: 781

Date : 05/03/2001  02:15 PM

**Clerk of The Circuit Court**
**Eleventh Judicial Circuit**
**County of McLean**
**104 W Front St. Bloomington, IL 61702**

RECEIPT  VOUCHER

**\*1014733\***

Date Received : 05/03/2001     Batch Id : CR305042001     Effective Date 05/04/2001     Receipt # : 1014733

Manual Receipt # :

| Received From : | ROLAND, BRUCE LAMBERT | Source/Ck# or CC Val.# | Amount |
|---|---|---|---|
| Party Name : | ROLAND, BRUCE LAMBERT | CASH | $    1.00 |
| Case Number : | 2001CF000013 | Total Paid : | $    1.00 |
| New Party Balance : | $    .00 | | |

| Count | Citation # | Account Name | Starting Balance | Amount Paid | Ending Balance |
|---|---|---|---|---|---|
| | | COPY OR NOTICE FEE | $    1.00 | $    1.00 | $    .00 |

Date : 04/02/2001  09:37 AM

**Clerk of The Circuit Court**
**Eleventh Judicial Circuit**
**County of McLean**
**104 W Front St. Bloomington, IL 61702**

Page 1 of 1

RECEIPT VOUCHER

Date Received : 04/02/2001        Batch Id : CR304022001        Effective Date 04/02/2001        Receipt # : 1013126
                                                                                                 Manual Receipt # :

| Received From : | ROLAND, BRUCE LAMBERT | Source/Ck# or CC Val.# | Amount |
|---|---|---|---|
| Party Name : | ROLAND, BRUCE LAMBERT | CASH | $ 15.50 |
| Case Number : | 2001CF000013 | Total Paid : | $ 15.50 |
| New Party Balance : $ | .00 | | |

| Count | Citation # | Account Name | Starting Balance | Amount Paid | Ending Balance |
|---|---|---|---|---|---|
| | | COPY OR NOTICE FEE | $ 15.50 | $ 15.50 | $ .00 |

| STATE OF ILLINOIS | ) | | IN THE CIRCUIT COURT OF THE |
| COUNTY OF MCLEAN | ) SS | | ELEVENTH JUDICIAL CIRCUIT |

| THE PEOPLE OF THE | ) |
| STATE OF ILLINOIS | ) |
| | ) |
| VS. | ) |
| | ) |
| BRUCE ROLAND | ) |

F I L E D
McLEAN    COUNTY
MAR 0 2 2001
CIRCUIT CLERK

NO. 01 CF 13

## SUPPLEMENTAL DISCOVERY COMPLIANCE PURSUANT TO RULE 412

Now comes the People of the State of Illinois by Sandra Thompson, Assistant State's Attorney, in and for the County of McLean, State of Illinois, and presents as Discovery Compliance herein the following:

1. Pursuant to Supreme Court Rule 412(a)(iii), see exhibit 10 for a transcript of the grand jury testimony.

Respectfully Submitted,

Sandra Thompson
Assistant State's Attorney

I, Sandra Thompson, hereby certify that the answer to Defendant's Motion for Discovery in People v. Bruce Roland, 01 CF 13, is complete to the best of my knowledge, information and belief and all the exhibits referenced in this Answer have been provided to the defense.

Sandra Thompson
104 W. Front St., Room 605
PO Box 2400
Bloomington, IL 61701
(309) 888-5400

## PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorney's of record of all parties to the above cause by:

   _∅∅_ Depositing a true and correct copy of the same in the U.S. Post Office or post office box in the City of Bloomington, Illinois, enclosed in an envelope with postage fully prepaid on the  _/_  day of _March_, 2001.

   _✓_ Hand delivering a true and correct copy of the same on the _/_ day of _March_, 2001.

_Denise Nee_

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

THE PEOPLE OF THE STATE OF     )
ILLINOIS                       )
                               )
        PLAINTIFF,             )
                               )
        VS.                    )        NO. 01 CF 13
                               )
BRUCE ROLAND                   )
                               )
DEFENDANT.                     )

**FILED**
McLEAN    FEB 16 2001    COUNTY
CIRCUIT CLERK

ANSWER TO STATE'S MOTION FOR DISCOVERY

Now comes Bruce Roland, by Brian McEldowney, Public Defender

and in response to State's Motion for Discovery states as follows:

1.    There are no reports available at this time.

2.    Defendant intends to assert that he is not guilty.
      Defendant may call any of the persons listed in State's
      Answer to Motion for Discovery as a witness.

3.    There are no written or recorded statements available
      at this time.

4.    Defendant does not intend to assert an affirmative
      defense.


                        Respectfully submitted,
                        Bruce Roland, Defendant


                        _Brian McEldowney_

                        his Public Defender
                        Brian McEldowney

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the 16th,

day of February, 2001.

Brian McEldowney
Public Defender
104 W. Front Street, Room 603
Bloomington, IL 61701
Telephone: (309)888-5235

Date : 01/30/2001  10:44 AM

Page 1 of 1

Clerk of The Circuit Court
Eleventh Judicial Circuit
County of McLean
104 W Front St. Bloomington, IL 61702

BOND RECEIPT

| Date Received : | 01/30/2001 | Batch Id : TR201302001 | Effective Date: | 01/30/2001 | Receipt # : | 508911 |
|---|---|---|---|---|---|---|
| | | | | | ManualReceipt # : | |

| | | | | |
|---|---|---|---|---|
| Received From : | $300.00 from Case# 2000DT000723 | | Booking # : | |
| Defendant Name : | ROLAND, BRUCE LAMBERT | | Citation # : | |
| Case Number : | 2001CF000013 | | | |

| Bond Seq | Bond Type | Face Amount | Source | Check/CC# | Deposit Amount |
|---|---|---|---|---|---|
| 2 | D3 | $ 3,000.00 | Transfer Bond In | | $ 300.00 |
| | | | | Total Deposited : | $ 300.00 |

Date : 01/30/2001 10:44 AM

Page 1 of 1

**Clerk of The Circuit Court**
**Eleventh Judicial Circuit**
County of McLean
104 W Front St. Bloomington, IL 61702

BOND RECEIPT

| Date Received : | 01/30/2001 | Batch Id : TR201302001 | Effective Date: | 01/30/2001 | Receipt # : | 508910 |

Manual Receipt # :

| Received From : | $300.00 to Case# 2001CF000013 | | Booking # : |
| Defendant Name : | ROLAND, BRUCE LAMBERT | | Citation # : | 46571 |
| Case Number : | 2000DT000723 |

| Bond Seq | Bond Type | Face Amount | Source | Check/CC# | Deposit Amount |
|----------|-----------|-------------|--------|-----------|----------------|
| 1 | D3 | $ 3,000.00 | Transfer Bond Out | | $ - 300.00 |
| | | | | Total Deposited : | $ - 300.00 |

# IN THE ELEVENTH JUDICIAL CIRCUIT COURT MCLEAN COUNTY, ILLINOIS

00 - 723

THE PEOPLE OF THE STATE OF ILLINOIS    )
    )    CASE NO: TMP0014923
                vs    )
    )    _____
    )    Defendants date of birth: 01/26/64
Defendant:  ROLAND, BRUCE LAMBERT    )    _____

## APPEARANCE BOND

The DEFENDANT, whose signature appears below, has been charged with the offense(s) DRIVING WHILE LICENSE REVOKED, ILLEGAL TRANSPORTATION—CARRY ALCOHOLIC LIQUOR BY DRIVER, DRIVING UNDER THE INFLUENCE OF ALCOHOL.

Bond for this offense has been set at $ THREE THOUSAND DOLLARS AND NO CENTS——————dollars.

Therefore, in consideration of being released from custody, the DEFENDANT, and the BOND DEPOSITOR, if other than the DEFENDANT AGREE:

1. That they are indebted to the PEOPLE OF THE STATE OF ILLINOIS in the full amount of the appearance bond stated above.
2. That as security for the performance of this agreement, there has been deposited the following:
    (A) 10% BOND. The defendant/Depositor has deposited, in cash, 10% of the bond as stated above.
    B. RECOGNIZANCE or Individual Bond.
    C. REAL ESTATE BOND. (Separate sworn statement and schedule required. Judicial approval required.)
    D. CASH BOND: No 10% to apply.
3. That the DEFENDANT SHALL:
    A. Personally appear to answer the charges(s) at the MCLEAN COUNTY LAW AND JUSTICE CENTER, Bloomington, Illinois, on the 19TH day of DECEMBER 2000, at 0900AM A.M.P.XX and appear each time as ordered by the Court, until discharged.
    B. Not violate any criminal statute of any jurisdiction.
    C. Not leave the State of Illinois without permission of the Court.
    D. Give written notice of any address change to the Clerk of this Court within 24 hours at P.O. Box 2420, Bloomington, IL 61702-2420.
    E. Other Conditions: _____

If victim is a family/household member, as defined by 725 ILCS 5/112-A-3(3):
☐ F. Refrain from contact or communication with_____ for a minimum period of 72 hours following the defendants release from custody.
☐ G. Refrain from entering or remaining at residence for a minimum period of 72 hours following the defendant's release from custody.

<table>
<tr><td>

NOTICE TO PERSON PROVIDING BOND MONEY
IF OTHER THAN THE DEFENDANT
I hereby acknowledge that I have posted bond for the defendant named above, I further understand that if the defendant fails to comply with the conditions of this bond, that the Court shall enter an Order declaring the bond to be forfeited and used to pay costs, attorney's fees, fines or other purposes authorized by the Court. I further understand that if the defendant is convicted part or all of the bond may be used to pay fines, costs, fees and restitution.

Print Depositor's Name _____

Signature X _____

SS# _____

Date of Birth _____

TIN# _____

Print Address _____

City, State, Zip _____

</td><td>

CERTIFICATE OF DEFENDANT
I, the Defendant, do hereby state that I know and understand the terms and conditions of this appearance bond as shown on the FRONT AND REVERSE SIDE of this appearance bond form. I understand further that if at any time prior to the final disposition of the charge(s), I escape or am released on bond and fail to appear in Court when required I hereby waive my right to confront the witnesses against me; the trial and/or sentencing can proceed in my absence; I forfeit the security posted; judgment will be entered against me for the full amount of this bond, plus costs; a warrant may be issued, in which event additional bond may be required to be posted. I understand and accept the terms and conditions set forth above and on the reverse side of this appearance bond.

Signature of DEFENDANT X _____

SS# 350626314

TIN# _____

Print Address 2603 Keystone

City, State, Zip Bloom IL 6170?

</td></tr>
</table>

FILED
NOV 08 2000
McLEAN CIRCUIT CLERK

Signed and acknowledged before me and bond received by me.
this 07TH day of NOVEMBER 2000

_____
Official Signature
CORRECTIONAL OFFICER

### ASSIGNMENT OF BOND BY THE DEFENDANT
I hereby authorize the return of the bond herein posted to the person shown above after all conditions of this bond have been met.

STATE OF ILLINOIS   )
   ) SS
COUNTY OF MCLEAN   )

THE PEOPLE OF THE   )
STATE OF ILLINOIS   )
   )
VS.   )
   )
BRUCE ROLAND   )

IN THE CIRCUIT COURT OF THE

ELEVENTH JUDICIAL CIRCUIT

**FILED**

McLEAN    FEB 0 8 2001    COUNTY

CIRCUIT CLERK

NO.   01 CF 13

## DISCOVERY COMPLIANCE PURSUANT TO RULE 412

Now comes the People of the State of Illinois by Sandra Thompson, Assistant State's Attorney in and for the County of McLean, State of Illinois, and presents as Discovery Compliance herein the following:

1. Pursuant to Supreme Court Rule 412(a)(i), the State may call the following as witnesses:

Eric Owens
2921 Lisa Dr, Apt 4
Bloomington, IL 61701

Melissa Downey
335 Riley Dr
Bloomington, IL 61701

Officer Robert Peterson
Officer Steven Clifford
Bloomington Police Dept.
305 S. East St.
Bloomington, IL 61701

See exhibits 1-9 for statements or memoranda of statements of the above-listed witnesses.

2. Pursuant to Supreme Court Rule 412(a)(ii), see exhibits 1-9 for statements of the accused or codefendants. See #1 above for witnesses of the statements.

3. Pursuant to Supreme Court Rule 412(a)(iii), a copy of the grand jury testimony will be given upon receipt.

4. Pursuant to Supreme Court Rule 412(a)(iv), there are no reports of experts at this time.

5. Pursuant to Supreme Court Rule 412(a)(v), physical evidence may include: Secretary of State records, bottle of beer and any evidence contained or mentioned in State's exhibits..

6. Pursuant to Supreme Court Rule 412(a)(vi), known prior convictions of above witnesses: Melissa Downey, 98 CF 1233

7. Pursuant to Supreme Court Rule 412(b), there has been no electronic surveillance.

8.  Pursuant to Supreme Court Rule 412(c), see exhibits 1-9 for known <u>Brady</u> material.

Respectfully submitted,

Sandra Thompson
Assistant State's Attorney

I, Sandra Thompson, hereby certify that the answer to Defendant's Motion for Discovery in People v. Bruce Roland, 01 CF 13, is complete to the best of my knowledge, information and belief and all exhibits referenced in this Answer have been provided to the defense.

Sandra Thompson
104 W. Front St., Room 605
PO Box 2400
Bloomington, IL  61702-2400
(309) 888-5400

## PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorney's of record of all parties to the above cause by:

_____ Depositing a true and correct copy of the same in the U.S. Post Office or post office box in the City of Bloomington, Illinois, enclosed in an envelope with postage fully prepaid on the _____ day of _____, 2001.

__✓__ Hand delivering a true and correct copy of the same on the _7_ day of _February_, 2001.

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
McLEAN COUNTY, ILLINOIS

The People of the State of Illinois
                    Plaintiff,

*Bruce L. Roland* vs.
                    Defendant.

Case No. _01CF13_

## AFFIDAVIT OF ASSETS AND LIABILITIES

I, _Bruce Roland_, Defendant in this case, state that I am without adequate assets to retain counsel, and that I make the following statement in support of my request to be represented by Court-appointed counsel. I am aware that I may be ordered to reimburse the County for the reasonable cost of Court-appointed counsel.

1. Name _Bruce Roland_  Date of birth _01/26/64_ Telephone No. _309 663-7683_
2. Address _2603 Keystone_  City _Bloom_  State _IL_  Zip _61704_
3. Family: (a) Marital status _Married_  (b) Number of children _five_
4. Name and address of employer _Roland Painting_
   Length of employment _5 years_  Occupation _Painter_
5. **INCOME:**
   (a) $ _1500⁰⁰_ per month from employment.
   (b) $ _-0-_ per month from pension, trusts, annuity, welfare, Workman's Compensation, retirement or disability plan, or any similar State, Federal, local or private benefit plan.
   (c) $ _1500⁰⁰_ Total per month from all sources.
6. **ASSETS:**
   (a) Home or other dwelling $_____Where situated_____
   (b) Cars $_____
   (c) Bank accounts $_____
   (d) Cash on hand  $_____
   (e) Total value of assets $_____
7. **LIABILITIES:**
   (a) Mortgage/rent on residence $_156,000⁰⁰_ Monthly payment $ _1400⁰⁰_
   (b) Amount owed on car $ _-0-_ Monthly payment $ _-0-_
   (c) Personal debts $_____To whom owed_____
   (d) Other debts $_____To whom owed_____
   (e) Total liabilities and debts $_____  Total Monthly payments $_____
8. If released on bail, specify amount of security $ _300⁰⁰_ and source of payment of security (defendant's funds, borrowed cash, etc.)_____

FILED
McLEAN
FEB 07 2001
CIRCUIT CLERK

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

_B— Roll_
Defendant

Revised 6/97

STATE OF ILLINOIS          )
                           ) SS
COUNTY OF MC LEAN          )

THE PEOPLE OF THE          )
STATE OF ILLINOIS          )
                           )
        VS.                )
                           )
                           )
BRUCE LAMBERT ROLAND)

IN THE CIRCUIT COURT OF THE

ELEVENTH JUDICIAL CIRCUIT

NO.  01 CF 13

FILED
FEB 07 2001
McLEAN
CIRCUIT CLERK

## MOTION TO NOL-PROS

Now comes the People of the State of Illinois by the State's Attorney of McLean County,

and moves this court to nol-pros all counts of the Information heretofore filed herein, for the reason

that the Defendant has been indicted by the McLean County Grand Jury.

DATE: _2/2/01_                    _Teresa Phillips_
                                  Assistant State's Attorney

## ORDER

This cause coming on to be heard on the foregoing motion, and the Court being fully

advised in the premises,

FILED
FEB 07 2001
McLEAN
CIRCUIT CLERK

IT IS THEREFORE ORDERED that all Counts of the Information heretofore filed herein

be and hereby are nol-prossed.

DATE: _2-2-01_                    _____
                                  Judge

STATE OF ILLINOIS  )          IN THE CIRCUIT COURT OF THE
                   ) SS
COUNTY OF MC LEAN  )          ELEVENTH JUDICIAL CIRCUIT

THE PEOPLE OF THE  )
STATE OF ILLINOIS  )      **F I L E D**
                   )
        VS.        )      JAN 0 4 2001
                   )                      NO. 01 CF 13; 00 DT 723
BRUCE LAMBERT ROLAND)     CIRCUIT CLERK

N O T I C E

TO:   Bruce Lambert Roland, 2603 Keystone, Bloomington, IL 61704

        YOU ARE HEREBY NOTIFIED that you have been charged in the Circuit Court of McLean
County in the above entitled cause with the offense(s) of Aggravated Driving Under the Influence of
Alcohol (2 Cts.), Driving While License Revoked-Subsequent Offense Felony and Illegal Transportation
of Alcohol. The Court has ordered that you be given notice that the matter is set for
**ARRAIGNMENT/STATUS AT 9:00 A.M. ON JANUARY 19, 2001**, in Judge DeCardy's Courtroom
at the McLean County Law and Justice Center, 104 West Front Street, Bloomington, Illinois, at which
time and place YOU MUST BE PRESENT.

        THE DEFENDANT SHALL FILE all pre-trial motions of a discovery nature on or before the
arraignment date, at which time said motions shall be heard.
        Dated at Bloomington, Illinois, this 4th day of January, 2001.

                                        _____
                                        (Assistant) State's Attorney

CERTIFICATE OF SERVICE

Virginia Bicknell, being first duly sworn on oath, says that she served the foregoing Notice in the above-
entitled cause by:

____  Depositing a true and correct copy of the same in the U. S. Post Office or post office box in the
City of Bloomington, Illinois, enclosed in an envelope, with postage fully prepaid on the _4_ day of
_____, 2001, to Bruce Lambert Roland, plainly addressed as indicated in the above Notice.

_____  Hand delivering a true and correct copy of the same on the ____ day of _____, 2001,
to

                                        _____

Subscribed and sworn to before me this _4_ day of _____ 2001.

                                        OFFICIAL SEAL
                                        BOBBI RUDESILL
                                        NOTARY PUBLIC, STATE OF ILLINOIS
                                        MY COMMISSION

STATE OF ILLINOIS                                IN THE CIRCUIT COURT OF THE
COUNTY OF McLean                                 ELEVENTH JUDICIAL CIRCUIT
The People of the State of Illinois
                    VS.

DEFENDANT:                                       Case#:    2001CF000013
BRUCE LAMBERT ROLAND
2603  KEYSTONE
BLOOMINGTON, IL   61704

# INFORMATION

COUNT 1      :The STATE's ATTORNEY of McLean County, Illinois, in the name
and by the authority of the People of the State of Illinois charges that
BRUCE LAMBERT ROLAND on or about  07th day of November , 2000  at

BLOOMINGTON,
in the County of McLean, State of Illinois, committed the offense of

   AGGRAVATED DRIVING UNDER THE INFLUENCE OF ALCOHOL

   IN THAT HE DROVE A VEHICLE OR WAS IN ACTUAL PHYSICAL CONTROL OF A VEHICLE WITHIN
   THIS STATE WHILE UNDER THE INFLUENCE OF ALCOHOL,  AND HE PREVIOUSLY COMMITTED
   OFFENSES OF DRIVING WHILE UNDER THE INFLUENCE OF ALCOHOL IN 1984 IN MCLEAN COUNTY,
   IN 1988 IN MCLEAN COUNTY, AND IN 1992 IN MCLEAN COUNTY,

   * (DUI UPGRADE: SEE 00 DT 723)
   * (ELIGIBLE FOR EXTENDED TERM SENTENCE BASED ON PRIOR CLASS 3 AND CLASS4
   CONVICTIONS)
in violation of  625 ILCS 5/11-501(d)(1)(A)            A Class 4 Felony

                              _____
                              CHARLES   REYNARD
                              By Assistant State's Attorney

The undersigned, on oath, states that the facts set forth in the foregoing
information are true in substance and matter of fact, to the best of his
knowledge, information and belief.

                                          _____
|  DESCRIPTION  |                          Complainant
| D.O.B. | SEX | RACE |                    Subscribed and sworn to before me
| 01/26/1964 | Male | White |                   03th day of January   , 2001

Additional ID
Hgt: 5 11   Wgt: 225   Hair:     Eyes: BLU    "OFFICIAL SEAL"
SSN: 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      DLN: IL R45307264026     VIRGINIA BICKNELL
                                              NOTARY PUBLIC, STATE OF ILLINOIS       _____
                                              MY COMMISSION EXPIRES 5/8/2003         Virginia Bicknell
                                                                                    Notary Public

People request bond be set at          Bond Transfer
Case Request Type: Notice to Appear                    ┌─────────────────────────┐
Enhanced Penalty: Y                                    │ M c    Filed        C O │
Incident: 200014863     Agency: Bloomington PD         │ L E  01/03/2001 03:01:17 PM  U N │
Intake#: 210008           Booking#: 130111981          │ A N                 T Y │
                                                       │        CIRCUIT CLERK     │
                                                       └─────────────────────────┘



STATE OF ILLINOIS                                     IN THE CIRCUIT COURT OF THE
COUNTY OF McLean                                      ELEVENTH JUDICIAL CIRCUIT
The People of the State of Illinois
              VS.
DEFENDANT:                                            Case#:    2001CF000013
BRUCE LAMBERT ROLAND
2603  KEYSTONE                                        
BLOOMINGTON, IL  61704

# INFORMATION

COUNT 2    :The STATE's ATTORNEY of McLean County, Illinois, in the name
and by the authority of the People of the State of Illinois charges that
BRUCE LAMBERT ROLAND on or about  07th day of November , 2000  at

 BLOOMINGTON,
 in the County of McLean, State of Illinois, committed the offense of


   AGGRAVATED DRIVING UNDER THE INFLUENCE OF ALCOHOL

   IN THAT HE DROVE A VEHICLE OR WAS IN ACTUAL PHYSICAL CONTROL OF A VEHICLE WITHIN
   THIS STATE WHILE HE WAS UNDER THE INFLUENCE OF ALCOHOL, DURING A PERIOD IN WHICH
   HIS DRIVING PRIVILEGES WERE REVOKED, AND THE REVOCATION WAS FOR A VIOLATION OF
   DRIVING UNDER THE INFLUENCE OF ALCOHOL PURSUANT TO 620 ILCS 11-501,

   *(DUI UPGRADE: SEE 00 DT 723)
   *(ELIGIBLE FOR EXTENDED TERM SENTENCE BASED ON PRIOR CLASS 3 AND CLASS 4
   CONVICTIONS)
 in violation of  625 ILCS 5/11-501(c-1)(1)              A Class 4 Felony



                                          _____
                                          CHARLES  REYNARD
                                          By Assistant State's Attorney

The undersigned, on oath, states that the facts set forth in the foregoing
information are true in substance and matter of fact, to the best of his
knowledge, information and belief.

_____
|       DESCRIPTION
| D.O.B.     SEX      RACE                  Complainant
| 01/26/1964 Male     White                 Subscribed and sworn to before me
|_____           03th day of January   ,  2001
Additional ID
Hgt: 5 11  Wgt: 225  Hair:    Eyes: BLU     _____
SSN:  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     DLN: IL R45307264026  "OFFICIAL SEAL"
                                            VIRGINIA BICKNELL            Virginia Bicknell
                                            NOTARY PUBLIC, STATE OF ILINOIS
                                            MY COMMISSION EXPIRES 5/8/2003
                                            _____
                                            Notary Public

People request bond be set at           Bond Transfer      _____
Case Request Type: Notice to Appear                        M              Filed          C
Enhanced Penalty: Y                                        c                             O
Incident: 200014863                                        L  01/03/2001 03:01:18 PM     U
                         Agency: Bloomington PD            E                             N
Intake#: 210008                                            A                             T
                              Booking#: 130111981          N    CIRCUIT CLERK           Y

STATE OF ILLINOIS
COUNTY OF McLean

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

The People of the State of Illinois
VS.

DEFENDANT:
BRUCE LAMBERT ROLAND
2603 KEYSTONE
BLOOMINGTON, IL 61704

Case#:   2001CF000013

# INFORMATION

COUNT 3      :The STATE's ATTORNEY of McLean County, Illinois, in the name
and by the authority of the People of the State of Illinois charges that
BRUCE LAMBERT ROLAND on or about  07th day of November , 2000  at

BLOOMINGTON,
in the County of McLean, State of Illinois, committed the offense of

DRIVING WHILE LICENSE REVOKED - SUBSEQUENT OFFENSE FELONY

IN THAT HE DROVE A MOTOR VEHICLE ON A HIGHWAY IN THE STATE OF ILLINOIS AT A TIME
WHEN HIS DRIVER'S LICENSE OR PRIVILEGE TO DRIVE WAS REVOKED BY THE ILLINOIS
SECRETARY OF STATE AND THE BASIS OF SAID REVOCATION WAS A CONVICTION FOR DRIVING
UNDER THE INFLUENCE OF ALCOHOL IN VIOLATION OF 625 ILCS 5/11-501 AND HE WAS
PREVIOUSLY CONVICTED OF DRIVING WHILE LICENSE REVOKED IN McLEAN COUNTY CASE 92 CF
938,

* (TRAFFIC UPGRADE: SEE 00 DT 723)
* (ELIGIBLE FOR EXTENDED TERM SENTENCE BASED ON PRIOR CLASS 3 AND CLASS 4
CONVICTIONS)
in violation of  625 ILCS 5/6-303(d)

A Class 4 Felony

---

CHARLES  REYNARD
By Assistant State's Attorney

The undersigned, on oath, states that the facts set forth in the foregoing
information are true in substance and matter of fact, to the best of his
knowledge, information and belief.

---

Complainant

Subscribed and sworn to before me
03th day of January   ,  2001

| DESCRIPTION | | |
| --- | --- | --- |
| D.O.B. | SEX | RACE |
| 01/26/1964 | Male | White |

Additional ID
Hgt: 5 11   Wgt:225   Hair:       Eyes: BLU
SSN:  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      DLN: IL R45307264026

"OFFICIAL SEAL"
VIRGINIA BICKNELL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6/8/2003

Virginia Bicknell

Notary Public

People request bond be set at
Case Request Type: Notice to Appear
Enhanced Penalty: Y
Incident: 200014863
Intake#: 210008

Bond Transfer

Agency: Bloomington PD

Booking#: 130111981

M c L E A N   Filed   C O U N T Y

01/03/2001 03:01:18 PM

CIRCUIT CLERK

STATE OF ILLINOIS
COUNTY OF McLean
The People of the State of Illinois
              VS.

DEFENDANT:
BRUCE LAMBERT ROLAND
2603  KEYSTONE
BLOOMINGTON, IL  61704

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

Case#:    2001CF000013

# INFORMATION

COUNT 4    :The STATE's ATTORNEY of McLean County, Illinois, in the name
and by the authority of the People of the State of Illinois charges that
BRUCE LAMBERT ROLAND on or about  07th day of November , 2000  at

BLOOMINGTON,

in the County of McLean, State of Illinois, committed the offense of

    ILLEGAL TRANSPORTATION OF ALCOHOL

    IN THAT HE POSSESSED AN ALCOHOLIC LIQUOR WITH THE ORIGINAL SEAL BROKEN, WITHIN THE
    PASSENGER AREA OF A MOTOR VEHICLE UPON A HIGWAY OF THIS STATE,
in violation of  625 ILCS 5/11-502(a)                    A Petty Traffic-Fine Only

CHARLES   REYNARD
By Assistant State's Attorney

The undersigned, on oath, states that the facts set forth in the foregoing
information are true in substance and matter of fact, to the best of his
knowledge, information and belief.

| DESCRIPTION | | |
|---|---|---|
| D.O.B. | SEX | RACE |
| 01/26/1964 | Male | White |

Additional ID
Hgt: 5 11   Wgt: 225   Hair:      Eyes: BLU
SSN: 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      DLN: IL R45307264026

Complainant

Subscribed and sworn to before me
    03th day of January   , 2001

"OFFICIAL SEAL"
VIRGINIA BICKNELL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5/8/2003

Notary Public

People request bond be set at
Case Request Type: Notice to Appear
Enhanced Penalty: N
Incident: 200014863      Agency: Bloomington PD
Intake#: 210008          Booking#: 130111981

Bond Transfer

M   c   L   E   A   N
**Filed**
01/03/2001 03:01:18 PM
CIRCUIT CLERK
C O U N T Y

STATE OF ILLINOIS
COUNTY OF McLean

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

The People of the State of Illinois

vs.

DEFENDANT:
BRUCE LAMBERT ROLAND
2603 KEYSTONE
BLOOMINGTON, IL  61704

Case#:    2001CF000013



# BILL OF INDICTMENT

COUNT 4  / 4   :The GRAND JURY of McLean County, Illinois, charges that
BRUCE LAMBERT ROLAND on or about the 07th day of November , 2000      at
BLOOMINGTON,
in the County of McLean, State of Illinois, committed the offense of


ILLEGAL TRANSPORTATION OF ALCOHOL

IN THAT HE POSSESSED AN ALCOHOLIC LIQUOR WITH THE ORIGINAL SEAL BROKEN, WITHIN THE
PASSENGER AREA OF A MOTOR VEHICLE UPON A HIGWAY OF THIS STATE,

in violation of   625 ILCS 5/11-502(a)          A Petty Traffic-Fine Only

A TRUE BILL

| DESCRIPTION | | |
|---|---|---|
| D.O.B. | SEX | RACE |
| 01/26/1964 | Male | White |

_Paul Horman_
Foreman

Additional ID
Hgt: 5'11 " Wgt:225  Hair:      Eyes:BLU
SSN:  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     DLN:ILR45307264026


LIST OF WITNESSES
RANDALL  MCKINLEY

Intake#:      210008

Booking#: 130111981

**Exhibit 16-4**

Incident: 200014863  Agency: Bloomington PD

FILED
JAN 3 1 2001
MCLEAN COUNTY
CIRCUIT CLERK

STATE OF ILLINOIS
COUNTY OF McLean

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

The People of the State of Illinois

        vs.

DEFENDANT:
BRUCE LAMBERT ROLAND
2603 KEYSTONE
BLOOMINGTON, IL 61704

Case#:    2001CF000013



# BILL OF INDICTMENT

COUNT 3 / 4   :The GRAND JURY of McLean County, Illinois, charges that
BRUCE LAMBERT ROLAND on or about the 07th day of November , 2000    at
BLOOMINGTON,
in the County of McLean, State of Illinois, committed the offense of


DRIVING WHILE LICENSE REVOKED - SUBSEQUENT OFFENSE FELONY

IN THAT HE DROVE A MOTOR VEHICLE ON A HIGHWAY IN THE STATE OF ILLINOIS AT A TIME WHEN
HIS DRIVER'S LICENSE OR PRIVILEGE TO DRIVE WAS REVOKED BY THE ILLINOIS SECRETARY OF
STATE AND THE BASIS OF SAID REVOCATION WAS A CONVICTION FOR DRIVING UNDER THE
INFLUENCE OF ALCOHOL IN VIOLATION OF 625 ILCS 5/11-501 AND HE WAS PREVIOUSLY CONVICTED
OF DRIVING WHILE LICENSE REVOKED IN MCLEAN COUNTY CASE 92 CF 938,

*(TRAFFIC UPGRADE: SEE 00 DT 723)
*(ELIGIBLE FOR EXTENDED TERM SENTENCE BASED ON PRIOR CLASS 3 AND CLASS 4 CONVICTIONS)

in violation of   625 ILCS 5/6-303(d)                    A Class 4 Felony

A TRUE BILL

| DESCRIPTION | | |
|---|---|---|
| D.O.B. | SEX | RACE |
| 01/26/1964 | Male | White |

Foreman

Additional ID
Hgt: 5'11" Wgt: 225   Hair:      Eyes: BLU
SSN: 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    DLN: ILR45307264026

LIST OF WITNESSES
RANDALL MCKINLEY

Intake#:    210008

Booking#: 130111981

FILED
JAN 31 2001
McLEAN COUNTY
CIRCUIT CLERK

Incident: 200014863  Agency: Bloomington PD

THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

The People of the State of Illinois
                    VS.

DEFENDANT:
BRUCE LAMBERT ROLAND
2603 KEYSTONE
BLOOMINGTON, IL  61704

Case#:     2001CF000013

# BILL OF INDICTMENT

COUNT 2 / 4  :The GRAND JURY of McLean County, Illinois, charges that
BRUCE LAMBERT ROLAND on or about the 07th day of November , 2000     at
BLOOMINGTON,
in the County of McLean, State of Illinois, committed the offense of

AGGRAVATED DRIVING UNDER THE INFLUENCE OF ALCOHOL

IN THAT HE DROVE A VEHICLE OR WAS IN ACTUAL PHYSICAL CONTROL OF A VEHICLE WITHIN THIS
STATE WHILE HE WAS UNDER THE INFLUENCE OF ALCOHOL, DURING A PERIOD IN WHICH HIS
DRIVING PRIVILEGES WERE REVOKED, AND THE REVOCATION WAS FOR A VIOLATION OF DRIVING
UNDER THE INFLUENCE OF ALCOHOL PURSUANT TO 620 ILCS 11-501,
*(DUI UPGRADE: SEE 00 DT 723)
*(ELIGIBLE FOR EXTENDED TERM SENTENCE BASED ON PRIOR CLASS 3 AND CLASS 4 CONVICTIONS)
in violation of   625 ILCS 5/11-501-(c-1)(1)

A Class 4 Felony

A TRUE BILL

DESCRIPTION
D.B.                SEX          RACE
-/26/1964         Male         White

tional ID
5 '11 " Wgt:225  Hair:       Eyes:BLU
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     DLN: ILR45307264026

Foreman

OF WITNESSES
ALL MCKINLEY

ke#:      210008

Booking#: 130111981

: 200014863  Agency: Bloomington PD

FILED
JAN 3 1 2001
MCLEAN COUNTY
CIRCUIT CLERK

The People of the State of Illinois
VS.

HE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

DEFENDANT:
BRUCE LAMBERT ROLAND
2603 KEYSTONE
BLOOMINGTON, IL   61704

Case#:    2001CF000013

# BILL OF INDICTMENT

COUNT 1 / 4    :The GRAND JURY of McLean County, Illinois, charges that
BRUCE LAMBERT ROLAND on or about the 07th day of November , 2000     at
BLOOMINGTON,
in the County of McLean, State of Illinois, committed the offense of

AGGRAVATED DRIVING UNDER THE INFLUENCE OF ALCOHOL

IN THAT HE DROVE A VEHICLE OR WAS IN ACTUAL PHYSICAL CONTROL OF A VEHICLE WITHIN THIS
STATE WHILE UNDER THE INFLUENCE OF ALCOHOL,    AND HE PREVIOUSLY COMMITTED OFFENSES OF
DRIVING WHILE UNDER THE INFLUENCE OF ALCOHOL IN 1984 IN MCLEAN COUNTY, IN 1988 IN
MCLEAN COUNTY, AND IN 1992 IN MCLEAN COUNTY,
* (DUI UPGRADE: SEE 00 DT 723)
* (ELIGIBLE FOR EXTENDED TERM SENTENCE BASED ON PRIOR CLASS 3 AND CLASS4 CONVICTIONS)
violation of   625 ILCS 5/11-501(d)(1)(A)

A Class 4 Felony

A TRUE BILL

| DESCRIPTION | | |
| SEX | RACE | |
.B.
6/1964      Male      White

ional ID
'11 " Wgt:225   Hair:      Eyes:BLU
50-62-6314   DLN: ILR45307264026

WITNESSES
MCKINLEY

Foreman    Paul Horman

210008

200014863  Agency: Bloomington PD

Booking#: 130111981

FILED
JAN 3 1 2001
McLEAN COUNTY
CIRCUIT CLERK

# FELONY
# RECORD SHEET

Nature of Case  DRIVING WHILE LICENSE RE
VOKED—SUBSEQUENT OFFENSE
FELONY

Attorneys

PEOPLE OF THE STATE OF ILLINOIS

VS

BRUCE LAMBERT ROLAND

F I L E D
McLEAN          COUNTY
JAN 9 – 2008
CIRCUIT CLERK

J. H. Kelley

| DATE | | | JUDGE AND REPORTER | | COSTS | |
|---|---|---|---|---|---|---|
| | | | | | Dollars | Cents |
| 02 | 09 | 01 | | CLERK'S FILING FEE | | 40 00 |
| | | | | COURT SECURITY FEE | | 15 00 |
| | | | | STATE'S ATTORNEY FEE | | 30 00 |
| | | | | AUTOMATION FEE | | 5 00 |
| | | | | SURCHARGE | | |
| | | | | VCVA | | |
| | | | | COURT DOCUMENT STORAGE FEE | | 5 00 |
| | | | | COURT SYSTEM FEE | | 50 00 |

2 14 00  *Notice of Arraignment/Status at 9:00 AM on March 2, 2001 – filed Bond to be transferred from 01 TR 451*

3 2 01  D. Clerk   w/ B.W. Elbow

Deft., Age 37, appears in person with copy of complaint. Bond set at $ _____. Deft. pleads not guilty and (does not) waive(s) jury

Cause ordered set for _____ on 3-16, 01 at 10:00a.

Deft. remanded to custody of Sheriff. Affirmus Affidavit on file Public Defender (granted) (denied).

Deft. waives P.H.

Case No. 01 CF 127          RECORD SHEET          Page No. ②

| DATE | JUDGE AND REPORTER | | COSTS Dollars | Cen |
|------|-------------------|---|---|---|

| 7 01 | | Affidavit filed - copy sent to PD | | |
| 16 01 | DeCardy | Defendant present w/ PD Mill and ASA S. Thompson. Status hearing continued to 5/4/01 @ 10:30 by agreement. | | |
| 15 01 | | DISCOVERY COMPLIANCE PURSUANT TO Rule 412 FILED | | |
| 21 01 | | DISCOVERY COMPLIANCE PURSUANT TO Rule 412 FILED | | |
| 4 2 01 | | Answer to State's Motion for Discovery filed | | |
| 2 01 | | On Jeff & by J. Kelley met, w/o objection of State, cause continued for Status to 5-18-01 @ 10:00 am AHN to hours. | | |
| 2 01 | | Appearance filed - Joseph Kelly | | |
| 5 4 01 | | Notice filed | | |
| 18 01 | DeCardy | By agreement Status hearing con't to 6/25/01 @ 10:00 AHN. Order granting leave to depart State entered. See Order | | |
| 25 01 | | Def. and by J. Kelly ; ASA Thompson On dep motion, w/o objection, cause continued for Status to 8-27-01 at 10:00 am to ruling/AHN | | |
| 27 01 | DeCardy | By agreement, cause continued for plea to 11.9.2001 @ 1:30pm. AHN. | | |
| 9 01 | DeCardy Wenz | Deft w/ J. Kelly; ASA Thompson. Plea agreement tendered and accepted. Deft is sentenced to 2½ years | | |

C se No. _01CF127_                **RECORD SHEET**                Page No. ___3___

| DATE | | JUDGE AND REPORTER | | COSTS Dollars | Cen |
|---|---|---|---|---|---|
| 13 | 01 | | Certified copies of Judgment-Sentence to IDOC (3) sent to Sheriff's Dept w/ proof of receipt filed. | | |
| 14 | 01 | | 125⁰⁰ Bond transferred from 01 CF 13 | | |
| 14 | 01 | | Bond applied # 1083337   Bal 20⁰⁰ | | |
| 14 | 01 | | State's Attorney History Sheet Filed. | | |
| 29 | 01 | ✓ | Jail Time Sheet Filed. | | |
| 12 10 | 01 | | Notice of filing Notice for Motion for Reduction of Sentence, Motion for Reduction of Sentence filed | | |
| 9 | 02 | DeCardy | More than 30 days having elapsed since Sentencing on Nov. 9, 2001, to filing of Motion on Dec 10, 2001, defendant's Motion for Reduction of Sentence is hereby stricken. See letter. | | |
| 13 | 03 | ✓ | $20. financial balance NEA'd per ASA Wright | | |

# MCLEAN COUNTY CIRCUIT CLERK
## SUMMARY OF COLLECTION EFFORTS ON PAST DUE ACCOUNTS

CASE NUMBER _01 CF 127_

NAME _Bruce Roland_

FINE AMOUNT _0_

COST AMOUNT _20.00_

PAST DUE PROBATION FEES _0_

RESTITUTION _0_

PUBLIC DEFENDER FEE _0_

TOTAL DUE _20.00_

DATE DUE _8/11/03_

DEFENDANT'S ADDRESS _4360 Wildwood_

_Rhinelander, WI  54501_

## COLLECTION INFORMATION

DATE SENT _NA_

DATE CANCELLED FROM COLLECTIONS _NA_

DATE REFERRED TO S.A FOR REVIEW _8/27/03_

## STATE'S ATTORNEY ACTION

PLANNED ACTION _to SA_

DATE _10-13-03_

STATE'S ATTORNEY SIGNATURE _____

_00CF1460 sent to coll. this date $239.00_

# Circuit Court of Illinois

### ELEVENTH JUDICIAL CIRCUIT
### McLEAN COUNTY

CHAMBERS OF
WILLIAM D. DeCARDY
LAW & JUSTICE CENTER
BLOOMINGTON, IL 61701
(309) 888-5245

COUNTIES
FORD
LIVINGSTON
LOGAN
McLEAN
WOODFORD

January 9, 2002

Mr. Bruce Lambert Roland
Reg. No. B-53847
Centralia Correctional Center
9330 Shattuc Road
P.O. Box 7711
Centalia, Illinois 62801

RE:     People v. Bruce L. Roland
        Cases: 01 CF 13, 01 CF 127, 00 CF 1460,
        99 DT 712 and 01 CM 1059

Dear Mr. Roland:

Please be advised that the Court has on this date entered the following entry upon the docket in the above-entitled cases:

"More than 30 days having elapsed since sentencing on November 9, 2001, to filing of Motion on December 10, 2001, defendant's Motion for Reduction of Sentence is hereby stricken."

Respectfully,

William D. DeCardy
Associate Circuit Judge

FILED
McLEAN JAN 0 9 2002 COUNTY
CIRCUIT CLERK

WDD/sjw

cc:     Joseph Kelley, Attorney at Law
        Sandra Thompson, Assistant States Attorney

Clerk of the Court
Sandra Parker
The Law and Justice Center
104 W. Front St.
P.O. Box 2400
Bloomington, IL. 61702-2400


                    99-DT-712   01-CF-13
                                          01-CM-1059
RE:   Case No. 00-CF-1460   01-CF-127
      Warrant
         NO._____

To Clerk of the Court, for the ___ELEVENTH___ Judicial Circuit:

    Please find enclosed an original and ___1___ copy(s) of a

    Motion For Reduction Of Sentence
_____

One (1) additional copy is enclosed for you to kindly file/stamp

and return to me.

    I THANK YOU in advance for your time, effort, and consideration

and   should you need further assistance, please contact me at the

address below.


                              Respectfully Submitted,

                              /s/ [signature]

                              Reg. No. B-53847
                              Centralia Corr. Center
                              9330 Shattuc Road
                              P. O. Box 7711
                              Centralia, Illinois
                                        62801
                              Ph.(618) 533-4111




FILED
DEC 1 0 2001
McLEAN COUNTY
CIRCUIT CLERK

IN THE

CIRCUIT COURT OF THE___11th___JUDICIAL CIRCUIT

McLean COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,                    )
                                                    )
      Plaintiff-Petitioner,                         )
                                                    )
                                                    )
         -vs-                                    )
                                                    )
                                                    )
BRUCE LAMBERT ROLAND_____,                         )
                                                    )
      Defendant-Respondent.                         )

99-DT-712
00-CF-1460
01-CF-13
CASE NO.  01-CF-127
01-CM-1059

HONORABLE:  William D. DeCardy
               Judge Presiding.

NOTICE OF FILING

TO:  State's Attorney
     Charles Reynard
     The Law and Justice Center
     104 W. Front St.
     P.O. Box 2400
     Bloomington,IL.61701-2400

PLEASE TAKE NOTICE that on ___December 6th___, 2001_, I shall cause to
be filed by U.S. Mail with the Clerk of the Circuit Court of ___McLean___ County,
Illinois, at ___Centralia C.C.___, ___Centralia___, Illinois _62801___, the
attached ___Motion For Reduction Of Sentence___
which is herewith served upon you.

SUBSCRIBED AND SWORN TO
before me this _6th__, day of
December_____, 2001_.

_____
     NOTARY PUBLIC

_____
Defendant, pro se. (Signature)

Bruce L. Roland_____
Defendant's Name (Print or Type)
Number _B-53847_____
Centralia Correctional Center
P.O. Box 7711
Centralia, Illinois  62801

"OFFICIAL SEAL"
Gina R. Feazel
Notary Public, State of Illinois
My Commission Exp. 08/31/2005

FILED
McLEAN
DEC 1 0 2001
CIRCUIT CLERK
COUNTY

IN THE CIRCUIT COURT OF ____McLEAN____ COUNTY, ILLINOIS
THE COURT FOR THE ____ELEVENTH____ JUDICIAL CIRCUIT
CRIMINAL DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, ) Plaintiff, ) ) vs. ) ) BRUCE LAMBERT ROLAND___, ) Defendant. ) | 99-DT-712 00-CF-1460 01-CF-13 No. 01-CF-127 01-CM-1059 |

## NOTICE OF MOTION FOR REDUCTION OF SENTENCE

NOW COMES the defendant, ___Bruce L. Roland___, pro se, in order to give notice of intention to file a MOTION FOR REDUCTION OF SENTENCE before the Court.

This notice of MOTION FOR REDUCTION OF SENTENCE is being filed pursuant to Illinois Revised Statutes (1991), Chapter 38 Section 1005-8-1 et. seq., [730 ILCS 5/5-8-1 et. seq.]

Defendant is currently incarcerated at Centralia Correctional Center, Centralia, Illinois, 62801.

WHEREFORE, the defendant, ___Bruce L. Roland___, prays for the Court to review the sentence in case numbers ( As men-tioned above) of imprisonment entered against defendant on ___11-9-01___ and to reduce the defendant's sentence.

Respectfully submitted,

Defendant, pro se
Number B-53847
Centralia Correctional Center
P.O. Box 7711
Centralia, Illinois 62801



IN THE CIRCUIT COURT OF ___McLEAN___ COUNTY, ILLINOIS
THE COURT FOR THE __ELEVENTH__ JUDICIAL CIRCUIT
CRIMINAL DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE<br>OF ILLINOIS,<br>　　　　　Plaintiff,<br><br>　　vs.<br><br>BRUCE LAMBERT ROLAND__,<br>　　　　Defendant. | )<br>)<br>)<br>)<br>)　No.<br>)<br>)<br>)<br>) |

　99-DT-712
　00-CF-1460
　01-CF-13
　01-CF-127
　01-CM-1059

MOTION FOR REDUCTION OF SENTENCE

NOW COMES the defendant, ___Bruce L. Roland___, pro se,
and respectfully requests the Court to reduce the sentence
of imprisonment imposed upon the defendant in the above
captioned cause pursuant to Illinois Revised Statutes (1991)
Chapter 38 Section 1005-8-1 et. seq., [730 ILCS 5/5-8-1 et.
seq.].

　　　1.　The defendant was sentenced by the Court to a term
of imprisonment in the Illinois Department of Corrections.
_____5_____ years, for the offenses of ___Driving On A Re-___
___voked License and Aggravated DUI___                      .

　　　2.　That the above sentence was imposed upon the
defendant  by the Honorable Judge ___William D. DeCardy___
on ___November 9th___ ,_2001_, following a
( ) jury trial  ( ) bench trial  (XX) plea agreement.

FILED
McLEAN DEC 1 0 2001 COUNTY
CIRCUIT CLERK

3.    The defendant requests that the Court review the
sentence imposed because there exists a litany of
substantial extenuating circumstances that surround the
above captioned cause.   The defendant further states the
following in support of his motion (State all the reasons
why you believe your sentence should be reduced):

  Excessive Sentence, I would ask this honorable Court to
reconsider the sentence of five (5) years to be reduced to
four (4) years or less allowing me to introduce circumstances
such as character references, mental state, financial hard-
ship on Spouse and Children, Therapy goals, Treament plans.
      Wherefore, I ask this Honorable Court for the opportunity
to present my circumstances in open court.

_____

_____

4.    WHEREFORE, defendant prays the Court will review
the terms of imprisonment and grant relief on MOTION FOR
REDUCTION OF SENTENCE.   Defendant further prays that the
Court will enter an order thereby reducing his sentence to
be served in the Illinois Department of Corrections.

/s/ _____
Defendant, pro se

STATE OF ILLINOIS          )
                           )    SS
COUNTY OF CLINTON          )

### AFFIDAVIT

I, __Bruce L. Roland_____, deposes and says that
as to the petition herein, he is the Defendant in the above
entitled cause; that he has read the foregoing document, by
his signed, and that the statements contained therein are
true in substance and in fact.

/s/ _____
Defendant, pro se

Signed before me this __6th__ day of __December__, 20__01__.

_____
Notary Public

"OFFICIAL SEAL"
Gina R. Feazel
Notary Public, State of Illinois
My Commission Exp. 08/31/2005

IN THE CIRCUIT COURT OF _____ COUNTY, ILLINOIS
    THE COURT FOR THE _____ JUDICIAL CIRCUIT
                        CRIMINAL DIVISION

THE PEOPLE OF THE STATE        )
   OF ILLINOIS,                )
              Plaintiff,       )
                               )
         vs.                   )   No._____
                               )
_____,      )
           Defendant.          )
                               )

ORDER

Upon the review of the defendant's MOTION FOR REDUCTION
OF SENTENCE, and being fully advised in the premises;

IT IS HEREBY ORDERED that the defendant, _____

_____, shall have his sentenced

reduced to a term of _____ in the Illinois

Department of Corrections.

ENTERED:

                              _____
                                      Judge

IN THE CIRCUIT COURT, 11th JUDICAL CIRCUIT
McLEAN COUNTY, ILLINOIS

Subject:    Bruce Lambert Roland                    W/M  01-26-64

Memo – Re: Prisoner's period spent in jail in connection with case No. 2001CF000127

    Driving While License Revoked

INTERVAL

11 - 09 - 01    to    11 - 15 - 01

David Owens
                                                    Sheriff

By    Records
11/14/2001



REPORT OF FELONY CONVICTION

Circuit Court, _McLean_ County, _Eleventh_ Municipal District

☒ Involving a motor vehicle as referenced in section 6-205(a)3 of the *Illinois Vehicle Code*.
☐ Mandatory Insurance as referenced in section 7-603 of the *Illinois Vehicle Code*.

| Driver's License Number _R 453072 640 26_ | Licensing State _IL_ |
| Plate Number | Licensing State |
| Full Name    Last _Roland, Bruce_    First _Lambert_ | Middle |
| Street _4360 Wildwood_ | |
| City _Rhinelander_ | County _Oneida_ |
| State _WI_ | Zip _54501_ |
| COL | Classification | Sex _M_ | Date of Birth   Month _01_ / Day _26_ / Year _1964_ |

Case No./Docket Number _01CF 127_ Ticket Number _Information_

Arrest Date _1 / 05 / 2001_ Conviction Date _11 / 09 / 01_

Description of Offense _Ct. 1, Driving while license revoked,_
_subsequent offense felony, Class 4_

Violation of Chapter(s) _625 ILCS_ Section _5/6-303_ Para. _(d)_

☐ Operating a Commercial Motor Vehicle   ☐ Operating a Placarded HazMat Vehicle

I certify that a motor vehicle was used in the commission of the above identified felony.

_William D. DeCardy_

COURT SEAL

Signature of Judge or State's Attorney

I hereby certify that the information on this Report of Felony Conviction is a true abstract of this Court, as required by The Illinois Vehicle Code.

_Sandra K. Parker, Clerk_
_Valerie A. French, Deputy_
Signature of Circuit Clerk

FILED

MCLEAN COUNTY

NOV 14 2001

CIRCUIT CLERK

Date mailed to the Secretary of State _11 / 14 / 01_
           Mo.   Day   Yr.

MAIL TO:
     Secretary of State
     Driver Services Department
     2701 South Dirksen Parkway
     Springfield, Illinois 62723

OSO OC-112.2

FOR OFFICE USE ONLY

FILED

McLEAN

NOV 1 4 2001

COUNTY

CIRCUIT CLERK

McLEAN COUNTY STATE'S ATTORNEY
104 W. Front Street
Bloomington, IL  61701

STATE'S ATTORNEY'S STATEMENT FOR DEFENDANT
COMMITTED TO THE ILLINOIS DEPARTMENT OF CORRECTIONS

Defendant's Name:   Bruce Roland

Defendant's Address: McLean County Jail
                     Bloomington, IL


Sex: male                  Race:  white
Date of birth: 1-26-64     Other:

Defendant's Prior Record: FBI: 308315x8   IBI:

McLean County Case Number:    01 cf 127
Arresting Agency:   Bloomington
Charges:  DWLR - sub offense


Offenses Convicted of:    same


Victim/Complainant:
Address:



Details of Offense: see attached indictment


Sentencing Date:    11-9-01

Sentence Imposed:    2 ½ years DOC


Relevant Information about defendant:


(Assistant) State's Attorney: Sandy Thompson
Sentencing Judge:   William DeCardy


        Prepared pursuant to 38 Illinois Revised Statutes 1005-4-1(d)
1982

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
STATE OF ILLINOIS, COUNTY OF McLEAN

RECEIVED

NOV 1 4 2001

McLEAN CO. Sheriffs Dept.

PEOPLE OF THE STATE OF ILLINOIS

vs.

Case No. _01-CF-127_

_Bruce Lambert Roland_
Defendant

## JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above-named defendant _1-26-54_ has been adjudged guilty of the offenses enumerated below,
                                    (date of birth)

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | OFFENSE | DATE OF OFFENSE | STATUTORY CITATION | CLASS | SENTENCE |
|---|---|---|---|---|---|
| I | Driving While License Revoked (Felony) | 1-5-01 | 625-ILCS 5/6-303(d) | 4 | 2 Yrs. 6 Mos. |

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:
_____ _____ _____ _____ ___ _____ Yrs. ___ Mos.

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:
_____ _____ _____ _____ ___ _____ Yrs. ___ Mos.

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:
_____ _____ _____ _____ ___ _____ Yrs. ___ Mos.

IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) _____I_____ be (concurrent with) (consecutive to) the sentence imposed in case number _01-CF-13_ in the Circuit Court of _McLean_ County; be (concurrent with) (consecutive to) the sentence imposed in case number _02-CF-860_ in the Circuit Court of _McLean_ County; be (concurrent with) (consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

The Court finds that the defendant is entitled to receive credit for time actually served in custody (of ___0___ days as of the date of this order) (from/to [specify dates]):_____

(Check boxes if applicable)

☐ Convicted of a class _____ offense but sentenced as a class X offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in great bodily harm to the victim (730 ILCS 5/3-6-3[a][2][iii]).

IT IS FURTHER ORDERED that Defendant is sentenced to pay a fine of $_____
plus costs of $ _£145.00_ _____; to pay restitution of $ _____
to _____; all to be paid by _within 6 months of release_. Bond applied.

IT IS FURTHER ORDERED that _____

IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

This order is ( ✓ effective immediately) (_____ stayed until _____).

FILED
NOV 0 9 2001
McLEAN COUNT

DATE: _11-9-01_ ENTER: _____

_William DeCard_
JUDGE

Date : 11/14/2001   10:21 AM                    Clerk of The Circuit Court                    Page 1 of 1
                                        Eleventh Judicial Circuit
                                           County of McLean
                          104 W Front St. Bloomington, IL 61702


RECEIPT  VOUCHER


Date Received : 11/14/2001        Batch Id : CR311142001        Effective Date 11/14/2001        Receipt # :  1023337
                                                                                        Manual Receipt # :

| Received From : | ROLAND, BRUCE LAMBERT | Source/Ck# or CC Val.# | Amount |
|---|---|---|---|
| Party Name : | ROLAND, BRUCE LAMBERT | BOND RECLASSIFY | $    125.00 |
| Case Number : | 2001CF000127 | Total Paid : | $    125.00 |
| New Party Balance : | $    20.00 | | |

| Count | Citation # | Account Name | Starting Balance | Amount Paid | Ending Balance |
|---|---|---|---|---|---|
| | | CIRCUIT CLERK | $    40.00 | $    40.00 | $    .00 |
| | | STATE'S ATTORNEY | $    30.00 | $    30.00 | $    .00 |
| | | COURT AUTOMATION | $    5.00 | $    5.00 | $    .00 |
| | | COURT SYSTEM FEE | $    50.00 | $    30.00 | $    20.00 |
| | | SECURITY FEE | $    15.00 | $    15.00 | $    .00 |
| | | DOCUMENT STORAGE FEE | $    5.00 | $    5.00 | $    .00 |

STATE OF ILLINOIS
IN THE CIRCUIT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

ROLAND BRUCE LAMBERT
( Defendant's Name )

Case No. _____ 2001CF000127

## NOTICE TO DEFENDANT

YOU ARE HEREBY NOTIFIED that the following fine and court costs have been assessed against you in connection with this case:

|  |  | Assessed | Paid |  |
|---|---|---|---|---|
| 010 | CIRCUIT CLERK | $ 40.00 | $ .00 | 705 ILCS 105/27.1 |
| 090 | STATE'S ATTORNEY | $ 30.00 | $ .00 | 55 ILCS 5/4-2002 |
| 120 | COURT AUTOMATION | $ 5.00 | $ .00 | 705 ILCS 105/27.3a |
| 130 | COURT SYSTEM FEE | $ 50.00 | $ .00 | 55 ILCS 5/5-1101 |
| 131 | SECURITY FEE | $ 15.00 | $ .00 | 55 ILCS 5-1103 |
| DSF | DOCUMENT STORAGE FEE | $ 5.00 | $ .00 | 705 ILCS 105/27.3c |

| TOTAL AMOUNT DUE | $ | 145.00 |
| Past Due Probation | $ | .00 |
| Less Bond Posted | $ | 125.00 — *from 01CF13* |
| NET DUE/REFUND | $ | 20.00 |
| Remaining Probation Fee ( 016) | $ | .00 ($ _____ X _____ mos. ) |
| GRAND TOTAL | $ | 20.00 |

YOU HAVE BEEN ORDERED BY THE PRESIDING JUDGE TO **PAY THE FINE AND COSTS IN FULL BY** 08/11/2003.

**FAILURE TO PAY SAID AMOUNT OR APPEAR ON SAID DATE MAY RESULT IN A FORFEITURE AND/OR A WARRANT BEING ISSUED FOR YOUR ARREST.**

Mailing address : Circuit Clerk of McLean County , P.O. BOX 2420 , BLOOMINGTON , IL , 61702-2420
Street address: 104 W Front St., Bloomington, IL, 61702

FILED
McLEAN COUNTY
NOV 0 9 2001
CIRCUIT CLERK

I acknowledge Receipt of this Notice:

_____        _____
Date                                                          Signature

_____
Mailing Address

## CERTIFICATE OF MAILING

I, the undersigned, certify that I did on ____11/14/01____ deposit a copy of this Notice to Defendant,

in the United States Mail, in a sealed envelope with postage prepaid, addressed to: _Def_

_C/o    McLean    County    Jail_

_____

_____

CIRCUIT CLERK OF MCLEAN COUNTY

By: _____*TB*_____

Deputy

F I L E D
McLEAN    NOV 0 9 2001    COUNTY

# IN THE ELEVENTH JUDICIAL CIRCUIT COURT MCLEAN COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS

OD- 723

)
)
vs                                                        )        CASE NO: TMP0014923
)
)
Defendant:    ROLAND, BRUCE LAMBERT                         )        Defendants date of birth: 01/26/64

## APPEARANCE BOND

The DEFENDANT, whose signature appears below, has been charged with the offense(s) DRIVING WHILE LICENSE REVOKED, ILLEGAL TRANSPORTATION—CARRY ALCOHOLIC LIQUOR BY DRIVER, DRIVING UNDER THE INFLUENCE OF ALCOHOL.

Bond for this offense has been set at $ THREE THOUSAND DOLLARS AND NO CENTS——————dollars.

Therefore, in consideration of being released from custody, the DEFENDANT, and the BOND DEPOSITOR, if other than the DEFENDANT AGREE:
1. That they are indebted to the PEOPLE OF THE STATE OF ILLINOIS in the full amount of the appearance bond stated above.
2. That as security for the performance of this agreement, there has been deposited the following:
   (A) 10% BOND. The defendant/Depositor has deposited, in cash, 10% of the bond as stated above.
   B. RECOGNIZANCE or Individual Bond.
   C. REAL ESTATE BOND. (Separate sworn statement and schedule required. Judicial approval required.)
   D. CASH BOND: No 10% to apply.
3. That the DEFENDANT SHALL:
   A. Personally appear to answer the charges(s) at the MCLEAN COUNTY LAW AND JUSTICE CENTER, Bloomington, Illinois, on the 19TH day of DECEMBER 2000 at 0900AM A.M. P.M. and appear each time as ordered by the Court, until discharged.
   B. Not violate any criminal statute of any jurisdiction.
   C. Not leave the State of Illinois without permission of the Court.
   D. Give written notice of any address change to the Clerk of this Court within 24 hours at P.O. Box 2420, Bloomington, IL 61702-2420.
   E. Other Conditions: _____

If victim is a family/household member, as defined by 725ILCS 5/112-A-3(3):
☐ F. Refrain from contact or communication with_____ for a minimum period of 72 hours following the defendants release from custody.
☐ G. Refrain from entering or remaining at residence for a minimum period of 72 hours following the defendant's release from custody.

### NOTICE TO PERSON PROVIDING BOND MONEY IF OTHER THAN THE DEFENDANT

I hereby acknowledge that I have posted bond for the defendant named above, I further understand that if the defendant fails to comply with the conditions of this bond, that the Court shall enter an Order declaring the bond to be forfeited and used to pay costs, attorney's fees, fines or other purposes authorized by the Court. I further understand that if the defendant is convicted part or all of the bond may be used to pay fines, costs, fees and restitution.

Print Depositor's Name _____

Signature X _____

SS# _____

Date of Birth _____

TIN# _____

Print Address _____

City, State, Zip _____

### CERTIFICATE OF DEFENDANT

I, the Defendant, do hereby state that I know and understand the terms and conditions of this appearance bond form as shown on the FRONT AND REVERSE SIDE of this appearance bond form. I understand further that if at any time prior to the final disposition of the charge(s), I escape or am released on bond and fail to appear in Court when required I hereby waive my right to confront the witnesses against me; the trial and/or sentencing can proceed in my absence; I forfeit the security posted; judgment will be entered against me for the full amount of this bond, plus costs; a warrant may be issued, in which event additional bond may be required to be posted. I understand and accept the terms and conditions set forth above and on the reverse side of this appearance bond.

Signature of DEFENDANT X _____

SS# 350626314

TIN# _____

Print Address 2603 Registown

City, State, Zip Bloom IL 61701

Signed and acknowledged before me and bond received by me this 07TH day of NOVEMBER 2000

FILED
NOV 0 8 2000
MCLEAN CIRCUIT CLERK

### ASSIGNMENT OF BOND BY THE DEFENDANT

I hereby authorize the return of the bond herein posted to the person shown above after all conditions of this bond have been met.

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
STATE OF ILLINOIS, COUNTY OF McLEAN

PEOPLE OF THE STATE OF ILLINOIS

vs.                                                    Case No. _01-CF-127_

_Bruce Lambert Roland_
Defendant

## JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above-named defendant _1-26-64_ has been adjudged guilty of the offenses enumerated below,
                                    (date of birth)

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | OFFENSE | DATE OF OFFENSE | STATUTORY CITATION | CLASS | SENTENCE |
|---|---|---|---|---|---|
| I | Driving While License Revoked (FO) | 1-5-01 | 625 ILCS 5/6 303(d) | 4 | 2 Yrs. 6 Mos. |

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on: _____ Yrs. ___ Mos.

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on: _____ Yrs. ___ Mos.

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on: _____ Yrs. ___ Mos.

IS FURTHER ORDERED that the sentence(s) imposed on count(s) ___I___ (be (concurrent with) (consecutive to) the sentence imposed in case number _01-CF-13_ in the Circuit Court of _McLean_ County; be (concurrent with) (consecutive to) the sentence imposed in case number _02-CF-160_ in the Circuit Court of _McLean_ County; be (concurrent with) (consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

The Court finds that the defendant is entitled to receive credit for time actually served in custody (of ___0___ days as of the date of this order) rom/to [specify dates]): _____

(Check boxes if applicable)

☐ Convicted of a class _____ offense but sentenced as a class X offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in great bodily harm to the victim (730 ILCS 5/3-6-3[a][2][iii]).

IT IS FURTHER ORDERED that Defendant is sentenced to pay a fine of $_____

us costs of $ _£145_ _____; to pay restitution of $_____

_____; all to be paid by _within 6 months of release._ Bond applied.

IT IS FURTHER ORDERED that _____

IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

order is ( ✓ effective immediately) (_____ stayed until _____ ).

FILED

DATE: _11-9-01_      ENTER: _[signature]_

STATE OF ILLINOIS )
COUNTY OF McLEAN )

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

THE PEOPLE OF THE
STATE OF ILLINOIS

vs

*Bruce Roland*

)
)
)
)
)
)
)

No.

*00 CF 1460*
*01 CF 13*
*01 CF 127*
*99 DT 712*
*01 CM 1059*

### PLEA AGREEMENT

The defendant and the State's Attorney hereby submit to the Court the following Plea Agreement which was reached pursuant to discussions initiated by them. The defendant consents to the Court's receiving evidence in aggravation and mitigation in advance of the tender of this plea. The Agreement is as follows:

1. Defendant agrees to plead guilty to *CT. I 00 CF 1460 - CT. I DWLR-SOF, CT. I 01 CF 13 Agg DUI, 01 CF 127 CT. I DWLR-SOF, 99 DT 712 CT. I*

2. State's Attorney agrees to nolle pros *00 CF 1460 CT. II - III 01 CF 13 CT. II, III, IV 99 DT 712, CTS. II, III, IV, V 01 CM 1059 - CT. I*

3. The court will impose as a maximum sentence in this case the following:

    a. $ _____ fine, plus court costs and fees as authorized by law, payable as follows:

    b. *5* (years)/months/days imprisonment in *IDOC*, as follows:
    *00 CF 1460 - 2½ years, 01 CF 13 and 01 CF 127 - 2½ yrs. consecutive to 00 CF 1460, 364 days on 99 DT 712 concurrent*

    c. Probation/Conditional Discharge/Court Supervision for _____ years/months with

    payment of court costs and fees no later than _____

    Payment of Restitution no later than _____, as follows:

    <table>
    <tr><td colspan="2">PERSONS OWED</td><td>AMOUNT PAYABLE</td></tr>
    <tr><td colspan="2">*Weavers Rent - 911*<br>*212 N. Main St.*<br>*Normal, ILL 61761*</td><td>*$ 60.00*</td></tr>
    </table>

    FILED
    McLEAN COUNTY
    NOV 0 9 2001
    CIRCUIT CLERK

    d. Additional conditions: _____

4. It is stipulated that the defendant's prior record is as follows:
    *92 OF 938 - DUI SOF, 94 CF 408 Theft over - no records*

5. The defendant does (not) waive presentence investigation and written report.

_____    *11/9/01*
Date

_____
Defendant

_____
State's Attorney

_____
Defendant's Attorney

white:    Court copy

MACE PRINTING CO.

WAIVER OR DEMAND OF JURY AND PLEA TO COMPLAINT

STATE OF ILLINOIS,    }  SS.

COUNTY OF McLEAN

IN THE CIRCUIT COURT 11th JUDICIAL CIRCUIT,
McLEAN COUNTY, ILLINOIS

**The People of the State of Illinois**

vs.

Bruce Roland

No. _01 - CF 127_

The undersigned defendant in the above entitled cause, comes now in open court in _his_ own proper person, acknowledges receipt of copy of complaint in due time, acknowledges admonition by the Court as to effect of this plea, for plea herein says that _he_ is guilty not guilty in manner and form as charged in said complaint, and waives demands a jury in said cause.

Date this _7_ day of _Nov_ 200_1_

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MC LEAN

THE PEOPLE OF THE STATE )
OF ILLINOIS, )
                                         )
        Plaintiff, )
                                         )
    vs. )          No. 01 CF 13
                                         )    01 CF 127
BRUCE ROLAND, )                  00 CF 1460
                                         )
        Defendant. )

**F I L E D**

JUN 2 5 2001

McLEAN COUNTY

CIRCUIT CLERK

## MOTION TO CONTINUE

Now come the Defendant, BRUCE ROLAND, by his attorney of
record, JOSEPH H. KELLEY, and moves for a continuance of this cause
scheduled at 10:00 a.m. on June 25, 2001, and in support thereof
states as follows:

1.    The above-captioned matter is presently set for a status
hearing at 9:00 a.m. on June 25, 2001, before the Honorable William
DeCardy presiding.

2.    BRUCE ROLAND now resides in the State of Wisconsin and
an emergency mental health detention hearing is scheduled for June
25, 2001 at 11:00 a.m. in Oneida County Wisconsin.    Bruce Roland
attempted to commit suicide on June 20, 2001.    Correspondence from
Assistant Corporation Counsel Tomas Wiensch is attached to this
motion.

3.    The Defendant waives any speedy trial rights occasioned
by this continuance.

1

WHEREFORE, Defendant requests the entry of an Order continuing this cause from its present setting at 10:00 a.m. on June 25, 2001, to some future date.

BRUCE ROLAND, Defendant

By:_____
Joseph H. Kelley
Attorney for Defendant

JOSEPH H. KELLEY
Attorney at Law
237 East Front Street
Bloomington, Illinois 61701
Phone: (309) 827-8375

2

Lawrence R. Heath
Corporation Counsel

Thomas D. Wiensch
Assistant Corporation Counsel

CORPORATION COUNSEL
ONEIDA COUNTY
Court House Building
P.O. Box 400
Rhinelander, Wisconsin 54501-0400
Telephone (715) 369-6155
Thomas D. Wiensch 362-1550
Fax (715) 369-6284

June 21, 2001

VIA FACSIMILE 309-827-5693

Mr. Joe Kelly
Attorney at Law
237 E. Front Street
Bloomington, IL 61701

Re:    Bruce L. Roland

Dear Mr. Kelly:

As you are aware, Mr. Roland has a matter pending in Oneida County. This matter is scheduled for June 25, 2001 at 11:00 a.m. You need to be aware that Oneida County does not include weekends and holidays when calculating the time limits for these cases. Also, Mr. Roland's wife, Danielle, and her daughter, Brittany, are required to attend the hearing on Monday.

If you have any further questions, please do not hesitate to call.

Sincerely

Thomas D. Wiensch
Assistant Corporation Counsel
Bar No. 1018958

TDW/cla

Jun 21 01 01:21p    Roland Painting and Finis    309-665-0853    p.2

STATE OF WISCONSIN, CIRCUIT COURT, Oneida _____ COUNTY

For Official Use

ICV

IN THE MATTER OF THE CONDITION OF:

**STATEMENT OF
EMERGENCY DETENTION BY
LAW ENFORCEMENT OFFICER**

Bruce L. Roland
_Name of Subject_

1-26-64
_Date of Birth_

Case No. 01SC56-17

MON-25-01
72 hrs - Bus. days

- File this statement with the court immediately, because a probable cause hearing must be held within 72 hours of detention.
- Please print or type all information below. All blanks must be filled in.

I am a law enforcement officer and have cause to believe:
- The subject is mentally ill, drug dependent, or developmentally disabled.
- The subject evidences behavior which constitutes a substantial probability of physical harm to self or to others, as set forth in §51.15, Wisconsin Statutes.

My belief is based on specific and most dangerous acts, attempts, threats or omissions by the subject as observed by me or reliably reported to me as stated below:

When: 6-20-01    1233

Where: 4360 W. Wildwood

Dangerous Behavior: Bruce has been making suicidal threats for the past few days. Today he took 15-20 lithium caps, pain tabs and 15-20 5mg clonazepam in addition to a large amount of alcohol. Bruce has an extensive history of alcohol abuse and was treated at a mental health facility as a teenager. Just prior to our arrival Bruce attempted to cut his wrist with a utility knife

_Attach additional page if necessary._

Witnesses to the dangerous behavior (including officers who observed behavior):

| Witness Name | Address and Telephone |
|---|---|
| Brittany J. Sipp | 4360 Wildwood  362-7097 |
| Danielle E. Roland | 4360 Wildwood  362-7097 |

The subject was detained at St. Mary's Hospital
_Name of §51.15(2) Facility_

on 6-20-01 ____, at 1330 ____  ☐ am.  ☒ pm.
_Date_          _Time_

| Subject's Street Address | City | County | State |
|---|---|---|---|
| 4360 Wildwood | Rhinelander | Oneida | WI |

Distribution:
1. Original - Court
2. §51.15(2) Detention Facility
3. Subject with Notice of Rights

| Signature of Officer | Department |
|---|---|
| Brian Wege | Oneida Co. Sheriff |
| Name Printed or Typed | Telephone |
| Bryan Wege | 361-5100 |

901.8/99  STATEMENT OF EMERGENCY DETENTION BY LAW ENFORCEMENT OFFICER    §51.15, Wisconsin Statutes

STATE OF ILLINOIS
COUNTY OF McLEAN

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

_People_

Plaintiff/Petitioner,

vs

_Bruce Roland_

Defendant/Respondent.

FILED
MAY 1 8 2001
CIRCUIT CLERK

No.

00-CF-1460
01-CF-13
01-CF-127
99-DT-712

## ORDER

This cause coming on for status hearing People appearing by Assistant States Attorney Thompson Deft in person & by Attorney Joseph Kelley, and on Deft's motion, without objection, status hearing continued to June 25, 2001 at 10:00 AM.

It is further ordered that Deft being orally moved to be allowed to reside in Wisconsin during pendency of these cases, and the States Attorney having no objection, Deft is allowed to reside in Wisconsin upon properly filing with the Clerk of the Circuit Court a Waiver of Extradition

DATE: _5-18-01_

Judge

Name
Attorney for
Address

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF McLEAN

THE PEOPLE OF THE
STATE OF ILLINOIS,                    )
                        Plaintiff     )
                                      )     No.   00-CF-1460
        v.                            )           01-CF-13                  **FILED**
                                      )           01-CF-127
Bruce Roland                          )           99-DT-712                 MAY 1 8 2001
                        Defendant     )                                    COUNTY
                                                                           CIRCUIT CLERK

WAIVER OF EXTRADITION AS CONDITION OF BAIL BOND

I, Bruce Roland, of Rhinelander, State of Wisconsin, in consideration of having been admitted to bail and being granted permission by the Court as a condition of my bail bond to travel outside of the State of Illinois during the pendency of the above-entitled case, in which I am charged with the offense(s) of Agg Driving under the Influence of Alcohol, Driving on Revoked License which are felony/misdemeanor offense under the laws of the State of Illinois, and travel to:

and reside in Wisconsin, 4360 Wildwood, Rhinelander, Wisconsin 54501

DO HEREBY WAIVE EXTRADITION TO THE STATE OF ILLINOIS FROM ANY STATE IN WHICH I MAY BE FOUND in the event I am charged with any violation of the conditions of said bail bond or with the commission of any additional offenses against the laws of the State of Illinois. By this statement I waive, forfeit, and give up any and all legal rightrs under teh laws of the State of Illinois and of the jurisdiction in which I am found to contest my immediate transfer of custody to authorities of the State of Illinois for return to said State for further legal proceedings against me.

5-18-01
DATE                                          _____
                                                                ,Defendant

Subscribed and sworn to before me this
_____ day of _____, 19_____.

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

THE PEOPLE OF THE          }
STATE OF ILLINOIS,         }
                           }
        Plaintiff,         }          00-CF- 1460
                           }
        vs.                }    NO:  01-CF-    13
                           }          01-CF- 127
BRUCE LAMBERT ROLAND       }
                           }
        Defendant.         }

NOTICE

TO:  State's Attorney's Office      Bruce Lambert Roland
     104 West Front Street          4360 Wildwood
     Law & Justice Center           Rhinelander, Wisconsin 54501
     Bloomington, IL  61701

     You are hereby notified that the undersigned, as attorney for
DANIELLE ROLAND, will appear before the Honorable William D.
DeCardy, in the courtroom usually occupied by him at McLean County
Law & Justice Center, 104 W. Front Street, Bloomington, Illinois,
on     May 18, 2001      at 0:00 a.m for the purpose of having a
hearing a continued status, at which time you must appear and be
heard.

                         BRUCE LAMBERT ROLAND, Defendant

                    BY: _____
                         JOSEPH H. KELLEY
                         Attorney for Defendant

JOSEPH H. KELLEY
Attorney at Law
237 East Front Street
Bloomington, IL   61701
(309) 827-8375

FILED
MCLEAN COUNTY
MAY 0 4 2001
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing instrument was hand-delivered to the McLean County State's Attorney's Office on _____ 5-4-01 _____.

JOSEPH H. KELLEY

IN THE CIRCUIT COURT
THE ELEVENTH JUDICIAL CIRCUIT
McLEAN COUNTY, ILLINOIS

DATE _5~2~01_

NO. _00 CF 127_

_People_
Plaintiff

_Bruce Roland_
Defendant

FIL-
MAY 02 2001
CIRCUIT CLERK

# APPEARANCE

I hereby enter my appearance in the above entitled case.

_Bruce Roland_
Defendant

_Joseph Kelly_
His Attorney

Address: _237 E Front_

City/State: _Bloomington, Il 61701_

Phone: A/C _309_ Number _827-8375_

Attorney Registration Number _____

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

THE PEOPLE OF THE STATE OF        )
ILLINOIS                          )
                                  )
        PLAINTIFF,                )
                                  )
        VS.                       )      NO. 01 CF 127
                                  )
    BRUCE ROLAND                  )
                                  )
    DEFENDANT.                    )

ANSWER TO STATE'S MOTION FOR DISCOVERY

Now comes Bruce Roland, by Brian McEldowney, Public Defender
and in response to State's Motion for Discovery states as follows:

1.    There are no reports available at this time.

2.    Defendant intends to assert that he is not guilty.
      Defendant may call any of the persons listed in State's
      Answer to Motion for Discovery as a witness.

3.    There are no written or recorded statements available
      at this time.

4.    Defendant does not intend to assert an affirmative
      defense.


                    Respectfully submitted,
                    Bruce Roland, Defendant


                    _Brian McEldowney_
                    his Public Defender
                    Brian McEldowney



FILED
McLEAN    APR 02 2001    COUNTY
        CIRCUIT CLERK

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the 2nd,

day of April, 2001.

Brian McEldowney
Asst. Public Defender
104 W. Front Street, Room 603
Bloomington, IL 61701
Telephone: (309)888-5235

STATE OF ILLINOIS            )                                    IN THE CIRCUIT COURT OF THE
                            ) SS
COUNTY OF MCLEAN            )                                    ELEVENTH JUDICIAL CIRCUIT

THE PEOPLE OF THE          )        F I L E D
STATE OF ILLINOIS          )
                            )    McLEAN    MAR 2 1 2001    COUNTY    NO.    01 CF 127
VS.                         )
                            )        CIRCUIT CLERK
BRUCE ROLAND               )

<u>DISCOVERY COMPLIANCE PURSUANT TO RULE 412</u>

Now comes the People of the State of Illinois by Sandra Thompson, Assistant State's Attorney in

and for the County of McLean, State of Illinois, and presents as Discovery Compliance herein the

following:

1. Pursuant to Supreme Court Rule 412(a)(i), the State may call the following as witnesses:

> Steve Evans
> Bloomington Police Dept.
> 305 S. East St.
> Bloomington, IL 61701

See exhibits 1-3 for statements or memoranda of statements of the above-listed witnesses.

2. Pursuant to Supreme Court Rule 412(a)(ii), see exhibits 1-3 for statements of the accused or codefendants. See #1 above for witnesses of the statements.

3. Pursuant to Supreme Court Rule 412(a)(iii), a copy of the grand jury testimony will be provided upon receipt.

4. Pursuant to Supreme Court Rule 412(a)(iv), there are no reports of experts at this time.

5. Pursuant to Supreme Court Rule 412(a)(e), physical evidence is available for inspection and/or copying during reasonable business hours by contacting the undersigned attorney and scheduling a viewing/copying time. Physical evidence may include: Secretary of State records and any and all evidence contained or mentioned in exhibits provided.

6. Pursuant to Supreme Court Rule 412(a)(vi), there are no known prior convictions of above witnesses.

7. Pursuant to Supreme Court Rule 412(b), there has been no electronic surveillance.

8. Pursuant to Supreme Court Rule 412(c), see exhibits 1-3 for known <u>Brady</u> material.

Respectfully submitted,

Sandra Thompson
Assistant State's Attorney

I, Sandra Thompson, hereby certify that the answer to Defendant's Motion for Discovery in People v. Bruce Roland, 01 CF 127, is complete to the best of my knowledge, information and belief and all exhibits referenced in this Answer have been provided to the defense.

Sandra Thompson
104 W. Front St., Room 605
PO Box 2400
Bloomington, IL  61702-2400
(309) 888-5400

## PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorney's of record of all parties to the above cause by:

_____ Depositing a true and correct copy of the same in the U.S. Post Office or post office box in the City of Bloomington, Illinois, enclosed in an envelope with postage fully prepaid on the _____ day of _____, 2001.

___✓___ Hand delivering a true and correct copy of the same on the 20 day of _Marh_, _____, 2001.



STATE OF ILLINOIS    )
                     ) SS
COUNTY OF MCLEAN   )

THE PEOPLE OF THE
STATE OF ILLINOIS

    VS.              )

BRUCE ROLAND      )

IN THE CIRCUIT COURT OF THE

ELEVENTH JUDICIAL CIRCUIT

FILED
MAR 15 2001
CIRCUIT CLERK
McLEAN COUNTY

NO.   01 CF 127

## DISCOVERY COMPLIANCE PURSUANT TO RULE 412

Now comes the People of the State of Illinois by Sandra Thompson, Assistant State's Attorney in and for the County of McLean, State of Illinois, and presents as Discovery Compliance herein the following:

1. Pursuant to Supreme Court Rule 412(a)(i), the State may call the following as witnesses:

> Steve Evans
> Bloomington Police Dept
> 305 S. East St.
> Bloomington, IL 61701

See exhibits 1-3 for statements or memoranda of statements of the above-listed witnesses.

2. Pursuant to Supreme Court Rule 412(a)(ii), see exhibits 1-3 for statements of the accused or codefendants. See #1 above for witnesses of the statements.

3. Pursuant to Supreme Court Rule 412(a)(iii), a copy of the grand jury testimony will be provided upon receipt.

4. Pursuant to Supreme Court Rule 412(a)(iv), there are no reports of experts at this time.

5. Pursuant to Supreme Court Rule 412(a)(e), physical evidence is available for inspection and/or copying during reasonable business hours by contacting the undersigned attorney and scheduling a viewing/copying time. Physical evidence may include: Secretary of State records and any and all evidence contained or mentioned in exhibits provided.

6. Pursuant to Supreme Court Rule 412(a)(vi), there are no known prior convictions of above witnesses.

7. Pursuant to Supreme Court Rule 412(b), there has been no electronic surveillance.

8. Pursuant to Supreme Court Rule 412(c), see exhibits 1-3 for known Brady material.

Respectfully submitted,

Sandra Thompson
Assistant State's Attorney

I, Sandra Thompson, hereby certify that the answer to Defendant's Motion for Discovery in People v. Bruce Roland, 01 CF 127, is complete to the best of my knowledge, information and belief and all exhibits referenced in this Answer have been provided to the defense.

Sandra Thompson
104 W. Front St., Room 605
PO Box 2400
Bloomington, IL 61702-2400
(309) 888-5400

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorney's of record of all parties to the above cause by:

_____ Depositing a true and correct copy of the same in the U.S. Post Office or post office box in the City of Bloomington, Illinois, enclosed in an envelope with postage fully prepaid on the _____ day of _____, 2001.

_✓_ Hand delivering a true and correct copy of the same on the _14_ day of _March_____, 2001.

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
McLEAN COUNTY, ILLINOIS

The People of the State of Illinois
                                    Plaintiff,

            vs.                                 Case No. _01 CF 127_

                                    Defendant.

## AFFIDAVIT OF ASSETS AND LIABILITIES

I, __Bruce Roland_____, Defendant in this case, state that I am without adequate assets to retain counsel, and that I make the following statement in support of my request to be represented by Court-appointed counsel. I am aware that I may be ordered to reimburse the County for the reasonable cost of Court-appointed counsel.

1. Name _Bruce Roland_ Date of birth _1-26-64_ Telephone No. _309 663-7683_
2. Address _2603 Keystone_ City _Bloom_ State _IL_ Zip _61701_
3. Family: (a) Marital status _Married_ (b) Number of children _5_
4. Name and address of employer _Self_
   Length of employment _2_ Occupation _Painter_
5. INCOME:
   (a) $ _2000.00_ per month from employment.
   (b) $ _____ per month from pension, trusts, annuity, welfare, Workman's Compensation, retirement or disability plan; or any similar State, Federal, local or private benefit plan.
   (c) $ _2600.00_ Total per month from all sources.
6. ASSETS:
   (a) Home or other dwelling $_____ Where situated _____
   (b) Cars $_____
   (c) Bank accounts $_____
   (d) Cash on hand $_____
   (e) Total value of assets $_____

```
        FILED

McLEAN   MAR 0 2 2001   COUNTY

        CIRCUIT CLERK
```

7. LIABILITIES:
   (a) Mortgage/Rent on residence $ _158,000_ Monthly payment $ _1519.00_
   (b) Amount owed on car $ _0_ Monthly payment $_____
   (c) Personal debts $ _0_ To whom owed _____
   (d) Other debts $ _0_ To whom owed _____
   (e) Total liabilities and debts $ _158,000_ Total Monthly payments $ _1519.00_
8. If released on bail, specify amount of security $ _—_ and source of payment of security (defendant's funds, borrowed cash, etc.)

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

_____
                    Defendant

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

PEOPLE OF THE STATE
OF ILLINOIS,                      )
                                  )
            Plaintiff,            )
                                  )
    vs.                           )      CASE NO. *01 CF 127*
*Bruce Roland*,                   )
                                  )
            Defendant.            )
                                  )
                                  )

## WAIVER OF PRELIMINARY HEARING

NOW COMES the undersigned with counsel into open court, and being duly advised as to the right to a preliminary hearing and the consequences if found guilty, waives the right to a preliminary hearing, and consents to be bound over for trial.

DATED: *March 2, 2001*

_____
                    DEFENDANT

FILED
MAR 02 2001
McLEAN COUNTY
CIRCUIT CLERK

| | | |
|---|---|---|
| STATE OF ILLINOIS | ) | IN THE CIRCUIT COURT OF THE |
| | ) SS | |
| COUNTY OF MC LEAN | ) | ELEVENTH JUDICIAL CIRCUIT |
| THE PEOPLE OF THE | ) | |
| STATE OF ILLINOIS | ) | |
| | ) | |
| VS. | ) | NO. 01 CF 127; 01 451 |
| | ) | |
| BRUCE LAMBERT ROLAND | ) | |

**FILED**
FEB 14 2001
McLEAN COUNTY
CIRCUIT CLERK

### N O T I C E

TO:    Bruce Lambert Roland, 2603 Keystone, Bloomington, IL 61704

YOU ARE HEREBY NOTIFIED that you have been charged in the Circuit Court of McLean County in the above entitled cause with the offense(s) of Driving While License Revoked-Subsequent Offense Felony. The Court has ordered that you be given notice that the matter is set for **ARRAIGNMENT/STATUS AT 9:00 A.M. ON MARCH 2, 2001,** in Judge DeCardy's Courtroom at the McLean County Law and Justice Center, 104 West Front Street, Bloomington, Illinois, at which time and place YOU MUST BE PRESENT.

THE DEFENDANT SHALL FILE all pre-trial motions of a discovery nature on or before the arraignment date, at which time said motions shall be heard.

Dated at Bloomington, Illinois, this 13th day of February, 2001.

_____
(Assistant) State's Attorney

### CERTIFICATE OF SERVICE

Virginia Bicknell, being first duly sworn on oath, says that she served the foregoing Notice in the above-entitled cause by:

_✓_ Depositing a true and correct copy of the same in the U. S. Post Office or post office box in the City of Bloomington, Illinois, enclosed in an envelope, with postage fully prepaid on the _13_ day of _Feb_____, 2001, to Bruce Lambert Roland, plainly addressed as indicated in the above Notice.

_____ Hand delivering a true and correct copy of the same on the ____ day of _____, 2001, to

_____

Subscribed and sworn to before me this _13_ day of _February_, 2001.

_____
NOTARY PUBLIC

{ "OFFICIAL  SEAL" }

STATE OF ILLINOIS
COUNTY OF McLean
The People of the State of Illinois
VS.

DEFENDANT:
BRUCE LAMBERT ROLAND
2603  KEYSTONE
BLOOMINGTON, IL  61704

THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

Case#:   2001CF000127

## INFORMATION

COUNT   1    :The STATE's ATTORNEY of McLean County, Illinois, in the name
and by the authority of the People of the State of Illinois charges that
BRUCE LAMBERT ROLAND on or about  05th day of January  , 2001  at

BLOOMINGTON,

in the County of McLean, State of Illinois, committed the offense of

DRIVING WHILE LICENSE REVOKED SUBSEQUENT OFFENSE FELONY

IN THAT SAID DEFENDANT KNOWINGLY DROVE A MOTOR VEHICLE ON A HIGHWAY IN THE STATE OF
ILLINOIS AT A TIME WHEN HIS/HER DRIVER'S LICENSE OR PRIVILEGE TO DRIVE WAS REVOKED
BY THE ILLINOIS SECRETARY OF STATE AND THE BASIS OF SAID REVOCATION WAS A
CONVICTION FOR DRIVING UNDER THE INFLUENCE OF ALCOHOL IN VIOLATION OF 625 ILCS
5/11-501   AND HE WAS PREVIOUSLY CONVICTED OF DRIVING WHILE LICENSE REVOKED IN
MCLEAN   COUNTY CASE 92 CF 938.

(FELONY UPGRADE 01TR 00451)
in violation of  625 ILCS 5/6-303(d)                    A Class 4 Felony

CHARLES   REYNARD
By Assistant State's Attorney

The undersigned, on oath, states that the facts set forth in the foregoing
information are true in substance and matter of fact, to the best of his
knowledge, information and belief.

|                | DESCRIPTION |       |
| D.O.B.         | SEX         | RACE  |
| 01/26/1964     | Male        | White |

Additional ID
Hgt: 5 11   Wgt: 175  Hair:      Eyes: BLU
SSN:  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      DLN: IL R45307264026

Complainant

Subscribed and sworn to before me
09th day of February  , 2001

"OFFICIAL SEAL"
AMY MAURER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10/4/2001

Notary Public

People request bond be set at $1,000.00          Bond Transfer
Case Request Type: Bond Posted
Enhanced Penalty: N

Intake#: 210430

| M<br>c<br>L<br>E<br>A<br>N | Filed<br><br>02/09/2001 08:02:41 AM<br><br>CIRCUIT CLERK | C<br>O<br>U<br>N<br>T<br>Y |

STATE OF ILLINOIS )
COUNTY OF McLEAN )

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT

THE PEOPLE OF THE
STATE OF ILLINOIS

**FILED**
McLEAN COUNTY
JAN 28 2000
CIRCUIT CLERK

vs

No. 99 CF 889

JODY WINKLER

## PLEA AGREEMENT

The defendant and the State's Attorney hereby submit to the Court the following Plea Agreement which was reached pursuant to discussions initiated by them.. The defendant consents to the Court's receiving evidence in aggravation and mitigation in advance of the tender of this plea. The Agreement is as follows:

1.  Defendant agrees to plead guilty to _Forgery_

2.  State's Attorney agrees to nolle pros _____

3.  The court will impose as a ~~maximum~~ sentence in this case the following:

    a.  $_____fine, plus court costs and fees as authorized by law, payable as follows:

    b.  _4_ years/~~months/days~~ imprisonment in _I DOC_, as follows: _credit for 66 days from 11/24/99 - 1/28/2000_

    c.  Probation/Conditional Discharge/Court Supervision for _____ years/months with payment of court costs and fees no later than _____
    Payment of Restitution no later than _____, as follows:

    PERSONS OWED                          AMOUNT PAYABLE
    _Lance Winkler Fence Co._              _$929.26_
    _505 E. Jackson, Blm_

    d.  Additional conditions: _____

4.  It is stipulated that the defendant's prior record is as follows:
    _97 CF UDCS (class 2); 96 CF 702 unl restraint; 96 cm theft, 96 cm_
    _deceptive; 88 CF burglary, 88 CF agg battery; 92 CM deceptive._

5.  The defendant does (not) waive presentence investigation and written report.

Date _____

**FILED**
McLEAN COUNTY
JAN 9 - 2008
CIRCUIT CLERK

State's Attorney

Defendant

Defendant's Attorney

white:   Court copy
yellow:  State's Attorney
pink:    Probation Off.

Exhibit 17

State of Illinois Corrections Inr    e Search Result                    Page 1 of 1

# ILLINOIS CORRECTIONS

DEPARTMENT OF

George H. Ryan, Governor
Donald N. Snyder Jr., Director

admINISTRATION | inmate search | facilities | DOC news | locations
reports & stats | DOC @ DOC | interactive | industries | victim services

## N98537 - WINKLER, JODY

Parent Institution:      Centralia Correctional Center
Inmate Status:           TEMP RESIDENT
Location:                LOGAN
Discharge Reason:

| | | | | |
|---|---|---|---|---|
| Date of Birth: | 01-11-1970 | Weight: | 255 lbs. | Hair: | Brown |
| Sex: | Male | Height: | 6 ft. 04 in. | | |
| Race: | White | Eyes: | Blue | | |

### Marks, Scars, & Tattoos

SCAR, ARM, RIGHT -

TATTOO, CHEST - "N",LIGHTNING BOLT,"S"

TATTOO, ARM, LEFT UPPER - "WHITE"

TATTOO, ARM, RIGHT UPPER - "PRIDE",HEARTS,ROSE,"BREANNE"

TATTOO, THIGH, RIGHT - SKULL ; L THIGH: SKULL

### Admission / Release / Discharge Information

Custody Date:               05/08/1997
Projected Parole Date:      05/24/2001       Paroled Date:
Tentative Discharge Date:                    Discharge From Parole:    05/24/2002

### Sentencing Information

| Mittimus | Class | Count | Offense | Custody Date | Sentence | County |
|---|---|---|---|---|---|---|
| 99CF889 | 3 | 1 | FORGERY/MAKE/ALTER DOCUMENT | 11/24/1999 | 4 yrs 0 mths 0 days | MCLEAN |
| 97CF78 | 2 | 1 | OTHER AMT NARCOTIC SCHED I&II | 01/25/1997 | 3 yrs 0 mths 0 days | MCLEAN |
| 96CF702 | 4 | 1 | UNLAWFUL RESTRAINT | 01/25/1997 | 1 yrs 0 mths 0 days | MCLEAN |
| 88CF307 | 2 | 1 | BURGLARY | 11/27/1989 | 4 yrs 0 mths 0 days | MCLEAN |
| 88CF92 | 3 | 1 | AGG BATTERY/GREAT BODILY HARM | 11/25/1989 | 2 yrs 0 mths 0 days | MCLEAN |

* Sentence Comments

All complaints regarding the accuracy of document information contained in these documents should be sent in writing to the
Illinois Department of Corrections, P.O. Box 19277, Springfield, IL 62794-9722.

Another
Search



STATE OF ILLINOIS

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

COUNTY OF McLEAN

THE PEOPLE OF THE          )
STATE OF ILLINOIS,         )
     Plaintiff,           )
                  )
     vs.                  )      CASE NO. 99 CF 889
                  )
JODY WINKLER,              )
     Defendant.           )

REPORT OF PROCEEDINGS of the PLEA/SENTENCING before the HONORABLE DONALD D. BERNARDT on the 28th day of January, 2000.

APPEARANCES:

     MS. STEPHANIE WONG,
        Assistant State's Attorney
        for the People of the State of Illinois.

     MR. MICHAEL J. O'ROURKE,
        Attorney for Defendant.

Ms. Diane M. Black, CSR
License No. 084-003667
104 W. Front St., Room 420
Bloomington, IL  61701

1    THE COURT:  Be on the record in 99 CF 889, People

2    versus Jody Winkler.  The People are appearing by Ms.

3    Wong; Mr. Winkler appears with Mr. O'Rourke.  Cause comes

4    on today for plea, which would be to Count I.  Four years

5    in the Department of Corrections with sixty-six days;

6    restitution of nine, twenty-nine, twenty-six.  Ninety-

7    seven unlawful delivery; Ninety-six unlawful restraint and

8    theft and deceptive; Eighty-eight burglary; Eighty-eight

9    agg. batt; Ninety-two deceptive, domestic.

10                   Does that sound like your agreement, Mr.

11    Winkler?

12                   MR. WINKLER:  Yes.

13    THE COURT:  Have you been in DOC before on any of

14    these offenses?

15                   MR. WINKLER:  Yes, sir.

16                   THE COURT:  Which one?

17                   MR. WINKLER:  The ninety-eight, and I just got

18    out.

19                   THE COURT:  Okay.  So the controlled substance?

20                   MR. WINKLER:  Yes, sir.

21                   THE COURT:  Are you still on parole?

22                   MR. WINKLER:  Yes, sir.  I have about four months

23    left.

24                   THE COURT:  And they haven't --

1

1    MR. WINKLER: I already got --

2    THE COURT: They issued a warrant for him?

3    MR. WINKLER: No. She -- Well, yeah. She come up

4    and brought the work up December third. He did.

5    THE COURT: What was your sentence in that case?

6    MR. WINKLER: To have the parole.

7    THE COURT: No. What was the sentence in the

8    delivery of a controlled substance?

9    MR. WINKLER: They were just waiting -- Oh, I got

10   three years.

11   THE COURT: Okay. And is that what you want to do

12   today?

13   MR. WINKLER: Yes, sir.

14   THE COURT: All right. I'll accept the proposed

15   agreement. I'll ask you, Mr. Winkler, if you did, between

16   March 10 and March 12 of '99, in Bloomington, McLean

17   County, commit a forgery by knowingly, with intent to

18   defraud, deliver a check drawn on Union Planters Bank

19   Account of Paulette Crego in the amount of $929.26, which

20   was capable of defrauding another in that it purported to

21   have been made or by authority of Lance Winkler and

22   Winkler Fence Company and you knew that the check was not

23   made by authority of Lance Winkler or the Winkler Fence

24   Company.

2

1                       Did you do that?

2              MR. WINKLER:  Yes.

3              THE  COURT:   You understand that that's a Class

4      III, so the maximum penalties for that felony is five

5      years.  For you it would be up to ten because you have a

6      prior Class III or greater.  You understand that?

7              MR. WINKLER:  Yes.

8              THE  COURT:   And you understand on top of that

9      would  be  a  one-year  mandatory  supervised  release  or

10     parole?

11             MR. WINKLER:  Yes.

12             THE COURT:  Now, do you realize you do not have to

13     plead guilty?  You can persist in your denial and remain

14     silent and remain with your plea of not guilty and require

15     the State to prove your guilt beyond a reasonable doubt.

16     You understand that?

17             MR. WINKLER:  Yes.

18             THE COURT:  You realize you have a right to a jury

19     trial?

20             MR. WINKLER:  Yes.

21             THE COURT:  You know what a jury trial is I take

22     it?

23             MR. WINKLER:  Yes.

24             THE COURT:  And the right to an attorney if you

                              3

1    couldn't afford it at trial?

2         MR. WINKLER:  Yes.

3         THE COURT:  And the right to confront and question

4    any witness the State would call to testify on their

5    behalf and to compel witnesses to appear in your own

6    behalf.  Do you understand that?

7         MR. WINKLER:  Yes.

8         THE COURT:  You realize you give all that up if

9    you plead guilty?

10        MR. WINKLER:  Yes.

11        THE COURT:  Knowing that, do you still wish to

12   plead guilty?

13        MR. WINKLER:  Yes.

14        THE COURT:  Ms. Wong?

15        MS. WONG:  State's evidence would show that

16   Paulette Crego wrote a check out to Lance Winkler Fence

17   Company for services rendered in the amount of $929.26.

18   The Defendant is the son of the owner of Lance Winkler

19   Fence Company, and he was able to obtain a check written

20   by Paulette Crego and endorsed the back of it payable to

21   Lance Winkler and he collected the money himself.  Lance

22   Winkler would testify the endorsement on the back of the

23   check was a forgery.

24        THE COURT:  Okay.  Mr. O'Rourke, would you

4

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    stipulate that the People would be able to present

2    witnesses --

3        MR. O'ROURKE:  We would, Your Honor.

4        THE COURT:  -- to establish that?  I'll find that

5    that's accurate and there's a factual basis.

6            Mr. Winkler, did anyone threaten, force

7    or coerce you in any way to get you to enter into these

8    pleas?

9        MR. WINKLER:  No.

10        THE COURT:  And you were promised the sentence and

11    restitution as a condition.  Is that fair --

12        MR. WINKLER:  Yes.

13        THE COURT:  -- to say?  All right.

14        MR. WINKLER:  Yes.

15        THE COURT:  I'll find it's knowing and voluntary,

16    accept the plea on Count I and sentence you to four years

17    in the Department with credit for sixty-six days.  And the

18    way they would normally calculate that is to cut it in

19    half and take that meritorious time of nine months, six

20    months and in some cases three months, and then take the

21    sixty-six off of that.  You understand how that's done?

22        MR. WINKLER:  Yes.

23        THE COURT:  You have any questions about the

24    order?

5

1            MR. WINKLER:  No.

2            THE COURT:  You understand you need to pay your

3       dad's company when you get out?

4            MR. WINKLER:  Yes.

5            THE COURT:  You have to do that within two years

6       of your release.  You understand that?

7            MR. WINKLER:  Yes.

8            THE COURT:  All right.  Do you understand also

9       that even though you have agreed to all the terms of this

10      plea agreement, you still have a right to appeal?  And the

11      way you do that is within thirty days you need to file a

12      written motion asking to have the judgment vacated and to

13      withdraw your plea of guilty.  And you would have to state

14      the grounds or reasons for it.  If that's allowed, the

15      plea of guilty, judgment and sentence would be vacated and

16      a trial would be set on Count I.

17                       If you are indigent and can't afford it,

18      a copy of the transcript would be provided to you as well

19      as an attorney to help you with that motion.

20                       On any appeal from judgment or plea of

21      guilty, any issue or claim of error you don't raise in the

22      motion to vacate the judgment or withdraw a plea of guilty

23      would be deemed waived by the Appellate Court.

24                       You understand that?

6

1          MR. WINKLER:  Yes.

2          THE COURT:  Do you have any questions at all?

3          MR. WINKLER:  No.

4          THE COURT:  You are remanded for transport to the

5     Department.

6                    (Hearing concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

7

1          MR. WINKLER:  Yes.

2          THE COURT:  Do you have any questions at all?

3          MR. WINKLER:  No.

4          THE COURT:  You are remanded for transport to the

5     Department.

6                    (Hearing concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                              7



MARY BURNS STATEMENT

R                    now, McLean County Case #: 99 CF 106

T                    tely 2:20 p.m. Present during this interview
i                    , Detective Dan Cass and State's Attorney,
Charles Reynard.  Mary, before we start, let me first ask you
would you please tell me your name?

Mary Jean Burns.

And your date of birth?

3-22-61.

And Mary are you aware that this conversation is being tape
recorded?

Yes I am.

And do we have your permission to tape record this conversation?

Yes you do.

Mary, it's true that I called you I believe yesterday?

Correct.

Yesterday morning in fact and we talked on the telephone.

Correct.

And we talked about Jamie Snow, the William Little homicide and
Susan Powell.

Correct.

You used to be a correctional guard at the McLean County Jail.

That's correct.

You're no longer a guard there.

I am no longer a guard there.

While you were a guard at the McLean County Jail, can you tell me
what your duties or assignment would have been?

FILED
McLEAN    JAN 9 - 2008    COUNTY
CIRCUIT CLERK

1

Exhibit 18

Sure, we were all booking officers, which means we entailed
booking inmates in and out. We were also assigned pod duties
which housed like 54 males. We also worked back linear and the
front linear which was the females. So we transporting inmates
to and from basically babysitting inmates. Getting them to and
from doctors.

So you would have worked sometimes in the west pod; is that
correct?

That's correct.

And Jamie Snow was housed in the west pod at one point?

That's correct, yes he was.

Let me first start back in September of 1999. Did you have a
conversation or did you have any contact with Susan Powell?

Yes I did. I came into my post at 11 p.m. Susan had been there
already I believe for a couple of hours. Transport had brought
her in and myself and Brenda Morgan did the booking procedure to
get Susan booked officially to the jail.

While you were booking Susan into the McLean County Jail, did she
anything about her case or why she was there?

Uh, she sure did. Um, while I was booking her in and doing her
medical, she had told me at that time that she was approximately
4-6 weeks pregnant. She also told me – Officer Burns, I just
want to tell up front, which stopped my booking process, and said
"Officer Burns I didn't do this. I didn't have anything to do
with any of this murder trial."

Did Susan ever talk to you about driving the car or being in a
car with Jamie Snow?

Uh, the conversation that she had told myself and other CO's is
that she doesn't understand why Jamie would lie about that
because to her knowledge, she doesn't ever remember driving in a
car or anywhere with Jamie.

With her denying ever being in a car or driving the car with
Jamie Snow, that happened one time, more than one time?

More than once. A lot when her trial was going on.

Can you give me a number, do you think, the number of times she
denied ever driving a car or being in the car with Jamie Snow?





I am going to say probably 6 to 10 times at least, within a matter of 3 or 4 days.

I want to more less direct your attention now to Jamie Snow.

OK.

While he was housed in the west pod and you were working there in the west pod, what was Jamie Snow's job or job classification?

Jamie's job classification after a length of time that he was in the pod. He became a pod worker, which means he is responsible for dispensing meals - breakfast, lunch, and dinner. They also are responsible for cleaning all of the tables after the pods are locked down at 11 o'clock at night. They are also responsible for vacuuming, cleaning the windows, cleaning the bathrooms and then they are also allowed to stay up to 2:30 in the morning and watch TV after their pod duties are completed.

Do you remember ever hearing a conversation or being involved in a conversation with Jamie Snow and a couple of other inmates at the time?

Yes I do.

Can you tell me what that conversation was about?

I do. It was after the pod was locked down. I do remember that and they had completed their duties, because they were all sitting around the couch and then they had come up to my desk while we were all talking and Jamie had said that he remembered a time where himself, Susan, and he stated that Susan was the driver on this particular instant, there was another female and another male who was in the back with him. The female was in the front with Susan -

OK, let me stop you there.

This conversation that Jamie was talking about or talking to you or two other pod workers, did he ever start the conversation out as though he might know who actually committed this case?

He did. When he had been - he was talking about - he says you know I think I might know who did this Mary and I just once told him - I cleared myself saying that I am a correctional officer and you know that I have to tell if you're going to say anything. He's like well - he's goes I'm just telling you I think I know who did it and that's when he led into the story of he was with this other couple and Susan

3

Exh. ___ - 5 - P6

OK, let me stop you again.

OK.

So there was Susan Powell?

Correct.

Jamie Snow states that Susan Powell was the driver of the car
that night.

Correct.

There was another female?

Correct.

Where was that second female seated in the car?

Adjacent to Susan in the front.

Then there was Jamie Snow and another male?

Correct.

Where was Jamie Snow and the other male seated in the car?

OK, Jamie clearly stated to me that he was behind Susan and the
other male was sitting next to him in the back seat.

So the two females were in the front seat and the two males were
in the back seat?

That's correct.

OK, so we've got these four people in the car.  Did they ever
tell you or did Jamie tell you what kind of a car it was?

He did not.

Whose car it was?

He didn't say.  I mean I would assume it was probably Susan's
since she was driving the vehicle.  I mean that's just an
assumption.

OK, so we've got these four people in the car - continue on with
what Jamie told you.

4

OK, he said that they were out joyriding. They had been drinking
quite a bit. They continued drinking in the car and I thought it
was kind of weird that you know with all of Jamie's background
that he would be drinking - and you know I was concerned with
Susan drinking and driving, but he said that they were
obliterated, they were just drunk. He remembers saying that the
heat was on in the car. He felt like he had to regurgitate. He
had Susan pull off in this alley by a gas station. He had her
pull in the alley, stop, then he got out of the car, went over by
some garage and started getting sick. The male that was in the
back with him. Got out of the car. He remembers saying hey
where you going - he said I'll be back in a minute. He said the
male walked up the alley, was gone for a few minutes, came back.
They all got in the car, left and went home. Susan took, I
believe everybody home and then he said he remembers waking up
the next morning reading in the newspaper that there was a murder
at that gas station.

Did Jamie tell you or identify the name of the gas station that
they pulled in by or the alley that was -

He did, he said it was the Clark gas station because he
remembered it in the paper the next morning when he read it -
that it was that station where they were in that alley at. And
he thought - then he said that's how I knew that that was
probably that guy because he was gone for a few minutes and then
came back.

Did he say what time they were in the alley or what they -

He remembers it being early evening, but he didn't say anytime.

Did he ever name the female or the other male that was in the car
with him?

No he didn't.

Did Jamie ever say that what they were doing before they got in
the car and they were drinking - where they were drinking at
before they got in the car?

Nope. He said that they had just been drinking all day and they
decided to go joyriding. He didn't say where.

Did any of the inmates ask any questions while he was talking
about this - driving around town, drinking, regurgitating in the
alleyway?

I believe it was Darren that said - well if you know who did it



5

then why aren't you saying or why aren't you talking to your
lawyer or why aren't you telling somebody about it. You know, if
I knew who did it then I wouldn't be keeping my butt here in jail
and I believe Jamie ended the conversation then and went back to
his cell.

So he didn't answer the question?

He did not answer that question.

Is it true that one of the inmates also asked Jamie what he
thought when he saw the police coming towards him in Ohio?

Yeah, we were all standing around -

Is this the same conversation?

Nope. This is a separate conversation.

The same evening or a different evening?

No it was a different evening.

OK, was it after the conversation about the alley?

It was way after that conversation.

Way after - Do you have any idea how long that -

I believe that was right around the period of when Susan's trial
was going on as well.

OK, before we go into that conversation, let's go back to the
conversation about the alley and parking behind the Clark gas
station. When did that conversation take place with Jamie Snow,
the other two pod workers and yourself?

Right, it had to have been when Jamie first became a pod worker
and I can't begin - it's right around that March - in fact it had
to have been April because it was after my birthday. My birthday
is March 22 and I do remember having that conversation after my
birthday with Jamie. So it had to have been in late March or
early April that we had that conversation.

OK, the second conversation or another conversation you had with
the inmates. Were these the same two pod workers that were
talking to Jamie?

The second conversation?

6

The second conversation.

It couldn't be because Darren Smart - he wasn't with us very
long.  He had been sent to DOC, so it had to have been Jamie,
Demetrius Kritz, and let me see who the other gentleman was at
that time - we were going through them so fast because they were
being housed in and out -

While you're thinking - let me ask you this easier question.
Could you name the two inmates, the two pod workers who were
present at your desk when Jamie was talking to you -

Darren Smart and Demetrius Kritz.

Darren Smart is a white male?

Correct.

And Demetrius is a black male?

Correct.

OK, going back to the Ohio conversation about Ohio.  It was
Demetrius that also heard that conversation?

Correct.

Yourself?

Correct.

Where did that conversation take place at?

That was actually on the couches in the middle of the pod that
are placed right in front of the television.

Would this - do you have any idea about what time of the day or
evening this occurred?

Uh, probably between midnight and one.

Because you work the midnight shift?

I work the midnight shift.

So this conversation that took place with Demetrius and Darren
took place on your shift sometime between -

Correct, it had to have been after 11 because the pods are locked

7

down after 11 and Jamie did most of his talking after the pods
were actually locked down.

OK, so this is between like 11 and 2:30 in the morning.

Correct.

OK, once again let's go back to the Ohio conversation. How did
that come about?

Uh, they were all sitting around talking about how they got
caught or how they got apprehended and uh – some of the stories
are quite unique, but uh – he had said – well I've got a good one
and in fact – if I'm not mistaking there was COPS on the TV and
it's amazing how inmates will just flock to that TV when COPS are
on.   54 men will be right at that TV and I believe there was a
COPS show or some investigation show going on and they were
talking about how on the movie COPS where the officers are so
rough with them and how they just like take him down – and Jamie
was like – well they whooped on me.  And they were like – how'd
they catch you and he said – he remembers either working on a
vehicle I believe with his girlfriend at the time that he just
had the baby with and he said he remembers looking up and I
believe it was a Sunday, if I'm not mistaken or a weekend and he
said he looked up and saw cops coming.  He said what kind of man
would be if I didn't run so he goes – I hightailed it – and he
said this little – I don't know if you want me to use the term he
said –

Yes.

He said this little fat fuckers just started chasing me down the
road.  He said I thought I was gone because he said that out of
sight thing – if I'm out of sight then they're supposed to not
apprehend me anymore.  He said I ran into some trees and some
brush and hid and he said the dog caught me.   The dog was
standing on top of me barking.  The next thing I knew they were
beating the poop out of me.  He says that the last thing he
remembers.

So he told you that and you're thinking to yourself anything?

I was cracking up laughing.  I thought it was hilarious.  I
thought it was hilarious.  Like, why would anybody purposely want
to get beat up.  Just go down.

Did you also think to yourself or did you tell me this yesterday
that only a guilty person runs?

8

I do. I think one of the fellows had said - why did you run if
you're not guilty. Why didn't you just stay there and answer
their questions. I think I had even made a comment to you about
that whole OJ thing - and I really could have believed in him
until that whole Blazer thing when he ran and it's like - when
Jamie said he ran - it just clicked in my mind - only guilty
people run.

There was another time that there was a conversation - Jamie made
a comment to you. And this was sometime, I think you said during
Susan's trial. Do you remember what that conversation was or
what that comment was?

Yeah, he had said that - Mary he said - I've done a lot of things
in my life and he goes - I've gone to jail. I've done my time,
but he says I remember reading the witness list and he says there
is one individual where he said that I went - I spent less than 8
hours with in this one little cell and he says I don't understand
why meeting somebody for 8 hours or less than 8 hours that I
would come up and say I killed somebody. He said usually you
talk about your family or kids, anything, but he said this
individual said I confessed to this murder. Why would I do that
in less than 8 hours of meeting this person.

Did he tell you when this conversation took place?

He did. He said it was at the processing center which would be
Joliet, because he said he was with this guy just a short amount
of time.

Did he tell you what year that this conversation supposedly took
place or why he was in the reception center?

Uh, he had just been sentence I believe on an obstruction case or
I'm not sure if it was an armed robbery or if it was an
obstruction. I remember him talking about an obstruction case a
lot and he had just been sentenced. I believe he said for three
years or something like that.

Also when Susan told you - you said 5 or 6 times over the course
of the time that she was at the jail - that she was not in the
car with Jamie. She didn't drive the car for Jamie. She doesn't
know why anybody would say anything like that.

Right.

Now Jamie Snow tells you that Susan Powell was driving the car?

Correct.

What did you think?

Well, at that point in time, I thought Susan was lying and Jamie was telling me the truth. I thought that this was just kind of unique that their stories were just not anywhere similar.

Let me ask you about some names and see if it jogs your memory or if Jamie talked about them or Susan talked about them.

OK.

Jodie Winkler?

Yes.

Was that Jamie that talked about Jodie Winkler.

Actually both of them. Jamie did the majority of the talking. Susan was a hall worker so she saw a lot of the inmates coming in and out and she was quite shocked when Jodie had come in on a different case and said Mary – that's Jodie Winkler, what's he here for? Then she was thinking that he was there as a witness, obviously we can't discuss other cases of other inmates to her. So I told her we weren't going to have that conversation.

What did Jamie say about Jodie Winkler?

Jodie was real adamant about Jodie from day one –

You mean Jamie?

Jamie, excuse me, was adamant about Jodie when he first even arrived into the jail. He said man – he's gonna be bad news. I said what do you mean? He said well, Jodie worked for me down in Florida at my tree cutting business, I believe is what he said he had and he said that I can't remember if he had said that they had met here in Bloomington or if they met down in Florida and realized that they had roots together and he said that Jodie came to work for him. He said that Jodie had an apparent substance abuse problem and he said that when he was paying Jodie every week, Jodie was going through the money so fast that he finally took his money away from him and was giving him like $20-25 a day so he knew he was eating and then he said that at one point in time Jodie was sleeping in the alley and he remembers coming to work one morning and Jodie was sleeping in his truck and he was real concerned about him. I gave him a break and now he's gonna turn on him like this.

Did Jamie ever explain what he meant by turn on him?

10

Not really. You know – Jamie was real famous for going around the jail saying I just – I hope Jodie sticks to the truth and you know if they talked to Steven Powell who was also housed in there with them – I hope he sticks to the truth. We just all thought that was pretty unique. We're like well what do you mean by the truth and he would never elaborate on that as well.

While he was concerned about Jodie Winkler, was he concerned about Jodie Winkler telling on him?

Yeah he was, because after Jodie got sentenced he said – he had made a comment to myself and several other CO's to – saying man the state made a deal with Jodie Winkler – why else would he get a limited amount of time. He said he's gonna tell on me.

What could he tell?                                    LiE

Well, that's what I asked him and then when you always confronted Jamie with questions like that, he would always clam up and either he would walk away or he would go back into his or he'd go sit down and watch TV.

In your mind, Jamie must have told Jodie something that could hurt him.

Oh, I'm sure.

The Hendricks boys. Does that ring a bell?

Jamie talked a lot about that – I've heard him talk about it in the pod a lot. He talked to me very briefly about the Hendricks boys, but I said isn't that a real popular family in this area. I said isn't that the guy that got off on the murder charge and he says – yeah that he had murdered his wife and kids or stepkids or something and he said that well if that guy can get off on murder then I can only in McLean County. Then he made reference to some other Hendricks boys, which I thought was the same family, but obviously it's not.

Like Billy, Bobby, Denny?

Right. So I was just under the assumption that he used to run around with this boys.

There was a – Jamie was a pod worker.

Correct.

There was a time you said that Jamie was sick. He got sick for a

11

couple of days.

Yes he did.

Can you tell me when that was and what happened and why he got sick?

I can't give you an estimated time –

How about in reference to these conversations, can you put –

This was all way after.  It had to have been way after because I came in one night and noticed that Jamie was very pale and sickly looking and I asked him if he was all right, which we customarily do with inmates that you know – look out of the norm.  And he's like, I'll talk to you after the pod's locked down.  After the pod locked down, he came up to my little desk and he said I'm not going to work tonight, can you call the Sargent and tell him that.  I said – yeah it shouldn't be a problem.  I said – are you OK.  He said yeah I got the crime scene pictures today and I'm just not feeling real well.  And we do ½ hour checks on the inmates every night and several times through the night and I probably even documented it on some kind of log that Jamie had been physically ill by regurgitating and he was ill for 3 or 4 days after that.

And this crime scene picture sickness incident happened after these conversations with Jamie and the pod workers and you?

Right.

In fact, I was the only present with Jamie when he was talking about the crime scene pictures.

But that conversation took place after all of the other conversations?

Uh-hum.

Is there is anything else that you can think of today that you feel you need to tell us about in this case about Jamie Snow?

I can't think of anything else.

You've been gone from the jail for quite some time.

About three months.

My contact at you probably jogged your memory and you've been

thinking about it?

Oh, sure.  Sure.

If you think of anything else, would you please get in contact with me.

You bet.

Well, we are going to shut the tape off at approximately 2:45 p.m.  Thank you for your time.

Your welcome.

STATE OF ILLINOIS          )
                           )SS
COUNTY OF                  )

## AFFIDAVIT

I _Darren Smart_, being first duly sworn under oath, depose and state that the following information within this affidavit is true and correct in substance and in facts:

I was never contacted by the Lawyers of Jamie Snow before his trial in 2000 & 2001. I was contacted by detectives before Snows trial in Pontiac C.C. at ____ They were asking me about a statement Mary Burns had given them about Jamie Snow, and conversations he had with Myself, Mary Burns and another inmate in the West Pod of the McLean County Jail in 2000.!! NEVER at anytime did Jamie Snow ever say to me or anyone in front of me that he knew who did the Murder of Bill Little at the Clark Station in Bloomington Ill. on 3-31-91. The only thing Jamie Snow has ever told me. Was that he did not do the crime. and he DID not know who did. any statements given by Mary Burns saying that Jamie Snow told Her, myself and another inmate that he knew who did the crime is untrue. He never said that at anytime. and I told this to the Detectives when they came to see me.

F I L E D
JAN 9 - 2008
McLEAN COUNTY
CIRCUIT CLERK

Darren Smart
_____
Affiant Signature

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 22nd DAY OF September 2003.

Peggy Sue Feldpouch

"OFFICIAL SEAL"
NOTARY PUBLIC STATE OF ILLINOIS
PEGGY SUE FELDPOUCH
COMMISSION EXPIRES 04/30/06

Exhibit 19


Exhibit 20

RUSSELL THOMAS

having been first duly sworn, was examined upon
oral interrogatories and testified as follows:

EXAMINATION BY MS. GRIFFIN:

Q  Would you state your name please?

A  Russell Thomas.

Q  Where are you employed?

A  The City of Bloomington.

Q  As a police officer with them, is that
correct?

A  Police Detective, yes.

Q  I want to ask you if your department got
involved in investigating an armed robbery that occurred
at the Freedom Oil Station at Linden and Emerson
Streets n Bloomington back on February 18th, 1991?

A  Yes I did.

Q  Initially did your department respond with
patrol cars who responded to the immediate call, is that
correct?

A  That's correct.

Q  And when they arrived there, they spoke with
a victim who was Sheryl Murphy?

A  Yes.

Q  She gave them information as to what had

F I L E D

McLEAN JAN 9 - 2008 COUNTY

CIRCUIT CLERK

just taken place, is that right?

A  Yes she did.

Q  As part of the patrol work there, did they actually learn some other witnesses or individuals who may have been in that area at that time?

A  Yes.

Q  And would one of those have been a Mr. James Gillabrand(sic)?

A  Yes.

Q  What information did he relate to  them?

A  Said that he had seen two people run behind or between the two buildings of the Freedom and the pizza place next door.  Run along the creek.

Q  And that pizza place next door to Freedom would be  to the east of Freedom, is that correct?

A  That's correct.

Q  And as part of the police followup on that case and the information they found,  did they check the area, the surrounding area  around there for items of evidence or people?

A  Yes.

Q  And although they did not locate the subjects involved, did they find some items of clothing?

A   Yes they did.

Q   Where were those found?

A   Those were found I believe on Eastholme near Empire Street.

Q   Where was that in relation to the Freedom Oil Station?

A   Two blocks southeast of there.

Q   And what items did they find?

A   They found a sweatshirt, I believe with a hood, a ski mask and a pair of red-colored athletic pants.  I guess that's what you call them.

Q   Now where exactly did they find those?  Were those items like all separated and thrown to the side of the road type, like in bushes on the sidewalks or street?

A   Partially on the street or park lane.

Q   They collected all those items?

A   Yes they did.

Q   Did they take them back and actually show them to Ms. Murphy, the victim?

A   Yes they did.

Q   Did she identify those as being the items of clothing that the person who robbed her had on?

A   Yes she did.

Q   At that time was there any other discovery
of any other witnesses who saw anything there at the
scene?

A   No.

Q   The case then came to the Detective Division
and there's been followup done by the Detective
Division, is that correct?

A   That's correct.

Q   And you've been involved in that situation,
is that right?

A   Yes.

Q   Did you come into contact as part of your
investigation   then with an individual who actually
stated she was in the area of that armed robbery on the
night in question?

A   Yes.

Q   And who was that individual?

A   Mary Cooper. She goes by Mary Hinthorne and
Mary Hinthorne-Cooper.

Q   Now how is it you came to get in contact
with Miss Cooper or Hinthorne?

A   I received a Crimestoppers tip with several
names and a location where one of the people   involved
was staying at.

Q    At that time was there any other discovery
of any other witnesses who saw anything there at the
scene?

A    No.

Q    The case then came to the Detective Division
and there's been followup done by the Detective
Division, is that correct?

A    That's correct.

Q    And you've been involved in that situation,
is that right?

A    Yes.

Q    Did you come into contact as part of your
investigation then with an individual who actually
stated she was in the area of that armed robbery on the
night in question?

A    Yes.

Q    And who was that individual?

A    Mary Cooper. She goes by Mary Hinthorne and
Mary Hinthorne-Cooper.

Q    Now how is it you came to get in contact
with Miss Cooper or Hinthorne?

A    I received a Crimestoppers tip with several
names and a location where one of the people involved
was staying at.

the Freedom Station at the corner of Linden and Emerson
Street.   He directed her to park the vehicle about a
block and a half south of there on Eastholme.   At that (3)
point, Jamie Snow and Michael Conneely got out of the
car.  Went between two houses. She said they returned
about 15 minutes later. Got back into the car. Michael
Conneely told her to drive away but not in a suspicious
nature. Just drive slow and get out of the area.

        Then once she started going south on Eastholme,
they were discarding clothing, throwing it out the
window.  They went back to her residence where according
to her they, Michael Conneely and Jamie Snow, counted
out the money on her kitchen table and then they left
later on after that.  Went to Creve Coeur.

        Q   Now, did she indicate or give to you a
description of the type of clothing that was being
discarded and thrown out?

        A   Yes. She gave an exact description of what
was found at the scene.

        Q   Being the sweatshirt and athletic pants and
a ski mask?

        A   Yes. In regards to the pants itself, she
gave the description of the red pants wtih white zippers
down the ankles which was the type of clothing found at

the scene.

Q    Now did she indicate whether or not either Jamie or Michael made any statements about what they had just done when they were in the car?

A    Yes. Michael Conneely had made the statement that he had robbed a store. He didn't say anything specific about what store but she, in her statement she says that she believes she knows what he was talking about. Later on they went and picked up another person on their way to Peoria. And in the drive over there, there was a discussion between Michael Conneely and a Dennis Hendricks. Address is 501 West Market in Bloomington is where he lives at.

In the car they discussed, he was telling them about doing an armed robbery at the Freedom Station and gave the location.

Q    And during the time she was with him, either at the apartment or in the car, did he in fact make some reference to the state that the cashier was in?

A    Yes.

Q    During the robbery.

A    Very nervous. The term I believe he used was, they were laughing about the fact that her eyes were bugging out when he pointed the gun in her face.

Q   Now Miss Cooper or Hinthorne indicated that once they were actually at her apartment, she actually saw the money changing hands there?

A   Yes.

Q   And the money, did she have any idea how much money was involved?

A   Could you repeat the question?

Q   Did she have any idea when she saw them dividing up that money, the type or amount of money that was involved, at least whether it was alot or small amount?

A   Between $250.00 and $300.00. She believed that Jamie got about $125.00.

Q   And did she provide you with any additional information about the burglary--excuse me, I mean the armed robbery at the station?

A   Yes. We recovered a gun from in her kitchen in the cabinets.

Q   And what type of gun was that?

A   It was a Davis--correction, Daisy bb type pistol or air pistol.

Q   And where was that located at?

A   In the kitchen cupboard at the northeast end of the room.

Q   And did she relate to you whose that was or how that came to be there?

A   Yes. She said that was Mike's.

Q   Now at the time that you initially made contact with her at her residence, were there other individuals that were there?

A   On the 10th of March one, on our first meeting with her, yes.

Q   And did you later learn who those subjects were?

A Yes.

Q   Who were those individuals?

A   Michael Conneely, Kimmie King, Cherie Cochran and Scott Bishop.

Q   Now when you actually got these details from Miss Hinthorne or Miss Cooper, that was at the Bloomington Police Department, is that correct?

A   Yes.  This wasn't on the first initial contact.  This was a couple contacts later.

Q   Did you attempt to find out where Mr. Conneely was then after you had these conversations with her?

A   Yes.

Q   Were you successful in locating him?

A   At that time, no.

Q   Did you in fact have to talk to several of those individuals who you first saw there at the house and got some different stories of different times about where he was?

A   Yes I did.

Q   And at this point, it's only now that you've found out that he's actually in the State of Massachusetts, is that correct?

A   Yes.

Q   That was after a warrant was issued in this case?

A   That's correct.

Q   And he's not made any statements that you're aware of about these incidents, is that right, to police?

A   Not at this time that I'm aware of.

Q   Now after you got that information from Miss Hinthorne or Miss Cooper, did you talk to some other individuals who may have had some information by way of statements Mr. Conneely made or that Mary said relating to placing him at the Freedom Station?

A   Yes.

Q   Who would that be?

A   Cherie Cochran.

Q   What information did she relate to you?

A   She said she had a discussion with Mary Cooper which was her roommate at the time and told her about that.

Q   And in fact Mary told her essentially what she told you?

A   Yes.

Q   Jamie and Mike were both involved?

A   Yes.

Q   Did you speak with any other individuals that had any information about statements Mike or Jamie stated?

A   In reference to?

Q   In reference to the Freedom Oil, admitting they were involved in Freedom Oil?

A   No.

Q   Now by way of speaking either with Miss Cooper or with other individuals, did they relate any information as to what Jamie's part was in the armed robbery?

A   He was standing outside. He was becoming a lookout or spotter.

Q   Any other information that I haven't brought out about this investigation that is relevant to

the Freedom Oil Station?

(There was a discussion off the record.)

Q   Now, you attempted to locate Mr. Snow and
Mr. Conneely both, is that correct?

A   That's correct.

Q   And as we indicated, Mr. Conneely was
located out in Massachusetts?

A   That's correct.

Q   And just yesterday had a chance to actually
track Mr. Snow down, is that correct?

A   Day before yesterday, he was arrested by the
Webster Grove, Missouri Police Department.

Q   And do you as well as other officers, or at
least one other officer had a chance to  actually meet
with Mr. Snow yesterday?

A   Yes. I picked him up along with Detective
Charles Crowe. We picked him up in the St. Louis County
Jail and brought him back up to Bloomington.

Q   Did you have a chance during your contact
with him to discuss this, specifically the Freedom Oil
case with him?

A   Upon arrival at the station, Charlie went
home and Sergeant Michael Bernardini with the Illinois
State Police DCI  Task Force 6  who is assigned to the

R. Thomas

Task Force, the Bloomington Homicide Task Force along with myself and several others, Sergeant Bernardini and I did the interview.

Q   Now prior to asking him any questions about that, you read him his Miranda rights?

A   Yes.

Q   And what information did he give you about the Freedom, his involvement in the Freedom Oil robbery?

A   He didn't deny it. He was wanting assurances, he said he would be able to explain everything. That he didn't actually do the armed robbery, but he wouldn't discuss it until he had assurances which we told him that we cannot--we have no authority to make any type of deals like that. That's up to the State's Attorney.

BY MS. GRIFFIN: I don't believe I have any other questions. Does anybody else?

EXAMINATION BY GRAND JURY:

Q   You said that James Snow was, you found out is a lookout outside. Did he possess a gun or has anything come forward that he had a gun or was he just standing outside the building?

A   No. He just--he was just standing outside.

Q   But he got half the money for standing outside?

A   Yes.   There's the accountability that Miss Griffin can explain that to you at a later time.

BY MS. GRIFFIN: Okay.   Thanks.

(Witness excused.)

ARDC | Lawyer Search: Attorney's Registration and Public Disciplina...    https://www.iardc.org/ldetail.asp?id=732419729

Case: 1:13-cv-03947 Document #: 2-24 Filed: 05/28/13 Page 1 of 16 PageID #:379
Case: 17-1113    Document: 33-3    Filed: 09/21/2017    Pages: 781

**ARDC** ATTORNEY REGISTRATION & DISCIPLINARY COMMISSION OF THE SUPREME COURT OF ILLINOIS

WEBSITE INFORMATION | SEARCH SITE | HOME

Lawyer Search

Lawyer Registration

How to Submit a Request For Investigation

Rules and Decisions

Ethics Inquiry Program

Publications

New Filings, Hearing Schedules and Clerk's Office

Client Protection Program

Resources & Links

ARDC Organizational Information

## LAWYER SEARCH: ATTORNEY'S REGISTRATION AND PUBLIC DISCIPLINARY RECORD

ARDC Individual Attorney Record of Public Registration and Public Disciplinary and Disability Information as of January 25, 2010 at 1:14:27 PM:

| | |
|---|---|
| **Full Licensed Name:** | Frank Matthew Picl |
| **Full Former name(s):** | None |
| **Date of Admission as Lawyer by Illinois Supreme Court:** | April 28, 1977 |
| **Registered Business Address:** | Po Box 418 Peoria, IL 61651-0418 |
| **Registered Business Phone:** | (309) 673-8110 |
| **Illinois Registration Status:** | Not authorized to practice law due to discipline and has not demonstrated required MCLE compliance |
| **Malpractice Insurance: (Current as of date of registration; consult attorney for further information)** | No malpractice report received as attorney is not registered. |

### Public Record of Discipline and Pending Proceedings:

Case(s) below are identified by caption and Commission case number. If there is more than one case, the cases are listed in an order from most recent to oldest. A case may have more than one disposition or more than one component to a disposition, in which situation each disposition and component is also listed separately within that case record, again in an order from most recent to oldest.

Click on R & D to access any documents regarding this lawyer that are in Rules and Decisions. R & D contains all disciplinary opinions of the Supreme Court and most other Court orders and board reports issued since 1990. If R & D does not contain the decision that you are seeking, contact the Commission's Clerk's office for assistance. Contact information for the Clerk's office is available at Office Hours.

**In re Frank Matthew Picl, 06DC1009**

Disposition:                    Disbarment on consent


Exhibit 21

| | |
|---|---|
| Effective Date of Disposition: | November 17, 2006 |
| End Date of Disposition: | No disposition end date scheduled at this time. Discipline continues until further order of the Court. |
| Definition of Disposition: | Disbarment on consent is imposed by the Supreme Court based upon the lawyer's filing of a motion to strike his or her name from the roll of attorneys in face of disciplinary charges that are set forth in the Administrator's Statement of Charges. The disbarred lawyer is not authorized to practice law during the period of the disbarment on consent and may not return to the practice of law unless and until the lawyer has demonstrated his or her rehabilitation, good character, and current knowledge of the law in a subsequent reinstatement case, which may not be filed until three years after the effective date of the disbarment on consent. |

### In re Frank Matthew Picl, 02SH0066

| | |
|---|---|
| Disposition: | Censure |
| Effective Date of Disposition: | May 22, 2003 |
| End Date of Disposition: | Not applicable. Censures and reprimands do not affect the authority of the lawyer to continue to practice law. |
| Definition of Disposition: | A censure reflects a determination that the lawyer has engaged in misconduct, but that the violation is not so serious to warrant a sanction that would affect the lawyer's authority to continue to practice law. As a result, censure does not affect the authority of a lawyer to continue to practice law. |

Check carefully to be sure that you have selected the correct lawyer. At times, lawyers have similar names. The disciplinary results displayed above include information relating to any and all public discipline, court-ordered disability inactive status, reinstatement and restoration dispositions, and pending public proceedings. Investigations are confidential and information relating to the existence or status of any investigation is not available. For additional information regarding data on this website, please contact ARDC at (312) 565-2600 or, from within Illinois, at (800) 826-8625.

ARDC makes every effort to maintain the currency and accuracy of Lawyer Search. If you find any typographical errors in the Lawyer Search information, please email registration@iardc.org. For changes to contact information, including address, telephone or employer information, we require that the attorney submit a change of address form. Please consult our Address Change Requests page for details. Name changes require the filing of a motion with the

Case: 1:13-cv-03947 Document #: 2-24 Filed: 05/28/13 Page 3 of 16 PageID #:381
Case: 17-FH13    Document: 33-3    Filed: 09/21/2017    Pages: 781

Supreme Court. Please consult our Name Change Requests page for details.

Return to Search

**IARDC ®:online access to registration and discipline information regarding Illinois
lawyers
presented by the Illinois Attorney Registration & Disciplinary Commission.**

Lawyer Search | Lawyer Registration | How to Submit a Request For Investigation
Rules and Decisions | Ethics Inquiry Program | Publications
New Filings, Hearing Schedules and Clerk's Office | Client Protection Program
Resources & Links | ARDC Organizational Information
Website Information | Search Site | Home

*Rules and Decisions*

---

Recently Filed Disciplinary Decisions and Complaints | Rules Governing Lawyers and Judges |
Disciplinary Reports and Decisions | Search Help and Collection Scope | Home

## DECISION FROM DISCIPLINARY REPORTS AND DECISIONS SEARCH

### BEFORE THE HEARING BOARD
### OF THE
### ILLINOIS ATTORNEY REGISTRATION
### AND
### DISCIPLINARY COMMISSION

In the Matter of:

**FRANK MATTHEW PICL,**                  Commission No. 02 SH 66

Attorney-Respondent,                       **FILED --- August 26, 2002**

No. 2203561.

### COMPLAINT

Mary Robinson, Administrator of the Attorney Registration and Disciplinary Commission,
by her attorney Julie A. Smith, pursuant to Supreme Court Rule 753(b), complains of
Respondent, Frank M. Picl, who was licensed to practice law in Illinois on April 28, 1977,
and alleges that Respondent has engaged in the following conduct which tends to defeat the
administration of justice or to bring the courts or the legal profession into disrepute:

#### *(Neglect of Criminal Appeal)*

1. On January 25, 1996, a jury convicted Thomas A. Rice ("Rice") of first degree murder,
*People v. Rice,* 95 CF 573, Sangamon County, Illinois.

2. On March 29, 1996, the trial court sentenced Rice to a term of 35 years imprisonment.

3. On February 7, 1997, the Fourth District Appellate Court affirmed the conviction and
sentence, *People v. Rice,* Case No. 4-96-0297.

4. In March 1997, Respondent agreed to represent Rice in filing a petition for leave to
appeal the decision of the Fourth District Appellate Court, and, if leave to appeal was
denied, Respondent agreed to represent Rice in post conviction proceedings.

5. In September 1997, Respondent received $10,000 from Rice's family as attorney's fees.

6. On October 1, 1997, the Illinois Supreme Court denied Rice's petition for leave to appeal
the decision of the Fourth District Court affirming his conviction and sentence.

7. Respondent subsequently filed, on behalf of Rice, a post-conviction petition and a petition for post-judgement relief in the Circuit Court of Sangamon County. Both petitions were denied (although Rice's sentence was modified) and Respondent filed separate notices of appeal in each case. *People v. Rice*, Case No. 4-99-0599 (post-conviction petition); *People v. Rice*, Case No. 4-00-1075 (post judgement petition).

8. On May 22, 2001, Respondent filed a motion with the Appellate Court to consolidate Cases 4-99-0599 and 4-00-1075 and requested an extension of time to file his initial brief. The Appellate Court granted the motion and ordered Respondent's brief filed on or before June 22, 2001.

9. At no time on or before June 22, 2001, did Respondent file a brief.

10. On June 28, 2001, and July 20, 2001, Respondent filed motions for extensions of time in which to file his initial brief in Cases 4-99-0599 and 4-00-1075. The Appellate Court granted the motions and ordered Respondent's brief filed on or before July 31, 2001.

11. At no time on or before July 31, 2001, did Respondent file a brief or request a further extension of time.

12. On or about August 6, 2001, Rice wrote the Court asking for a status report on the consolidated cases.

13. On August 8, 2001, the Court issued a Rule to Show Cause to Respondent as to why the consolidated appeals should not be dismissed on or before August 15, 2001, for Respondent's failure to file a brief.

14. On August 15, 2001, Respondent filed a response to the Rule to Show Cause and made an additional request for an extension of time in which to file a brief. Respondent cited his heavy caseload as the reason for the request.

15. On August 16, 2001, the Court granted Respondent up to and including August 20, 2001, to file his brief. In the order, the Court stated that Respondent's failure to file a brief on or before August 20, 2001 would result in automatic dismissal of the consolidated appeals.

16. On August 20, 2001, Respondent filed his fifth request for an extension of time to file the brief. Respondent cited his heavy caseload as the reason for the request.

17. On August 21, 2001, the Court denied Respondent's motion for an extension of time in which to file the brief. The Court enforced the Rule to Show Cause previously entered and dismissed Rice's appeals. Pursuant to Supreme Court Rule 315(b), any appeal to the Illinois Supreme Court of the Appellate Court's dismissal was due on or before September 11, 2001.

18. At no time did Respondent petition for leave to appeal the dismissal by the Appellate Court.

19. At no time did Respondent inform Rice that his appeals had been dismissed.

20. On or about September 10, 2001, Rice wrote to Respondent requesting information about his appeal.

21. At no time did Respondent respond to Rice's inquiry of September 10, 2001.

22. On September 17, 2001, Respondent filed a motion in the Appellate Court to reinstate the dismissed appeals

23. On September 21, 2001, the Appellate Court denied Respondent's motion to reinstate the appeals for lack of jurisdiction. The Court advised the Clerk of the Appellate Court to refer the matter to the Attorney Registration and Disciplinary Commission.

24. On or about September 21, 2001, Rice wrote to the Court asking for a status report on the consolidated cases.

25. On October 2, 2001, the Court sent a letter to Rice which indicated that his appeal had been dismissed.

26. On October 19, 2001, Rice filed a pro se motion with the Court requesting a recall of the mandate dismissing his appeals.

27. On October 23, 2001, the Court denied Rice's pro se motion for lack of jurisdiction.

28. On November 13, 2001, Rice filed a pro se motion with the Illinois Supreme Court seeking to appeal the Fourth District Appellate Court's dismissal of his appeals.

29. On April 25, 2002, the Illinois Supreme Court, under its supervisory authority, directed the Fourth District Appellate Court to vacate its order in Case Nos. 4-99-0599 and 4-00-1075, and to reinstate Rice's appeals.

30. On April 26, 2002, the Fourth District Appellate Court reinstated Rice's appeals and appointed the State Appellate Defender to represent Rice.

31. By reason of the conduct described above, Respondent has engaged in the following misconduct:

    a. failure to act with reasonable diligence and promptness in representing a client, in violation of Rule 1.3 of the Illinois Rules of Professional Conduct;

    • failure to keep a client reasonably informed about the status of a matter, in violation of Rule 1.4(a) of the Illinois Rules of Professional Conduct;

    • failure to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representations in violation of Rule 1.4(b) of the Illinois Rules of Professional Conduct;

- failure to make reasonable efforts to expedite litigation consistent with the interests of the client, in violation of Rule 3.2 of the Illinois rule of Professional Conduct;

- engaged in conduct that is prejudicial to the administration of justice, in violation of Rule 8.4(a)(5) of the Illinois rules of Professional Conduct; and

- engaged in conduct which tends to defeat the administration of justice, or to bring the courts of the legal profession into disrepute, in violation of Supreme Court Rule 771.

**WHEREFORE,** the Administrator requests that this matter be assigned to a panel of the Hearing Board, that a hearing be held, and that the panel make findings of fact, conclusions of fact and law, and a recommendation for such discipline as is warranted.

Respectfully submitted,

Mary Robinson, Administrator
Illinois Attorney Registration and
Disciplinary Commission

By:  Counsel for the Administrator

Julie A. Smith, Counsel
Attorney Registration and
Disciplinary Commission
Hilton Offices, Suite 201
700 East Adams Street
Springfield, Illinois 62701-1625
Telephone: (217) 522-6838

A▸DC | Rules and Decisions          https://www.iardc.org/rd_database/disc_decisions_detail_print.asp?G...

Case: 1:13-cv-03947 Document #: 2-24 Filed: 05/28/13 Page 8 of 16 PageID #:386
Case: 17-1113     Document: 33-3     Filed: 09/21/2017     Pages: 781

*Rules and Decisions*

---

Recently Filed Disciplinary Decisions and Complaints | Rules Governing Lawyers and Judges | Disciplinary Reports and Decisions | Search Help and Collection Scope | Home

# DECISION FROM DISCIPLINARY REPORTS AND DECISIONS SEARCH

## *Supreme Court Order Imposing Discipline on Consent and Underlying Consent Petition*

**M.R.18700 - In re:  Frank Matthew Picl  (May 22, 2003)**

Disciplinary Commission.

The petition by the Administrator of the Attorney Registration and Disciplinary Commission to impose discipline on consent pursuant to Supreme Court Rule 762(b) is allowed, and respondent Frank Matthew Picl is censured.

Order entered by the Court.

## IN THE SUPREME COURT OF ILLINOIS

In the Matter of:

**FRANK MATTHEW PICL,**                         Supreme Court No. M.R. 18700

Attorney-Respondent,
                                                Commission No. 02 SH 66
No. 2203561.

## PETITION TO IMPOSE DISCIPLINE ON CONSENT

Mary Robinson, Administrator of the Attorney Registration and Disciplinary Commission, by her attorney, Julie A. Smith, pursuant to Supreme Court Rule 762(b), with the consent of Respondent, Frank Matthew Picl, and his attorney, Ronald L. Hamm, and the approval of the Hearing Board, petitions the Court to enter an order censuring Respondent.  In support, the Administrator states:

### I. SUMMARY OF THE PETITION

1.  Respondent is fifty years old and was licensed to practice law in Illinois in 1977.  Respondent maintains a criminal law practice in Peoria, Illinois.

2.  Respondent neglected to file a post-conviction appellate brief on behalf of a client who had been convicted of first degree murder.  A full description of Respondent's misconduct is set forth in Section

II, below, at pages 2 through 3.

3. The Court has not previously disciplined Respondent. A more complete summary of Respondent's mitigation evidence is provided in Section III below, at pages 3 through 4.

4. Respondent's affidavit is attached as Exhibit One. At the time this petition was prepared, complaint number 02 SH 66 was pending against Respondent before the Hearing Board, and the members of the Board approved the submission of this matter to the Court as an agreed matter pursuant to Rule 762(b)(1)(b). A copy of the Hearing Board order authorizing the submission of this matter to the Court is attached as Exhibit Two. A copy of the transcript of the Hearing Board proceedings is attached as Exhibit Three.

## II. DESCRIPTION OF MISCONDUCT

5. In March 1997, Respondent agreed to represent Thomas A. Rice in filing a petition for leave to appeal the decision of the Fourth District Appellate Court affirming his conviction for first degree murder. Respondent further agreed to represent Rice in any necessary post-conviction proceedings.

6. After the Supreme Court's denial of the petition for leave to appeal, the Respondent filed a petition for post-conviction relief, which was denied by the circuit court. Respondent filed a notice of appeal on July 19, 1999. Between November 5, 1999, and August 4, 2002, Respondent sought and received seven extensions of time for filing the appellant's brief.

7. Respondent also filed a petition for post-judgment relief, which was denied, and his notice of appeal was filed on December 15, 2000. On Respondent's motion, filed May 22, 2001, the two appeals were consolidated, and the Appellate Court ordered Respondent's brief to be filed on or before June 22, 2001.

8. At no time between June 22, 2001, and August 21, 2001, did Respondent file an appellate brief on behalf of Rice in the consolidated cases.

9. On August 21, 2001, the Appellate Court dismissed the consolidated appeals. Respondent did not timely move to have the appeals reinstated, did not file a petition for leave to appeal from the dismissal, and did not respond to the client's request for information about the appeals.

10. On September 17, 2001, Respondent filed a motion in the Appellate Court to reinstate the dismissed appeals, but the motion was denied for lack of jurisdiction. The Appellate Court advised its Clerk to refer the matter to the Attorney Registration and Disciplinary Commission.

11. By reason of the conduct described above, Respondent has engaged in the following misconduct:

   a. failure to act with reasonable diligence and promptness in representing a client, in violation of Rule 1.3 of the Illinois Rules of Professional Conduct;

   b. failure to keep a client reasonably informed about the status of a matter, in violation of Rule 1.4(a) of the Illinois Rules of Professional Conduct;

   c. failure to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representations in violation of Rule 1.4(b) of the Illinois Rules of Professional Conduct;

d. failure to make reasonable efforts to expedite litigation consistent with the interests of the client, in violation of Rule 3.2 of the Illinois rule of Professional Conduct;

e. conduct that is prejudicial to the administration of justice, in violation of Rule 8.4(a)(5) of the Illinois rules of Professional Conduct; and

f. conduct which tends to defeat the administration of justice, or to bring the courts of the legal profession into disrepute, in violation of Supreme Court Rule 771.

### III. RESPONDENT'S BACKGROUND AND FACTORS IN MITIGATION

12. Respondent is fifty years old, has practiced law since 1977, and has no prior disciplinary history. In November 1999, Respondent separated from his wife after twenty-five years of marriage, and their marriage was dissolved in October 2001.

13. In September 2001, Respondent's oldest daughter was living and working in New York City, and the terrorist attack on the World Trade Center had a mental, emotional and physical impact on him due to concerns for his daughter's safety.

14. A number of members of the bench and bar would testify to Respondent's excellent reputation for truth and veracity.

15. Respondent agrees that he will not represent any individual at the appellate level in the future.

16. Respondent has cooperated fully with the Commission during the disciplinary process and has candidly admitted his misconduct in this matter. Respondent has refunded $2,500 of his $10,000 fee to Rice.

17. On October 19, 2001, Rice filed a pro se motion with the Appellate Court requesting a recall of the mandate dismissing his appeals. The Appellate Court denied Rice's pro se motion for lack of jurisdiction. Thereafter, Rice filed a pro se motion with the Illinois Supreme Court seeking to appeal the Appellate Court's dismissal of his appeals. On April 25, 2002, the Illinois Supreme Court, under its supervisory authority, directed the Appellate Court to vacate its dismissal order and to reinstate Rice's appeals.

### IV. RECOMMENDATION FOR DISCIPLINE

18. The Administrator respectfully recommends that Respondent be censured for his admitted misconduct.

19. A censure would be consistent with this Court's precedent. In re Weinberg, 119 Ill. 2d 309 (1988), and In re Runge, 92 SH 161, M.R. 8264 (May 27, 1992), this Court censured the respondents for their neglect of their client's criminal appeal. Most recently, in In re Redmond, 01 CH 43, M.R. 18387 (November 26, 2002), the Court censured an attorney for incompetently representing a criminal defendant on a post-conviction appeal.

20. The Respondent in the instant case, as the respondents in Weinberg, Runge, and Redmond, engaged in an isolated incident of misconduct in connection with a criminal appeal; had not been previously disciplined, presented evidence to mitigate the conduct, and cooperated fully with the disciplinary process.

**WHEREFORE**, the Administrator, Respondent's counsel and Respondent, with the consent of the Hearing Board, requests that this Court enter an order censuring Respondent.

Respectfully submitted,

Mary Robinson, Administrator
  Illinois Attorney Registration and
    Disciplinary Commission

By: Counsel for Administrator

Julie A. Smith, Counsel
Attorney Registration and
Disciplinary Commission
One Old Capitol Plaza North, Ste. 333
Springfield, Illinois 62701
Telephone: (217) 522-6838

*Rules and Decisions*

# DECISION FROM DISCIPLINARY REPORTS AND DECISIONS SEARCH

## M.R.18700 - In re:  Frank Matthew Picl  (May 22, 2003)

Disciplinary Commission.

The petition by the Administrator of the Attorney Registration and Disciplinary Commission to impose discipline on consent pursuant to Supreme Court Rule 762(b) is allowed, and respondent Frank Matthew Picl is censured.

Order entered by the Court.

*Rules and Decisions*

## DECISION FROM DISCIPLINARY REPORTS AND DECISIONS SEARCH

### Statement of Charges Allowed by the Illinois Supreme Court and Imposing Discipline on Consent

*Allowed November 17, 2006*

## IN THE SUPREME COURT OF ILLINOIS

In the Matter of:

**FRANK MATTHEW PICL,**                    Supreme Court No. M.R. 21151

Attorney-Respondent,                       Commission No. 06 DC 1009

No. 2203561.

## STATEMENT OF CHARGES PURSUANT
## TO SUPREME COURT RULE 762(a)

Mary Robinson, Administrator of the Attorney Registration and Disciplinary Commission, by her attorney, Deborah Barnes, pursuant to Supreme Court Rule 762(a), states that, on the date Frank Matthew Picl signed a motion requesting that his name be stricken from the Master Roll of Attorneys, an investigative matter was pending before the Administrator alleging that Movant engaged in the following misconduct. If the cause proceeded to hearing, the evidence set forth below would establish clearly and convincingly the misconduct described below:

1. Certified court records and Movant's admissions would establish that:

    a. On March 31, 2005, Movant was indicted in the Circuit Court of Peoria County, Illinois, on the following charges:

        1) three counts of Financial Exploitation of an Elderly Person, in violation of 720 ILCS 5/16-1.3(a)(Counts I - III); and

        2) three counts of theft, in violation of 720 ILCS 5/16-1(a)(2) and 5/16-1(a)(2)(C)(Counts IV - VI).

    b. On June 28, 2006, Movant pled guilty but mentally ill to Counts I through VI, described above.

    c. The factual basis for the guilty plea is that from January 2003 to March 2005, Movant withdrew $278,200 from various financial accounts owned by Alice

PAGE 2:

DC | Rules and Decisions                                    https://www.iardc.org/rd_database/disc_decisions_detail_print.asp?G...

Case: 1:13-cv-03947 Document #: 2-24 Filed: 05/28/13 Page 14 of 16 PageID #:392
Case: 17-1113      Document: 33-3      Filed: 09/21/2017      Pages: 781

Vargas, an elderly client for whom he had power of attorney, and he used the money for personal purposes, including gambling, without authority.

    d. A hearing addressing the guilty but mentally ill plea is scheduled for September 25, 2006.

2. As a result of the conduct described above, Movant has engaged in the following misconduct:

    a. committing criminal acts that reflect adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects in violation of Rule 8.4(a)(3) of the Illinois Rules of Professional Conduct;

    b. conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4) of the Illinois Rules of Professional Conduct;

    c. conduct that is prejudicial to the administration of justice in violation of Rule 8.4(a)(5) of the Illinois Rules of Professional Conduct and which tends to defeat the administration of justice or to bring the courts and the legal profession into disrepute in violation of Supreme Court Rule 770.

Respectfully submitted,

Mary Robinson,
Administrator
Illinois Attorney
Registration and
Disciplinary Commission

By: Deborah Barnes
Counsel for the
Administrator

Deborah Barnes, Counsel
Attorney Registration and
Disciplinary Commission
1 North Old Capitol Plaza, Suite #333
Springfield, Illinois 62701
Telephone: (217) 522-6838

*Rules and Decisions*

---

Recently Filed Disciplinary Decisions and Complaints | Rules Governing Lawyers and Judges |
Disciplinary Reports and Decisions | Search Help and Collection Scope | Home

# DECISION FROM DISCIPLINARY REPORTS AND DECISIONS SEARCH

## M.R. 21151 - In re:  Frank Matthew Picl.  (November 17, 2006)

Disciplinary Commission.

The motion by Frank Matthew Picl to strike his name from the roll of attorneys licensed to practice law in Illinois pursuant to Supreme Court Rule 762(a) is allowed, effective immediately.

Order entered by the Court.

# IN THE TENTH JUDICIAL CIRCUIT OF THE STATE OF ILLINOIS

## PEORIA COUNTY, ILLINOIS

THE PEOPLE OF THE )
STATE OF ILLINOIS, )
                              )
                  Plaintiffs, )
                              )
          v.                   )Case No. 2005-CF-275
                              )
FRANK M. PICL, )
                              )
                  Defendant. )

<u>SENTENCING HEARING</u>

       REPORT OF PROCEEDINGS of the hearing had before the **HONORABLE STEPHEN A. KOURI**, Judge of said Court, on the 25th of September, 2006.

# <u>APPEARANCES</u>:

         **MR. KEVIN W. LYONS**
         State's Attorney of Peoria County, by
         **MR. LARRY EVANS**
         Assistant State's Attorney
         REPRESENTING THE PLAINTIFF;


         **MR. HUGH TONER**
         Attorney at Law
         REPRESENTING THE DEFENDANT.


       REPORTED BY:   Robin L. Roberts, CSR, RPR
                      Official Court Reporter
                      License No.  084-004317



Exhibit 22-1



C 3311

```
 1                        I N D E X

 2  STATE'S WITNESSES       DIRECT   CROSS   REDIRECT   RECROSS

 3  PAUL KELLY                 7       19

 4  DEFENDANT'S WITNESSES  DIRECT   CROSS   REDIRECT   RECROSS

 5  W. CLAY MACAULAY          23       30        35

 6  DORIS BERNARD             36       42

 7  STEVE BRADBURY            44       50        52        53

 8  STEVE BRADBURY                               53

 9  MICHAEL LEVAN             54       60        64

10  JERRY LINDSEY             65       70        76

11  SHIRLEY HANNON            78       93       104

12  ANNA SAXON               105      114       119

13  THOMAS PENN              120      127

14  DAVID RADEMAKER          131

15  WILLIAM MITCHELL         136      139

16  GREG DANIEL              139      144

17

18

19

20

21

22

23

24
```

C 3312

1    THE COURT:  Let's go on the record.  This is Case

2    No. 05-CF-275, People of the State of Illinois versus

3    Frank Matthew Picl.  Mr. Picl, the defendant, is here

4    with his attorney, Hugh Toner, and the State is

5    represented here this morning by Assistant State's

6    Attorney Larry Evans.  Is the State ready to proceed?

7        MR. EVANS:  Yes, Judge.

8        THE COURT:  Mr. Toner?

9        MR. TONER:  We are, Judge.

10    THE COURT:  At the outset we have kind of had a

11    unique twist in the case and then Mr. Picl pled guilty

12    several weeks ago, but mentally ill, and he has since

13    waived that part of it or relinquished that part, the

14    mentally ill part, but we had at the earlier hearing

15    taken the factual basis.  And I don't know that I have

16    formally accepted the plea, which I want to do right

17    now, but in so doing, I have spent some time once again

18    reviewing the charges, and I would like the State to

19    tell me -- because I want to be absolutely clear on

20    this -- what are the sentence ranges -- and I want

21    Mr. Picl to listen very carefully to this -- what are

22    the sentencing ranges we are dealing with with each

23    count?  And, in particular, I am interested in wanting

24    to know whether the State believes they are entitled to

3

C 3313

1   have extended-term sentencing on these counts or

2   enhanced sentencing.

3      MR. EVANS: Judge, it's the People's position with

4   regard to Count 1, a Class I felony, the range of four

5   to 15 years; Count 2 to which the defendant likewise

6   pled guilty, Class I, 4 to 15 years; Count 3, Class I,

7   again, a range of 4 to 15 years; and then I'll skip

8   ahead to Count 6, Judge, a Class II, that would be the

9   normal range of 3 to 7 years.

10       With regards to 4 and 5, theft, the State's

11  position is that the sentencing range is 4 to 15 years

12  that can be extendible by this Court to 30 years. And

13  the authority for that, Judge, is Supreme Court case

14  People versus Graves, 2003, where there was the

15  Appellate Court, I believe it was the Third District

16  that felt that the enhancement under that particular

17  extension provision of 730 ILCS 5/5-5-3.2, Subsection

18  (b)(4)(ii) was an impermissible enhancement with the

19  Appellate Court that -- because what they interpreted

20  the charges to encompass identical elements. However,

21  the Supreme Court said that this is not an identical

22  element. The allegations are not related to deception,

23  and, again, in Counts 4 and 5 there is no allegation of

24  deception.

4

C 3314

1      THE COURT:  That dealt with age?

2      MR. EVANS:  That dealt with enhancement based on

3  age, Judge, yes, sir.

4      THE COURT:  Of an elderly person?

5      MR. EVANS:  Yes.

6      THE COURT:  Mr. Toner, do you have any disagreement

7  with how he's recited what the potential penalties are,

8  range?

9      MR. TONER:  I have no particular disagreement with

10  those -- with his recitation.  I have some argument

11  about it.

12      MR. EVANS:  Judge, if I could, for the record,

13  People versus Graves, that Supreme Court case I have

14  cited is a 207 Ill. 2d 478, 479, Illinois Decisions,

15  502, 3d, November 2003.

16      THE COURT:  Thank you.

17          Mr. Picl, you have heard what the possible

18  sentence ranges are?

19      THE DEFENDANT:  I have.

20      THE COURT:  You understand that to be the range?

21      THE DEFENDANT:  I do.

22      THE COURT:  The Court based on the factual basis

23  that was provided some weeks ago and the admonitions

24  and waivers that were given, admonitions by the Court

5

C 3315

1   and the waivers given by the defendant at that time,

2   the Court accepts his plea of guilty as voluntary and

3   we will proceed to sentencing today.

4        I have the presentence investigation, and the

5   way I would like to proceed is hear statements --

6   State's side of this and their position on aggravation,

7   then hear the defendant's position on mitigation.   Then

8   I'll hear some argument by both sides.   And then at the

9   conclusion of the argument -- and I'm going try to be

10  quiet during all of that -- I'm going to ask some

11  pretty tough questions of both sides, particularly on

12  this side (indicating).

13       So we'll see how it goes.   I'm sure we are

14  going to go beyond today.   As I have indicated to the

15  attorneys, we are going to hear one witness this

16  morning, hear more witnesses this afternoon in another

17  courtroom, 213, probably start up around 1:30, and then

18  we'll go into tomorrow, and if we go past tomorrow, we

19  go past tomorrow.   I'm not sure what courtroom we are

20  in tomorrow, but probably 213, also.

21       Mr. Evans, if you are ready to go.

22     MR. EVANS:   Yes, Judge.   People would call

23  Mr. Kelly to the stand, Paul Kelly.

24     THE COURT:   Mr. Kelly, please step forward and

6

C 3316

1   raise your right hand.

2                    (Thereupon the witness was duly sworn.)

3        THE COURT:  Go ahead.

4                         PAUL KELLY

5   called as a witness on behalf of the Plaintiff, after

6   having been first duly sworn, was examined and

7   testified as follows:

8                    DIRECT EXAMINATION

9                    BY MR. EVANS:

10       Q    Sir, tell us your name, please.

11       A    Paul Kelly.

12       Q    And, Mr. Kelly, what is your present

13  profession?

14       A    I'm executive director of Independence

15  Village.

16       Q    What is the Independence Village, sir?

17       A    It's an independent retirement community, not

18  a nursing home.  Most of the residents there still

19  volunteer their time.  Our goal is basically to let

20  them continue living independently as long as possible.

21       Q    Where is Independence Village located?

22       A    1201 West Northmoor in Peoria.

23       Q    How long have you been employed as a director?

24       A    Since February of 1999.

                                        C 3317        7

1     Q     You said, we are not a nursing home.  Explain
2  what you mean by that.
3     A     Well, majority of our residents have lived
4  there for many years, some more than ten years, and
5  they are able to take care of their own day-to-day
6  activities generally and live in an independent setting
7  rather than skilled nursing facility.
8     Q     Did you have an occasion to meet a resident,
9  new resident in the summer of 2004 by the name of Alice
10  Varga?
11     A     Yes.  I meet all the residents prior to them
12  moving in, and when they move in, go over the residence
13  handbook and several things about Independence Village.
14     Q     Is this something then that you did
15  specifically with Alice Varga?
16     A     Yes, I did.
17     Q     The evidence in this case shows that Ms. Varga
18  at that time would have been 84 years old.  Is that
19  your recollection, her age being approximately 84?
20     A     I believe so.
21     Q     At that time when she first came, what was she
22  coming into Independence Village as?  Is there any
23  classification of care and treatment?
24     A     No.  All of the residents come in living

C 3318

8

1    independently.  There is a home health agency in the

2    building.  So should they need some supplemental

3    health, they are able to get that within the confines

4    of their own home.

5        Q    So when she first came into your establishment

6    to live, she came as an independent person; is that a

7    fair characterization?

8        A    With some support services, yes.

9        Q    Do you recall what support services?

10       A    Initially, I believe it was -- and this is

11   offered to everyone that comes in -- escorts for three

12   days until they learn the lay of the land.  And I don't

13   know specifically what other services she might have

14   had.  She may have had medication reminders, things

15   like that.

16       Q    Now, with regard to Mrs. Varga, did she pay --

17   or can you explain to the Court, please, the manner and

18   the mechanism of payment for her stay at Independence

19   Village?

20       A    Yes.  It's all private pay.  They pay their

21   own bill every month.  There is no supplement from

22   Medicare or any type of insurance.

23       Q    So every month, then, is the individual

24   resident billed by your --

C 3319

1    A   Yes.  We send a statement usually by the 26th,

2    27th of the month, and then the rent is due for the

3.   next month on the 6th.

4    Q   Now, at the time that Mrs. Varga came into

5    Independence Village, was she also with an individual

6    by the name of Frank Picl?

7    A   Yes.

8    Q   And do you see Mr. Picl in court today?

9    A   Yes, I do.

10    Q   Could you describe him and point to him?

11    MR. TONER:  Stipulate to the identification of

12  Mr. Picl.

13    MR. EVANS:  That's fine.

14    THE COURT:  Let the record show this witness has

15  identified Mr. Picl.

16    MR. EVANS:  Q  Now, at the time that you --

17  strike that.

18    Had you known Mr. Picl before you met her -- met

19  him at the time Mrs. Varga became --

20    A   No.  This was the first time I met him.

21    Q   What was your relationships with Mr. Picl in

22  relation to Mrs. Varga when she came --

23    A   He initially made the contact with our sales

24  director, came, toured the apartment.  Generally set up

C 3320

1  all of the arrangements for her coming in.

2      Q    And did Mr. Picl on occasion likewise visit

3  Mrs. Varga?

4      A    Yes, he did.

5      Q    Do you recall with what regularity?

6      A    Very regularly.  I mean, we saw Frank pretty

7  often.

8      Q    When you saw Frank, as you characterize it,

9  was it for the purpose of visiting Mrs. Varga?

10     A    Yes.

11     Q    Now, at some point after her -- during her

12  stay, did you have some questions concerning her --

13  payment of her I guess you would call it rent?

14     A    Yes.  Generally, we expect it by the 6th, but

15  if someone is getting a social security check or it's

16  coming from a trust, we certainly give four or five

17  days leeway.  Then we send out a letter to remind

18  people.  If it gets to, say, the 20th of the month,

19  usually I'll follow up with a phone call just to see if

20  there is a problem.

21     Q    Let me back up a moment.  When you first met

22  Mrs. Varga when she first came to Independence Village,

23  how would you describe her?

24     A    She was very lively.  Kind of a spunky little

C 3321    11

1    lady.  Very conversational.  Really was looking forward

2    to and I think enjoyed the socialization with the

3    people there.  She was very happy and I think grateful

4    that her husband, Frank, had left her well provided

5    for, and I think she was looking forward to kind of

6    living in a manner in which she was really looking

7    forward to.

8        Q    And during the time at least initially now

9    when she was staying at Independence Village, did she

10   appear to enjoy living at your establishment?

11       A    Yes, I believe so.

12       Q    Now, with regards to payment of Mrs. Varga --

13   is rent the proper term?

14       A    Yes.

15       Q    What, if anything, occurred -- what, if

16   anything, did you do when there first became questions

17   about her timely payment?

18       A    Initially, I was the one that made several

19   follow-up calls either to Frank or his office that

20   we're getting late in the month and certainly we need

21   to take care of this.  As time went on, we did get some

22   checks back NSF from the bank that we got late in the

23   previous month.

24       Q    NSF being not sufficient funds?

C 3322        12

1    A    Yes.

2    Q    Probably a stamp like they do on the checks?

3    A    Yes.

4    Q    After receiving those checks back, what would
5    you do, if anything, to follow up, sir?

6    A    I would certainly follow up with a call.  You
7    know, procedure is we would get a cashier's check or
8    some sort of a bank check if there had been an occasion
9    like that.  So that's what we did as far as following
10   up.

11   Q    On the occasions you followed up and talked
12   with the defendant, what, if anything, would occur
13   after those conversations?

14   A    Generally, they were taken care of within a
15   matter of a few days.  We did at one point offer to
16   give ACH which is an electronic draft which a number of
17   our residents do for convenience.

18   Q    Who did you give that or make that offer to?

19   A    I made the offer to Frank and I left the form.
20   I don't believe the form was ever picked up.
21   Certainly, we did not receive it back.

22   Q    Now, did this activity concerning a late
23   payment, did that continue for Mrs. Varga?

24   A    Yes.  It continued for several months.

C 3323                13

1        Q      During that time, what, if anything, did you

2    do, sir?

3        A      Well, you know, initially I contacted Frank.

4    I then contacted the state's attorney's office because

5    Alice had indicated to me in coming in and in several

6    conversations that she would never have to worry about

7    that, and certainly getting checks back there was some,

8    I guess, red flags.  Our company has 60 properties and

9    they kind of let us know things to look for as well.

10       Q      So the occurrence of a lateness of payment

11   that was occurring in Mrs. Varga's case, how would you

12   characterize it?  Was that a common occurrence or

13   uncommon?

14       A      No.  I have been there seven and a half years

15   and I have had maybe two instances where I have had to

16   call people later in the month and really one other

17   instance of checks coming back.

18       Q      Now, with your concern about the payments of

19   Mrs. Varga, what did you do, sir, with regard to

20   reporting it to any agency?

21       A      I contacted the state's attorney's office and

22   just let them know that, you know, I didn't know that

23   anything was taking place, but certainly wanting to be

24   responsible and putting it to the authorities who can

C 3324      14

 1  certainly follow up on something like that through the
 2  proper channels.

 3      Q    Did you report that to Mr. Kevin Lyons, the
 4  State's Attorney of Peoria County?

 5      A    Yes, I did.

 6      Q    Shortly thereafter, are you aware that an
 7  investigation began into the activities?

 8      A    Yes.

 9      Q    I want to draw your attention to approximately
10  February -- or, actually, March of 2005.  Were you
11  present during a conversation between investigators of
12  the state's attorney's office with Mrs. Varga?

13      A    Yes.  Yes.  Each time they came they asked me
14  to be present with her.

15      Q    And specifically can you tell us about a
16  meeting between the investigators and Mrs. Varga, and I
17  believe it was March of 2005.

18      A    Well, I believe that was when we had to inform
19  her that there was no money left, that, you know,
20  certainly there were some red flags and they were
21  pursuing an investigation to find out what had happened
22  with her funds.

23      Q    Was it indicated to her the amount of funds
24  that were missing from her account?

C 3325          15

1    A    I think a ballpark was indicated to her.

2    Q    Was that approximately in excess of $250,000?

3    A    Yes.

4    Q    Were you present when she received that news?

5    A    Yes, I was.

6    Q    Can you describe her -- the effect that that

7    news had on her, please?

8    A    Well, she was devastated.  Her husband who was

9    Frank, also, had -- they had not had children.  She

10   thought of Frank as a son, had placed complete trust in

11   him.  And, unfortunately, you know, she looked at her

12   husband and he was a good provider and that's what he

13   had done for her and that's something she was very

14   proud -- she was very proud to live at Independence

15   Village.  It was a very nice place.  And I think she

16   was devastated because she didn't -- she had not ever

17   had to worry about things like that.  Frank had taken

18   care of that, her husband, and then Frank Picl had

19   taken care of that for the last several years.

20   Q    After she had received the news that her

21   money, in essence, was gone or missing at that time,

22   can you describe her demeanor thereafter, sir?

23   A    Well, she was obviously distraught.  You know,

24   certainly her whole outlook changed.  What she had

C 3326    16

1   expected would be the remainder of her life --

2       MR. TONER:  Objection.  Speculation, what she would

3   have expected.

4       THE COURT:  Sustained.

5       MR. EVANS:  Q  Can you describe her demeanor,

6   sir, not what she --

7       A    She was devastated.

8       Q    When you say she was devastated, what did you

9   see about Ms. Varga that leads you to say that?

10      A    She had several falls within the next week.

11  Went to the point where she needed 24-hour care from

12  Spoon River Home Health.  Started to have meal trays

13  sent up to her room rather than down in the dining

14  room.

15      Q    All these effects occurred after being told

16  that her money was no longer available; is that

17  correct?

18      A    I know she had had some services from Spoon

19  River prior to, but I do know that the, you know,

20  meals, the falls, some of those things occurred after.

21      Q    Other than the physical effects, did you see

22  any personality changes that you saw?

23      A    Well, probably was up there two or three times

24  a day.  Initially, the caregivers that were with her

C 3327        17

1   were very attentive and certainly understood that she

2   was distraught about this, but, you know, she needed

3   reassurances that we weren't going to put her out on

4   the street and that some accommodations would be made

5   until, you know, there was some sort of a plan.

6        Q    Now, following this notification to

7   Mrs. Varga, did you attempt to work out some

8   arrangements so she could stay there for a period of

9   time thereafter?

10       A    Yeah.  I talked to my boss and then a

11  representative of the state's attorney's office took

12  care of paying her rent through a certain period as

13  well as taking care of some bills with Spoon River Home

14  Health, I believe.

15       Q    At some point, however, Mrs. Varga moved out

16  of Independence Village?

17       A    Yes, she did.

18       Q    And where did she move to, sir?

19       A    I believe she moved to Bellwood Nursing Home.

20       Q    And how is Bellwood characterized?

21       A    It's a county-run nursing facility.  It is a

22  skilled nursing facility and a lot of the people that

23  are there are people that do not have the wherewithal

24  or the funds to be in other facilities.

C 3328          18

1      Q     Prior to being told that she no longer had any

2   money left in her accounts, did Mrs. Varga ever

3   indicate to you that she had ever any kind of plans to

4   move into Bellwood Nursing Home from Independence

5   Village?

6      A     No.

7      MR. EVANS:   No further questions.

8      MR. TONER:   Couple, if I may.

9                     CROSS-EXAMINATION

10                    BY MR. TONER:

11     Q     You say that you think that she may have had

12  some Spoon River Health Care prior to this being told

13  to her?

14     A     Uh-huh.

15     Q     Is that correct?

16     A     Yes.   I believe she did.

17     Q     And one of those things involved the fact that

18  she had fallen prior to this, too, correct?

19     A     Oh, certainly.

20     Q     And, in fact, one of the reasons that she was

21  put in there, it was your understanding, is that she

22  was falling at her home, correct?

23     A     Well, that's not necessarily -- I believe that

24  she needed to be around people and needed more services

19

C 3329

1    than she was getting at her home.

2        Q    Now, you said that Belwood is a skilled

3    nursing facility?

4        A    Correct.

5        Q    And so there were services that she needed at

6    Bellwood, correct?

7        A    Certainly.

8        Q    And those were some of the services that

9    weren't necessarily provided at Independence Village

10   because of the type of nature that your organization

11   has?

12       A    No.  Because Spoon River who is in our

13   building is Medicare certified.  They are basically

14   able to provide many of the same services as skilled

15   nursing facility.  This was a move necessitated by

16   finances.

17       MR. TONER:  I don't have any further questions.

18       MR. EVANS:  No further questions, sir.

19       THE COURT:  You can step down.  Thank you.

20               (Witness excused.)

21       THE COURT:  Does that conclude what you want to do

22   this morning, Mr. Evans?

23       MR. EVANS:  People have no additional witnesses for

24   formal aggravation.

C 3330

1    THE COURT:  So now we turn to you, Mr. Toner, and
2  we'll pick up at 1:30.

3    MR. TONER:  Judge, just for scheduling, during the
4  recess I contacted all my professional witnesses who
5  were going to be here today.  They can all be here
6  tomorrow morning with the exception of Mr. Gilroy who
7  is in Lincoln down there because he's all tomorrow.  So
8  he'll be the only witness I would call on Wednesday.

9    MR. EVANS:  Judge, respectfully, I would object.
10  Certainly, the defense has known for a number of
11  months, a number of months about this hearing and
12  sentencing set for today.  For them not to have a
13  witness when they have been told as the State has that
14  we were to start this morning at 9:00 a.m. on the 25th,
15  and it's the People's position that they should have
16  had all of their witnesses available, just as they
17  should have had all these numerous letters which have
18  been collected in the community within the last couple
19  of days.  It's the People's position that we would ask
20  the Court before the sentencing, we would like to move
21  along something extraordinary, but I think it's a
22  question of not having the witnesses available in a
23  timely manner even though they have had a number of
24  months to have these witnesses available.

C 3331

21

1      THE COURT:  Unless we think we are going to get
2  done at 10:00 tomorrow morning, which I doubt we are,
3  I'm going to accommodate you.  We had all three days
4  blocked off.
5      MR. TONER:  Thank you, Judge.
6      THE COURT:  Looks like we are into Wednesday.
7          With that, we will go off the record and pick
8  back up at 1:30 in Courtroom 213.
9              (Recess taken.)
10     THE COURT:  Let's go on the record.  This is People
11  versus Picl, again, Case No. 05-CF-275.  All parties
12  are present with their respective attorneys.
13         We heard the State's evidence this morning on
14  aggravation.  We are ready to hear, I think, the
15  defense's evidence on mitigation.
16         Before we do that, I just want to make sure we
17  are all on the same page.  Mr. Evans, if you look at
18  your Count 5, I just want to point something out to you
19  and you can look at this maybe at a break or something,
20  but there is no subsection that you cited in that
21  statute.  There's no Subsection 2C.  So I think I
22  know --
23     MR. EVANS:  Judge, I see what the Court's talking
24  about.  I could -- I mean, that would be an error in

C 3332        22

1  terms of the preparation mechanically. I could make

2  the change.

3      THE COURT: You can look at it and then maybe

4  advise me some time today as to what that all means and

5  I can hear from the defense, too, on that. All right.

6          Mr. Toner, ready to go?

7      MR. TONER: We are, Judge.

8          Please the Court. We would call Reverend

9  Macaulay first.

10     THE COURT: Sir, please step forward and raise your

11  right hand in front of the clerk.

12              (Thereupon the witness was duly sworn.)

13     THE COURT: Have a seat right here and pull that

14  door.

15         Go ahead.

16                  W. CLAY MACAULAY

17  called as a witness on behalf of the Defendant, after

18  having been first duly sworn, was examined and

19  testified as follows:

20                DIRECT EXAMINATION

21                BY MR. TONER:

22     Q    Please state your name and spell your last

23  name for the court reporter.

24     A    My name is W. Clay Macaulay, and the last name

C 3333          23

1    is spelled M-A-C-A-U-L-A-Y.

2        Q    And your occupation or profession, please?

3        A    I am a pastor Presbyterian at Westminster

4    Presbyterian Church in Peoria on Moss Avenue.

5        Q    How long have you been a pastor at that

6    particular church?

7        A    Six and a half years.

8        Q    In that capacity, do you know Frank Picl?

9        A    I do.

10       Q    And is he one of your congregation members?

11       A    He is.

12       Q    And have you had an occasion to meet with him,

13   consult with him and talk about these events?

14       A    I have.

15       Q    And, particularly, I'm going to direct your

16   attention to the last -- approximately 18 months ago,

17   did Frank come and seek you out?

18       A    That's correct.

19       Q    And can you tell the judge the circumstances

20   concerning that?

21       A    Yes.  As pastor, I read in the newspaper the

22   situation involving Frank, and as pastor I called Frank

23   to say I want you to know that the support of your

24   church is there and left a message for him to that

C 3334    24

1  effect.  And I think within 24 hours, as I recall,

2  Frank called me and asked if he could come see me and I

3  said, by all means.  And he came to see me at the

4  church and we spoke at length on that occasion.

5      Q     And do you recall that first occasion that you

6  met with him after that phone call his demeanor and how

7  he appeared?

8      A     I recall it penitent.  And if I may expound

9  upon that.

10     Q     Go ahead, please.

11     A     I would say it was an interesting just of

12 position that Frank was coming to see me, as I recall,

13 during holy week, the season between Palm Sunday and

14 Good Friday, and he came to see me during that week and

15 was expressing remorse over the circumstances involving

16 the charges against him.

17     Q     In addition to his being penitent or

18 expressing remorse, other recollections about how he --

19 besides being sorrowed, did he seem upset, did he seem

20 in good control of himself?

21     A     I was certainly impressed with his demeanor

22 and his sense of control over himself.  He definitely

23 sensed the gravity of the situation as I heard it and

24 was expressing the seriousness of that charge and that

C 3335      25

1   he, as I recall, was indicating he made some mistakes

2   and was looking to make ways better for him to become

3   in better control of his life.

4        Q    And did he -- did the two of you discuss the

5   areas of his life that did not appear to be in control?

6        A    One that came particularly to mind at that

7   time was his dependence on alcohol. And as I recall

8   that conversation, this was right before Frank was to

9   go into alcohol rehabilitation and had indicated to me

10  he would be away for some time for that and we

11  discussed how that was a positive step in regaining a

12  sense of control over his life..

13       Q    And, to your knowledge, did he follow through

14  on that going through with the alcohol treatment and --

15       A    To my knowledge he did, that is correct.

16       Q    Did he talk to you then or at some subsequent

17  time at all about gambling?

18       A    Also on that occasion I recall his indicating

19  his difficulty with gambling, that is correct.

20       Q    Now, you mentioned the holy week meeting with

21  him, and I imagine being a pastor you are pretty busy

22  during that time. He left shortly after Easter, in

23  fact, on Easter Sunday of '05 to go up to Minnesota.

24  While he was in Minnesota or when he got back, did you

C 3336          26

1    keep in touch with him either directly or indirectly?

2        A    Indirectly.  I did try on one or two occasions

3    to dial a phone number that I had accessible, learned

4    either that the mailbox was full, his voicemail or the

5    line was disconnected.  On one occasion I seem to

6    recall leaving a message, and I believe his sister --

7    and I believe it was his sister, Mary, called me and

8    said Frank appreciates the concern and we spoke about

9    the situation in that phone conversation.

10       Q    And is Mary, is she or has she been a member

11   of your congregation as well?

12       A    That's correct.

13       Q    In fact, is his whole family --

14       A    The whole family --

15       Q    -- has gone to church --

16       A    -- have had a long-standing involvement with

17   Westminster Presbyterian.

18       Q    When Frank came back, has he seen you in the

19   last 18 months?

20       A    Yes.  And most recently within the last week

21   as contact has been made and with my colleague,

22   Reverend Anna Saxon, an arrangement was made for Frank

23   to come and actually speak with both of us, and he did

24   so last Thursday afternoon and we talked for an

C 3337

27

1   extended period on that afternoon.

2       Q    If you could recall, please -- and I assume

3   you have seen Frank at some points, if not between then

4   and now -- how he appears differently, if he does,

5   between holy week of '05 and now?

6       A    One change I noticed was I believe he has an

7   even greater understanding of the difficulty he had

8   both with alcohol and with gambling, and I felt that

9   the time in his alcohol rehabilitation was a time of

10  greater awakening of himself, awareness of himself, and

11  we spoke at greater length on the second time when we

12  saw him within the last week of his difficulty with

13  gambling.

14      Q    Okay.

15      A    So I sense that he had a greater sense of the

16  problems he has had with alcohol and with gambling and

17  he said to me that he has not had a drink in that

18  period of time and I believe him.

19      Q    Now, you have been a Reverend for a period of

20  time?

21      A    Twenty years.

22      Q    And you indicate that most recently you talked

23  with Reverend Saxon and Frank for a couple of hours?

24      A    Correct.  Almost two and a half.

28

C 3338

1    Q    I assume you hear people come to you with all

2  kind of things?

3    A    That's correct.

4    Q    I don't know if this is a proper question, but

5  were you able to get a feeling as to whether or not he

6  was sincere about what he was telling you and his

7  intentions here?

8    MR. EVANS:  Object.  I object to the form of the

9  question.

10    THE COURT:  Could you elaborate on that?

11    MR. EVANS:  The feelings of the witness, Your

12  Honor, is irrelevant to this issue.

13    MR. TONER:  I can rephrase the question.

14    THE COURT:  Go ahead.

15    MR. TONER:  Q  Did you have an impression during

16  this conversation that he was being sincere with

17  you?

18    A    My impression was that he was sincere.

19    Q    And what is that impression based upon?  What

20  things were you seeing or what was he saying that would

21  cause you to reach that conclusion?

22    A    The initial expression of remorse, the seeking

23  of help, the following through on his getting help, his

24  being willing to talk about the help he needed and has

29

1    received and his sense of the problem that he continues

2    to face in terms of the charges that are before him.

3         Q     Did he indicate to you that he was going to

4    continue moving forward towards this facing what he has

5    to face, including his addiction problems?

6         A     He did.  He did indicate how he would continue

7    with his meetings with Alcoholics Anonymous, for

8    example, and how he has been involved with that with

9    actually, I think, numerous groups and continuing to

10   seek the help that he needs with that particular

11   dependency.

12        MR. TONER:  If I may have a moment, Judge.

13             I don't have any further questions of this

14   witness, Your Honor.

15        THE COURT:  Mr. Evans.

16        MR. EVANS:  Thank you, Judge.

17                     CROSS-EXAMINATION

18                      BY MR. EVANS:

19        Q     Sir, you are in the business of talking to

20   persons who come to you as members of your church

21   community; is that a fair statement?

22        A     That's correct.

23        Q     And when had you last seen the Defendant Frank

24   Picl before holy week of last year, sir?

                                                          30

C 3340

1       A    I had seen him on at least one occasion at

2   formerly Jumer's Hotel, the restaurant, now the

3   Radisson Hotel.

4       Q    When was that, sir?

5       A    That would have been about three years ago as

6   I recall.

7       Q    And it was only during holy week of 2005 in

8   April last year that he came to you and talked with you

9   about his criminal problems?

10      A    That is correct.

11      Q    And at that time, did he tell you that he had

12  taken money from an 85-year-old woman?

13      A    As I recall that conversation, he did.

14      Q    Did he tell you that he took approximately

15  $280,000 from that woman?

16      A    I had understood a figure comparable to that.

17  Perhaps 250,000.

18      Q    And did he also tell you that when he did that

19  he was acting as her attorney?

20      A    He did.

21      Q    And certainly you were concerned with the

22  information that he gave you?

23      A    Most definitely.

24      Q    Just as you would have been concerned as a

31

C 3341

1    pastor with the victim of that crime, Mrs. Varga?

2        A    I would be concerned of anyone in that

3    situation, yes, sir.

4        Q    These conversations with you, sir, were only

5    after he was arrested in March of 2005; is that

6    correct?

7        A    The conversation when he came to speak with me

8    in my study, that is correct.

9        Q    Now, you also indicated that the defendant

10   went into alcohol treatment following your

11   conversation, correct, sir?

12       A    Yes.

13       Q    And he followed through, as you described it,

14   with his treatment program, I think he went to,

15   according to counsel, Minnesota somewhere?

16       A    I believe that is correct.

17       Q    Again, these were events that occurred only

18   after he was arrested, correct?

19       A    Conversation, and, yes, his going for alcohol

20   rehabilitation that I'm aware of, yes.

21       Q    Now, in your role, sir, there's probably many,

22   many of your parishioners that you have talked with

23   about personal problems; is that a fair statement?

24       A    Yes, it is.

C 3342

1    Q    And, sir, you have also, I'm sure, talked to

2  many persons in your church community that perhaps

3  drank too much or are alcoholics?

4    A    Yes.

5    Q    And is there also other persons in your

6  community that perhaps have talked with you about the

7  fact that they go to the boat, they go to different

8  gaming establishments such as the Par-A-Dice Casino?

9    A    On some occasions, yes.

10    Q    On those occasions when those persons talk

11  with you, you counsel them and talk with them in your

12  role as their pastor; is that correct, sir?

13    A    That's correct.

14    Q    When you talked with Mr. Picl, did he ever

15  tell you that the reason he stole this woman's money is

16  because -- solely because he drank too much?

17    A    He certainly gave drinking as a primary reason

18  for his gambling, but I don't recall his saying that

19  was the sole purpose of his gambling.

20    Q    And did the defendant ever talk with you about

21  his ability to perform in these very courtrooms in the

22  county as a public defender?

23    A    He did discuss that.

24    Q    Did he ever tell you how much money he used of

33

C 3343

1  Mrs. Varga's to gamble?

2      A    That is a detail I cannot recall his giving me

3  initially if you are referring to that first

4  conversation.

5      Q    At any time?

6      A    In the second conversation that we had, that

7  figure was mentioned.  And as I mentioned, I think it

8  was in the neighborhood of 250,000, if I remember

9  correctly.

10     Q    So it's your best recollection the defendant

11 told you that he spent approximately $250,000 of this

12 money on gambling activities?

13     A    That is what I recall.

14     Q    Did he ever tell you what he did with the

15 money of Mrs. Varga that he didn't use for gambling?

16     A    No.

17     Q    He never talked about that.  Thank you, sir.

18     MR. EVANS:  No further questions.

19     THE COURT:  Mr. Toner?

20     MR. TONER:  Couple follow-ups, if I may.

21

22

23

24

C  3344

1                    REDIRECT EXAMINATION

2                    BY MR. TONER:

3       Q     Reverend, in AA, they have an expression about

4    bottoming out or hitting bottom.  Is there something

5    that's comparable in your profession?  I mean, is it

6    unusual for people to wait until things are pretty

7    bleak until they talk to you?

8       A     In our particular faith system, we have an

9    expression of an awakening, a sense of we have done

10   something wrong and we turn from that and turn towards

11   in our belief God and ask for God's mercy and

12   forgiveness and help in seeking a better life.

13      Q     Now, the $250,000 that you mentioned, that's

14   what Frank said this money was involved, correct?

15      A     That's my understanding.

16      Q     Do you recall specifically if he gave a

17   breakdown of whether it was gambling or what he had

18   spent it on or did he?

19      A     This is where I'm having some difficulty

20   remembering specifically.  I thought I understood the

21   gambling.  There may have been some living expenses

22   involved with that.  That's what I --

23      Q     You don't have a particular recollection if he

24   did talk about what they were?

35

C 3345

1      A    Other than just living expenses.

2      MR. TONER:  Nothing further.

3      MR. EVANS:  No further questions.

4      THE COURT:  You can step down.  Thank you,

5   Reverend.

6                   (Witness excused.)

7      MR. TONER:  Call Doris Bernard.

8                   (Thereupon the witness was duly sworn.)

9                        DORIS BERNARD

10  called as a witness on behalf of the Defendant, after

11  having been first duly sworn, was examined and

12  testified as follows:

13                   DIRECT EXAMINATION

14                     BY MR. TONER:

15     Q    Good afternoon.

16     A    Hi.

17     Q    Please state your name and spell your last

18  name for the court reporter.

19     A    Doris Bernard.  B, as in boy, E-R-N-A-R-D.

20     Q    And, ma'am, where do you live?

21     A    I live at 3509 North Gale in Peoria.

22     Q    And are you employed outside the home?

23     A    Yes.

24     Q    What is it you do?

36

C 3346

1      A      I'm a floral designer at Geier Florist in West

2   Peoria.

3      Q      And do you know Frank Picl?

4      A      I do.

5      Q      And can you tell the judge, please, how long

6   you have known him and how you became acquainted with

7   him?

8      A      I have known Frank about 24 years.  I met him

9   in a courtroom.  He was the defense attorney and I was

10  serving on the jury.

11     Q      And I want to expand a little bit.  You have

12  written a letter.  So we won't cover those things, but

13  there came a time, as you indicate in your letter, that

14  your own son needed an attorney and you contacted

15  Frank, correct?

16     A      Correct.

17     Q      Do you recall approximately what year that

18  was?

19     A      1982.

20     Q      And your son, Jeff, had been in a serious car

21  accident?

22     A      Correct.

23     Q      And this occurred a short time after you saw

24  Frank's performance in the courtroom?

C 3347

37

1    A    A matter of days, yes.

2    Q    And you contacted Frank to represent your son?

3    A    Yes.

4    Q    Now, can you elaborate briefly the -- what

5  happened to your son and the circumstances -- it was a

6  serious car accident, correct?

7    A    Yes.  He was in a car accident on a country

8  road.  He was a senior in high school at the time, just

9  before his 18th birthday.  He was thrown from the car.

10  He was left paraplegic for life.  It was a real

11  difficult time for Jeff, but for all of us.  And that's

12  how we came to know Frank.  I had met -- not met him

13  personally, but I had seen him in the courtroom and I

14  went home and I was impressed with him.  I said if I

15  ever need a lawyer I want to hire Frank Picl.  So we

16  went to see him and hired him.

17    Q    At that point in time, what were Jeff's plans

18  as far as going to college?

19    A    Before the accident, Jeff had all but a

20  nomination to the Air Force Academy from Bob Michel,

21  and that was his plan.  So, of course, immediately the

22  day after the accident he knew that would not be

23  possible.  So then his second choice was to go to the

24  University of Illinois because that was a favorite of

C 3348

1    his.  So he was determined that that was where he

2    wanted to go.  He didn't know how.  He didn't know how

3    he would manage it physically or financially or

4    anything, but that was what he wanted to do.

5        Q    In addition to serving as Jeff's lawyer, would

6    it be fair to say that he assumed other duties as kind

7    of like almost a mentor?

8        A    Yes.  Frank spent a lot of time with Jeff,

9    just trying to uplift his spirits and his affirmation

10   in himself that even though he would have to spend his

11   life in his wheelchair that his life was not over, that

12   there were many things out there that he could do and

13   that he would have to be stronger now than he'd ever

14   been in his life.  He just was excellent to help Jeff

15   be determined and be strong and overcome all these

16   obstacles.

17             He had six surgeries after the initial

18   surgery.  It was a long haul, but he did go to U of I.

19   He graduated in five years because of all the surgeries

20   he had to go through, but regardless of what hospital

21   Jeff was in, Frank was always there.  He came to our

22   house when Jeff was unable to get out.  He -- we went

23   to the office.  He was just always there, always like a

24   cheerleader for Jeff to help him realize that life had

C 3349

1    things out there for him to do that were well worth

2    doing and could be accomplished if he so wanted to, you

3    know.  So, yes, he was a big influence on Jeff.  In

4    fact, Jeff is an attorney today because of that fact.

5         Q    And he works for the Attorney General's Office

6    in Springfield?

7         A    Well, State of Illinois.

8         Q    In the last year or so, have you had an

9    occasion to talk to Frank and do you stay in touch with

10   him?

11        A    Well, I hadn't over the last several years,

12   but I did write him a note after I read in the paper

13   what had happened just to let him know that we cared

14   and that we were there and that our faith in him had

15   not changed, that he had proven himself to us long ago

16   and that the Frank Picl that we knew is a good man and

17   we knew that even if he had done wrong he would come

18   around and do the very best he could to make it right

19   because that's Frank Picl.  So, yes, I wrote him a note

20   and I talked to him several times over the last year

21   and not at great length on any subject, but just to let

22   him know that we care.

23        Q    And you have known him for roughly 25 years?

24        A    Right.

1    Q    Do you up until what you have read about this

2    and he's pled guilty, so it's true, you understand

3    that, do -- would you still -- you said you continue to

4    believe in him.  Would it be fair to say then that you

5    would take him at his word?

6    A    Absolutely.

7    Q    Have you talked to him during these -- any of

8    these conversations about pursuing his recovery and how

9    he's doing there?

10    A    I have.

11    Q    And did he seem sincere about that?

12    A    Oh, absolutely.  He talked -- most recently

13    sounded like the Frank Picl that I knew from the very

14    beginning, you know, strong and determined.  He knew

15    that he had done wrong, but he was determined to make

16    the best of his life that he could, and, you know,

17    that's all anyone can ask.  He's a good man.

18    MR. TONER:  If I may have a moment, Judge.

19    I don't have any further questions of

20    Ms. Bernard.  Thank you.

21    THE COURT:  Mr. Evans.

22    MR. EVANS:  Thank you, Judge.

23

24

41

1                    CROSS-EXAMINATION

2                    BY MR. EVANS:

3        Q    Ma'am, when was it that you first met the

4    defendant?

5        A    Twenty-four years ago.

6        Q    And your son's unfortunate accident was that

7    same time period, ma'am?

8        A    Right.

9        Q    And you are thankful for everything the

10   defendant did for your son starting 24 years ago,

11   correct?

12       A    Right.

13       Q    And your opinion about him has not changed in

14   terms of him being a good man, in your words, even

15   though if I were to tell you he took almost $280,000

16   from an 85-year-old woman?

17       A    That's unfortunate.  I'm very sorry that he

18   did that, but --

19       Q    But would your opinion about him change,

20   ma'am?

21       A    Not as a person, no, because I know inside he

22   is still a good person.  He made some bad choices.  He

23   did some bad things, but that doesn't make him a bad

24   person.

1    Q    .Aside from being a bad person, did you talk

2    with the defendant at all in these conversations about

3    what he actually did, how he took this money?

4    A    Well, I didn't talk to him about how he did

5    it.  He, you know, admitted what he had did and he said

6    he was sorry and wrong.

7         He told me about going to AA, and, you know,

8    we didn't go into great detail on anything, but I could

9    tell that -- you know, Frank is -- he knows that --

10   well, that there are just things in life that we each

11   do that we're sorry for that we can't go back and undo.

12   We can maybe never make them totally right.

13   Q    Did he handle your son's case appropriately 24

14   years ago?

15   A    Yes.

16   Q    And that would have been back in 1982, '83?

17   A    '83, uh-huh.

18   Q    And other than what the defendant has told

19   you, you know nothing about how he handled Mrs. Varga's

20   matters or estate, or I should say her finances, do

21   you, ma'am?

22   A    Right.

23   MR. EVANS:  Thank you.

24   THE COURT:  Mr. Toner?

43

C 3353

1    MR. TONER:  I don't have any further questions.

2    Thank you.

3       THE COURT:  You can step down.  Thank you.

4              (Witness excused.)

5       MR. TONER:  Call Steve Bradbury.

6       THE COURT:  Sir, step forward, please, and raise

7    your right hand.

8              (Thereupon the witness was duly sworn.)

9                  STEVE BRADBURY

10   called as a witness on behalf of the Defendant, after

11   having been first duly sworn, was examined and

12   testified as follows:

13                 DIRECT EXAMINATION

14                 BY MR. TONER:

15      Q    Good afternoon.  Please state your name and

16   spell your last name for the court reporter.

17      A    Steve Bradbury, B-R-A-D-B-U-R-Y.

18      Q    And, Mr. Bradbury, your occupation and

19   profession?

20      A    I'm currently not working right now.

21      Q    And do you know Frank Picl?

22      A    I do.

23      Q    How long is it that you have known him?

24      A    I have known Frank approximately 18 months.

44

C 3354

1    Q    And how is it that you met him?

2    A    I met Frank -- I first met Frank at an AA

3  meeting and subsequently shortly after that at the

4  White Oaks Treatment Center.

5    Q    And are you involved in AA and at White Oaks?

6    A    Yes, I am.

7    Q    And in the treatment center, was that the

8  recovery meeting group?

9    A    Yes.  It's called the Men's Recovery

10  Management program, MRM.

11    Q    MRM?

12    A    MRM at White Oaks.

13    Q    You met him 18 months ago.  Can you tell the

14  judge with regard, first of all, to MRM, how often is

15  it that you meet?

16    A    Yes.  The MRM program at White Oaks is a

17  primary outpatient care, intensive outpatient care

18  program.  Part of that program involves alumni from the

19  program coming back on a weekly basis.  This is where I

20  met Frank.  I had gone through that program in August

21  of 2003 and came back on a weekly basis on Thursday

22  nights.

23    Q    So you came back to help out to go with --

24  that's why they call it the alumni meeting?

45

C 3355

1    A    Right.

2    Q    People come back to it?

3    A    Right.

4    Q    With regard to the alumni meetings on Thursday
5    night, you met him there.  On what type of a basis
6    would you see him there on Thursday night?

7    A    Of course, going back over a year and a half,
8    I can't say for absolutely positive, of course, when he
9    was in there in the aftercare program.  I would see him
10   on Tuesday nights and Thursday nights and since that
11   time very regularly on Thursday nights.  Frank has
12   continued to come as an alumni himself having completed
13   the program.  Not all of the alumni are able to come
14   back.  Frank certainly was one that has come back over
15   that time.

16   Q    With regard to -- so he comes back on a pretty
17   consistent basis?

18   A    Yes.

19   Q    And while it's encouraged, perhaps, and you
20   say not everybody can come back, it certainly is not
21   required, is it, that you come back?

22   A    No, absolutely not.

23   Q    Now, from the time you first met him with --
24   until today -- you talked to him there.  You talked to

46

C 3356

1    him at your AA meetings.  Did you form an -- from your

2    observation, have you seen any change over the last 18

3    months?

4        A     Absolutely.

5        Q     And can you tell the judge what you have

6    noticed and what you take as being significant about

7    those observations?

8        A     It's very difficult to explain because it's

9    such a dynamic change that happens and it's very subtle

10   and a lot of times it's -- it's what it means to me,

11   but, basically, the program over -- you know, being a

12   part of this program requires a lot of

13   self-examination.  Obviously, from my own experience,

14   you know, and from the experience that I have

15   witnessed, you know, people, especially new that are

16   just coming in, they say it's a thinking disease.  I

17   mean, convoluted thinking.  People start to -- people

18   start to -- they see things more as they are, more as

19   they -- really as they are, start to come to grips with

20   reality.  I know that's probably a poor explanation,

21   but people change.

22       Q     I have heard the expression that when you talk

23   about that, you are talking about alcoholism, the

24   thinking disease?

47

1    A    Correct.

2    Q    And somebody in prepping for this told me

3  it's --

4    MR. EVANS:  I object to counsel testifying now,

5  Your Honor.

6    THE COURT:  Sustained.

7    MR. TONER:  Q  You have heard the expression

8  90 percent thinking, 10 percent drinking?

9    A    I have, yes.

10   Q    That would describe alcoholism in the fashion

11 you are talking about?

12   A    Definitely.

13   Q    With regards to Frank personally, the things

14 that -- has he talked to you about, number one, these

15 charges?

16   A    I was -- I have been over the period of time

17 aware of the charges.  Frank has talked about the

18 charges, not in great detail to me.  However, you know,

19 I am aware.  Also, I have read in the paper.

20   Q    Are you aware of your observations of how he

21 approaches recovery?

22   A    Yes.  What my perception of is he's very

23 serious, he's involved.  He chairs meetings at Share

24 Clean Air two meetings a week.  I know 7:00 a.m. on

48

C 3358

1   Monday and 6:00 p.m. on Monday.  I see him at meetings

2   frequently.  I go to AA meetings myself personally

3   every day.  And then also at our treatment facility.

4   So I know he's involved.

5       Q    So you know he on a regular basis chairs two

6   AA meetings on Monday, the 7:00 a.m. and --

7       A    Right.  He is a cochair, but --

8       Q    Is he active in the MRM alumni group?

9       A    Yes.

10      Q    Have you had an observation concerning how he

11  helps to support particularly people who haven't made

12  it through their meeting?

13      A    Sure.  That's the purpose of the meeting, you

14  come back to help the new guys that are coming in.  You

15  share your experience.  That's what Frank does.  He's

16  there almost every week, as I am, and, you know, he's

17  trying to impart his experience and help the guys that

18  are just coming in, and that's what that program is

19  about and it's something that he does.

20      Q    Does he seem to be open with them, telling

21  them about what this has done with him?

22      A    Yes.

23      Q    Does he seem to have an impact, I mean, as far

24  as them listening to him?

49

C 3359

1      A      Yeah.  Well, it's hard to say.  I can't put

2    myself in somebody else's position.  I know that -- I

3    know that that period of time, that in treatment people

4    are, you know, dazed, confused.  This is not anyplace

5    anybody wants to be.  You know, I certainly didn't want

6    to be there, but --

7      Q      Are they helped out by people like you and

8    Frank's willingness to go back?

9      A      Right.

10      MR. TONER:  I don't have any further questions,

11    Judge.

12      THE COURT:  Mr. Evans.

13      MR. EVANS:  Thank you, Judge.

14                    CROSS-EXAMINATION

15                    BY MR. EVANS:

16      Q      Sir, the defendant you are telling us is a

17    member of AA meetings now; is that correct?

18      A      Yes.

19      Q      And that's Alcoholics Anonymous?

20      A      Yes.

21      Q      And the defendant started coming to these

22    meetings about 18 months ago?

23      A      Yes, sir.

24      Q      And that was after he was arrested; is that

1  correct?

2      A    Yes, sir, I believe that's correct.

3      Q    And you never saw the defendant prior to the

4  time he was arrested in March of last year, did you?

5      A    No, sir.

6      Q    And if I could ask you, sir, how long have you

7  been in the AA program?

8      A    Three years.

9      Q    Thank you.  Now, you say the defendant chairs

10 meetings.  He's the one who kind of runs the AA

11 meeting, a particular meeting from time to time; is

12 that correct?

13     A    Correct.  The AA meeting -- AA chair

14 facilitates the meeting.  He doesn't no more than pick

15 out, make sure the coffee is on, open the door, pick

16 the reading.

17     Q    So that's passed around among the members from

18 time to time?

19     A    On a volunteer basis.

20     Q    The defendant's explanation as to what he did

21 in taking money from this 85-year-old woman, did he

22 talk with you about that?

23     A    Generally.  Not specifically as in certainly I

24 have heard him share it.

Exhibit 22-2

51

C 3361

1    Q    Has he shared with you or the group as a whole

2    how much money he took from this woman?

3    A    I can't recall, but I would say -- well, I

4    can't recall for sure.  I know it was substantial.

5    Q    In his conversations with you or the group,

6    did the defendant say what he did with the money?

7    A    I'm not certain.

8    MR. EVANS:  No further questions, sir.

9    THE WITNESS:  Thank you.

10    THE COURT:  Mr. Toner.

11    MR. TONER:  Thank you.

12                    REDIRECT EXAMINATION

13                    BY MR. TONER:

14    Q    Mr. Bradbury, are you familiar with the term

15    hitting bottom?

16    A    Yes.

17    Q    Can you explain to the judge what that means?

18    A    Hitting bottom to me means to -- that a person

19    reaches a turning point where we can't continue to go

20    on the way we are going on and to seek help to change.

21    Q    So there is a correlation generally between

22    hitting bottom and seeking help?

23    A    Correct.  One is almost necessary for the

24    other to be effective.

C 3362

1       MR. TONER:  I don't have any further questions.

2    Thank you.

3                    RECROSS-EXAMINATION

4                    BY MR. EVANS:

5       Q    Sir, hitting bottom would also be consistent

6    with the defendant being arrested for taking this money

7    from the 85-year-old woman, correct?

8       A    It could very well, yes.

9       MR. EVANS:  Nothing further.

10      THE COURT:  Mr. Toner.

11                   REDIRECT EXAMINATION

12                   BY MR. TONER:

13      Q    Would it be fair to say, Mr. Bradbury, hitting

14   bottom would be consistent with almost as many

15   different things as there are people involved in AA?

16      A    Absolutely.

17      Q    Because that's what brings them to the

18   program, correct?

19      A    Correct.

20      MR. TONER:  Nothing further.

21      MR. EVANS:  No further questions.

22      THE COURT:  You can step down.  Thank you.

23                   (Witness excused.)

24      MR. TONER:  Call Michael Levan.

53

C 3363

1           (Thereupon the witness was duly sworn.)

2                      MICHAEL LEVAN

3  called as a witness on behalf of the Defendant, after

4  having been first duly sworn, was examined and

5  testified as follows:

6                    DIRECT EXAMINATION

7                    BY MR. TONER:

8      Q    Please state your name.

9      A    Michael Levan.

10     Q    And, Mr. Levan --

11     A    L-E-V-A-N.

12     Q    Do you know Frank Picl?

13     A    Yes, I do.

14     Q    How is it you know him?

15     A    I met Frank back in I believe it was either

16  '80 or '81.  I was a sophomore in high school.

17     Q    Did you have an occasion to have him represent

18  you in a criminal case?

19     A    Yes.  He was appointed my public defender.

20     Q    Since then, have you stayed in contact with

21  Frank?

22     A    Yes, I have.

23     Q    What's your occupation?

24     A    I'm a carpenter.

C 3364

1    Q   And did you some time after that experience in

2    the early '80s, did you and he have an occasion to help

3    put on an addition to his house?

4    A   Yes.  He had talked -- I had seen him around

5    town and if I was ever downtown I would stop by and say

6    hi to him.  He mentioned he bought the house on Merle

7    Lane and wanted to enclose to I believe it's called a

8    breezeway and asked me about how to do it, asked me if

9    I had plans, we would go from there.

10    Q   And the two of you and other people worked on

11    the --

12    A   Yes, we did.

13    Q   Over the years have you stayed in touch?

14    A   Yes, I have.

15    Q   I'm going to direct your attention from the

16    late 1980's until about 18 months ago.  Do you recall

17    having a conversation with Frank on Easter Sunday of

18    2005?

19    A   Yes, I did.

20    Q   Can you relate your recollection of what the

21    substance of that conversation was?

22    A   Well, I couldn't remember -- not to get off

23    the subject, but I couldn't remember how I had found

24    out, either from another attorney friend of mine or the

C 3365

1  newspaper, but I had contacted Frank about the

2  situation he was in. And if I may say something --

3  it's -- I don't know how to say this. So I'm going to

4  say it. You ever heard the phrase can't bullshit a

5  bullshitter?

6      Q    You can't kid a kidder?

7      A    That's fine. I'm sorry. You can't kid a

8  kidder. And Frank was always honest with me about

9  this. And he had called me. I had left a couple notes

10 at his parents' home and to call if he needed to talk,

11 and he had called me a couple times and he was on his

12 way to rehab, and it was up north, Wisconsin or

13 Minnesota. I wasn't sure, but he called me on the way

14 and we talked in detail about what was going on and his

15 problem with alcohol and his addictive behavior.

16     Q    And what did he tell you about that that you

17 recall?

18     A    I remembered he said that he was guilty and he

19 had done taken this money from this lady and explained

20 in detail what he had done and was very honest with me.

21     Q    That was way back 18 months ago?

22     A    Yes.

23     Q    And before you hung up from that conversation,

24 did the two of you do anything else?

56

C 3306

1    A    Yes.  We said a prayer that he made it through

2  there and was honest with himself.  And we had talked

3  about alcoholism and how it leads to other addictive

4  behavior, because my mother was an alcoholic, and I

5  myself, I don't drink, never have and I went to

6  counseling myself to deal with it.

7    Q    Now, more recently, in say the last several

8  months or several weeks, have you seen Frank and talked

9  to him?

10    A    Yes.  On a constant basis.

11    Q    On a fairly regular basis?

12    A    Yes.

13    Q    You are familiar somewhat from your testimony

14  there about the process of alcoholism and treatment and

15  things like that.  Are you able to observe Frank's take

16  on this?  Is he sincere?

17    A    Yes.

18    MR. EVANS:  Object.  I object to the form of the

19  question.  Calls for some form of expert opinion.  I

20  think the form of the question does, Judge.

21    THE COURT:  Overruled.

22    THE WITNESS:  When he was on his way up to

23  treatment, we had a lengthy conversation and he told me

24  everything, how he'd -- what he did with the money, how

57

C 3367

1  he went to the Par-A-Dice and used the trust check, if

2  that's the term -- I'm not sure of the term -- and had

3  gambled the money because he thought he could win. And

4  we had talked about my brother and his alcoholic

5  adventures that I told him that it was addictive

6  behavior. And that because he had been an alcoholic

7  that you think you cannot overrun, but do things that

8  are not possible. Your brain and your body convinces

9  you that you can do these things and succeed.

10       And he had told me that he was wrong and that

11  he realized that the term hit bottom has been used and

12  how he was very disgusted with himself for the fact

13  that he used this lady's money.

14       Q    Right now, say within the last three or four

15  months, how often do you talk to him?

16       A    Well, I met him -- I have always left notes at

17  his parents' house. In fact, before he used to have

18  his red BMW and I -- I didn't know he had sold it, but

19  every time I saw it I left a note on it, give me a call

20  Frank. For some reason, I didn't realize that he sold

21  the car, and whoever this person was must have

22  contacted him because I always got a call and we always

23  talked at length.

24       Q    And he continues to do so?

58

C 3368

1       A     Yes, we do.

2       Q     Does he continue to express the same type

3   feelings towards his recovery?

4       A     Yes.   I talked to him like -- or we have

5   talked about that.   I have talked to him on the way up

6   to recovery, and I talked to him I want to say a day or

7   two after he had finished his recovery period in

8   Minnesota, and like you can't fool someone.   I know

9   that -- you know, I have been around alcoholics, my

10  mother and brother.   Frank was very sincere to me.

11  Like I said, you can't fool someone, and I knew that

12  Frank was honest with me because of my time of knowing

13  him and everything else.

14      Q     You have been to prison before, have you not?

15      A     Yes, I have.

16      Q     How many times?

17      A     Twice.

18      Q     From your experience there -- strike that.

19            Did Frank represent you in either of those

20  cases?

21      A     No, he did not.

22      Q     From your experience there, do you think that

23  there's any benefit to be gained from sending Frank to

24  prison?

59

C 3369

1      A      I can honestly say that it's -- it may be a

2   quick means to an end for the state's attorney's

3   office, but I don't think that -- if you were to go

4   into a courtroom today and said to someone you can

5   either have prison time or probation, 90 percent of

6   them are going to say prison because probation is too

7   tough, too many rules, and I believe that is -- in my

8   opinion, that is what Frank needs is rules because he's

9   done a fantastic job following the rules set before him

10  in rehab, and, in my opinion, he's doing a fantastic

11  job with his rehab.  And I know that I'm not a

12  counselor, but I have been to counseling because of

.13 dealing with alcoholics, and I know there is a

14  recidivism rate that is very high.

15          In fact, I had talked to someone who was in

16  rehab with Frank up there.  And they told me that Frank

17  was very honest about what he said and was very sincere

18  about his time there.  And he's also been sincere to me

19  since then.  I shouldn't say since then.  I mean the

20  whole time.

21          MR. TONER:  I don't have any further questions.

22                   CROSS-EXAMINATION

23                   BY MR. EVANS:

24      Q      Sir, what have you been in prison for?

1      A    Theft and criminal damage to property.

2      Q    How long have you served in prison?

3      A    Two-year sentence and a three-year which was

4   18 months and 9 months.

5      Q    How long ago was that, sir?

6      A    That was in '81 and '84.

7      Q    And you used a comment that this is a quick

8   end for the state's attorney's office?

9      A    For the --

10     Q    Is that the term you used, sir?

11     A    I believe it is, yes.

12     Q    Do you have some hard feelings against the

13  state's attorney's office?

14     A    No.

15     Q    Does the state's attorney's office prosecute

16  you for your criminal offenses?

17     A    Not this -- well, different state's attorneys,

18  but same office, same county.

19     Q    Same office, Peoria County State's Attorney's

20  Office?

21     A    Yes.

22     Q    And --

23     A    But don't take any comment out of context

24  either.

61

1    Q    Now, you said that the defendant followed the

2   rules of his treatment program?

3    A    Yes.

4    Q    Is that according to what the defendant told

5   you?

6    A    No.  Other people.

7    Q    Others in addition to yourself?

8    A    I have never been to treatment myself.

9    Q    No.  I'm saying other people told you what you

10  have conveyed to us today, correct?

11    A    Yes.  And I also asked Frank about these, and

12  he was very honest with me.

13    Q    And he told you that he's complied with the

14  rules with regard to treatment, correct?  The defendant

15  told you that, also?

16    A    No.  He never come out and told me, Mike, I

17  followed the rules.  I could gather it by our

18  conversations.

19    Q    Fair enough.  Now, do you know yourself as you

20  sit here today what rules he was required to follow in

21  handling the money of an 85-year-old woman as he was

22  acting as an attorney for, sir?

23    A    I know he shouldn't have spent the money.

24    Q    How about not taking the money?

62

C 3372

1    A    Well, it's the same thing, spending or taking.

2  Wasn't his to take or spend.

3    Q    Exactly.

4    A    And he explained that to me very thoroughly in

5  many of our conversations.

6    Q    Sir, did he tell you, the defendant, what he

7  did with the money he took?

8    A    I remember he -- what comes to mind was that

9  he told me that he thought that one point he thought he

10  was a professional gambler and could win the money

11  back, and I believe he told me he had used it for

12  living expenses.

13    Q    How much did he use for living expenses?

14    A    Oh, we didn't get down to dollars and figures.

15    Q    How much did he use for gambling?

16    A    That I don't know.

17    Q    When you talked with the defendant did he

18  attribute his criminal activity to drinking solely?

19    A    No.  He didn't do that at all.  He never made

20  an excuse for what he had done or how he handled this

21  lady's affair.

22    Q    And the only time he contacted you about this

23  drinking problem, if you will, was after he was

24  arrested, correct?

63

C 3373

1      A     No.  I have known Frank for a long, long time

2   and we talked about problems before.

3      Q     He talked with you about taking money from

4   Mrs. Varga before he was arrested?

5      A     No.  Like I said, I found out from another

6   attorney friend of mine or through the newspaper.

7      Q     That was after he was arrested, sir, correct?

8      A     If it was in the newspaper, I assume so.

9   MR. EVANS:  No further questions.  Thank you.

10   THE COURT:  Mr. Toner.

11                 REDIRECT EXAMINATION

12                 BY MR. TONER:

13     Q     Very briefly.  Your testimony here today is

14   not for the purpose of some kind of taking a swipe at

15   the state's attorney's office, is it?

16     A     No.  I'm not here because of the state's

17   attorney or Judge Kouri or this lady here (indicating).

18   I'm here for Frank and I volunteered my services.  I

19   shouldn't say services.  My testimony.

20   MR. TONER:  Thank you.

21   THE COURT:  Mr. Evans.

22   MR. EVANS:  No, sir.  No further questions.

23   THE COURT:  You can step down.  Thank you.

24                 (Witness excused.)

64

C 3374

1        MR. TONER:  Call Jerry Lindsey to the stand.

2                    (Thereupon the witness was duly sworn.)

3                    JERRY LINDSEY

4    called as a witness on behalf of the Defendant, after

5    having been first duly sworn, was examined and

6    testified as follows:

7                    DIRECT EXAMINATION

8                    BY MR. TONER:

9        Q    Good afternoon, Mr. Lindsey.  Would you please

10   state your name and spell your last name for the court

11   reporter?

12       A    My name is Jerry Lindsey.  My last name is

13   spelled L-I-N-D-S-E-Y.

14       Q    And do you know Mr. Picl?

15       A    For approximately 30 years.

16       Q    And over the years, has he ever had an

17   occasion to represent you in court?

18       A    Yes.  I have an extensive criminal record and

19   on three or four of those occasions Mr. Picl has

20   defended me.

21       Q    And you indicated in your letter -- I'm going

22   to ask you to expand on it.

23       A    Okay.

24       Q    You are now a real estate appraiser?

65

C 3375

1     A    Residential appraiser, yes, licensed by the

2  State of Illinois.

3     Q    And you indicated in part that's because of

4  Frank.  Can you explain why?

5     A    Primarily -- I think the last time that I

6  was -- I ran afoul of the law Mr. Picl was talking to

7  me and Mr. Picl told me that he really couldn't

8  understand why a person that he thought was as

9  intelligent as me would waste away my life being

10 convicted of petty thefts.  And I think he knew at that

11 time that I had a drug problem.

12    Q    And did he, in fact, do anything to help you

13 address that drug problem?

14    A    He petitioned the court to help me get into

15 long-term treatment in Peoria, which was a year's worth

16 of treatment, and -- to help me change my life around.

17 But I believe that without him being as forceful as he

18 was with the court to try to get that opportunity for

19 me, I never would have received it.

20    Q    Did you go to that treatment?

21    A    Yes, I did.

22    Q    Did it take?

23    A    Yes.  Well, as far as I'm concerned, yes, it

24 has.  I feel like I have been a success at it for the

66

C 3376

1  last 16 years, going on 17 years.

2     Q    So you are approaching 17 years of being

3  clean?

4     A    I just celebrated my 16th clean and sober

5  birthday on September 11th.

6     Q    Congratulations.

7     A    Thank you.

8     Q    Besides that, do you have an occasion or have

9  you had an occasion over the years to see Frank?

10    A    I would run into Frank in the courthouse here

11 when I would come to the assessor's office to get

12 records for properties, and I would see Frank at Peoria

13 High School when his daughter would be involved in some

14 graduation exercise or activities at Peoria High.  My

15 daughter and his daughter both graduated in the same

16 year, 1999.

17    Q    Have you had an occasion to talk to Frank

18 about recovery?

19    A    No, but I have been aware for the last 25 or

20 30 years that he had a severe drinking problem which

21 I'm so surprised that nobody else recognized that or

22 that this problem ever came up before because I had

23 always expected at some point in place and time to read

24 in the Peoria Journal Star that a client would have

1  accused him of misrepresentation because of being
2  intoxicated.

3      Q    Some kind of criminal proceeding or just some
4  kind of proceeding?

5      A    Some kind of proceeding, but the reason I
6  think that never happened is because his persona was so
7  smooth and that the representation that he has always
8  provided has been more than par, excellent.

9      Q    So despite that, you felt he performed well,
10 particularly --

11     A    Extremely well.  Extremely well.

12     Q    What kind of an effort does someone have to
13 put forth towards turning their life around and coming
14 clean?

15     A    Well, the first thing --

16     MR. EVANS:  Judge, again, I object at this point.
17 I think that if it's just with regard to this witness
18 it would be irrelevant.  If not, it's the subject of
19 expert testimony.

20     THE COURT:  Mr. Toner?

21     MR. TONER:  I'll rephrase the question.  If I can
22 have a second.

23     MR. TONER:  Q  So you indicated that you had run
24 afoul of the law before?

68

C 3378

1    A    Yes.

2    Q    And in those experiences, have you had

3  occasion to receive both a prison sentence and a

4  probation sentence?

5    A    Yes.  And I would consider the last time that

6  I was arrested and ran afoul is where I actually hit my

7  bottom, meaning that I couldn't go on anymore the way

8  that I was existing, and I didn't know the difference

9  then between existing and living.  And each

10  individual's bottom is different and they teach us in

11  the 12 steps that usually that bottom either comes with

12  jail, institutions, or death, but you don't reach that

13  bottom because you are under an illusion and you are

14  intoxicated or drug induced.

15    Q    Based on your experience, is it harder for you

16  to -- is it harder for a person to do a rigid probation

17  or do a prison time?

18    MR. EVANS:  Objection.  Relevance, Your Honor.

19    THE WITNESS:  I think that's a relevant question.

20    THE COURT:  He can answer it.

21    THE WITNESS:  I have been on probation, and I have

22  been in penitentiary.  I've done both of them.  Doing

23  probation is a lot more difficult than serving

24  institutional time because when you serve institutional

69

C 3379

1    time -- can I finish?

2         MR. TONER:  Q  Go ahead.

3         A    When you serve institutional time you have

4    rules and regulations, but those rules and regulations

5    can be ones of your own design to keep your own self

6    out of trouble.  However, but when you are doing

7    probation and you know that your freedom is on the line

8    you deal with a more rigid program for yourself because

9    you don't want to go to penitentiary, but once you are

10   there you are already there, so you do what you got to

11   do to survive.

12        MR. TONER:  I don't have any further questions.

13        THE COURT:  Thank you.  Mr. Evans.

14                    CROSS-EXAMINATION

15                    BY MR. EVANS:

16        Q    Mr. Lindsey, what's your extensive criminal

17   record that you mentioned?

18        A    Petty theft.

19        Q    Petty theft?

20        A    Petty theft and one charge for delivery

21   charge.

22        Q    A delivery charge.  What did you deliver?

23        A    What did I deliver?

24        Q    Right.

70

C 3380

1       A       Can I tell you the circumstances of it?

2       Q       I'm asking what you delivered.

3       A       Heroin.

4       Q       And you went to prison for that?

5       A       No.  Actually, I went to prison because of --

6       Q       Did you go to prison for the delivery of

7    heroin?

8       A       Yes, but I have a reason I would like to

9    explain.

10      Q       I'm not asking that, sir.  You did go to

11   prison for delivery of heroin?

12      A       Yes.

13      Q       Now, your petty theft is your only other

14   charges.  You told us that was a misdemeanor, correct?

15      A       No.  Once you are convicted of theft each

16   theft after was --

17      Q       Becomes a felony?

18      A       Becomes a felony.

19      Q       Is that the one you had probation for, sir?

20      A       The last one was what I had probation for and

21   it was for theft.

22      Q       So how many convictions do you have?  Delivery

23   of heroin, theft?  Is there another theft in addition

24   to that?

71

C 3381

```
 1        A     I'm sure there is plenty of them.

 2        Q     How many?

 3        A     I don't know.

 4        Q     Take a guess.

 5        A     I don't know.  Maybe five, six.

 6        Q     And you had contact with Mr. Picl; he

 7   represented you in court, correct?

 8        A     Correct.

 9        Q     And he represented you adequately?  He came

10   into court?

11        A     Yes.

12        Q     Prepared your defense?

13        A     Yes.

14        Q     Acted as your attorney?

15        A     Yes.

16        Q     And, at the time, you knew that he would drink

17   sometimes more than he should?

18        A     Yes.

19        Q     And yet he could still represent you

20   adequately in front of a judge, right?

21        A     The prosecutors didn't mind him representing

22   me like that, why should I?  He did it adequately.

23        MR. EVANS:  Judge, I move to strike his nonresponse

24   to my question.
```

72

1      THE COURT:  Motion granted.  Please listen

2    carefully to the question and just answer it.  I know

3    there is a lot you want to tell me, but when Mr. Toner

4    asks the questions, you can answer those.  When

5    Mr. Evans asks, you got to answer those, too.

6      THE WITNESS:  I was aware that he might have been

7    intoxicated when he was representing me.

8      MR. EVANS:  Q  But he represented you

9    adequately, didn't he?

10     A    Yes.

11     Q    Now, you knew based on your experiences with

12   the defendant -- I think you used the term that it was

13   just a manner of time or a question of time until you

14   read about him taking some money from somebody?

15     MR. TONER:  Objection.

16     THE WITNESS:  No.  That's not what I said.

17     THE COURT:  Hold on.

18     MR. TONER:  My objection was simply that that was a

19   misstatement of what he had said.  I think he cleared

20   it up.  I'll withdraw the objection.

21     THE COURT:  Go ahead.

22     MR. EVANS:  Q  When you knew Mr. Picl, you used

23   the phrase that it was a matter of time or a

24   question of time when counsel asked you questions.

73

C 3383

1   Do you remember that answer?

2       A   Yes.   Can I repeat that answer?

3       Q   Sure.   That's what I'm asking.   Do you recall

4   that, and I'm asking you to explain what you meant by

5   that.

6       A   Right.   I said that I was surprised that I had

7   not read in the paper that Mr. Picl would have been

8   accused of misrepresentation of a client because I knew

9   that he was an alcoholic.   He didn't know that he was

10  an alcoholic, but I did.

11      Q   I assume then that you used that as basis for

12  appealing your sentences?

13      A   I never appealed one.

14      Q   You never appealed it?

15      A   No.

16      Q   You never brought that to the attention of the

17  Appellate Court?

18      A   No, but neither did none of the attorneys in

19  the building bring it to their attention either.

20      THE COURT:   One at a time.

21      MR. EVANS:   Q   You never brought it to the

22  attention of anyone in a position of authority

23  before today, did you?

24      A   I thought I answered that question.   No.

74

C 3384

1    Q    That's correct, my statement that you have

2  never brought that issue before a judge before today,

3  did you, in the form of a written motion; is that a

4  correct statement, sir?

5    A    No.

6    Q    Which judge did you bring this issue in front

7  of in the form of a written statement?

8    THE COURT:  I think he answered.

9    THE WITNESS:  What?

10   THE COURT:  Hold on.  Hold on.  Why don't you

11 rephrase the question.  He may have misunderstood the

12 question.  I think he's testified to this, but now if

13 he's confused, I'm confused.  So ask the question again

14 maybe a bit simpler.

15   MR. EVANS:  Q  What you are saying today is did

16 you ever bring that issue that Mr. Picl was under

17 the influence of alcohol in any written motion

18 before a court or an Appellate Court?

19   A    I think I heard the question right and the

20 answer to that is no.

21   MR. EVANS:  No further questions.

22   THE COURT:  Mr. Toner.

23   THE WITNESS:  Please.

24

75

C 3385

REDIRECT EXAMINATION

BY MR. TONER:

1      MR. TONER:  Q  You were going to mention about

the circumstances surrounding your heroin case.

    A    Yes.

    Q    Would you briefly elaborate on that?

    A    Thank you.  I had went to a short-term

treatment program at Proctor Community Hospital.  It

was a short program.  It was before I went to a

long-term program, and I had made a decision when I

went to Proctor that I wasn't going to use hard drugs

anymore.  I wanted to be like everybody else and I

wanted to be able to socialize, but I didn't want to

run afoul of the law.  So I chose to do a legal

substance which was alcohol.

        I was in a club one night and an undercover

agent bought me plenty of alcohol and under the

intoxication he talked me into taking him to buy some

heroin.  My point is this.  Had I never been

intoxicated, I never would have done that, and today I

feel that the worst drug on the market or attainable is

alcohol because it really deludes you.

    Q    You mentioned your probation and your

long-term residential care.  Did going to prison ever

76

C 3386

1   do anything to help you or anyone you know with their

2   addiction?

3      A    Probably --

4      MR. EVANS:  Your Honor, I would object,

5   respectfully.  This individual is certainly not an

6   expert in that field.

7      THE WITNESS:  I don't know.  Being 30 years addict

8   I should be an expert in something.

9      THE COURT:  I'm going to sustain the objection.

10     MR. TONER:  I don't have any further questions.

11  Thank you.

12     THE COURT:  Hold on.

13     MR. EVANS:  No further questions.

14     THE COURT:  You can step down.  Thank you.

15            (Witness excused.)

16     MR. TONER:  Call Shirley Hannon.

17     THE COURT:  Ma'am, step forward and raise your

18  right hand in front of the clerk, please.

19            (Thereupon the witness was duly sworn.)

20     THE COURT:  Have a seat.

21

22

23

24

1                        SHIRLEY HANNON

2    called as a witness on behalf of the Defendant, after

3    having been first duly sworn, was examined and

4    testified as follows:

5                       DIRECT EXAMINATION

6                        BY MR. TONER:

7        Q    Please state your name.

8        A    Shirley Hannon, H-A-N-N-O-N.

9        Q    Mrs. Hannon, you live in the Peoria area?

10       A    I do.

11       Q    And are you acquainted with Frank Picl?

12       A    I am acquainted with Mr. Picl.

13       Q    How is it that you know him?

14       A    I was Mr. Picl's secretary for approximately

15   13 years.

16       Q    And could you tell the judge, please, from

17   when until when?

18       A    I believe I started in the fall of 1989 and

19   through 2003.

20       Q    And during that period of time, did you have

21   an occasion to work closely with him?

22       A    Well, fairly closely.  I was actually a

23   part-time secretary.  I came in at 11:30 and worked

24   until 4:30.  So we passed, you know, probably every day

78

1    at some point or talked on the phone.

2        Q    And with regard to that period of time, did

3    you have an occasion to observe Frank's work habits?

4        A    I did.

5        Q    And can you describe with regard to his habits

6    whether or not you noticed him having trouble

7    organizing, focusing, finishing tasks?

8        A    Well, it appeared to me that he could focus in

9    on one particular thing at a given time, but the whole

10   picture sometimes I didn't -- I didn't really have any

11   concern about it because he always seemed to get the

12   job done and he was very capable of doing things in a

13   very quick manner. I believe he had a very good mind

14   for what he was doing and -- but if we had a lot of

15   things going we just seemed to focus in on one thing

16   and it seemed like sometimes there would always be a

17   problem closing out something. There would be one

18   little thing left to be done and we'd always just kind

19   of -- that can wait until tomorrow.

20       Q    So --

21       A    Didn't seem to cause any great problems, but I

22   was kind of like let's finish this out.

23       Q    So finishing tasks was a difficulty?

24       A    Uh-huh.

79

C 3389

1     Q    Is that a yes?

2     A    I would say yes.

3     Q    And did you notice this on a consistent basis?

4     A    Well, I noticed -- when I first started

5 working there, mostly Mr. Picl's work involved being

6 assistant public defender. So his days were pretty

7 much set out for him. I noticed it becoming more of a

8 problem probably the last couple years I worked for

9 him. I think I was probably maybe more aware of it.

10    Q    What would you notice, the same thing you

11 described or how would it be different?

12    A    I think his drinking became more of a problem.

13 I think that all of a sudden he became kind of obsessed

14 with gambling. I think he had some personal matters in

15 his life that probably were of great concern to him.

16 And so I just felt that with all the problems that he

17 had that the drinking was kind of a way to escape

18 facing these personal problems.

19    Q    And when you say personal problems, are you

20 talking about his family life?

21    A    Well, I think he had a health problem and

22 marital problems.

23    Q    His health problem being the back surgery?

24    A    Right.

80

1   Q   Let's start with that first. And when you say
2  the time we are talking about is roughly 1999, 2000, in
3  there?
4   A   Yeah. I would -- yes.
5   Q   Subsequent to that, what about when he had the
6  occasion back I think it was 2001 to injure his back?
7  Do you recall how that affected him getting around?
8   A   I think he was moving pretty slow. I can
9  remember that he was -- he went to the pain clinic I
10  think maybe three different times because I believe I
11  took him and picked him up, and I think he kind of
12  wanted to avoid the surgery thinking he was going to
13  get better because I think we all kind of think we are
14  indestructible, but then I think he ended up with the
15  surgery and, you know.
16   Q   Was this period of time he was also going
17  through trouble at home, correct?
18   A   I think in that same time frame.
19   Q   And you mentioned finally this obsession with
20  gambling. Can you describe what it is that you saw
21  that would lead you to that conclusion to describe it
22  as being an obsession?
23   A   Well, it seemed like he was spending an awful
24  lot of time at the boat which I didn't approve of. It

81

C 3391

1    was none of my business, but I felt there was more time

2    being spent on the boat than on matters that needed

3    attention in the office.

4        Q    And those are --

5        A    And I think he just seemed like his life was

6    not going real smooth and this was maybe a way -- maybe

7    if I go to the boat maybe tomorrow will be better or

8    we'll do this tomorrow.

9        Q    Would he ever say things like that to you or

10   what --

11       A    I wouldn't say he would come out directly and

12   say, I'm going to the boat, we'll do this tomorrow.  It

13   would be like I have something all set out to be

14   finished and I was always able to contact him, but then

15   he never showed up to finish what needed attention.

16       Q    Now, to be clear on this, the types of things

17   that you would have to be finished, I mean, were --

18   they would have different range, I take it, from just

19   maybe signing something to just doing a little bit more

20   work?

21       A    Right.

22       Q    So it wasn't anything elaborate; he just

23   couldn't even come in?

24       A    No.  I don't think it was elaborate.  He just

82

C 3392

1   didn't come in and get it taken care of.  Actually, I
2   was working out of my house.  I had an office in the
3   house.  So it wasn't like I was in an office situation
4   where, you know, I'm going to leave at 4:30, you better
5   get here type thing.  I was at home and we had a good
6   working relationship for the most part with me working
7   out of the home for what I did.  I basically kind of
8   tried to keep his schedule in tact and took incoming
9   phone calls which I typed every day and they were sent
10  to him.  We reviewed the ones that needed more
11  attention than others and mostly it involved his work
12  as a public defender.  I mean, he had some private
13  cases, too, but, you know, it was keeping his
14  scheduling conference and his trial dates and that and
15  getting files lined up so that he could take them to
16  court.

17      Q    Let me ask you this.  Did you notice any
18  change in his work habits as far as attention over the
19  13 years that you worked for him?

20      A    I would say the last two or three years his
21  attention to his work schedule was poor.

22      Q    Would that make a difference whether you were
23  talking about his public defender cases or his private
24  case or didn't make a difference at all?

83

C 3393

1     A    I would say it pertained to both cases, his

2  private and public defender work.

3     Q    So it wasn't a --

4     A    Seems to me like maybe a last -- I think he

5  was not a public defender for a few months that I

6  worked for him.  I just can't remember the time frame

7  on that.

8     Q    But it was just -- it wasn't a disinterest in

9  one or the other?

10     A    It was like he couldn't focus in on getting

11  things done that needed to be done, whether they were

12  simple things or...

13     Q    Now, did you over the course of your

14  representation or your working for Frank either meet or

15  hear about Alice Varga?

16     A    I did know Alice Varga.

17     Q    Can you tell the judge, how is it you knew

18  her?

19     A    Alice Varga was a client of Mr. Picl's when I

20  was working there.  I believe he was handling something

21  to do with some estate that she maybe -- that she was

22  involved in a serious accident, and I was working there

23  at the time.

24           And Mr. Picl took care of Alice very well.  He

84

C 3394

1  saw to her needs. She was in the hospital and then she

2  went to the nursing home. When she was able to take

3  care of herself again at home he was the one who was

4  there day and night to meet her needs. She finally

5  decided she could drive again and he took her out

6  shopping. They got her a car. He took her driving to

7  make sure, and he kind of got her back into her

8  normal -- she wanted to go home. He got her back into

9  her normal routine. She decided she needed this dog.

10  So they got the dog, and if the dog needed attention,

11  Frank was the one that took care of -- really her

12  personal needs, whether it was her medical needs,

13  whether she needed something from the store. He was --

14  they lived pretty close and he kept a pretty good eye

15  on her. If she needed something and he was in court,

16  she knew that then she could call me and I would get

17  the message to Mr. Picl.

18      Q   Now, from the time this relationship between

19  the two of them at least in as far as from the time

20  this started until the time you quit working for Frank,

21  about what number of years are we talking about?

22      A   Well, I would say at least 10 or 11 years. I

23  think she had her automobile accident, I can't remember

24  the date, but he represented her -- she -- I mean, he

85

1    represented her from that time until she went to

2    Independence Village and, you know, he was always

3    available.  She really counted on him to be available,

4    whether she was having a good day or a bad day.

5        Q    How often would, if you recall on -- if you

6    can -- would she call him regularly?

7        A    Oh, yes.

8        Q    Monthly, weekly?

9        A    I don't know if I would say daily, but I bet

10    almost daily after her accident that he had some kind

11    of communication with her because she had a lot of

12    needs.

13        Q    Now, you mentioned the drinking, the obsession

14    with gambling.  Were you aware of -- did you know Frank

15    and his kids?

16        A    I knew his family and the children, yes, and

17    his sisters and he had a brother that I knew.

18        Q    And is that just you met them over the years

19    that you had worked for him?

20        A    I met them probably right after I started

21    working for him.  I met his parents.  I met the girls.

22    They were young and I didn't see them on a regular

23    basis, but once in a while they would pop into the

24    office or when he had an office in the home and I had

C 3396 86

1   my office in my home, I had occasion to go to their

2   home to deliver things and the girls were there and

3   Jenny, and they were a lovely family.

4       Q     Now, when Frank and Jenny were getting

5   divorced, you were working for him then, weren't you?

6       A     I was.

7       Q     Can you tell the judge -- that was basically

8   during the same period of time around when he was hurt

9   and when he started gambling, et cetera -- what type of

10  effect did that seem to have on him?

11      A     I think I really noticed a big change when the

12  divorce was final because I don't -- this is just my

13  feeling.  I think he thought that was never going to

14  happen.  I think that he thought this was going to be

15  all worked out and his family was going to be there and

16  that was his hope, and when it didn't happen then I

17  think that took a drastic change on what I saw.

18      Q     A drastic change --

19      A     In his personality, in his mannerism.

20      Q     Did it have an effect on his work as far as --

21      A     At that time, I was kind of working out of the

22  office.  I wasn't observing his work habits because

23  he'd moved back downtown and there was another

24  secretary who was kind of doing some of the work that I

C 3397
87

1   did.  So I was basically just getting the mail, doing

2   the phone messages and bringing him up-to-date every

3   day on what the mail consisted of and what the messages

4   were.  I do think that sometimes when I had to try to

5   contact him it took me longer to get him to get back to

6   me.  Usually, I got a call right back, you know,

7   because if we needed an answer, you know, and it was

8   just kind of like there would be longer periods of time

9   before I would get a reply to my phone call.

10      Q    How about his personality?  Did you notice any

11   changes there?

12      A    The personality that I would say change was I

13   thought he was drinking more and became just totally

14   obsessed with his gambling.

15      Q    Now, I'm going to bring you -- you said that

16   you ceased working for him.

17      A    I think in January of 2004, but I would say my

18   last year probably I was just doing minimal work.

19      Q    What kind of contact did you have with Frank

20   from say 2004 until now?  How often would you say?

21      A    I did not have any contact with him.  Once I

22   terminated my employment, I did not have any contact.

23      Q    Did you recently have an occasion to talk to

24   him?

88

C 3398

1    A    Recently, Mr. Picl called and asked if he

2   could stop over to the house.  He wanted to talk to me

3   and explain his actions and he was concerned how my

4   feelings -- if he caused me any stress or ill feelings

5   or anything.  So he stopped over and we had a nice

6   visit and he sort of brought me up-to-date on where he

7   was.  I expressed my shock at what he did because I

8   never thought I would see -- I just never thought that

9   that would ever be something I would be reading in the

10  paper.

11   Q    He told you how he felt about it?

12   A    He told me he was very sorry and that he --

13  his biggest sorrow probably was Alice knew about it

14  before she passed away and any sorrow or hurt he may

15  have caused her because Alice really did think a lot of

16  Frank and Frank really took care of her from what I

17  observed, and I observed quite a bit, you know.

18       MR. TONER:  If I may have a moment, Judge.

19       THE WITNESS:  And Alice was very -- when she would

20  call me, she told me how much she depended on him.  So

21  that's why I was surprised that, you know...

22       MR. TONER:  Q  Now, when you and Frank were both

23  sharing the same office downtown, can you describe

24  to the judge the condition of the office as far as

89

C 3399

1    clutter and piles and things?

2        A    Oh, well our filing system was on top of the

3    desk or on the floor or in the chairs.  And I tried to

4    have an organized system, and sometimes I got my way

5    and sometimes I didn't, but he knew where everything

6    was.

7        Q    And they were just in piles?

8        A    That was just the way it would seem to work

9    for him.  I did get my way on public defender cases.

10   When they were closed we would box them up, label them,

11   put them in a box and put them in storage in case there

12   was ever a need to recall them for some reason, and I

13   was always -- I could always do what I wanted, but I

14   just didn't kind of always get my way.

15       Q    You mentioned sometimes the final details on

16   the thing.  Would that ever, for instance, include

17   billing?

18       A    Oh, we never did any billing hardly, and that

19   was always one thing I did not do anything with the

20   bookkeeping, but there would be times when things

21   needed to be billed and they wouldn't get billed.

22       Q    And would you talk to Frank about this?

23       A    Yes, I did.

24       Q    Would they be sent or ready to be taken care

90

C 3400

1    of and what happens?

2        A    They would just get ready to get done, but

3    they never got done.

4        Q    That happened more than once?

5        A    More than once.

6        Q    His public defender business, you know he'd

7    get a check every month for that, correct?

8        A    Uh-huh.

9        Q    But, for example, would the federal work that

10   he did, you have to bill for that?

11       A    We'd have to bill for it and he pretty much

12   had to get the time lined up, and they had a form that

13   needed to be filled out, but we just never seemed to

14   get it done.

15       Q    Of all the federal-appointed cases that Frank

16   did, do you have an opinion percentage-wise of how many

17   of those would have gotten billed?

18       A    I'm going to say maybe there was a time when

19   we had a lot of them that needed to be billed and his

20   brother was working in the office.  And Bill and I kind

21   of got everything lined up and it was up to Frank, and

22   Bill kind of stayed on him and that batch got billed

23   out.  They were paid and then the next batch just never

24   happened.  And I'm not sure.  I would say there were

91

C 3401

1   six, eight cases that needed to be billed that probably

2   had some substantial time.

3       Q    And substantial money?

4       A    Well, yeah.

5       Q    Now, the times when you indicated that you

6   would try to encourage or push Frank along sounds when

7   you were saying Bill would do the same thing.  Would it

8   be fair to say that Frank needed people to push him and

9   focus or push him to focus?

10      A    I think so.  I think he needed a little push.

11  I think he knew what needed to be done, but I think he

12  needed that little push.  Whether he took the push or

13  not, that was --

14      Q    Did that pushing become harder or more often

15  toward the end?

16      A    Did what?

17      Q    Did you have to push him either harder or more

18  often toward the end of your time working for him?

19      A    I think at the end I just did what I could do,

20  told him what needed to be done and I don't know that

21  there was any huge push because I was working out of

22  the office, and basically I felt I was there to take

23  phone calls, and, you know, I had no control -- lot of

24  Mr. Picl's work he did himself, like when it came to

92

C 3402

1  pleadings and, you know, I didn't do what I would say a

2  lot of secretarial type work.  I could maybe get

3  something lined up.

4        I can remember an instance of where we needed

5  a car title for something and I got everything lined

6  up, the affidavit.  Now all we had to do was up to him.

7  Well, to my knowledge, I don't know if it ever got

8  done.

9     MR. TONER:  I don't have any further questions of

10  this witness.

11     THE COURT:  Why don't we take a five or ten-minute

12  break at this point.  And you are still not done, but

13  you can step down for a minute.

14              (Recess taken.)

15     THE COURT:  We'll go back on the record.

16        Ms. Hannon, if you would step back up, please.

17  You are still under oath.  Mr. Evans.

18     MR. EVANS:  Thank you, Judge.

19                 CROSS-EXAMINATION

20                 BY MR. EVANS:

21     Q   Ms. Hannon, you worked for the defendant from

22  the fall of '89 until did you say January of 2004?

23     A   I think it was, January, February, but I think

24  January, towards the end of January.

93

C 3403

1    Q   I think the last years you were working out of

2  your home mainly?

3    A   I was.

4    Q   Up until I guess it would be some time in 2003

5  since 1989 you had worked at the defendant's office; is

6  that correct?

7    A   No.  When I first started working there he had

8  his office in the Commerce Bank building.  I don't know

9  how many years we were there, but then he decided he

10  was going to have his office in his home, I would have

11  my office in my home.

12    Q   When did that change take place?

13    A   I just can't remember, but I would say we were

14  downtown three or four, five years, then to the home.

15  Then towards the latter part, Mr. Picl had an office

16  back downtown, but I remained in the home.

17    Q   But you were familiar with the defendant,

18  Mr. Picl, the fact that he was an assistant public

19  defender, right?

20    A   I was.

21    Q   And you know he spent most of his day in the

22  courtroom?

23    A   I don't know if he spent most of his --

24  Fridays he would have scheduling conferences, and then

94

C 3404

1    they would set cases on Monday for trial.

2        Q    Trial call is Monday?

3        A    And then if he had a case to go he spent it in

4    court, and if he didn't, I don't believe he spent the

5    day in court.

6        Q    Did he have clients other than his public

7    defender clients?

8        A    Yes.

9        Q    And he would, I assume, travel to different

10   courts in the area to represent those people privately?

11       A    If he had one outside of Peoria County he

12   would go to another county or --

13       Q    So Mr. Picl was able to perform his function

14   as an attorney throughout the time that you knew him;

15   isn't that a fair statement?

16       A    I would say he was able to function as an

17   attorney.  I do think he had time -- problems focusing

18   in on something if something wasn't set for a given

19   time.  He seemed to work well if he had a time frame in

20   the courtroom, he had to be done, he didn't have any

21   choice to put it on hold.

22       Q    He would procrastinate I think is what you are

23   telling us?

24       A    Yes.

95

1    Q    There is other people that procrastinate in

2  getting things done, correct, that you know of?

3    A    I think so.

4    Q    And he, however, as you told us he would

5  get -- he would handle the problem or he would get the

6  problem taken care of?

7    A    Usually got the problem taken care of.

8    Q    And his office was messy sometimes or most of

9  the time?

10   A    I would say messy.  It was his way of -- his

11 filing system was the open filing system, on the floor,

12 on the desk, on the chair.  It worked for him.  It was

13 messy probably to me, but that was his system.

14   Q    As you told us, he knew where the items were?

15   A    Yes.

16   Q    In other words, he knew which pile to go to to

17 get the pleading perhaps?

18   A    Yes.

19   Q    Mr. Picl, the defendant, he went through a

20 divorce.  His first divorce was when, do you recall?

21   A    I don't remember the year.  It was while I was

22 working for him.

23   Q    That caused him quite a bit of discomfort and

24 stress?

96

1    A    In my opinion, it did.

2    Q    And there was also a period of time that the

3  defendant represented -- when he first began to

4  represent Mrs. Varga in relation to an auto accident,

5  correct?

6    A    I think he handled one minor thing before

7  her -- I think maybe she -- it was something to do with

8  an estate that she was an heir and maybe he just -- I'm

9  not 100 percent sure, but I think that was first and

10  then she was involved in the automobile accident.

11    Q    And both for his representation of Mrs. Varga

12  and the heir issue, to use that term, and the auto

13  accident he received compensation for that, didn't he,

14  as her attorney?

15    A    I believe so.

16    Q    Now, as you told us, she became very dependent

17  on the defendant, correct?

18    A    Correct.

19    Q    And she would call your office a number of

20  times?

21    A    She would call when she needed something that

22  needed attention.

23    Q    And then you would tell the defendant about

24  her phone call?

97

C 3407

1    A    I would.

2    Q    Now --

3    A    She had access to his number.  I think she

4  would try him, and if she didn't get him that was

5  probably an occasion he couldn't receive the call and

6  she would call the office.

7    Q    When she would call, you would pass on her

8  message to the defendant?

9    A    Right.

10    Q    Were you working for the defendant in January

11  of 2003?

12    A    I was working there, but I had very little

13  contact with another -- another secretary was in the

14  office downtown who -- I felt like my services really

15  were not needed.  I basically answered the phone and

16  picked up the mail.  I had probably no contact.  I was

17  not -- I didn't have any problem with the other

18  secretary, but I felt at that point Frank was using

19  some poor judgment on how he was handling his practice.

20    Q    Now, with regard to Mrs. Varga, though, in

21  January of 2003, did you, yourself, handle any

22  documents relating to her assets?

23    A    No.

24    Q    Did you handle any documents relating to any

98

C 3408

1    of her bank accounts?

2        A    No.

3        Q    Did you handle any documents of the defendant

4    for his client trust accounts that he had?

5        A    No.

6        Q    Who handled all of those items first off with

7    regard to the defendant's own client trust account, if

8    you know?

9        A    I think Mr. Picl handled all the financial --

10   I did not do any bookkeeping pertaining to his practice

11   or his -- you know, his private practice.

12       Q    As you have also told us, the defendant was

13   not timely in sending out his billing statements for

14   the -- for instance, for clients he was representing in

15   federal court; is that a fair statement?

16       A    No, he was not timely.

17       Q    And he also wasn't timely in sending out

18   statements and bills for other legal work he did for

19   private attorneys -- or private individuals?

20       A    No.

21       Q    So if he didn't send those statements out, his

22   income coming into his practice was diminished because

23   of it, at least partly; is that a fair statement?

24       A    I don't know if it was diminished or not.

99

C 3409

1　Maybe some of his billing didn't need a statement.

2　There was a few -- there was not a whole lot of them

3　that I thought could be billed, but I don't know how it

4　affected his income.

5　　　Q　Let me ask this.

6　　　A　I would say the federal cases probably

7　diminished his income, but I think there were times he

8　spent on the cases the bill would have been sent.　It

9　would have been paid.

10　　　Q　Do you know how much he had in outstanding

11　billings at least as of your last knowledge of that,

12　the defendant had when you left his employment?

13　　　A　No.　To my knowledge, it wouldn't have been a

14　great sum.

15　　　Q　Pardon?

16　　　A　To my knowledge, it wouldn't have been a great

17　sum other than the federal cases.

18　　　Q　Would not have been a great sum?

19　　　A　Right.

20　　　Q　Then with regard to other billings, separate

21　and apart from his billings to the federal government,

22　how much would you estimate those other billings were,

23　let's say the private individuals?

24　　　A　I would say probably minimal because I think

100

C 3410

1   mostly if somebody hired him to do something he got his

2   whatever he quoted as the retainer, it was paid, and...

3       Q    Based on your experience, what was the

4   defendant's source of income at the time that you left

5   his employment?

6       A    I would say his income from his being an

7   assistant public defender and any personal cases that

8   he handled, and I have no idea what amount income that

9   involved.

10      Q    And then how about with regard to his

11  employment as a public defender, assistant public

12  defender, how much was he making in terms of his

13  salary, if you know?

14      A    I think a little over $2,000 a month, I think.

15      Q    And was that as of the last time that you were

16  working with Mr. Picl in January of 2004?

17      A    I don't know.  I really don't know anything --

18  I would say from 2003 I'd -- I was just kind of like

19  out of the picture.

20      Q    The defendant's brother, Bill, he worked with

21  you on occasion, I think, in trying to bring up-to-date

22  the defendant's billings?

23      A    I think there was a period of time when Bill

24  was in the office when we were in the Commerce Bank

Exhibit 22-3

C 3411

101

1    Building.

2        Q    What period was that, ma'am?

3        A    Probably in the first three or four years I

4    worked for him.  And I think Bill had a few

5    disabilities, and Frank always took care of Bill, and I

6    think he was trying to find something for Bill to do

7    that he would have the opportunity to use the skills he

8    had.  And so one of the things was we tried to get

9    these federal cases lined up and Bill worked on that,

10   and we got a result on that.

11           And then Bill left the office.  I think he --

12   I don't know.  I think he went to Chicago and became a

13   substitute teacher.  I'm not sure what path Bill -- I

14   know Frank always knew where Bill was.  There was a

15   period of time when Bill actually rented a house from

16   my husband and I, and Frank saw to it that he was

17   settled in there and he had what he needed and he got

18   along fine, and then I didn't really follow Bill's

19   career.

20       Q    Let me go back to something you said a while

21   ago, that you felt the defendant wasn't showing good

22   judgment.  Did you bring your concern to anyone?

23       A    No, I didn't.  There was nobody to bring it

24   to.

C 3412

1    Q    Did you talk with the defendant about his poor
2  judgment?

3    A    I think he knew how I felt about the new
4  secretary, that I didn't feel that my services were
5  needed and we weren't going to work as a team.

6    Q    And you felt that his use of his new
7  secretary, did you have some conflict with her?

8    A    I can't say I had any conflict with her.

9    Q    And his new secretary, what was her name that
10  you are talking about?

11    A    Rita.

12    Q    That became the defendant's wife at some point
13  thereafter; is that correct?

14    A    I'm not sure.  I think they were married and I
15  think they were divorced, but I know that -- don't know
16  that -- I was not working there at the time.  I didn't
17  really know too much about Mr. Picl's personal life.

18    Q    Did you know that they were having problems
19  between the defendant and his second wife, Rita?

20    A    No.  I didn't know anything about his life
21  with Rita.

22    Q    Pardon?

23    A    I didn't know a whole lot about his life with
24  Rita.  I knew Rita was a new person in his life, and at

103

C 3413

1   that point, like I say, I was working out of my home

2   doing very little work.

3        MR. EVANS:  Thank you.  No further questions.

4        THE COURT:  Mr. Toner.

5                    REDIRECT EXAMINATION

6                    BY MR. TONER:

7   Q    Two brief questions.

8        With regard to the fact that you thought Frank

9   was showing poor judgment, was that in relationship to

10  his hiring Rita or were there other aspects of his

11  practice that that's what you mentioned?

12  A    I think maybe sometimes during the course of

13  my employment I thought he was showing poor judgment

14  because he wasn't doing things just the way I thought

15  they should be done, but...

16  Q    But I guess things such as what?  What were

17  the --

18  A    Getting things done when we would have two or

19  three calls, and they just never seemed to get done,

20  and it would become a problem because I would try to

21  tell these people, yeah, we're going to get this

22  resolved, just be patient and it became kind of hard to

23  put them on the hold plan for --

24  Q    You mentioned Frank took care of his brother

104

C 3414

1   Bill or made sure his needs were --

2       A    I think Frank always knew Bill's whereabouts

3   and made sure he was taken care of, what I observed.

4   And I think Bill looked to Frank for guidance and help.

5       MR. TONER:  If I may have a moment, Judge.

6           I don't have any further questions.

7       MR. EVANS:  No further questions.

8       THE COURT:  You can step down.  Thank you.

9               (Witness excused.)

10      THE COURT:  Please step toward and raise your right

11  hand.

12              (Thereupon the witness was duly sworn.)

13      THE COURT:  Please have a seat.

14                      ANNA SAXON

15  called as a witness on behalf of the Defendant, after

16  having been first duly sworn, was examined and

17  testified as follows:

18                  DIRECT EXAMINATION

19                  BY MR. TONER:

20      Q    Please state your name.

21      A    Reverend Anna Saxon.  My last name is spelled

22  S-A-X-O-N.

23      Q    And where are you a Reverend?

24      A    I'm an associate pastor at Westminster

105

C 3415

1  Presbyterian Church, 1420 West Moss Avenue here in

2  Peoria.

3      Q    How long have you been assigned to

4  Westminster?

5      A    I have been there a little over 11 years now.

6      Q    In that capacity, do you know Frank Picl?

7      A    Yes.  I have known him for that entire time.

8      Q    And how is it that you know him?

9      A    I first knew Frank as a part of his entire

10  family, his wife at the time and his three children as

11  well as Frank were very active in the life of the

12  church.  And, indeed, Frank was an assistant actually

13  in leading worship on a fairly regular basis with us

14  when I first became a part of the staff there.

15     Q    So is that -- in your denomination, is that

16  what they would call an elder?

17     A    Well, actually, the service that he provided

18  in worship was as a lay liturgist, but he has served as

19  an elder for our congregation which is somebody who

20  serves on the governing board.  He was not currently

21  serving as an elder when I came to Westminster, but had

22  previously served.

23     Q    As a lay liturgist, what would his

24  responsibilities be?

106

1       A     He would assist the pastors in leading Sunday

2   morning worship.  So he would be in the pulpit leading

3   prayers and assisting in the liturgy of the morning

4   worship.

5       Q     When you say first, did that -- and I take it

6   there was a period of time when he wasn't as active?

7       A     Yes.  He kind of disappeared after I had been

8   there for some period of time, became aware that he and

9   his wife were having marital difficulties, and it was

10  at that time that he kind of disappeared.  And that's

11  not uncommon with members of the church especially when

12  there is marital difficulties especially that end in

13  divorce.  Oftentimes both parties just kind of

14  disappear from the life of the church.

15      Q     In doing the math, you said you have been

16  there 11 years.  So you got there about '95?

17      A     Uh-huh.

18      Q     And for the first period of time up until they

19  were getting separated he was involved, and that's when

20  he kind of fell out?

21      A     Right.

22      Q     Would that -- when was the next time you saw

23  Frank on that kind of a regular basis, or would you see

24  him sporadically?

107

C 3417

1    A    You saw him sporadically. Mostly in the

2 community, sometimes at the courthouse when I might be

3 here with somebody else that I was maybe working with,

4 a family or some other issues and I might see him here.

5 I might see him out and about in the community.

6         He didn't really reappear at the church other

7 than occasionally when he would come to worship on

8 particularly holidays, especially when his daughters

9 were with him, until about two years ago. Maybe two

10 and a half years ago he kind of all of a sudden showed

11 back up in a new worship service we started on a

12 Saturday afternoon called our Celtic vespers worship.

13 He started coming to that on occasion with his father

14 as well.

15    Q    I want to ask you to back up for a second, but

16 those two things, first of all, as a pastor, you say

17 that even after he and his wife separated occasionally

18 he would be there with his daughters?

19    A    Yes.

20    Q    Did you have an opportunity to know them?

21    A    No.

22    Q    His daughters?

23    A    I had more contact with them as they were

24 involved in the Sunday school program, but after the

C 3418

1   divorce they were also getting older and had gone off.

2       Q    Going to school?

3       A    Yeah.  And so I didn't have as much

4   opportunity with them at that time.

5       Q    What about he started taking his dad to the

6   vespers service on a Saturday?

7       A    Uh-huh.

8       Q    His dad just lives down the street?

9       A    Yes.  And they have been long-time members,

10  and his dad has been having difficulty, and Frank was

11  making sure that his dad had an opportunity on occasion

12  to come to worship because that was something his dad

13  enjoyed doing.  Frank stated at the time when he

14  reappeared, I really need to do this, I need to

15  reconnect with the church.  I was kind of surprised at

16  that, but I was glad to have him make the first move to

17  come back.

18      Q    Now, you say that was about two years ago?

19      A    Yes.

20      Q    So would that have been before he was arrested

21  or --

22      A    Yes.  Absolutely before he was arrested.

23      Q    And he indicated that he connected back --

24      A    Yes.  He was actually quite emotional about

109

C 3419

1    it.

2        Q    Did you and he talk about that?

3        A    Not in depth.  We were at a worship service at

4    that time, and, I mean, he was kind of erratic talking,

5    you know, he was jumping around from different things

6    about bringing his dad back and some of the needs that

7    his dad had.  And I remember asking him about his

8    brother because he had been back in town, and so he

9    jumped around a lot of different issues, but did

10   mention his desire and his need to kind of reconnect

11   with Westminster and with his faith.

12       Q    Now, with regard to the needs of his father,

13   have you had an occasion to observe this in the last

14   couple years?

15       A    In terms of his father's issues?

16       Q    Yes.

17       A    Absolutely.

18       Q    Can you tell the judge what his father's

19   current health issues are and then what role Frank

20   plays in helping to assist those?

21       A    It's a little difficult because I would ask

22   for Frank's permission for confidentiality in terms of

23   his father's situation.

24       Q    His father has some health concerns?

110

C 3420

1　　　A　　His father had a number of health concerns --

2　has, many of now keep him homebound, forms of I would

3　say dementia, Alzheimer's related kinds of things.  We

4　witnessed that as he would come to worship at various

5　times, and Frank has been very good at being able to be

6　the one who could care for his father.  And he was

7　great with him when he would bring him to worship and

8　other times that I would see them.

9　　　Q　　Does he -- to your knowledge, does he play a

10　role in that even inside as well as outside the church?

11　I mean, in other words, outside is he doing other

12　things than just bringing him to church?

13　　　A　　I have heard from family members as well as

14　Frank that he does that, but I don't make regular

15　visits to their home to know that personally.

16　　　Q　　Let's move forward to did you have an occasion

17　to talk with Frank shortly after he was arrested?

18　　　A　　Actually, my knowledge after he was arrested

19　was through conversation with Pastor Macaulay who has

20　previously testified as to the conversation that they

21　had together.

22　　　Q　　And subsequent there, what contact would you

23　have had with Frank concerning these -- have you talked

24　to him about this?

111

C 3421

1      A    Yes.  I have talked to him more recently about

2    this situation and what he was -- how he was dealing

3    with it, and I think it would be wrong to in any way

4    characterize his comments about some of his addictions

5    and other things like that as excuses for his behavior.

6          First and foremost, he admitted the wrongness

7    of his behavior as regards to his client and accepted

8    responsibility for the decisions he made and was very

9    remorseful probably mostly about the breach of trust

10   and the way that that hurt her.  Also concerned about

11   the monetary aspect as well, but the conversations

12   about the alcohol addiction, the gambling addiction,

13   other treatments for mental illness, all came as a way

14   as his description of coming to grips with a life

15   that's been out of control and finally coming to terms

16   with a lot of those things that needed to be addressed

17   that he had just not recognized or fully addressed

18   before.

19      Q    You mentioned in your letter that -- you used

20   a term spinning.  Is that spinning out of control?

21      A    I think when he came back two years ago when I

22   first began to see him back on those occasions back at

23   worship, my sense and I even mentioned to my colleague

24   that I felt like Frank's life was spinning out of

C 3422

1  control. His conversations were erratic. He was at

2  worship with a strong smell of alcohol on him, all

3  kinds of things that sent messages to me that he was --

4  he was having a hard time controlling his life. Like I

5  said before, his conversation was kind of all over the

6  map in terms of what he was talking about. So that

7  would be the -- the way I would characterize my

8  perception of him at that time.

9      Q    But that nonetheless was before he was

10  arrested --

11     A    Right.

12     Q    -- and trying to reestablish --

13     A    Absolutely.

14     MR. TONER: If I may have a moment, Judge?

15     THE COURT: Sure.

16     MR. TONER: Q  In addition to serving in church

17  positions, have you ever had an occasion or anybody

18  at your church ever had occasion to ask Frank to

19  utilize his talents helping somebody else around the

20  church or community?

21     A    Certainly legal advice. And as I said, a

22  couple times when I have run into him here in the

23  courthouse or contacted him for advice regarding

24  somebody that we became aware of in the church, both

113

C 3423

1  members and nonmembers who needed some legal advice,

2  and he has always been very helpful to us in that

3  regard.

4      Q    He steps up to the plate and --

5      A    Yes.  Gives good advice and we're able to find

6  the help for the people that need it.

7      Q    And that's something that you have experienced

8  on a consistent basis?

9      A    Yeah.  I would say so.

10     MR. TONER:  I don't have any further questions.

11  Thank you.

12     THE COURT:  Mr. Evans?

13                CROSS-EXAMINATION

14                BY MR. EVANS:

15     Q    Ma'am, you use the term that he gave good

16  advice.  You don't know what advice he gave to

17  Mrs. Varga in this case, do you?

18     A    No, I don't.

19     Q    Do you know anything about the facts of this

20  case?

21     A    I know certainly what I have read.  I know

22  what he's admitted to in terms of the charge.

23     Q    Has he admitted taking almost $280,000 from

24  this 85-year-old woman?

114

C 3424

1    A    Yes.

2    Q    Has he told you if he's made restitution to

3  this woman?

4    A    He has said he has not at this point.

5    Q    Has not?  Not a penny?

6    A    To my knowledge, not a penny.

7    Q    Now, ma'am, your term that you have used, out

8  of control, that's a term of art that you have used, I

9  assume?

10    A    I'm sorry.  Could you help me?

11    Q    Out of control, that was a term you used in

12  describing the defendant?

13    A    Yes.

14    Q    Now, at the time that you talked to him two

15  years ago, that was the first time you'd seen him in a

16  number of years?

17    A    Probably two years ago.  Would have been back

18  in 2004.  So it had been since the time of his divorce.

19  So maybe a couple of years.

20    Q    He was divorced in 1999?

21    A    Well, it was around 2000 because we had seen

22  him with -- when Pastor Clay had come in 2000.

23    Q    When you saw the defendant that time

24  approximately two years ago, he told you then that he

115

C 3425

1   wanted to reconnect with the church?

2       A    Uh-huh.

3       Q    He had been drinking when you talked with him?

4       A    He smelled of alcohol.

5       Q    He didn't reconnect with the church, though,

6   until 18 months ago, correct?

7       A    No.  At that time at two years, at that

8   two-year mark was when he began attending and then he

9   was arrested, and then he's not been regular in church,

10  but, as I understand, he's also been doing some other

11  things, but he has been back in church in the last 18

12  months, yes.

13      Q    I know that, but he had not -- from the time

14  you saw him two years ago, he didn't come back to see

15  you until holy week approximately 18 months ago?

16      A    No.  He actually worshipped with us on a few

17  occasions at that two-year point.

18      Q    At that time, did he smell of alcohol?

19      A    Yeah.

20      Q    And --

21      A    I don't know that every time, but it was -- I

22  noticed it, and it was mentioned to me by another

23  parishioner at that time.

24      Q    Do you have any concern -- and I'm sure you

116

C 3426

1  do.  I don't mean to phrase it that way.  You do have a

2  concern with what the defendant did in this case?

3      A    Absolutely.  In fact --

4      Q    In your letter -- if I could just ask the

5  question, please, ma'am.

6      A    Sure.

7      Q    You say that you are very vigilant regarding

8  exploitation and abuse of elderly individuals, correct?

9      A    Yes.

10      Q    And I assume, ma'am -- you said you work

11  closely with the Center For Prevention of Abuse?

12      A    Yes.

13      Q    And in your profession, in your ministerial

14  profession, and I understand that you, yourself, are

15  not concerned with punishment for someone?

16      A    I'm concerned for punishment, but I'm also

17  concerned that justice is more than punishment, that

18  there's restorative and a societal element that must be

19  looked at in terms of not only punishment, but doing

20  what will restore somebody to being a good and positive

21  influence and asset to society.

22      Q    Who is responsible for stealing Alice Varga's

23  money?

24      A    Frank is, and he's admitted to that.

C 3427

1      Q    And he hasn't returned any money that he took

2  from her, right?

3      A    Not to this point.

4      Q    And you are concerned in your field with

5  reconciliation and restoration, which I believe you

6  have written to the Court?

7      A    Right.

8      Q    You feel it's important to restore someone

9  back into society, correct?

10     A    If at all possible, yes.

11     Q    You are aware in your contact with other

12  individuals through the Center of Abuse that taking an

13  85-year-old woman's sole life savings can have a

14  debilitating effect, correct?

15     A    Emotionally as well as physically.

16     Q    As well as physically, right, ma'am?

17     A    Yes.

18     Q    And you have also seen the horrendous effects

19  of actions on other elderly persons, correct?

20     A    I have seen the effects, yes.

21     Q    You haven't seen the effect in terms of

22  Mrs. Varga, obviously, because you didn't know her?

23     A    No, I didn't know her personally.

24     MR. EVANS:  No other questions.

118

C 3428

1      THE COURT: Mr. Toner.

2                REDIRECT EXAMINATION

3                BY MR. TONER:

4      Q    Ma'am, you indicated you have seen this and

5   you are aware of these effects?

6      A    Uh-huh.

7      Q    Yet, you still believe that there should be an

8   aspect of the justice system that deals with the

9   restorative potential, if applicable?

10     A    Uh-huh.

11     Q    Is that correct?

12     A    That's correct. I think in this --

13     MR. EVANS: Judge, I object at this point. I think

14  that's the province of the Court at this point.

15     THE COURT: Mr. Toner.

16     MR. TONER: I was going to ask the next question,

17  if I may.

18     THE COURT: Go ahead.

19     MR. TONER: Q  Do you believe in this particular

20  case that Frank has the qualities that would allow

21  him to be restored?

22     A    I do. I believe that as other folks have

23  said, you can't go back and undo -- what he has done is

24  wrong, and he's admitted that. You can't go back and

119

C 3429

1  undo that.  The next best thing to do is to show

2  consequences for his wrong choices and wrong behaviors

3  as well as then provide the opportunity for him to

4  become productive and also, therefore, to begin working

5  on restitution.

6       I do believe in what I have seen of Frank and

7  the commitment he's made to counseling, counseling

8  alcohol treatment, gambling treatment and the sincerity

9  that he's shown that he does have the capabilities to

10 be restored to society in a positive manner.

11     MR. TONER:  Thank you.  No further questions.

12     THE COURT:  Mr. Evans.

13     MR. EVANS:  No further questions.

14     THE COURT:  You can step down.  Thank you.

15               (Witness excused.)

16               (Thereupon the witness was duly sworn.)

17               THOMAS PENN

18 called as a witness on behalf of the Defendant, after

19 having been first duly sworn, was examined and

20 testified as follows:

21               DIRECT EXAMINATION

22               BY MR. TONER:

23     Q    Please state your name.

24     A    Thomas Penn.

120

C 3430

1    Q    And your occupation and profession?

2    A    An attorney at law, currently public defender,

3    chief public defender, Peoria County.

4    Q    In that capacity, do you know Frank Picl?

5    A    I do.

6    Q    And how long is it that you have known him?

7    A    If I remember correctly, I think I gave Frank

8    his first job.  He was an assistant public defender

9    when he got out of law school and also worked for me in

10   my own practice for a number of years.  So I have known

11   him for over 25 years, sir.

12   Q    I'm going to -- I'm going to ask you to expand

13   upon the areas that you wrote in your letter.  In your

14   letter you indicate that you know two Frank Picls.

15   A    Yes, sir.

16   Q    Could you explain what you mean by that?

17   A    Well, first of all, there's Frank Picl the

18   professional attorney that I have long known to be very

19   qualified, a man of high integrity.  I think I

20   characterized it in the letter as being in terms of

21   trial abilities the finest trial attorney I have seen

22   in the 40 years that I have been here.  Served the

23   interests of his clients well.  He dedicated himself to

24   public defender's work, which can be a thankless task,

C 3431

1  for over a quarter of a century and served the

2  interests of those clients, I think, very well.  And I

3  have already said a man of high integrity.

4        Then the other Frank Picl that I came to know

5  was the addicted Frank Picl.  I knew his addiction as

6  it pertained to alcohol.  Because Frank and I had a

7  professional relationship and didn't spend personal

8  time together, I was not aware of that addiction

9  shifting itself to the area of gambling ultimately.

10    Q    Now, you indicate that he handled himself

11  honorably, to your knowledge, in this capacity as the

12  assistant public defender?

13    A    He did.

14    Q    With regard to his personal life, did you

15  notice any changes in that?

16    A    Well, many years ago, I certainly became aware

17  of the fact or had the opinion that Frank was drinking

18  irresponsibly.  Some of this had relevance to my own

19  life because I'm a recovering alcoholic and I know the

20  signs.  I have been there, done it, and, in a sense,

21  bought the T-shirt.  So I had awareness many years ago

22  of a problem and would talk to Frank about it

23  periodically.  The other thing I did which I felt I had

24  the obligation to do as public defender, I alerted

122

C 3432

1   through the years many judges -- and I have done this

2   as to other people who have worked for me as well -- I

3   alerted many judges to my concern and insisted that I

4   be notified if there was any signs of impairment as far

5   as his professional work for me was concerned.  I can

6   honestly say as I sit here that notwithstanding the

7   problem, I never had one complaint from one judge or,

8   for that matter, that I can recall any prosecutor that

9   ever related to me that anything had happened in the

10  courtroom that had anything to do with his drinking.

11       Frank had a right to make his own life's

12  choices.  I was concerned about the professional

13  ability and the professional outcome.  And

14  notwithstanding the problems that I knew to exist,

15  Frank did an exemplary job in representing his clients

16  at least until a few years ago.

17       Q    And when you say a few years ago, what do you

18  mean by that?

19       A    Well, probably in I'm going to guess in 2003

20  maybe Frank began to talk to me about perhaps getting

21  out of the practice of law, doing his own thing in a

22  different direction and that led to his decision to

23  resign from the public defender's office, which I think

24  was in 2004.  I urged Frank to reconsider that.  I had

123

1   my own concerns that that public defender's position

2   because of Frank's pride that he always had in his work

3   may have served as a rudder of sorts, that I had some

4   fears if that position were resigned that that rudder

5   wouldn't be there.

6       Q    When you say a rudder, you mean something that

7   a rudder maybe an anchor?

8       A    It was something that I think in my mind kept

9   Frank -- when he was in the courtroom kept him on the

10  straight and narrow so that he could do his work as

11  professionally as he did.  With those responsibilities

12  being gone, I had some fears that maybe the addiction

13  could take even a greater toll on him.  I had serious

14  concerns about that.

15      MR. TONER:  May I have a moment, Judge?

16      Q    Over the years you indicated that for a while

17  you and Frank actually had an office relationship in

18  addition to him being an assistant public defender.

19      A    That's correct.  That's early in Frank's

20  career.

21      Q    And then the two of you broke off socially and

22  he had moved on in his own practice and you didn't see

23  him as much socially?

24      A    That is correct.

124

C 3434

1    Q    And over the years, had you had an occasion to
2   talk to him about his drinking?

3    A    I did.

4    Q    And would it be fair to say that it fell on
5   deaf ears?

6    A    There were moments when Frank enjoyed periods
7   of being clean and sober, but, for the most part, he
8   would seem to relapse into old habits.  Unless you have
9   lived it or been around it, it's a difficult concept to
10  understand, but when you are an addict, whatever the
11  substance is you are addicted to or activity, that
12  addiction becomes your guide and you do insanely stupid
13  things to feed and support that addiction.  The
14  objective is to conquer those demons, and that was
15  something that up to recent times Frank didn't seem to
16  be able to do.

17   Q    You say up until recent times.  Did you talk
18  to him shortly before he went to Minnesota?

19   A  ·  Yes.

20   Q    And what was his demeanor then at that point?

21   A    Well, once this became public, Frank is --
22  this will sound probably kind of crazy given these
23  circumstances, but once Frank was exposed, Frank was a
24  very proud man, and I think that pride contributed to

125

C 3435

1  his professional success in the courtroom.  He wanted

2  to do a good job.  As long as this was not a matter of

3  notoriety, it wasn't a problem, but when the whole

4  thing was exposed and the charges were brought, Frank

5  became very much a hermit.  He was embarrassed to come

6  downtown.  Went I would meet him, we would meet outside

7  the area because he didn't want to be around people.

8       I saw from the get-go once the charges were

9  brought a very remorseful, very sorrowful, very ashamed

10  person as to what he had done, and I spoke rather

11  frankly to him as to what he had done.  There's no way

12  that those actions can be justified in any way, shape,

13  or form, and that's clearly -- I'm not here for that

14  purpose today, and we talked about that on a number of

15  occasions.

16       For what it's worth, I have every reason to

17  believe that when Frank Picl tells me today that he has

18  been clean and sober for a long period of time, I have

19  every reason to believe that perhaps for the first time

20  in his life that's the absolute God's truth.  I think

21  he has seen that door open up and I think he's gone

22  through it.

23       Q    That was going to be my next area.  That was

24  before he went into treatment.  Have you talked to him

126

C 3436

1    more recently?

2        A    Yes.

3        Q    He's indicated -- does he seem committed to

4    this?

5        A    Yeah.  And you are talking to a real sceptic

6    when it comes to people telling me that they have seen

7    the light, but, you know, in all honesty, I have every

8    reason to believe that that situation in Frank's life

9    may very well be over, whatever happens here.

10       Q    Do you have -- you have seen and you have done

11   an awful lot of criminal work.  With the type of

12   commitment that Frank seems to indicate, do you think

13   he would be able to complete a probationary period with

14   conditions?

15       A    Absolutely.  As I mentioned in my letter, this

16   could be probation up to 30 years, and I can in good

17   conscience say that I think Frank could complete a

18   period of probation with whatever conditions.

19       MR. TONER:  I don't have any further questions.

20       THE COURT:  Mr. Evans.

21                    CROSS-EXAMINATION

22                    BY MR. EVANS:

23       Q    Mr. Penn, it's still possible for the

24   defendant to also serve a term of imprisonment; isn't

127

C 3437

1   that correct?

2       A    Yes, sir.  And I believe I referenced that in

3   my letter as well.

4       Q    The defendant did not come to you as his boss

5   and say, hey, I took the lady's money, what should I

6   do, did he?

7       A    He did not, but then I also was not his boss.

8   He's an independent contractor.

9       Q    But he never approached you beforehand and

10  admitted any wrongdoing until he was arrested by the

11  state's attorney's investigators?

12      A    I was astonished, Mr. Evans, when I learned of

13  this because it was so out of character for the man I

14  knew.

15      Q    Now, the defendant has a reputation in this

16  county as an excellent trial attorney, correct?

17      A    That is correct.

18      Q    As you have told us, he could try cases well?

19      A    Very well.

20      Q    He represented his clients adequately?

21      A    He did.

22      Q    He gave a forceful defense?

23      A    He did.

24      Q    He always put the interests of the client

C 3438

1    ahead of his own?

2        A    There is no question about that.

3        Q    He was prepared for trial?

4        A    In my estimation he was.

5        Q    He showed up for trial?

6        A    Yes.

7        Q    And he gave the proper objections and

8    arguments on the appropriate case?

9        A    Well, I wasn't in the courtroom when he

10   argued, but I certainly heard nothing to the contrary.

11       Q    And as you have told us, nobody complained to

12   you that Frank Picl didn't adequately represent his

13   client?

14       A    No one -- I mean, that is correct, but on the

15   same line, a lot of people certainly were aware that

16   Frank at different times in his life was drinking too

17   much.

18       Q    Right.  There were times that the defendant

19   would go on a Friday afternoon or other weeknight he

20   would go to a local bar and have something to drink?

21       A    I'm assuming that's true.

22       Q    And when you say that it was known, other

23   individuals knew that perhaps Mr. Picl had more to

24   drink than he should have?

1      A      Perhaps.

2      Q      When you use the term relapse, that meant that

3   he took that next drink again?

4      A      One too many.

5      Q      One too many?

6      A      Uh-huh.

7      Q      Now, you used the term that he shifted to

8   gambling.  Do you know why he started to gamble?

9      A      No.  As I say, I have no knowledge of that

10  until the charges were exposed.  I'm assuming he

11  shifted the addiction.  Again, those of us who are so

12  afflicted often when we get rid of one addiction, we

13  transfer it to another.  That's a common activity

14  within addiction circles.

15     Q      How about that he took so much money of

16  Mrs. Varga he was trying to find a way to get it back

17  to her?

18     A      Again, I never had any conversations with him

19  along those lines.

20     Q      That's another plausible reason to go to the

21  boat and try to get lucky, try to get some money; isn't

22  that a fair statement?

23     A      I suppose so.

24     MR. EVANS:  No further questions.  Thank you,

                                                    130

C 3440

1   Judge.

2       MR. TONER:  No further questions.  Thank you,

3   Judge.

4                   (Witness excused.)

5       THE COURT:  Sir, please raise your right hand.

6                   (Thereupon the witness was duly sworn.)

7                   DAVID RADEMAKER

8   called as a witness on behalf of the Defendant, after

9   having been first duly sworn, was examined and

10  testified as follows:

11                  DIRECT EXAMINATION

12                  BY MR. TONER:

13      Q    Thank you.  Please state your name, spell your

14  last name for the court reporter.

15      A    David Rademaker, R-A-D-E-M-A-K-E-R.

16      Q    Mr. Rademaker, what's your occupation and

17  profession?

18      A    I'm a union carpenter.

19      Q    Do you know Frank Picl?

20      A    Yes, I do.

21      Q    And can you tell the judge how is it that you

22  know him?

23      A    I met Frank 17 months ago when I went into

24  treatment at White Oaks Center for alcoholism.

131

C 3441

1       Q     Did you enter about the same time he did?

2       A     I believe about a week after he did in the

3    program.

4       Q     So would it be fair to say that you and he

5    have gone through recovery together?

6       A     Absolutely.

7       Q     And did you and he both complete the MRM?

8       A     Yes.

9       Q     And the aftercare?

10      A     Yes, sir.

11      Q     And did your schedules coordinate that you

12   were going along those programs together?

13      A     Yes, sir.

14      Q     Would you see him on a regular basis?

15      A     Yeah.  During the seven weeks that I was there

16   I saw him daily, and then after that, during the

17   aftercare program, which went on for eight weeks, nine

18   weeks.

19      Q     And you saw him on a regular basis?

20      A     Correct.

21      Q     Do you see him at other settings, AA meetings

22   and things like that?

23      A     Yeah.  I see Frank about once a week even to

24   today in an AA meeting or at the -- as we discussed

132

1   earlier, the MRM alum meetings.

2       Q    Have you had an occasion to talk with Frank

3   about what brings him here today?

4       A    Yes, I have.

5       Q    And what has he told you about that?

6       A    That basically he has exercised bad judgment,

7   he was very sick, and he did it.

8       Q    He freely acknowledged that he stole this

9   woman's money?

10      A    Right.

11      Q    Has he in your experience there with that, has

12  he been candid in acknowledging what he did in moving

13  toward his treatment?

14      A    Yeah.  I believe so.  There's nothing he can

15  do about it.  He knows that, and he's left with doing

16  the best he can with his own recovery and helping

17  others along in their recovery.

18      Q    Have you seen him attempt to do that?

19      A    Absolutely.

20      Q    Can you think of some instances or examples

21  where he is helping other people along with their

22  recovery?

23      A    Well, after the meeting there's usually a

24  crowd around him.  There's a lot of people that come to

C 3443

1    AA meetings that are driven to AA meetings because of

2    legal problems, marital problems, lot of things that

3    involve the court system, and he has kind of a calming

4    effect on them for two reasons; A, because he's

5    obviously facing larger consequences than they are and

6    presenting himself in a calm manner, and, B, because if

7    anything can be said about an alcoholic and their

8    nature, they can make mountains out of mole hills and

9    you can definitely think yourself into a drink quickly,

10   and he has a way of quelling the imagination of people

11   that are going way out there with legal events that may

12   never come to pass that are unfounded and bringing them

13   back to reality and getting them through another day

14   without a drink.

15       Q    So you have seen him actually do this on more

16   than one occasion?

17       A    With me, too.

18       Q    How has he helped you?

19       A    I have been going through a separation with my

20   wife for some time, and not so much in legal terms, I

21   guess, but just in terms as a friend, discussing that

22   with me.

23       Q    Is Frank as a friend a good asset to have a

24   around?  Is he dependable?

134

1    A    Yes, he is.

2    Q    As the two of you are going through your

3  recovery process, do you discuss the journey along the

4  way, so the speak, how you are reacting, what's going

5  on?  Does Frank tell you how he's handling this?

6    A    We have gone through the journey pretty much

7  together.  As we said earlier, I mean, that journey

8  starts out from recovering from insanity.  You know, in

9  my humble opinion, I drank myself to the state of

10  insanity, and it takes a while for the alcohol to get

11  out of your system for that sanity to start to return

12  slowly.

13         Going through that time when the chemicals are

14  leaving your body and gradually starting to learn

15  again, I kind of wake up, and I'm 48 years old and kind

16  of starting to pick up where I left off when I started

17  drinking in terms of maturing, and it's a journey we

18  have been going on together.

19    Q    Have you noticed those types of changes in

20  Frank's behaviors as well?

21    A    Yeah.

22    MR. TONER:  May I have a moment, Judge?

23         Nothing else.

24    THE COURT:  Mr. Evans.

135

C 3445

1    MR. EVANS:  No questions.

2    THE COURT:  You can step down.  Thank you.

3                (Witness excused.)

4    MR. TONER:  If I can have a second, Judge.

5         William Mitchell.

6                (Thereupon the witness was duly sworn.)

7                WILLIAM MITCHELL

8    called as a witness on behalf of the Defendant, after

9    having been first duly sworn, was examined and

10   testified as follows:

11               DIRECT EXAMINATION

12               BY MR. TONER:

13   Q    Please state your name.

14   A    William Mitchell.

15   Q    And, Mr. Mitchell, you know Frank Picl,

16   correct?

17   A    I do.

18   Q    How is it you know him?

19   A    I first came to know Frank at Alcoholics

20   Anonymous meetings.

21   Q    And what group do you go to?

22   A    We go to a group called Share Clean Air.

23   Q    And when is it that you met him approximately?

24   A    More than a year ago.

136

C 3446

1    Q    And does he come to meetings on a regular
2   basis?

3    A    Yes.  Yes.  We attend meetings sometimes at
4   different times, but we often pass each other in coming
5   and going.  Frank attends more than one meeting a day.
6   So I often see him in the same meeting that I attend.

7    Q    And in that capacity, have you had an occasion
8   to have him talk to you about his recovery?

9    A    Yes.  To some degree before and after meetings
10  we do talk.  Most of what I know of Frank and his
11  recovery I have heard him talk about during meetings.

12   Q    During the meetings, is there a point in time
13  when the people talk and give presentation and tell
14  what's going on with them and discuss things?

15   A    Yes.  That's the purpose of the meetings is to
16  discuss our own addictions, in particular alcohol in
17  this case, and how it has affected our lives and how
18  our lives are changed because of our recovery.

19   Q    In the meetings that you have gone through
20  with Frank, has he been open in sharing these things?

21   A    Absolutely, yes.

22   Q    And has he either at the meetings or with you
23  later or before meetings discussed what brings him here
24  today?

137

1    A    To some degree. I'm not aware of all the

2    details. As a matter of fact, I didn't really know

3    what was going on with Frank when I first knew him. It

4    was after he was in the meetings a while that I became

5    aware of what his problems were.

6    Q    And does he seem genuine about his approach

7    towards recovery?

8    A    Yes. When Frank -- when I first saw Frank in

9    meetings, he was like many of us when we first start.

10    We were like deers in headlights.

11    As he attended more, he began to relax. He

12    began to talk about his specific problems, about how

13    his addictions had affected his life in the past and

14    how he has begun to realize that what life should be is

15    what he's learning in Alcoholics Anonymous.

16    Q    And has he expressed what that life should be

17    or --

18    A    Yes. Yes. Life -- according to what I heard

19    Frank say life should be one of honesty, of

20    self-knowledge, of simply doing the next right thing,

21    and I think that's something that Frank genuinely

22    accepts and intends to pursue.

23    MR. TONER: I don't have any further questions.

24    Thank you.

138

C 3448

1          THE COURT:  Mr. Evans.

2                      CROSS-EXAMINATION

3                      BY MR. EVANS:

4          Q    Sir, the defendant's comment to you that he

5     wanted to do -- or life should be about doing the next

6     right thing, this was only something you heard him say

7     after he was arrested?

8          A    Yes.  I have known Frank only for little more

9     than a year.

10         MR. EVANS:  Thank you.

11         THE WITNESS:  You are welcome.

12         THE COURT:  You can step down.

13                     (Witness excused.)

14         MR. TONER:  Nothing further on that.

15              Greg Daniels I think will be the last witness

16    for the afternoon.

17                     (Thereupon the witness was duly sworn.)

18                     GREG DANIEL

19    called as a witness on behalf of the Defendant, after

20    having been first duly sworn, was examined and

21    testified as follows:

22                     DIRECT EXAMINATION

23                     BY MR. TONER:

24         Q    Please state your name.

139

C 3449

1     A     Greg Daniel.

2     Q     And do you know Frank Picl?

3     A     Yeah.  I have known Frank for probably ten or

4  more years.  I'd like to apologize for my dress.  I

5  came from work.

6        THE COURT:  You are fine.

7        MR. TONER:  Q  So you have -- you knew him for

8  ten years or more?

9     A     Sure.

10    Q     Did you know him when he was drinking?

11    A     Yes.

12    Q     And did you and he ever drink together?

13    A     Yes, sir.

14    Q     You drank at Whitey's?

15    A     Yes, sir.

16    Q     Would you see him on a regular basis there?

17    A     Yes, sir.

18    Q     And do you also know him now and see him at

19  meetings?

20    A     Yeah.  We cochair Alcoholics Anonymous

21  meetings together.

22    Q     Where do you cochair meetings?

23    A     Share Clean Air.

24    Q     And do the two of you ever have occasion to

                                              140

C 3450

1    discuss now versus then?

2        A    In terms of our lives?

3        Q    Yeah.

4        A    Sure.   That's part of the program.

5        Q    And what has Frank told you that's different

6    about his life now as opposed to back when he was

7    drinking at Whitey's with you?   What have you observed?

8        A    Well, he's totally changed his life around

9    just as I have myself.   The alcohol, you know --

10   alcoholism is a disease.   I don't know if many people

11   realize that.   It makes you do things that a sane

12   person wouldn't do.   What I have noticed in Frank which

13   I have noticed in myself, too, his life has totally

14   changed.   He's not the same Frank I drank with.   I'm

15   not the same Greg he drank -- you know, we both turned

16   our lives around from total chaos to, I hope, on the

17   right path.   He's expressed his remorse of his actions.

18       Q    Has he talked to you about those?

19       A    Not a lot, but we discussed it.   Remorse of,

20   you know, just normal things in life that -- with his

21   divorces, things that alcohol brings on.   Like I said

22   earlier, it's a disease, and it's hard to imagine

23   unless you have set and -- or walked in that person's

24   shoes.   It's not -- it's a lot harder than people

141

C 3451

1    think.

2         Q    How long have -- strike that.

3              Has Frank ever told you about any other

4    diseases that he may suffer from?

5         A    Physical or mental?

6         Q    Mental.

7         MR. EVANS:  Judge, I object to conversations.

8    Certainly, this witness is not qualified to mental

9    illness and this is irrelevant I submit for purposes of

10   the sentencing.

11        THE COURT:  I don't think he asked him to diagnose

12   him.  I think what he asked was has Frank ever told him

13   about a mental illness.  I think he can answer that.

14   Where we go from there, we'll see.

15        THE WITNESS:  Other than a problem with gambling,

16   no, I don't think he ever mentioned to me he was

17   mentally deficient.

18        MR. TONER:  Q  How often do you see him at the

19   meetings, would you say?

20        A    Very often.  I see Frank at least a couple

21   two, three times a week.  Like I say, we are cochairs

22   on the Monday evening meetings.  I see him at White

23   Oaks every week.

24        Q    At the recovery meeting?

C 3452

1        A    Yeah.  I see him at a lot of other different
2    meetings.  Our schedules conflict a lot.  I work in the
3    daytime.  He goes to a lot -- well, when I was in
4    recovery, I'd see him in the daytime and evening.
5    Mostly I see him in the evening now because it fits my
6    schedule with work and all.

7        Q    Do you see him particularly at meetings, both
8    AA and in the alumni meeting, the recovery group, do
9    you see him as providing assistance to people who are
10   going --

11       A    Definitely.

12       Q    -- into the program, too?

13       A    Definitely.  He was an inspiration to me.
14   When I first got into -- I missed Frank there for a
15   while because I was still in my abuse and Frank had
16   gotten -- gone to recovery, and low and behold I ran
17   into him in recovery, too.

18            So I missed him for a little point in time
19   there because I was still out active, but he was in
20   there.  Naturally, when you are not, you are not around
21   those people.  He was not going to bars, but when I
22   went in there I thought, wow, because we were both in
23   the same boat.  I mean, in the same stage of addiction
24   and that gave me hope that if he could do it, and all

143

C 3463

1    the other people could do it, yeah, I was really --

2    yeah.  That was a big, big plus for me knowing somebody

3    in there because it's a scary thing to go into.  I used

4    for over 30 years, and when I went in, I seen a fellow

5    addict that, well, if he can do it, I can do it.

6        Q    Have you and he talked about that?

7        A    Yeah.  Before and after meetings and during

8    the meetings.

9        MR. TONER:  If I may have a moment.

10            Nothing further.  Thank you.

11        THE COURT:  Mr. Evans.

12                    CROSS-EXAMINATION

13                    BY MR. EVANS:

14        Q    Sir, when did you first meet the defendant?

15        A    I would say a little over ten years ago.  I

16    couldn't give you an exact date.

17        Q    And you drank with the defendant how long,

18    sir?

19        A    Yes, sir.  Probably all those years.

20        Q    All ten years you knew him?

21        A    Yeah.  I would see -- we weren't -- I don't

22    know how you call it.  We weren't drinking pals, but I

23    would see him.

24        Q    You would bump into each other?

144

```
 1       A     Sure.

 2       Q     I think defense counsel knew that I guess you

 3    drank with him at Whitey's?

 4       A     Right.  A bar I frequented after work.

 5       Q     And, at that time, he was working as a public

 6    defender, assistant public defender?

 7       A     Yes, sir.

 8       Q     And then you've had contact with him now while

 9    you and he are in Alcoholics Anonymous?

10       A     Yes, sir.

11       MR. EVANS:  No further questions.  Thank you.

12       MR. TONER:  Nothing on that, Judge.

13       THE COURT:  You can step down.  Thank you.

14              (Witness excused.)

15       MR. TONER:  Actually, we do have one more.  Mike

16    Taylor.  That would be it, Judge.  He's not here.

17       THE COURT:  So you want to break for a few minutes

18    or you want to break for the evening?

19       MR. TONER:  I think break for the evening, Your

20    Honor.

21       THE COURT:  What time do you want to start up

22    tomorrow -- I'm asking both sides that -- 9:00, 9:30?

23       MR. TONER:  Whatever is convenient with the Court.

24       MR. EVANS:  9:30 would be fine.  Whatever you want,
```

145

1    Judge.

2        THE COURT:  We'll cut it down the middle.  9:15.  I

3    think we are back in this courtroom, 213.

4            Off the record.

5            (Discussion held off the record.)

6        THE COURT:  Let's go back on the record.

7    Mr. Evans, is there something you wanted to bring up?

8        MR. EVANS:  Judge, Your Honor asked a question

9    before the afternoon proceedings concerning one of the

10   counts.  Could I ask that the Court ask that again?  It

11   was an issue with regard to --

12       THE COURT:  I wanted the statutory cites I think on

13   Count 5 which is one that implicates extended-term

14   sentencing.  I was wanting to essentially verify for

15   myself, I guess, you know, what you had argued about

16   extended term on that count, and I was looking up the

17   case that you cited and so forth and I noticed that --

18   I didn't think that was an actual accurate cite.  I

19   don't think Subsection A(2)(C) exists unless I have a

20   faulty statute.

21       MR. EVANS:  Judge, I'm referencing 16-1(A)(2)

22   obtains by deception, control, property of the owner,

23   and C is the uses, conceals, or abandons or property

24   will deprive the owner permanently of the use or

146

 1  benefit.

 2      THE COURT:  I don't have my book open yet, but is

 3  that --

 4      MR. EVANS:  It's on page 367, Your Honor.

 5      THE COURT:  We probably have different books.  Tell

 6  me -- I have the page open.  Tell me what you are

 7  telling me.

 8      MR. EVANS:  The allegation with regard to that

 9  charge of theft is A --

10      THE COURT:  Five.

11      MR. EVANS:  16-1(A)(2)(C).

12      THE COURT:  Am I reading this wrong?

13      MR. EVANS:  The 5, Your Honor, is -- 1 through 5 is

14  the manner in which the defendant would obtain certain

15  property, and then there's the conjunctive and at the

16  end of 5 which is read in relation to A, B, or C.

17      THE COURT:  I see.  I'll take your reading of it

18  and accept that.  We will go off the record.

19                  (Which were all the proceedings had on

20                  said day in said cause.)

21

22

23

24

C 3457

IN THE TENTH JUDICIAL CIRCUIT OF THE STATE OF ILLINOIS

PEORIA COUNTY, ILLINOIS


## REPORTER'S CERTIFICATION


I, **ROBIN L. ROBERTS, CSR, RPR,** an Official

Court Reporter in the Tenth Judicial Circuit of the

State of Illinois, do hereby certify that I reported in

machine shorthand the foregoing proceedings had before

the **HONORABLE STEPHEN A. KOURI,** in the above-entitled

cause, and that I thereafter caused the same to be

transcribed into typewritten form which I now certify

to be a true and accurate transcription of same.


Dated this 6th of April, 2010.


_____

**Robin L. Roberts, CSR, RPR**
Official Court Reporter
License No. 084-004317


148

C 3458

C 3459

# IN THE TENTH JUDICIAL CIRCUIT OF THE STATE OF ILLINOIS

## PEORIA COUNTY, ILLINOIS

THE PEOPLE OF THE
STATE OF ILLINOIS,

               Plaintiffs,

      v.               )Case No. 2005-CF-275

FRANK M. PICL,

               Defendant.

### SENTENCING HEARING

REPORT OF PROCEEDINGS of the hearing had before the
**HONORABLE STEPHEN A. KOURI**, Judge of said Court,
on the **26th** of **September, 2006.**

## APPEARANCES:

**MR. KEVIN W. LYONS**
State's Attorney of Peoria County, by
**MR. LARRY EVANS**
Assistant State's Attorney
REPRESENTING THE PLAINTIFF;

**MR. HUGH TONER**
Attorney at Law
REPRESENTING THE DEFENDANT.

REPORTED BY:   Robin L. Roberts, CSR, RPR
               Official Court Reporter
               License No.  084-004317

1

C 3460

## I N D E X

**DEFENDANT'S WITNESSES**

  **SOHEE LEE, M.D.**

    Direct Examination by Mr. Toner           4

    Cross-Examination by Mr. Evans           26

    Redirect Examination by Mr. Toner       36

    Recross-Examination by Mr. Evans      38

    Redirect Examination by Mr. Toner       39

  **JEFFERY SCHUCK**

    Direct Examination by Mr. Toner           40

**WILLIAM BRUMMITT**

    Direct Examination by Mr. Toner           46

    Cross-Examination by Mr. Evans           52

**ROBERT POTTS**

    Direct Examination by Mr. Toner           54

    Cross-Examination by Mr. Evans           60

**TODD KOLLAR**

    Direct Examination by Mr. Toner           62

    Cross-Examination by Mr. Evans           67

    Redirect Examination by Mr. Toner       68

    Recross-Examination by Mr. Evans      69

    Redirect Examination by Mr. Toner       70

Exhibit 22-4

2

C 3461

I N D E X (cont'd.)

RICHARD L. GRANT, M.D.

Direct Examination by Mr. Toner                        71

Cross-Examination by Mr. Evans                         74

Direct Examination (cont'd.) by Mr. Toner              75

Cross-Examination (cont'd.) by Mr. Evans              109

Redirect Examination by Mr. Toner                     134

Recross-Examination by Mr. Evans                      143

Redirect Examination by Mr. Toner                     143

JANE VALEZ, M.D.

Direct Examination by Mr. Toner                       144

Cross-Examination by Mr. Evans                        146

Direct Examination (cont'd.) by Mr. Toner             148

Cross-Examination (cont'd.) by Mr. Evans              153

Redirect Examination by Mr. Toner                     172

Recross-Examination by Mr. Evans                      174

Redirect Examination by Mr. Toner                     175

Recross-Examination by Mr. Evans                      175

Redirect Examination by Mr. Toner                     177

### E X H I B I T S

| EXHIBIT NUMBER | IDENTIFIED | RECEIVED |
|---|---|---|
| Defendant's Group Exhibit No. 1 | 101 | 178 |

C 3462

1    THE COURT:  Let's go on the record.  Case

2  No. 2005-CF-275, People versus Frank Picl.  Mr. Picl is

3  here with his attorney, Mr. Toner; and State is here

4  represented by Assistant State's Attorney Larry Evans.

5         Are we ready to continue?

6    MR. TONER:  We are, Judge.

7    THE COURT:  Call your next witness, Mr. Toner.  Is

8  there any matter I need to attend to before --

9    MR. TONER:  I don't think so.

10   THE COURT:  Call your next witness.

11   MR. TONER:  Dr. Sohee Lee.

12         (Thereupon the witness was duly sworn.)

13             SOHEE LEE, M.D.

14  called as a witness on behalf of the Defendant, after

15  having been first duly sworn, was examined and

16  testified as follows:

17             DIRECT EXAMINATION

18             BY MR. TONER:

19   Q    Please state your name.

20   A    I'm Dr. Sohee Lee.

21   Q    And your profession?  What type of doctor are

22  you?

23   A    I am a psychiatrist.

24   Q    And how long have you been a psychiatrist?

4

1      A    I finished my training in December, 1975.
2   Ever since then, almost 30 years.
3      Q    In those 30 years, where have you practiced?
4      A    I was in Iowa about less than two years and
5   the rest of time, in the last almost 27 years in
6   Peoria.
7      Q    And has your practice been predominantly or
8   exclusively psychiatry?
9      A    Yes.
10     Q    Where did you attend school?
11     A    I graduated from Seoul National University
12  School of Medicine in Seoul, Korea, and I had my
13  internship from Southside Hospital in Pittsburg,
14  Pennsylvania, and had residence training in psychiatry
15  from Rush-Presbyterian St. Lukes Medical Center in
16  Chicago.
17     Q    Do you have any -- are you licensed in the
18  State of Illinois?
19     A    Yes, I am.
20     Q    Are you certified by any boards?
21     A    Yes.  I'm certified since 1978.
22     Q    In what?
23     A    In psychiatry and neurology.
24     Q    Have you ever testified as an expert witness

5

C 3404

1    before?

2        A    Yes, I have.

3        Q    And in courts here in Peoria?

4        A    Yes.

5        Q    Other courts as well?

6        A    When I was in Chicago and Iowa I testified in

7    mental health area only.

8        MR. TONER:  Judge, at this time, I'm going to

9    tender Dr. Lee as an expert in the area of psychiatry

10   subject to counsel's cross-examination.

11       THE COURT:  Any objection?

12       MR. EVANS:  No objection.

13       THE COURT:  Okay.

14       MR. TONER:  Thank you.

15       MR. TONER:  Q  Doctor, do you know Frank Picl?

16       A    Yes.

17       Q    And how long have you known him?

18       A    Well, I had known him personally a long time,

19   but he has been to my care as a patient since October

20   of 2000.

21       Q    And in October of 2000, can you tell the

22   Court, please, what he came to you to see?

23       A    At that time, he had been treated by another

24   psychiatrist for two years, and he came to see me for

6

1  depression.

2      Q    And how did you determine that he met the --

3  or how did you reach the conclusion for depression?  Is

4  that something he told you or what did you do to find

5  out to -- was that determined through an interview?

6      A    Well, depression -- he had feeling of sadness,

7  unhappy, and had very little energy and interests and

8  motivation in his life and all the typical symptoms of

9  depression.

10     Q    Did he indicate any particular stressors or

11 things that were going on in his life that may have

12 caused that?

13     A    I remember that at that time he had had

14 problem with his marriage and he was struggling with

15 his professional activity as well.

16     Q    And as he came to you in 2000, what, if any,

17 course of treatment did you prescribe?

18     A    What we as psychiatrists usually treat

19 depression with medication, antidepressant.  We believe

20 this is not just an emotional reaction, but it's a

21 brain disease, and we usually refer the patient to

22 another profession for further, more intense

23 counseling.

24     Q    So you are doing two things:  You are working

7

C 3466

1   on the organic part of it and then there's a person

2   who's working on the -- working through the other

3   areas, therapy?

4       A    That's right.

5       Q    Is that a course of treatment that you talked

6   about?  That's what he did or that's --

7       A    Yes.

8       Q    And after 2000, did Frank see you again in --

9   did he continue to see you again in 2001 and couple

10  times in 2002?

11      A    Well, until his last treatment was kind of

12  sporadic and his compliance was not that good

13  sometimes, and he was still drinking, and I saw him

14  twice in 2000, seven times in 2001, twice in 2002, and

15  I didn't see him at all in 2003, and four times in

16  2004.

17      THE COURT:  I'm sorry.  Go over those again.

18      THE WITNESS:  Twice in 2000, seven times in 2001,

19  twice in 2002.

20      THE COURT:  I got the rest.

21      THE WITNESS:  You got it?

22      THE COURT:  None in 2003 and four in 2004.

23      MR. TONER:  Q  Would it be fair to say that if

24  he did not see you at all in 2003 he was not getting

8

C 3407

 1  any medications to the best of your knowledge?

 2      MR. EVANS:  Objection, Judge.  No foundation for

 3  that knowledge on the doctor's part.

 4      MR. TONER:  Q  Let me ask you particularly, he

 5  wasn't seeing you, was he, in 2003?

 6      A    That time he was not taking any medication

 7  because I didn't give any prescription.

 8      Q    You said more recently since 2005 he came back

 9  and saw you again?

10      A    Yes.

11      Q    And how has his compliance been as far as

12  seeing you and as far as taking medicine since 2005?

13      A    Well, his compliance since last year March has

14  been excellent.

15      Q    Takes his meds?

16      A    Not only taking medication and keeping

17  appointment time, but also keeping close contact with

18  me whenever he had anymore problems.

19      Q    That was what you had told him to do and he's

20  been compliant in that?

21      A    Right.

22      Q    Have you noticed improvement because of that?

23      A    Well, yes, I believe so.  He has been on

24  medication regularly and getting counseling, the cross

C 3468

1    individual counseling, and he is also getting good

2    treatment continuously for his alcoholism.  After his

3    treatment from White Oaks, intensive outpatient

4    treatment, he has been attending AA very faithfully and

5    very actively involved.

6        Q    Now, since March of '05, and according to your

7    report, you changed his diagnosis and his medication

8    since -- in March of '05?

9        A    Until '05 I treated him as depression.

10            In '05 when I saw him, yes, I noticed a

11   significant -- also, when I thought back, too, he has

12   had significant mood swing, and until '05, March, my

13   diagnosis was depression with him and since March last

14   year is bipolar disorder, bipolar II disorder.

15       Q    Can you explain to the Judge the difference

16   between bipolar II and depression?

17       A    What -- in psychiatry basically we have a big

18   category of thought disorder and mood disorder, and in

19   mood disorder we have major depression and bipolar and

20   we divide bipolar I and II.  The major depression or

21   dysthymic disorder which is a chronic depression is

22   only depression, depressed mood.  And bipolar disorder

23   exhibits -- it is a significant mood swing from being

24   high to the down.  Anyone who has experienced any

                                                    10
                                              C 3469

1   severe manic episode we would say no matter how many

2   other times depressed in psychiatry we diagnose those

3   people as bipolar disorder.

4          The difference between bipolar I and II is

5   well psychiatry still -- compared to other specialties

6   and that is still rather primitive, we cannot measure

7   it in blood tests or x-ray, we cannot do that.  So the

8   main thing we do is the severity of the symptom and

9   duration of the symptom.

10         The bipolar I and II, the difference is the

11  difference in the severity and duration.  Bipolar I is

12  really the range of the mood swing is very severe, and

13  when they go through manic episode they lose completely

14  reality and they become sometimes delusional,

15  hallucinating and they are overly involved in a lot of

16  activity.  They cannot sleep and that can cause a lot

17  of problems, too.  When they are depressed, severely

18  depressed, they are suicidal.  And the bipolar II, the

19  severity of mood swing is not as bad as bipolar I.

20     Q    Now, if a person -- is it a common occurrence

21  when a person that is bipolar, when they start swinging

22  up or going to the manic phase, do they feel better and

23  they feel that they don't need their medicine?  Is that

24  something that's common in your experience?

11

C 3470

1        A    That is the problem with the compliance, yes.

2    Sometimes we see the bipolar patient, we treat those

3    patients with only an antidepressant.  Their depressed

4    moods swing back to manic or hypomanic, less than

5    manic.

6           The reason I haven't diagnosed Frank as

7    bipolar I is he has never been in the hospital.  His

8    condition hasn't been that bad, number one, and also he

9    was on the antidepressant alone for quite a few years

10   and his clinical condition from depression never turned

11   to severe manic.

12       Q    Is that one of the signs that -- one of the

13   possibilities?

14       A    Yes.  Back to your question, yes.  Lot of

15   people, they want to stay on a little high.  They don't

16   want to go down.  So sometimes they don't take

17   medication regularly and they sometimes -- those people

18   have -- lot of bipolar patient, one of the problem is

19   the comorbidity with bipolar disorder with some other

20   personality disorder and substance abuse problems.

21       Q    Is that a common thing that you see?

22       A    It's very common, yes.

23       Q    From -- your report indicated that Frank

24   discontinued his medication for a little bit in '05.

12

C 3471

1   Was that after he discussed that with you?

2       A    Well, I think that was a good test.  I think

3   for the diagnosis, too, lot of times we -- again, in

4   psychiatry, we sometimes confirm the diagnosis with the

5   outcome of the treatment.

6       He started to take antidepressant again in

7   March of last year, and after then he went to Minnesota

8   for the treatment for his gambling and alcoholism, and

9   that time he was on medication and he was feeling

10  really good and he wanted to stop medication; I think I

11  can do it.

12      So he learned a lot of things.  He learned

13  about himself and the nature of the problems he has

14  had.  So then I was seeing him and I told him, yeah,

15  let's try to do that.  And he was seeing other

16  counselor, too.

17      About five months after he collapsed without

18  medication, I was out of town that time, and that was

19  end of December last year.  He was extremely depressed

20  at that time.  He was contemplating suicide.  So we

21  started it again, the medication, antidepressant.  And

22  he was doing better, was coming out from depression,

23  but he -- with antidepressant he experienced more mood

24  swing, irritability and the racing thoughts.  So in

13
C 3472

1    March of this year, I started to use mood stabilizer
2    along with an antidepressant.  So he has been very
3    stable with his antidepressant and mood stabilizer at
4    this point.

5        Q    What's the purpose of a mood stabilizer?
6    What's that do?

7        A    Mood stabilizer is -- it is trying to
8    stabilize the moods.  The range of the mood swing, we
9    try to put it here (indicating).  In the past, until
10   about maybe about 15 years ago, we had only couple of
11   mood stabilizers we used.  Lithium carbonate was mostly
12   commonly used.  Now we use many other medications.  He
13   has been on the Lamictal, L-A-M-I-C-T-A-L.  That has
14   been quite effective for him.  We -- I tried another
15   one, Depakote, and it wasn't doing too good.  Lamictal
16   has been good for him with no side effect.

17       Q    And have you been in the -- since you have
18   changed his medication regimen, have you been adjusting
19   it from time to time?

20       A    First two months we -- especially Lamictal you
21   have to regulate medication very cautious -- with
22   caution.  It can have some very critical side effect to
23   it.  So start with a low dosage.  And right now he has
24   settled with 25 milligram in morning and 100 milligram

14

C 3473

 1  at bedtime.

 2      Q    He's taking other medication in addition to

 3  that, correct?

 4      A    The other antidepressant he is on -- he is on

 5  two different antidepressant, Wellbutrin and Lexapro.

 6  The reason I use two different antidepressants is we

 7  psychiatrists believe, again, that depression is

 8  depressive feeling and their behavior out of the

 9  depression is brain disease and several

10  neurotransmitters involved in the brain and we believe

11  at least three different neurotransmitters involved in

12  depression, feeling of depression, Serotonin,

13  Norepinephrine and Dopamine.  So he is taking Lexapro

14  and Wellbutrin and two different antidepressants for

15  this reason.

16      Q    Recently have you added additional medication

17  in the last couple of weeks?

18      A    He was doing a lot better, but yes.  I

19  remember I wrote it down here.  On September 13th,

20  couple weeks ago, he wanted to try some medication for

21  attention deficit disorder.  He has always had a lot of

22  over symptoms of -- between attention deficit and

23  bipolar.

24          And, again, this is -- a lot of psychiatry

                                                    15

C 3474

1  diagnosis come from the outcome of the treatment, and
2  it was no harm then I prescribed Focalin,
3  F-O-C-A-L-I-N, five milligram, which is used quite
4  commonly for attention deficit or attention deficit
5  hyperactivity type disorder for the children or adult.
6  And I use a very small dosage because he is on other
7  medication already, and I didn't change his medication.
8  He was keeping the same medication, Wellbutrin, Lexapro
9  and Lamictal and added Focalin, five milligram.

10       And I saw him ten days after, and he had been
11 on ten days, five milligram, and he reported to me he
12 felt much different.  He was able to focus on his
13 product lot better and he was able to organize his life
14 better.

15  Q    Getting back to the disease of bipolar, you
16 talked about mood disorders and different things like
17 that.  What's the relationship, if there is one,
18 between bipolar and thoughts of grandiosity?

19  A    Well, grandiosity, grandiose thoughts is a
20 very common symptoms of bipolar disorder.  Bipolar
21 disorder they feel so good they have inflated
22 self-esteem, and they think they are someone very
23 special, but the thought of grandiosity is not only
24 symptoms of bipolar disorder.

16

C 3475

1     Q     With those thoughts, how do they relate to a

2   person's judgment?  Can they have an effect or

3   impairment of judgment?

4     A     When they have the thoughts of grandiosity,

5   yeah, again, that depends on the severity of the

6   symptom.  Some schizophrenic patient, they can have

7   grandiose thoughts and those people they come with

8   other symptoms that usually cause a lot of problems.

9   For -- for instance, they can fly from the top of a

10  50-story building and do that.

11    Q     Left untreated, is bipolar a condition that's

12  chronic and progressive?

13    A     Yes and no.  It's -- again, as bipolar

14  disorder they have some other psychiatric disorder at

15  the same time as a chemical substance abuse is a big

16  problem.  And underlying personality problem is another

17  problem.  And their life stress is a big problem.

18        And the people can function very well with

19  medication, counseling, but under the circumstance more

20  stressful situation, yeah, more -- sometimes internal

21  stress, too.  Taking other medication interact with the

22  medication patient takes, they can have this other

23  range in mood swing.

24    Q     Focusing particularly back to Frank, you are

17

C 3476

1    aware of what he's pled guilty to, correct?

2    A    Yes.

3    Q    Has he talked to you about this?  You know

4    what he did, correct?

5    A    Yes.

6    Q    Your report concludes that his bipolar

7    condition did not exonerate -- and the nature, criminal

8    nature of insanity, his behavior, but do you believe it

9    was a contributing factor in any way?

10   A    Yes.  I think --

11   MR. EVANS:  I would ask respectfully for a

12   foundation in terms of the time period that we are

13   talking about, Judge.  So my objection would be to the

14   form of the question.

15   THE COURT:  Mr. Toner.

16   MR. TONER:  If I could focus in on the time period.

17   I think the time period is alleged in the indictment

18   but, if I could ask him a particular question.

19   THE COURT:  I think what he's wondering about is

20   when he told him about it or when they talked about it

21   or what?

22   MR. EVANS:  The doctor is apparently being asked an

23   opinion concerning a condition without a framework in

24   terms of what time period is discussed, Judge.

18
C 3477

1      THE COURT:  I'll sustain it.

2      THE WITNESS:  In -- as I stated before, I saw him

3  twice in 2002.  I didn't see him at all in 2003.  And

4  in 2004, I saw him four times.  That time, he was not

5  on medication regularly and -- but he was drinking

6  heavily at that time, not only -- I wasn't -- of

7  course, I was not aware what was going on about his

8  activities with the lady, but he had the problem with

9  his marriage.  He was divorced and going through

10  another relationship that was pretty chaotic, too, and

11  a lot of this situation and he continued the drinking

12  and without counseling or proper medication.  It's not

13  hard to speculate that he was more -- he was having

14  more problem at that time.

15      MR. TONER:  Q  And with those -- those are the

16  types of things you earlier mentioned, the factors

17  that go into the bipolar and the personality

18  problems and the other factors such as substance

19  abuse.  So getting back to my question.  During that

20  time frame, what effect, if you have an opinion,

21  based on your medical expertise, would that or those

22  factors have on his judgment?

23      MR. EVANS:  Judge, I -- again, I would object to

24  the question only with regard to the period of time.

19
C 3478

1    If that's for the period of time alleged in the

2    indictment, then I would withdraw the objection, but I

3    would like clarification for period of time.

4         THE COURT:  Period of time as to what?  As to --

5         MR. EVANS:  As to -- he's asking the doctor for an

6    opinion --

7         THE COURT:  As to whether or not his condition

8    would have affected his judgment?

9         MR. EVANS:  Right, Judge.  Without asking in the

10   question what period of time.  Was it 20 years ago?

11   That's my objection, Judge.

12        THE COURT:  Why don't you re-ask the question

13   because it got a little disjunctive there anyway.

14        MR. TONER:  Q  I think we are talking about for

15   purposes of this question particularly -- we'll

16   expand backwards perhaps -- between the period of

17   2002 when he saw him and then through 2004.  You saw

18   him some time in 2002 a couple times, not in 2003,

19   and I believe four times in 2004, correct?

20        A    Yes.

21        Q    During that period of time, first of all,

22   based on the things that you have testified to, do you

23   have an opinion as to how those factors would have

24   contributed to his judgment?

20

1     A     As I think, I believe that his poorly

2  controlled bipolar disorder must have contributed some.

3  I don't know how much, what extent, and I believe still

4  at that time he was able to function in his profession

5  and I have never received any telephone call from him

6  about changes of his conditions. And he never ended up

7  in the emergency room because of any exacerbated

8  symptoms, but I believe it's poorly controlled bipolar

9  disorder with alcoholism and gambling problems added.

10  So poorly controlled bipolar disorder must have

11  contributed to some degree.

12     Q     Now, you talked about from 2002 until 2004.

13  You had mentioned early on or little bit earlier in

14  your testimony that when he came back -- or when he

15  came and saw you first in say 2000 when he was having

16  difficulty after his marriage broke up, did you note

17  anything as far as a difference in his condition as it

18  presented itself to you between 2000 and 2002?

19     A     One thing I have good memory of, I think his

20  unrealistic grandiose idea was more than in the past.

21  You are thinking about -- of course, I didn't know

22  anything about the managing another person's money, but

23  he started to talk about going to the Par-A-Dice and he

24  said that he was sometimes winning and he was studying

C 3480

 1  about gambling, that he is a good reader and he was

 2  reading books and going to practice from what he

 3  learned from in the book. And he one time talked about

 4  being -- he was really frustrated with his profession

 5  over 25 years, and being a professional gambler he was

 6  talking about that. Then I tried to point out that was

 7  not really realistic.

 8      Q    What effect did that seem to have on him when

 9  you said it's not realistic, you can't do that? What

10  was his reaction, if you recall?

11      A    He believed that he could still do that.

12      Q    Now, you mentioned the alcoholism and the

13  gambling. Do you think that -- you also mentioned the

14  underlying personality disorders. Would that include

15  the grandiosity or is that by-product of bipolar?

16      A    Yeah. It's a -- certain people, certain -- we

17  believe this bipolar disorder or schizophrenia is

18  hereditary, runs in family because children from the

19  family history -- the chance is much higher to getting

20  this kind of disease, but at the same time certain

21  personality tends to develop more disorder. For

22  instance, schizophrenic patient, some of them are

23  really -- we can see since very young and early teen

24  that shows very isolated and very exclusive and quiet

22

C 3481

1    and have some strange ideas.  And bipolar disorder is a
2    little different and some -- especially the people
3    with -- very narcissistic people, they have a lot of
4    grandiose ideas and self-importance, and I believe
5    Frank has in personality-wise and obsessive-compulsive
6    personality and the narcissistic personality, that area
7    he has, I think, but that personality is ongoing and
8    since early adulthood.  I think that is another factor
9    of being -- having the grandiose ideas.

10       Q    Would -- you mentioned the obsessive
11   personality disorder.  Would that have an effect either
12   in conjunction with or just by itself on his inability
13   to be able to focus and finish tasks and, as a result,
14   become frustrated if he's unable to do so?

15       A    Yes.  That also attention deficit disorder can
16   cause that kind of problems, too, yes.  Obsessive --
17   the person with obsessive compulsiveness, they have
18   that tendency.  They are involved in a lot of different
19   things.  It's hard to complete because they try to be
20   on their own and perfect ideal way.

21       Q    Are those problems, the obsessive-compulsive
22   personality disorder, are they progressive as well if
23   they are not treated?

24       A    Well, personality disorder, there's not much

23

C 3482

1   treatment, and also this is, again, the severity of the

2   problems.  We all have -- most professionals they have

3   certain obsessive compulsiveness in certain area, and I

4   think even in our textbook we say it's a personality

5   disorder and a little less than personality disorder we

6   have another category, personality trait.  So I don't

7   know how can I just -- I will say he has the tendency

8   in obsessive compulsiveness and narcissistic.

9        Q    Are you familiar, without get into the

10  particulars of Frank's family history, mental health

11  history-wise -- you had mentioned some of these things

12  tend to be seen from generation to generation.  Would

13  that be the situation in his case?

14       A    Especially we know the schizophrenia and

15  bipolar disorder has a very strong hereditary factors

16  even though we don't know what is the real genetic

17  markers.

18       Q    But it is accepted that it goes through

19  generations?

20       A    That's right.

21       Q    Do you understand it to have affected prior

22  generations of his?

23       A    And I know Frank at least one -- one of his

24  brother -- his brother sound like he has bipolar I

24

1    disorder.  He has been in the hospital several times

2    and is a very -- the functioning has been poor in the

3    last several years, I believe.

4        MR. TONER:  If I may have a moment, Judge.

5        THE COURT:  Sure.

6        MR. TONER:  Q  When you say, Doctor, that -- I

7    asked you earlier about whether or not you believed

8    that bipolar and the other factors that you

9    considered such as personality disorder contributed

10   to what Frank did here.  You said you believed so,

11   but you couldn't say how much.  Is that because this

12   is the type of thing that you can't quantify?

13       A    Well, yeah.  That's true.  We cannot measure

14   it.  And, also, at the same time, he was able to

15   function his professional activities.  He never ended

16   up in the hospital, until this, never had been

17   arrested, he never ended up in the emergency room.

18       Q    That's one of the things that you -- you are

19   making this one of things that you have going is that

20   as far as a professional, as far as you know, he was

21   doing okay?

22       A    Yes.

23       Q    Well, in his capacity as Mrs. Varga's power of

24   attorney or attorney, what he did here certainly wasn't

25

C 3434

1   acting well as a professional; would you agree?

2        MR. EVANS: I object now. Mr. Toner doesn't like

3   the answer, so he's cross-examining his own witness,

4   Judge. I object to the form of the question.

5        THE COURT: Overruled.

6        THE WITNESS: I didn't know about his capacity in

7   that area, but his -- I knew about his being attorney

8   and public defender.

9        MR. TONER: Q So you are talking pretty much

10  about his public defender?

11       A    Right.

12       MR. TONER: Nothing further.

13       THE COURT: Mr. Evans.

14       MR. EVANS: Thank you, Judge.

15                  CROSS-EXAMINATION

16                  BY MR. EVANS:

17       Q    Doctor, you indicated you are board certified

18  in psychiatry and was it neurology?

19       A    Well, American Board, they have the same

20  board, American Board of Psychiatry and Neurology, yes.

21  And we -- when we take exam we have to take neurology

22  exam and the neurology they should take out of -- they

23  examine psychiatry.

24       Q    And you took that exam in 1970 what, sir?

26

C 3435

1    A    1978.

2    Q    You actually sit for an exam and take the exam

3  and pass it to become board certified, correct?

4    A    Yes.  It's -- that's a written test and oral

5  test that's by the American Board of Psychiatry and

6  Neurology.

7    Q    Now, you indicated that you have treated the

8  defendant, Frank Picl, beginning in October of 2000,

9  correct?

10    A    Yes.

11    Q    And you have seen him for a number of times

12  except you didn't see him at all in 2003?

13    A    Yes.

14    Q    And then four times in 2004?

15    A    Yes.

16    Q    And at the time that you saw the defendant he

17  was going through, what, quite a few life-changing

18  experiences, wasn't he?

19    A    Yes.

20    Q    He was divorced from his first wife?

21    A    Yes.

22    Q    He had much conflict in his life regarding his

23  first wife and the breakup of his marriage, didn't he?

24    A    Yes.

27

1      Q    He was very concerned with the effect that the

2   breakup would have both on his children and his family,

3   correct?

4      A    Yes.

5      Q    And that's a normal response for someone who's

6   going through a stressful event such as that; isn't

7   that a fair statement, doctor?

8      A    Yes.

9      Q    So it's nothing unusual that someone would be

10  depressed or feel bad about the breakup of his actual

11  life itself?

12     A    Yes.  You know, it's -- let me put it this

13  way.  We all have a different tolerance.

14     Q    Right.

15     A    And when ten people exposed to the same damp,

16  cold weather, somebody will get pneumonia and somebody

17  won't, and the people with depression or bipolar

18  depression, bipolar disorder, those people under those

19  stressful situation, yet they react different.

20     Q    Right.  Now, people with bipolar disorder

21  don't all steal money, do they?

22     A    Not all, no.

23     Q    People with bipolar disorder can lead lives,

24  normal lives amongst the rest of us in society, can't

28

C 3437

```
 1   they --
 2        A    Not all --
 3        Q    Let me finish -- in terms of the ability to
 4   function on a day-to-day level?
 5        A    Yes.  Lot of successful professionals that
 6   have bipolar disorder, they are taking medication, they
 7   are having successful state of life.
 8        Q    Now, during the years you have treated Frank,
 9   you know that he came into this very courthouse on
10   almost a daily basis to perform his duties as a lawyer,
11   correct, doctor?
12        A    That's what I understand.
13        Q    And he was one of those professional people
14   that you have talked about?  He is a professional; is
15   that correct?
16        A    Yes.
17        Q    And he was able to represent clients on a
18   daily basis both as a public defender and as a private
19   attorney?
20        A    Yes.
21        Q    He was able to get up in the morning, get
22   dressed, and come into court?
23        A    Yes.
24        Q    Now, the defendant had other financial
```

1  problems other than this incident.  Are you aware that

2  the defendant didn't pay any federal income taxes for a

3  period of time?

4      A    He talked to me a few times about that.  He

5  hadn't done the income tax return, the report for -- in

6  the last few several years.  I don't know which.

7      Q    Did he indicate to you that because of his

8  inability or the fact that he simply didn't file his

9  returns that he owed the IRS approximately $100,000?

10     A    I don't know.  We never talked about in

11  detail.  He talked about he had to do it, but that he

12  was not able to do it because he didn't know where

13  he -- he should have started for several years and all

14  the papers and stacked up.

15     Q    Now, doctor, when you saw him when he came in

16  your office in March of 2005, last year, that was

17  immediately after he was arrested in this case,

18  correct?

19     A    Yes.

20     Q    Now you told Mr. Toner that you are familiar

21  with what the defendant, Frank Picl, did in this case,

22  correct?

23     A    Yes.

24     Q    Do you know how many times he cashed checks of

30

1  Alice Varga?

2      A    No.    The only thing I know is I read in the

3  newspaper.

4      Q    Do you know how many times he went to the bank

5  and received certified checks from monies of Alice

6  Varga?

7      A    No.

8      Q    Do you know how many times he took the money,

9  the certified checks to the Par-A-Dice Casino boat?

10     A    No.

11     Q    Do you know what he did with the money that he

12  passed through the account at the Par-A-Dice Casino?

13     A    No.

14     Q    Did he ever tell you?

15     A    No.

16     Q    Now, those times when the defendant, as you

17  understand it, was committing this crime, he wasn't

18  hearing voices, was he?

19     A    No.

20     Q    He wasn't being told to do this by some

21  outside force, was he?

22     A    No.

23     Q    And you have used the term schizophrenia,

24  doctor.    I know you certainly know the difference.    The

31

 1  defendant does not have schizophrenia, does he?

 2      A    No.  He's not schizophrenia.

 3      Q    As you have told us today, the defendant

 4  suffers from alcoholism?

 5      A    Yes.

 6      Q    Bipolar disorder II, correct?

 7      A    Yes.

 8      Q    And he doesn't have bipolar disorder I because

 9  he doesn't have the very severe mood swings that we

10  talked about?

11      A    Yes.

12      Q    He had mood swings of a lesser amount; he was

13  up sometimes, he was down sometimes?

14      A    Yes.

15      Q    Again, the mood swings are not in and of

16  themselves unusual in someone going through many

17  life-changing episodes?

18      A    Yes.

19      Q    Now, are you also aware that the defendant

20  around this time in 2003 was dating who was to become

21  his second wife?

22      A    Can you repeat the question?

23      Q    Were you aware that the defendant in 2002 and

24  2003 actually was a period of time when he was dating

32

C 3491

1   who was to become his second wife?

2        A    Yes.  I think so at that time.

3        Q    Were you aware that there was also apparently

4   much conflict in that relationship between the

5   defendant and his soon to be second wife?

6        A    Yes.  I remember that, yes, was not a stable

7   relationship.  Very chaotic.

8        Q    Now, you used the term at one point in the

9   beginning of your testimony, doctor, the term brain

10  disease.  Do you remember that?

11       A    Yes.

12       Q    Now, brain disease.  Did you perform any tests

13  on the defendant, any brain scans or any types of

14  tests?

15       A    Yes.  We do a lot of MRI or the PET scan on

16  research base.

17       Q    A PET scan.  That's the PET?

18       A    PET.

19       Q    Positive Emission Topography?

20       A    That's right.

21       Q    Did you do that on the defendant?

22       A    No.

23       Q    Did you do any brain scan on the defendant?

24       A    We don't do it.  We do it only on research

33
C  3492

1    base.  I don't think his insurance would cover it even

2    if I ordered it.

3        Q    Okay.  Now, you also used the term -- and I

4    think you didn't give yourself and your profession

5    enough credit, but you did say in some ways psychiatry

6    is somewhat primitive.  You used the term somewhat

7    primitive in terms of testing.  Do you recall saying

8    that on direct examination?

9        A    Court examination?  What I said is I testified

10   in out of state only in the mental health court.

11       Q    Maybe I misunderstood you.

12       A    Yeah.  Mental health court.

13       Q    You did tell us that the defendant's

14   conditions of depression that what he has is treatable

15   or controllable with regard to taking medications,

16   correct?

17       A    Medications, yes, sir, essential.

18       Q    Counseling?

19       A    Counseling, yes.

20       Q    As you say actually in your report, as long as

21   he keeps sobriety of alcohol and gambling, he should be

22   able to work after all the legal problems are settled?

23       A    With medications and counseling and no

24   alcoholism and gambling, yes.

34

C 3493

1    Q    So it's incumbent on the defendant to actually

2  take the medicine he's prescribed, correct?

3    A    Yes.

4    Q    And it would be incumbent on him to go to the

5  meetings or the counseling for alcoholism like he's

6  going to right now, correct?

7    A    Yes.

8    Q    When the defendant was stealing money from his

9  client, he knew what he was doing was wrong, didn't he?

10    A    I believe he knew.

11    Q    And he actually knew what he was doing, also,

12  didn't he?

13    A    Yes.  The same thing.  He knew that drinking

14  was bad, but he couldn't stop it.

15    Q    Right.  There's many people in our society

16  that are alcoholics; is that correct, doctor?

17    A    Yes.

18    Q    And there's many people that go to meetings,

19  don't take that first drink, and function well in

20  society, is that correct, based on your experience?

21    A    Yes.

22    Q    And people that are alcoholics, per se, it

23  doesn't make them steal money, does it?

24    A    No.

35

C 3494

1      MR. EVANS:  Thank you, sir.  No further questions.

2      THE COURT:  Mr. Toner.

3      MR. TONER:  A couple redirect, if I may.

4                  REDIRECT EXAMINATION

5                  BY MR. TONER: .

6      Q     Doctor, you mentioned -- strike that.

7            Counsel asked you about the fact whether or

8  not a person who is experiencing particular life

9  stressors might be depressed and you indicated that he

10 might be.  There is a clinical difference, is there

11 not, between being depressed and depression?

12     A     Yes.

13     Q     Can you explain what that is?

14     A     People with no depression, no symptoms of

15 depression, they are able to cope with the problems

16 with some help from friends, family members and pastors

17 of the church.  And people with severe depression, this

18 is -- the reason they are not feeling good, the reason

19 they are not able to do -- the reason they have no

20 motivation, no interest, that is not just an emotional

21 problem from the stress.  That stress can contribute .

22 changes in the brain that make the people feel that way

23 and act that way.

24     Q     When you talk about these contributing factors

36

C 3405

1  and the medical condition of depression, that is what

2  you think can cause a person to lose his bearing with

3  regard to judgment?

4  A    Yes.   Depression is a medical disease like

5  hypertension or diabetes and even people with diabetes

6  or hypertension they can be very under the good control

7  under the stress, outside stress or some change in

8  food, yet their condition can be changing, too.

9  Q    Now, with regard to the fact that you didn't

10 know the exact amount of money Frank took or how many

11 times he cashed checks or how many -- or how he spent

12 it, knowing any of those factors, would that have had

13 any difference on your conclusion of what you have

14 testified here today?

15 A    Well, I think it's once he got in gambling,

16 yeah, he became very quickly the pathological gambler

17 and he was preoccupied with that and he had to do it

18 and he wanted to do it to recover the money he has

19 lost.

20 Q    Would you indicate and believe that one of

21 these, be it the alcohol, the gambling --

22 A    Alcoholism, gambling, the bipolar disorder and

23 its underlying personality disorders, they all, yes,

24 put together, yes.

37

C 3496

1      Q      They feed off each other?

2      A      Yes.

3      Q      They drive each other?

4      A      Uh-huh.

5      MR. TONER:  Nothing further.

6                    RECROSS-EXAMINATION

7                    BY MR. EVANS:

8      Q      Doctor, you indicate that he stole the money

9   to cover his gambling losses?

10     A      What I'm saying is that is a typical pattern

11  of pathological gamblers.  They usually try to gamble

12  more to recover their money they lost in the gambling.

13  That's what I'm --

14     Q      How much -- I'm sorry.  I don't mean to cut

15  you off.  How much did the defendant lose gambling?

16     A      I don't know.

17     Q      How much did the defendant take from Alice

18  Varga?

19     A      I don't know.

20     Q      So your answer is conditioned on him losing

21  all of the money gambling?

22     A      I don't know where the money -- what

23  percentage of the money was spent in gambling.  I have

24  no idea.

38

C  3407

1    Q    He didn't have to go to the bank teller window

2  and take this woman's money, did he?

3    A    Again, I have no information about that.

4    MR. EVANS:  Thank you.  No further questions.

5    THE COURT:  Mr. Toner.

6                    REDIRECT EXAMINATION

7                    BY MR. TONER:

8    Q    Assuming you were to have information about

9  any of that, would that have changed what you have

10  testified to?  Does that make a difference to your

11  diagnosis?

12    A    Tell me again.

13    Q    In other words, are any of those questions

14  that he asked, are they important to your diagnosis?

15    A    No, not really.  What I'm -- basically all

16  this bipolar disorder, alcoholism, and a lot of times,

17  you know, if he was drinking every day and either he

18  was under the influence or some degree of -- in terms

19  of that.  Gambling, underlying personality problems,

20  all this, yes, I believe contributed some degree in his

21  behavior what he did.

22    MR. TONER:  Nothing further.

23    MR. EVANS:  No further questions.

24    THE COURT:  You can step down.  Thank you.

39

C 3498

```
 1                        (Witness excused.)

 2          MR. TONER:   Judge, may we approach?

 3          THE COURT:   Sure.

 4                        (Whereupon proceedings were had at the

 5                        bench out of the hearing of the court

 6                        reporter.)

 7                        (Thereupon the witness was duly sworn.)

 8                        JEFFERY SCHUCK

 9     called as a witness on behalf of the Defendant, after

10     having been first duly sworn, was examined and

11     testified as follows:

12                        DIRECT EXAMINATION

13                        BY MR. TONER:

14          Q    Please state your name and spell your last

15     name.

16          A    Jeffery Shuck, S-H-U-C-K.

17          Q    And your occupation or profession?

18          A    I'm an attorney.

19          Q    And where are you an attorney?

20          A    I'm employed with the State of Illinois.  I'm

21     the Deputy General Counsel for personnel for the

22     Department of Central Management Services.

23          Q    And do you know Frank Picl?

24          A    I do.
```

40

1     Q     And how is it that you know him?

2     A     Frank was my attorney back in 1983

3  representing me in a lawsuit that arose out of an

4  accident, an automobile accident that I was involved in

5  that left me paraplegic.

6     Q     And your mother testified yesterday.  I'm not

7  going to cover a lot of those details.  Did Frank have

8  an impact on your life as far as being an attorney?

9     A     He has, yes.

10    Q     And over the years, sometimes more, sometimes

11  less, you have kept in contact with Frank?

12    A     We have kept in touch.  Sporadically over the

13  23 years that I have known him, but on a somewhat

14  regular basis, talked about events as they have come

15  up, and it's important to understand that he

16  represented me at a time when I was going through a

17  great period of change in my life.  I was very young.

18  I was 18 years old and then through my time in college

19  and grad school and law school and having a young

20  family and everything else, we had many occasions to

21  talk and discussed different things that were going on

22  at the time.

23    Q     Did he provide a positive impact and effect on

24  your life?

41

C 3500

1    A    He did.  One of the things that's most notable
2    was his example as an attorney when he represented me
3    in that lawsuit.  I had very little exposure to anyone
4    who was an attorney by that point.  As I said, I was
5    just a teenager, but he was a strong presence.  He was
6    a very prominent figure.  He was providing a lot of
7    guidance and a lot of support for me and my family at
8    that time when it was very much in need.

9    Q    So at the time, you needed him and he was
10   there?

11   A    He was.  He was.

12   Q    And I'm going to direct your attention to move
13   forward in the last, say, six months to a year.  Have
14   you talked to Frank about what brings him here?

15   A    We have had several occasions to talk about
16   why he's in this case and what his future might hold.

17   Q    What has he explained to you concerning why
18   he's in this case and how he feels about it?

19   A    We have had a number of conversations about
20   that.  It is apparent to me as someone who's known
21   Frank for as long as I have that he is a different
22   person now than he was when I first met him back in
23   1983.

24   Q    In what way?

42

C  3501

1      A      He is much more self-aware about a lot of

2    things that have gone on in his life.  Frank always

3    came across as a very confident, very professional

4    individual, and at the same time it was also apparent

5    that he was dealing with the issue of his alcoholism.

6    He had always had that problem and, yet, managed to

7    function, and to even thrive in the courtroom setting.

8    Having become an attorney myself and having had

9    considerable courtroom experience, I think I have

10   gained a certain understanding of how the crucible --

11   the courtroom can cause a person to focus and to be

12   able to set aside the distractions that are otherwise

13   present in day-to-day life.  And, you know, we have

14   talked about how he has forever lost that, that that

15   crucible -- that role as an attorney is something that

16   will now and forever be behind him, and that's a big

17   adjustment, you know.

18          We discussed on numerous occasions, you know,

19   how he viewed the practice of law and the profession

20   and how in some ways, it was very satisfying and in

21   other ways less so.  And I always did get the

22   impression that while Frank got a great amount of

23   personal satisfaction in doing his work and doing it

24   very well and helping the people he was representing,

43

C 3502

1    whether it be in his roles as public defender or his

2    private clients, that it still left him wanting in some

3    ways and I think I see now from having discussed it

4    with him that a lot of those wants and a lot of those

5    unsatisfying envisions were related to his addictions.

6    They never really allowed him to focus on his practice

7    the way he would have wanted to.

8        Q    As a person who is an attorney -- you have

9    been an attorney for a period of time now?

10       A    About nine years now.

11       Q    Thinking back, were you able to -- I think you

12   touched on this briefly -- see a different Frank inside

13   the courtroom as opposed to outside the courtroom?

14       A    Well, I have actually never seen Frank the

15   whole way through a case.  The one time I came closest

16   was in voire dire.  Was called for jury duty and was

17   near to being selected as a panel list and turned out

18   that Frank was serving in his role as a public defender

19   on a criminal case and the counsel and court decided

20   that perhaps it was best that I not serve in that

21   capacity, but my knowledge of Frank's role in the

22   courtroom and how he served in that role comes from the

23   conversations with him and from having talked to

24   others, including my mom, who have witnessed him in the

C 3503

1  courtroom over the years that I have known him, rather

2  than having seen him in that role or setting.

3       MR. TONER:  If I may have a moment, Judge.

4            I don't have any further questions.  Thank

5  you.

6       MR. EVANS:  I have no questions.  Thank you.

7       THE COURT:  Thank you.

8                 (Witness excused.)

9       THE COURT:  Sir, please step forward.

10                (Thereupon the witness was duly sworn.)

11                (Whereupon proceedings were had at the

12                bench out of the hearing of the Court

13                Reporter.)

14      THE COURT:  Why don't we take a break for about

15  five minutes.  Sir, you step back down and we'll go off

16  the record.

17                (Recess taken.)

18      THE COURT:  Let's go back on the record.  And, sir,

19  have a seat.  You are still under oath.  We have yet to

20  ask you a question, including your name.  So I don't

21  know your name.

22            So, go ahead, Mr. Toner.

23

24

45
C 3504

1                          WILLIAM BRUMMITT

2    called as a witness on behalf of the Defendant, after

3    having been first duly sworn, was examined and

4    testified as follows:

5                          DIRECT EXAMINATIQN

6                          BY MR. TONER:

7         Q      Please state your name and spell your last

8    name for the court reporter.

9         A      William Brummitt, B-R-U-M-M-I-T-T.

10        Q      And, Mr. Brummitt, are you acquainted with

11   Frank Picl?

12        A      Yes, I am.

13        Q      And how is it that you are acquainted with

14   him?

15        A      I first met Frank at White Oaks when he

16   entered treatment there approximately 18 months ago.  I

17   was there in my capacity as both a volunteer and as a

18   recovering addict myself.

19        Q      And in the capacity that you volunteer, what

20   is it that you do there?

21        A      Well, primarily, I sit in group, group

22   therapy, and just offer the observations of someone six

23   years into recovery might.  I also share my meditation

24   experience every week there with the gentlemen

46

C 35 5

1   currently in treatment.

2       Q    So you do the meditation program as well as

3   part of the program out there?

4       A    Yes.  Yes, I do.

5       Q    You got to know Frank through those roles?

6       A    Both out there at treatment and subsequently

7   in AA meetings.

8       Q    And are you currently Frank's AA sponsor?

9       A    Yes, I am.

10      Q    Now, do you see him or have you seen him over

11  the past 18 months on a fairly regular basis?

12      A    Yes.  At least once weekly.

13      Q    And that would be out in the alumni meeting?

14      A    That would be on Thursday nights, right.  I

15  should add I would often see him also on Friday at an

16  AA meeting.  Not every week necessarily.

17      Q    And having gone through the process of

18  recovery yourself, working on that, your recovery, have

19  you noted things about how Frank has changed over the

20  last 18 months?

21      A    I think there has been progress.  I think over

22  the past 18 months -- one of the things about AA is

23  it's rather foolproof in the sense that if you come

24  around and hang around a group of people concerned with

1    the spiritual nature of the program that there is going

2    to be change, and I think that Frank is -- that's true

3    of Frank as well as everybody that does that.  You

4    know, there has been a definite progress from some --

5    some of the ways I would characterize Frank when I

6    first met him are not necessarily the things that I

7    would say now.

8        Q    What were they then?  What's different?

9        A    When I first met Frank, he tended towards the

10   arrogant side.  He was rather brash, loud, maybe not

11   completely honest.  I should add none of those are

12   particularly unusual for people when they enter into

13   treatment.

14            And I have seen -- over the past 18 months I

15   have seen a movement towards humility.  Certainly a

16   degree of remorsefulness about what he has done with

17   his misdirection of the funds that I understand that he

18   took.  And just a greater self-awareness, I believe, of

19   some of his problems, and I think most -- I think

20   importantly, I think he sees -- today, I think he sees

21   the necessity for addressing his spiritual condition on

22   a lifetime basis.  This is not something that's going

23   to go away.  This is something that he's going to have

24   to deal with on a daily basis for the rest of his life.

48

C 3507

1    Q    You and he discussed that?

2    A    Yes.

3    Q    He seems to appreciate and understand that?

4    A    Yes.  He seems to understand that.

5    Q    And have you in your discussions, are you

6    aware of his taking medication?

7    A    I am aware that he takes medication, yes.

8    Q    And has he discussed the need for continuing

9    that regimen as well?

10   A    I don't remember specifically talking with him

11   about continuing his medication.  I really couldn't

12   answer that, I guess.

13   Q    When you indicated in your testimony that you

14   felt that he had some movement toward remorse, what did

15   you mean by that?

16   A    I heard him talk at meetings about what he's

17   done and about the fact that he's sorry that he's done

18   it.  And, you know, more than just words, you know,

19   this whole thing, spiritual condition thing is rather

20   subjective.  You know, behind the words I see a certain

21   attitudinal attitude that's consistent with that.

22   Q    So it's not just talking?

23   A    I don't think so.  We hear a lot of talk in

24   AA, and usually those are the people that don't

49

C 3508

1    continue to come around.  In other words, working on

2    the spiritual condition for the rest of their life is

3    not something that they're interested in and they don't

4    come around.  Frank has continued to come around which

5    is an objective thing we say.  So he has demonstrated

6    his interest in that, I think, in that way in that he's

7    continued to come around.

8        Q    In your experience as a participant and person

9    who helps out, volunteers in these meetings, with

10   regard to addiction, what role does hitting bottom play

11   during recovery?

12       A    It's -- there's -- it has to happen.  It has

13   to happen.  Until it does, what a person needs to do,

14   they look at themselves, they need to take, the honesty

15   that must manifest, it's not going to happen.  People

16   think they are ready, and they come back in and they

17   not necessarily haven't hit bottom yet.  Hitting bottom

18   is probably the greatest teacher of all.

19       Q    What about -- you talk about a higher power of

20   the spiritual side that recognizes something other than

21   just your own inner will power, correct?

22       A    That's true, yes.

23       Q    What is it that AA teaches us and why does it

24   work that you depend on that rather than simple willing

50

C 3509

 1  your way through this addiction?

 2      A    Well, as far as addiction and alcoholism, drug

 3  addiction is concerned, will power is of no use

 4  whatsoever.  It's something that if it were only that

 5  simple.  The will power is not something that I

 6  personally had any luck with at all.  I mean, I

 7  recognized eventually my spiritual bankruptcy is what

 8  led to my condition.  So I'm not sure if I answered

 9  your question.  Perhaps you can ask it again.

10      Q    You -- when you talk about -- you say will

11  power works for some or doesn't work for an addict.

12  Why not?

13      A    Well, how is the best way to answer that?

14  Because the best way I can put it is that just -- that

15  it does not work.  Will power is not something that is

16  part of the spiritual picture that we are talking

17  about.  It's more in the line of, I guess, more self,

18  you know, and in what we are looking for is the --

19      Q    Something beyond?

20      A    Something beyond ego, kind of like the

21  opposite, if you will.

22      MR. TONER:  I don't have any further questions.

23  Thank you.

24

                                              51
                                           C 3510

1                    CROSS-EXAMINATION

2                    BY MR. EVANS:

3        Q    Mr. Brummitt, the defendant didn't show up at

4    White Oaks until after he was arrested on this case; is

5    that a correct statement?

6        A    I believe that's true.

7        Q    And you understand that he's not here today

8    because he's an alcoholic, it's because of this crime?

9    You understand that --

10       A    Yes.

11       Q    -- as his sponsor?

12       A    Yes.

13       Q    He's talked with you about what he did?

14       A    Yes.

15       Q    Did he tell you what he did with the money?

16       A    We -- no.

17       Q    Did he tell you how much money he took?

18       A    I am aware of a certain figure.  I'm not

19    sure -- what the newspaper accounts, other people

20    talking, talking to Frank myself -- exactly where I

21    came up with that.

22       Q    And the question, though, sir, is does the

23    defendant in these conversations with you, has he ever

24    told you how much money he took?

Exhibit 22-5

52

C 351

1    A    Not to my exact recollection, no.

2    Q    Did he tell you the age of the victim?

3    A    Yes.

4    Q    How old did he tell you she was?

5    A    I believe she was in her 70's.

6    Q    You used the term misdirection of funds.  Was

7  that your term or is that Frank's terms?

8    A    That's entirely my own.

9    Q    Did you have any knowledge about the length of

10  time that defendant took money from Alice Varga?

11    A    Not really.

12    Q    Do you know how many times the defendant

13  cashed cashier's checks out of the accounts which were

14  her assets?

15    A    No, sir, I do not.

16    Q    Your concern obviously is with the program of

17  AA and staying sober?

18    A    That's true.

19    MR. EVANS:  Thank you, sir.

20    THE COURT:  Mr. Toner.

21    MR. TONER:  Nothing on those points, Judge.  Thank

22  you, sir.

23    THE COURT:  You can step down.  Thank you.

24              (Witness excused.)

C 35 12

```
 1        THE COURT:  Mr. Toner and Mr. Evans.

 2                    (Whereupon proceedings were had at the

 3                     bench out of the hearing of the court

 4                     reporter.)

 5                    (Thereupon the witness was duly sworn.)

 6                        ROBERT POTTS

 7   called as a witness on behalf of the Defendant, after

 8   having been first duly sworn, was examined and

 9   testified as follows:

10                     DIRECT EXAMINATION

11                     BY MR. TONER:

12        Q    Please state your name.

13        A    Robert Potts.

14        Q    And how are you employed, sir?

15        A    I'm an attorney.

16        Q    And you are an attorney in Elmwood, Illinois?

17        A    That's correct.

18        Q    And do you know Frank Picl?

19        A    I know Frank.

20        Q    And can you tell the judge, please, how is it

21   that you know him?

22        A    Frank was a friend of my former law partner,

23   George Whitney.  I met Frank on a couple of occasions

24   during a period of time when George was alive.  In
```

1   1987, George met with a tragic accident and was killed

2   in an automobile crash.

3        Following that, I had the tremendous burden of

4   files and work to get done alone.  We had an associate

5   before that who had left and started his own practice.

6   So we had really a three-man practice, and I was the

7   only guy.

8        So knowing that Frank had -- was an attorney

9   and friend of George, I asked him to help me as much as

10  he could with the work that I had and to take over some

11  of my partner's files.

12       Q    And did he, in fact, help you out?

13       A    He did, very graciously.  I knew he was very

14  busy with his own public defender -- well, as a public

15  defender and with his own practice, but he came to

16  Elmwood one day a week, took files with him, met

17  clients, closed up many files that I just couldn't get

18  to and that relationship went on until we were able to

19  catch up and I could manage on my own and eventually

20  hire a full-time associate.

21       Q    So I take it that as far as your business

22  relationship with Frank, that ceased some time, but did

23  you continue to maintain a social relationship?

24       A    I did.  During the course of working together,

55

C 3514

1   we became good friends.  Our families became good

2   friends.  Frank's wife, my wife, his kids were about

3   the same age as mine, and we would be together on

4   several social events many occasions, and I would talk

5   to Frank on a fairly regular basis by phone and so

6   forth.

7       Q    Now, directing your attention back toward the

8   late 1989 -- excuse me, 1998 through 2000, in that

9   area, when he was going through his first divorce.

10  Were you -- did you still have contact or talk to him?

11      A    Well, I did.  I was in somewhat of a form of

12  denial.  I heard the rumors, and it never really came

13  up, and finally there was -- I mean, when you have, you

14  know, both husband and wife and good friends you try to

15  deny the fact that they are not getting along, but,

16  eventually, I learned that they were parting ways and

17  then had a chance to talk to both Frank and Jenny on

18  occasion.

19      Q    With regard to Frank, can you describe the

20  impact that that had on him?  Was it significant?

21      A    He was very devastated.  No less.  I think

22  he -- Frank understood the situation, understood his

23  problem and recognized that.

24          About the same period of time my second

1    tragedy in my life happened, my wife had a brain

2    aneurysm, had brain surgery, and was in a coma at

3    St. Francis Hospital.  She was in a coma for almost two

4    weeks, and I stayed at the hospital, slept on the floor

5    and never went home, and Frank and his wife opened

6    their home to me and my family and we went over there

7    and had meals and showers on occasion and so forth.  So

8    at that -- about -- at that time, they tried to be

9    positive with me and help me through my own deal.  And

10   so, again, I was still in that form of denial at that

11   point in time because they were trying to help me and

12   my family through our ordeal.  So it never really came

13   up totally.

14       Q    Those are the type of friendship that you had

15   with Frank.  Those are the observations that you had

16   that when you needed him he produced or --

17       A    Oh, absolutely.  And his whole family did.

18       Q    Now, through the time that you knew him and

19   you are probably describing almost 20 years, I guess?

20       A    Uh-huh.

21       Q    Have you had an occasion to observe his moods?

22       A    Absolutely.  On one occasion I can remember

23   there was a house remodeling project that Frank took on

24   a whole new addition and was excited about tearing down

                                                    57
                                               C  3516

1   walls and building, took a gigantic project on.  He was

2   elated about it.  He was focused, excited about it,

3   something he could do that was positive construction,

4   doing something with his hands and have a -- it was --

5   it appeared to be good therapy for him.

6          And when Frank and I would talk, I would try

7   to be positive to him, and from that point on, I sensed

8   some depression and, you know, going from one time you

9   talk to him being real positive and have a good outlook

10  on things and the next time he was extremely depressed.

11       Q    I'm going to ask you two questions.

12  Approximately when would this time frame be as far as

13  you can recall, if you can, as far as the talking to

14  him?  He built the addition on his house about --

15       A    That was before my wife had her aneurysm, and

16  after she had the aneurysm in 2000 is when I started --

17  noticed the sadness, the satisfaction with his practice

18  and with his life and the sense of depression, although

19  he wouldn't come out -- he didn't -- I never knew that

20  he was being treated for depression.

21       Q    Now, you were aware that he drank, correct?

22       A    Yes.

23       Q    Now, with this sense of depression that you

24  were able to pick up during your conversations with

58

C 3517

1   him, would it really make a difference in your

2   observation in the way he presented himself to you

3   whether he'd been drinking or not?

4      A   I couldn't really tell the difference.  From

5   when he was drinking or wasn't drinking in terms of

6   depression, I couldn't tell because oftentimes our

7   conversation would be over the phone.  I didn't notice

8   any slurring of words or anything like that.  It was

9   mostly the sadness of the things he discussed about

10   himself and so forth.

11      Q   Now, you attended after -- you were aware he

12   was arrested, correct?

13      A   Uh-huh.

14      Q   And last April you attended his daughter's

15   wedding?

16      A   That's correct.

17      Q   And did you and Frank have an opportunity to

18   have a long talk?

19      A   We certainly did.  My wife and who -- Willa

20   had a remarkable recovery -- were sitting at the table

21   and Frank joined us at the reception.  We had a good

22   conversation.  He was very positive.  He'd been through

23   some treatment and just had a great euphoria about what

24   he'd learned about himself, what positive things that

C 3518

1    had come of the treatment, how he was able to quit

2    drinking and what he was going to hopefully do with his

3    life in a state of being alcohol free and nondependent,

4    but the whole conversation was focused at that time

5    about being very positive and about his recovery.

6        Q    Is that a marked difference from the last

7    conversations you had had?

8        A    Absolutely.

9        Q    Now, more recently in the last couple months,

10   have you had occasions to talk to him on a fairly

11   regular basis?

12       A    I have.  Still note the depression, the

13   remorsefulness of what he has done.  He can't

14   understand it, I don't think, and it's hard to believe,

15   and, certainly, I don't condone it.  It's deplorable

16   conduct and he would admit to -- he has admitted that

17   as well.  And it's something that I hope he can get

18   through and get over.

19       MR. TONER:  If I may have a moment, Judge.

20           Nothing further.  Thank you, sir.

21       THE COURT:  Mr. Evans.

22                   CROSS-EXAMINATION

23                   BY MR. EVANS:

24       Q    Sir, what period of time was it that the

60

C 3519

1    defendant was doing work for your law firm?

2        A    Well, Mr. Whitney passed away in 1987.   I

3    think that relationship went on from immediately after

4    that date until probably -- it gradually dissipated

5    over a period of three or four, maybe five years.

6        Q    And you are aware of what Mr. Picl has pled

7    guilty to?

8        A    I am.

9        Q    And as you have told us, this is deplorable

10   conduct, is it not?

11       A    It is.

12       Q    You know as well as all of us that as

13   attorneys that we have a special obligation to our

14   clients?

15       A    We do.

16       Q    Clients trust us in our expertise; you are

17   aware of that in your experience?

18       A    That's our profession.

19       Q    And to violate that trust is a serious

20   offense, correct, sir?

21       A    You are absolutely right.

22       MR. EVANS:   Thank you.  No further questions.

23       THE COURT:  Mr. Toner.

24       MR. TONER:  Nothing on that, Judge.

C 3520

1        THE COURT:  Thank you.

2                   (Witness excused.)

3        MR. TONER:  Todd Kollar.

4                   (Thereupon the witness was duly sworn.)

5                        TODD KOLLAR

6   called as a witness on behalf of the Defendant, after

7   having been first duly sworn, was examined and

8   testified as follows:

9                   DIRECT EXAMINATION

10                  BY MR. TONER:

11       Q    Morning.  Please state your name and spell

12  your last name for the court reporter.

13       A    Todd Kollar, K-O-L-L-A-R.

14       Q    And your occupation or profession?

15       A    I'm the owner of CGM's, Commercial Grounds

16  Maintenance.

17       Q    And do you know Frank Picl?

18       A    Yes, I do.

19       Q    And could you tell the Court, please, how it

20  is you know him?

21       A    I know him through the MRM program at White

22  Oaks.

23       Q    And how long have you known him?

24       A    Eighteen months.

62

C 3521

1       Q    So you and he went through the program
2    together?
3       A    Actually, we didn't go through the initial
4    program together, but I have contact with him on
5    Thursday nights.
6       Q    So you have known him --
7       A    Yes.
8       Q    -- about that long?
9            So you see him at the MRM alumni meetings?
10      A    Those and other meetings throughout the --
11      Q    AA meetings?
12      A    Yes.
13      Q    How often is it that you see him?
14      A    I see him quite frequent.  He's usually -- at
15   most of the meetings that I attend, he is usually
16   there.
17      Q    Approximately how many -- well, you have the
18   one alumni meeting on Thursday nights?
19      A    I go to three a week, and I think he goes to
20   more.
21      Q    So you see him on a regular basis usually at
22   least three times a week?
23      A    Yes.
24      Q    Have you and Frank talked about your recovery?

63

C 3522

1        A    Yes.

2        Q    What has Frank told you about his?

3        A    It's basically at the beginning of when he

4   first came in, and it was kind of stated earlier, it's

5   more or less what I have noticed. You know, we talk

6   about how life is today and how it was before and, you

7   know, he's actually stated that he seems to be happier

8   now than he was before, but he has definitely changed

9   since I first met him.

10       Q    You mentioned that there are things that you

11  have noticed. Why don't you tell us about those.

12       A    Well, at the beginning, when he first came in,

13  you know, and I have been in the courtroom all morning,

14  he seemed to -- the arrogance level was fairly high and

15  seemed to -- seems to know exactly what he was supposed

16  to do at the beginning. And now, you know, there's

17  definitely been a personality change. He has -- really

18  has a sense of humility now. He's no longer the center

19  of the show -- the center of attention. He's a lot

20  more pleasant to be around.

21       Q    Do you attribute -- or in your observations of

22  your own life perhaps and as well as other people going

23  through this process, is that part of the process of

24  moving on, the moving away from being the focal point

64

C 3523

1   or the center to --

2       A    Oh, that's the number one focus.

3       Q    -- looking somewhere other than to yourself?

4       A    Exactly, yes.

5       Q    And has this become kind of a revelation to

6   him?  Have you talked about that?

7       A    You know, usually it's seen from the outside,

8   from other outside people.  I don't -- besides that his

9   change of that -- you know, we used -- he used to be a

10  lawyer, and I'm not exactly sure what he's doing now,

11  but to be happy, and he states that he's happy, now is

12  kind of a -- I contribute it to the fact that, you

13  know, he's had the change and he's doing what he needs

14  to do and that's the lifetime -- that's what we have to

15  do for our lifetime in order to achieve that, and he's

16  on that path.

17          And, yeah, I think -- you know, yeah, that's

18  basically what -- it's -- I don't know how really to

19  put this.  He's never really stated to me that, oh, I'm

20  doing great, and I think if he would state to me that

21  if he's doing great, I think that would kind of defeat

22  that purpose of what he's trying to do.

23      Q    But the signs you see and the signs that you

24  are taught to work on apparently seems to be there?

65

C 3524

1        A    Oh, yes.

2        Q    Does he seem more free or at peace with

3   himself?

4        A    Yes.  Yes, he does.

5        Q    And you have noticed that as a change?

6        A    Yes.

7        Q    In your AA experience, and particularly with

8   regard to Frank, is part of the process realizing the

9   fact that you have choices and the ability to make the

10  choices in striving to make a right one?

11       A    Can you repeat that?

12       Q    Is part of your treatment in talking about the

13  fact that there are choices to make and you have to

14  make the next right choice; is that true?

15       A    Yes.

16       Q    And have you seen him moving toward that

17  direction as well?

18       A    Oh, yes.

19       Q    Is that part of the process that helps one

20  feel better about themselves?

21       A    Of having the choice.

22       Q    Knowing they have the choice and the idea that

23  you are supposed to be working towards the next right

24  one that helps you feel better about yourself in the

C 3525

1  program?

2      A    It would, yes.

3      Q    Does that seem to have been working for

4  Mr. Picl, Frank?

5      A    Has --

6      Q    Does he seem to be making a step in the

7  direction towards making the next right choice?

8      A    Based on my observation that I see, you know,

9  again on a weekly basis, he attends and actually is

10 more active than I am and I am -- I feel that, yeah.  I

11 mean, he's definitely -- definitely in the right

12 direction.

13     MR. TONER:  Thank you.

14     THE COURT:  Mr. Evans, cross.

15                 CROSS-EXAMINATION

16                 BY MR. EVANS:

17     Q    Mr. Kollar, you as an alcoholic or the

18 defendant are no different in terms of makes choices.

19 We all make choices every day, don't we?

20     A    Yes.

21     Q    People, millions of people who aren't

22 alcoholics make choices on a day-to-day basis, right?

23     A    Yes.

24     Q    So there's nothing unusual about having to

67
C 3526

1   make a choice every single day of our life, is there?

2       A    After recovery and before recovery I think

3   there is a huge difference.

4       Q    We still have to make choices at both times,

5   don't we?

6       A    Yes.

7       Q    And now that the defendant -- you are saying

8   he feels better about himself because of the choices

9   he's making today.  Is that something he's told you or

10  something you have seen?

11      A    It's what I have witnessed from him.

12      MR. EVANS:  Thank you.  No further questions.

13                  REDIRECT EXAMINATION

14                  BY MR. TONER:

15      Q    Very briefly, if I may.

16          You mentioned the fact that there are

17  differences between choices you make before recovery

18  and after.  Could you elaborate on that briefly?

19      A    Before as -- is based off my experience as a

20  recovering alcoholic and drug addict.  You lose the

21  conscious effort to have a choice, and what happens

22  after recovery is -- and into recovery you have -- it's

23  a spiritual program where you are so obsessed with

24  yourself and whatever else that you are trying to do at

68

C 3527

1  that time that you know -- and I have heard earlier,

2  will power is a complete liability.  There is

3  absolutely no will power involved before and once you

4  make the conscious effort now to do what you need to do

5  you become -- your thoughts become clearer and you are

6  able to -- how I kind of say is become a functioning

7  productive member of society today.  And that's

8  basically how my recovery has been.

9        MR. TONER:  Nothing further.

10              RECROSS-EXAMINATION

11             BY MR. EVANS:

12     Q    You are not saying, sir, that you couldn't

13  make a choice even when you were drinking, correct?

14  You made choices every day when you drank, didn't you?

15     A    Yeah.  You can -- there were choices to be

16  made, but they are not controlled by -- you know, I

17  don't want to come into this as a voices in your head,

18  but like, for instance --

19     Q    Sir, as an alcoholic, did you have a choice as

20  to what you did during the day before you came into the

21  program?

22     A    As an alcoholic before?

23     Q    Before you came into recovery.

24     A    Here's an example, if this would be clear.

1    Q    I'm asking you if you were able to make

2  choices, sir.  I'm not asking for an example.

3    A    Not under my own free will.

4    Q    So something was making you do everything you

5  did before you went into recovery, some outside force?

6    A    Yes.  Alcohol and drugs seem to have been the

7  contributing factor in my situation, yes.

8    Q    How about in your experience with other

9  alcoholics?  Do they all steal money?

10    A    To say do they all is --

11    Q    That's my question.

12    A    I can't answer if they do.  I don't know them

13  all.

14    MR. EVANS:  Thank you, sir.  No further questions.

15                REDIRECT EXAMINATION

16                BY MR. TONER:

17    Q    With regard to the choices that you make

18  before you went into the recovery, do you have a

19  choice, for example, prior to recovery as to whether or

20  not you are going to drink or not drink?  Is that a

21  choice you make or are able to make?

22    A    You are asking did I have a choice --

23    Q    Yes.  Is it a choice or is it an obsession?

24    MR. EVANS:  Judge, I would object at this time to

70

C 3529

1  the relevance as to what this individual witness's

2  states of mind were.

3       THE COURT:  Mr. Toner.

4       MR. TONER:  If I could have a minute, Judge.

5            I'll withdraw the question.  Thank you very

6  much.

7       THE COURT:  Mr. Evans, anything further?

8       MR. EVANS:  No.

9       THE COURT:  You can step down.  Thank you.

10                 (Witness excused.)

11                 (Thereupon the witness was duly sworn.)

12                 RICHARD L. GRANT, M.D.

13  called as a witness on behalf of the Defendant, after

14  having been first duly sworn, was examined and

15  testified as follows:

16                 DIRECT EXAMINATION

17                 BY MR. TONER:

18       Q    Please state your name and spell your last

19  name for the court reporter.

20       A    Richard L. Grant, G-R-A-N-T.

21       Q    And your occupation or profession?

22       A    I'm a psychiatrist.

23       Q    Where is your practice, doctor?

24       A    I'm not clinically practicing at the present

C 3530

1    time.

2        Q    But you are doing forensic work?

3        A    I do forensic psychiatry.

4        Q    How long have you been -- are you licensed,

5    first of all, in the State of Illinois?

6        A    Yes.

7        Q    How long have you been so licensed?

8        A    Since about '83 when I came here.

9        Q    Where did you come here from?

10       A    Colorado.

11       Q    And do you have any certifications?

12       A    American Board of Psychiatry and Neurology.

13       Q    How long was that -- when did you get that?

14       A    1986.

15       Q    Where did you go to school?

16       A    Medical school was University of Chicago.

17       Q    And when did you graduate from there?

18       A    1959.

19       Q    And beyond that, what was your education, if

20   any?

21       A    I did a rotating internship, internal medicine

22   residency for two years and psychiatry residency for

23   two and a half years at University of Oregon Medical

24   School.  And then -- well, then I have been on the

72

C 3531

1   faculty of four medical schools, University of Oregon,

2   University of Vermont, University of Colorado, and

3   here.  And there were periods of time in between that I

4   was full time with two different mental health centers

5   dealing with the chronic and severely mentally ill

6   including here at the Human Service Center in Peoria

7   for eight years.

8       Q     And your role at the Human Service Center in

9   Peoria, you were the --

10      A     Staff psychiatrist.

11      Q     I'm sorry?

12      A     Staff psychiatrist.

13      Q     Have you ever testified as an expert witness

14  in court before in Illinois?

15      A     Yes.

16      Q     Approximately how many times?

17      A     Maybe a dozen.

18      Q     Here in Peoria County?

19      A     Yes.

20      Q     In a variety of psychological areas, correct?

21      A     Yes.  Quite a range of civil and criminal

22  cases.

23      Q     You testify regarding your forensic work?

24      A     Pardon?

73

1      Q    Have you testified regarding your forensic
2  work in court?
3      A    Those were all forensic.
4      Q    All forensic work.  Okay.
5      MR. TONER:  Your Honor, at this. time, I'm going to
6  tender Dr. Grant as an expert in the area of psychiatry
7  subject to counsel's right to cross-examine.
8      THE COURT:  Mr. Evans?
9      MR. EVANS:  Judge, I have a couple questions, if I
10 could.
11                    CROSS-EXAMINATION
12                    BY MR. EVANS:
13     Q    Doctor, how many times have you testified in a
14 criminal case?
15     A    Perhaps six or eight.
16     Q    Six or eight?
17     A    Yes.
18     Q    And were those -- your testimony, was that
19 relating to insanity?
20     A    One was.
21     Q    How about the other five or seven?
22     A    Oh, what are my choices?
23     Q    Well, what were you testifying to?
24     A    The criminal cases were sometimes sex

C4 3583

1    offenders and just presenting psychiatric information

2    about that.

3        MR. EVANS:  That's fine.  I have no objection.

4        THE COURT:  No objection.  Court will recognize the

5    doctor as an expert.

6        MR. TONER:  Thank you.

7                    DIRECT EXAMINATION (cont'd)

8                    BY MR. TONER:

9        Q    In your role as a psychiatrist, did you have

10   an occasion to meet Frank Picl?

11       A    Yes.

12       Q    And can you tell the Court when that was and

13   for what purpose you met with him?

14       A    I met with him at your request on the 5th of

15   September to do an evaluation, psychiatric evaluation

16   to be able to present any information to inform the

17   Court about his psychiatric condition.

18       Q    So that was as it related to this particular

19   case?

20       A    Yes.

21       Q    When you met with him on September the 5th,

22   first of all, approximately how much time did you meet

23   with him?

24       A    I met with him and his sister a little over

75

C 3534

1  five hours. And I had talked with him on the phone

2  over this before that and since which added a bit of

3  information as well.

4  Q   In addition to that, did you review any other

5  materials?

6  A   The materials I reviewed were Dr. Valez's

7  psychological assessment and Dr. Lee's letter to you

8  with regard to Frank Picl.

9  Q   Going back to -- let's talk, first of all,

10 about your interview with him on the 5th. What type of

11 an interview was that? Was it a clinical or did you do

12 any testing there?

13 A   It was predominantly clinical, although I did

14 do one computerized test that's an assessment for

15 attention deficit disorder. I may use the term

16 attention deficit disorder synonymous with attention

17 deficit hyperactivity disorder. I'll just use ADD.

18 It's a computerized test.

19 Q   So the computerized test you -- that was the

20 one test you did other than the clinical interview,

21 correct?

22 A   Correct.

23 Q   Let's talk about that first. Can you tell the

24 Court, please, how that test works, what it looks for

76
C 3535

1  | and what your findings were?

2  |     A    Let me get it out. This is called the

3  | Conners' Continuous Performance Test II, and it's a

4  | test for concentration and attention. And it throws

5  | numbers up on the screen and the person is supposed to

6  | hit the space bar if there is a letter -- it's not

7  | numbers, it's letters. If there is an X, they are not

8  | supposed to hit. It does a variety of rather complex

9  | computations of performances that have to do with

10 | intervals between the time the letter appears and how

11 | quickly and how consistently the person responds, how

12 | accurate they are, just a number of dimensions, and it

13 | gives a score, an overall score as well as individual

14 | scores for different scales comparing the person's

15 | response to a normal population. So it's normed to

16 | people without ADD and then it compares the person's

17 | response to that normative sample.

18 |     Q    And with regard to Mr. Picl's performance on

19 | that, what was -- what were the results of the test?

20 |     A    In simple terms it gives a bar graph of how

21 | likely the person meets clinical criteria for ADD, and

22 | he's at the 50 percent response level.

23 |     Q    What would that indicate to you?

24 |     A    Pardon?

77

C 3536

1      Q     What would that indicate to you?

2      A     Well, a high degree of suspicion for the

3  presence of ADD.  This is not a diagnostic test.  This

4  is a source of information to put together with

5  clinical data that one collects to see whether or not a

6  final conclusion is that there's the possibility or

7  probability of attention deficit disorder.

8      Q     What type of clinical information would you

9  gather and in this particular case did you gather

10  concerning the possibility or probability of this

11  condition existing?

12      A     The hyperactivity part, attention deficit

13  hyperactivity is one that usually manifested in early

14  life.  So I would ask questions of him and his sisters

15  about the evidence of hyperactivity like getting in

16  trouble in school, being a class clown, things like

17  that.  And in his case, there wasn't -- there were no

18  examples of that.  On the other hand, multiple examples

19  of difficulty with attention, concentration, sticking

20  to things, particularly sticking to things that aren't

21  so interesting or are boring or like, for instance, in

22  school, not liking the teacher, or in any of his levels

23  of education, being not interested in the topic would

24  leave him to daydream, scribble, any number of things

1    that -- those are the questions that I ask, looking for
2    examples of difficulty with attention, and he had those
3    despite being very bright.

4          He had -- and he did well in school.  He did
5    less well on courses that he wasn't interested in and
6    that's a fairly typical -- there's just a whole range
7    of questions, looking for attentional difficulties.
8    And I'm talking about just dealing with ADD.  In his
9    case, it's mixed with other diagnostic entities.  So
10   it's hard to parse out just what belongs to the ADD and
11   belongs to the others.

12   Q    Well, you said that there are other things
13   involved.  What other types of diagnoses were you able
14   to find concerning Mr. Picl and his condition?

15   A    I think his principal diagnosis is bipolar
16   disorder, and in my report I called it bipolar II.  A
17   case could be made for Roman Numeral I, and I can go
18   into details about the distinction of that.

19   Q    Why don't you, please.

20   A    Pardon?

21   Q    Would you, please?

22   A    Okay.  The difference between bipolar I and
23   bipolar II is predominantly there has to be an episode
24   of manic behavior.  It's not whether they're

79

 1  hospitalized.  It's not whether they are psychotic.
 2  There has to be at least one episode that meets the
 3  criteria for manic behavior.  So the key for separating
 4  those lies in the presence of a manic disorder.  So
 5  manic disorder has five criteria.  The first criterion
 6  is there has to be a period of abnormally and
 7  persistently elevated expansive --
 8      MR. EVANS:  Your Honor.  I'm sorry.  Apparently,
 9  the witness is reading from something.  Could I just
10  ask what he's reading from, Judge.  Apparently, this
11  isn't based on his own recollection.
12      THE COURT:  Sir, what are you referring to there?
13      THE WITNESS:  Pardon?
14      THE COURT:  What are you using?
15      THE WITNESS:  I'm sorry.  This is the Diagnostic
16  and Statistical Manual, Roman Numeral IV, TR, the
17  current DSM.
18      MR. EVANS:  Thank you.
19      MR. TONER:  I'm sorry about that.
20      THE WITNESS:  Thank you.
21      MR. TONER:  Q  I'm sorry.  Continue, if you
22  would, doctor.
23      A    There has to be an elevated expansive or
24  irritable mood lasting at least one week.  And then the

C 3509

 1  B criterion, there has to be inflated self-esteem or

 2  grandiosity, decreased need for sleep, more talkative

 3  than usual or pressure to keep talking, flight of ideas

 4  or subjective experience that thoughts are racing,

 5  distractibility, and i.e., attention to easily drawn to

 6  unimportant or irrelevant external stimuli, has to be

 7  increased in goal directed activity and parenthetically

 8  this could be social, work, school or sexuality, or

 9  under number six, psychomotor agitation.  The seventh

10  is excessive involvement in pleasurable activities that

11  have a high potential for painful consequences,

12  engaging in unrestrained buying sprees, sexual

13  indiscretions or foolish business investments are given

14  as examples.  There has to be three of these criteria

15  met of the seven.

16       And C is the symptoms do not meet criteria for

17  a mixed episode, and unless you want me to, I won't go

18  into that.

19    Q    But with regard to those seven, did you find

20  three?

21    A    Oh, yes.  He has inflated -- he has had

22  inflated self-esteem, he has had decreased need for

23  sleep episodically.  There are times when he is under

24  pressured speech.  And when I met with him, I thought

C 3540

1   that was true.  Flight of ideas.  In his responses to

2   me, he'd get way off the track of the particular thing

3   that I might be asking him.  The distractibility, the

4   attention too easily drawn to unimportant or irrelevant

5   external stimuli.  That's a little harder to assess in

6   a one-shot evaluation.  You see that over time when you

7   are treating people and specifically focus on that, but

8   he's met the first four.  Increase in goal-directed

9   activity; certainly, in his gambling, if not in some of

10  his other preoccupations.  The way he -- I mean, he's

11  been successful at stopping drinking, but his attention

12  to and almost compulsive involvement in AA also belongs

13  somewhere in this mix for latching on to something.

14  Increase in goal directed activity.  And excessive

15  involvement in pleasurable activity, high potential for

16  painful consequences, sexual indiscretions are

17  mentioned in his history.  Foolish business

18  investments.

19         His brother has severe bipolar disorder.  And

20  his interest in trading commodities.  He set his

21  brother up in an office and they attempted

22  unsuccessfully to do that.  And certainly the current

23  reason to be here has to do with his misusing funds in

24  a fiduciary capacity, taking funds, taking money.

82

C 3541

1    Q    Stealing?

2    A    Stealing.  And excess involvement in

3  pleasurable activities that have a high potential for

4  painful consequences.  That certainly meets.  So he

5  meets four, five, six of the seven.

6         Criterion D is the mood disturbance is

7  sufficiently severe to cause marked impairment in

8  occupational function or in usual social activities or

9  relationships with others.  And I think he meets that

10 criterion.

11   Q    Why?

12   A    Well, he certainly has had significant

13 impairment in his capacity to function as an attorney,

14 and it's been progressively deteriorating over the

15 years.  And the gambling was -- social activities or

16 relationships with others, he became preoccupied with

17 that.  He had difficulty in close interpersonal

18 relationships with partners.  Or -- now that's one.

19 And the next part of the criterion D is or to

20 necessitate hospitalization or prevent harm to self or

21 others.  Well, that's not relevant, but I think he

22 meets the first part of this.  Or there are psychotic

23 features.  These are two or's.  He doesn't have either

24 the second two, but I think he meets D, the first part.

83

1        And E is the symptoms are not due to the

2   direct physiological effect of a substance such as

3   drugs of abuse, medication or other treatment or

4   general medical condition of like hyperthyroidism.

5        Now, it's clear he's had substance abuse

6   long-standing, but he's had periods of time when he

7   hasn't used substances and these symptoms have still

8   appeared.  So I do not attribute them to the substance

9   abuse.  Alcohol abuse changes the brain.

10   MR. EVANS:  Respectfully, Your Honor, I would

11   object at this time and ask that a question be posed to

12   the doctor.  I think he's answered the question a long

13   time ago, the original question.

14   THE COURT:  Sustained.  I do see that it's about

15   11:44, and I need to break at about 11:45.  So why

16   don't we break now and we'll come back at 1:15.

17        We'll go off the record.

18             (Recess taken.)

19   THE COURT:  We are back on the record.  Mr. Grant

20   here?

21   MR. TONER:  Judge, he was parking the car about 10

22   minutes, 15 minutes ago.

23   THE COURT:  We'll wait a few minutes.  In fact,

24   I'll be back in about five minutes.

84

C 3543

1              (Recess taken.)

2        THE COURT:  Be seated.

3              We'll go back on the record.  Mr. Grant is

4    back on the stand.  Your witness, Mr. Toner.

5                  DIRECT EXAMINATION (Cont'd)

6                  BY MR. TONER:

7        Q    Doctor, you were indicating earlier about the

8    symptoms of bipolar I versus bipolar II.  Would it be

9    sufficient to say that at the very least there is

10   sufficient evidence as Dr. Lee found and Dr. Valez

11   found that Mr. Picl to a reasonable degree of

12   psychiatric certainty suffers from bipolar II?

13       A    I think the critical variable is that he

14   suffers from bipolar disorder.  The distinction between

15   I and II, and I called it II as well, has nothing to do

16   with my other opinions about the impact of that on his

17   behavior.  It wouldn't make a difference, I or II.

18       Q    So either way, the bipolar is what's pertinent

19   to your testimony?

20       A    Yes.

21       Q    And his behavior?

22       A    Yes.

23       Q    From your clinical interviews as well as

24   reviewing other sources, were you able to give an

85

1   opportunity to form an impression how long this bipolar

2   condition had existed?

3       A    It's a bit difficult, but yes, I do.

4       Q    And what would that be and why?

5       A    Okay.  One would look for signals as a youth,

6   as an adolescent, and into adulthood.

7           The first depressive episode was when he

8   entered law school that anybody speaks about as a

9   depressive episode, but he had some unusual brief

10  episodes of elated behaviors when he was a teenager as

11  reported by his sisters in a household that was

12  otherwise very unhappy.  He would dance around for a

13  brief period of time listening to music very

14  uncharacteristic of him.

15          And then you told me in the presentence report

16  his mother said that even at age four he was having

17  episodes of withdrawal, that is a tone down,

18  withdrawal, isolation kind of thing.  By inference, I'm

19  collecting those two things because in the kids that I

20  saw with bipolar disorder some of the earliest symptoms

21  were withdrawal.  They weren't depression.  Kids that

22  age don't even say they are depressed.  It's just a

23  change in mood.

24          So because bipolar disorder is a highly

1  genetic disorder, very strong in his family, I would

2  think that those could have been the early symptoms,

3  but there isn't any question after he begins to have

4  recurrent depression that that's a signal for me to

5  look for bipolar.

6      Q   Before we get there, let me touch on one thing

7  before.  Now, you had mentioned that one of the signals

8  and one of the things you look at is family history

9  through the generations for these afflictions of

10  bipolar and other types of mood personality disorders.

11     A   Yes.

12     Q   And in your observation and your investigation

13 and interviews, were you able to substantiate whether

14 or not those, in fact, existed in his family?

15     A   Yes.

16     Q   And you mentioned he's got a brother who is

17 bipolar, correct?

18     A   Yes.

19     Q   His sisters have OCD and some depression?

20     A   Yes.  And there are other family members,

21 including a father, who have bipolar disorder and other

22 relatives.  As a matter of fact, there exists a chart

23 that I was given by one of the sisters where she laid

24 out all of this, and I can certainly make it available.

C 3546

1    Q    Now, getting back to the recurrent depression

2  that you mentioned, what would you define as recurrent

3  depression?

4    A    Well, first let's talk about diagnosis of

5  depression.  I'm talking about DSM IV, either dysthymia

6  which is a diagnosis in here of chronic low level

7  depression, or major depression recurrent which is a

8  greater manifestation of depressive symptoms with

9  criteria.  If a person has recurrent depression, let's

10 say major depression or dysthymia and a major

11 depressive episode, that is always a cue to me to look

12 for bipolar disorder because recurrent depressive

13 episodes are the predominant mode in which bipolar

14 people are symptomatic.  They are less frequently

15 hypomanic or manic.

16   Q    But before we talk about that in relationship

17 to the bipolar, a little bit more concerning you

18 mentioned that depression is a medical term of -- or

19 psychological term of art that is more than just being

20 depressed or having the blues, correct?

21   A    Yes.  That's why it's important -- that's why

22 I made the distinction between diagnostic entities

23 dysthymia, major depression.  Just saying I'm depressed

24 or people are depressed or down or blue or bummed out

1   doesn't mean they meet criteria for a depression.

2   Frequently, we get very lost in, well, he's got a

3   depression.  Well, maybe yes, maybe no.  So when the

4   word's used, I need to think criteria, but other people

5   could think of depression as -- I mean, when a person

6   has grief with a loss, they have all the symptoms of

7   depression, but we don't call it that.  It's grief

8   because a loved one has died or a relationship has

9   ended.  It has all the symptoms, but it's usually

10  self-limiting, but we don't call it depression and we

11  don't treat it with medication because it's expected

12  grief, normal grief.

13     Q     When you say -- you talk about an external

14  force such as that, a grief of a -- over the loss or

15  death of a spouse, for example.

16     A     Right.

17     Q     Out of 100 people, most of them theoretically

18  are probably going to have some type of grief, but is

19  that -- who is that going to cause a true depression to

20  and why?

21     A     Okay.  Take 100 people, have them all face the

22  same circumstances, end of marriage, health problems

23  that Mr. Picl had for which he seemed to have had

24  depressive symptoms and perhaps met criteria for

89

1   depression, according to Dr. Lee in the letter that I
2   read.  Well, out of those 100 people having exactly the
3   same circumstances, not all the people will have a
4   depression.  Their brain doesn't have the abnormalities
5   that are genetically derived to have a depression.  It
6   just doesn't occur.

7        Q    So medical -- a medical -- or the depression
8   you speak to is a medical condition affecting the
9   organic activity of the brain?

10       A    Yes.  It's a brain disorder.

11       Q    Now, when you move in to talking about
12  bipolar, and you mentioned that the recurrent
13  depressive episodes that appear, do you indicate that
14  you would want to rule out bipolar because they appear
15  more often in a person bipolar than the hypomanic or
16  manic episodes?

17       A    Bipolar symptoms if a person has bipolar
18  disorder, whatever the number, they spend the
19  predominant symptomatic time on the depressed side
20  rather than on the hypomanic or manic side over their
21  life.

22       Q    And that's why it would be expected to be
23  observed more readily?

24       A    Yes.

90

C 3549

1      A     Because he has a very long history of being

2   able to do quite well at things that really interest

3   him, and I would expect the high arousal thing and

4   certainly going to -- going in front of the bar and

5   testifying, being a trial attorney for those people who

6   like to do it, it's an arousal-seeking behavior.  If

7   people don't like it, they don't do it.  And so I think

8   that that was a high and, therefore, he could do well

9   at that and really poorly at other things.  And I'm not

10  at all concerned that that mitigates my opinion about

11  what affected his behavior as far as stealing is

12  concerned.

13     Q     Now, with regard to that -- you mentioned one

14  of the factors that is indic -- one of symptoms of this

15  behavior is his liking or taking risks, correct?

16     A     Yes.

17     Q     Doing jury trials to some extent, would that

18  be risky behavior or --

19     A     I would think so.  I wouldn't want to do it.

20     MR. TONER:  If I may approach the witness, Judge?

21  The record could reflect, Your Honor, I'm showing a

22  group exhibit to the doctor.

23          Take a look at those, please.  It's Group

24  Exhibit No. 1.  Take a look at those, please.

101

C 3550

 1                    (Defendant's Group Exhibit No. 1 was

 2                    previously marked by counsel for

 3                    identification.)

 4        THE WITNESS:  Okay.

 5        MR. TONER:  Q  Have you had an opportunity to

 6   review those?

 7        A    Yes.

 8        Q    Now, doctor, if I told you that those were

 9   pictures taken of Mr. Picl's apartment in March of '05,

10   just prior to his going into treatment --

11        MR. EVANS:  Judge, I object to the lack of

12   foundation.

13        MR. TONER:  I'm offering -- I'll lay foundation,

14   but this is a hypothetical.  He's looked at the

15   pictures.

16        MR. EVANS:  In terms of when they were taken and

17   things like that, Judge, respectfully that's counsel's

18   opinion in terms of the time period shown in these

19   photographs.  The doctor obviously would have no clue

20   when these pictures were taken.

21        THE COURT:  Sustained.

22        MR. TONER:  If I may.

23        THE COURT:  Let me see.

24        THE WITNESS:  There's a date on the back.

                                                  102

                                          C  3551

1       THE COURT:  Mr. Toner, are you going to offer

2   these?

3       MR. TONER:  I am, Judge, and I would be offering

4   them through Dr. Valez who was there when they were

5   taken.  I would note that they were developed in April

6   of '05.

7       MR. EVANS:  Judge, if Dr. Valez is going to lay

8   foundation, I withdraw my objection.

9       MR. TONER:  Thank you.

10      THE COURT:  That's fine.  Go ahead.

11      MR. TONER:  Q  Doctor, having reviewed those

12  photos, what impact would that have on your

13  testimony?  Does that confirm aspects?  If so, which

14  ones?

15      A   Accumulation of multiple items and having them

16  all over one's household or one's office speaks to two

17  things.  For one of the more technical word, we call it

18  clutter.  Clutter is stuff that's on its way to where

19  it belongs.  It could belong in the garbage, could

20  belong in a cabinet, could belong somewhere.  That is

21  an example of clutter.  And it's seen in people who

22  horde things and it's seen in people who have a

23  combination of ADD and OCD.  Not all people with ADD

24  and OCD have clutter because the OCD part may not be a

C 3552

1  hording part. The principal part of hording is people

2  can't bear to throw something away. It's not that they

3  necessarily need it. I talked to a man who had 12

4  identical drop cords on the wall in his garage much to

5  his wife's dislike. He needed them. This represents

6  the accumulation of materials and no organizational

7  ability to keep it neat.

8      Q    With regard to the illegal activity, the

9  stealing that Mr. Picl has pled guilty to, to -- and

10  these next couple questions would be whether or not you

11  have an opinion based to a reasonable degree of

12  psychiatric certainty to that, do you believe that he

13  knew what he was doing was wrong?

14      A    Yes. I think he knew that this was illegal.

15      Q    Do you believe he was able to control himself

16  from doing that?

17      A    All I can go by is the evidence that he did

18  not. It would be pure speculation. I think his

19  judgment was distorted.

20      MR. EVANS: Judge, respectfully, I would ask that

21  the answer be stricken in its entirety. It's not

22  relevant. It's speculation only and, therefore, I

23  would move for its inadmissibility.

24      THE COURT: I think what he testified to was it

104

C 3552

1    would be speculation on his part to say yes or no.  I

2    think he answered it the way you probably would want it

3    answered.  So I'm going to overrule the objection.  I

4    think that's what he testified, unless I misunderstood.

5        MR. EVANS:  I may have misunderstood it.

6        THE COURT:  I thought he said it would be

7    speculation on his part to say that.  He can only go on

8    what occurred and that his judgment was distorted,

9    but --

10       MR. EVANS:  I misunderstood him, Judge.

11       MR. TONER:  Q  So you can't say one way or the

12   other, but to a degree of psychiatric certainty you

13   can say his judgment was distorted?

14       A    Yes.

15       Q    Without a doubt?

16       A    Yes.

17       Q    And that had an impact on what he did?

18       A    Yes.

19       Q    With regard to people who have bipolar in the

20   same fashion as Mr. Picl, is there a relationship or

21   correlation between that and substance abuse?

22       A    Yes.

23       Q    And what would that be?

24       A    Having bipolar disorder -- a person having

C 3554

1    bipolar disorder, having attention deficit disorder or

2    having obsessive compulsive disorder, which I think he

3    has all three, each of those puts people at a higher

4    risk of substance abuse principally towards

5    self-medication, and then, of course, substance abuse

6    changes the brain and takes on a life of its own, but

7    there is a much higher risk if a person has those

8    disorders of developing substance abuse.

9        Q     And you indicated that at that point it

10   changes the brain and takes on a life of its own.  What

11   do you mean by that?

12       A     Well, continuing use of alcohol changes

13   neurotransmitter -- neurotransmitter amounts in the

14   brain.  They are pleasure centers in the brain, doing

15   something that brings pleasure, lights up certain areas

16   of the brain, and alcohol has a tendency to do that.

17   And so the reason people have craving for alcohol is

18   because it makes them feel good and it works by way of

19   transmitting, neurotransmitter.  And so the brain --

20   what addiction is is craving for another hit of

21   something that makes the brain feel good, and that's

22   sort of the mechanism that we are beginning to

23   understand about the biologic basis of alcohol and

24   other drug use.

106

C 3555

1        Q     And when you say you reach this point, one
2   feels the other?

3        A     Yes.

4        Q     And would it be fair to kind of draw an
5   analogy to snowball rolling down a hill; it keeps
6   spinning and getting bigger?

7        A     You mean alcohol use?

8        Q     Well, the alcohol use, the bipolar, this kind
9   of behavior; there's a relationship you said between
10  them, correct?

11       A     Yes.  And, for instance, there are brain spec
12  scans showing that a person without alcohol can have a
13  wildly active brain that resembles people with bipolar.
14  They probably do have it, some people.  And give them
15  alcohol and that quiets down.  Those parts of the brain
16  that are overactive quiet down, and, unfortunately, the
17  judgment part of the frontal lobes falls out, but this
18  is a self-medication, ill advised.  Doctors have better
19  medications than alcohol.

20       Q     That's --

21       A     Choose the dose and so forth.

22       Q     That's one of the reasons why people
23  self-medicate?

24       A     Right.

107

1      Q      When you talk about cravings, doctor, what is

2    the relationship, if there is one, between cravings and

3    choice when talking about addiction, be it alcohol,

4    substance abuse, or any other type of addiction?

5      A      What's the difference between cravings and

6    choice?

7      Q      Is there a relationship between those?

8      A      If I'm thirsty, I want water.  If I have gone

9    without water for 24, 48 hours I might call the height

10   of my desire for water a craving.  It's a matter of

11   degree from desire to craving.  That is a stronger

12   feeling of wanting.  That's how I would --

13     Q      So craving is just a higher form of desire or

14   choice?

15     A      Yes.

16     Q      And one of the natures of an addiction is that

17   you have these cravings?

18     A      Yes.  They are stronger than that person

19   without having used alcohol or people that don't want

20   to drink at all.

21     Q      What about -- what if you were an alcoholic?

22   Would you have that choice?  Could you make that

23   choice?

24     A      Can alcoholics make a choice not to drink?

108

C 3557

1   Yes.

2       Q    That's by going through the programs and

3   things of that nature?

4       A    Some are successful, yes.

5       MR. TONER:  Nothing further.  Thank you.

6       THE WITNESS:  And medications -- increasingly there

7   are medications used to help decrease cravings.

8       MR. TONER:  Q  And those are things that people

9   work through, then, would it be fair to say, with

10  therapy as well as medications?

11      A    Yes, both.

12      MR. TONER:  Nothing further.  Thank you.

13                  CROSS-EXAMINATION (cont'd.)

14                  BY MR. EVANS:

15      Q    Sir, you have talked about craving and choice.

16  Would it be fair to say based on what you know of this

17  case the defendant had a craving for someone else's

18. money and stole almost $300,000?  Would that be a fair

19  type of craving and choice as asked to you by defense

20  counsel?

21      A    No.  I don't think that would apply.

22      Q    That wouldn't apply to your expertise,

23  correct?

24      A    I don't think it has anything to do with any

109

1  expertise.  I said it didn't apply to the situation

2  about stealing.

3      Q    Let's talk about this situation, doctor.  By

4  the way, you mentioned a brain scan.  Did you take a

5  brain scan of the defendant?

6      A    Did I?

7      Q    Right.

8      A    No.

9      Q    So any comments you made about

10 neurotransmitters in relation to the defendant was,

11 again, speculation on your part?

12     A    No.  It's based on my reading of research

13 evidence about issues such as alcohols affect on the

14 brain.

15     Q    Did you check the defendant's brain with

16 regard to any type of testing other than what you have

17 read, doctor?

18     A    No.

19     Q    Now, you first became involved in this case,

20 doctor, when exactly?  September 5th, I believe you

21 first met the defendant?

22     A    That's when I first met him.

23     Q    You spent five hours with him that day?

24     A    With him and his sisters.

110

C 3559

1        Q    And his sisters.  And you also interviewed his

2    sisters, correct?

3        A    Yes.

4        Q    Much of the information you received about

5    Frank's life as a young lad, teenager and years when he

6    was in law school was from the defendant and his

7    sisters, correct?

8        A    Yes.

9        Q    You did no independent verification of the

10   information they gave you, did you, doctor?

11       A    I considered talking to the sisters

12   independent triangulation, validation of information

13   said by him.

14       Q    Did you talk to any disinterested individuals

15   other than the defendant's sisters concerning the

16   defendant's childhood and his upbringing?

17       A    No.

18       Q    Sir, in your experience, individuals,

19   especially in a criminal setting, might give you

20   information that may not be completely truthful or

21   accurate; is that a correct statement?

22       A    Indeed, yes.

23       Q    And, likewise, would the family members, such

24   as was the case in the defendant's case, perhaps his

111

 1   sisters weren't completely -- gave you the complete

 2   story of the defendant; would that be a fair

 3   assessment?

 4        A    Are you asking me could they have distorted

 5   what they knew to be true?

 6        Q    Yes.

 7        A    I presume that has to be a possibility.

 8        Q    Now, so that you met with him five hours on

 9   September 5th.  Did you meet with the defendant any

10   other time?

11        A    I talked on the phone several times.

12        Q    And did you talk with anyone else concerning

13   the defendant's condition, if you will, other than the

14   defendant, his sisters, anyone else?

15        A    Mr. Toner.

16        Q    Now, at the time that you were asked to

17   evaluate the defendant, did you receive any

18   correspondence from Mr. Toner?

19        A    No.

20        Q    Did you talk with Mr. Toner?

21        A    Yes.

22        Q    What did he tell you to do?  Do you recall?

23        A    He didn't tell me to do anything.

24        Q    Did he ask you to evaluate his client?

Exhibit 22-6                112

C 3561

1    Q    More frequently?

2    A    Yes.

3    Q    The result of that, is that somehow caused

4  bipolar to be misdiagnosed?

5    A    Yes, indeed.  A researcher in Zurik,

6  Switzerland, thinks that half the people who have

7  recurrent depression are probably bipolar and mental

8  health professionals are missing it.

9    Q    With regard to the -- you have read the

10 information here.  With regard to 2000 when Mr. Picl

11 presented himself to Dr. Lee, would you have an opinion

12 based upon a reasonable degree of psychiatric certainty

13 as to whether or not he was bipolar?

14   A    Yes.

15   Q    And what would that opinion be?

16   A    I think he had a depressive episode that was

17 part of bipolar disorder.

18   Q    And with regard to that, what can you tell us

19 about the nature of the bipolar disorders as far as how

20 it progresses, whether or not it's chronic, and such

21 things as that?

22   A    Bipolar disorder is a chronic remitting

23 disorder.

24   Q    What do you mean by that?

91

C 3562

1    A    Chronic meaning it's there over time, but it's

2  remitting in the sense of its expression of symptoms

3  either on the high side or low side of mood. So it can

4  wax and wane in its expression. Generally untreated

5  tends to get worse over a person's lifetime, but the

6  essential nature of it is it's remitting up and down.

7  Normal mood for some people in between, maybe just up

8  and down for some people.

9    Q    Now, what happens -- how is it that you treat

10  bipolar disorder? What do you do?

11    A    There is -- in the literature -- there's been

12  a lot of discussion. It's not clear, but the treatment

13  guidelines predominantly say treat the high side of

14  mood first because --

15    Q    High side being the --

16    A    The elevated mood, hypomania, mania. If a

17  person has had both and they present with depression,

18  you run the risk giving an antidepressant alone of

19  making the bipolar disorder worse. So with patients

20  where carefully I comb their history and they are

21  presenting with depression, and one as a physician is

22  tempted to give an antidepressant, I have to be careful

23  because I can make their bipolar disorder worse, put

24  them into a hypomanic, manic episode treating only with

C 3563

1    antidepressants. And even if there is just a hint of

2    bipolar, I have said to people I want to have a mood

3    stabilizer on board before we start an antidepressant

4    or before we start stimulant medication for ADD.

5        Q    Now when you say -- so the stimulant

6    medication would be for ADD?

7        A    Yes.

8        Q    Now, your observation or at least suspicion

9    based upon what you reviewed, when you looked at the

10   change in diagnosis in March of '05 and the

11   introduction of mood leveling as well as of medication

12   and the change that that exhibited, how does that --

13   does that confirm or how does that relate to your

14   earlier suspicion from 2000?

15       A    Well, Dr. Lee went from a depression diagnosis

16   to a bipolar diagnosis and started mood stabilizers.

17   And is your question about how does that relate to my

18   opinion about bipolar?

19       Q    But, I mean, given the fact -- no. I guess

20   that's -- since he's -- the medication been changed and

21   there's indication there's been an improvement,

22   correct?

23       A    Yes.

24       Q    So that would confirm -- would that tend to

93

C 3564

1   confirm that probably he had been misdiagnosed earlier?

2       A    Yes.  You don't just catch bi -- Frank didn't

3   just catch bipolar in 2005.

4       Q    And do you believe that he was mismedicated

5   back in 2000 through 2004?

6       A    I wouldn't go that strongly.  Based on the

7   evidence Dr. Lee had, he probably engaged in reasonable

8   behavior.  I just don't think he had all the data that

9   could have been gathered.

10      Q    Do you think that with regard to medication he

11  was taking and the things that you have heard about his

12  addictive behaviors, his ADD and OCD, what is the play

13  or what is the result of the -- these combinations of

14  factors?

15      MR. EVANS:  Judge, I would just respectfully

16  object.  Is he asking the doctor's opinion, I assume?

17  I think the form of the question is completely

18  improper.

19      THE COURT:  Why don't you rephrase?

20      MR. TONER:  Q  Given the time frame between say

21  2000 and 2005.

22      A    Yes.

23      Q    You know about the behavior as far as drinking

24  and alcoholism.  You know about the medication, what

94

1   was being taken, when it was taken or no medication,

2   the bipolar disease and as far as the OCD and the ADD.

3   What, in your opinion, would be the interplay between

4   these factors?

5       A    Are you asking what is the interplay with

6   regard to its impact on his behavior?

7       Q    Correct.

8       A    I think that there was a deterioration of his

9   function in not filing income taxes which had occurred

10  before, in not filing briefs, in getting in trouble

11  with courts because he was not doing things that he had

12  done before, and as nearly as I can determine from the

13  history, the beginnings of bad judgments and risky

14  behaviors, taking money from someone.  That's a

15  deterioration of function from his prior function, and

16  I think those things were elements -- were the result

17  of this combination of disorders.  Those disorders

18  permitted bad judgment to happen.

19      Q    And can you explain then why concerning

20  ethical and moral decision-making how that judgment

21  would get distorted because of these combinations of

22  factors?

23      A    I can't explain how it happens.  I only know

24  that it happens.  It's listed as a symptom of manic

95

C 3506

1   disorder or hypomanic disorder, poor judgment, a change

2   in judgment from a person's previous state.  The fact

3   that it occurs and is called a symptom of a hypomanic

4   or manic episode is the reason that I attribute a

5   change in his behavior to the disorder.  It permitted a

6   different judgment to be made on his part that was

7   illegal as far as the money is concerned.

8       Q   So, in other words -- bipolar having a bipolar

9   illness did not cause him to steal, correct?

10      A   You mean just having bipolar?  No.

11      Q   It was a combination of these other factors?

12      MR. EVANS:  Objection to the form of the question,

13  Your Honor, and now counsel is testifying.

14      THE COURT:  Sustained.

15      MR. TONER:  Q  What factored into that happening

16  in your opinion?

17      A   If you took 100 people with his combination of

18  disorders and the opportunity to engage in illegal

19  behavior such as taking money from someone when you

20  have responsibility to act as a fiduciary agent and 100

21  people who don't have bipolar with that same thing and

22  aggravation of the bipolar I think will cause much more

23  temptation and bad judgment on the side of taking money

24  than in the normal people.  There is a higher

C 3567

1  likelihood because one of the characteristics of

2  bipolar is precisely the point of engaging in risky

3  behavior, losing your life savings, giving away things

4  that you wouldn't ordinarily give away, engaging in

5  sexual behavior that one wouldn't otherwise engage in.

6  There is a lot of examples that I have seen and read

7  about in the literature of very bad judgments in the

8  height -- at the height of a hypomanic or manic

9  episode.

10     Q    Do you have an opinion based upon a degree of

11  reasonable psychiatric certainty to what extent these

12  factors played into Mr. Picl doing this?

13     MR. EVANS:  Judge, objection.  I believe that's

14  been asked and answered, that exact same question, Your

15  Honor.

16     THE COURT:  Overruled.  Go ahead.

17     THE WITNESS:  Do it again.

18     MR. TONER:  Q  Based upon a degree of

19  psychiatric certainty, reasonable psychiatric

20  certainty, do you have an opinion concerning these

21  factors with regard to somebody in Mr. Picl's

22  position with these factors known to you what

23  percentage of people would have done the same thing

24  given the opportunity?

97

C 3568

1     MR. EVANS:  Judge, respectfully, again, I object to

2   the form of the question.  It's these factors.  If he's

3   going to ask for the doctor's opinion, respectfully,

4   Judge, I would ask that he ask it in the proper way,

5   not just in these factors, so there is some basis for

6   the doctor's so-called opinions.

7     MR. TONER:  I'll rephrase the question.

8     THE COURT:  Go ahead.

9     MR. TONER:  Q  The factors you have testified to

10  include bipolar, correct?

11    A    Yes.

12    Q    The ADD, correct?

13    A    Yes.

14    Q    The OCD?

15    A    Yes.

16    Q    The alcoholism?

17    A    Yes.

18    Q    Okay.  Any others that we -- and earlier

19  talked about a mix of things.  Those are the

20  significant things, correct?

21    A    Yes.

22    Q    With regard to -- and it's your testimony that

23  at the period of time that we are talking about, and

24  that's roughly between the years 2000 to 2005, okay,

C 3569

1  Mr. Picl was afflicted by those, correct?

2      A    Yes.

3      Q    And being either improperly or nonmedicated,

4  correct?

5      A    Yes.

6      Q    Given that combination of factors, do you have

7  an opinion based upon a reasonable degree of

8  psychiatric certainty that a person with those

9  conditions that we have just delineated, having the

10  opportunity to steal this money, what percentage of

11  people would do it?

12      A    It's my opinion that certainly more than

13  50 percent, but it would be impossible to say

14  100 percent.  So I would put it somewhere in between.

15  A very high likelihood that there was a relationship

16  between the symptom picture and the behavior.

17      Q    Now, with regard to the psychiatric or medical

18  history of Mr. Picl, there are other significant

19  factors involving injuries that might come into play?

20      A    Yes, there are.

21      Q    What are they?

22      A    Two head injuries.  My understanding is that

23  there was a head injury at age 16 and a head injury at

24  age -- in 1989, both consequence of automobile

99

C 3570

1    accidents.  And the first one resulted in a week-long

2    hospitalization, and my remembrance was the second one

3    did, too.  And when the brain is injured it becomes

4    more susceptible to further injury with even less

5    trauma because something's not to skew by the first

6    injury and a person is more vulnerable given a

7    particular injury to more damage.

8           And the last injury was 1989 and his behavior

9    has been deteriorating after that.  I'm not willing to

10   say that I know because I don't have a brain spec scan.

11   I don't have any kinds of neuropsychological testing

12   that would tell me about with better detail about brain

13   function, but at least I have to harbor a suspicion,

14   have an index of suspicion that the deterioration could

15   have been contributed to by the head injuries or simply

16   the natural progression of untreated bipolar, ADD and

17   OCD.

18       Q    Now, we had heard testimony earlier from

19   different people concerning Mr. Picl's performance in

20   the courtroom being at least adequate, if not above

21   average.  Does that cause you to question your opinion

22   that you have given here in any way?

23       A    No.

24       Q    Why not?

100

C 3571

1       A     Yes.

2       Q     Now, were you provided with Dr. Valez's

3    report?

4       A     Yes.

5       Q     Were you provided with Dr. Lee's report?

6       A     Yes.

7       Q     Were you provided with the factual information

8    which forms the basis of this crime?

9       A     I had no written document concerning grand

10   jury investigation or indictment and so forth.

11      Q     As you sit here today, do you have any

12   documentation concerning this crime?

13      A     No.

14      Q     Do you have any information that you received

15   from anyone concerning this crime?

16      A     Yes.

17      Q     From whom?

18      A     You, and Mr. Toner.

19      Q     From who?

20      A     You.  You told me that there was $300,000.

21      Q     I think I just did that a couple minutes ago.

22      A     Yeah.

23      Q     Any other information before you wrote your

24   report concerning this crime?

113

C  3572

1      A    Mr. Toner gave me information.

2      Q    And did Mr. Toner go into the details of the

3    extent and period of time that this crime occurred

4    over?

5      A    Not in precise dates.

6      Q    Did he tell you the individual dates that the

7    defendant went and took the money of Alice Varga?

8      A    No.

9      Q    Did he tell you the manner in which his client

10   took the money of Alice Varga?  In other words, how he

11   obtained --

12     A    Not completely.  I have some idea.

13     Q    Now, you have told us today that the defendant

14   has a number of -- how can I use the term --

15   impressions you have of him or diagnoses?

16     A    Opinions.

17     Q    Opinions?

18     A    My opinions.

19     Q    Your opinions you referred on numerous

20   occasions, including this morning you referred to the

21   DSM manual?

22     A    Yes.

23     Q    What is the DSM manual you have in front of

24   you, doctor?

114

C 3873

1    A    This is the current edition of the American

2   psychiatrics -- American Psychiatric Associations

3   Diagnostic Nomenclature that is giving a criteria for

4   making any of the mental disorder diagnoses.

5    Q    Mental disorders?

6    A    Right.

7    Q    And in that book one such as yourself, a

8   psychiatrist or a psychologist, can go in and find out

9   information as you were reading to us this morning

10  concerning certain diagnoses?

11   A    Yes.

12   Q    And as you read to us this morning at great

13  length you read the section concerning, I believe,

14  bipolar disorders?

15   A    Yes.

16   Q    And, specifically, it's your opinion and per

17  your report also that the defendant has what is defined

18  in the DSM as bipolar II; is that correct, doctor?

19   A    Partially because whether it's I or II isn't

20  relevant for my opinions about his behavior.

21   Q    In your report --

22   A    I said II.

23   Q    II, correct?

24   A    Correct.

115

C 3574

1    Q    And bipolar II --

2    A    Also, in my report I raised this issue whether

3  it's I or II wasn't very important.  So I mentioned I

4  in there, but not in my diagnostic list.

5    Q    Doctor, you also explained the defendant also

6  meets the criteria for the DSM condition of obsessive

7  compulsive disorder?

8    A    Yes.

9    Q    And also alcoholism?

10   A    In remission, yes.

11   Q    Which means that it's not actively -- he's not

12  actively drinking right now today, correct?

13   A    Correct.

14   Q    And you also have come up with a new diagnosis

15  not found by Dr. Lee of attention deficit disorder; is

16  that correct, doctor?

17   A    Yes.  And Dr. --

18   Q    You also --

19   A    -- Valez found OCD.

20   Q    I'm talking about ADD.

21   A    Oh, I thought you said OCD.

22   Q    My mistake.  Did you find the defendant to

23  have a condition of ADD?

24   A    Yes.

116

C 3575

```
 1        Q    And that's a new impression that you had that
 2   was not found by Dr. Lee, correct?
 3        A    Not until recently --
 4        Q    And --
 5        A    -- when he started treating him.
 6        Q    Dr. Lee told us this morning the defendant
 7   actually came into him and told him that he had ADD and
 8   that he might like some medication.  Are you aware of
 9   that?
10        A    Yes.
11        Q    Now, in your report, sir, you talk about the
12   defendant's intelligence, correct?
13        A    Yes.
14        Q    He's quite intelligent, isn't he?
15        A    Yes.
16        Q    He has an IQ about 145 to 147 per the testing
17   he was given by, I think, Dr. Valez?
18        A    It's in that range, my understanding.
19        Q    You found him also to be a very intelligent
20   individual?
21        A    Yes.  I mean, I didn't do any testing for IQ.
22        Q    Also, sir, in your report you also found that
23   he is a collector of things, correct?
24        A    Yes.
```

C 3576

1      Q      That's not unreasonable, is it, to check
2  things?

3      A      It depends on the extent of the collection.

4      Q      Those pictures that you looked at, they are
5  also consistent, are they not, with say a college
6  student living in a certain smaller room that he or she
7  might need?

8      A      I haven't seen the rooms of college students
9  since I lived in college, but I never saw the rooms
10  like that.

11     Q      How about a person who was gone through two
12  divorces, has moved from a house to an apartment and
13  now an apartment here in Peoria.  Are those pictures
14  consistent with someone who's had all of his life
15  belongings around him where he lives?

16     A      I don't even understand the question.

17     Q      The items that are shown in the pictures, they
18  are just as consistent, doctor, as an individual 54
19  years old who's gone through two divorces who has all
20  of his personal items with him and he's living in a
21  small apartment; isn't that true?

22     A      No.  I respectfully strongly disagree with
23  you.

24     Q      There's something about that picture that

118

C 3577

1   leads you to form a psychological diagnosis based on

2   those pictures, correct, doctor?

3        A    No.

4        Q    Those --

5        A    Wait.  I have to explain.

6        Q    I'm not asking you to explain, doctor.  Thank

7   you.

8             The pictures themselves show a series of

9   plastic drawers in which numerous items are placed

10  individually in those drawers; is that a correct

11  statement?

12       A    That's part of what they show.

13       Q    They show magazines on the floor?

14       A    Yes.

15       Q    They show clothes on the bed?

16       A    Yes.

17       Q    They show other personal items of the

18  defendant presumably?

19       A    Presumably.

20       Q    At one time you talked about risky behavior

21  that the defendant exhibited.  Do you recall that,

22  doctor?

23       A    Yes.

24       Q    Many people engage in risky behavior, do they

C 3578

```
 1   not?

 2        A    What do you mean by "many"?

 3        Q    Well, more than one.

 4        A    Some people engage in risky behaviors.  In the

 5   normal population?

 6        Q    Sure.

 7        A    Probably --

 8        Q    You used an example of trial lawyers.

 9        A    Yeah.

10        Q    People who speculate in commodities are among

11   individuals who engage in risky behavior, correct?

12        A    Yes.

13        Q    You put that in your report, right?

14        A    Right.

15        Q    Nothing unusual about engaging in risky

16   behavior, is there, in the normal population?

17        A    It depends on the degree --

18        Q    Now --

19        A    -- and consequences.

20        Q    Now, in your interview of the defendant and

21   his sisters, I believe his sister Mary told you that

22   she worked in his office for six years in the 1980's,

23   his law office, correct, sir?

24        A    Yes.
```

120

C 3579

1    Q    And she gave you information concerning how

2  the defendant handled his office?

3    A    Yes.

4    Q    Have you talked to or interviewed his

5  secretary who worked with him for I think it was

6  approximately 14 years?

7    A    No.

8    Q    When you saw the defendant he was fully

9  oriented to time, place, person, and location, was he

10  not?

11    A    Yes.

12    Q    He was very friendly?

13    A    Yes.

14    Q    Loquacious?

15    A    Indeed.

16    Q    Good talker?

17    A    I beg pardon?

18    Q    He could talk well?

19    A    His speech was clear, if that's what you mean.

20    Q    That's what I meant.

21    A    Okay.

22    Q    Dr. Lee in your review of the records in this

23  case did not necessarily agree with the obsessive

24  compulsiveness diagnosis of Dr. Valez and thought that

121

C 35

1   it had been over emphasized; is that correct?

2        A    That was Dr. Lee's opinion, yes.

3        Q    The defendant's diagnosis by his treating

4   doctor, at least when he showed up in March of 2005 at

5   Dr. Lee's door, his diagnosis then was changed from

6   dysthymic disorder to bipolar II disorder based on your

7   review of the records?

8        A    Yes.

9        Q    That was also concurrent with the time that

10  the defendant was arrested in this case.  Are you aware

11  of that?

12       A    Yes.

13       Q    That's certainly a life-changing experience

14  for anyone; is that correct, doctor?

15       A    Indeed.

16       Q    Now, in your report, and specifically on page

17  seven, doctor, take a moment and look at your report.

18  You reference questions four, questions five, questions

19  seven, and I'm asking you, if you would, to look what

20  questions are being referred to there.

21       A    The questions in Dr. Lee's letter.  The

22  questions that he numbered and was responding to.

23       Q    So those references in your report are

24  referring to Dr. Lee's report?

122

1      A     Yes.  See, it was -- this is not a report from

2   Dr. Lee that I read.  It was a letter.

3      Q     I understand.  As you told us today, the

4   defendant's judgment was not impaired at the time of

5   this crime to the extent that he lacked the ability to

6   appreciate his criminality, correct?

7      A     That's my opinion.

8      Q     But you know at the time that you interviewed

9   the defendant that this crime that he committed against

10  this 85-year-old woman occurred while he was

11  representing her as her attorney?

12     A     Yes.

13     Q     You were aware the defendant has practiced law

14  in this courtroom and adjacent areas for 28 years,

15  doctor?

16     A     Yes.

17     Q     Are you aware that the public defender of

18  Peoria County testified that he was probably one of the

19  finest trial lawyers he's ever seen?

20     A     I didn't know that.

21     Q     Would it change your opinion?

22     A     No.

23     Q     You are aware, doctor, that the defendant also

24  didn't bother to pay any income tax in the mid '90s?

123

C  3582

```
 1        A      I was --

 2        Q      Are you aware of that?

 3        A      Yes.

 4        Q      And for which he had to obtain loans from his

 5   family?  Are you aware of that, doctor?

 6        A      Yes.

 7        Q      Now, you are aware, doctor, in your interview

 8   of the defendant that he went through a divorce in, I

 9   believe, 1999?

10        A      From '99 to 2001.

11        Q      He suffered great turmoil from the breakup of

12   his family.  Are you aware of that, doctor?

13        A      Yes.

14        Q      He entered into a relationship after the first

15   marriage with a woman and had a very stormy

16   relationship.  Are you aware of that?

17        A      Yes.

18        Q      They got married.  Are you aware of that?

19        A      Yes.

20        Q      And then they subsequently got divorced.  Are

21   you aware of that, doctor?

22        A      Yes.

23        Q      All these marital problems certainly caused

24   stresses in the defendant's life, correct?
```

124

C 3583

1    A    Yes.

2    Q    I mean, anybody that would go through that

3  would have some stress in their life?

4    A    They are stressors, yes.

5    Q    You indicate that on the personal assessment

6  inventory that the defendant may not have answered in a

7  completely forthright manner.  Do you recall making

8  that statement, doctor?

9    A    Page?

10    Q    Twelve.  My question is was that your

11  assessment or was that Dr. Valez?

12    A    That was Dr. Valez's.

13    Q    Fair enough.  You indicated that the

14  defendant -- I think you used the term of art a

15  disordered brain.  Do you recall using that term?

16    A    Page?

17    Q    It's in your testimony, doctor.

18    A    You mean today?

19    Q    Today.

20    A    I may have used it, yes.

21    Q    Is that a -- is that a psychiatric term of art

22  or a clinical term?

23    A    It's a euphuism for abnormal.

24    Q    Is that found -- disorder brain syndrome found

125

1  in the DSM manual in front of you?

2     A    No.

3     Q    Doesn't exist in the manual, does it?

4     A    Right.  These are mental disorders, meaning

5  this is something wrong with the brain.

6     Q    Now, you also based on your evaluation of the

7  defendant doubt the existence of any pathologic

8  gambling in the defendant's case; is that correct,

9  doctor?

10     A    I stated that.

11     Q    You also indicate in your response on page 14

12  that you considered malingering in the defendant's

13  case, but the consistency of accounts by observers over

14  time spoke strongly against that, correct?

15     A    Yes.

16     Q    In other words, you thought perhaps he was

17  being less than truthful with you when he talked with

18  you?

19     A    I must do that all the time for what I do.

20     Q    Did you give him a psychological test of

21  malingering?

22     A    No.

23     Q    There is one available, is there not?

24     A    There are multiple ones.

126

C 3585

1     Q    Did you give him any of those?

2     A    No.

3     Q    Doctor, all bipolar individuals don't steal

4 money, do they?

5     A    No.

6     Q    All OCD individuals who have that diagnosis

7 don't steal money, do they?

8     A    No.

9     Q    Alcoholics don't all steal money, do they?

10    A    No.

11    Q    Persons with ADD don't all steal money, do

12 they?

13    A    No.

14    Q    And I think you gave a question to counsel

15 when he asked you about all those diagnoses you found

16 in the defendant's case that in the population of 100

17 people what percentage to a reasonable degree of

18 scientific certainty would steal money, and do you

19 recall your answer being 50 to 100 percent?

20    A    No.

21    Q    What is your answer?

22    A    I said it's better than 50 and certainly not

23 100 percent.

24    Q    Is that based on any scientific study?

C 3586

1      A     It's based on my clinical experience.

2      Q     Is it based on any of the readings that you

3    have done relating to those particular diagnoses and

4    how they cause someone to take money or take items that

5    are not theirs?

6      A     I have not seen research on that.

7      Q     You haven't seen any such research, have you,

8    doctor?

9      A     I just said that.

10     Q     You told us that an alcoholic can make a

11   choice not to drink, correct?

12     A     Yes.   Clearly, Mr. Picl didn't.

13     Q     Let me take you through a couple dates early

14   in this crime, doctor.  As you have told us, you did

15   not receive specific information about the crime,

16   correct, sir?

17     A     Correct.

18     Q     If I were to tell you on January 13th, 2003,

19   the defendant redeemed a CD of Mrs. Varga of 33,000, --

20   $33,184 at the Associated Bank and received a cashier's

21   check, was that something that he chose to do or

22   something these diagnoses made him do?

23     A     I got distracted in your question because -- I

24   don't remember the date you said.

128

C 3587

1       Q     January 13th, 2003, sir.

2       A     He cashed a cashier's check for $33,000.

3       Q     Right.  Of Alice Varga, his client.

4       A     Yes.

5       THE COURT:  CD.

6       THE WITNESS:  And your question is?

7       MR. EVANS:  Q  Was that something he did

8    willingly?  Was that a choice he made?

9       A     I'm not sure exactly what you are asking me.

10      Q     Well, was there something making him do that?

11   Voices?

12      A     No voices.

13      Q     Some irresistible impulse to make him go to

14   the bank and cash that?

15      A     His mental disorder was permitting him to make

16   a bad judgment.

17      Q     How about if I were to tell you that the

18   defendant received a check three days later at Commerce

19   Bank in the amount of $20,000, again, funds of Alice

20   Varga payable to himself, would you know at that time

21   on January 16th if he was acting under any type of

22   compulsion or irresistible impulse?

23      A     Given that my opinion in it that his judgment

24   about ethical moral behavior was distorted by his

129
C  3638

1   disorder, then he was making a choice that he thought

2   was appropriate based on what he had to deal with.

3       Q    I'm not asking you about his judgment.  I'm

4   asking you about his choice to take Alice Varga's money

5   and $20,000 have a check payable to. himself.

6       A    Are you asking me if he --

7       Q    That transaction, that appearance at the

8   teller's window, saying give me a check for $20,000

9   payable to myself, was that a conscious choice he made?

10      A    Are you asking me if that was a completely

11  free-will choice?

12      Q    A choice that he made.

13      A    In the same way that a person who commits

14  suicide has to choose to raise the gun to their head

15  when they are by themselves.  It's a choice.

16      Q    Thank you.

17      A    But the distortion of their thinking creates a

18  difference in the appropriateness of the judgment.

19      Q    Well, are you telling us today -- let me

20  finish up, doctor, on that same date -- actually, the

21  next day, he took a check of $17,500, again of

22  Mrs. Varga's funds to the Par-A-Dice Casino and ran it

23  through his Par-A-Dice cage account.  Was that a

24  conscious choice on his part?

130

C 3539

1        A       I don't have any different response than the

2     two previous questions you have asked me of a similar

3     nature.

4        Q       Is it your testimony, doctor, that everything

5     the defendant did was set in the dial a long time ago

6     when he was a young child?

7        A       No.

8        Q       Is it your testimony that the actions of

9     stealing approximately $278,000 from Mrs. Varga was an

10    unconscious action on his part?

11       A       No.

12       Q       And there are many alcoholics who don't steal,

13    correct?

14       A       Yes.

15       Q       Doctor, have you been paid for your services

16    in rendering your opinions today?

17       A       Yes.

18       Q       And how much have you been paid, sir?

19       A       $250 an hour.

20       Q       $250 an hour.  So what is your total bill to

21    date, sir?

22       A       I haven't computed it because my charge for

23    testimony is over and above.  Last time I computed it

24    it was about $4,300.

131

1      Q    4,300, correct, sir?

2      A    Prior to --

3      Q    Is that including today's testimony?

4      A    Prior to coming.

5      Q    If we added your time today, approximately

6    what's your total bill going to be, sir?

7      A    It might be in the range of 5500.

8      Q    $5,500?

9      A    Yes.

10     Q    Doctor, if you would open up your DSM that you

11   have there in front of you, please.  Do you consider

12   this to be an authoritative text, do you not, sir?

13     A    On diagnoses.

14     Q    On diagnoses.  In the introduction of the use

15   of DSM IV in the forensic setting, do you see that,

16   doctor?

17     A    What page?

18     Q    I have 23.

19     A    How far down from the beginning of the

20   introduction is it?

21     Q    See the section, use of DSM and forensic

22   settings?  Let me do this.  Rather than have you sit

23   and try to find it, let me read something from the DSM.

24   Even when diminished control over one's behavior is a

132

 1   feature of the disorder, having the diagnosis in itself

 2   does not demonstrate that a particular individual is or

 3   was unable to control his or her behavior at a

 4   particular time.  Do you agree with that comment, sir?

 5        A     I have a section here, but I --

 6        Q     I'm asking if you agree with that comment I

 7   just read to you.

 8        A     This is the most updated version, and I

 9   haven't read this particular setting yet.

10        Q     Just listen to what I'm reading, doctor.  Put

11   away the DSM, please.

12        A     You asked me to look at it.

13        Q     Apparently, you can't find it.

14        THE COURT:  Hold on.  I think he's changing his

15   mind.  Go ahead.

16        Q     I'm going to read the item to you.

17        THE COURT:  Maybe you can read along, but go ahead.

18        MR. EVANS:  Q  Even when diminished control over

19   one's behavior is a feature of the disorder, having

20   the diagnoses in itself does not demonstrate that a

21   particular individual is or was unable to control

22   his or her behavior at a particular time.

23        A     Yes.

24        Q     Do you agree with that?

133

C 3592

1    A    Yes.

2    MR. EVANS:  Thank you.  No further questions, sir.

3  Thank you.

4    THE COURT:  Mr. Toner?

5                REDIRECT EXAMINATION

6                BY MR. TONER:

7    Q    Starting there first, doctor, you've testified

8  about control and choice and in this regard Mr. Picl,

9  correct?

10    A    Yes.

11    Q    Okay.  And with regard to the statement that

12  counsel just read, how is it that you would expand on

13  that part to support your conclusion?

14    A    Well, the last statement was a broad statement

15  essentially saying anybody with a -- any particular

16  diagnosis.  Just having the diagnosis doesn't bear on a

17  particular behavior.  And that's true.  Just because

18  people have a diagnosis doesn't mean any particular

19  behavior would come from carrying the diagnosis in the

20  people that carry it.

21    Q    So when Mr. Evans asked you, for example, the

22  same questions just because a person is bipolar doesn't

23  mean he's going to steal?

24    A    Right.

134

C 3593

1    Q    Just because a person has ADD doesn't mean
2    he's going to steal, just because a person is an
3    alcoholic doesn't mean he's going to steal, just
4    because a person has OCD doesn't mean they are going to
5    steal, that's what that criteria or that's what that
6    statement, broad, general statement is saying, correct?
7    A    That was my understanding.
8    Q    And what in effect have you been saying that's
9    different than that in this particular case?
10   A    I have been talking about the degree of mental
11   disorder and its distortion of Mr. Picl's judgment
12   because we know that distortion of judgment is a
13   symptom of bipolar plus the combinations of the other
14   difficulties.
15   Q    So you are looking at factors in addition just
16   to the broad labels here, correct?
17   A    Yes.
18   Q    And you found those factors?
19   A    Yes.
20   Q    And that's to a reasonable degree of
21   psychiatric certainty, correct?
22   A    Yes.
23   Q    Now, with regard to -- you had talked about
24   the situation whereby a person chooses to pick a gun up

135

C 3594

1   and pick a gun up and pull the trigger in suicide, and

2   that is a choice, correct?

3       A    Yes.

4       Q    But would you agree from a medical prospective

5   that that choice involves a distortion of judgment?

6       A    Yes.

7       Q    And is that type of distortion similar --

8   maybe not the exact, but the same type of distortion as

9   exhibited here?

10      A    Yes.

11      Q    Now, with regard to your comments with counsel

12  concerning malingering, you said that that was

13  something that you always had to be vigilant about?

14      A    Yes.

15      Q    Is there anything that presented itself with

16  Mr. Picl or his sisters or that would cause you to be

17  any more vigilant or any more aroused at your

18  suspicions with him than anyone else?

19      A    There wasn't anything that raised any

20  suspicion in what I heard, and the consistency of

21  reports, cross observers supported a conclusion that

22  that was not a factor.  That doesn't preclude it 100

23  percent, but to a reasonable degree of medical

24  psychiatric certainty, I don't think so.

136

C 3595

1      Q      With regard to your opinion concerning

2   pathological gambling?

3      A      Yes.

4      Q      And you don't find that, correct?

5      A      Well, I wanted to explain that.

6      Q      Why don't you.

7      A      There are parts of DSM that are cleaner and

8   clearer than others and there's constant revisions of

9   this, and pathologic gambling is one of them.  In the

10  criteria for pathologic gambling it names ten

11  persistent and recurrent maladaptive gambling

12  behaviors.  I won't bother to read them.  Mr. Picl

13  meets a lot of these except those are the A criteria.

14  The B criteria, the gambling behavior is not better

15  accounted for by a manic episode.

16            So that confounds -- he meets many of the A

17  criteria, but the fact that he has bipolar disorder and

18  I think has had some manic episodes muddies the water

19  for me to agree fully with the diagnosis of this and I

20  don't think it makes any difference whether we call it

21  pathologic gambling or we understand the high level of

22  preoccupation in indulgence and practice to devise a

23  perfect method to win money which was much more

24  grandiose and obsessive than it was anything else, but

137

C 3596

1    if you listen -- if you read some of these criteria,
2    some of them have to do with ADD, some of them have to
3    do with OCD.  And as a matter of fact, pathologic
4    gambling, increased rates of mood disorder, attention
5    deficit, hyperactivity disorder, substance abuse or
6    dependence and other impulse control disorders and
7    antisocial, narcissistic and borderline personality
8    disorders have been reported in individuals with
9    pathologic gambling.
10            So it's simply a symptom of something, and if
11   you want to call it an entity unto itself, it doesn't
12   add anything.  They have those other disorders.
13       Q    So whether you pick it up on one or the other,
14   it's there?  Is that what you are saying?
15       A    Yes.
16       Q    With regard to the stressors that we have
17   talked about, again, is it your opinion that these
18   external stressors, be they marital or otherwise, are
19   not going to cause depression?
20       A    To the extent that a person might have a brain
21   not vulnerable to depression they would not cause a
22   depression.
23       Q    So, in other words, a person is either going
24   to be predisposed to have that or they are not?

138

C 3597

1    A    Yes.

2    Q    You talked about risky behavior, and your

3  testimony -- your answer was that depended upon the

4  degree and the consequences --

5    A    Yes.

6    Q    -- in your answers?

7    A    Yes.

8    Q    Would you expand on that?  How and why?  How

9  does it depend upon them and why?

10    A    The consequences are things that people weigh

11  as they decide to do certain things, and some people

12  don't consider playing a slot machine risky behavior

13  because they are putting nickels in or quarters.  They

14  are not putting $100,000.  The judgment that occurs in

15  the brain for how much could I lose versus how much

16  could I gain, it's that balance that lets a person do

17  anything.

18        So the higher the risk, the more judgment

19  people use, and there's a lot of research on

20  risk-taking behaviors in the social psychological

21  literature and the higher the risk, the less likely

22  people are to do something.  So you have to measure

23  risk taking as a continuum of behavior rather than

24  something as risky or not risky.  It's risky for me to

139

C 3598

1    drive my car down the street.  Everybody understands

2    that it's better to fly a mile than it is to drive a

3    mile, but I am willing to take that risk because I

4    think it's low.  I wouldn't do that in Baghdad.  So the

5    brain computes decisions about risk and makes

6    judgments.

7        Q    And how -- you mentioned the combination of

8    factors that you have described and the alcoholism, the

9    ADD, the OCD as well as the bipolar contribute to

10   impairment of that function; is that correct?

11       A    Yes.

12       Q    And at the time that Mr. Picl was doing this,

13   do you have an opinion that that was affecting his

14   judgment?

15       A    Yes.

16       Q    Now, you've mentioned the pictures that you

17   took there -- that you saw there.  You said that those

18   were significant as to what they depicted because of

19   how they appeared, correct?

20       A    Yes.

21       Q    And why -- what was the significance in

22   your --

23       A    The significance was the extraordinary degree

24   of clutter.  I have had occasion to examine evidence

140

1  from people in legal cases where there's been

2  accumulation of materials and it's a matter of degree.

3  Some people have a little clutter from time to time,

4  but that's out there at the end of the percentile in

5  terms of looking at those pictures and seeing them

6  comparing to other kinds of pictures I have seen.

7       I was in correspondence with an expert on

8  hording at Smith College who was treating a woman with

9  hording behaviors and I saw pictures of what her

10  premises looked like.  It looks very similar and these

11  are people who meet the diagnosis of hording or the

12  subdiagnosis category of hording of OCD.

13     Q    With regard finally to the documentation that

14  Mr. Evans talked about concerning the dates, the

15  amounts and the manner of taking this money?

16     A    Yes.

17     Q    If you knew all the particulars of that, would

18  that in any way change your opinion about his -- when I

19  say his, I'm talking about Mr. Picl's poor judgment,

20  concerning risk taking behaviors and judgment in his

21  actions?

22     A    No.  It doesn't surprise me at all.  There

23  were multiple occasions.  It's all one package to me.

24     Q    Now, finally with regard to the brain scan

141

C 3600

1   questions.

2       A    Yes.

3       Q    You talked about the transmitters, et cetera?

4       A    Yes.

5       Q    Now, you in your capacity as a physician as

6   well as a psychiatrist have studied the workings of the

7   brain, correct?

8       A    As best I could.

9       Q    Would you expect Mr. Picl's brain at least

10  from the biological prospective to be working -- I

11  mean -- strike that.

12          A human brain has certain types of behaviors

13  and characteristics, correct?

14      MR. EVANS:  Judge, respectfully, I would object.  I

15  think now Mr. Toner is testifying.

16      THE COURT:  Sustained.

17      MR. TONER:  Q  I don't -- let me ask you this.

18  Do you think that there would be anything to be

19  gained from -- in addition to what you haven't

20  obtained here to that would change your testimony?

21      A    No.

22      Q    Nothing --

23      THE COURT:  You are talking about the PET scan?

24      MR. TONER:  The brain spec scan, yes.

142

C 3601

1       A    No.

2       MR. TONER:  Nothing further.

3       THE COURT:  Mr. Evans.

4                    RECROSS-EXAMINATION

5                    BY MR. EVANS: .

6       Q    Doctor, the fact is in the defendant's case he

7   didn't pick up that gun and shoot himself.  He stole

8   $278,000 from an 85-year-old woman, correct, doctor?

9       A    Yes.  Well --

10      MR. EVANS:  Thank you.

11      THE COURT:  Hold on.  Is that it?  Mr. Evans.

12      MR. EVANS:  I'm sorry, Judge, yes.

13      THE COURT:  Mr. Toner.

14                   REDIRECT EXAMINATION

15                   BY MR. TONER:

16      Q    Doctor, with regard to that particular type of

17  behavior you drew the concept, do you have any

18  similarities between picking up that gun and doing what

19  Mr. Picl did here?

20      A    No.  I don't draw much distinction.  Judgment

21  has been distorted and people are engaging in behaviors

22  they would not under other circumstances do.

23      MR. TONER:  Nothing further.

24      THE COURT:  Mr. Evans.

143

C 3602

 1      MR. EVANS:  Excuse me, Judge.  No further

 2   questions, Judge.  Thank you.

 3      THE COURT:  You can step down.  Thank you.

 4              (Witness excused.)

 5      THE COURT:  Why don't we take a five to ten minute

 6   break.

 7         Go off the record.

 8              (Recess taken.)

 9      THE COURT:  Back on the record.  Mr. Toner, are you

10   ready to proceed?

11      MR. TONER:  We are.  Call Jane Valez to the stand.

12      THE COURT:  Ma'am, please step forward and raise

13   your right hand.

14              (Thereupon the witness was duly sworn.)

15                  JANE VALEZ, M.D.

16   called as a witness on behalf of the Defendant, after

17   having been first duly sworn, was examined and

18   testified as follows:

19               DIRECT EXAMINATION

20                  BY MR. TONER:

21      Q     Please state your name.

22      A     Dr. Jane Valez.

23      Q     And your employment?

24      A     I'm a licensed clinical psychologist in

                                             144

 1    Peoria.

 2         Q    And you are licensed by the State of Illinois?

 3         A    State of Illinois, yes.

 4         Q    How long have you been so licensed?

 5         A    Since 1995.

 6         Q    And what's the nature of your practice?

 7         A    I'm a licensed clinical psychologist and most

 8    of my business is in forensics regarding courts, court

 9    issues.

10         Q    Is it a variety of different court issues?

11         A    Right.

12         Q    Have you ever testified as an expert here in

13    court before?

14         A    Yes, I have.

15         Q    Approximately how many occasions, if you know,

16    in Peoria County?

17         A    In Peoria County, maybe 30 times.

18         Q    Other counties around Peoria?

19         A    Yes.

20         Q    Federal court?

21         A    Yes.

22         Q    And you testified that you do work or

23    evaluations, a lot of them for court work, correct?

24         A    Yes.

145

C 3604

1       Q     Is that on a variety of issues?

2       A     Variety of forensic issues, yes.

3       Q     Such as?

4       A     Fitness to stand trial, insanity defense, sex

5    offenders, DCFS cases, disability cases.

6       MR. TONER:  Judge, at this time I would offer the

7    witness as an expert subject to counsel's right to

8    cross-examine.

9       THE COURT:  Mr. Evans.

10      MR. EVANS:  Briefly, Judge.

11                    CROSS-EXAMINATION

12                    BY MR. EVANS:

13      Q     Ms. Valez, you always testify for the defense

14   in Peoria County, don't you?

15      A     I believe so, yes.

16      Q     In your evaluation that the Court has on the

17   defendant, Frank Picl, you are a board-certified

18   forensic psychologist?

19      A     Yes.

20      Q     Is that a test that you sat for?

21      A     No.  This is just an organization I belong to

22   with a group of other forensic specialists.  We have --

23      Q     It's like -- I'm sorry.  I didn't mean to cut

24   you off.

146

1    A    We have yearly conferences around the United

2  States and continuing education, and it's generally

3  made up of others that specialize in the field of

4  forensics in one manner or another.

5    Q    It's like being a member in our profession of

6  the American Bar Association or the Illinois State Bar

7  Association?

8    A    It's not exactly like that because, for

9  instance, I am a member of the American Psychological

10  Association.

11   Q    Let me ask this.  Did you take a test to get

12  that?

13   A    No, I did not.  There was no test required at

14  the time.

15   Q    You just paid a fee and you got the

16  certification, correct?

17   A    It was more than just a fee.

18   Q    You had a certain number of clinical

19  evaluations?

20   A    Certain number of forensic cases.  I can't

21  remember the entire application process, but there was

22  no exam.

23   Q    Not like a doctor who sits for a board

24  certification in a subspecialty such as neurology or

147

C 3606

1   neurosurgery, correct?

2       A    That's correct.

3       MR. EVANS:  I have no further questions.

4       THE COURT:  Court will recognize Dr. Valez as an

5   expert in the field.

6       MR. TONER:  Thank you.

7               DIRECT EXAMINATION (Cont'd)

8               BY MR. TONER:

9       Q    Doctor, I want to ask you first did you

10  receive a call from me concerning this case

11  approximately the end of March, early April of last

12  year?

13      A    Yes, I did.

14      Q    At that time, did you meet with an

15  investigator from my office and myself up at an

16  apartment on Moss Avenue?

17      A    Yes, I did.

18      Q    And I'm going to ask you to look at Group

19  Exhibit No. 1, if you would, please.

20      A    Yes.

21      Q    Do you recognize those?

22      A    Yes, I do.

23      Q    Do you recognize those as the apartment you

24  looked at the week toward the end of March or the first

148

C 3607

1  part of April of '05?

2      A    Yes, I do.

3      Q    And you understood that to be Mr. Picl's

4  apartment, correct?

5      A    Yes.

6      Q    Did those pictures truly and accurately depict

7  how that apartment appeared as of the time you saw

8  them?

9      A    Actually, the pictures -- and I'm not saying

10  this because you asked me to, but they don't even do it

11  justice as what I saw in person was --

12      Q    Were you --

13      A    Yes.

14      Q    What's depicted in there, that's the way it

15  looked that day?

16      A    Yes.

17      Q    As you saw it all laid out, it looked --

18      A    Worse.

19      Q    Thank you.

20          Later on, did you have an occasion to

21  interview Mr. Picl?

22      A    Yes, I did.  On two occasions.

23      Q    And when were these?

24      A    September 12th, 2005, and February 12th, 2006.

149

C 3608

1    Q    Between those two interviews, approximately
2  how much time did you spend during this interview
3  process?
4    A    Oh, probably eight hours.
5    Q    And was that time -- did that include both
6  paper and pencil test as well as interview?
7    A    I believe that it was at least a six-hour
8  interview.  I would say altogether it was more time
9  than eight.  Probably 11, 12 altogether.  I'm not
10  counting the paper and pencil part.
11   Q    And so that would be in addition to the
12  interview, the paper and pencil test?
13   A    Yes.
14   Q    What type of paper and pencil test did you
15  give Mr. Picl?
16   A    He took a variety of personality tests
17  including the Millon Clinical Multiaxial Inventory or
18  MCMI, the MMPI II which is the Minnesota Multiphasic
19  Personality Inventory, Second Edition.  He took the
20  another personality assessment inventory -- or two
21  others actually, the OMNI and the PAI.  I also
22  administered a verbal IQ test and a brief academic
23  screening which really was unnecessary, but I decided
24  do it anyway.

150

C 3609

1    Q     The results of your testing, what were -- what

2    did they indicate to you on the results of the

3    different tests?

4    A     Well, there were a number of pathological

5    elevations including those for bipolar disorder.  There

6    was elevations on the depression scales.  There was

7    elevations on obsessive compulsive disorder scales and

8    substance abuse.

9    Q     Now, with regard to those tests, it's my

10   understanding, am I correct, that you used those in

11   conjunction with an interview to reach a diagnosis?

12   A     Yes.

13   Q     And after reviewing those or in conjunction

14   with those with regard to the index for indices or

15   indices for bipolar, substance abuse, OCD, what were --

16   did they -- were the testing results confirmed?

17   A     Yes, they were.

18   Q     And to a reasonable degree of psychological

19   certainty, do you believe that what -- strike that.

20         To a reasonable degree of psychological

21   certainty, do you have an opinion as to the

22   psychological infirmities or illness that Mr. Picl

23   suffered from?

24   A     Yes.  I believe to a reasonable degree of

151

C 36

 1   psychological certainty that he was suffering from

 2   enough different combinations of illnesses that he was

 3   unable to function and think clearly and rationally.

 4       Q    Now, with regard to those illnesses, and we

 5   are talking about those illnesses, you tested him

 6   September of '05 and the early part of '06, correct?

 7       A    The testing occurred in September and there

 8   was a follow-up interview in February.

 9       Q    But you based your opinion on the assessment

10   of both days, correct, the findings of both times?

11       A    Well, yes.  I wanted to do a follow-up to see

12   if there was any change.

13       Q    That's part of my question.  With regard to

14   these types of diagnoses, are they of a long-standing

15   duration?  How long would you have expected him to have

16   been inflicted by those?

17       A    Many years.  Most of his adult life I would

18   imagine.  Now, of course, under stress symptoms can be

19   exacerbated, become worse.  Of course, substance abuse

20   can affect them.  Depending on medication, psychiatric

21   medications can help, you know, reduce some of the

22   symptoms, but never cause the condition to go away.

23       Q    So your opinion would be then that he's been

24   affected by these a good part of his adult life?

152

Exhibit 22-7

C 3611

1      A    Yes.

2      MR. TONER:  I don't have any further questions at

3  this time of the witness, Judge.

4      THE COURT:  Mr. Evans.

5      MR. EVANS:  Thank you, Judge.

6               CROSS-EXAMINATION (cont'd.)

7               BY MR. EVANS:

8      Q    Ma'am, when you saw the defendant's

9  apartment -- at least you were told that it was his

10  apartment, correct?

11      A    Yes.

12      Q    The pictures that you have identified in I

13  think it's Group Exhibit No. 1, ma'am?

14      A    Yes.

15      Q    Did the defendant know you were coming over?

16      A    I don't know.

17      Q    You saw the defendant in September '05 and

18  February '06?

19      A    Yes.

20      Q    And did you see him alone?

21      A    Yes.

22      Q    No one was with him then?

23      A    No.

24      Q    Aside -- your opinions are based, as you have

153

C 3612

1    told us, partly on how the defendant performed,

2    Mr. Picl, on his numerous psychological tests that you

3    gave him, correct?

4        A    Yes.

5        Q    And I assume the rest of your opinion is based

6    on your interview, your clinical interview by Mr. Picl?

7        A    Yes.

8        Q    And that's separate and apart from these

9    actual tests themselves, correct?

10       A    Yes.

11       Q    And you found the defendant to be highly

12   intelligent, did you not?

13       A    Yes.

14       Q    As a matter of fact, I think you said his IQ

15   was about 146 or 145?

16       A    I can't remember.  It was in superior range.

17       Q    He graduated seventh in his class from Peoria

18   Central High School?

19       A    Yes.

20       Q    And that he also ranked high in his

21   undergraduate class rank at the University of Illinois,

22   correct, ma'am?

23       A    Yes.

24       Q    And he told you at the time when you

154

1  interviewed him that he tests well, correct, page five

2  of your report?

3       A    He's talking about academic testing, yes.

4       Q    Now, when you saw Mr. Picl he told you that he

5  had been working as an assistant public defender, did

6  he not?

7       A    Yes.

8       Q    He told you that he had gone through a divorce

9  from his first wife?

10      A    Yes.

11      Q    And did he also tell you that that caused

12  quite a bit of stress in his life, the breakup of his

13  family?

14      A    Yes.

15      Q    And did he also tell you that at least at the

16  time of your interview in September of 2005 -- strike

17  that.  In your interview of February of '06 that his

18  second wife he was divorced from her now?

19      A    I can't recall the details.

20      Q    Page two, your third paragraph, ma'am.  He

21  told you he and his second wife are now divorced?

22      A    Page two, third paragraph?

23      Q    Yes, ma'am.  During the second interview with

24  Mr. Picl, comma?

155

1    A    I'm sorry.  I can't find an exact sentence,

2  but I take your word for it.

3    Q    Thank you.  The defendant told you -- Mr. Picl

4  did in both these interviews that he had drank for a

5  number of years?

6    A    I see where you are.  Yes.

7    Q    He told you that everyone in his family had

8  some form of a mental problem?

9    A    Just about.

10    Q    Now, you found that the defendant, Mr. Picl

11  appeared to be suffering at the time you saw him from a

12  symptomatic of unresolved midlife crisis issues,

13  correct, doctor?

14    A    I did mention that in my report.

15    Q    You mentioned it because you found that to be

16  present in the defendant's case based on your --

17    A    It's a possible.

18    Q    -- clinical evaluation of him, correct,

19  doctor?

20    A    It's a theory.

21    Q    In Mr. Picl's case, it's more than a theory;

22  it says he appeared to be symptomatic of midlife crisis

23  issues?

24    A    It's one point.  It's not the most important

156

C 3615

1  conclusion in my report.

2      Q    I'll get to that, doctor.  That does appear in

3  your report, correct, ma'am?

4      A    Yes.

5      Q    He told you that, that he felt somewhat

6  unfulfilled and disillusioned in his profession?

7      A    Yes.

8      Q    He told you from time to time he thought about

9  perhaps leaving the legal profession?

10     A    Yes.

11     Q    It's not unusual for a professional, be it

12  medicine, law, or other business occupation to be

13  unhappy with their job at any particular time perhaps?

14     A    I wouldn't think so.

15     Q    He told you that he could not believe that his

16  first divorce was happening, correct?  In other words,

17  that was quite a traumatic stressful event in his life

18  back in 1999?  He told you that, too, didn't he,

19  doctor?

20     A    Yes.

21     Q    He told you that after that divorce that he

22  moved in with a friend in the Twin Towers apartment for

23  about five months?

24     A    I don't remember -- oh, there.  Yes.

157

C 3618

1      Q      Thereafter, he moved into an apartment which I

2    believe is the one shown in Group Exhibit No. 1?

3      A      The one -- okay.

4      Q      Is that correct, he moved out of the Twin

5    Towers he told you and he moved to a --

6      A      I guess.  I don't recall the details.

7      Q      Well, page four, second paragraph.

8      A      Okay.

9      Q      He then moved -- soon moved into an apartment

10   on Moss Avenue where he remains.  He told you that,

11   doctor?

12     A      Yes.

13     Q      He told you he quit drinking for eight months,

14   but then he began drinking due to the stress of a

15   murder trial, correct?

16     A      Yes.

17     Q      He told you he was practicing -- still able to

18   practice law and appear in court on a daily basis?  He

19   told you that, didn't he, doctor?

20     A      Yes.

21     Q      Now, when you talked with Mr. Picl, he told

22   you that he had been looking around for ways to

23   supplement his income and that one of the ways he had

24   come up with was gambling, correct, page six, paragraph

158

C 3617

1    three, ma'am?

2        A    I read over this, but I can't remember every

3    detail.

4        Q    I understand.

5        A    Yes.

6        Q    And Mr. Picl told you that gambling was

7    somewhat similar to stock and commodities trading?

8        A    Yes.

9        Q    And he told you that he had become a power of

10   attorney of the victim in this case following an

11   accident case he handled for her in Tazewell County?

12       A    Yes.

13       Q    He said that he had used some funds.  Was that

14   his actual words or were those your words, he had used

15   some funds from her trust account to pay off some

16   medical bills?

17       A    Let's see.  Was that --

18       Q    Page six, paragraph five, bottom of page

19   four -- I'm sorry -- bottom of paragraph four.  He had

20   used some funds from her trust account to pay off

21   some --

22       A    I don't have it in quotes.  So I don't know if

23   those were his exact words or just my summary of what

24   he explained since it's not in quotes.  I cannot say

159

1   they were his exact words.

2       Q   Now, did the defendant tell you how many times

3   he withdrew money from the account of Alice Varga?

4       A   I don't know the exact amount, no.

5       Q   Do you know how many times he went to the

6   various banks in the Peoria area to withdraw money out

7   of her account?

8       A   I assume it was quite a number of times, but I

9   don't know how many.

10      Q   Do you know over what period of time his

11  transactions relating to Mrs. Varga's account took

12  place, ma'am?

13      A   Well, he reports he began using the victim's

14  money in 2001 or 2002 and then he was arrested in 2005.

15  So I imagine during that time period.

16      Q   By the way, did Mr. Picl tell you how much

17  money he took from the victim in this case?

18      A   I actually remember discussing it and he

19  didn't know exactly.  It was significant, but he was

20  unable to state exactly how much at that time.

21      Q   Did he give you an approximate amount, ma'am?

22      A   I can't remember.  I know it was discussed.  I

23  don't know if it's in my report, but it's significant,

24  six figures.

160

C 3619

1    Q    Six figures.  Page 16 of your report, first

2  paragraph, about a third of the way down there, doctor.

3    A    Okay.

4    Q    Mr. Picl reports that he owes $400,000?

5    A    Yes.

6    Q    Was that his words, $400,000?

7    A    I think he said -- it was in the ballpark

8  around that range, yes.  That must have been a number

9  he gave me at one point.

10    Q    Now, the defendant also when he talked with

11  you at either one of these two visits, I don't know

12  which one it was, he told you that he had received a

13  check from the proceeds of the sale of her home in the

14  amount of I believe it was $78,000.  Page six, doctor.

15    A    Yes.  I remember seeing 78,000.

16    Q    Okay.  He told you he should have put the

17  victim's money into an account, but he didn't, correct?

18    A    Correct.

19    Q    And I think he told you at that time that he

20  had no volitional control over my actions at that time.

21  That's in quotes.

22    A    Yes.

23    Q    That's his own words, correct?

24    A    Yes.

161

1    Q   Did you question him on the basis for his

2    statement that he had no volitional control over taking

3    this woman's money?

4    A   Well, the whole point we were talking about

5    was the alcoholism, gambling, and mental illness.

6    Q   Did you talk with him about what he meant when

7    he used the terms that he had no volitional control

8    over my actions at that time?  Did you question on that

9    statement?

10    A   No, not on that statement directly.  It was

11    assumed.

12    Q   You just assumed what he told you was correct?

13    A   I was just interviewing him.  So I just wrote

14    down what he said.

15    Q   That's a self-serving statement, would you not

16    agree with me, doctor?

17    A   Could be.

18    Q   I had no control over what I did?

19    A   That's what he told me.

20    Q   Did you go through the transactions relating

21    to the theft of monies from Alice Varga in detail?

22    A   Not in detail.  I saw some records, but that

23    wasn't my purpose.  That's not my job.

24    Q   That's not your job.  The defendant, Mr. Picl,

162

1  entered treatment only after he was arrested in this
2  case, correct, ma'am?
3      A    I don't recall if he was ever in treatment
4  before that. I don't -- I know he did enter after his
5  arrest.
6      Q    You -- you are aware that Dr. Lee, Sohee Lee,
7  a psychiatrist had treated the defendant for at least a
8  period of time prior to when you first saw Mr. Picl in
9  2005; you know that, don't you?
10     A    Yes.
11     Q    The defendant also told you I believe in at
12 least one of your interviews that he had not filed
13 income taxes in the mid 1990's, correct, doctor?
14     A    Correct.
15     Q    And that he had had to ask for his family for
16 money to pay off those debts; you were aware of that,
17 ma'am?
18     A    What -- yes.
19     Q    The defendant told you, did he not, doctor,
20 that he considered the money of Mrs. Alice Varga to be
21 his money in a way?
22     A    Yes.
23     Q    And that he had used some of it to pay her
24 bills?

163

1     A    Yes.

2     Q    Did he ever tell you if he paid back any of

3   that money?

4     A    He said that he had intended to, but I don't

5   know that he paid any back.

6     Q    You also based on your examination in talking

7   with Mr. Picl determined that he had no evidence of

8   thought disorders, correct?

9     A    When we talk about thought disorders we are

10  talking about hallucinations, delusions, things like

11  that, that's correct.

12    Q    Exactly.  You found none of that to be present

13  in Mr. Picl's case?

14    A    Correct.

15    Q    No delusions, hallucinations or suicidal

16  ideation, correct?

17    A    No current suicidal ideation.

18    Q    Did you use the term "current" in your report

19  based on the third paragraph?

20    A    In the mental status section?

21    Q    Yes.

22    A    Mental status section is the current mental

23  status of the individual.

24    Q    When you wrote the report, the date of this

164

C 3623

1   report, you were talking about no suicidal

2   identification at that time, right, doctor?

3       A    Right.

4       Q    That was 3/20/06, the date of your report,

5   ma'am.  The recent --

6       A    That was -- it was written prior to the

7   signature.

8       Q    And you reviewed it for accuracy?

9       A    Yes.

10      Q    Any clerical errors and you signed it and

11  dated it March 20th, '06?

12      A    That's correct.

13      Q    You gave the defendant, Frank Picl, a number

14  of so-called psychological tests, correct, ma'am?

15      A    Yes.

16      Q    You didn't give him a malingering test, did

17  you?

18      A    There are scales on the test to assess for

19  malingering, lying, faking bad, faking good, et cetera?

20      Q    There are malingering tests independent from

21  those questions built into the different tests you gave

22  him, correct, doctor?

23      A    There are other malingering tests?

24      Q    Right.

165

C 3624

1    A    Yes.

2    Q    And you gave him none of those tests, did you?

3    A    They don't relate to the tests I gave him.  We

4  have built in scales for that.

5    Q    And you relied on your own ability to

6  determine if Mr. Picl was being completely honest or

7  not, correct, doctor?

8    A    No, I did not.  I relied upon the tests --

9    Q    The tests themselves?

10    A    Data.  The lie scale, fake index.

11    Q    Your assessment of personality functions which

12  Mr. Toner alluded to, you found many things.  I won't

13  go through them in detail.  Just a couple of questions.

14  You found Mr. Picl to often be irritable, impatient and

15  easily annoyed, correct?

16    A    That is what the test results revealed, yes.

17    Q    That's not unusual; many people exhibit that

18  characteristic, right, doctor?

19    A    Not to a pathological point on a personality

20  test.

21    Q    He tends to call attention to himself with his

22  appearance and behavior?

23    A    Yes.

24    Q    Another finding, he criticizes, demeans, and

166

```
 1   offends others?

 2       A    That's what the personality test showed.

 3       Q    He lacks drive?

 4       A    Yes.

 5       Q    Perseverance?

 6       A    Yes.

 7       Q    And at times he's irresponsible?

 8       A    Yes.

 9       Q    We talked about his IQ in the superior range?

10       A    Yes.

11       Q    And the personality inventory, the PAI test,

12   am I correct that certain of the indicators fell

13   outside of the normal range suggesting that Mr. Picl

14   may not have answered in a completely forthright

15   manner?

16       A    What page are we on there?

17       Q    Eleven, third paragraph, ma'am.   Third

18   sentence, third paragraph.

19       A    Yes.   On that test.

20       Q    And you found that based on that test?

21       A    Yes.

22       Q    Correct?

23       A    That's true.

24       Q    You indicated his use of alcohol had problems
```

167

C 3626

1    in his life concerning his interpersonal relationships?

2         A    Yes.

3         Q    Difficulties on the job?

4         A    Yes.

5         Q    And possible health complications?

6         A    Yes.

7         Q    And are you aware of the defendant's

8    reputation as a trial lawyer here in the Peoria County

9    area?

10        A    Well, I have not worked with him -- I never

11   worked with him.  I know he was a trial lawyer, but I

12   don't really know further than that.

13        Q    During the time period that we are talking

14   about, from 2000 to 2005, do you know the manner in

15   which he handled the representation of his clients in

16   court?

17        A    No, I don't.

18        Q    Your diagnoses of Mr. Picl, diagnostic

19   impressions as you define them, are based on the DSM;

20   is that correct?

21        A    Yes.

22        Q    And you find DSM to be authoritative in your

23   field, doctor?

24        A    Yes.

168

1    Q    With regard to your findings, would you agree

2    that the diagnoses that you found in the defendant's

3    case in and of themselves didn't cause the defendant to

4    steal this woman's money?  Could you agree with that

5    statement?

6    A    That's a difficult question to answer.  That

7    would need some elaboration.

8    Q    Well, the fact that he was an alcoholic, did

9    that cause him to take this woman's money?

10   A    Well, no.

11   Q    The fact that he had bipolar II disorder, did

12   that cause him to take this woman's money?

13   A    No.

14   Q    The fact that he has an obsessive compulsive

15   apparently messy apartment, did this cause him to take

16   her money?

17   A    No.

18   Q    How about the fact that you found him to have

19   a narcissistic personality disorder, did it cause him

20   to take the money?

21   A    No.

22   Q    The fact that he had gambled, did that cause

23   him to take this woman's money?

24   A    No.

169

1      Q     Now, you use the term mental illness I

2   think -- and I'm just about done, doctor.  That's a

3   term of art, is it not, in your profession?

4      A     A term of what?

5      Q     Art.

6      A     Art?

7      Q     Yeah.  I mean, illness in medicine is illness

8   as such as osteoporosis or brain cancer, correct?

9   Those are other illnesses?

10     A     I guess.

11     Q     So when you use the term illnesses, is that

12  something from the DSM?

13     A     Mental disorders is the actual --

14     Q     That's what I was going to ask you.  Would you

15  agree with the statement in the DSM that in most

16  situations, doctor, the clinical diagnosis of a DSM IV

17  mental disorder is not sufficient to establish the

18  existence for legal purposes of a mental disorder,

19  mental disability, mental disease or mental defect?

20  Would you agree with that?

21     A     You are now using legal terms.

22     Q     No.  I'm using the terms in the use of a DSM

23  IV, in a forensic setting from the authoritative text

24  you told us of the DSM.  Would you agree with that

C 3629

1 | statement?

2 |     A     Could you read it to me again?

3 |     Q     Sure.   In most situations the clinical

4 | diagnosis of a DSM IV, mental disorder is not

5 | sufficient to establish the existence for legal

6 | purposes of a mental disorder or mental disability, a

7 | mental disease or mental defect?

8 |     A     It says in most.   That's -- mental defect is a

9 | legal term.   Mental disorder is a psychological term.

10 | So I suppose you could say in most cases, but --

11 |     Q     Let me ask you about Frank's case.   These

12 | diagnoses, are they mental diseases, mental illness,

13 | mental defects or mental disorders?

14 |     A     Mental disorders.

15 |     Q     Disorders of personality?

16 |     A     Well, they are all mental disorders.

17 |     Q     Right.   Alcoholism which you found present in

18 | the defendant's family, you indicated that the

19 | defendant, at least in your opinion, he also has that

20 | diagnosis that you made, correct, doctor?

21 |     A     Yes.

22 |     Q     And you indicated that he may have little

23 | control over that predisposition he has for addictive

24 | actions on his part, correct?   I'm reading page 19.

171

C 3630

1    A    Well, people that -- there is a gene for
2  alcoholism we have discovered.  So the only cure is
3  abstinence.
4    Q    So in other words, if you don't take that
5  first drink, I think they talk about in AA, you are not
6  going to get drunk, correct?
7    A    Correct.
8    MR. EVANS:  Thank you, doctor.  That's all I have.
9  Thank you, Judge.
10    THE COURT:  Mr. Toner.
11                   REDIRECT EXAMINATION
12                   BY MR. TONER:
13    Q    Couple of follow-up questions, if I may,
14  doctor.
15         You indicated in response to thought
16  disorders, correct, that -- you mentioned those thought
17  disorders?
18    A    Yes.
19    Q    Thought disorders is different than an
20  impairment in judgment?
21    A    Thought disorders are generally used for
22  schizophrenia, psychosis, that's generally what we
23  mean.
24    Q    You mentioned, I think, four tests you gave

172

1  Mr. Picl, correct?

2      A    Yes.

3      Q    And one of the four tests there was a psych --

4  an elevated trigger to wonder whether or not he'd been

5  forthright on the PAI test, correct?

6      A    Well, the -- yet at the same time there was no

7  indication that he had -- well, yeah.  There was

8  something about that in the validity scale.

9      Q    But with regards to the other three tests

10 there was no indication that there was any attempt?

11     A    No, there was none.

12     Q    And, in fact, in the same paragraph on -- how

13 many tests -- strike that.

14          Mr. Evans has asked you about a messy

15 apartment and a midlife crisis.  Those are not criteria

16 found or disorders mentioned in the DSM, are they?

17     A    No.

18     Q    The recognized ones that you have mentioned

19 are, however, found in the DSM, correct?

20     A    Correct.

21     Q    Now, you indicate in response to counsel's

22 question that the alcohol, the OCD, the bipolar did not

23 cause the stealing, correct?

24     A    Correct.

173

C 3682

1      Q    You are talking about something causing it.
2   You would be talking about insanity, correct?

3      A    Well, as we know, you know, mental illnesses
4   together cause people to make poor judgments and have
5   problems in functioning in multiple areas, but for an
6   actual cause --

7      Q    But with regard to the impairment of judgment
8   as he -- even as Mr. Picl was acting here, do you
9   believe that these afflictions that you have found to a
10  reasonable degree of psychological certainty had an
11  adverse impact and caused his judgment to be impaired
12  in doing what he was doing?

13     A    Definitely.

14     THE COURT:  Mr. Evans.

15                 RECROSS-EXAMINATION

16                 BY MR. EVANS:

17     Q    Doctor, Mr. Picl suffers from no thought
18  disorders whatsoever, does he?  There's no delusions
19  present, correct, no hallucinations present?

20     A    He could have been mildly delusional during a
21  manic episode, but as far as --

22     Q    Did you find that to be the case, doctor?

23     A    When I talked to him, no, he was not
24  delusional or hallucinating.

174

C 3633

1        MR. EVANS:  That's all I have.  Thank you.

2        THE COURT:  Mr. Toner.

3        MR. TONER:  Can I have one second, Judge.

4                    REDIRECT EXAMINATION

5                    BY MR. TONER:

6    Q    The indication, doctor, that there was no

7    evidence that thought disorder was in the section

8    incaptioned mental status, correct?

9    A    Correct.

10   Q    And so if I understood your earlier testimony,

11   that would be limited to that time that you were

12   talking to him, correct?

13   A    Yes.

14   Q    And that does not rule out the possibility

15   that at other such times he may have in a manic phase

16   been under a delusion?

17   A    That is correct.

18       MR. TONER:  Nothing further.

19                   RECROSS-EXAMINATION

20                   BY MR. EVANS:

21   Q    Doctor, you found no evidence that even at

22   some other time there may have been a delusion, did

23   you?

24   A    Well, yes because there was elevations on the

175

1    bipolar manic scale.

2      Q    Well, are you aware that his treating

3    psychiatrist has indicated that he had no thought

4    processes affected, only the mood disorders?

5      A    I disagree with the psychiatrist in that area.

6      Q    You disagree with Sohee Lee?

7      A    Yes.

8      Q    It's your feeling that you would -- in other

9    words, you are testifying differently with regard to

10   the defendant's diagnosis?

11     A    I had some information that Dr. Lee did not

12   have.

13     Q    And you have told us that the defendant does

14   suffer, though, as a mental defect, correct, to use the

15   term properly?

16     A    I said disorder.

17     Q    Mental disorder?

18     A    Yes.

19     Q    That he has bipolar II is your diagnosis,

20   correct?

21     A    Yes.

22     MR. EVANS:    Thank you.

23     THE COURT:    Mr. Toner.

24

176

C 3635

1                    REDIRECT EXAMINATION

2                    BY MR. TONER:

3       Q    Very briefly.  In response to Mr. Evans'

4  question you indicated that you had a disagreement with

5  regard to Dr. Lee relating to a particular area?

6       A    Relating to obsessive compulsive disorder

7  and -- well, I do believe that Dr. Lee diagnosed him

8  with bipolar II disorder as well.  So I agree with

9  that.

10      Q    With regard to -- you mentioned though the

11 elevation scale on the manic episodes?

12      A    Yes.

13      Q    You had something there that I believe you

14 indicated might show that at some point that may have

15 been there?

16      A    Well, there were still elevations on the

17 depressive and on the manic scale as well.

18      MR. TONER:  Nothing further.  Thank you.

19      MR. EVANS:  No further questions.

20      THE COURT:  You can step down.  Thank you.

21              (Witness excused.)

22      MR. TONER:  Judge, at this time, I would offer the

23 Group Exhibit No. 1, the pictures, as evidence subject

24 to counsel's objection.

C 3636

1        THE COURT:  Any objection?

2        MR. EVANS:  I have no objection, Judge.

3        THE COURT:  Group Exhibit 1 is admitted without

4    objection.

5                    (Defendant's Group Exhibit No. 1 was

6                    admitted into evidence.)

7        MR. TONER:  Judge, we have no other witnesses for

8    today.  We have the one for tomorrow is all.

9        THE COURT:  What time did you tell this witness?

10       MR. TONER:  I was going to check on that.  I

11   believe I told him 9:00.

12       THE COURT:  Why don't we just plan on 9:15 and

13   we'll go from there.  Anything you want to add or

14   subtract, Mr. Evans?

15       MR. EVANS:  No, Your Honor.

16       THE COURT:  Let's break for today and we'll

17   reconvene at 9:15.  Once again, I think we are in this

18   Courtroom 213.

19                    (Which were all the proceedings had on

20                    said day in said cause.)

21

22

23

24

178

C 3637

IN THE TENTH JUDICIAL CIRCUIT OF THE STATE OF ILLINOIS

PEORIA COUNTY, ILLINOIS

## REPORTER'S CERTIFICATION

I, **ROBIN L. ROBERTS**, CSR, RPR, an Official Court Reporter in the Tenth Judicial Circuit of the State of Illinois, do hereby certify that I reported in machine shorthand the foregoing proceedings had before the **HONORABLE STEPHEN A. KOURI**, in the above-entitled cause, and that I thereafter caused the same to be transcribed into typewritten form which I now certify to be a true and accurate transcription of same.

Dated this 6th of April, 2010.

_____

**Robin L. Roberts**, CSR, RPR
Official Court Reporter
License No. 084-004317

179
C 3638

1    IN THE TENTH JUDICIAL CIRCUIT OF THE STATE OF ILLINOIS

2                    PEORIA COUNTY, ILLINOIS

3    THE PEOPLE OF THE                    )
     STATE OF ILLINOIS,                   )
4                                         )
                        Plaintiffs,       )
5                                         )
                v.                        )Case No. 2005-CF-275
6                                         )
     FRANK M. PICL,                       )
7                                         )
                        Defendant.        )
8

9                    <u>SENTENCING HEARING</u>

10

11        REPORT OF PROCEEDINGS of the hearing had before
          the **HONORABLE STEPHEN A. KOURI**, Judge of said
          Court, on the **27th** of **September, 2006**.
12

13   # APPEARANCES:

14

15   **MR. KEVIN W. LYONS**
     State's Attorney of Peoria County, by
     **MR. LARRY EVANS**
16   Assistant State's Attorney
     REPRESENTING THE PLAINTIFF;
17

18   **MR. HUGH TONER**
     Attorney at Law
19   REPRESENTING THE DEFENDANT.

20

21

     REPORTED BY:   Robin L. Roberts, CSR, RPR
22                  Official Court Reporter
                    License No.   084-004317
23

24

Exhibit 22-8

1

C 3640

I  N  D  E  X

DEFENDANT'S WITNESSES

BOB GILROY

    Direct Examination by Mr. Toner                    7

    Cross-Examination by Mr. Evans                    12

2

C 3641

1    THE COURT:  Mr. Toner, are you ready to go or you

2   need a few minutes?

3    MR. TONER:  Judge, if I may, I'm waiting for

4   Mr. Gilroy.  I have called.  I'm expecting him at 9:00.

5   There was no answer at TASC when I called about ten

6   minutes ago.  If I could have a few minutes.

7    THE COURT:  No problem.  Let's plan on 9:45 and see

8   if he's here.

9    MR. TONER:  Thank you.

10             (Recess taken.)

11    THE COURT:  Let's go on the record.  State of

12   Illinois versus Frank Picl, Case No. 05-CF-275.

13   Parties are present with their attorneys.  And we are

14   discussing some letters that have been tendered by the

15   defense for me to consider.

16        Mr. Evans, are you objecting to all of them

17   or --

18    MR. EVANS:  I haven't even seen the other ones,

19   Judge.

20    THE COURT:  Take a moment, look at those.  And did

21   you need to make another phone call?

22    MR. TONER:  I'm going to go out and do that.

23    THE COURT:  We'll reconvene in about five or ten

24   minutes.  And Mr. Evans can look at the letters.

3

C 3642

1                    (Recess taken.)

2          THE COURT:  Back on the record.  Mr. Toner,

3    anything new to report?

4          MR. TONER:  Judge, the only report I would have is

5    that Mr. Gilroy left the jail at 9:38.  Apparently, he

6    is on his way.

7          THE COURT:  Let's talk about these letters.

8    Mr. Evans, any objection?

9          MR. EVANS:  Judge, I would have no objection to any

10   of the letters other than the one letter written by

11   Mr. Hoehne, the letter that he was given to defense

12   counsel.  The information in that letter is -- there's

13   no foundation.  It leaves the impression with anyone

14   who reads it that there is $278,000 available to Alice

15   Varga's estate.

16         THE COURT:  I understand that this is an assignment

17   of a life insurance policy.

18         MR. EVANS:  It's a term life insurance policy,

19   Judge, that expires at age 75.  So unless the defendant

20   were to die within the next 21 years it will have no

21   value whatsoever, Judge.

22         THE COURT:  I understand -- of course, I don't see

23   Mr. Hoehne here.

24         MR. EVANS:  Right.


                                                        4

```
 1         THE COURT:  But --
 2         MR. EVANS:  Judge, I can represent I have talked
 3   with Mr. Hoehne.  So that's how I'm aware of the
 4   assignment and the type of life insurance policy it is.
 5   And what one -- last week at least there was this
 6   ongoing discussion about a possible assignment.
 7   Apparently, this evidence shows an assignment, but I
 8   guess my objection, Judge, is that as long as I
 9   wouldn't be foreclosed from arguing those very facts,
10   I'm representing to the Court that it's only of any
11   value should the defendant die.
12         THE COURT:  Well --
13         MR. EVANS:  There is no cash surrender --
14         THE COURT:  I understand.  I don't view it as
15   hollow, but I understand the limitations of it.
16         MR. EVANS:  Okay, Judge.
17         MR. TONER:  And I would with regard to the fact
18   that it is a term policy, et cetera, I have no
19   disagreement with those facts.  That's exactly
20   accurate, Judge.
21         THE COURT:  Okay.  All right.  Well, I guess we are
22   still at a standstill until Mr. X shows up to testify.
23         MR. TONER:  Apparently, so.  I do, again,
24   apologize.
```

5

C 3644

1        THE COURT:  I'm not upset with anybody, but, you

2   know, at some point, I'm not saying we are anywhere

3   near it, but at some point, we may just say we are

4   moving on.  So I'll be back in my chambers back there

5   if somebody wants to call me when we are ready to go.

6        MR. EVANS:  Judge, may we approach the bench?

7        THE COURT:  Yeah.

8                    (Whereupon proceedings were had at the

9                    bench out of the hearing of the court

10                   reporter.)

11                   (Recess taken.)

12       THE COURT:  Let's go back on the record.  Mr.

13  Toner, ready to proceed?

14       MR. TONER:  We are, Your Honor.

15           We call Dr. Gilroy.

16       THE COURT:  Sir, please raise your right hand for

17  the clerk.

18                   (Thereupon the witness was duly sworn.)

19       THE COURT:  Have a seat.  Go ahead.

20

21

22

23

24

6

C 3645

1                      BOB GILROY

2   called as a witness on behalf of the Defendant, after

3   having been first duly sworn, was examined and

4   testified as follows:

5                   DIRECT EXAMINATION

6                   BY MR. TONER:

7       Q    Please state your name and spell your last

8   name for the court reporter.

9       A    My name is Bob Gilroy, G-I-L-R-O-Y.

10      Q    Your occupation or profession?

11      A    I work for TASC, Treatment Alternatives for

12  Safe Communities.  I'm a case manager.

13      Q    Prior -- how long have you worked for TASC?

14      A    I have been at TASC three and a half years.

15      Q    Prior to that, what was your occupation?

16      A    I have worked in the addictions field.  I was

17  a clinical corporate clinician for the Illinois

18  Institute for Addiction Recovery.  I was -- that's at

19  Proctor for five years.  I worked a year and a half to

20  help develop the intensive outpatient program for

21  adolescent at White Oaks.  Prior to that, I was at

22  Pekin Hospital's Lifeway Adolescent Chemical Dependency

23  Program for 11 years where I was a program coordinator.

24      Q    How long have you been involved in the

7

C 3646

1    addiction recovery management area?

2        A    Since 1985.

3        Q    So little bit more than 20 years now?

4        A.   Yes.

5        Q    What type of education or background have you

6    had in that field?

7        A    Primarily, as far as college only have an

8    associate's.  I work certified through IAODAPCA, and

9    I'm a CRADC which is Certified Reciprocal Alcohol and

10   Drug Counselor, and also I'm certified as a MISA,

11   Mentally Ill Substance Abuse, work with those clients.

12   I've also been in the field, worked with compulsive

13   gamblers for approximately four years.  I also did

14   training around the state with compulsive gambling.

15       MR. TONER:  At this time, I tender the witness as

16   an expert in the area of addiction behavior and subject

17   to Mr. Evan's right to cross-examine.

18       THE COURT:  Mr. Evans?

19       MR. EVANS:  I would object to addiction behavior.

20   I think that requires a psychological and medical

21   background, but certainly I would accept him as an

22   expert in the field of recovery management and his work

23   with addicts, Judge.

24       THE COURT:  Any response to that, Mr. Toner?

8

1      MR. TONER:  That would be fine for this purpose,

2   Judge.

3      THE COURT:  I'll -- with that limitation that

4   Mr. Evans recited, I'll accept the witness as an

5   expert.

6      MR. TONER:  Thank you.

7      MR. EVANS:  Thank you.

8      MR. TONER:  Q  Mr. Gilroy, do you know Frank

9   Picl?

10     A    Yes, I do.

11     Q    Can you tell the Judge, please, how it is you

12  met him and how is it you know him?

13     A    Mr. Picl was referred to TASC by his attorney

14  Mr. Toner.  I assessed, evaluated Mr. Picl on

15  December 7th, 2005.

16     Q    What were the results of that assessment?

17     A    At that time, he -- we felt or I felt that he

18  met TASC acceptability criteria.  He had verification

19  of completion of primary inpatient as well as the

20  continuing care program, and at that time we felt that

21  we would do office monitoring with him.

22     Q    So he's TASC appropriate or TASC eligible for

23  your standards?

24     A    Exactly.

C 3648

1    Q    What type of -- when you say office

2  monitoring, can you advise the judge what that consists

3  of?

4    A    What we would do, would continue to see him on

5  a monthly basis.  When I saw him, that's what we called

6  service plan activities between 30 minutes and an hour

7  each time.  Also required him to attend a minimum of

8  two to three recovery meetings a week.  Also encouraged

9  him to access any type of mental health counseling at

10  that time.

11    Q    And do you monitor compliance with regard to

12  those things that you have mentioned?

13    A    Yes.

14    Q    And with regard to the AA follow-up, to the

15  best of your knowledge, has he been compliant with

16  that?

17    A    Yes, he has through the whole time, the tenure

18  that I have seen him.  I have seen him approximately, I

19  believe, nine times.

20    Q    And that's since last December?

21    A    Uh-huh.

22    Q    With regard to the mental health issues

23  follow-up, compliant there as well?

24    A    Yes.  My understanding he has been seeing

10

C 3649

1    someone at Antioch Group.

2        Q    For the counseling issue?

3        A    Exactly.

4        Q    Can you based upon your assessment of him give

5    an indication -- you found him acceptable last

6    December.  Do you still feel that way now?

7        A    Yes.  He's still been in compliance with TASC.

8    There's been no reason for us to give him jeopardies or

9    to terminate him unsuccessfully.

10       Q    Does that happen occasionally?

11       A    Pardon?

12       Q    Does it occasionally happen when you would

13   terminate somebody unsuccessfully during even just the

14   office monitoring period?

15       A    Exactly.  If a client would not show up for a

16   set appointment, failure to call, no shows, continued

17   to be involved in addictive behaviors, drinking or

18   whatever, using drugs, that's pretty obvious, and so

19   that's noncompliance.

20       Q    None of those situations occurred with him?

21       A    No.

22       MR. TONER:  I don't have any further questions.

23       THE COURT:  Mr. Evans.

24       MR. EVANS:  Thank you.

11

C 3650

1                    CROSS-EXAMINATION

2                    BY MR. EVANS:

3        Q    Sir, Mr. Picl came to you only after he was

4    arrested, correct?

5        A    Correct.

6        Q    And you were working with TASC -- you only

7    deal with those individuals who come to you after they

8    have been arrested, correct?

9        A    Correct.  It takes a referral from the legal

10   system.

11       Q    In this case, it was his own attorney who

12   brought Mr. Picl into your office?

13       A    Correct.

14       Q    Not -- you say that the defendant met TASC

15   acceptability.  That acceptability is set out in a

16   statutory guidelines in terms of what makes a person

17   acceptable or nonacceptable; is that correct, sir?

18       A    Correct.

19       Q    And at least with regard to those items such

20   as lack of a crime of violence, prior residential

21   burglaries, things like that that are set out in the

22   statute, he didn't have any of those disqualifying

23   factors, did he, sir?

24       A    Correct.

                                               12

1      Q     And he was acceptable because of the fact that

2   he in your opinion and based on what he told you and

3   I'm sure -- did you talk with him for a period of time,

4   sir?

5      A     Yes.

6      Q     You found him to be you said alcohol

7   dependent?

8      A     Correct.  That was the diagnostic impression.

9      Q     Generally referred to as alcoholism, sir?

10     A     Sure.

11     Q     And he was acceptable because he has continued

12  to show up in your office along with attendance at

13  numerous AA meetings that we learned about today,

14  correct?

15     A     Correct.

16     Q     You don't know anything about the particular

17  facts of this case, do you, sir?

18     A     Not necessarily.  Only what Mr. Picl may have

19  reported to me which is very minimal.

20     Q     Did he tell you how much money he took from

21  this woman?

22     A     Yes.

23     Q     How much?

24     A     I believe it was 240,000 or 250,000.

C 3652

1      Q      Did he tell you over what period of time he
2    took this money?
3      A      No.
4      Q      But regardless of the facts of the particular
5    crime, you determined him to be acceptable based on
6    your criteria, sir; is that right?
7      A      Right.
8      MR. EVANS:    Thank you.
9      THE COURT:    Mr. Toner?
10     MR. TONER:    Nothing on that.    Thank you very much.
11     THE COURT:    You can step down.    Thank you.
12                   (Witness excused.)
13     MR. TONER:    That would conclude our evidence, Your
14   Honor.
15     THE COURT:    Parties need a few minutes or are you
16   ready to make argument?
17     MR. EVANS:    Judge, I would be ready to argue.    If I
18   could just move the podium a bit so I could talk?
19     THE COURT:    Okay.
20     MR. EVANS:    May I proceed, Your Honor?
21     THE COURT:    Yes, you may.
22     MR. EVANS:    Your Honor, as we have sat here and
23   listened, to the evidence with regard to what is
24   certainly a difficult decision for the Court, the State

14

C 3653

1    is certainly aware of that.  I would point out to Your
2    Honor how close, how very close the defendant, Frank
3    Picl, came to getting away with this.  We would not be
4    here today perhaps if it hadn't been for Mr. Paul
5    Kelly, if it hadn't been for the executive director of
6    Independence Village approaching Kevin Lyons and
7    telling him that there were some payment problems.  As
8    Mr. Kelly told you, Alice Varga, 85-year-old woman, a
9    widow, was living at Independence Village.  She became
10   a widow, as the Court realizes from the presentence
11   letters of her family, in 1982.  She was a woman who
12   was receiving $1,378 per month as I indicated to the
13   Court at the time of the original plea.

14          The victim, Mrs. Varga, had, however,
15   substantial assets.  She had assets remaining since her
16   husband died in 1982.  And I assume they accumulated to
17   some point over the period of years.  At the time when
18   the defendant was acting as her lawyer in a position of
19   trust, he took that money.  He wrote checks.  He went
20   to the bank -- and I'll talk about that in a little
21   further detail, but I want to point out to the Court,
22   we have heard a lot about the defendant, and I always
23   have difficulty and I think the Court has been aware of
24   it, referring to the defendant as the defendant, as we

15

C 3654

1    all know him as Frank, Frank Picl.  Today, he's the

2    defendant.  And it didn't have to come to this, Judge.

3         When Paul Kelly approached Mr. Lyons, an

4    investigation began.  Because of just some

5    irregularity, some NSF, some checks that weren't paid

6    in a timely manner.  That's what triggered this.  The

7    defendant did not go to Mr. Penn, his immediate

8    supervisor, and say, look, I have done some bad things.

9    He didn't go to another member of the bar.  He didn't

10   turn himself in.  He was caught.  He was caught.

11        And this 85-year-old woman from that point on

12   when she was told what Frank did went downhill.  Her

13   nice apartment, her nice location at Independence

14   Village that she thought she would spend the rest of

15   her days at didn't come to happen.  She stayed for a

16   period of time.  Her spirit was broken.  She'd given up

17   on life and she eventually was transferred to Bellwood

18   Nursing Home in Peoria County and died a few months

19   after the defendant was arrested.

20        We have heard many witnesses, and certainly

21   the witnesses that have come forward, they did that for

22   their own reasons.  They are well-meaning people.  They

23   are well-intentioned.  The Reverend, other individuals

24   that know Frank, numerous people and in the community,

16

C 3655

 1   both legal and nonlegal knew Frank Picl, the defendant.

 2   They came here, they talked on his behalf.  His

 3   immediate supervisor, Tim Penn, came here, talked with

 4   us, told us what he told us about Frank, one of the

 5   best trial lawyers I have seen, one of the best.

 6            Against all of those witnesses, Judge,

 7   against -- if this case were to be decided by this

 8   Court on the number of witnesses the defense is allowed

 9   by the statute to put on versus the number of witnesses

10   that the State is permitted to put on, it would be an

11   easy call for the Court.  We would just say, well, they

12   had over 15 witnesses, the State just had Paul Kelly

13   and a couple of the sisters-in-law, so the Court can

14   sentence based on that, but, as we know, Your Honor,

15   that's not how it works.

16            One witness for the State, two letters.  Alice

17   Varga's sisters-in-law and myself, Judge, against all

18   those people well-intentioned who came up and told of

19   the defendant's recovery from alcoholism, and there's

20   no question, there's no question, the defendant is and

21   was an alcoholic.  He has other disorders, also, which

22   I'll touch upon, but I would ask the Court not to focus

23   just on these issues of the defendant and these

24   well-intentioned persons who came up and they did break

17

C 3656

1  their anonymity, and certainly I respect them for that
2  and for their loyalty. They showed Frank a lot more
3  loyalty and respect than he showed his client, but
4  addictive individuals and sometimes individuals in AA,
5  they are very self-focused. They are concerned about
6  their own recovery, as they should be, as I think these
7  witnesses talked about, but this case is not about
8  alcoholism. This case is about an 85-year-old woman
9  who had her life savings taken, not by a robber, but by
10 her own lawyer. This case is not about just Frank Picl
11 and how this has impacted his family or his life.
12 That's what the focus has been on for these number of
13 days is Frank, Frank, Frank, poor Frank.
14       When we look at the defendant's life, superior
15 intellect, the upper ranges of superior. I think it
16 was 145 to 146 IQ. They are numbers. The defendant
17 was, as I referred to him, a good talker. The good
18 doctor told me I must have meant some other word, that
19 he was able to -- that he was eloquent or words to that
20 effect. His friends testified to how the defendant was
21 able to talk, he was able to be gregarious, he was able
22 to do all those things when he was with people. He was
23 able to stand in front of juries in this courthouse and
24 make strong persuasive arguments. He represented his

18

1   clients well.

2       He has a wonderful family. It's been

3   difficulty, certainly, I know for the defendant to sit

4   in court with his daughters, his sisters sitting behind

5   him. It should never happen. It should never have

6   come to this, but it did. He went to law school. He

7   was in the upper ranges of his undergraduate class. He

8   graduated in 1977 from law school. Here is a man who

9   had everything, Judge, intellect, ability, personality

10   and the ability to handle clients' problems. He had it

11   all.

12       We have heard he was sloppy at times at work,

13   that his areas of work were not the neatest as his

14   secretary -- former secretary told us. A lot of us

15   handle businesses, legal practice. You could go into

16   anyone's courtroom in the legal profession or in the

17   professional community and there are different styles.

18   There are some people who keep their papers perfectly

19   neat. There are some that are sloppy. There are some

20   that are disorganized. There are some that

21   procrastinate. Some of us like to get some things done

22   early. Some of us like to get things done under a time

23   constraint. Whatever worked. And in the defendant's

24   case, I submit that is not evidence of, oh, he has OCD,

19

C 3658

1   obsessive compulsive disorder. He was perhaps just not

2   a real neat office organizer. There's many of us like

3   that, but it isn't just about Frank.

4          And I keep drawing the Court's attention as we

5   sat and listened to all of these well-intentioned

6   witnesses, it was easy at times when I was thinking of

7   what they were saying to be distracted that it is all

8   about Frank, it is all about poor Frank. It is all

9   about the poor hand that Frank was dealt in life, and,

10  Your Honor, it is my position that is not the case.

11         Does he have problems? Yes. Depression. At

12  times he's depressed. At times his treating

13  psychiatrist, not the hired experts, but the treating

14  psychiatrist, Dr. Lee, told us he has a form of

15  depression. It is a mood disorder, not a thought

16  disorder. He explained the difference, a mood

17  disorder, bipolar I, with swings in moods. Sometimes

18  he feels good. Sometimes he doesn't feel good. Well,

19  who amongst us in the courtroom don't have good days,

20  don't have bad days, don't feel high, don't feel down.

21  That's life. That's not intrinsically unique to Frank

22  or alcoholics or persons with a diagnoses of bipolar I.

23  That is life. You deal with it. This argument that

24  his life was completely out of control, he couldn't

20

1    control anything he did, Judge, I submit respectfully
2    is absolutely untrue, incorrect, because the people who
3    know him best, the people who saw Frank work and
4    practice knew that he was in control. Was he out of
5    control with his drinking? Perhaps. Should he have
6    not picked up that next drink or that third drink or
7    that fifth drink at Whitey's? Probably, but that's an
8    excuse, Judge. That's just an excuse.

9         The defendant liked to gamble, and you heard
10   both sides. One of the hired experts, no, I don't
11   think that's gambling, no, or I don't think that's
12   pathological gambling. Dr. Lee said, well, yes, he
13   gambled. Did any one of these cause his actions? No.
14   We used the terms from the experts mental illness, and
15   I confronted every witness on that very statement
16   because in society it's easy to think that every
17   problem that one may have related to the mind to the
18   way our moods are is an illness like cancer, like colon
19   cancer, like heart disease. It's not. The DSM that I
20   read out of talks about mental disorders, not mental
21   illness, not mental defects, none of these terms of
22   arts that Dr. Grant and the Dr. Valez talked about.

23        So yes, the defendant has depression, he's an
24   alcoholic, his form of depression is bipolar II -- I'm

21

C 3660

1    sorry -- I think I may have said one before.  He

2    gambled, and at least according to Dr. Valez, he has

3    OCD because he's got a messy bedroom.  No medical

4    tests, no brain scans.  So these phrases that the

5    doctors use, Dr. Grant of a brain disorder, brain

6    disease -- the disordered brain was my favorite --

7    doesn't exist in Frank's case.  They were terms of art.

8    They are not even recognized by the Statistical Manual

9    of Mental Disorders, the DSM IV.

10           When Dr. Lee was asked by Frank's own attorney

11   how these affected his actions and I guess it was in

12   relation to the crime, I don't know to what degree it

13   affected Frank as Mr. Toner continually re re

14   redirected.  He said that, well, it may have

15   contributed to some degree, some degree.  I'm sure it

16   did.  I'm sure it did contribute to some degree, but as

17   they also testified on my cross-examination, Judge,

18   this is not a case of a person -- for instance, a

19   person hearing voices, a person who stabs the person

20   over across the room because he sees that person as a

21   green monster talking in a foreign language to him.  He

22   specifically ruled out any delusions, any

23   hallucinations in Frank's case.  No irresistible

24   impulse.  Something made me do this.  That evidence

C 3661

1  doesn't exist, Judge.

2          I want to touch on Dr. Grant, the nontreating

3  psychiatrist. He testified quite a bit. He somewhat

4  reminded me of the chemistry professor who you asked

5  what the composition of oxygen is and gives you a

6  dissertation on the history of the world, but once he

7  was questioned on specific areas, none of these

8  individual common disorders that Frank has which are

9  not unusual in the world caused him to systematically

10 loot and steal over the course of time that Frank did

11 from Alice Varga. Much of his opinions, I

12 respectfully, suggest were somewhat speculative and

13 based on speculation.

14         At one point, he says, I can't explain how it

15 happens. He had some opinions with no backup and

16 scientific testing or anything, any actual formal

17 studies. It was just his somewhat convoluted opinions,

18 but he did, I think, at one point say that there was a

19 degree of distortion of his judgment. I think that's

20 the best he testified for the defense. A degree of

21 distortion of his judgment which was, in effect, I

22 guess at the time that the defendant committed his

23 crime.

24         He talked a lot about the defendant's risky

23

C 3662

1  behavior as if that's something unusual and he used an
2  interesting example of a trial lawyer. Apparently,
3  those of us who practice in trial courts engage in
4  risky behavior. That's not unusual. Iron workers,
5  pilots, sky drivers, NASCAR drivers also engage in
6  risky behaviors, but those things by themselves are not
7  something that causes someone to take the money or the
8  property of someone else.

9       Dr. Valez I won't spend much time on. When
10  she could recall what she actually had written in her
11  report, her comment was that none of these items,
12  again, that the defendant has caused his actions,
13  stealing. She admitted that all those persons that may
14  have that, they don't commit crimes, Judge. And she
15  also said that there was poor judgment. His judgement
16  was disturbed.

17      Well, Judge, if that is enough in our society
18  to allow a person's crime or even his sentence to be
19  mitigated, as I'm sure is going to be asked for by the
20  defense that he shouldn't be sent to the penitentiary
21  because of his disorders, that is true about every
22  single person who commits a crime. That would be true
23  about the purse snatcher. He showed bad judgement.
24  The teenager who brings the gun into our school and

24

C 3663

1  shoots at people.  That's poor judgment.  That's lousy

2  judgment.  The person who's in a bar fight and stabs

3  someone.  That's poor judgment.  That's disturbed

4  judgment, but that's what the evidence has been, but at

5  best, the defendant's judgment was not what it should

6  be.

7      And the other thing, Judge, and I ask the

8  Court to consider this, also, this isn't just about

9  Frank.  The defendant has presented witnesses that were

10  supposed to, I guess, show that it's the defendant who

11  is the victim here.  It's the I-am-the-victim approach.

12  Forget Mrs. Varga.  I am the true victim.  I've got

13  these things.  I've got depression, I've got

14  alcoholism.  What else was I going to do?  It runs in

15  my family.

16      No, Judge.  It's different because he still

17  had choices.  A person born with a hole between the

18  chambers of their heart, that person doesn't have any

19  choices.  Born with a cleft palate, that person doesn't

20  have any choices.  Hypertension, heart disease, those

21  are different.  Simply having poor judgment, be it from

22  whatever disorder the defendant was claiming is not an

23  excuse for his actions, nor is it a mitigating factor.

24  They are simply that, excuses.

25

1          Was his judgment operating the way it should?
2    Absolutely not.  Absolutely not, but Frank had a
3    special responsibility far beyond an ordinary citizen,
4    Judge.  He had a special responsibility to honor the
5    trust and faith that Alice Varga put in him.  And who
6    speaks for Alice?  Well, I would just read a portion of
7    one of the letters sent by Joanna Cunningham.  I have
8    touched on some of this, Judge.
9        THE COURT:  That's one of the letters I have?
10       MR. EVANS:  Yes, Judge.
11       THE COURT:  Can you wait a minute?
12       MR. EVANS:  It's attached to the original PSI, Your
13   Honor.
14          Judge, it was Ms. Cunningham, sister-in-law of
15   Alice Varga who indicated that her brother, Frank, died
16   in 1982.  And she explained how she became suspicious
17   of the defendant's actions and she even had contacted
18   Senior Strength -- or had been told to call Senior
19   Strength by the Agency for Aging, and she said that,
20   quote, "I felt like the guilty one."  She was
21   questioning or had concerns about Frank's activity
22   because Frank insulated Alice Varga.  And why is that
23   important?  He insulated her, kept her from her own
24   family.

26

C 3605

1    Why did he do that? He did it because he knew

2   there was nobody to help Alice Varga. He had this

3   80-some-year-old woman all by herself totally dependent

4   on him, and what did he do, Judge? He betrayed that

5   trust.

6    As we have learned from Ms. Cunningham, and it

7   was told to the Court at the time the defendant pled,

8   Alice's house was sold. When Joanna asked her

9   sister-in-law what happened to the money from the sale

10  of the house, she said Frank hadn't received it yet.

11  Frank had received it yet, and he had taken it. He had

12  taken the proceeds of the house of his client. Even

13  the money that Alice thought she would have available

14  to her for a prepaid funeral when she died didn't

15  exist, Judge. Did not exist.

16    When Alice was told she had no money and Frank

17  Picl had emptied her account and cashed her CD's, she

18  fell apart. She cried all the time. Alice died

19  penniless at the Bellwood Nursing Home all because she

20  put her trust in Frank Picl. She would say that if you

21  can't trust your lawyer, who can you trust? Indeed,

22  Judge.

23    And June Hartman in her letter, Judge, said

24  that Alice after she had found out what Frank had done

C 3606

1    to her, she, Alice, felt guilty for what her attorney
2    had done.  She gave up, her will to live was gone.  And
3    I feel her attorney, Frank Picl brought about the
4    premature death.

5          Now, Judge, I handle many homicide cases, as
6    does defense counsel, unfortunately, in Peoria County
7    and I have yet to see a coroner's report or medical
8    examiner report saying that this individual, this
9    elderly individual died of a broken heart or that this
10   elderly person who put her complete faith in her
11   attorney died because her spirit was broken, but I
12   suggest to you respectively that when the defendant
13   took that money, set in actions consequences which led
14   to the two investigators from my office and Paul Kelly
15   to go into her room at Independence Village, her life
16   was over, her spirit was broken.  Her will to live left
17   her.  And it didn't have to happen, Judge.  It did not
18   have to happen.  This lady was guilty of nothing other
19   than trusting the defendant, trusting her lawyer.  The
20   defendant's actions were purposeful, they were repeated
21   over and over.  They were for self-gain, and they were
22   under the guise of being her lawyer.

23         The facts that have been given to the Court at
24   the time the defendant pled guilty was that there

28

C 3667

1    was -- as far as our office was able to determine based

2    on our investigation for which the defendant has pled

3    guilty is $278,000 -- $278,200. Now, there was some

4    reference by one of the comments made --

5        THE COURT: Tell me that figure one more time.

6        MR. EVANS: $278,200, Judge.

7        There was some reference based on a statement

8    of the defendant that he owed $400,000 in restitution.

9    So perhaps there is additional monies that were taken

10   that the State has not shown to the Court to exist.

11       Be that as it may, Judge, the people are

12   asking the Court to consider that number of $278,200,

13   the factual basis, and the dates of the individual

14   transactions which were read into the record at the

15   original plea by the defendant, Judge.

16       Your Honor, I want to briefly go through the

17   factors in aggravation, and then I'll be finished.

18   This Court is aware certainly that there are certain

19   factors both in aggravation and mitigation which Your

20   Honor can consider when you pass sentence on the

21   defendant. It is the People's position certainly that

22   in this case of all cases, any sentence and certainly

23   the Court has available to them on the probationary

24   side a sentence of probation up to and including 48

29

C 3668

 1    months.  However, it's the People's position that

 2    probation would certainly deprecate the seriousness of

 3    this offense which I'll touch on in a moment.

 4        With regard to those factors, Your Honor, the

 5    defendant's conduct did cause serious harm to

 6    85-year-old Alice Varga.  The defendant by his duties

 7    of office or, in his case, his position as her attorney

 8    he was obliged to prevent this particular offense --

 9    and I'm reading from 730 ILCS 5/5-5-3.2, Your Honor.

10    Not only is that a statutory aggravating factor, I

11    would point out to the Court that in this defendant's

12    familiar role as an attorney he would have had an

13    obligation had some other lawyer performed this crime

14    and he became aware of it to report it to the

15    authorities or to the Attorney's Registration of

16    Disciplinary Commission.  That is an ethical obligation

17    that we have as members of the bar, but it was the

18    defendant himself who used his position as her lawyer

19    to steal from her.

20        THE COURT:  What subsection is that again?

21        MR. EVANS:  Subsection 4, Your Honor.

22        With regard to Subsection 6, Your Honor, the

23    defendant utilized his professional representation and

24    position in the community to commit the offense.  The

C 3669

1    reason Mrs. Varga came to Frank originally related to a

2    traffic accident in 1997.  He then performed legal work

3    for her.  He then performed work over the course of a

4    number of years until he took all of her money.

5         With regard to number 8, Judge, I would

6    explain to the Court the People's position with regard

7    to the extended terms provision.  Under

8    5/5-5-3.2(b)(4)(ii), this Court has available to it an

9    extended term provision under that subparagraph which

10   may be considered by the Court.  It's not mandatory.  I

11   want to represent that to the Court, but the Court may

12   consider that.  And if the Court does consider that,

13   then the range of possible incarceration is not 4 to

14   15.  It becomes 4 to 30.  So I would ask the Court to

15   consider that in terms of imposing or at least having

16   available to this Court an extended range.  Or,

17   alternatively, under Subparagraph A that subparagraph

18   says that if the defendant, which he did in this case,

19   commits the offense against a person 60 years of age or

20   older or such person's property, and that's the same as

21   with regard to the extended term.

22        So it's the People's position, Your Honor,

23   that the defendant's particular crime was against a

24   60-year-old individual which the evidence bears out and

31

C 3670

1 the reason the People are asking the Court to consider

2 the imposition of an extended term is because the

3 legislature, Your Honor, has put in that special

4 provision. This provision has been addressed and it

5 has been affirmed by the Illinois Supreme Court as a

6 proper legislative intent and mandate and that this is

7 a sentencing range not just from 4 to 15 but from 4 to

8 30. Certainly whatever sentence the Court would impose

9 has available to Your Honor is up to 4 years probation,

10 4 to 15 years or 15 to 30. So it would be a range of 4

11 to 30 years or the 48 months probation, Judge. So I

12 wanted to make that clear about those alternative

13 sentencing options available to the Court.

14        The other reason, Your Honor -- and I'm just

15 about finished.

16     THE COURT: That's all right.

17     MR. EVANS: That the People would ask for a

18 penitentiary sentence, and I'm not asking for a

19 penitentiary sentence on behalf of the People, Your

20 Honor, of a minimum. I'm sure that would be an

21 alternative argument that counsel will make. This

22 Court, I respectfully suggest, based on the statutory

23 criteria; based on the facts in this case should

24 sentence the defendant to the Illinois Department of

32

C 3671

1    Corrections for a substantial period of time, Judge, a

2    substantial number of years in the Illinois Department

3    of Corrections.  Lawyers who have an obligation to a

4    client need to be told or any lawyer that still may be

5    handling clients' funds, estates, this behavior will

6    not be tolerated.

7          The elderly, those in our society that have

8    special afflictions, the weak who come to a lawyer

9    asking for our help, our special expertise should know

10   that lawyer is going to act properly.  A message should

11   be sent that those People will be protected.  All of

12   these things we have heard about the defendant, his

13   need for medication, his counseling, are all available

14   in the Illinois Department of Corrections, Judge.  The

15   taking money from your own client who is all alone, 85

16   years old, every single penny, if that's not enough,

17   Judge, for this Court to send the defendant to the

18   penitentiary, I don't know what is, Judge, and on

19   behalf of the people, Your Honor, I would respectfully

20   ask this Court to sentence the defendant accordingly.

21   Thank you.

22        THE COURT:  Mr. Toner?

23        MR. TONER:  May it please the Court, counsel.

24             I suppose the first comment that I would

33

C 3672

1   direct is to the rhetorical question of why we are

2   here.  Lest there be no question about it.  The reason

3   that we are here is because of the egregious, illegal

4   and wrongful act of Frank for which he does and has

5   always accepted responsibility for.  The victim in this

6   case, as counsel has pointed out numerous times, is

7   Alice Varga, not Frank, the fact that has never been

8   questioned by Frank.  And, finally, Your Honor we are

9   here to seek an appropriate and just sentence.

10       The next thing I would like to talk about,

11  Judge, are excuses, explanations and truths.  Almost 40

12  years ago I was a member of the Boy's Club up in

13  Chicago, and many of the coaches, probably better than

14  half of them, were police officers.  And I remember one

15  in particular who called a friend of mine lawyer.  When

16  somebody said, well, why are you calling him lawyer, he

17  says, ah, the kid always has a story.  He always has an

18  excuse.  He's always got an explanation.  And as I was

19  preparing for this hearing, I thought about the fact

20  that to a certain extent that sometimes can be correct.

21       In this case, Judge, I would submit that it is

22  not with regard to excuses.  An excuse has never been

23  offered by us.  An excuse is the type of thing I would

24  submit that would tend to indicate that there was a

34

1    reason that he, Frank, is not guilty for this.  An
2    affirmative defense such as insanity, that has never
3    been raised.  That is not being raised now.  The
4    position of Frank has been unwavering.  He has to the
5    Court, his family, all the counselors that we have
6    heard from, the members of AA, accepted responsibility
7    for what he did.

8            With regard to explanations concerning this
9    conduct, Judge, I would like to expound on that a
10   little bit and indicate to you that I am unable to give
11   an explanation for what happened.  And I'll tell you
12   why.  Although occasionally as an attorney I can cobble
13   together something to make sense perhaps of certain
14   actions that a client has taken, in this case, after
15   preparing for it for the entire time that has developed
16   since Frank was arrested, I honestly don't know why he
17   did this.  And I think the reason because -- that I
18   don't know, excuse me, is because Frank is unsure
19   himself.

20           Because of that, I have reached the conclusion
21   that I would not want to guess because if I guessed
22   wrong and the Court didn't like my explanation, Frank
23   would have to suffer the consequences.  More
24   importantly, I would submit to the Court respectfully

35

C 3674

1   that I don't believe Frank knows why what happened here

2   did.  However, the particular details of that are not

3   as important because of the truth that all these facts

4   and circumstances were feeding on each other.  All the

5   things that we heard about were stoking the fire of the

6   engine of this locomotive that Frank was the engineer.

7   He's responsible.  He's indicated to the Court that he

8   accepts that responsibility.

9        With regard to the truth, Your Honor, I would

10  respectfully suggest this:  The truth as in this

11  circumstance is not always complete.  Sometimes we are

12  left in a situation where we simply don't know.  The

13  truth, as we've learned, is not always flattering.  And

14  to a certain extent, something that is present here and

15  I will explain the context in which I say this, one

16  thing we know about the truth is that it has set Frank

17  free, and I'm not talking about what may occur here

18  when the Court passes sentence, but rather what I'm

19  thinking of and speaking of are the inner demons and

20  the bonds that have plagued him throughout his entire

21  life because the truth as Frank has acknowledged and I

22  believe will acknowledge during his statement of

23  allocution are as follows:  He is an alcoholic.  He is

24  a gambling addict, and he's mentally ill.  And I would

C 3675    36

1  suggest respectfully those being the truths, that is
2  what permitted him to start down this long journey of
3  recovery.

4       With regard to that journey of recovery, one
5  of the cornerstones of recovery is the truth.  We
6  learned from the different witnesses that there are
7  choices that everybody makes.  There are consequences
8  that we have to learn -- or accept, excuse me, after
9  making a choice.  And to be untruthful, whether you
10  call it a delusion, as one of the witnesses called it,
11  or as Frank has referred to it time and time again or
12  other, a simple lie, a simple truth is incompatible
13  with recovery.

14       The final thing that I wish to discuss before
15  the Court is an appropriate and just sentence.
16  However, before I move into that, I will ask the Court
17  to look at the truths that have come out here, I
18  believe.  And I would simply say this:  That the facts
19  as they exist in front of the Court is that the
20  conditions that Frank suffers from according to
21  certainly Dr. Grant, certainly Dr. Lee, are medical
22  conditions.  I would respectfully disagree with
23  counsel's analogy that they are different than
24  hypertension because in effect that is a medical

1    condition.  Both of these conditions can be treated.

2    Frank's condition is being treated now.

3          An appropriate and just sentence as the Court

4    and counsel have acknowledged, the Court has a wide

5    range of options.  Pursuant to law, I think the first

6    place to approach is Section 5/5-6.1 where, if I may,

7    the Court in paragraph A --

8          THE COURT:  Tell me that section again.

9          MR. TONER:  5/5-6-1, sentences of probation and

10   conditional discharge.

11         THE COURT:  Okay.

12         MR. TONER:  With the same legislature that mandated

13   and authorized the imposition of the possibility of

14   extended terms which I would acknowledge is correct and

15   I would also acknowledge that certainly the Court has

16   the option of an extended term, but they say except

17   where specifically prohibited by other provisions of

18   this code the Court shall impose a sentence of

19   probation or conditional discharge upon the offender

20   unless having regard to the nature and circumstances of

21   the offense and the history, character, and condition

22   of the offender, the Court is of the opinion that,

23   number one, imprisonment or periodic imprisonment is

24   necessary for the protection of the public, and I would

38

C 3677

1    respectfully suggest that that's not the case here.
2    And the paragraph by which the State referred to, and
3    that's paragraph number two in that same section, the
4    probation or conditional discharge would deprecate the
5    seriousness of the offender's conduct and would be
6    inconsistent with the ends of justice.

7         Your Honor, perhaps it was an oversight on
8    counsel's part, but counsel when he read that provision
9    talked about the first half alone.  I would
10   respectfully indicate to the Court that paragraph
11   number two is written in its entirety in the
12   conjunctive, and both those elements need be found
13   before probation would be inappropriate in this
14   particular case.

15        With regard to inconsistence with the ends of
16   justice, I was attempting to do some research to see if
17   that and how that has been interpreted, and, quite
18   frankly, I was unable to find anything that was
19   guiding.  I would suggest to the Court that the ends of
20   justice really would talk about two particular things.
21   They would either talk about the ends of justice with
22   regard to a particular person that is being sentenced
23   or the ends of justice with regard to society in
24   general.  In either one of those cases, Your Honor, I

C 3678

1    would respectfully suggest that there would be nothing

2    inconsistent with those ends to give an appropriate

3    condition of probation to Frank.

4         I'll explain as follows:  The ends of justice

5    with regard to Frank personally, you look at the things

6    that he's done in the last 18 months.  He's accepted

7    his responsibility.  He's moved forward to try to make

8    sure that these factors don't occur again.  He's been

9    compliant.  He's indicated a willingness to make

10   restitution, and, more importantly, he's indicated a

11   willingness to make amends to the best of his ability.

12        With regard to the ends of justice as they

13   would relate to society, I would remind the Court of

14   the story of the lamp and why we don't put it under a

15   bushel.  I would suggest to the Court respectfully that

16   Frank Picl as testified by many of the witnesses as

17   mentioned by counsel is a brilliant man -- flawed, but

18   brilliant.  Frank Picl is a person who I have admired

19   as an attorney in Peoria for over 20 years.  He is far

20   more brilliant than I am, and I would suggest to the

21   Court respectfully that I think that it would be

22   inconsistent with the ends of justice to put that light

23   underneath a barrel.  There are so many areas in

24   society where his time as well as his many talents

40

1 could be put to use. It's inconceivable. I think that

2 some of the people who have testified have given the

3 Court an inkling of how he has impacted their lives.

4 He's a very, very charismatic person. He enjoys

5 helping people. In addition to the recovery that was

6 mentioned, Your Honor, I could go on, but I would

7 simply say, there are adult literacy programs at Common

8 Place, at Friendship House, at the Y. There are GED

9 programs, and I will just stop there and indicate that

10 those are some of the simple things that I can think of

11 that would put his talents to good use and that use

12 would be far better than just occupying a prison cell.

13         Another alternative that the Court would

14 have -- would be touched on by paragraph number three

15 where they mention a split sentence. And when you talk

16 about a combination of imprisonment with concurrent or

17 consecutive probation, given the fact that there are

18 six counts here, the Court could very well take

19 Mr. Picl to TASC. The Court could say, okay, with

20 regard to Count 6, I'm going to sentence you to a term

21 of imprisonment in the Department of Corrections for

22 three years, four years, five years, and I am going to

23 make that run along with probation in either count

24 number four or five -- and the importance of that I'll

41

1  get to in a minute.  And I would respectfully disagree

2  because true enough with regard to the general

3  probation statutes, on a Class I felony, the extended

4  possible range of probation is four years.

5        However, Mr. Gilroy's testified to the fact

6  that Frank does meet the criteria for TASC.  And in

7  that situation, he is eligible for a probationary

8  period of up to five years.  Now, the benefit of doing

9  something like that is he would be able to get a

10  Department of Corrections sentence which would be more

11  than the 180 days which would normally be allowed by

12  statute in conjunction with a probationary period.

13        He would get out and he would have to tow the

14  line, and if he followed up that probation the Court

15  would have the same option on a petition to revoke

16  probation of up to 30 years again.

17        I would suggest to the Court --

18      THE COURT:  Explain to me when you said he would

19  get days beyond 180 days.

20      MR. TONER:  Pardon me?

21      THE COURT:  He would get time beyond 180.

22      MR. TONER:  Sure.

23      THE COURT:  What time?  What's that formula?

24      MR. TONER:  I'm sorry?

42

C 3681

1          THE COURT:   What is that formula?   Is it just

2     whatever time I say?

3          MR. TONER:   Yes, because what -- maybe I'll make

4     myself a little bit more clear.   As a condition of

5     probation, the most he can get is 180 days.   If he were

6     sentenced to probation on one count and on the other

7     count he got the Department of Corrections time you

8     could give him whatever he would be eligible on that

9     count.   So he in effect -- the most you can get on 180

10    days, assuming he got the day for day is 90.

11         THE COURT:   I understand.

12         MR. TONER:   Judge, I would briefly talk about the

13    factors in aggravation and mitigation, and if the Court

14    were to be considering a prison sentence, I would point

15    out the following:   With regard to the factors in

16    aggravation, the position of trust and the 60 years

17    old, true enough while they do appear, and Mrs. Varga

18    was over 60 years old, Mr. Picl did hold a position of

19    trust, the fact is in conjunction with the various

20    offenses, those factors are taken into consideration

21    with the different counts in one or more of the counts.

22              With regard to the factors in mitigation, I

23    would respectfully suggest this:   That -- and this is

24    at 5/5-3.1, number one, the defendant's criminal

43

C 3682

1  conduct neither caused nor threatened serious physical

2  harm.  And there's no doubt that what Frank did, as

3  reprehensible as it was, obviously had a dramatic and

4  traumatic effect on Mrs. Varga, but the statute

5  nonetheless is written in conjunction with physical

6  harm.

7          Number two is applicable.

8          Number six is applicable in the sense that the

9  defendant has indicated a willingness to compensate and

10 pay restitution.  I would point out for the Court that

11 the assignment of bond in this case has been

12 transferred by Mr. Picl and that there were some

13 payments made to the state's attorney's office prior to

14 Mrs. Varga's death.

15     THE COURT:  How much was the bond?

16     MR. TONER:  The bond was 10,000, was it not?

17     THE COURT:  That has been assigned?

18     MR. TONER:  That was assigned and already been

19 used.  That's already been --

20     MR. EVANS:  That was for the living expenses she no

21 longer had, Judge.

22     THE COURT:  It's already been released and --

23     MR. EVANS:  It's already been spent.

24     MR. TONER:  Yeah.  And that's --

44

C 3683

1    THE COURT: All right.

2    MR. TONER: That the defendant has no history of

3 prior delinquency or criminal activity or has led a

4 law-abiding life for a substantial period of time. And

5 with the exception of the traffic tickets that are

6 mentioned in the presentence report, I would suggest

7 that is appropriate here.

8        And I would also take issue with the poor

9 judgment that is shown -- or that was argued by

10 Mr. Evans concerning the factors here that he's no

11 different than somebody who stabbed somebody in a bar

12 or does a purse snatching. Generally speaking, the

13 differences between the illustrations that counsel

14 pointed out, as I recall them, are as follows: He

15 wasn't hearing voices as far as shooting somebody over

16 there that appeared to be a green person talking in a

17 foreign language. I think the doctors were clear that

18 a person can have the thought processes as far as

19 auditory, visual hallucinations don't always apply to a

20 person suffering from a mental disease.

21        With regard to the other illustrations of

22 different types of criminal activity, I would suggest

23 respectfully that while Mr. Picl stands here today,

24 there are very seldom standing before a court a

45

C 3684

1  54-and-a-half-year-old man who has nothing but traffic

2  offenses on his record who is as well-educated as he

3  was, made the contributions to society and this system

4  that we all serve in as capably and for as long as he

5  has.

6         Continuing on the list, we get to point number

7  eight, that the defendant's criminal conduct was a

8  result -- was the result of circumstances unlikely to

9  recur. And the evidence that the Court has heard over

10 the last two and a half days now, I would respectfully

11 suggest would support that proposition. Whatever they

12 were, however, this was being driven, these problems

13 have been and are being addressed and are unlikely to

14 reoccur again.

15         I think the fact that the past 18 months by

16 way of Bob Gilroy and Dr. Lee have indicated that

17 Frank's particularly likely to comply with the terms of

18 a period of probation. Not only in medicine, but in

19 law you will find that past performance is sometimes a

20 good predictor of what someone may do in the future.

21 He's had to tow the line here. He's been compliant in

22 every way he was instructed to do. He's been compliant

23 in taking medications, staying in touch with Dr. Lee,

24 going to AA, completing the gambling program,

46

C 3685

1  completing the alcohol program, doing the follow-up,

2  going to the counseling.  That's an indication I would

3  respectfully suggest that would demonstrate that he

4  would likely complete a period of probation.

5         And, finally, that the imprisonment of the

6  defendant would endanger his or her medical condition.

7  And, true enough, the State points out that he could

8  get medical treatment in prison.  I would suggest

9  respectfully that it's not going to be of the kind that

10 we have been talking about receiving here.  Mr. Picl

11 has an opportunity to avail himself to that.  I would

12 suggest respectfully that this is a long and arduous

13 process that he has begun and he's undertaken, and I

14 would respectfully ask the Court to not do anything

15 that would perhaps jeopardize the progress that's been

16 made so far.

17        In conclusion, Your Honor, I would thank all

18 those who helped me in what truly has been the most

19 difficult case I have ever had in my life.  And I would

20 particularly like to thank you Mike Risinger, who

21 helped me initially, Laura Otten, my family and Frank's

22 family.  And I would finally respectfully conclude with

23 a thought from a book that I read recently by Richard

24 Rohr entitled Hope against Darkness, where in speaking

47

C 3636

1   in terms of the world that I think the message is

2   appropriate for this setting he indicates, quote, the

3   search for a so-called purity is over.  Now the only

4   issue is honesty and humility.  We call it by the hard

5   word repentance.

6        Judge, I would respectfully suggest that the

7   man standing before you today is truly repentant.  The

8   evidence that you have heard over the last couple days

9   would indicate that Frank has begun his journey down

10  the road to recovery with the help, the love, and

11  support of family and friends.  I pray that he will be

12  successful.  I simply and finally respect that your

13  justice be tempered with mercy.  Thank you very much.

14       THE COURT:  Thank you.  Mr. Toner, it's been my

15  most difficult case, too.  So you are not alone in that

16  regard.  And I'm sure that it has been difficult for

17  the state's attorney's office because the way this is

18  set up -- our system is set up is Mr. Picl is a lawyer

19  and the state's attorney's office is filled with

20  lawyers and we have to police our own, and I'm sure

21  this has not been a walk in the park for the state's

22  attorney's office either.  And it's a tragedy.  I'm

23  going to ask some very -- it's a tragedy for everyone

24  involved, for the defendant, for the victims, for

48

C 3687

 1   lawyers, anyone with a law license.

 2          I'm going to ask some questions of both sides

 3   here.  You shouldn't infer anything from the questions

 4   about where I'm at.  The questions are meant to be

 5   somewhat difficult on each side because there is a wide

 6   range here -- and I'm going to start with you,

 7   Mr. Evans.  There is a wide range.  I mean, you say

 8   it's 4 to 30, that probation is an option.  That's

 9   really 0 to 30 that I'm dealing with.  And I don't

10   think I have unlimited discretion in that range, do I?

11   I have to look at some factors, don't I?

12          MR. EVANS:  Yes, Your Honor.  Your Honor is

13   correct.  Your options are the probation up to 48

14   months and then also a sentence of penitentiary up to

15   and including 30 years.  There's no question that the

16   Court can fashion whatever sentence that you feel based

17   on your understanding of what you have heard today is

18   proper for the defendant.

19          However, I would respectfully suggest that the

20   criteria that's set out in the statute, both with

21   regard to possible mitigation and aggravation factors

22   are something that the Court should follow in terms of

23   its sentencing options.  One of the comments that

24   counsel did make, to partially answer your question,

49
C 3638

1   with regard to probation it said that an individual can
2   get probation unless having regard to the nature and
3   circumstances of the offense and to the history,
4   character, and condition of the offender.

5        Well, as I pointed out to the Court, it's the
6   People's position that defendant should not get
7   probation and I laid out all of the factors of this
8   particular act.

9        THE COURT:  Why do you think he shouldn't?  Because
10  of the number, because 278?

11       MR. EVANS:  Judge, because of the fact that all of
12  the aggravating factors that I have read that come out
13  of 5/5-5-3.2, Judge.

14       THE COURT:  The position of trust?

15       MR. EVANS:  Position of trust, conduct of the
16  defendant caused serious harm to the victim.  He was
17  obliged to prevent the particular offense.  He utilized
18  his professional reputation and position in the
19  community to commit the offense or to afford him an
20  easier means of commission.  He stood in a particular
21  position in our community.  And, lastly, the sentence
22  is necessary to deter others, along with the fact that
23  he committed the offense against a person 60 years of
24  age or older or such person's property.

50

C 368

1          Those are statutory factors that I'm asking on

2    behalf of the People for the Court to consider.  And

3    that's why based on these factors -- it isn't that

4    there's just one factor.

5          THE COURT:  Well, when you talk about the

6    seriousness of the offense.

7          MR. EVANS:  Yes, sir.

8          THE COURT:  I'm coming back to the number.  Is it

9    because it's 278,000 instead of 2,700?

10         MR. EVANS:  No, Judge.  It would be the same if he

11   took any of her money.  If it was $5, would I be asking

12   for the penitentiary?  No, to be honest with you, but

13   this is where he took all her money.  This is a woman

14   who had all of her money taken, Judge.  It wasn't

15   278,000 of $2 million.  It was every penny she had.

16         THE COURT:  You know, the state legislature has

17   said that when it's theft, probation is an option until

18   it hits 500,000.

19         MR. EVANS:  That's correct, Judge.  Under 16-1,

20   that's about absolutely true.

21         THE COURT:  When you say, well, if he took 5,000 or

22   whatever figure you said, some smaller figure, I

23   wouldn't be in here asking for penitentiary time,

24   roughly where is that line?  100,000?  When the statute

Exhibit 22-9

51
C 3690

1   says half a million dollars is when probation is no

2   longer an option?

3      MR. EVANS: Judge, the fact that under that

4   particular subparagraph you pointed out, Judge, that it

5   takes away the discretion of the Court to impose

6   probation doesn't mean that in this particular case

7   with these egregious circumstances with this type of

8   theft of an 85-year-old woman all of her money being

9   taken that the Court should not impose a penitentiary

10   sentence. In fact, the legislature said that you can

11   impose not only a penitentiary sentence up to and

12   including 15 years, but because of her age, up to 30

13   years.

14      THE COURT: You know, you haven't really said to me

15   where that number is, and I'm not asking you where you

16   think that number is. You can volunteer it to me if

17   you like, but you haven't already. So I'm not going to

18   ask you, but what I am going to ask you is this: If

19   Mr. Picl had gotten drunk, as he did so many times, got

20   in his car, ran over somebody, a father of a daughter,

21   the most I can give him is 14 years, am I right?

22      MR. EVANS: Correct, Judge.

23      THE COURT: But if he steals $278,000, I can give

24   him 30 years?

52

C 3691

1        MR. EVANS:  Yes, sir.

2        THE COURT:  While he's impaired?

3        MR. EVANS:  Yes, sir.  If I could just respond to

4    that briefly.

5        THE COURT:  Yes.

6        MR. EVANS:  The distinction I would also argue,

7    Judge, that's one impairment.  Just one, one mistake.

8    Too much to drink on a particular night.

9        THE COURT:  No.  He can be drunk every day and one

10   day he gets in his car -- or maybe every day he gets in

11   his car, but of those days he runs over somebody.  We

12   all know we have so many DUIs down there that people

13   get in their car drunk, get caught, but they haven't

14   run over anybody.

15       MR. EVANS:  True, Judge.

16       THE COURT:  So it's not one mistake.  It's the same

17   number of mistakes that he did here, he just didn't run

18   over anybody.  He stole 280,000.

19       MR. EVANS:  But, Judge, I don't mean to interrupt.

20   He didn't go to the bank on the day of impairment.  He

21   went on a daily basis or at least a weekly basis

22   beginning in January of '03.  It was systematic, it was

23   every day of the -- every week at least and he withdrew

24   every single penny of this woman, and I respectfully

53

1    suggest that's a distinction in terms of the character
2    of his actions under his so-called impairment as
3    opposed to the person who at that particular instance
4    under the influence has a tragic accident.

5         THE COURT:  The hypothetical I gave you -- and I
6    know it's probably a little bit unfair because each
7    case is different is -- we had that case, didn't we?

8         MR. EVANS:  Yes, sir.

9         THE COURT:  And the state's attorney's office
10   capped it at 12 years, didn't they, what they were
11   asking for?

12        MR. EVANS:  I believe you are correct, Judge,
13   right.

14        THE COURT:  And my question to you is, point blank,
15   do you think we are in the extended range here in terms
16   of what sentence should be imposed, the 15 to 30?

17        MR. EVANS:  Judge, I don't -- when I argue
18   sentencing I don't ask the Court for a particular
19   number of years.  I respect the Court's power to
20   fashion whatever remedy.  I do request incarceration.
21   Since the Court is asking me a direct question, I would
22   answer based on this particular case if the Court is to
23   sentence the defendant to the penitentiary I would ask
24   the Court to impose a sentence in the range of 15

54

C 3693

1  years.  I'm not going to stand here with the types of

2  cases that we have to prosecute in Peoria County and

3  ask you for a maximum sentence or even a 20-year

4  sentence against this defendant.

5       THE COURT:  I'm just trying to put it in context.

6            Mr. Toner?

7       MR. TONER:  Yes, sir.

8       THE COURT:  The flip side of that question is this:

9  State legislature says that if this felony is committed

10  against somebody 60 years or older I should consider

11  extended-term sentencing.

12       MR. TONER:  That's correct, Judge.

13       THE COURT:  Which is 15 to 30.

14       MR. TONER:  That's correct.

15       THE COURT:  This woman was in her 80's.  How can I

16  not start in that range?

17       MR. TONER:  May I respectfully reply to that,

18  Judge?

19       THE COURT:  Yes.

20       MR. TONER:  With regard to the factors in

21  mitigation and aggravation --

22       THE COURT:  Don't you have to move a mountain for

23  me to get out of that range?  Go ahead and finish now,

24  but that's --

55

C 3694

 1          MR. TONER:  Well, if I may.

 2          THE COURT:  Show me that this is a mountain, go

 3     ahead, that you are moving.

 4          MR. TONER:  Judge, what I would respectfully

 5     suggest is that I don't have to move the mountain

 6     necessarily because you don't get into the factors in

 7     aggravation and mitigation and what type of a prison

 8     sentence you get until you have overcome the

 9     presumption of probation.  Now, if the Court has

10     indicated that because -- because if you read down --

11          THE COURT:  Assume for purposes of this question

12     that I have.

13          MR. TONER:  Okay.  That's fine, but you asked me

14     why -- that would be the reason why initially.

15          Judge, one of the hardest things that I can do

16     in fashioning a recommendation is to try to put

17     together a Judge Posner type of approach of calculating

18     where you go.  I can tell you instances if the Court

19     wished of cases that from right around here that would

20     help illustrate where I think we are, but different

21     cases -- in all different cases results and revolve

22     around particular defendants, particular histories, and

23     as the statute points out, the history, character, and

24     other factors that involve the offense and the

56

C 3695

1 offender. If the Court wished me to continue --

2 THE COURT: Please.

3 MR. TONER: Within the last year, I was involved in

4 federal court with a woman who --

5 THE COURT: Well, I don't want to get bogged down

6 in other cases.

7 MR. TONER: In federal court under the

8 guidelines -- and nobody likes to go to federal

9 court -- Mr. Picl's sentence would be in the

10 neighborhood of 20 months.

11 I look at the things, the contributing

12 factors, and I would suggest respectfully that all the

13 things that you have heard about what he did, and this

14 is one of the things where prosecutors and defense

15 attorneys take issue is we are not I would suggest

16 respectfully to look simply at a snapshot, but rather

17 the entire picture for two reasons, because of the

18 history, character of the offense and the offender,

19 number one, and, number two, because of the broad range

20 of sentencing discretion that the Court is given. I

21 don't know if that efficiently answers the Court's

22 question, but --

23 THE COURT: Okay. How much credit do you think

24 should be given for these mitigating factors? Take it

57

C 3639

1    all the way down to probation, I guess, as your

2    thought.

3         MR. TONER:  Judge, realistically, I would say this.

4    That the Court has indicated that you are beyond

5    probation.

6         THE COURT:  I haven't indicated that.

7         MR. TONER:  But, hypothetically, if that's the

8    case, I would ask the Court to keep it under eight

9    years because, as I understand it, that would allow

10   Frank to participate in certain programs and it would

11   affect his classification to get him into a minimum

12   security facility which is all I think he needs.

13   That's one issue that goes into it.  I think that a

14   sentence as I mentioned during my argument concerning

15   giving him the Department of Corrections sentence in

16   conjunction with a probationary sentence might serve

17   both ends, giving him more than the 90 days that he can

18   get in probation and yet still allowing him the

19   opportunity to prove himself and to see if he's going

20   to make good on the promises that he's suggested he's

21   going to do here.

22        THE COURT:  What am I to make of the numbers?  Is

23   it irrelevant that it's 278 instead of 2700 to me?

24   Should it be?

58

C 3697

1        MR. TONER:  Judge, obviously the number has to
2    factor into it.  I think this that --
3        THE COURT:  Seems to me like your primary thrust in
4    what I have heard in the testimony was he was impaired
5    through a variety of, you know, disorders and
6    addictions and almost -- the way I took -- take the
7    argument is I should not concern myself with the
8    number.
9        MR. TONER:  Judge, to concern yourself with the
10   number I think obviously is appropriate.  It's a
11   significant amount of money, and it was taken under
12   circumstances that are inexcusable, and that's why we
13   offered no excuse.  However, I think that there are
14   numbers that have been drawn by the legislature,
15   $500,000 is where the Court's discretion is taken away
16   from giving any type of a probationary sentence and
17   between $100,000, over $100,000 is what makes this a
18   Class I felony.  So it's basically middle of the road.
19       THE COURT:  All right.  Let's -- is there -- oh,
20   Mr. Evans, is there any final comments you want to
21   make, and I'll ask you, Mr. Toner, the same thing and
22   we'll take a little five-minute break and Mr. Picl can
23   make a statement, if he would like, and I'll render a
24   decision.  So Mr. Evans, anything?

C 3608

1       MR. EVANS:  Just with regard to your questions.

2   Important distinction in terms of taking away a court's

3   discretion at the $500,000 mark.  That figure is

4   applied to a ten-year-old boy who has his money taken,

5   500,000 if he had a $10 million trust, or a person 25

6   years old who was a victim of a $500,000 theft.  That's

7   when it's taken away.  The circumstances in this case

8   is that all the money was taken and the legislature has

9   stepped in and said if you do this against someone over

10  60, here is the range of sentencing out to 30 years.  I

11  don't think they intended that in cases just because of

12  that lack of discretion that that cutoff time that a

13  defendant should not be sentenced to the penitentiary

14  in the appropriate circumstances.  They felt so

15  strongly about it they extended the Court's available

16  sentencing range out to 30 years, Judge.

17      THE COURT:  Mr. Toner, any final comments you need

18  to make or want to make?

19      MR. TONER:  Judge, I would simply point out that

20  with all respect to counsel that in a certain way begs

21  the question because we know what the range is and the

22  Court has these appropriate facts and I would agree

23  with counsel that the factors that the Court heard are

24  what is going to drive where in that range of his -- as

60

C 3609

1  the Court put it, from 0 to 30, that we are going to

2  have.

3     THE COURT:  Let's take a ten-minute break and then

4  we'll come back and finish it.

5           (Recess taken.)

6     THE COURT:  Let's go back on the record.

7      Would the defendant like to make a statement

8  in allocution?

9     THE DEFENDANT:  I would, Judge.

10      I have been admonished to stick to my remarks

11  here and I will, but something occurred to me.  I can't

12  for the life of me figure out what the hell I did to my

13  life in the last ten years and the lives of others

14  around me, those closest to me, Alice, whom I loved and

15  took care of and hurt at the same time.  My family,

16  people who cared about me.  I just -- I have no answer.

17  I have no explanation.

18      And it cut through my heart the last few days

19  to listen to the people from my past who recounted the

20  Frank that at one time did things, good things for

21  people.  I enjoyed that.

22      I loved the courtroom, but I always wanted the

23  right answer at the end of a case.  I represented 28

24  years, thousands and thousands and thousands of guilty

C 3700

1   clients, factually guilty clients. I knew it, they

2   knew it, probably everybody knew it. It was -- there

3   was a small part of me, not a part of the zealous

4   advocate that I was duty bound to be in every case that

5   every trial, hundreds and hundreds of trials I had

6   where the result was guilty because the result -- the

7   system had produced a result that matched the facts and

8   was just. Those times when the result obtained

9   oftentimes because of my persuasive powers and my

10  charisma and my agile mind in the courtroom. God, I

11  wish I could trade all that crap for some of the stuff

12  I have done, but the times that the verdict suggested

13  that justice was not done, for a few years that was --

14  oh, that was powerful ego food. For a young lawyer

15  that was -- boy, I was on top of the world, but after a

16  while, it became more important to me that the right

17  result come out.

18          I over the last not just 18 months, not

19  just -- it will be 19 months tomorrow since I had my

20  last drink, God willing I will never drink again. It's

21  a day-to-day proposition. You reset your clock every

22  day at midnight. Years ago, my life started going off

23  the track. There were so many times when I just

24  thought, what's going on? This isn't right.

62

C 3701

1          With Alice, I honestly believed I could

2    somehow through gambling for Christsake get her money

3    back to her and that until that time I would simply pay

4    all of her bills myself.

5          That -- you know, the essence of addiction, as

6    was mentioned by a witness or two, is delusion.  We lie

7    to ourselves and we believe our lies to keep our life

8    going, completely uncognizant many times of the fact

9    that our life is -- we are going to hell in a hand

10   basket and we are hurting everybody.  It's like your

11   field of vision narrows down to a point where it's a

12   struggle just to get through every day.

13         Starting at 10 or 15 years ago I -- I don't

14   know what happened.  I began to not do my work in the

15   office.  I have always been undisciplined.  For years,

16   I thought the answer was simply as I was told forever

17   as a child by my dad, God bless him, that, by God, you

18   need discipline, you need more discipline, as if I

19   could go out in the garage and get something out of a

20   sack or something.  Yeah, that begs the question.  I

21   have always needed discipline, but it grew into

22   something more than that.  I mean, it got to the point

23   where I couldn't move anything forward.

24         The struggle was with Jeff Shuck's case, the

63

C 3702

1   biggest piece of civil litigation I ever involved

2   myself in.  That thing took years, years longer than it

3   should have because not only was I learning what I was

4   supposed to be doing as I went along, but it just --

5   despite the fact that potentially there was a lot of

6   money to be made in the case, I couldn't -- there were

7   many times I couldn't work on it.

8        And that's what happened on a lot of my cases.

9   I couldn't send out bills.  I represented the UAW in

10  their 1994, '95 struggle.  I handled 50 trials for

11  them.  I think 49 of them were not guilty.  I never

12  sent them a bill until after my first wife left me.

13  Simply couldn't -- she said, Frank, you are going down

14  for some reason and you are pulling us with you.  I

15  have got to save the family.  I don't know what's wrong

16  with you.  I didn't know what was wrong with me either.

17  Find another lawyer who doesn't want to make money for

18  crying out loud when it's already been earned and is

19  sitting there.  I don't know.  I don't -- I don't know

20  what the hell happened.

21       At any rate, I looked for the answer in all

22  the right places in a tavern, and, you know, they say

23  alcohol is a perfect cleaning fluid.  It cleans you of

24  your respect, your self-respect, your self-esteem and

64

C 370B

1  cleans you of your material possessions, your

2  relationships.  It cleans you of everything, your

3  health and finally it takes your life.  And that's the

4  goal I have learned and in all the other treatments I

5  have gone through the last 18 months, which I

6  dedicated, right or wrong, I dedicated to my recovery,

7  I -- you learn that addictions want your life.

8          And, you know, the last five years after I

9  have lost my wife and my family, none of which was

10 enough to get me to stop drinking, to seek some help

11 other than a bottom of a bottle for my problems, I was

12 ashamed of my inabilities to be like other lawyers,

13 to -- I just couldn't figure it out.  I admired other

14 sole practitioners who while they didn't have, you

15 know -- they didn't bloom and blossom in a courtroom,

16 they could do their work.  They could make money.  They

17 could send out bills, they could pay their taxes, they

18 could file their returns.  You know, the money that I

19 didn't bill the UAW for years, that was more than

20 enough to pay my taxes.  And I'd -- there were years I

21 had the returns and all the information ready to go and

22 I couldn't do it.  I don't know what that was.

23          The briefs that I got in trouble for not

24 filing.  It's a simple business to write an appellate

65

1  brief. You know the issues if you handled the trial.
2  You know where to find the law. The Seventh Circuit
3  back in the '80s took me off a federal case because I
4  couldn't file the brief. They referred me to the ARDC.
5  I straightened up my file. I went to Chicago. The
6  ARDC said, well, you don't appear to have horns and a
7  point on your tail, so, you know, we'll watch you for
8  three years and then we'll assume you have healed or
9  whatever. You know, whatever was going on was an
10  anomaly. For three years I didn't do any appellate
11  work, I can assure you, but then even in the late '90s
12  I got involved at a friend's request in the appeal to
13  the Third District of a divorce case. Two separate
14  justices, one died, another took his place. They took
15  to calling me home, imploring me. They knew me. I
16  knew them. I knew them for years when they were
17  lawyers. Imploring me to simply file something. One
18  said just file a sandwich. We don't care. Just get
19  something up here. Indicative of where my life was
20  headed at the time, and this was when I was supposedly
21  practicing law at home.

22        Shirley and I closed my office down here
23  because I couldn't stand to enter it. I couldn't look
24  at all of the undone work, and worse I couldn't sit

C 3705

1   down and tend to any of it.  So I went to the tavern.

2   I would either be in court safe from what was going on

3   outside the courtroom or in a tavern.  I don't know

4   what I was safe from there, but rarely did anybody find

5   me.

6        I could no more work at home in my den than I

7   could in an office.  And, yet, I continued to try

8   cases.  You know, I'm sure there are going to be people

9   puzzled at how I could come to these courtrooms and go

10   through cases and argue to juries and do a good job.  I

11   mean, I was always proud of what I was able to do in a

12   courtroom.

13        I knew in the last five years, particularly

14   after my divorce, which devastated me -- you know, I

15   used to do a lot of divorce work, and I could never

16   understand how many people just go about their lives

17   after a divorce.  I was married to a woman I dearly

18   loved.  We had wonderful daughters.  We still do.  I

19   simply couldn't stop drinking.  I tried, but as we

20   learn in recovery, until you want it for yourself,

21   wanting it for a wife, wanting it to save a job,

22   wanting it to hang on to a relationship, that doesn't

23   get it.  You don't want it for yourself.  I lost

24   that -- I gave that marriage away.  I was married to

67

C 3706

1   her for 26 years and I just gave it away.  And Alice

2   used to tell me, Frank, God darn it, why don't you get

3   your wife back, ask her to come back to you, I'm sure

4   she will.  She didn't believe in divorce.

5          God bless her.  I mean, there is a long time

6   when I considered her my only decent friend.  She'd ask

7   me -- she had me go get a cheap -- the very cheapest

8   beer on the market, Blatz Light because she didn't want

9   to spend an extra penny for the two cans of beer she

10  drank a night, and I would sit and drink beer with her

11  and -- and I loved that woman.

12         And when I started taking her money, I just --

13  you know, I was already dying inside.  That period of

14  time I just didn't care.  You know, at the end, I just

15  didn't expect to wake up some morning because I

16  couldn't -- I mean, I -- it had been so long since I

17  had made a right decision that I didn't -- I was

18  hopeless.  I was just waiting to die.

19         When Kevin's investigators came down to the

20  courthouse March 14, I think it was, of 2005 and

21  arrested me, what a relief.  I wanted to go to prison

22  right then and there.  There has been -- there have

23  been so many days in the -- there hasn't been a single

24  day since I have been finally brought to heal where I

68

C 3707

1  haven't said to myself you should be locked up forever

2  for this.  It's -- it was so inconsistent with the way

3  of life that for a long time I was able to follow.

4         I haven't always been a bad man and, you know,

5  I just -- I remember the day, the very day in my office

6  ten years ago maybe I decided to become a gambler or

7  I'd investigated, two years of intense study obsessive,

8  you'd say, buying books, practicing on the computer,

9  wasting time, night after night.  My then wife would

10 say, what are you doing up?  What's going on here?  And

11 I would say, well, I'm learning to lose.  That was one

12 of my justifications for learning to gamble, teaching

13 myself to gamble.  I figured if I could learn to lose,

14 then that would act as a control.  So when I did lose,

15 I would be able to withstand it and go on.  What a lie.

16 What a fantasy.  I instead of making the hard decision

17 that afternoon in my office -- and I told myself -- I'd

18 never been on a riverboat.  It was still in Peoria.  I

19 remember saying, you know, you got to do something.

20 You got to supplement your income.  Your kids some day

21 are going to college.  You are unable to make money out

22 of this.  I remember friends of mine saying, why don't

23 you work at what's in this office?  You would make all

24 the money you need and more.  And I don't know.  I have

69

1   no answer for that.

2           Do I think I'm lazy?  No.  There have been

3   times when my industry has taken my own breath away.

4.  But I have never been able to consistently harness any

5   of that.  My life just went wild.  It was out of

6   control.  That afternoon I said to myself with no basis

7   in fact other than I wanted to believe it, well, there

8.  must be people who can successfully make a living

9   gambling otherwise this whole industry is a multi

10  billion dollar industry is just a scam on the unwitting

11  American public.

12          Well, you know what, I don't know.  I don't

13  know where I pulled that assumption from, but, quite

14  obviously, from what I have seen both in myself and in

15  others, that's what it is.  Entertainment.  You know

16  what?

17          At any rate, I decided instead of doing the

18  right thing then and saying you know what Frank, you

19  are a failure as a lawyer.  You can't for whatever

20  reason make this go, go to work for somebody else, go

21  to work for somebody else.  Either it was my pride -- I

22  mean, all of my time was at my disposal.  If I wasn't

23  at court, I had all the time in the world to drink, and

24  I did.  It wasn't just daily drinking.  It was four to

70

C 3709

1   six to eight to ten hours of drinking. And you know

2   what, I think everybody knew it, which is neither here

3   nor there, but I never -- you know, I didn't screw up

4   in court. I tried to -- I thought I prided myself on

5   that. I regarded these courtrooms as sacrosanct. And

6   I didn't want to step over that line because I'd seen

7   lawyers when I started the practice, some very good

8   trial lawyers who just ruined themselves and eventually

9   I would watch them get handcuffed and led out of

10  courtrooms and then they died from their disease.

11          So I didn't want to go that far, but I clung

12  to this fantasy that I could be a gambler, not

13  recognizing that doing anything successfully, gambling,

14  practicing law, anything else requires structure and

15  balance and, yeah, you got to discipline yourself if

16  you are doing it alone. If you work for somebody else,

17  they do it for you. While I would come to court and a

18  judge would say, you know what, all you guys are out of

19  options we are picking a jury. I had no choice. At

20  that point, let's go. And as a defense attorney in a

21  courtroom, all I'm required to do in almost every case

22  is react.

23          And you know what, yeah, I have a quick mind,

24  big deal. I've wished a million times over my life

71

C 3710

1   that I hadn't been blessed, if you want to call it

2   that, with a quick mind.  I mean, I would sit there and

3   I would study the work the other side was doing which

4   is what the State has to do and I would look for their

5   mistakes.  You know, like laying in the weeds.  You

6   know, I would pick apart their work product, bundle it

7   all and try to hoodwink 12 unsuspecting citizens.

8   After a while I didn't feel very good about that.

9   Because I wasn't -- I knew my duty as a zealous

10  advocate was to -- and I knew that I paid lip service

11  to the notion that you have to have zealous advocates

12  on both sides to obtain a just result in an adversarial

13  system.

14       But I began cringing on Friday afternoons.

15  That's when we did our sentences.  Particularly with

16  the cases when my clients were addicts or alcoholics,

17  and there were so many of them.  There were so many of

18  them.  And I would make arguments on their behalf and I

19  would question them and I thought, you know, I'm going

20  to be there some day.  I just had a premonition.  I'd

21  dismiss it.  I'd run from the hearing to the bar and

22  away we would go.  And that would settle everything.

23       I'm so proud of Jerry Lindsey.  You know, I

24  mean, he's an inspiration to me.  The last hearing, he

72

C 3711

1    said, I'm tired.  And I said, Judge, try probation.

2    He's gone to prison any number of times, and it took.

3    And, Jerry, I -- you're great.

4            At any rate, Alice had so much money.  She had

5    no idea how much money she had, and she didn't want to

6    know.  She just said pay my bills, write me checks,

7    come talk to me and, you know, take care of my

8    business.  And she was such a nice woman.  I mean, such

9    a good friend.  I remember one Saturday I bought a

10   chain with a pulley on it and she wanted me to repair

11   her chain link fence in the back of her yard.  So I

12   spent my Saturday in the hot sun fixing her fence for

13   her.  I didn't know any lawyers who did stuff like

14   that, and, you know what, yeah, I got too close to her.

15   There was no one else.  And, you know, she'd yell at me

16   if I'd show up five minutes late for an appointment at

17   her house.  Picl, you are late again.  It was nice.

18   She was just a nice, nice woman.  And, you know, I

19   victimized her.  I preyed upon her.  She had no idea

20   what was going on.  She trusted me to handle her money,

21   and for a long time I did.  She was in her accident and

22   that's when I became her power of attorney.  And later

23   on in this sorry story I remember occasionally day

24   dreaming about justifications, oh, that power of

73

C 3712

1   attorney gives me the power to do anything I want to
2   and -- good or bad, and that was a lie.  It was all a
3   lie.  Everything about my life became a lie, and I had
4   to keep them going.  I couldn't -- I don't know.

5           And when the whole house of cards fell down on
6   top of me, the first time in my life I said, you know,
7   I can't -- I can't think my way or talk my way out of
8   this.  This is -- I mean, this is -- that was a moment
9   of surrender.  I finally said you are an alcoholic, and
10  I knew that wasn't the complete story.  I mean, I
11  have -- I hate to say it for years I have up until the
12  last year and a half, and this has been one of the few
13  blessings of this whole -- there have been some silver
14  linings -- I have reestablished contact with my whole
15  family.  For years I have avoided them, and I think
16  they have always known it, because they have problems,
17  and mental problems, some of them.  I guess I wanted to
18  deny that I was a part of them, and I felt terrible
19  about that.  I don't know.

20          You know, there was so much guilt in me that
21  started building with my divorce.  This nonsense about
22  gambling, this avoiding reality, and that's what --
23  that's -- I have learned that's -- I mean, I know a lot
24  about addictions.  I mean, I realized when I woke --

74

C 3713

1  you know, when I woke up after the first night in jail

2  in the spring of 2005, I thought, you know, I bet

3  everybody you know expects you to bond out and just go

4  back drinking and just say, well, I'll take my loss.

5  That thought never occurred to me. I -- I guess what I

6  thought was this. I figured that there had to be --

7  there had to be some sort of answer that -- I couldn't

8  just write off the rest of my life, but I knew I

9  couldn't continue living the way I'd been living.

10        That -- later that summer after I went through

11 the treatment programs I did a lot of walking. I

12 walked up to four or five hours a day out on the Rock

13 Island Trail. It calmed me down and it allowed me time

14 to think. I remember towards the end of that summer I

15 was bothered -- I'm getting to that. I'm sorry. Okay.

16 All right.

17        At any rate, just let me finish that.

18        People had asked me why aren't you concerned

19 about going to prison? And the thought occurred to me,

20 I have been in prison. I have been -- I have been in a

21 prison in my mind and locking me up -- I mean, I didn't

22 consider that as a -- I have spent 18 months, as I say,

23 every day and I turn my thoughts to it just saying, you

24 know, you deserve it. You did a horrible thing. Lots

75

C 3714

1  of horrible things, and I did. You know, I stood at

2  this very podium 25 years ago, saved a man's life in

3  front of a jury in this very box and because of my

4  argument they didn't give him the dealt penalty. They

5  let him live. I may see him before long. And it's

6  hard to even get my mind around that concept. I did

7  some good in this courtroom. And I'll address -- I'll

8  turn to my remarks. I'm sorry.

9       We have heard a lot of testimony since Monday

10 about me. Larry's right, good and bad. And Larry is

11 also right, we are here primarily because of Alice and

12 the harm I did to her. You know, once a case I

13 defended was sent back by the Appellate court because I

14 refused despite my client's insistence to ask for

15 probation. I'm not saying anything to the Court about

16 what's appropriate here, but, at any rate, Alice Varga

17 was a wonderful little woman who I came to treasure

18 over the years as I cared for her. My pain and my

19 shame for what I did to her, taking advantage of her,

20 preying upon her, violating her trust will never fade.

21 I apologize with every ounce of my being to her and to

22 her heirs, and I understand they don't want to accept

23 my apologies. I understand that completely.

24       I'll make full restitution -- or I'll make

76

C 3715

1    restitution in full if I live long enough.  If not
2    before I die, then upon my death.  I mean, I have done
3    what I could with the assignment, and there are a lot
4    of days where, you know what, I wouldn't mind dying in
5    a few days and at least we'd make one day, we'd cross
6    off one day.

7         I apologize to the citizens of Peoria County
8    and to my former profession.  I was honored to serve in
9    these courtrooms which I loved and I was honored to be
10    a member for a while of the legal profession whose
11    purpose is to serve others and which I disgraced.

12         I apologize to my family for the pain I have
13    caused them over the years and, finally, of my horrible
14    actions leading to these charges all of which are true.
15    I only hope that I can return even a small portion of
16    the love and support you have shown me during my life
17    even when I was blind to it.

18         I thank those who showed their concern and
19    support by their presence and testimony in this hearing
20    and with their letters.  My shame has not allowed me to
21    read any of them.  Some day I will when I can better
22    reconcile the good and bad inside of me.

23         I thank the doctors who provided me with some
24    explanation for my behavior.  My frustration without

77

1    the answers they have given me would be intolerable.  I

2    can't stop living because of what I have done.

3         And I thank my attorneys whose dedications,

4    steadfast effort and support impressed me beyond

5    measure even while I fell undeserving of it.  As

6    clients go, I'm sure I was a challenge.  I'm sorry.

7         I thank Kevin Lyons, Larry Evans and the many

8    fine prosecutors I have known and worked with over the

9    years in our justice system.  You fight the good fight.

10   I truly regret having my name on one of your files.

11        The purpose of the last 18 plus months of my

12   life since my last drink on February 28, '05 was to try

13   to discover what went wrong with me.  It was not to try

14   to shift blame in any way or to diminish my culpability

15   for victimizing Alice and that's not been the goal of

16   the proceeding.  The evidence we presented here was

17   intended to simply educate, to try to explain how this

18   could have happened.  I take full responsibility for

19   what I did to Alice.  What I have learned in the last

20   18 months of treatment, recovery, and reflection is

21   this:

22        I am now and always will be an alcoholic.  I

23   am now and always will be a gambling addict.  I am now

24   and always will be mentally ill.

78

C 3717

1      Finally, I accept all of these things as true.
2   I have denied them for so long. It's not important how
3   this came to be. There are no fingers to point, no
4   blame to be laid anywhere other than at my feet for my
5   terrible misdeeds which victimized Alice Varga. I have
6   the debt that can never be repaid to Alcoholics
7   Anonymous which have shown me that I can live yet a
8   happy and productive life despite my addictions.

9      Few people except those who have benefitted
10  from its fellowship and plan for living can know how
11  many truly desperate lives AA saves. I thank my fellow
12  MRM alumni, finest and strongest group of men I could
13  ever hope to meet. They are truly one of the silver
14  linings of my recovery.

15      I said good-bye last night to my father who's
16  dwindling rapidly due to dementia. I realized finally
17  as I looked at his aged and worried face how terror
18  filled Alice must have been upon being informed that I
19  had betrayed her trust and stolen her security. I told
20  my father that he'd been a good father to me to which
21  he replied, not good enough.

22      How wrong he was. I do not believe two more
23  caring, loving and concerned people exist on this earth
24  than my parents and my actions cannot in any way be

79

C 3718

1  attributed to the quality of my upbringing.  My parents

2  have been and simply are the best.  Thank you for your

3  love.

4      My three daughters and I went for one last

5  walk at the trail last night at twilight.  It was

6  beautiful out in the country, quite and serene, and we

7  met by happenstance an acquaintance and his wife who

8  recently lost a young son in a tragic accident

9  involving drunken driving.  I can only imagine the pain

10 they must feel.  It reminded me that living life means

11 experiencing both its joys and its sorrows not hiding

12 from them in addictions.  My girls are without question

13 the best in my life.  I love them.  Thank you for

14 believing in me despite what I have done and become.

15     I accept without complaint whatever punishment

16 the Court imposes just and deserved, and I pledge to

17 return some day to society and make my amends by

18 grateful and humble service to those I can help in my

19 experiences and my new understanding of how life must

20 be lived, with honesty to oneself and others.  It's

21 okay to say I failed.  It's okay to say I can't do it

22 perfectly.  And it's okay to say I need help.

23     And I never understood that, and I intend to

24 live with some degree of happiness and peace one day at

80

C 3719

1   a time.  Thank you, and, Alice, wherever you are, I'm

2   so sorry.  Thank you.

3       THE COURT:  Thank you.  Mr. Toner and Mr. Evans,

4   Mr. Toner, if you would step up, this is the letter

5   from one of the daughters, I made a copy of them, but I

6   think the original ought to stay with you.

7       MR. TONER:  Thank you very much.

8       THE COURT:  Let me start off by saying that I want

9   to thank the attorneys involved with this proceeding in

10  the last three days.  It's a difficult case, as I have

11  said.  And it's helpful to the Court to have two very

12  quality -- two attorneys with the highest quality

13  representing their respective sides.  It helps the

14  Court immensely to formulate a result that hopefully is

15  correct.

16      I want to thank also the people that stepped

17  forward.  There were -- I quit counting after about 60

18  letters.  I have read all of them, some of them several

19  times, and then there were a number of witnesses, I

20  think about 20.

21      I want to -- in that regard in talking about

22  the letters, I want to first say to the Varga family

23  that there were but two letters, for lack of a better

24  way of saying it, for your side, but I want you to know

81

C 3720

1    even though most of my remarks from here on out are

2    going to be about Mr. Picl, the defendant, and things

3    that were said about him and so forth, I want you to

4    know that those two letters are paramount to me.   That

5    this isn't about who submitted the most letters.   It's

6    about what was said and what was done.   So I want you

7    to know that those two letters and what was in those

8    letters is paramount to me.

9          Next, I want to look to Mr. Picl's daughters.

10   I'm going to refer to my experience of two years up in

11   misdemeanor court where you sit and the defendant

12   stands right there, eyeball to eyeball with I counted

13   about 7,000 different defendants over two years.   Now,

14   that doesn't make me an expert on anything, but it's a

15   perspective I think that very few people have had to

16   look eyeball to eyeball with 7,000 different

17   defendants.   And I used to think lots of them in

18   misdemeanor court are young adults, probably 17 to 23,

19   24, and on those rare occasions when I would have a

20   parent show up with their child, with their young

21   adult, I would pretty much send them on their way

22   because I knew chances are that child was not going to

23   be back, that I had help because it was a rare occasion

24   when the parent showed up.   It never occurred to me

82

C 3721

1  that the situation would be reversed.  And I want you

2  to know that the fact that you sat here for three days

3  and submitted the letter that you submitted, one of you

4  submitted -- there was another one earlier -- had a

5  great impact on me and moved me.  And, in fact, one of

6  the comments in the letter I got today that basically

7  was a letter from one of you to your father of years

8  ago where you said you won't let me and your family

9  help you, I want you to know that you helped him the

10  last three days with me.

11         Now, having said that and told you the story I

12  told you about misdemeanor court, if this was a

13  misdemeanor, Mr. Picl would be going home and I would

14  send him home three times over because you three sat

15  here, but this is not a misdemeanor and Mr. Picl, I

16  think he knows what's coming.  I think he understands

17  that, and I cannot do my job and send him home.

18         What we are here for today is that -- and I

19  understand both sides here.  I understand both sides

20  that were argued.  I understand the interest of the

21  Varga's and what their perspective of what justice is

22  or should be in this case, and I understand, I think,

23  what the interest of the defendant is in this case and

24  what their perspective of perhaps justice is in this

83

C 3722

1  case. And those are not -- they don't overlap, as I

2  see it, but I have to take those two perspectives and

3  the perspective or interests of the public and try to

4  meld that all together and come up with something that

5  I think holds the defendant accountable for his

6  actions.

7  Stated another way, a price must be paid for

8  the conduct. I don't think that Frank Picl,

9  although -- well, one more reference to the misdemeanor

10  court experience. Every once in a while when you look

11  into somebody's eyes you actually see evil. Now, some

12  people would say I'm nuts, but you do. Several people

13  were up there through bonding court or whatever that

14  had committed murder. And every once in a while you

15  look in their eyes and you saw evil. When I look into

16  Frank Picl's eyes, I don't see evil. If I did, he'd be

17  looking at 30 years for this crime, but I do not --

18  never have I thought in these proceedings as I look in

19  his eyes, and I look a lot, did I ever see evil, but I

20  do -- I have seen demons. And, in fact, that was

21  referred to several times in some of the letters that

22  were written. Mr. Picl does have demons, and for

23  whatever reason, it resulted in unlawful conduct and

24  those demons do not, whatever disorder, whatever

84

C 3723

1    addiction, they don't excuse the conduct.  They may

2    diminish somewhat in my mind the price that has to be

3    paid, but a price nonetheless has to be paid, and I'll

4    tell you why.

5            I don't think Mr. Picl is necessarily going to

6    commit another crime.  In fact, I don't think so at

7    all.  I don't think that that's going to happen.  I

8    think eventually some day he will be out in public, and

9    I just don't think he is going to return to unlawful

10   conduct, but it's important in my judgment that there

11   be a deterrent, and somebody in one of the letters

12   said, well, you know, people that are addicts don't

13   really think of deterrents.  They don't really think of

14   what they are doing.  So, judge, if you sentence

15   Mr. Picl to the DOC, you know, that's not going to stop

16   somebody else who's got an addiction or disorder from

17   doing something.  Well, I look at deterrent a little

18   more generally than that.  It isn't necessarily that

19   I'm trying to deter this exact crime from happening

20   again.  Although certainly I don't want to ever see it

21   again, but for anybody out there in public, they must

22   know whether they are law abiding or not law abiding,

23   the public must know that there will be a price that is

24   paid for the wrongful conduct and that price has to be

85

C 3724

1   paid in this case.

2         So I don't believe that short of the insurance
3   policy, life insurance policy being assigned, I don't
4   believe that there's a strong likelihood that
5   restitution is going to be made. Realistically, he
6   owes the estate over 270-some-thousand dollars
7   theoretically with interest. He hasn't paid his taxes
8   since 2000. Lord knows what that obligation is. It
9   wasn't significant to me, but Mr. Evans made the point
10  about, well, maybe it's 400,000. Well, I just assume
11  when Mr. Picl at some point said 400,000 to somebody
12  that that included the IRS obligation, but in any
13  event, it's clear that he owes hundreds of thousands of
14  dollars and the likelihood other than his life
15  insurance policy, proceeds from that, the likelihood of
16  the Varga estate being paid through restitution, which
17  I am going to order, is not very great and -- any time
18  in the foreseeable future. So the suggestion that has
19  been made about probation and restitution which was
20  made repeatedly in the letters to me isn't a price at
21  all. It's a hollow price.

22        So given the crime which I place a great deal
23  of significance on the number, 278, $278,000, that's --
24  that represented the victim's life savings, took away

86

C 3725

1  her choice to go on the riverboat and gamble it. We

2  all know that she wasn't going to do that, but it was

3  her choice to make what happened to that money, and she

4  wasn't able to make it. Her age is a significant

5  factor to me.

6       I understand that I do have a wide latitude of

7  discretion here, but in looking at the statute, the

8  fact that she was in her 80's and not in her 60's puts

9  me at the beginning before I deal with mitigation

10  factors, but had there been no mitigation factor, I

11  would be in the extended term range simply because of

12  her age and the amount and the breach of trust.

13       I am going to allow -- I am going to factor in

14  a credit for various mitigation factors, one of which

15  is the defendant has no prior record. Beyond that, I

16  think he has done -- you know, lots of people have no

17  prior record, but that doesn't make them, you know, a

18  strong positive influence in their world of influence.

19  I was moved by the testimony of the mother of the

20  paraplegic which symbolized to me what I surmised

21  anyway that there was a lot of good out there that

22  Mr. Picl did. One of the things that people

23  overlook -- and I was proud of my profession. I

24  indicated earlier that we have to the way the system is

87

C 3726

1   set up, all of us with law licenses basically police

2   our own.  And I was proud that it is my profession that

3   prosecuted Mr. Picl.  I was proud that at least 25

4   lawyers stepped up and did what lawyers did.  They

5   wrote letters on behalf of somebody who needed a -- a

6   defendant who needed support.

7          And I was moved by the content of a good deal

8   of those letters and one of the letters talked --

9   several of the letters talked about their own personal

10  experience with alcohol and one of the little unspoken

11  hidden secrets of lawyers is I have to believe -- I

12  don't have a study, I have to believe that we have a

13  higher percentage of alcoholics than a good number of

14  professions, and that says something about the

15  profession.  And one of the attorneys, I won't

16  embarrass him by saying who, talked about what it is to

17  be a public defender and how public constantly asks you

18  how can you do what you do, you represent guilty

19  people?  And if you lose, it's always your fault and if

20  you win, it was never because of what you did; it was

21  an act of God and you shouldn't have -- and he

22  shouldn't have been charged in the first place.  But

23  public defenders do a tremendous service to the public,

24  and Mr. Picl did that.  They don't get paid a whole lot

88

C 3727

1   of money.  I'm sure that in the thousands of cases that

2   he handled many people were found innocent that were

3   innocent and might not have been found innocent with a

4   lesser attorney.

5        So I think this notion of mitigation that he

6   hasn't had any prior criminal activity, has led a law

7   abiding life for a substantial period of time, I'm

8   rolling into that also what good he did with the law

9   license, even though he is permanently forfeited that

10  right to continue with that law license because of the

11  egregious violation of his -- of the trust.

12       On balance when I factor all the items of

13  mitigation -- and, Mr. Picl, why don't you please rise.

14  I believe in this case that the appropriate period of

15  time is a sentence in the Department of Corrections for

16  10 years, day for day will apply.  You'll get credit

17  for any time served.  Mr. Toner, I made reference to

18  some -- if it was eight years minimal -- minimum

19  security prison or something, and to the extent that my

20  opinion matters, which it probably doesn't, to the

21  Department of Corrections, that would be my

22  recommendation even though it is a ten-year sentence.

23       Having said that -- and you can be seated, if

24  you want -- I want to read your appeal rights, as you

89

C 3728

1  know.  You have a right to appeal the judgement and
2  sentence entered as a result of your plea of guilty --
3  of your plea of guilty and the sentence that has been
4  entered.  However, before taking an appeal you must
5  file in this court within 30 days of today's date a
6  motion to withdraw your plea of guilty and vacate
7  judgment and sentence or a motion to reconsider the
8  sentence.  Both motions must be in writing and set
9  forth with particularity of any claim of error or any
10  claim of error not so stated would be waived for
11  purposes of appeal.  If the motion to withdraw your
12  guilty plea is allowed, the judgment and sentence will
13  be set aside and the case will be set for trial.  If
14  the motion to reconsider is allowed, the sentence may
15  be modified.  Any charges dismissed by the State as a
16  part of the plea agreement may also be reinstated and
17  set for trial.  If either motion is denied you must
18  then file a motion -- or, I'm sorry -- a notice of
19  appeal within 30 days of the date of the denial or
20  direct the clerk to do so on your behalf.  If you are
21  indigent, a free lawyer and free transcript will be
22  given to you for purposes of the above proceedings and
23  your appeal.  Are there any questions?  That sentence
24  is imposed on each count to run concurrent.  Are there

90

C 3729

1 || any questions?

2 ||     MR. TONER:  May we approach, Judge?

3 ||               (Whereupon proceedings were had at the

4 ||               bench out of the hearing of the court

5 ||               reporter.)

6 ||     THE COURT:  Let me modify something ever so

7 || slightly.  What count is that?

8 ||     MR. EVANS:  Six.

9 ||     THE COURT:  Six is a Class II felony.  So the

10 || sentence that will be imposed on that count is a

11 || five-year sentence.

12 ||     MR. TONER:  Judge, additionally, we would request

13 || that the letters to the DOC reflect that Mr. Picl be

14 || allowed to go to a facility to participate and continue

15 || with his treatment for addiction?

16 ||     THE COURT:  Mr. Evans, any response to that?

17 ||     MR. EVANS:  Judge, certainly the People would have

18 || no objection to the recommendation of such by the

19 || Court.

20 ||     MR. TONER:  And, finally, the Court had made a

21 || motion as far as the recommendation of a minimum

22 || security.  We also ask that include to the extent

23 || possible a facility as close to Peoria as he could for

24 || the reasons that are stated in the --

91

1    THE COURT:  That can be noted in the record both as

2    to minimum security and closeness as possible.  Again,

3    that's up to the discretion of the Department of

4    Corrections.

5        MR. TONER:  Thank you, Judge.

6        THE DEFENDANT:  Thank you, Judge.

7        THE COURT:  You are welcome.  With that, we'll go

8    off the record.

9        MR. EVANS:  Judge, I do have a motion on the record

10   I would like to make if I may on behalf of the People,

11   Your Honor.  I would respectfully move that the

12   defendant's present bail in light of the sentence of

13   the Court be revoked and that a mittimus issue and

14   execute without delay and that the defendant be taken

15   into custody.

16       THE COURT:  That's allowed.

17           Anything else?

18       MR. EVANS:  No, sir.

19       THE COURT:  Let's go off the record.

20                   (Which was all the evidence offered and

21                   received and all other proceedings had

22                   in the Sentencing Hearing of the above

23                   cause.)

24


                                                        92

# IN THE TENTH JUDICIAL CIRCUIT OF THE STATE OF ILLINOIS

## PEORIA COUNTY, ILLINOIS

### REPORTER'S CERTIFICATION

I, **ROBIN L. ROBERTS, CSR, RPR**, an Official Court Reporter in the Tenth Judicial Circuit of the State of Illinois, do hereby certify that I reported in machine shorthand the foregoing proceedings had before the **HONORABLE STEPHEN A. KOURI**, in the above-entitled cause, and that I thereafter caused the same to be transcribed into typewritten form which I now certify to be a true and accurate transcription of same.

Dated this 6th of April, 2010.

_____
**Robin L. Roberts, CSR, RPR**
Official Court Reporter
License No. 084-004317

93

C 3792