For his part, Roland was a multiple felon who could not identify Jamie Snow in court. (Vol. XIV, R. 79-81.) Roland admitted that he did not go to the police, even after being released from prison, until he was arrested for a DUI. (Vol. XIV, R. 89-90, 97.)

43.    Karen Strong testified that she lived with Mark McCown on Easter of 1991. She testified that McCown returned to their house between 10:00 pm. and midnight with Jamie Snow, and that she then rejected McCown's request for Jamie to stay with them. (Vol. XV, R. 4-10.) On rebuttal, she testified that McCown told her he was in trouble because he shot the Little kid during a robbery. She didn't tell the police this until five months before Jamie Snow's trial. (Vol. XV, R. 7-9, 14-15.)

44.    Mary Jane Burns, a former McLean County Correctional Officer, testified that she spoke with Jamie Snow in the jail and Snow told her that he thought he knew who committed the murder. (Vol. XV, R. 16-23.) According to Burns, Snow told her that he was in a car that pulled over behind the Clark station, and another male in the car walked to the gas station when Snow got out to be sick. According to Burns, Snow told her he believed the other person in the car did the murder. (Vol. XV, R. 23-24.) Snow testified that he had a conversation with Ms. Burns but never told her that he was in a car by the Clark station or that he knew who did the murder, but rather just tried to explain to her how he could be a suspect in the murder. (Vol. XVII, R. 127.)

45.    Timothy Powell testified that a few weeks before the Clark station robbery, he was in the car with his sister, Susan Claycomb Powell, Jamie Snow, and Jamie Snow's wife when Snow stated he was going to rob the Freedom gas station, but he did not. He did direct Susan Claycomb Powell to drive to a home near the Clark station, and then to the Clark station itself. According to Powell's testimony, Snow went into the station and then returned. (Vol. XIII, R. 199-205.)

C 2627

### E.   Jamie's Limited Defense

46.     Jamie Snow's lawyers presented a limited defense.  In addition to the witnesses described above, Dennis Hendricks, a friend of Jamie Snow's for some time, testified that William Gaddis' story about coming upon a room of people crying about Bill Little's death was absolutely false.  (Vol. XVI, R. 31-32, 41-52.)

47.     Jamie Snow's wife also testified that she was with Jamie Snow on Easter Sunday of 1991, and that after going to her mother's house for Easter they returned home.  She said there were never any composite drawings in her house, that Timothy Powell's testimony was false, and that while she was with Jamie when he ran into Ed Palumbo, Palumbo's account of a conversation was false.  (Vol. XVI, R. 62-69, 70-72.)

48.     The state rebutted this testimony with testimony from Bridget Logsdon that Tammy told her that "she knew he did it," though Logsdon acknowledged that she overheard this in another conversation and that she did not contact the police after hearing this comment.  (Vol. XVIII, R. 46-49.)

49.     Mark McCown testified that he was not with Jamie Snow on Easter Sunday of 1991 and that he never spoke with Karen Strong about the Little homicide.  He said William Little's death never came up in Florida, and that Jamie never said he ever shot anyone.  (Vol. XVII, R. 5-7, 12-13, 22, 25, 64.)

50.     Susan Claycomb testified that she was in a car with Jamie Snow when the car stopped at a Freedom gas station, but that she couldn't remember ever stopping at the Clark gas station.  (Vol. XVII, R. 30-32, 39.)

51.     In addition to the testimony described above, Jamie Snow denied being the person who robbed the Clark station and killed Bill Little.  He said at that time he had a large cast on his right arm and said that on Easter of 1991 he had facial hair, no earrings (his ears were not

C 2628

pierced), and had no wound or scar on his chin. (Vol. XVII, R. 56.) When Mr. Snow was ultimately arrested for this crime in 1991, he was interviewed, and the police claimed that he had a conversation with them about the crime and indicated that he wanted to cooperate but was scared. (Vol. XV, R. 47, 52, 130.) However, the officers admitted that they did not tape-record this interview, and that Mr. Snow never admitted any involvement. (Vol. XV, R. 48, 52, 137-40.) When he testified at trial, he explained that his conversation with the police related to the other crime for which he was arrested. (Vol. XVII, R. 69.)

**F.      Jamie Snow is Convicted, and Questions His Lawyers' Performance**

52.     Jamie Snow was convicted of first degree murder on January 16, 2001. (Vol. XX, R. 5-7.) Before his sentencing, he wrote letters to the court questioning the effectiveness of his counsel. (Vol. XX, R. 11-40.) He later presented his allegations, and the court ruled that even if some errors occurred, they did not affect the verdict. (Vol. XX, R. 41-143.) To the extent that any of the claims in this petition were partially addressed in this motion, these proceedings did not provide Jamie Snow with a full and fair opportunity to litigate those issues.

53.     Following post-trial motions, Jamie Snow was sentenced to natural life.

## EVIDENCE OUTSIDE THE RECORD

54.     Since Mr. Snow's conviction, new evidence has come to light, evidence that was not made part of the record during his trial and that supports the state and federal constitutional claims he raises in the instant petition. That evidence is described in detail below.

C 2629

A.    **The First Responding Officer, Jeffery Pelo, Completely Discredits Star Prosecution Witness Danny Martinez**

1.    **Pelo's affidavit makes clear no one left the gas station while he was on the scene.**

55.    Jeffery Pelo, the first responding officer on the scene, has submitted a new sworn affidavit in which he avers that as he approached the Clark gas station on the night of Bill Little's murder, he saw Danny Martinez squatting by his car. (Ex. 1, Jeffery Pelo Aff., ¶ 9.) He then saw Danny Martinez stand up, walk toward the station, pause and look back. (Id. at ¶ 11.) Martinez then walked toward the station, and within seconds walked back to his car. (Id.) Pelo further avers that as Martinez was walking in the parking lot, "I was constantly looking between him, the surroundings, and the front of the station. From the time I arrived across the street to the time I entered the gas station, my gaze was never off the front of the station for more than a few seconds." (Id. at ¶ 12.) Pelo's affidavit states unequivocally:

> I am absolutely positive that from the time I arrived at the Empire and Linden intersection in response to the 1090 [hold up/panic alarm] call to the time that I eventually entered the gas station, no one other than Bill Little was either in the gas station or entered or exited the gas station. I had a clear, unobstructed view of the gas station door and was focusing on the station because I was concerned about the 1090 call and the fact that I couldn't see anyone inside.

(Id. at ¶ 17.) This affidavit establishes that Danny Martinez could not have seen anyone exiting the gas station, much less Jamie Snow.

56.    Jeffery Pelo's affidavit also contradicts Danny Martinez's testimony in another critical respect. Danny Martinez testified that after he left the gas station he drove to his home next door by pulling out backwards and parking right across the street. (Vol. X, R. 163.) However, Jeffery Pelo avers that when Martinez left the station he "got in his car and drove west on Empire" at least a few blocks. (Ex. 1, Pelo Aff. at ¶ 13.) Pelo confirms that he did not ask Danny Martinez to leave or to move his car. (Id. at ¶ 15.)

16

C 2630

57.     Jeffery Pelo's affidavit recalls his conversations with Detective Katz and prosecutor Tina Griffin.  In his affidavit he explains that he told Katz and Griffin that no one could have left the gas station while he was at the scene, but Griffin implied that he should say the opposite.  (Id. at ¶ 25.)  According to Pelo, he expected Jamie Snow's attorney to inquire into this area further during his cross-examination of Pelo, but Mr. Snow's attorney did not.  (Id. at ¶ 26.)

### 2.     Police radio tapes confirm Pelo's account.

58.     This affidavit and the bulk of Jeffery Pelo's account at trial of what occurred is corroborated by the police radio tapes of this incident that were disclosed to Mr. Snow through discovery in this case.  (Ex. 2, Police Radio Tape.)  These tapes support Officer Pelo's version of events – from the time Pelo arrived at the scene to the time that he went into the gas station, no more than a few seconds passed, and the radio tapes reflect the chronology that he describes, from arriving, calling in Martinez's plate, and then discovering Mr. Little.

### B.     Numerous Witnesses and Evidence Discredit Supposed Eyewitness Testimony from Danny Martinez, Carlos Luna, and Gerardo Gutierrez

### 1.     Danny Martinez knew Jamie Snow.

59.     Billy Hendricks did not testify at Mr. Snow's trial, but he has presented new evidence in the form of an affidavit further proving that Danny Martinez's testimony is false, and that Martinez had a motive to provide false testimony against Jamie Snow.  Billy avers that he grew up with Danny Martinez and was friends with Martinez and his brother.  (Ex. 3, Aff. of William Hendricks, at ¶ 4.)  He further states that because Jamie Snow also hung out with them "all the time," Danny Martinez saw Jamie many times.  (Id. at ¶ 5.)

60.     As Billy explained, he worked as a laborer in Local No. 362 beginning in 1988, and worked with Martinez all the time.  He drove to and from work every day in 1991 with

C 2631

Danny Martinez, and had several conversations with him about this case. (Id. at ¶¶ 6-9.) According to the affidavit, Martinez told Hendricks that the composite sketch that came out "wasn't Jamie, Jamie doesn't look like that. I know what Jamie looks like." (Id. at ¶ 9.) Further, Martinez told Hendricks, "Don't worry. I don't believe Jamie did it either." (Id. at ¶ 10.) In all these conversations, Martinez never told Hendricks that he thought Jamie was involved. (Id.)

61.     Billy Hendricks' affidavit provides a crucial connection between Martinez and Bill Little's family. According to Hendricks, Danny Martinez was a family friends with the Penn family. (Id. at ¶¶ 13-14.) John Penn is the business agent of Local 362, meaning he is the head of the local and exerts influence. (Id. at ¶ 13.) Linda Penn, John Penn's sister, was very good friends with Bill Little's mother. (Id.) Hendricks avers that before Jamie Snow was arrested, Martinez told Hendricks that Mrs. Little had been over to his house a few times. (Id. at ¶ 16.)

62.     Billy Hendricks' affidavit states that he did not share this information with Jamie or his attorneys because he did not know that Danny Martinez was claiming he did not know Jamie, and he did not have unfettered access to Jamie or his attorneys. (Id. at ¶ 17.)

63.     Like his brother Billy, Dennis Hendricks has also provided an affidavit stating that he grew up with Martinez, and that he ran into him at a bar sometime before Jamie's trial. (Ex. 4, Aff. of Dennis Hendricks, at ¶¶ 10-11.) During this meeting, Danny told him that "he hadn't been able to pick Jamie out of a lineup and that he didn't think Jamie was involved." (Id. at ¶ 11.) Like Billy, Dennis remembered that he, Danny, and Jamie used to play sports together. (Id. at ¶ 10.)

### 2. Interview tapes of Jeffery Pelo confirm that Pelo, not Martinez, is telling the truth.

64.     Police interview tapes which were not presented at Mr. Snow's trial further demonstrate that Pelo, and not Martinez, is telling the truth about what happened in that gas

C 2632

station parking lot. Jeffery Pelo gave an tape-recorded interview with the Bloomington Police Department on March 2, 1999. (Ex. 5, Transcript of Jeffery Pelo Interview.) This interview took place before Danny Martinez ever identified Jamie Snow. (R. 173-74.) In this interview, Jeffery Pelo states that he was watching Martinez at the time that Martinez claimed he was looking at the man who came out of the gas station. (Id. at p. 2.) Further, Pelo told these officers that Martinez left the lot before the truck pulled in and did not indicate that he ordered Martinez to leave. (Id.)

### 3. Paul Williams' inquest testimony and initial police report confirm that Martinez's testimony is false.

65.    The inquest testimony from Paul Williams confirms that Martinez's testimony is false. (Group Ex. 6, May 20, 1991 Inquest Testimony of Paul Williams.) In that testimony, Officer Williams stated that he and Officer Pelo arrived at the gas station at the same time, but Pelo got out before he did. (Id. at 2.) He further stated that when he heard Pelo arrive and state that he was out on foot by the station, he pulled his car up closer and waited "about 15 or 20 seconds." (Id.) At that point, he "hadn't seen any unusual activity, so I got out of my squad car and as I approached the station, Officer Pelo exited and said there was someone on the floor inside the station." (Id.) The narrative of Williams' initial case report confirms that Williams "observed [Pelo] walking up to the station and heard him ask dispatch to hold a license plate." (Id. at 2.) It also confirms that "at this time" Williams "had not observed any movement inside the station." (Id.)

66.    Given this testimony and narrative, Paul Williams was present and in front of the station from the time that Pelo radioed that he was outside his car. Given Williams' description of his position, he would have seen anyone exiting the station. This discredits Martinez's story.

C 2633

4. **Additional evidence contained in police reports would have impeached Martinez, demonstrated his identification of Jamie Snow was tainted, and shown that the victim's mother was contacting him in the months leading up to his identification of Snow.**

67.　Police reports of Martinez's interviews with the police before trial also contradict Martinez's trial testimony, and provide evidence that his identification of Jamie Snow was tainted. (Group Ex. 7, Police Reports Relating to Danny Martinez.)

68.　These reports reflect that, given multiple opportunities to identify the person that he supposedly saw outside the gas station, Danny Martinez picked several other people as the suspect, <u>failed</u> to select Jamie Snow in the lineup in which he participated, and only finally identified Jamie Snow after seeing his name and photograph in the paper announcing his arrest for this crime.

69.　In the early morning hours immediately after Bill Little's death, a supplemental case report (completed by an unknown author, as the copy counsel has obtained is too light to read the signature on the report) reflects that Martinez looked at the "suspect photo file" and told an officer that two mug numbers in that book resembled the suspect. According to the report, Martinez said "it's between these two." (<u>Id.</u>, Police Supplemental Case Report.) Gutierrez also identified one of these people as the suspect. (<u>Id.</u>)

70.　Petitioner does not have access to the Bloomington Police Department "suspect photo file" and cannot identify these individuals by mug book numbers, but believes that neither is Jamie Snow, and that neither are the two participants that Martinez picked out of the June 1991 lineup. The State should have access to information which would identify these two individuals.

71.　Second, these reports reflect that at the lineup Martinez viewed in June of 1991, the lineup in which Jamie Snow participated, Martinez asked to see two <u>other</u> participants in the

20

C 2634

lineup first, and then said that one of these individuals looked like the person, but he was not sure. (Id., June 22, 1991 Thomas Supplemental Case Report.)

72.     In October of 1991, Danny Martinez looked through the suspect books for this case, and identified two people that he knew. (Id., October 22, 1991 Supplemental Case Report.) One of these individuals was someone, not Jamie Snow, that he believed he'd seen in the station numerous times, possibly a friend of someone who worked there. The other picture he pointed out, also not Jamie Snow, he identified as looking "a lot like" the person he saw coming from the station but having a different hair and mustache. (Id.) In Charlie Crowe's testimony in Ms. Claycomb's trial, he confirmed that two separate photographs of Jamie Snow were included in this set of books. (Ex. 18 to the *Pro Se* Post-Conviction Petition in People v. Snow, Testimony of Detective Crowe in People v. Claycomb, 99 CF 1017.)

73.     A report from an interview with Danny Martinez on November 3, 1993, reflects that on that date Martinez was again shown books of suspect pictures, and was unable to identify anyone. (Group Ex. 7, November 3, 1993 Supplemental Case Report.)

74.     In all these reports reflecting multiple interviews with the police, Danny Martinez had multiple opportunities to answer detailed questions about what happened that night, what he saw, and to give a description of the person he claimed he saw outside the gas station. However, in all those interviews he never told the police that this person had distinctive eyes. He never said the person seemed under the influence of drugs or alcohol.

75.     This exhibit also contains the transcript of a March 4, 1999 interview with Danny Martinez conducted by Detectives Katz and Barkes. In this interview there is the following exchange:

DM:    And another thing I wanted to say is that I don't know who called Mrs. Little to have her call me I mean that was I mean, I mean I know that her son was involved and uh I know

C 2635

Easter's coming around the corner and she's goin through a hard time right now I mean couldn't returned your phone call towards me and you know mentioned something to me

DB:    And I, and I, and I did and I tried doin that and I'll have to take responsibility for that and I'll explain to you a little bit later about what transpired there.

(Id., Transcript of March 4, 1999 interview at 14.)

76.    In this exchange Martinez appears to acknowledge that immediately before this interview the victim's mother had his telephone number and was contacting him.   Further, Detective Barkes appears to acknowledge that he has information explaining how Mrs. Little was able to contact him.

**5.    Carlos Luna says that Jamie Snow only "looked the most like" the man he saw at the scene, and Thomas Sanders' testimony in another proceeding confirm that Carlos Luna did not see Jamie Snow.**

77.    The only person of the three purported eyewitnesses to identify Jamie Snow in a lineup was Carlos Luna.  He viewed a lineup in June of 1991 and at the time identified Jamie Snow because of "the shape of his face and his hair."  (Vol. XI, R. 18-26.)

78.    In a recent affidavit, Carlos Luna has clarified that the man he saw that night was "a male white, approximately 5'11", thin build, dark brown hair, wearing a black baseball cap, a black trench coat, and blue jeans."  (Ex. 30, Aff. of Carlos Luna, at ¶ 4.)  He was later asked to do a lineup, and identified person number 6 (Snow) because "[h]e was the person who best fit the description of who I originally observed" and because "[a]s a 14 year old I thought the police had caught the right person."  (Id. at ¶¶ 9, 13.)  Luna clarifies, however, that "[a]t 14 years of age and at a distance of about 200 feet I can not say that I am sure that Jamie Snow is the person who I observed."  (Id. at ¶ 9.)  He also states that "I am not sure that I identified the correct person.  I can not be sure from a distance of 200 feet that I could identify his face."  (Id. at ¶ 14.)

79.    Testimony from Thomas Sanders, a sketch artist for the Bloomington Police Department, in Susan Claycomb's criminal trial further discredits Carlos Luna's trial testimony.

C 2636

(Ex. 8, Sanders Testimony in <u>People v. Claycomb</u>, 99 CF 1017.)  In that proceeding, Sanders testified that shortly after the crime he met with Danny Martinez and then Gerardo Gutierrez and developed composite drawings based on his conversations with both of them.  (<u>Id.</u> at 6-11.)  Sanders admitted, however, that he then spoke with Carlos Luna but did <u>not</u> make a composite drawing based on what Luna told him because "he didn't think that he could provide enough information to complete an effective composite."  (<u>Id.</u> at 12.)  For the other witnesses, he was able to elicit specific details about the person those witnesses believed they saw, and generate a composite drawing based on that information.  For Mr. Luna, he was not able to engage in this process because Mr. Luna simply didn't have a good enough look at the person he said he saw walking outside the gas station.

### C.     Witnesses Who Claimed Jamie Snow Made Inculpatory Statements to Them Were Subjected to Various Pressures and Inducements to Testify

#### 1.     Ed Palumbo was threatened into testifying and hoped to receive a deal.

80.     Ed Palumbo, who testified at trial that Jamie Snow made inculpatory statements to him, has submitted a new affidavit admitting that at the time he signed a statement about Jamie, the police told him that Jamie had already told them about this conversation. (Ex. 10, Aff. of Ed Palumbo, at ¶ 4.)  This was false.  In addition, Palumbo admitted that at that time he was trying to get a deal on other charges.  (<u>Id.</u>)  He testified in part because "the Bloomington Police and state's attorney told me if I didn't testify I would be put in segregation in prison, be charged with perjury or get five years in prison for not cooperating."  (<u>Id.</u> at ¶ 5.)  He also testified because he "was still trying to get a deal for myself."  (<u>Id.</u> at ¶ 7.)   He believed that if he cooperated he could get a deal or at least be transferred to a different prison he believed this because prior to his testimony, prosecutor Charles Reynard told him "if there was any prison I wanted to go to he would see what he could do."  (<u>Id.</u> at ¶ 9.)  He further avers that after he testified, Reynard "told

C 2637

me that Jamie Snow didn't do this, someone else had, but since they couldn't get that other person Jamie would have to do." (Id. at ¶ 8.)

81.    Like other witnesses, Ed Palumbo did not give all these details to police when he first spoke to them - these details appeared for the first time in his trial testimony.  In fact, in a statement Ed Palumbo gave to the police implicating himself in a different crime, when asked if he knew if anyone had done any armed robberies Palumbo implicated Jamie and someone else in a different crime.  (Ex. 10, Police Reports Relating to Ed Palumbo, at 2.)

**2.    Dawn Roberts has recanted her trial testimony.**

82.    Dawn Roberts has signed a new affidavit recanting her trial testimony.  In her affidavit, she states that she did take down composite sketches of the murder suspect, but that Jamie didn't even know that she had done this until afterward.  (Ex. 12, Aff. of Dawn Roberts, at ¶ 12.)

83.    In addition, Roberts' affidavit states that her testimony was "molded" by the state's attorney "for the judge and jury to make it sound different."  (Id. at ¶ 2.)  With respect to her testimony about a toast to Bill Little, Roberts avers that at a party in the summer of 1994, Jamie made a toast to a "Billy" by pouring out a little bit of alcohol after opening a bottle and saying, "This is for Billy."  (Id. at ¶ 4.)  Roberts specifically recalled that Jamie did not give a last name.  (Id.)  According to Roberts' affidavit, she did not know what Billy he was talking about, but thinking back on it, she believes this toast was for Billy McWhorter, the brother of Tina McWhorter who had died before the toast.  (Id.)  Roberts' affidavit states that this toasting was always done as a sign of respect, and not done in a negative way.  (Id. at ¶ 5.)  Roberts also states that no one from Jamie Snow's defense team ever came to speak with her; had they, she would have told them this toast was for Billy McWhorter.  (Id. at ¶ 9.)

C 2638

84.    Dawn Roberts' affidavit also states that, "To this day, I don't think [Jamie Snow] could have done this.  That is not the kind of person that I saw."  (Id. at ¶ 10.)

85.    Tina McCombs' affidavit supports Dawn Roberts' recantation.  McCombs, who lived with Dawn Roberts and was present at the party where there was a toast to a "Billy," confirms that there was never a toast to Bill Little.  (Ex. 13, Aff. of Tina McCombs, at ¶ 4.)  If called to testify at Jamie Snow's trial, Tina McCombs would have testified that she was at a cookout when Dennis Hendricks made a toast "to the brothers that aren't here, naming Steve Graham and Billy McWhorter."  Billy McWhorter was Tina's brother who died in a car accident in September of 1991.  (Id. at ¶ 4.)

86.    Tina McCombs also avers that she went to court to testify in Jamie's case, but while she was waiting to testify Detective Barkes came out into the hallway and told her that she was not needed and could go home.  She believes Jamie's attorney had called her to testify, but she did not talk to Jamie about her testimony.  (Id. at ¶¶ 7-8.)

### 3.    Randy Howard was pressured to testify.

87.    Randy Howard has provided a new affidavit stating that in his interview with Bloomington detectives before he appeared at the grand jury, he "answered yes to their questions to get them out of the door.  It was really early in the morning and I was sick of them.  To this day I'm not sure what they asked me."  (Ex. 14, Affidavit of Randall Howard at ¶ 8.)

88.    Howard also testified that when he appeared before the grand jury, he recognized two people, including one heavyset woman with red hair who he remembered he and Jamie had teased in school.  (Id. at ¶ 9.)

89.    Randall Howard also describes in detail how, as he sat in the hallway waiting to testify, he heard a bailiff tell someone else that Jamie was "gonna fry this time" because he had robbed two of the jurors' homes in the past.  (Id. at 12.)  According to Howard, the bailiff

C 2639

described one of the jurors as a "she." (Id.) Howard avers that he told one of Jamie's lawyers about this and the lawyer said he would take care of it, but the lawyer did not follow up. (Id. at ¶ 14.)

90.    Randall Howard also did not initially tell the police that Jamie Snow confessed to him. This evidence was not presented at Jamie's trial, but police reports exist that confirm that when the police first spoke to Howard, he talked about Jamie Snow but said nothing about Snow's involvement in this murder. (Ex. 14, April 11, 1991 Supplemental Case Report, at 2.)

### 4.    Bill Moffitt and Ronnie Wright received deals.

91.    Dennis Hendricks provided very limited testimony for Jamie Snow at trial. In a new affidavit, he explains that he tried to share additional relevant information with Jamie Snow's attorney, but was told that Jamie Snow's attorney wanted him to focus on another issue. (Ex. 4, Aff. of Dennis Hendricks, at ¶ 12.) His newly-obtained affidavit, however, makes clear that he had additional issues upon which he could have provided relevant information.

92.    According to this affidavit, Hendricks was locked up at Dixon Correctional Center for about 18 months, and during that time ran into Bill Moffitt, who he knew at Bloomington. (Id. at ¶ 4.) After they had spent some time together, Bill Moffitt told him that he had testified against Jamie Snow, and that "he got a time cut in exchange." (Id. at ¶¶ 5-6.) Hendricks had earlier heard that Palumbo and Wright also received deals. (Id. at ¶ 8.)

93.    Counsel believes that further evidence reflects the fact that Ed Palumbo and Ronnie Wright received consideration, but have no ability to obtain this information. Such information is in the possession of the Bloomington Police Department and McLean County State's Attorney's Office. This issue is the subject of Petitioner's accompanying motion for discovery.

C 2640

**5.    Steven Scheel was pressured to testify, and has recanted his testimony as false.**

94.    Steven Scheel testified at trial that Jamie Snow told him that he committed this crime, and he provided detailed testimony about seeing Jamie at a party and Jamie making inculpatory statements.

95.    In conversations with two separate investigators, Scheel has recanted that testimony and explained that this testimony was the product of police pressure. He also explains that certain of the testimony he gave was specifically coached by the prosecutor and police.

96.    In a recent interview with investigator Larry Biela, Scheel provided a detailed account of conversations with the police in this matter. (Ex. 15, Aff. of Larry Biela.) He stated that the police came to speak to him several times, first while he was in prison in Illinois, then when he paroled to North Carolina, and most recently at his home in Arkansas. (Id. at ¶¶ 8-17.) According to Biela's affidavit, Scheel told him that "he felt guilty because he knew that he was part of the reason that Jamie Snow has been serving all this time in prison for a crime of which he was innocent." (Id. at ¶ 6.) He also said that he gave that testimony because "the Bloomington Police and the McLean County State's Attorney pressured him to cooperate and he was afraid what would happen if he did not say what they wanted him to say." (Id.)

97.    In this conversation, Scheel also said that he felt pressure to tell the detectives what they wanted to hear because he was on parole, this parole could be revoked, and he "knew he wouldn't get out of the room with them unless he cooperated." (Id. at ¶¶ 14-15.) He finally agreed to testify because Detective Katz and Charles Reynard agreed to "stop harassing him" if he testified. (Id. at ¶ 17.)

C 2641

98.    Scheel told Biela that his trial testimony was coached, and that right before he

testified Katz and Reynard told him what clothes to say Jamie was wearing the night he

supposedly confessed to him – Scheel did not remember this detail.  (Id. at ¶ 19.)

99.    Scheel made clear to Biela that while he did talk briefly to Snow at a party at his

niece's house in 1990 or 1991, Jamie Snow never said anything to him about a gas station

robbery or Jamie Snow.  (Id. at ¶ 7.)

100.    What Scheel told Biela is in keeping with earlier admissions he made to

investigator Anthony Matens, who spoke with Scheel on September 1, 2005.  (Ex. 16, Aff. of

Anthony Matens, at ¶¶ 3, 7-8.)

101.    In fact, in the first contact that Scheel supposedly had with detectives back in

1991, Scheel purportedly stated that the information he might have relative to the case was that

Snow had told his cousin that he was involved in the Clark station shooting.  (Ex. 17, BPD Lead

Sheet, August 8, 1991.)

### 6.    Dan Tanasz has recanted his trial testimony.

102.    At trial, Dan Tanasz testified that he'd had conversations in Florida with Jamie in

which Jamie said he'd shot someone and that he couldn't return to Bloomington because he'd

been involved in a robbery.  Dan Tanasz has recently provided an affidavit, however, in which he

states that Jamie Snow never told him that he was involved in a murder or robbery.  (Ex. 18, Aff.

of Dan Tanasz, at ¶¶ 6, 16.)  He said that Jamie Snow did tell him that the police were accusing

him a of a robbery, but not that he had been in a robbery.  (Id. at ¶¶ 5-6.)  Further, Tanasz's

affidavit details the pressure put on him by detectives to testify against Jamie Snow.  He explains

that detectives who came to speak to him told him that Jamie Snow had shot his father, and that

someone else who was caught with drugs in Illinois and was trying to make a deal had told them

C 2642

that Dan Tanasz was present in a conversation about this crime. (Id. at ¶¶ 9-10.) Tanasz denied

this. (Id. at ¶ 11.)

103.    When Tanasz was called to testify, he said he did not understand why he was even

called because he did not feel he had relevant information. (Id. at ¶ 15.) As he was waiting to

testify, he was given a newspaper with an article about the trial on its headline. (Id. at ¶ 14.)

### 7.    Jody Winkler is not truthful.

104.    Dave Arison, who lived in Florida with Jamie Snow and knew him there for about

8 years, has submitted a sworn affidavit stating that he does not believe that Jamie Snow was

involved in Bill Little's murder. (Ex. 10, Aff. of Dave Arison at ¶¶ 2-4.) Arison confirms that

Jody Winkler was a person who lied often and who had a reputation for being a liar, and

someone who had a problem with crack. (Id. at ¶ 6.) When Jamie's attorney spoke to Arison

before trial, he did do more than just tell Arison what questions he was going to ask him and ask

him what he had discussed with the state – Jamie's attorneys did not do a more in-depth

interview to find out what else Arison knew. (Id. at ¶ 8.)[1]

105.    Further, Jody Winkler testified at trial that he had not received a deal in exchange

for his testimony. However, documents reflect that Jody Winkler was sentenced on a forgery

charge on January 28, 2000, and that on this date he received an agreed plea for this charge. (Ex.

20, Jody Winkler Sentencing Documents.) These documents further reflect that the sentence Mr.

Winkler was given was 4 years when he faced up to 10 years for this crime given his criminal

history. (Id.)

---

[1]75.    In addition, Dave Arison describes that the police came to speak to him in Florida
and pressured him into saying that Jamie Snow had confessed to him, which he had not. (Ex.
10, Arison Aff. at ¶ 7.)

29

C 2643

### 8.    Several sources discredit Karen Strong.

106.    Mark McCown testified at Jamie Snow's trial, denying that he ever spoke with Karen Strong about the Little murder or that Jamie ever confessed to him.  However, he has also submitted a new affidavit in which he presents evidence that Karen Strong had a cocaine arrest at the time of this trial and that her then-boyfriend also had legal troubles, and that her testimony was part of "working off" this arrest.  (Ex. 22, Aff. of Mark McCown at ¶ 5.)  He explains that Karen Strong did not get along with Tammy Snow, Jamie Snow's then-wife, and that Karen Strong had a physical altercation with Tammy Snow in 1989.  (Id. at ¶ 13.)  Jamie Snow's attorney never asked Mark if he knew why Karen Strong would present false evidence against Jamie.  (Id. at ¶ 14.)

107.    Mark McCown also avers that while he was locked up he was visited several times by Dan Katz and he, "got the feeling [Katz] was trying to coax me to agreeing with his version of the facts even though that wasn't true.  He was trying to get me to say what he wanted me to say."  (Id. at ¶¶ 6-8.)

108.    Like other witnesses who knew Jamie, Mark McCown states that Jamie never told him anything about being involved in this crime, and that he believes he would have heard something if Jamie Snow were telling people he did this.  (Id. at ¶ 12.)

109.    In addition to Mark McCown's knowledge that refutes Karen Strong's testimony, Mark Huffington has also presented an affidavit that rebuts her testimony.  Mark Huffington grew up with Karen Strong, and they called each other brother and sister.  (Ex. 23, Aff. of Mark Huffington, at ¶ 2.)  He and Strong had several conversations about Jamie Snow's case in 1995, 1996, and again in 1999.  (Id. at ¶ 4.)

C 2644

110.    Mark Huffington's affidavit states that Karen told him that the night Bill Little was killed, Mark McCown woke her up when he got home.  She told Huffington that this was all she knew about the case, and that she and Mark McCown had not talked that night.  (Id. at ¶ 5.)

111.    Mark Huffington was also incarcerated with several people who had information about this case, including Garren Bradford, Rick Bradford and Travis Gaddis.  All three told them that Bloomington detectives had come and talked to them about Jamie Snow's case and told them if they testified against Jamie Snow they could "be out tomorrow."  (Id. at ¶¶ 8-9.) Jamie Snow's attorney never came to talk to him about this or any other aspect of Jamie Snow's case.  (Id. at ¶ 10.)

### 9.    Bill Moffitt's testimony is contradicted by his earlier interviews with police.

112.    Bill Moffitt testified at trial to specific statements that Jamie Snow supposedly made to him during their first and only night as cellmates in Joliet Correctional Center. However, these statements are directly contradicted by his earlier interviews with the Bloomington Police Department, in which he gave different versions of this supposed conversation.  (Group Ex. 32, Police Reports Relating to Bruce Moffitt.)  Specifically, in his other interviews with the police Moffitt initially stated that other than that first conversation, he and Snow never discussed this again, but in his second conversation he said they discussed it "numerous times."  (Id.)  Moffitt also said, in response to how many times they spoke, "Yeah, yeah I mean it didn't, I, that was just me fishin you know I don't know if I knew in the future this was gonna happen or whatever or me just reward money happy and, and but yeah we talked several times over it."  (Id.)

31

C 2645

**10.    Bruce Roland denied on the stand receiving a deal, when in fact he did.**

113.    In his testimony in this case claiming that Jamie Snow had confessed to him, Bruce Roland stated that he came forward because his attorney advised him to come forward, and not because he was given any promises or guarantees in exchange.  (R. 89-90.)  However, police reports related to Bruce Roland clearly reflect that Charles Reynard, through the Bloomington Police, advised Roland that "his office had a history of taking the persons [*sic*] cooperating into consideration at sentencing time."  (Group Ex. 23, December 1, 1999 Narrative Report, at 1.)  Anthony Matens had a conversation with Roland's attorney that confirmed that this conversation took place.  (Group Ex. 23, Matens Memorandum at 1.)

114.    A review of Roland's criminal history demonstrates that at the time of trial he had several pending felony convictions on which he seemingly received light sentences and special considerations, such as bond, a favorable deal that ignored his multiple charges, and permission to leave the State of Illinois.  (Group Ex. 23, Roland Case Documents.)

115.    Counsel is without resources to present further evidence concerning consideration and deals Bruce Roland received in exchange for his testimony, but believes such evidence is in the custody of the McLean County State's Attorney's Office.  This issue is the subject of Mr. Snow's motion for discovery in this case.

**11.    Likewise, Kevin Schaal falsely denied receiving a deal.**

116.    Similarly, Kevin Schaal, who was sentenced for a federal crime in Florida before testifying at Mr. Snow's trial, testified on the stand that he had no idea whether the judge took his cooperation into consideration.  (R. 64.)

117.    Sentencing documents from Mr. Schaal's conviction, however, show that on July 19, 2000, prosecutors filed a motion for downward departure in Mr. Schaal's case specifically

C 2646

requesting a reduction in sentence because "the defendant has provided information valuable to the murder trial and has agreed to testify in that trial if called upon to do so." (Group Exhibit 24, United States Motion for Downward Departure from Sentencing Guidelines, United States v. Schaal, Case No. 3:00-cr-103-J-25C, at 1 (July 19, 2000).)  The docket sheet in Mr. Schaal's case specifically reflects that on July 24, 2000, the court orally granted this motion "to recognize defendant's substantial assistance pursuant to Rule 5k1.1." (Group Ex. 24, Docket Sheet, United States v. Schaal, Case No. 3:00-cr-103-J-25C.)

> ### 12.    Mary Jane Burns is impeached by her statement to the police and by the affidavit of Darren Smart.

118.    Police reports exist discrediting Mary Jane Burns' testimony.  She testified that she and Jamie Snow had a conversation in the county jail in which he made inculpatory statements to her.  However, in an interview with the police just a few weeks before her testimony, she stated clearly that the conversation she had with Jamie in which he purportedly made these comments was with Jamie and two other inmates.  (Ex. 25, Statement of Mary Burns, at 6-7.)

119.    One of the other inmates she identified in this interview, however, has submitted an affidavit absolutely refuting this testimony, and stating that he told detectives as much when they came to see him at Pontiac Correctional Center before Jamie Snow's trial.  (Ex. 31, Aff. of Darren Smart.)

> ### 13.    Testimony about Jamie Snow's purported inculpatory statements to the police is contradicted by police reports.

120.    Detectives Russell Thomas and Mike Bernardini testified about comments Jamie Snow purportedly made to them after he was arrested on April 24, 1991, and implied in their testimony that these comments related to Bill Little's murder.  Snow was actually arrested on this date for an unrelated crime, however.  In grand jury testimony, Detective Russell Thomas made

C 2647

this clear, and testified about those comments as specifically applying this unrelated crime. (Ex. 26, Grand Jury testimony of Russell Thomas.)

**D.    Since Jamie Snow's Conviction, New Evidence Has Been Uncovered of a Pattern of Misconduct by the McLean County State's Attorney's Office and the Bloomington Police Department**

121.    In the time since Jamie Snow was convicted, new evidence has surfaced demonstrating a pattern of misconduct by the McLean County State's Attorney's Office and the Bloomington Police Department.  Specifically, in two recent post-conviction cases from Bloomington, Illinois courts have found that exculpatory evidence was withheld from McLean County defendants, and on that basis have reversed convictions and granted those defendants new trials.

122.    In People v. Beaman, Case No. 94 CF 476, the Illinois Supreme Court found that Alan Beaman's constitutional rights were violated when prosecutors from the Office of the McLean County State's Attorney failed to disclose exculpatory evidence that a "Doe" suspect was a viable alternative suspect.  (Group Ex. 27, People v. Beaman, 229 Ill.2d 56, 890 N.E.2d 500 (Ill. 2008).)  Alan Beaman was granted a new trial and was not re-prosecuted for this crime. Charles Reynard, the same State's attorney who prosecuted Jamie Snow's case, was involved in the prosecution of Alan Beaman's case as well.

123.    In People v. Drew, Case No. 98 CF 790, the circuit court and appellate court found that Eric Drew's constitutional rights were violated when prosecutors failed to disclose the full extent of consideration and assistance with other criminal cases that the key witness in his case had received from the McLean County State's Attorney and the Bloomington Police Department, specifically Detective Dan Katz.  (Group Ex. 28, People v. Drew, Case No. 4-08-0011, Order at 27-28 (4th Dist. Dec. 4, 2008).)  The court in that case found the state's attorney involved in the case and Detective Dan Katz were both "incredible" in their denials that

C 2648

undisclosed benefits were provided.  (Id. at 17.)  The court also found the main witness credible

when he claimed that both the State's Attorney and Detective Katz "urged him to lie about the

events surround [the] shooting."  (Id. at 22.)  Mr. Drew was also granted a new trial and was

recently released from prison after entering a plea deal with the State.

### E.   Jamie Snow's Trial Counsel, Frank Picl, Has a Demonstrated Record of Problems Which Rendered His Counsel Ineffective

124.   At trial Jamie Snow was represented both by Frank Picl and by G. Patrick Riley,

although Mr. Riley suffered a stroke that limited his ability to speak during trial.  There can be no

dispute that Frank Picl played a lead role in Jamie Snow's trial.  Unfortunately, new evidence has

come to light since Mr. Snow's conviction that at the time Mr. Picl represented Mr. Snow, he

was beset by personal problems which impacted his ability to effectively represent Mr. Snow.

These problems resulted in his felony conviction in 2006 for acts related to the representation of

a client, and his voluntary disbarment.  A review of publicly-available discipline records from the

ARDC also demonstrates that Mr. Picl received several other sanctions for problems related to

client representation during the time period that Mr. Picl represented Mr. Snow, including failure

to file appellate documents for clients.  (Group Ex. 29, ARDC Documents Related to Frank Picl.)

125.   The felony charges which contributed to Mr. Picl's voluntary disbarment occurred

a few years after his representation of Mr. Snow, but Mr. Picl pled guilty but mentally ill to these

charges.

126.   The documents related to the charges against Mr. Picl in that case, as well as the

documents pertaining to his attorney discipline during the relevant time period are not publicly

available, and therefore Mr. Snow has not attached them to this petition.  These documents,

however, would support Mr. Snow's claim that Mr. Picl was ineffective in his representation, and

are the subject of Mr. Snow's accompanying motion for discovery.

C 2649

## LEGAL CLAIMS

## I. ACTUAL INNOCENCE

**Jamie Snow's Conviction and His Continued Detention Violate the Right to Due Process of Law Because Newly Discovered Evidence Proves His Innocence**

127.    Petitioner re-alleges every paragraph of this petition and expressly incorporates them as if they were fully set forth herein.

128.    Jamie Snow is actually innocent of the crime for which he was convicted.  It is well-established that Illinois has no interest in wrongfully incarcerating innocent persons.  Procedurally, "doing so would be fundamentally unfair." People v. Washington, 171 Ill.2d 475, 487, 665 N.E.2d 1330, 1336 (1996); see also U.S. Const. amends. V, XIV.  Substantively, imprisoning the innocent would be "so conscience shocking as to trigger the operation of substantive due process." Washington, 171 Ill.2d at 487-88, 665 N.E.2d at 1336; see also U.S. Const. amends. V, XIV.

129.    Thus, a defendant who is actually innocent of the offense for which he stands convicted may bring a free standing claim of actual innocence, seeking reversal of his conviction.  To prevail, the defendant must present supporting evidence, which is new, material, and non-cumulative, and which would probably change the result on retrial. Washington, 171 Ill.2d at 489, 665 N.E.2d at 1336.  Jamie Snow is coming forward with evidence of that character here.

130.    Since his trial, Jamie Snow has uncovered substantial new evidence to support his claim of innocence.  This includes new testimony from the first responding officer to the scene about what he saw there, testimony that is corroborated by radio tapes of the police response, affidavits from numerous witnesses recanting their trial testimony and stating that Jamie Snow did not make inculpatory statements to them, an affidavit from a purported eyewitness who identified Jamie Snow in a lineup stating that he cannot be sure if he saw Jamie Snow at the

36

C 2650

scene, and newly-discovered evidence of a pattern of misconduct by law enforcement in Bloomington in directing witnesses to falsely testify in an effort to assist in prosecuting defendants.

131.    Two types of evidence convicted Jamie Snow: statements from purported eyewitnesses that they saw him or someone matching his description leaving the gas station, and statements from people claiming that Jamie made inculpatory statements to them.  The new evidence Jamie Snow has collected and presents in this petition eviscerates both types of evidence, and leaves the state with no credible evidence to connect him to this crime.

### A.    No Credible Witness Saw Jamie Snow At the Scene

132.    At trial, the state made much of Danny Martinez's trial identification of Jamie Snow.  It was compelling, dramatic testimony that Jamie Snow's eyes were unforgettable.  (Vol. X, R. 174-76, 179-82.)  It made it seem as though Jamie Snow had burned an indelible image into Martinez's brain, and bolstered Martinez's identification of Jamie that much more.  The state made use of this in closing, and one juror said afterward that this was critical evidence in the jury's decisionmaking.  (C. 731.)

133.    What the new evidence Jamie Snow has now obtained makes clear, however, is that this is completely wrong.  It is Jeffery Pelo and Paul Williams who should be believed when they say that after arriving at the scene, they did not see anyone leaving the gas station.  Jeffery Pelo's affidavit establishes that Danny Martinez did not see Jamie Snow outside the gas station.  (Ex. 1, Pelo Aff. at ¶ 17.)  This is supported by Carlos Luna's new affidavit that he is not sure if Jamie Snow was the person he saw from 200 feet away, and that he only identified Jamie because "as a 14 year old, he believed that the police had caught the right person."  (Ex. 30, Luna Aff. at ¶ 13.)  His affidavit completely backs away from his trial testimony.  Gutierrez, the third eyewitness, never gave a description that really matched Jamie Snow – the circumstances and

37

details were off, and he is the only person to say that the person he saw had any type of chin scar. (Vol. XIII, R. 15-19, 30, 112, 115.) Gutierrez also never came close to identifying Jamie Snow after looking at pictures and a lineup. (Vol. XIII, R. 9-24, 32, 36-37.) Like Martinez, he actually identified someone else. (Group. Ex. 7, April 1, 1991 Supplemental Case Report.)

134.    Jeffery Pelo's affidavit contradicts Martinez's testimony in almost every respect. Martinez could not have come face to face with Jamie Snow outside in that parking lot. He was not asked to leave the parking lot by Jeffery Pelo. He was not asked to go home. He did not go immediately home – he drove west, away from his residence, down Empire. He was not on the scene when Jeffery Pelo asked the other car to move away from the gas station. (Ex. 1, Pelo Aff.)

135.    This discrediting of Martinez should be considered in light of the fact that Martinez had multiple opportunities in the months after this crime to identify Jamie Snow as the person he claimed he saw in the parking lot. He viewed mug books. He viewed suspect books. He viewed a lineup in which Jamie Snow was present. (Group Ex. 7.) And it shouldn't have been hard for him to identify Jamie Snow – they were childhood acquaintances and played sports together. (Ex. 3, W. Hendricks Aff. at ¶¶ 4-5; Ex. 4, D. Hendricks Aff. at ¶¶ 10-11.) And yet, with all these opportunities, he claims that it didn't "click" for him that Jamie Snow was the person until he read the Pantagraph years later and saw Jamie Snow's picture in the paper and read about his arrest.

136.    This is particularly unbelievable given that, in the months after this crime, Danny Martinez told two other childhood friends, William Hendricks and Dennis Hendricks, that Jamie did not do this crime and that he was not the person that he saw. (Ex. 3, W. Hendricks Aff. at ¶¶ 6-10; Ex. 4, D. Hendricks Aff. at ¶¶ 10-11.)

C 2652

137.    Martinez's testimony is not backed up by much else, but Jeffery Pelo's account is back up by other neutral, objective evidence – the newly-obtained police radio tapes (Ex. 2), prior testimony of Paul Williams (Ex. 6), and prior statements of Danny Martinez to the police. (Group Ex. 7.)

138.    In total, this new evidence establishes that Jamie Snow did not walk out of that gas station while Martinez, Williams and Pelo were outside.  That the jury believed that he did was the primary reason for his conviction.  This new evidence is therefore material, non-cumulative, and would have changed the result on retrial.

**B.    The Inculpatory Statements Presented Against Jamie Snow Were Largely the Result of Pressure and Deals**

139.    The state's case against Jamie Snow succeeded in part because it appeared to include a litany of friends and acquaintances of Jamie Snow who were willing to come to court, without pressure and without incentive, to testify that Jamie Snow had confessed some aspect of his involvement to these individuals.  However, the new evidence that Jamie Snow has collected shows that this litany can be explained: the prosecutor and police were offering deals to people, and pressuring others with consequences for failing to testify.  This new evidence of coercion supports Jamie Snow's claim of actual innocence.

140.    The new evidence Jamie has collected demonstrates that the following witnesses received deals in exchange for testifying:

- **Ed Palumbo.**  Dennis Hendricks averred that he Palumbo received a deal (Ex. 4, D. Hendricks Aff. at ¶ 8), and Palumbo himself at least admits that when he testified he was "trying to get a deal for myself" and that Reynard had promised him consideration.  (Ex. 10, Palumbo Aff. at ¶¶ 7, 9.)

- **Kevin Schaal.**  Kevin Schaal claimed on the stand that he had no idea whether he'd received a deal in exchange for his testimony, but the records of his federal criminal case in Florida demonstrate that he received a downward departure by federal prosecutors in exchange for providing information "valuable to the murder trial" in Illinois and for agreeing to

39

C 2653

testify if called to do so in the future.  (Group Ex. 24, Filings in <u>United States v. Schaal</u>, Case No. 3:00-CR-103-J-25C.)

- **Bruce Roland.**  Although he denied on the stand that he received a deal, interviews with his counsel and police reports reflect that Reynard advised Roland that cooperation is "taken into consideration" at sentencing. (Group Ex. 23, Roland Case Documents.)

- **Bill Moffitt.**  Dennis Hendricks saw him at Dixon Correctional Center, and Moffitt admitted to him that he got a "time cut" in exchange.  (Ex. 4, D. Hendricks Aff. at ¶ 7.)  In police reports he also implies that he is seeking reward money in exchange for his testimony.  (Ex. 32, Police Reports Related to Bill Moffitt.)

- **Ronnie Wright.**  Dennis Hendricks also heard that he received a deal. (Ex. 4, D. Hendricks Aff. at ¶ 7.)

- **Karen Strong.**  Evidence suggests that Strong's testimony was part of her "working off" an arrest.  (Ex. 21, McCown Aff. at ¶ 5.)

- Mark Huffington explains that Garren Bradford, Rick Bradford, and Travis Gaddis all told him that Bloomington detectives had come and talked to them and told them that if they testified against Jamie Snow they could "be out tomorrow."  (Ex. 23, Huffington Aff. at ¶¶ 8-9.)

- In addition, Dan Tanasz avers that when detectives came to talk to him about testifying, they told him that someone who was caught with drugs in Illinois and who "was trying to make a deal" had implicated Jamie in this crime.  (Ex. 18, Tanasz Aff. at ¶¶ 9-10.)

141.    The new evidence Jamie has collected demonstrates that the follow witnesses were pressured or threatened, or felt pressured or threatened, and that this affected their testimony:

- **Ed Palumbo** avers that the BPD and state's attorney told him that "if I didn't testify I would be put in segregation in prison, be charged with perjury, or get five years in prison for not cooperating."  (Ex. 10, Palumbo Aff. at ¶ 5.)

- **Steve Scheel** told Larry Biela that after being contacted by detectives numerous times, being put in segregation while incarcerated as a result of the Bloomington investigation, and feeling as though "he wouldn't get out of the room with them unless he cooperated," he finally agreed to testify so that law enforcement and prosecutors would "stop harassing him."  (Ex. 15, Biela Aff. at ¶¶ 6, 14-15, 17.)

C 2654

- **Randy Howard** states that Bloomington detectives showed up at his home very early in the morning before he appeared at the grand jury, and he "answered yes to their questions to get them out of the door. It was really early in the morning and I was sick of them." (Ex. 14, Howard Aff. at ¶ 8.)

- **Mark McCown** was visited several times by Detective Katz while incarcerated and "got the feeling [Katz] was trying to coax me to agreeing with his version of the facts even though that wasn't true. He was trying to get me to say what he wanted me to say." (Ex. 22, McCown Aff. at ¶¶ 6-8.)

- **Dave Arison**, who did not testify about this issue, describes in his affidavit how police came to speak with him in Florida and pressured him to say that Jamie Snow confessed to him, when this was untrue. (Ex. 10, Arison Aff. at ¶ 7.)

- **Danny Martinez**, who told Billy Hendricks that Mrs. Little had visited his home, and expressed concern to the police that they'd given Mrs. Little his telephone number. (Ex. 3, W. Hendricks Aff. at ¶ 16; Group Ex. 7, Transcript of March 4, 1999 interview at 14.)

142.    Particularly given the lack of solid evidence connecting Jamie Snow to this crime, this evidence is material, non-cumulative, and would have changed the result on retrial. The jury heard this list of witnesses and must have concluded in part that the sheer number of these individuals suggested there was some truth in the argument that Jamie Snow had confessed involvement and was actually involved. For this reason, each person who received a deal or was threatened is critical to showing that all of these purported confessions were false. The number of people who were given deals or pressured also suggests that those witnesses for whom Mr. Snow does not now have evidence suggesting that their testimony was tainted are also questionable, because of the *modus operandi* of law enforcement and prosecutors in making this case against him.

41

C 2655

### C.   The Pattern of Misconduct By The Bloomington Police Department and McLean County State's Attorney's Office

143.   As described above, several witnesses in this case only testified after pressure from Detective Katz or prosecutors. Detective Katz testified in this case about portions of his investigation.  Newly-discovered evidence of a pattern of misconduct by both these agencies supports the claims of witnesses in this case that they were threatened or pressured.

144.   As other courts have held, pattern evidence of this type, even evidence of only one other instance of misconduct, is relevant to show *modus operandi*, intent, plan, motive, or to impeach a witness' credibility, see People v. Banks, 192 Ill. App.3d 986, 994, 549 N.E.2d 766, 771-72 (1st Dist. 1989).

145.   Here, there is such evidence.  As described above, in People v. Drew the circuit and appellate courts specifically found that Detective Dan Katz and others failed to disclose the full of extent of consideration and assistance provided to the key witness in Eric Drew's case.  (Group Ex. 28, Orders and Pleadings from People v. Drew, Case No. 98 CF 790.)  The circuit court specifically credited the testimony of that witness over Detective Katz's denials that he "urged" that witness to lie about the circumstances of the shooting at issue in that case.  (Group Ex. 28, People v. Drew, Case No. 4-08-0011, Order at 22 (4th Dist. Dec. 4, 2008).)

146.   In addition, in People v. Beaman, the Illinois Supreme Court found that Alan Beaman's constitutional rights were violated when prosecutors from the Office of the McLean County State's Attorney failed to disclose exculpatory evidence that a "Doe" suspect was a viable alternative suspect.  (Group Ex. 27, People v. Beaman, 229 Ill.2d 56, 890 N.E.2d 500 (Ill. 2008).)

C 2656

### D.    Reynard Himself Told a Witness that Jamie Snow Was Innocent

147.    In his new affidavit, Ed Palumbo also says that after he testified against Jamie, prosecutor Charles Reynard told him that Jamie hadn't done this, someone else had, but "since they couldn't get that other person Jamie would have to do." (Ex. 9, Palumbo Aff. at ¶ 8.) If the prosecutor over this case was willing to acknowledge to a witness that Jamie was innocent, the basis for his knowledge, which is the subject of the accompanying motion for discovery, would be material to establishing Jamie Snow's innocence.

148.    Reynard's comment to Palumbo comports with the views of many of the witnesses in this case, even witnesses who originally provided testimony that was used to convict Jamie Snow. These witnesses all make clear that they believe Jamie Snow to be innocent. (Ex. 4, D. Hendricks Aff, at ¶ 13 ("I don't think that Jamie Snow did this. I know him from growing up and this isn't something he would have done."); Ex. 9, Palumbo Aff. at ¶ 9 ("I don't believe Jamie did this crime. He is not a killer."); Ex. 11, Roberts Aff. at ¶ 11 ("To this day, I don't think he could have done this. That is not the type of person that I saw."); Ex. 15, Biela Aff. at ¶ 15 (reflecting that Steve Scheel told him that he "didn't believe that Jamie had anything to do with this crime."); Ex. 19, Arison Aff. at ¶ 19 ("I do not believe Jamie was involved in Bill Little's murder. I do not believe he was that type of person.").)

### E.    The Newly Discovered Evidence Presented Above Demonstrates Snow's Actual Innocence

149.    Individually and taken together, along with all of the evidence presented at Jamie Snow's trial, the evidence presented above demonstrates that Jamie Snow is actually innocent of the crime for which he was convicted.

150.    This evidence is new, material, and non-cumulative.

C 2657

151.    For these reasons, Jamie Snow should be granted a new trial or, in the alternative, an evidentiary hearing at which he can prove his claims.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

### 6TH AND 14TH AMENDMENTS - U.S. CONSTITUTION
### ARTICLE 1, SECTION 8 - ILLINOIS CONSTITUTION

**Jamie Snow's Attorneys' Performance Violated His Constitutional Right to Counsel**

152.    Petitioner re-alleges every paragraph of this petition and expressly incorporates them as if they were fully set forth herein.

153.    The Sixth and Fourteenth Amendments to the U.S. Constitution guarantee a person accused of a crime the right to counsel, as does Article I, Section 8 of the Illinois Constitution of 1970. U.S. Const. amend. VI & XIV; Ill. Const. 1970, art. I, sec. 8. This right to counsel is a fundamental right aimed at protecting the right to a fair trial, and it includes the right to effective representation. Strickland v. Washington, 466 U.S. 688 (1984); People v. Perez, 148 Ill.2d 168, 592 N.E.2d 984 (1992).

154.    To show ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that the result of the proceedings would have been different absent counsel's errors. Strickland, 466 U.S. at 687; People v. Weir, 111 Ill.2d 334, 337, 490 N.E.2d 1, 2 (1986).

155.    Here, counsel's performance fell far below that threshold in numerous ways. Simply put, Jamie Snow's counsel could have investigated and presented evidence that would have exposed some of the misconduct in this case, challenged improper evidence, and effectively impeached questionable witnesses presented by the state. They inexplicably failed to do so. In the face of his counsel's ineffectiveness, he had no opportunity to combat the state's weak evidence.

C 2658

156.    Some of the evidence that Mr. Snow presents in this petition in support of his other claims is evidence that he gleaned from reviewing the discovery in this case, and from speaking with known witnesses. In some instances, this is information that his trial counsel, had they conducted meaningful investigation into his case, might have obtained and should have used to support Mr. Snow's defense.

157.    Counsel failed to use Jeffery Pelo's interview transcript, the police reports concerning Danny Martinez, and testimony from Dennis Hendricks and William Hendricks as guides to elicit testimony from Pelo and to discredit Martinez's testimony about what happened in front of the gas station. (Exs. 1, 5 & 7.)

158.    Counsel failed to subpoena the police radio tapes, which support Pelo's version of events and which, considered with Pelo and Williams' testimony, establish that Martinez's testimony is incredible. (Exs. 1, 2, 5, & 6.)

159.    Counsel failed to call Thomas Sanders, whose testimony was readily available from Susan Claycomb's trial, to demonstrate that Carlos Luna's "identification" of Jamie Snow was completely weak. (Ex. 8.)

160.    Counsel failed to speak to Steve Scheel, who told Larry Biela that had counsel spoken to him in advance, would have exposed the reasons for his testimony. (Ex. 15, Biela Aff. at ¶ 20.)

161.    Given the information in the police reports concerning how Danny Martinez finally came to identify Jamie Snow, counsel was ineffective for failing to file a motion to suppress arguing that his identification was unreliable and the product of inherently suggestive tactics.

162.    Counsel failed to investigate the report from Randall Howard that someone on the jury knew Jamie Snow and had a reason to have animus against him. (Ex. 13, ¶¶ 12-15.)

163.    Counsel failed to investigate Karen Strong's reasons for providing false testimony against Jamie Snow.

C 2659

164.     Counsel failed to investigate available evidence that witnesses in this case received deals in exchange for their testimony, and to use that evidence to impeach those witnesses. Counsel further failed to ask for and develop evidence that would impeach witnesses who claimed Jamie Snow confessed to them while they were incarcerated together

165.     Counsel failed to investigate and present evidence that Dawn Roberts' testimony about toasts was flawed, and that the only toasting Jamie Snow did to any "Billy" was a respectful toasting for Tina McWhorter's brother Billy who had died shortly before.

166.     Counsel failed to use the testimony of Charlie Crowe to impeach Martinez by exposing how many other people he'd identified for this crime, and clearly explaining that when given the perfect opportunity to identify Mr. Snow as the person he claimed he saw, he was unable to do so.

167.     Counsel failed to expose evidence that the victim's mother had been contacting the key witness in this case, Danny Martinez, possibly at the behest, direction, or with the consent of the Bloomington Police Department.

168.     Counsel failed to use available discovery to impeach testimony by Detectives Thomas and Bernardini who falsely implied at Jamie's trial that he had admitted some involvement in this crime.

169.     Counsel failed to investigate and present evidence from Darren Smart impeaching Mary Jane Burns.

170.     These claims of ineffectiveness are supported by the documents included in Group Exhibit 29, which show that Frank Picl, who because of health issues for G. Frank Riley, had major responsibility over Jamie Snow's trial, developed a repeating pattern of misconduct in other cases around this same time, and was shortly thereafter disbarred for major misconduct.

C 2660

171.    Finally, to the extent any of the new evidence included in this petition was known or could have been known to counsel, then counsel was ineffective for failing to use it, because such evidence supports Jamie Snow's innocence.

172.    Individually and cumulatively, these instances of ineffectiveness prejudiced Mr. Snow and denied him his constitutional right to counsel.  These actions cannot be attributed to trial strategy.  Jamie Snow is therefore entitled to a new trial, or in the alternative, an evidentiary hearing where he can further prove this claim.

### III.  DUE PROCESS VIOLATION
### 5TH AND 14TH AMENDMENTS - U.S. CONSTITUTION
### ARTICLE 1, SECTIONS 2 AND 8 - ILLINOIS CONSTITUTION

**The Prosecution Violated Jamie Snow's Right to Due Process By Withholding Exculpatory Evidence**

173.    Petitioner re-alleges every paragraph of this petition and expressly incorporates them as if they were fully set forth herein.

174.    It is well-settled that the prosecution has a duty to disclose evidence that is materially favorable to a criminal defendant; the failure to do so violates due process.  Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 154-55 (1972).  "Materially favorable" evidence not only includes exculpatory evidence, but also evidence that is impeaching of a prosecution witness. U.S. v. Bagley, 473 U.S. 667, 676 (1985). Evidence tending to demonstrate the lack of credibility of a prosecution witness is material, especially where the prosecution's case depends on the credibility of that witness. Giglio, 405 U.S. at 154-55 (1972).  In Jamie Snow's case, credibility was the key issue for each and every prosecution witness.

47

C 2661

175.    The standard on review is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 434 (1995) (quoting Bagley, 473 U.S. at 682). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id.

176.    In Jamie Snow's case, given the pervasive Brady violations that are apparent from the evidence that Jamie Snow has presented in this petition, the weakness of the State's case, and the fact that each and every prosecution witness played an important role in the state's case, these violations, individually and collectively, render his verdict unworthy of confidence. There is more than a reasonable probability that, had this evidence been disclosed, the outcome of Mr. Snow's trial would have been different.

177.    First, and most critically, Jeffery Pelo shared with the prosecutor and police his belief that "no one could have left the gas station while I was on the scene." (Ex. 1, Pelo Aff. at ¶ 25.) Instead of disclosing this information to the defense, the prosecutor "implied that she wanted me to say the opposite." (Id.) She carefully did not instruct Pelo to lie, but she did not affirmatively disclose this critical piece of Brady evidence either.

178.    The prosecution and police also provided affirmative details to other witnesses without disclosing that they were the source of this testimony. For example, Steve Scheel admitted to Larry Biela that when he came to trial to testify, he had no idea what clothes Jamie had been wearing at the party he'd attended with him in 1990 or 1991 when Jamie supposedly confessed. Rather than disclose that Scheel didn't know this detail, Katz and Reynard told

48

Scheel what clothes to say Jamie was wearing. (Ex. 15, Scheel Aff. at ¶ 19.) They did not disclose this prompting to the defense.

179.    As described in Claim I above, Mr. Snow's claim of actual innocence, numerous witnesses in this case were given deals or were pressured to testify. These deals and threats were not disclosed to the defense. In fact, the state allowed to go uncorrected specific testimony from witnesses who denied that they had received consideration, including Jody Winkler, Bruce Roland, and Kevin Schaal, and failed to disclose that their *modus operandi* in this case was visiting witnesses and offering deals in exchange for testimony.

180.    Prosecutors failed to disclose that they had come to Darren Smart to confirm Mary Jane Burns' story, and he had instead discredited her story. (Ex. 31, Smart Aff.)

181.    Charles Reynard related to Ed Palumbo that he knew that Jamie Snow was innocent, but prosecuted him anyway because he could not charge the true perpetrator. He failed to disclose this to defense.

182.    With respect to Claim II of this petition, that counsel was ineffective, to the extent that counsel could not know about any of this evidence in order to make use of it during Mr. Snow's trial, the prosecution violated Jamie Snow's right to due process by failing to disclose it.

183.    In light of the State's failure to turn over this material evidence, Jamie Snow is entitled to a new trial, or in the alternative, an evidentiary hearing at which he can prove his claim.

C 2663

## IV.  DUE PROCESS VIOLATION
## 5TH AND 14TH AMENDMENTS - U.S. CONSTITUTION
## ARTICLE 1, SECTIONS 2 AND 8 - ILLINOIS CONSTITUTION

**Jamie Snow's right to due process was violated by the jury's consideration of extraneous information, namely jurors' belief that Jamie Snow committed a crime against those jurors in the past.**

184.    Petitioner re-alleges every paragraph of this petition and expressly incorporates them as if they were fully set forth herein.

185.    A defendant's right to due process is violated when the jury considers extraneous information that the defendant does not have an opportunity to challenge or confront. People v. Holmes, 69 Ill.2d 507, 372 N.E.2d 656 (1978).

186.    Based on the affidavit of Randall Howard, in which he states that he learned from a bailiff that Jamie was "gonna fry" because of the jurors' belief that Jamie had committed a crime against them in the past, extraneous information may have been known by the jury in Jamie Snow's case and may have impacted their deliberations and consideration of Jamie's case. (Ex. 13, Howard Aff. at ¶ 12.)

187.    As described more fully above, Jamie Snow does not have additional resources to investigate whether the jurors had this belief and what impact this had on their deliberations. This is the subject of Mr. Snow's accompanying motion for discovery.  However, Mr. Snow believes that this discovery would establish that his jury considered outside information as part of their deliberations and that this information, regardless of the veracity of the jury's belief, denied him the right to due process.

188.    In light of this extraneous information being believed by the jury, Jamie Snow is entitled to a new trial, or in the alternative, an evidentiary hearing at which he can prove his claim.

C 2664

## V. DUE PROCESS VIOLATION
### 5TH AND 14TH AMENDMENTS - U.S. CONSTITUTION
### ARTICLE 1, SECTIONS 2 AND 8 - ILLINOIS CONSTITUTION

**Jamie Snow's right to due process was violated by the admission of Danny Martinez's unreliable identification.**

189.    Petitioner re-alleges every paragraph of this petition and expressly incorporates them as if they were fully set forth herein.

190.    The admission of inherently unreliable and suggestive identification evidence denies a defendant the right to due process. See, e.g., People v. Rodriguez, 387 Ill.App.3d 812, 829, 901 N.E.2d 927, 943 (1st Dist. 2008).

191.    Here, the admission of Danny Martinez's identification of Jamie Snow was such a due process violation. As described above, Danny Martinez ultimately identified Jamie Snow only a short time before trial. He failed to identify Jamie on numerous occasions in the past, in lineups, photo books, and mug shot books. He was finally able to identify Snow only after seeing his picture in the paper in an article recounting that Snow was arrested for this crime. He was only able to identify him after knowing that he was being called to testify in Jamie Snow's trial on these charges, and after being called to come to prepare for that testimony. These circumstances are incredibly suggestive. In fact, it is difficult to think of a more suggestive and less reliable identification procedure.

192.    Moreover, because of the importance of Martinez's testimony in Jamie's case, and because he was the only witness who really connected Snow to the scene, the admission of this evidence was highly prejudicial to Jamie, and impacted the outcome of his trial.

193.    In light of the admission of this evidence, Jamie Snow is entitled to a new trial, or in the alternative, an evidentiary hearing at which he can prove his claim.

C 2665

## CLAIM VI
### 6ᵀᴴ AND 14ᵀᴴ AMENDMENTS - U.S. CONSTITUTION
### ARTICLE 1, SECTION 8 - ILLINOIS CONSTITUTION
### ILLINOIS SUPREME COURT RULE 651(C)

**To the Extent That Any of the Claims Asserted Herein or in Jamie Snow''s *Pro Se* Post-Conviction Petition Are Deemed Waived for Failure to Present Them Previously, Snow Received Ineffective Appellate Counsel and Fundamental Fairness Requires Their Review Here**

194.    Petitioner re-alleges every paragraph of this petition and expressly incorporates them as if they were fully set forth herein.

195.    To the extent that any of the claims asserted herein are deemed waived for failure to present them on direct appeal, Snow received ineffective appellate counsel. The Strickland standard for ineffectiveness of trial counsel applies equally to claims of ineffective assistance of appellate counsel. See, e.g., People v. Makiel, 358 Ill.App.3d 102, 112, 830 N.E.2d 731, 743 (1st Dist. 2005).

196.    Additionally, fundamental fairness requires that this Court review any claims that may have been waived for failure to raise them previously. See People v. Pitsonbarger, 205 Ill.2d 444, 458, 793 N.E.2d 609, 620-621 (2002).

## CLAIM VII
### CUMULATIVE ERROR

**Jamie Snow Should Be Granted Post-Conviction Relief Because of the Cumulative Effect of All Errors Alleged in this Petition**

197.    Petitioner re-alleges every paragraph of this petition and expressly incorporates them as if they were fully set forth herein.

198.    Even if individually the errors and other matters alleged here are not found to be sufficiently prejudicial to grant Jamie Snow post-conviction relief, the cumulative effect of all of the matters alleged in this petition deprived him of his fundamental due process right to a fair trial. Thus, this Court should grant Jamie Snow post-conviction relief in the form of a new trial.

C 2666

## CONCLUSION

WHEREFORE, Petitioner Jamie Snow, by and through his attorneys, respectfully requests the

following relief:

A.    Outright reversal of his conviction;

B.    Vacation of his conviction followed by a new trial;

C.    A hearing in which proof may be offered concerning the allegations

contained in his petition; or

D.    Any other relief that this Court deems appropriate.

Respectfully submitted,

Attorneys for Jamie Snow
January 27, 2010

Jon Loevy (ARDC Number 6218254)
Russell Ainsworth (ARDC Number 6280777)
Gayle Horn (ARDC Number 6286427)
Tara Thompson (ARDC Number 6279922)
THE EXONERATION PROJECT
   at the University of Chicago Law School
6020 S. University Avenue
Chicago, Illinois 60637
(312) 243-5900 (tel)
(312) 243-5902 (fax)

Counsel for Petitioner

C 2667

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

McLEAN COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,       )
                                       )
              Plaintiff,               )
                                       )
        vs.                            )     No. 99–CF–1016
                                       )
JAMES SNOW,                            )
                                       )
              Defendant.               )

FILED
APR 2 1 2011
McLEAN COUNTY
CIRCUIT CLERK

## ORDER

Cause comes on for hearing on State's Motion to Dismiss Defendant's Amended Petition for Postconviction Relief. The Court, having considered the parties' pleadings, authorities, and arguments, holds as follows:

The Defendant requests postconviction relief in a number of areas which this Court will address individually.

### Actual Innocence

The Defendant raises a claim of actual innocence based on evidence that no credible witness saw Defendant at the scene; pressure and deals for state's witnesses, some of whom have now recanted in affidavits; a pattern of misconduct by police and prosecutor; an affidavit stating that the state's attorney told the affiant prior to trial that the Defendant was innocent; and alleged newly discovered evidence.

The facts Defendant wishes the Court to rely on contain no credible evidence that the State was involved in proffering false testimony at trial. The Defendant relies on People v. Washington, 171 Ill 2nd 475, holding that no proof of state involvement is required for an actual innocence claim. That case, however, deals with a witness who did not testify at trial because of fear and absented herself from the State and hid for years after the trial. The current facts involve witnesses who testified under oath and now by affidavit tell a different story.

The State relies on People v. Brown, 169 Ill 2nd 94 (1995). The Illinois Supreme Court, when faced with a defendant's claim in a postconviction

petition that his conviction was procured in part with the false testimony of a witness at trial but no allegation of the State's knowledge of the false testimony. The Court held that the rule in a due process claim is that the defendant must allege and prove knowledge by the State of the false testimony. Brown does not address whether this rule should be applied to claims of actual innocence. This Court believes that granting Defendant the benefit of doubt the relevant inquiry should be can he state a claim of actual innocence regardless of proof of the State's knowledge.

What is required for a proper pleading of actual innocence which would grant the Defendant a third phase evidentiary hearing in this matter? The Defendant must present in his petition for postconviction relief newly discovered evidence and that evidence must be new, material, and noncumulative. It must also be so conclusive as the new evidence would change the result on retrial. People v. Barrow, 95 Ill 2nd 506 (2001).

The Court has read the 30 exhibits attached to the Defendant's Petition that set out his "new evidence." The majority of the affidavits merely question evidence presented at the trial and provide no new evidence. Many of them are hearsay with no affidavit from the actual witness changing their trial testimony or providing new facts. Most of the affidavits rely on conclusions, not facts, to state "I don't think Jamie Snow would do this." In effect, they simply rehash the trial testimony and question why defense counsel didn't talk to them more. The recanting witnesses were not the primary witnesses at trial. The bulk of the witnesses who testified at trial to being present at the time of the murder, or who the Defendant later admitted the crime to, have not provided affidavits changing their testimony.

This case was built on witnesses for the State telling what they observed, what they heard from the Defendant, and this evidence then being questioned by the defense with other witnesses who contradicted what the State's witnesses said. The jury had the difficult task of wading through this contradicting evidence and reaching a decision. This Court, in a postconviction hearing, cannot substitute itself for the jury and re-evaluate the same evidence.

This is a claim of actual innocence, and Defendant must convince this Court of that new evidence. The only new fact is provided by affiant Ed Palumbo, who alleges that Judge Charles Reynard, then State's Attorney Reynard, the prosecutor in this case, made statements to him. Palumbo says that during the trial after he testified, then State's Attorney Reynard told him that Jamie Snow did not commit the murder, but they could not get the other person and Jamie would have to do. I am asked to rely on, as the only new evidence, the

C 3876

purported statement of Charles Reynard. I am to accept as credible that the state's attorney, during the course of a murder trial, would take a convicted felon sitting in the Department of Corrections into his confidence and advise him he was prosecuting an innocent man for murder. There is no evidence to corroborate this statement and alone it is not new credible evidence to carry a claim of actual innocence.

The balance of the affidavits are either trial witnesses who today have recanted part of their testimony with no corroborating evidence to back up their changed story or hearsay affidavits claiming that witnesses told them that they lied, but those witnesses provide no affidavits.

The allegations in the Petition are not new facts and evidence. They are an attempt to have this Court reconsider in a different light the evidence originally presented. The Defendant had that opportunity at trial and before the appellate court. This Court can't sit as the jury and reconsider the evidence.

The Defendant has failed to establish a freestanding claim of actual innocence and, as such, the People's Motion to Dismiss is Granted.

Ineffective Assistance of Counsel

This issue was fully litigated both prior to sentencing and on appeal, and principles of waiver and res judicata apply . Even if this were not so, the claims of ineffective assistance do not meet the <u>Strickland</u> standard of showing counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that the result would have been different absent counsel's errors. Most of what is complained of is trial strategy. <u>Strickland v. Washington</u>, 466 US 688 (1984). Also, counsel's behavior in other cases is not evidence of his ineffective assistance in this case. The State's Motion to Dismiss on this basis is Granted.

Due Process Violation of 5th and 14th Amendments – US Constitution
and Article 1 Sections 2 & 8 – Illinois Constitution

Defendant's allegations are based merely on speculation and no facts are alleged that raise a constitutional question of the relief sought under his Amended Postconviction Petition IV & V, and the State's Motion to Dismiss these sections is Granted.



3

6th and 14th Amendments – US Constitution Article I
Section 8 – Illinois Constitution Illinois Supreme Court Rule 651 (c)

Defendant's claims that waiver does not apply to a claim of ineffective assistance of appellate counsel is not substantiated and a claim under Strickland has not been substantiated, and the State's Motion to Dismiss on this ground is Granted.

## Cumulative Error

Defendant's claim that he should be granted a postconviction Stage 3 hearing or new trial because of cumulative errors is not substantiated in law and amounts to a request for this Court to act as the jury in this case, rehear the same evidence and reach a different conclusion. The State's Motion to Dismiss on this ground is Granted.

ENTER:   April 19,  2011.

ALESIA A. McMILLEN
Circuit Judge

cc: Atty
     Assistant SA

C  3878